*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Tom Coburn, Ranking Minority Member*

# U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History

## MAJORITY AND MINORITY STAFF  REPORT

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

## UNITED STATES SENATE



**RELEASED IN CONJUNCTION WITH THE**
**PERMANENT SUBCOMMITTEE ON INVESTIGATIONS**
**JULY 17, 2012 HEARING**

**SENATOR CARL LEVIN**
**Chairman**

**SENATOR TOM COBURN, M.D.**
**Ranking Minority Member**

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

**ELISE J. BEAN**
Staff Director and Chief Counsel
**ROBERT L. ROACH**
Counsel and Chief Investigator
**LAURA E. STUBER**
Senior Counsel
**ALLISON ABRAMS**
Detailee
**ERIC WALKER**
Detailee
**KRISTIN GWIN**
Congressional Fellow
**BRIAN EGGER**
Detailee
**ADAM C. HENDERSON**
Professional Staff Member

**CHRISTOPHER J. BARKLEY**
Staff Director to the Minority
**KEITH B. ASHDOWN**
Chief Investigator to the Minority
**JUSTIN J. ROOD**
Senior Investigator to the Minority

| | |
|---|---|
| **JAMIE BENCE** | **MICHAEL WOLF** |
| Law Clerk | Law Clerk |
| **BILL GAERTNER** | **ARIELLE WORONOFF** |
| Law Clerk | Law Clerk |
| **CURTIS KOWALK** | **TAMIR HADDAD** |
| Law Clerk | Intern |
| **KATIE MARTIN-BROWNE** | **SOFIA KNUTSSON** |
| Law Clerk | Intern |
| **WELLESLEY BAUN** | **NOELIA ORTIZ** |
| Law Clerk | Intern |
| **LAUREN ROBERTS** | **JASWANT SINGH** |
| Law Clerk | Intern |

**MARY D. ROBERTSON**
Chief Clerk

9/6/12

# U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History

## TABLE OF CONTENTS

I.   **EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
    **A. Findings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (1)   Longstanding Severe AML Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (2)   Taking on High Risk Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (3)   Circumventing OFAC Prohibitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (4)   Disregarding Terrorist Links . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (5)   Clearing Suspicious Bulk Travelers Cheques . . . . . . . . . . . . . . . . . . . . . . . .   10
       (6)   Offering Bearer Share Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10
       (7)   Allowing AML Problems to Fester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
    **B. Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
       (1)   Screen High Risk Affiliates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
       (2)   Respect OFAC Prohibitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
       (3)   Close Accounts for Banks with Terrorist Financing Links . . . . . . . . . . . . . . .   11
       (4)   Revamp Travelers Cheque AML Controls . . . . . . . . . . . . . . . . . . . . . . . . . .   11
       (5)   Boost Information Sharing Among Affiliates . . . . . . . . . . . . . . . . . . . . . . . .   11
       (6)   Eliminate Bearer Share Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11
       (7)   Increase HBUS' AML Resources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
       (8)   Treat AML Deficiencies as a Matter of Safety and Soundness . . . . . . . . . . . . .   12
       (9)   Act on Multiple AML Problems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12
      (10)   Strengthen AML Examinations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

II.   **GENERAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
    **A. Background on HSBC Group and HBUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13
    **B. HBUS AML Program** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19
       (1)   HBUS Compliance and AML Leadership . . . . . . . . . . . . . . . . . . . . . . . . . . .   21
       (2)   HBUS AML Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

III.   **HBMX: PROVIDING U.S. ACCESS TO A HIGH RISK AFFILIATE** . . . . . . . . . . .   35
    **A. HSBC Mexico** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36
    **B. Mexico** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   38
       (1)   U.S. Assessment of AML Risk in Mexico . . . . . . . . . . . . . . . . . . . . . . . . . .   39
       (2)   HSBC Assessment of Risk in Mexico . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42
    **C. HBMX's History of Weak AML Safeguards** . . . . . . . . . . . . . . . . . . . . . . . . . . .   48
    **D. HBMX High Risk Clients** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79
       (1)   High Risk Money Service Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80
          (a)   Casa de Cambio Puebla . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80
          (b)   Sigue Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   85

i

  (2) Cayman Island U.S. Dollar Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
  (3) Cashing U.S. Dollar Travelers Cheques . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
 **E. Bulk Cash Movements** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
  (1) HBUS' Global Banknotes Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105
  (2) HBMX U.S. Dollar Sales to HBUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107
  (3) Remedial Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110
 **F. Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**IV.** **HSBC AFFILIATES:  CIRCUMVENTING OFAC PROHIBITIONS** . . . . . . . . . . . 113
 **A. Background on OFAC Prohibitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115
 **B. Executing OFAC-Sensitive Transactions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
  (1) Transactions Involving Iran . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
   (a) Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119
   (b) Concealing Iranian Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122
   (c) Pressuring HBUS on Iran . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
   (d) Continuing Pressure on HBUS to Process Iranian Transactions . . . . . . . . 133
   (e) Reaching Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 144
   (f) Processing the Iranian Transactions . . . . . . . . . . . . . . . . . . . . . . . . . 151
   (g) Establishing Group-wide Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . 156
   (h) Shifting Iranian Transactions from HBUS to JPMorgan Chase and
     and Back Again . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 159
   (i) Getting Out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163
   (j) Looking Back . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
  (2) Transactions Involving Other Countries . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
   (a) 2005 and 2006 GCLs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
   (b) Transactions Involving Cuba . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170
   (c) Transactions Involving Sudan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172
   (d) Transactions Involving Burma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
   (e) Transactions Involving North Korea . . . . . . . . . . . . . . . . . . . . . . . . . 176
   (f) Other Prohibited Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
  (3) HBUS' OFAC Compliance Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
  (4) Server Issues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
 **C. Analysis.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

**V.** **AL RAJHI BANK: DISREGARDING LINKS TO TERRORIST FINANCING** . . . . 189
 **A. Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190
 **B. Saudi Arabia and Terrorist Financing** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
 **C. Alleged Al Rajhi Links to Terrorism** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194
 **D. HSBC Relationship with Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 203
 **E. Al Rajhi Trading Establishment** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 204
 **F. 2005: Decision to Sever Ties with Al Rajhi Bank** . . . . . . . . . . . . . . . . . . . . . . . . 206
 **G. 2006: HBUS Banknotes Account Reinstated** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 210
 **H. 2007 to 2010: Additional Troubling Information** . . . . . . . . . . . . . . . . . . . . . . . . . 221

    **I.**  **Servicing Other Banks with Suspected Links to Terrorism** . . . . . . . . . . . . . . . . . 224
        (1)  Islami Bank Bangladesh Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224
        (2)  Social Islami Bank Ltd. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 230
    **J.**  **Analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

**VI.**   **HOKURIKU BANK: CASHING BULK TRAVELERS CHECKS** . . . . . . . . . . . . . 240
    **A.** **Hokuriku Bank** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 241
    **B.** **Travelers Cheques** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242
    **C.** **2005 Concerns About Hokuriku Travelers Cheques** . . . . . . . . . . . . . . . . . . . . . 244
    **D.** **2007 OCC Pouch Examination** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 245
    **E.** **2008 OCC Inquiry into Hokuriku Travelers Cheques** . . . . . . . . . . . . . . . . . . . 248
    **F.** **Absence of Hokuriku Bank KYC Information** . . . . . . . . . . . . . . . . . . . . . . . . . 251
    **G.** **2008 Decision to Stop Cashing Hokuriku Travelers Cheques** . . . . . . . . . . . . 252
    **H.** **Hokuriku Bank's Continued Lack of Cooperation** . . . . . . . . . . . . . . . . . . . . 254
    **I.** **2010 OCC Discovery of Hokuriku Account Activity** . . . . . . . . . . . . . . . . . . . 257
    **J.** **Analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 258

**VII.**  **HBUS PRIVATE BANK AMERICAS:**
       **OFFERING BEARER SHARE ACCOUNTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 260
    **A.** **High Risk Corporate Accounts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 261
    **B.** **Bearer Share Activity at HBUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 263
    **C.** **Two Examples of Bearer Share Accounts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 277
    **D.** **Analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 281

**VIII. OCC:  EXERCISING INEFFECTIVE AML OVERSIGHT** . . . . . . . . . . . . . . . . . . . . . 282
    **A.** **Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
        (1)  Key Anti-Money Laundering Laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 284
        (2)  AML Oversight In General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
        (3)  OCC AML Oversight in General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292
    **B.** **OCC Oversight of HBUS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 299
        (1)  Chronology of OCC AML Oversight of HBUS . . . . . . . . . . . . . . . . . . . . . 299
        (2)  Six Years of AML Deficiencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 315
    **C.** **OCC Systemic Failures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 318
        (1)  Treating AML Deficiencies As A Consumer Compliance Issue . . . . . . . . . 318
        (2)  Restricting Citations of AML Program Violations . . . . . . . . . . . . . . . . . . . . 321
        (3)  Using Narrowly Focused Exams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325
        (4)  Failing to Use Enforcement Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 328
        (5)  Issuing Weak Supervisory Letters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 329
    **D.** **Analysis**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 333

# # #

# U.S. VULNERABILITIES TO MONEY LAUNDERING, DRUGS, AND TERRORIST FINANCING: HSBC CASE HISTORY

This Report examines the anti-money laundering (AML) and terrorist financing vulnerabilities created when a global bank uses its U.S. affiliate to provide U.S. dollars, U.S. dollar services, and access to the U.S. financial system to high risk affiliates, high risk correspondent banks, and high risk clients. This Report also offers recommendations to strengthen correspondent AML controls to combat money laundering, drug trafficking, and terrorist financing.

## I.   EXECUTIVE SUMMARY

Over the last decade, the U.S. Senate Permanent Subcommittee on Investigations has worked to strengthen U.S. AML efforts by investigating how money launderers, terrorists, organized crime, corrupt officials, tax evaders, and other wrongdoers have utilized U.S. financial institutions to conceal, transfer, and spend suspect funds.[1]  In 2001, the Subcommittee focused, in particular, on how U.S. banks, through the correspondent services they provide to foreign financial institutions, had become conduits for illegal proceeds associated with organized crime, drug trafficking, and financial fraud.[2]  Correspondent banking occurs when one financial institution provides services to another financial institution to move funds, exchange currencies, cash monetary instruments, or carry out other financial transactions.  The Subcommittee's 2001 investigation showed not only how some poorly managed or corrupt foreign banks used U.S. bank accounts to aid and abet, commit, or allow clients to commit wrongdoing, but also how U.S. financial institutions could protect themselves and the U.S. financial system from misuse.

In response to that investigation and the money laundering vulnerabilities exposed by the 9/11 terrorist attack, Congress enacted stronger AML laws as part of the Patriot Act of 2002, including stronger provisions to combat the misuse of correspondent services.[3]  Federal bank regulators followed with stronger regulations[4] and examination requirements[5] to guard against

---

[1] See, e.g., U.S. Senate Permanent Subcommittee on Investigations, "Keeping Foreign Corruption out of the United States," S.Hrg. 111-540 (Feb. 4, 2010); "Tax Haven Banks and U.S. Tax Compliance," S.Hrg. 110-614 (July 17 and 25, 2008); "Tax Haven Abuses:  The Enablers, The Tools and Secrecy," S.Hrg. 109-797 (Aug. 1, 2006); "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act," S.Hrg. 108-633 (July 15, 2004); "Role of U.S. Correspondent Banking in International Money Laundering," S.Hrg. 107-84 (March 1, 2 and 6, 2001); and "Private Banking and Money Laundering:  A Case Study of Opportunities and Vulnerabilities," S.Hrg. 106-428 (Nov. 9 and 10, 1999).  See also U.S. Senate Committee on Homeland Security and Governmental Affairs, "State Business Incorporation – 2009," S.Hrg. 111-953 (June 18 and Nov. 5, 2009).
[2] "Role of U.S. Correspondent Banking in International Money Laundering," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 107-84 (March 1, 2 and 6, 2001)(hereinafter "2001 Subcommittee Hearing on Correspondent Banking"), at 1.
[3] See, e.g., Sections 312, 313, and 319(b) of the USA Patriot Act (requiring due diligence to be conducted when opening accounts for foreign banks, with enhanced due diligence for offshore banks and banks in high risk jurisdictions; prohibiting the opening of correspondent accounts for shell banks; and strengthening the ability of U.S. regulators to obtain correspondent account records).
[4] See, e.g., 31 CFR §§103.175,103.176, 103.177, 103.185.
[5] See, e.g., 4/29/2010 "Bank Secrecy Act/Anti-Money Laundering Examination Manual," issued by the Federal Financial Institutions Examination Council, "Foreign Correspondent Account Recordkeeping and Due Diligence," at

money laundering through correspondent accounts.  In response, over the next ten years, U.S. banks substantially strengthened their correspondent AML controls.  Before the 2002 Patriot Act, for example, most U.S. banks opened correspondent accounts for any foreign bank with a banking license; now, most U.S. banks evaluate the riskiness of each foreign bank's owners, business lines, products, clients, and AML controls before agreeing to open an account.  They also routinely monitor account activity and wire transfers for suspicious activity, with enhanced monitoring of high risk correspondents.  In addition, before the 2002 Patriot Act, some U.S. banks readily opened accounts for foreign shell banks, meaning banks without any physical presence in any jurisdiction; today, in accordance with the Patriot Act's ban on shell bank accounts, all U.S. banks take measures to ensure they don't provide services to such banks, the ban on shell bank accounts has become an international AML standard,[6] and the thousands of stand-alone shell banks licensed by the Bahamas, Cayman Islands, Nauru, and other jurisdictions have virtually disappeared.

At the same time, the money laundering risks associated with correspondent banking have not been eliminated.  Correspondent accounts continue to provide a gateway into the U.S. financial system, and wrongdoers continue to abuse that entryway.  This investigation takes a fresh look at the U.S. vulnerabilities to money laundering and terrorist financing associated with correspondent banking, focusing in particular on the operations of global banks with U.S. affiliates that enable foreign financial institutions to gain access to the U.S. financial system.

**HSBC Case Study.**  To examine the current money laundering and terrorist financing threats associated with correspondent banking, the Subcommittee selected HSBC as a case study. HSBC is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, 300,000 employees, and 2011 profits of nearly $22 billion.  HSBC, whose initials originally stood for Hong Kong Shanghai Banking Corporation, now has operations in over 80 countries, with hundreds of affiliates spanning the globe.  Its parent corporation, HSBC Holdings plc, called "HSBC Group," is headquartered in London, and its Chief Executive Officer is located in Hong Kong.

Its key U.S. affiliate is HSBC Bank USA N.A. (HBUS).  HBUS operates more than 470 bank branches throughout the United States, manages assets totaling about $200 billion, and serves around 3.8 million customers.  It holds a national bank charter, and its primary regulator is the U.S. Office of the Comptroller of the Currency (OCC), which is part of the U.S. Treasury Department.  HBUS is headquartered in McLean, Virginia, but has its principal office in New York City.  HSBC acquired its U.S. presence by purchasing several U.S. financial institutions, including Marine Midland Bank and Republic National Bank of New York.

A senior HSBC executive told the Subcommittee that HSBC acquired its U.S. affiliate, not just to compete with other U.S. banks for U.S. clients, but primarily to provide a U.S. platform to its non-U.S. clients and to use its U.S. platform as a selling point to attract still more non-U.S. clients.  HSBC operates in many jurisdictions with weak AML controls, high risk

---

117-129, 183-187, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.  Prior versions of this Manual were issued in 2005 and 2007.
[6] See "International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation: The FATF Recommendations," issued by the Financial Action Task Force (2/2012), FATF Recommendation 13.

clients, and high risk financial activities including Asia, Middle East, and Africa.  Over the past ten years, HSBC has also acquired affiliates throughout Latin America.  In many of these countries, the HSBC affiliate provides correspondent accounts to foreign financial institutions that, among other services, are interested in acquiring access to U.S. dollar wire transfers, foreign exchange, and other services.  As a consequence, HSBC's U.S. affiliate, HBUS, is required to interact with other HSBC affiliates and foreign financial institutions that face substantial AML challenges, often operate under weaker AML requirements, and may not be as familiar with, or respectful of, the tighter AML controls in the United States.  HBUS' correspondent services, thus, provide policymakers with a window into the vast array of money laundering and terrorist financing risks confronting the U.S. affiliates of global banks.

The Subcommittee also examined HSBC because of its weak AML program.  In September 2010, the OCC issued a lengthy Supervisory Letter citing HBUS for violating Federal AML laws, including by maintaining an inadequate AML program.  In October 2010, the OCC issued a Cease and Desist Order requiring HSBC to strengthen multiple aspects of its AML program.[7]  The identified problems included a once massive backlog of over 17,000 alerts identifying possible suspicious activity that had yet to be reviewed; ineffective methods for identifying suspicious activity; a failure to file timely Suspicious Activity Reports with U.S. law enforcement; a failure to conduct any due diligence to assess the risks of HSBC affiliates before opening correspondent accounts for them; a 3-year failure by HBUS, from mid-2006 to mid-2009, to conduct any AML monitoring of $15 billion in bulk cash transactions with those same HSBC affiliates, despite the risks associated with large cash transactions; poor procedures for assigning country and client risk ratings; a failure to monitor $60 trillion in annual wire transfer activity by customers domiciled in countries rated by HBUS as lower risk; inadequate and unqualified AML staffing; inadequate AML resources; and AML leadership problems.  Since many of these criticisms targeted severe, widespread, and longstanding AML deficiencies, they also raised questions about how the problems had been allowed to accumulate and why the OCC had not compelled corrective action earlier.

During the course of its investigation into HSBC's AML deficiencies, the Subcommittee issued multiple subpoenas and collected and reviewed over 1.4 million documents, including bank records, correspondence, emails, and legal pleadings.  The Subcommittee staff also conducted over 75 interviews with officials at HSBC Group, HBUS, and other HSBC affiliates, as well as with U.S. banking regulators.  In addition, the Subcommittee received numerous briefings from HSBC legal counsel, initiated inquiries with foreign banks that had HSBC accounts, and consulted with experts on AML and terrorist financing issues.  HSBC was fully cooperative with the inquiry, producing documentation and witnesses from around the world, including documents for which it could have claimed privilege.

As a result of its investigation, the Subcommittee has focused on five issues illustrating key AML and terrorist financing problems that continue to impact correspondent banking in the United States.  They include opening U.S. correspondent accounts for high risk affiliates without conducting due diligence; facilitating transactions that hinder U.S. efforts to stop terrorists, drug

---

[7] On the same day, in coordination with the OCC, the Federal Reserve issued a Cease and Desist order to HBUS' holding company, HSBC North America Holdings, Inc. (HNAH), citing HNAH for an inadequate AML program and requiring it to revamp and strengthen both its program and that of HBUS.

traffickers, rogue jurisdictions, and other from using the U.S. financial system; providing U.S. correspondent services to banks with links to terrorism; clearing bulk U.S. dollar travelers cheques despite signs of suspicious activity; and offering high risk bearer share corporate accounts.  Avoiding the money laundering risks involved in these activities requires an effective AML program, with written standards, knowledgeable and adequate staff, the infrastructure needed to monitor account and wire transfer activity for suspicious transactions, effective AML training, and a compliance culture that values obtaining accurate client information.  In addition to focusing on these five issues at HBUS, the Subcommittee investigation examined the regulatory failures that allowed these and other AML problems to fester for years.

**Servicing A High Risk Affiliate.**  In 2001, the Subcommittee's investigation debunked the notion that U.S. banks should open a correspondent account for any foreign bank with a banking license, establishing instead the need to use due diligence to evaluate the money laundering and terrorist financing risks posed by a specific foreign financial institution before opening an account.  Today, some U.S. affiliates of global banks engage in an equally ill-advised practice, opening correspondent accounts for any affiliate owned by the parent holding corporation, with no analysis of the AML or terrorist financing risks.

Until recently, HSBC Group policy instructed its affiliates to assume that all HSBC affiliates met the Group's AML standards and to open correspondent accounts for those affiliates without additional due diligence.  For years, HBUS followed that policy, opening U.S. correspondent accounts for HSBC affiliates without conducting any AML due diligence.  Those affiliates have since become major clients of the bank.  In 2009, for example, HBUS determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[8]  HBUS failed to conduct due diligence on HSBC affiliates despite a U.S. law that has required all U.S. banks, since 2002, to conduct these due diligence reviews before opening a U.S. correspondent account for any foreign financial institution, with no exception made for foreign affiliates.

One HSBC affiliate that illustrates the AML problems is HSBC Mexico, known as HBMX.  HBUS should have, but did not, treat HBMX as a high risk correspondent client subject to enhanced due diligence and monitoring.  HBMX operated in Mexico, a country under siege from drug crime, violence and money laundering; it had high risk clients, such as Mexican casas de cambios and U.S. money service businesses; and it offered high risk products, such as U.S. dollar accounts in the Cayman Islands.  In addition, from 2007 through 2008, HBMX was the single largest exporter of U.S. dollars to HBUS, shipping $7 billion in cash to HBUS over two years, outstripping larger Mexican banks and other HSBC affiliates.  Mexican and U.S. authorities expressed repeated concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds.  The concern was that drug traffickers unable to deposit large amounts of cash in U.S. banks due to AML controls were transporting U.S. dollars to Mexico, arranging for bulk deposits there, and then using Mexican financial institutions to insert the cash back into the U.S. financial system.

---

[8] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.

In addition to its high risk location, clients, and activities, HMBX had a history of severe
AML deficiencies.  Its AML problems included a widespread lack of Know Your Customer
(KYC) information in client files; a dysfunctional monitoring system; bankers who resisted
closing accounts despite evidence of suspicious activity; high profile clients involved in drug
trafficking; millions of dollars in suspicious bulk travelers cheque transactions; inadequate
staffing and resources; and a huge backlog of accounts marked for closure due to suspicious
activity, but whose closures were delayed.  For eight years, from 2002 to 2010, HSBC Group
oversaw efforts to correct HBMX's AML deficiencies, while those efforts fell short.  At the
same time, HSBC Group watched HBMX utilize its U.S. correspondent account, without alerting
HBUS to the AML risks it was incurring.

HBUS compounded the AML risks it incurred from HBMX through its own AML
deficiencies, which included failing to investigate or evaluate HBMX's AML risks.  HBUS also
failed, from mid-2006 to mid-2009, to conduct any AML monitoring of its U.S. dollar
transactions with HSBC affiliates, including HBMX, despite the obvious well-known risks
attendant with large cash transactions.  In addition, because HBUS deemed HBMX to be located
in a low risk country, HBUS failed until 2009, to monitor HBMX's wire transfer or account
activity.  HBMX illustrates the money laundering and drug trafficking risks that result when the
U.S. affiliate of a global bank serves as the U.S. gateway for a high risk affiliate allowed to
operate with no initial due diligence or ongoing monitoring.

**Circumventing OFAC Prohibitions.**  The United States has devoted significant
resources to stopping some of the most dangerous persons and jurisdictions threatening the world
today from utilizing the U.S. financial system, including terrorists, persons involved with
weapons of mass destruction, drug traffickers, and persons associated with rogue jurisdictions
such as Iran, North Korea, and Sudan.  To implement the law, the U.S. Treasury Department's
Office of Foreign Assets Control (OFAC) has developed a list of prohibited persons and
countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited
transactions.  Transactions stopped by this filter typically undergo an individualized review to
see if the transaction can proceed or the funds must be blocked.

Because the OFAC filter can end up delaying or blocking transactions that are permitted
under U.S. law or by other jurisdictions, some non-U.S. financial institutions have used tactics to
circumvent it.  Common tactics include stripping information from wire transfer documentation
to conceal the participation of a prohibited person or country, or characterizing a transaction as a
transfer between banks in approved jurisdictions, while omitting underlying payment details that
would disclose participation of a prohibited originator or beneficiary.  In the case of Iran, some
foreign banks also abused what were known as "U-turn" transactions, which were allowable
transactions under Treasury regulations prior to November 2008.  In recent years, the United
States has imposed steep penalties on banks that violated the OFAC prohibitions.

At HBUS, documents provided to the Subcommittee indicate that, for years, some HSBC
affiliates took action to circumvent the OFAC filter when sending OFAC sensitive transactions
through their U.S. dollar correspondent accounts at HBUS.  From at least 2001 to 2007, two
HSBC affiliates, HSBC Europe (HBEU) and HSBC Middle East (HBME), repeatedly sent U-
turn transactions through HBUS without disclosing links to Iran, even though they knew HBUS

required full transparency to process U-turns.  To avoid triggering the OFAC filter and an individualized review by HBUS, HBEU systematically altered transaction information to strip out any reference to Iran and characterized the transfers as between banks in approved jurisdictions.  The affiliates' use of these practices, which even some within the bank viewed as deceptive, was repeatedly brought to the attention of HSBC Group Compliance, by HBUS compliance personnel and by HBEU personnel who objected to participating in the document alteration and twice announced deadlines to end the activity.  Despite this information, HSBC Group Compliance did not take decisive action to stop the conduct or inform HBUS about the extent of the activity.  At the same time, while some at HBUS claimed not to have known they were processing undisclosed Iranian transactions from HSBC affiliates, internal documents show key senior HBUS officials were informed as early as 2001.  In addition, HBUS' OFAC filter repeatedly stopped Iranian transactions that should have been disclosed to HBUS by HSBC affiliates, but were not.  Despite evidence of what was taking place, HBUS failed to get a full accounting of what its affiliates were doing or ensure all Iranian transactions sent by HSBC affiliates were stopped by the OFAC filter and reviewed to ensure they were OFAC compliant. In addition, documents show that, from 2002 to 2007, some HSBC affiliates sent potentially prohibited transactions through HBUS involving Burma, Cuba, North Korea, Sudan, and other prohibited countries or persons.  Other documents indicate that some HSBC affiliates may have sent non-U.S. dollar messaging traffic through U.S. servers in which the OFAC filter was not turned on or was restricted.

An outside auditor hired by HBUS has so far identified, from 2001 to 2007, more than 28,000 undisclosed, OFAC sensitive transactions that were sent through HBUS involving $19.7 billion.  Of those 28,000 transactions, nearly 25,000 involved Iran, while 3,000 involved other prohibited countries or persons.  The review has characterized nearly 2,600 of those transactions, including 79 involving Iran, and with total assets of more than $367 million, as "Transactions of Interest" requiring additional analysis to determine whether violations of U.S. law occurred. While the aim in many of those cases may have been to avoid the delays associated with the OFAC filter and individualized reviews, rather than to facilitate prohibited transactions, actions taken by HSBC affiliates to circumvent OFAC safeguards may have facilitated transactions on behalf of terrorists, drug traffickers, or other wrongdoers.  While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to the conduct.  HBUS' experience demonstrates the strong measures that the U.S. affiliate of a global bank must take to prevent affiliates from circumventing OFAC prohibitions.

**Disregarding Links to Terrorism.**  For decades, HSBC has been one of the most active global banks in the Middle East, Asia, and Africa, despite being aware of the terrorist financing risks in those regions.  In particular, HSBC has been active in Saudi Arabia, conducting substantial banking activities through affiliates as well as doing business with Saudi Arabia's largest private financial institution, Al Rajhi Bank.  After the 9/11 terrorist attack in 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to financing organizations associated with terrorism, including evidence that the bank's key founder was an early financial benefactor of al Qaeda.  In 2005, HSBC announced internally that its affiliates should sever ties with Al Rajhi Bank,

but then reversed itself four months later, leaving the decision up to each affiliate.  HSBC
Middle East, among other HSBC affiliates, continued to do business with the bank.

Due to terrorist financing concerns, HBUS closed the correspondent banking and
banknotes accounts it had provided to Al Rajhi Bank.  For nearly two years, HBUS
Compliance personnel resisted pressure from HSBC personnel in the Middle East and
United States to resume business ties with Al Rajhi Bank.  In December 2006, however,
after Al Rajhi Bank threatened to pull all of its business from HSBC unless it regained
access to HBUS' U.S. banknotes program, HBUS agreed to resume supplying Al Rajhi
Bank with shipments of U.S. dollars.  Despite ongoing troubling information, HBUS
provided nearly $1 billion in U.S. dollars to Al Rajhi Bank until 2010, when HSBC
decided, on a global basis, to exit the U.S. banknotes business.  HBUS also supplied U.S.
dollars to two other banks, Islami Bank Bangladesh Ltd. and Social Islami Bank, despite
evidence of links to terrorist financing.  Each of these specific cases shows how a global
bank can pressure its U.S. affiliate to provide banks in countries at high risk of terrorist
financing with access to U.S. dollars and the U.S. financial system.

**Clearing Suspicious Bulk Travelers Cheques.**  Another AML issue involves HBUS'
clearing more than $290 million in bulk U.S. dollar travelers checks in less than four years for a
Japanese regional bank, Hokuriku Bank, despite evidence of suspicious activity.  From at least
2005 to 2008, HBUS cleared bulk travelers cheques for Hokuriku Bank on a daily basis, at times
clearing $500,000 or more in U.S. dollars per day.  The cheques were in denominations of $500
or $1,000, submitted in large blocks of sequentially numbered cheques, and signed and
countersigned with the same illegible signature.  An OCC examination which determined that
HBUS was clearing travelers cheques with inadequate AML controls, discovered the stacks of
Hokuriku travelers cheques being processed on a daily basis, and directed HBUS to investigate.
When HBUS sought more information, Hokuriku Bank at first delayed responding, then
provided minimal information, and finally declined to investigate further, claiming to be
constrained by bank secrecy laws from disclosing client-specific information.  HBUS eventually
learned that the travelers cheques were purchased by Russians from a bank in Russia, a country
at high risk of money laundering.  HBUS also learned that the Japanese bank had little KYC
information or understanding why up to $500,000 or more in bulk U.S. dollar travelers cheques
purchased in Russia were being deposited on a daily basis into one of 30 different Japanese
accounts of persons and corporations supposedly in the used car business.

In October 2008, under pressure from the OCC, HBUS stopped processing the travelers
cheques, but continued the correspondent relationship, despite the Japanese bank's poor AML
controls.  Two years later, in 2010, an OCC examination uncovered the ongoing relationship,
between HSBC and Hokuriku, which the OCC thought had ended.  In 2012, after the
Subcommittee inquired about the account, HBUS closed it.  Since travelers cheques have been
misused by terrorists, drug traffickers, and other criminals, the HBUS experience shows how a
U.S. affiliate with ineffective AML controls can end up clearing suspicious bulk travelers
cheques and facilitating the movement of hundreds of millions of U.S. dollars across
international lines to unknown recipients.

**Offering Bearer Share Accounts.**  Over the course of a decade, HBUS opened over
2,000 accounts in the name of bearer share corporations, a notorious type of corporation that

invites secrecy and wrongdoing by assigning ownership to whomever has physical possession of the shares.  At its peak, HBUS' Miami office had over 1,670 bearer share accounts; the New York office had over 850; and the Los Angeles office had over 30.  The Miami bearer share accounts alone held assets totaling an estimated $2.6 billion, and generated annual bank revenues of $26 million.  Multiple internal audits and regulatory examinations criticized the accounts as high risk and advocated that HBUS either take physical custody of the shares or require the corporations to register the shares in the names of the shareholders, but HBUS bankers initially resisted tightening AML controls, and regulators took no enforcement action.

Two examples of the accounts illustrate the risks they posed.  In the first, Miami Beach hotel developers, Mauricio Cohen Assor and Leon Cohen Levy, father and son, used bearer share accounts they opened for Blue Ocean Finance Ltd. and Whitebury Shipping Time-Sharing Ltd. to help hide $150 million in assets and $49 million in income.  In 2010, both were convicted of criminal tax fraud and filing false tax returns, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties totaling more than $17 million.  A second example involves a wealthy and powerful Peruvian family which pressed HBUS to grant a waiver from its AML requirements that bearer share corporations either register their shares or place those shares in bank custody.  Bank documents showed how HBUS bankers pressed Compliance personnel to grant the waiver to please a wealthy client.  These accounts demonstrate the AML risks associated with bearer share accounts, whose owners seek to hide their identities.  Today, following an initiative that concluded in 2011, HBUS has reduced its bearer share accounts to 26, most of which are frozen, while at the same time maintaining a policy that allows the bank to open new bearer share accounts in the future.

**Regulatory Failures.**  HBUS' severe AML deficiencies did not happen overnight; they accumulated over time, even though its primary regulator, the OCC, conducted regular AML examinations.  Part of the reason HBUS' AML problems were not cured is attributable to certain peculiar and ineffective aspects of the OCC's AML oversight effort.

First, unlike other U.S. bank regulators, the OCC does not treat AML deficiencies as a matter of bank safety and soundness or a management problem.  Instead it treats AML deficiencies as a consumer compliance matter, even though AML laws and consumer protection laws have virtually nothing in common.  One consequence of this approach is that the OCC considers AML problems when assigning a bank's consumer compliance rating, but not when assigning the bank's management rating or its overall composite rating.  As a result, AML deficiencies do not routinely lower the ratings that national banks receive as part of their safety and soundness evaluations, and so do not increase the deposit insurance that banks pay for incurring heightened risk, contrary to how AML problems are handled at other Federal banking agencies.  At HBUS, after citing the bank for severe AML deficiencies, the OCC lowered its consumer compliance rating but not its management rating.

A second problem is that the OCC has adopted a practice of foregoing the citation of a statutory or regulatory violation in its Supervisory Letters and annual Reports of Examination when a bank fails to comply with one of the four mandatory components of an AML program.  The four minimum statutory requirements of an AML program are AML internal controls, an AML compliance officer, AML training, and independent testing of the effectiveness of its AML

program.  By consistently treating a failure to meet one or even several of these statutory requirements as a "Matter Requiring Attention" instead of a legal violation, the OCC diminishes the importance of meeting each requirement, sends a more muted message about the need for corrective action, and makes enforcement actions more difficult to pursue if an AML deficiency persists.  In contrast, citing a violation of law when one critical component of a bank's AML program is inadequate sends a strong message to bank management that its AML program is deficient, does not meet minimum statutory requirements, and requires remediation to ensure compliance with the law.  At HBUS, the OCC identified 83 Matters Requiring Attention over five years, without once citing a legal violation of Federal AML law.  It was only when the OCC found HBUS' entire AML program to be deficient that the OCC finally cited the bank for a legal violation.

Additional problems illustrated by the HBUS case history include the OCC's practice of conducting narrowly focused AML examinations of specific banking units without also assessing HBUS' overall AML program; the OCC's reluctance, despite mounting AML deficiencies, to make timely use of formal and informal enforcement actions to compel improvements in HBUS' AML program; and the practice by some OCC examiners to issue Supervisory Letters that sometimes muted AML examination criticisms or weakened recommendations for AML reforms at HBUS.

While the OCC insists that its AML approach has merit, the HSBC case history, like the Riggs Bank case history examined by this Subcommittee eight years ago,[9] provides evidence that the current OCC system has tolerated severe AML deficiencies for years, permitted national banks to delay or avoid correcting identified problems, and allowed smaller AML issues to accumulate into a massive problem before OCC enforcement action was taken.  An experienced OCC AML examiner told the Subcommittee: "I thought I saw it all with Riggs but HSBC was the worst situation I'd ever seen," yet during the six-year period from 2004 to 2010, OCC officials did not take any formal or informal enforcement action to compel HBUS to strengthen its AML program, essentially allowing its AML problems to fester.  In 2009, after learning of two law enforcement investigations involving AML issues at the bank, the OCC suddenly expanded and intensified an ongoing AML examination and allowed it to consider a wide range of AML issues.  The OCC examination culminated in the issuance, in September 2010, of a blistering supervisory letter listing numerous, serious AML problems at the bank.  In October 2010, the OCC also issued a Cease and Desist Order requiring HBUS to revamp its AML controls.

In response, HBUS has announced a number of key organizational and policy initiatives to improve its AML program in the United States and globally.  While those initiatives are promising, HBUS announced similarly promising AML reforms in 2003, when confronted with an AML enforcement action by the Federal Reserve Bank of New York and New York State Banking Department.  Even before the OCC lifted that order in 2006, HBUS' AML program deteriorated.  Both HBUS and the OCC will have to undertake a sustained effort to ensure the newest round of changes produce a better AML outcome.

---

[9] See "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-633 (July 15, 2004).

HSBC is the quintessential global bank, operating hundreds of affiliates in 80 countries, with its U.S. affiliate acting as the gateway into the U.S. financial system for the entire network. The OCC allowed AML problems at HBUS to build up until they represented major AML vulnerabilities for the United States.  Going forward, HBUS needs far stronger controls to ensure it doesn't leave AML risks to the U.S. financial system unattended; the OCC needs a much better approach to resolve AML problems in a more effective and timely manner.

## A.  Findings

This Report makes the following findings of fact.

(1)  **Longstanding Severe AML Deficiencies.**  HBUS operated its correspondent accounts for foreign financial institutions with longstanding, severe AML deficiencies, including a dysfunctional AML monitoring system for account and wire transfer activity, an unacceptable backlog of 17,000 unreviewed alerts, insufficient staffing, inappropriate country and client risk assessments, and late or missing Suspicious Activity Reports, exposing the United States to money laundering, drug trafficking, and terrorist financing risks.

(2)  **Taking on High Risk Affiliates.**  HBUS failed to assess the AML risks associated with HSBC affiliates before opening correspondent accounts for them, failed to identify high risk affiliates, and failed for years to treat HBMX as a high risk accountholder.

(3)  **Circumventing OFAC Prohibitions.**  For years in connection with Iranian U-turn transactions, HSBC allowed two non-U.S. affiliates to engage in conduct to avoid triggering the OFAC filter and individualized transaction reviews.  While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates and put an end to conduct which even some within the bank viewed as deceptive.

(4)  **Disregarding Terrorist Links.**  HBUS provided U.S. correspondent accounts to some foreign banks despite evidence of links to terrorist financing.

(5)  **Clearing Suspicious Bulk Travelers Cheques.**  In less than four years, HBUS cleared over $290 million in sequentially numbered, illegibly signed, bulk U.S. dollar travelers cheques for Hokuriku Bank, which could not explain why its clients were regularly depositing up to $500,000 or more per day in U.S. dollar travelers cheques obtained in Russia into Japanese accounts, supposedly for selling used cars; even after learning of Hokuriku's poor AML controls, HBUS continued to do business with the bank.

(6)  **Offering Bearer Share Accounts.**  Over the course of a decade, HBUS opened over 2,000 high risk bearer share corporate accounts with inadequate AML controls.

(7) **Allowing AML Problems to Fester.** The OCC allowed HBUS' AML deficiencies to fester for years, in part due to treating HBUS' AML problems as consumer compliance matters rather than safety and soundness problems, failing to make timely use of formal and informal enforcement actions to compel AML reforms at the bank, and focusing on AML issues in specific HBUS banking units without also viewing them on an institution-wide basis.

## B. Recommendations

This Report makes the following recommendations.

(1) **Screen High Risk Affiliates.** HBUS should reevaluate its correspondent relationships with HSBC affiliates, including by reviewing affiliate AML and compliance audit findings, identifying high risk affiliates, designating affiliate accounts requiring enhanced monitoring, and closing overly risky accounts. HBUS should conduct a special review of the HBMX account to determine whether it should be closed.

(2) **Respect OFAC Prohibitions.** HSBC Group and HBUS should take concerted action to stop non-U.S. HSBC affiliates from circumventing the OFAC filter that screens transactions for terrorists, drug traffickers, rogue jurisdictions, and other wrongdoers, including by developing audit tests to detect undisclosed OFAC sensitive transactions by HSBC affiliates.

(3) **Close Accounts for Banks with Terrorist Financing Links.** HBUS should terminate correspondent relationships with banks whose owners have links to, or present high risks of involvement with, terrorist financing.

(4) **Revamp Travelers Cheque AML Controls.** HBUS should restrict its acceptance of large blocks of sequentially numbered U.S. dollar travelers cheques from HSBC affiliates and foreign financial institutions; identify affiliates and foreign financial institutions engaged in suspicious travelers cheque activity; and stop accepting travelers cheques from affiliates and foreign banks that sell or cash U.S. dollar travelers cheques with little or no KYC information.

(5) **Boost Information Sharing Among Affiliates.** HSBC should require AML personnel to routinely share information among affiliates to strengthen AML coordination, reduce AML risks, and combat wrongdoing.

(6) **Eliminate Bearer Share Accounts.** HBUS should close its remaining 26 bearer share corporate accounts, eliminate this type of account, and instruct financial institutions using HBUS correspondent accounts not to execute transactions involving bearer share corporations. U.S. financial regulators should prohibit U.S. banks from opening or servicing bearer share accounts.

**(7)    Increase HBUS' AML Resources.**  HBUS should ensure a full time professional serves as its AML director, and dedicate additional resources to hire qualified AML staff, implement an effective AML monitoring system for account and wire transfer activity, and ensure alerts, including OFAC alerts, are reviewed and Suspicious Activity Reports are filed on a timely basis.

**(8)    Treat AML Deficiencies as a Matter of Safety and Soundness.**  The OCC should align its practice with that of other Federal bank regulators by treating AML deficiencies as a safety and soundness matter, rather than a consumer compliance matter, and condition management CAMELS ratings in part upon effective management of a bank's AML program.

**(9)    Act on Multiple AML Problems.**  To ensure AML problems are corrected in a timely fashion, the OCC should establish a policy directing that the Supervision Division coordinate with the Enforcement and Legal Divisions to conduct an institution-wide examination of a bank's AML program and consider use of formal or informal enforcement actions, whenever a certain number of Matters Requiring Attention or legal violations identifying recurring or mounting AML problems are identified through examinations.

**(10)   Strengthen AML Examinations.**  The OCC should strengthen its AML examinations by citing AML violations, rather than just Matters Requiring Attention, when a bank fails to meet any one of the statutory minimum requirements for an AML program; and by requiring AML examinations to focus on both specific business units and a bank's AML program as a whole.

13

## II. GENERAL BACKGROUND

This section provides a general overview of HSBC Group, HSBC Bank USA (HBUS), and the HBUS compliance and anti-money laundering (AML) program.

### A. Background on HSBC Group and HBUS

HSBC Group is one of the largest financial institutions in the world, with over $2.5 trillion in assets, 89 million customers, and 2011 profits of nearly $22 billion.[10]  Its parent corporation, HSBC Holdings plc, often referred to by the bank as "HSBC Group," is headquartered in London.  Despite its London headquarters, the principal office of the Group Chief Executive is located in Hong Kong.[11]  Altogether, HSBC has about 300,000 employees and 7,200 offices in over 80 countries, including North America, Europe, Asia, Latin America, the Middle East, and Africa.[12]

**United States Operations.**  Among other entities, the Group owns HSBC Overseas Holdings (UK) Ltd. (HSBC Overseas Holdings), which oversees its operations in the United States and Canada.  HSBC Overseas Holdings owns, in turn, HSBC North America Holdings Inc. (HNAH, pronounced "Hannah"), one of the ten largest bank holding companies in the United States.  HNAH has assets of about $345 billion, is headquartered in New York City, and is overseen by the Federal Reserve.[13]  Through various subsidiaries, HNAH owns three key HSBC financial institutions in the United States:  HSBC Bank USA N.A. (HBUS); HSBC Securities (USA) Inc. (HSBC Securities); and HSBC Finance Corporation.

HBUS operates more than 470 bank branches throughout the United States, manages assets totaling about $210 billion, and serves around 4 million customers.[14]  It holds a national bank charter and its primary regulator is the Office of the Comptroller of the Currency (OCC), which is part of the U.S. Treasury Department.  Because it holds insured deposits, its secondary regulator is the Federal Deposit Insurance Corporation (FDIC).  HBUS is the principal subsidiary of HSBC USA Inc. (HUSI), a bank holding company which is a wholly-owned subsidiary of HNAH.[15]  HBUS is headquartered in McLean, Virginia, and has its principal office in New York City.[16]

---

[10] See "HSBC Holdings plc 2011 Results-Highlights," (2/12/12), at 1-2, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/hsbc2011arn.pdf; "HSBC Holdings plc Annual Report and Accounts 2011," at 1, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/hsbc2011ara0.pdf (hereinafter "HSBC Group 2011 Annual Report").

[11] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.

[12] HSBC Group 2011 Annual Report  at 1; "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.

[13] See "HSBC North America Holdings Inc. Fact Sheet," at 1, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000/content/usshared/Inside%20HSBC/About%20 HSBC/Corporate%20Information/Corporate%20Facts/hnah_factsheet_0911.pdf.

[14] "HSBC Bank USA, National Association Fact Sheet," at 1, http://www.us.hsbc.com/1/PA_1_083Q9FJ08A002FBP5S00000/content/usshared/Inside%20HSBC/About%20 HSBC/Corporate%20Information/Corporate%20Facts/hbus_factsheet_0911.pdf (hereinafter "HBUS Fact Sheet").

[15] Id.

[16] Id. at 2.

HSBC Securities is a licensed broker-dealer regulated by the Securities and Exchanges Commission (SEC).  HSBC Finance Corporation, formerly subprime lender Household International, provides credit cards, automobile loans, consumer lending, and insurance products, and is overseen by several U.S. regulators including the Consumer Financial Protection Bureau.

HNAH also owns an Edge Act corporation in Miami, HSBC Private Bank International.[17]  The Edge Act allows U.S. national banks to form U.S. subsidiaries designed to engage solely in international banking operations, including holding deposits for non-U.S. persons.[18]  Edge Act corporations are chartered and regulated by the Federal Reserve.  In addition, HNAH sponsors the HSBC Latin American International Center, also referred to as "HSBC Miami Offshore," in Miami.  This center, like HSBC Private Bank International, is designed to help meet the needs of Latin American clients with banking needs in the United States.[19]

HNAH owns several other subsidiaries as well, including HSBC Trust Company, N.A., of Delaware, and HSBC Bank Nevada, N.A., of Las Vegas, Nevada.

**HBUS Major Lines of Business.**  HBUS has six major lines of business in the United States.[20]  The first is "Retail Banking and Wealth Management" which provides deposits, checking, savings, mortgages, loans, brokerage products, and certificates of deposit (CDs) to customers.[21]  HSBC Premier is a product within the retail bank that provides services for more affluent clients.[22]

The HBUS "Private Banking" offers wealth management services for high net worth individuals and families with deposits of at least $1 million.[23]  HSBC Private Bank provides banking, investment, custody, wealth planning, trust and fiduciary, insurance, and philanthropic advisory services to its customers.[24]  Clients receive a dedicated "relationship manager" to manage their Private Bank accounts.

The HBUS "Commercial Banking" offers global banking services to financial institutions, companies, governmental entities, and non-profit organizations worldwide.[25]  These services include deposits, checking, remote deposit capture, payments and cash management, pouch services, corporate loans and financing, merchant services, and insurance products.  HBUS assigns each client a dedicated relationship manager to handle its accounts.[26]

---

[17] See "FAQs – HSBC Money Laundering Enforcement Action," attached to 10/6/2010 email from OCC James Vivenzio to OCC colleagues, "HSBC FAQs," OCC-PSI-00898845-857.
[18] See the Edge Act, P.L. 102-242 (1919), codified at 12 U.S.C. § 611 et seq.
[19] See HSBC Latin American International Center website, https://www.us.hsbc.com/1/2/3/hsbcpremier/miami-offshore.
[20] HBUS Fact Sheet at 1-2.  According to the OCC, HBUS has a total of 32 lines of business altogether. Subcommittee interviews of OCC examiners Joseph Boss (1/30/2012)  and Elsa de la Garza (1/9/2012).
[21] See https://www.us.hsbc.com/1/2/3/hsbcpremier/miami-offshoreretail.
[22] HBUS Fact Sheet at 1.
[23] Id. at 2; Subcommittee interview of HSBC representatives (6/9/2011).
[24] HBUS Fact Sheet at 2.
[25] HBUS Fact Sheet at 1.
[26] Id.

The HBUS "Global Banking and Markets" line of business, with offices in more than 60 countries, provides a wide range of "tailored financial solutions" to major government, corporate, and institutional clients.[27]  This line of business includes an extensive network of correspondent banking relationships, in which HBUS provides banks from other countries with U.S. dollar accounts to transact business in the United States.  Due to its affiliates in over 80 countries, HSBC is one of the largest providers of correspondent banking services in the world. In 2010, it had about 2,400 correspondent customers, including for more than 80 HSBC affiliates.[28]  Among other services, HSBC provides financial institution clients with access to the U.S. financial system by handling international wire transfers, clearing a variety of U.S. dollar instruments, including travelers cheques and money orders, and providing foreign exchange services. HBUS Payment and Cash Management (PCM) is a key banking division, located in New York, that supports HBUS' correspondent relationships.[29]

In addition, as part of this line of business, until 2010, HBUS housed the Global Banknotes Department, which used offices in New York City, London, Hong Kong, and elsewhere to buy, sell, and ship large amounts of physical U.S. dollars.[30]  The Banknotes Department derived its income from the trading, transportation, and storage of bulk cash, doing business primarily with other banks and currency exchange businesses, but also with HSBC affiliates.[31]  In addition, for a number of years, HBUS held a contract with the U.S. Federal Reserve Bank of New York (FRBNY) to operate U.S. currency vaults in several cities around the world to assist in the physical distribution of U.S. dollars to central banks, large commercial banks, and businesses involved with currency exchange.[32]  In June 2010, however, HBUS exited the wholesale U.S. banknotes line of business, later selling portions of the business to other banks.[33]  It also did not renew its contract to operate FRBNY currency vaults.

The HBUS "Global Asset Management" line of business offers worldwide investment management services to clients, and currently manages nearly $400 billion in assets.[34]  It is one of the largest investment businesses in the world.  Finally, "HSBC Insurance" provides a wide variety of insurance products to customers in the United States and Canada.[35]

In addition to these major lines of business, in recent years, HBUS has become a leader in providing banking services to foreign embassies with a presence in the United States.  HBUS

---

[27] Id.

[28] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]  Subcommittee briefing by HSBC legal counsel (6/20/2012).

[29] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 341-342 [Sealed Exhibit.]; Subcommittee interview of Michael Gallagher (6/13/2012).

[30] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 341-342.  [Sealed Exhibit.]

[31] Id. at OCC-PSI-00864342.

[32] See Form 10-Q filed by HSBC USA Inc. with the SEC for the quarter ending June 30, 2011, at 9-10.

[33] Id.  In 2010, HSBC Holdings plc sold its U.S. wholesale banknotes business in Asia to United Overseas Bank Limited (UOB) for $11 million, and in 2011, sold its European banknotes business to HSBC Bank plc.  It recorded total closure costs of $14 million during 2010.  Id.

[34] HBUS Fact Sheet at 2.

[35] Id.

began this business after Riggs Bank and Wachovia Bank stopped providing those services in 2005, and embassies began looking for a new financial institution.[36]

Through its correspondent banking and Payments and Cash Management (PCM) businesses, HBUS has become one of the largest facilitators of cash transfers in the world. Between 2005 and 2009, the total number of PCM wire transactions at HBUS grew from 20.4 million to 30.2 million transfers per year, with a total annual dollar volume that climbed from $62.4 trillion to $94.5 trillion.[37]  In 2008, HBUS processed about 600,000 wire transfers per week.[38]  In 2009, PCM was the third largest participant in the CHIPS wire transfer service which provides over 95% of U.S. dollar wire transfers across U.S. borders and nearly half of all wire transfers within the United States, totaling $1.5 trillion per day and over $400 trillion in 2011.[39]

**HSBC Affiliates.**  HSBC has hundreds of affiliates located in over 80 countries.  At least 80 HSBC affiliates have turned to HBUS for access to U.S. dollars and the U.S. financial system. These affiliates typically interact with HBUS by opening a correspondent account at HBUS headquarters in New York.  Many use the account to clear U.S. dollars wire transfers; some use the account to cash U.S. dollar instruments like travelers cheques or money orders; still others use the account for foreign exchange purposes.  In addition, some opened a separate account to buy or sell physical U.S. dollars as part of HBUS' wholesale banknotes business, until it was shuttered in 2010.

HSBC affiliates have accounted for a large portion of HBUS' U.S. dollar activities.  In 2009, for example, HSBC determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[40]  HSBC also calculated that, over an eight-year period, its U.S. dollar clearing business had increased over 200%, from processing an average daily amount of $185 billion in 2001, to $377 billion in 2009.[41]  HBUS also executes transactions through HSBC affiliates in other countries.  It has been estimated that, in 2009, HBUS processed 19.4 million transactions, involving $45.9 trillion, through HSBC affiliates.[42]

---

[36] See 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-736, at 529-530; "HSBC to Open D.C. Branch, Pursue Embassy Clients," Washington Post, Terence O'Hara (10/5/2004)(quoting Riggs spokesperson: "As a service to our remaining embassy clients, Riggs is working closely with HSBC to ensure a smooth transition."), http://www.washingtonpost.com/ac2/wp-dyn/A7285-2004Oct4?language=printer.

[37] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]

[38] See 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962, at 4.  [Sealed Exhibit.]

[39] Id.  See also The Clearing House website, "About CHIPS," http://www.chips.org/about/pages/033738.php.

[40] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.

[41] Id. at "USD Payment Statistics – Fact Sheet," HSBC OCC 8874211.

[42] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7.  [Sealed Exhibit.]

One of the largest HSBC affiliates is The Hongkong Shanghai Banking Corporation Ltd., which is incorporated in Hong Kong and is Hong Kong's largest bank.[43]  Established in 1865, when Hong Kong was part of the British empire, it is the founding member of the HSBC Group, but now operates as a subsidiary of HSBC Holdings plc, the Group's parent corporation.  With more than 71,400 employees, it oversees a network of hundreds of HSBC affiliates in 20 countries throughout Asia and the Pacific Region, including Australia, Bangladesh, China, India, Japan, Malaysia, New Zealand, Thailand, and Vietnam.[44]  It is sometimes referred to in internal HSBC documents as HBAP, an abbreviation for HSBC Bank Asia Pacific.

A second key affiliate is HSBC Bank Middle East Ltd. (HBME).  Incorporated in Jersey in the Channel Islands and owned through a chain of subsidiaries reaching back to the Group's parent corporation in London, HBME oversees a network of financial institutions throughout the Middle East and North Africa.[45]  With more than 5,000 employees, HBME provides banking services through nearly 45 branches in Algeria, Bahrain, Jordan, Kuwait, Lebanon, Oman, Pakistan, Qatar, and the United Arab Emirates.[46]  In 1998, HSBC Group established "HSBC Amanah," a "global Islamic financial services division" designed to "serve the particular needs of Muslim communities" in compliance with Islamic law.[47]   HBME offers Amanah banking services to many of its clients in the Middle East and North Africa.

A third affiliate discussed in this Report is HSBC Mexico S.A. Banco (HBMX), the principal operating company of Grupo Financiero HSBC, S.A. de C.V., which owns HSBC's businesses in Mexico.  HSBC's Mexican group is one of Mexico's largest financial service conglomerates, with over 1,000 branches throughout the country, nearly $2 billion in assets, and over 8 million clients.[48]  HSBC purchased HBMX in 2002, when it operated under the name of Banco Internacional, S.A. and was part of Grupo Financiero Bital, S.A. de C.V.[49]  HBMX and its Mexican parent are headquartered in Mexico City and together have about 19,000 employees.[50]

---

[43] See "Hongkong Shanghai Banking Corporation Limited Annual Report and Accounts 2011," at 2, http://www.hsbc.com.hk/1/PA_1_3_S5/content/about/financial-information/financial-reports/bank/pdf/2011report.pdf.
[44] Id.
[45] See "HSBC Bank Middle East Limited Annual Report and Accounts 2011," http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/annual_report_2011.pdf.
[46] See id. at 32.  See also "HSBC Wins its Eighth Best Cash Management Bank in the Middle East Award," http://www.hsbc.ae/1/2/about-hsbc/newsroom/eighth-best-cash-management, viewed 4/2/12; "HSBC Research Picks Up More Regional Awards," (1/12/12), http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/newsroom/euromoney-research-awards-jan-12.pdf, viewed 4/12/12.  HSBC provides banking services in Saudi Arabia through both HSBC Saudi Arabia, in which it is a 49% shareholder, and Saudi British Bank (SABB), in which it is a 40% shareholder.  See "HSBC Research Picks Up More Regional Awards," (1/12/12), http://www.hsbc.ae/1/PA_1_083Q9FJ08A002FBP5S00000000/content/uae_pws/pdf/en/newsroom/euromoney-research-awards-jan-12.pdf, viewed 4/12/12.
[47] See HSBC website, "About HSBC Amanah," http://www.hsbcamanah.com/amanah/about-amanah.
[48] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.
[49] See "HSBC Consuma la Adquision de GF BITAL," (11/25/02), http://www.hsbc.com.mx/1/PA_1_1_S5/content/home_en/investor_relations/press_releases/infpress/hsbc_consuma.pdf.
[50] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.

**HSBC Leadership.**  Over the last few years, HSBC leadership has undergone significant change.  In 2010, HSBC Holdings plc appointed a new Chairman of the Board of Directors, Douglas J. Flint, replacing Stephen Green, who had become a U.K. Cabinet Minister.[51]  A new Group Chief Executive was also selected, replacing Michael Geoghegan, who retired, with Stuart T. Gulliver.  In 2012, HSBC Holdings plc also appointed a new Chief Legal Officer, Stuart Levey, former Undersecretary for Terrorism and Financial Intelligence at the U.S. Treasury Department.  Mr. Levey replaced the Group's General Counsel, Richard Bennett.[52]

Also in 2010, Sandy Flockhart, became Chairman of Europe, Middle East, Africa, Latin America, Commercial Banking; as well as Chairman of HSBC Bank plc.[53]  Mr. Flockhart, who first joined HSBC in 1974, is an emerging markets specialist and, among other posts, headed HBMX in Mexico for five years, from 2002 to 2007.[54]  He was also appointed to the HSBC Group Board of Directors in 2008, and became a director of HSBC Bank Middle East in July 2011.[55]

**HNAH Leadership.**  At HNAH, the U.S. bank holding company, the persons holding leadership positions have often overlapped with those of HNAH's key subsidiaries, HBUS, HSBC Securities, and HSBC Finance Corporation.  HNAH's current Chief Executive Officer (CEO), for example, is Irene Dorner, who is also the CEO of HBUS.[56]  Her immediate predecessor at HNAH, for less than a year, was Niall Booker, who was preceded by Brendan McDonagh, former Chief Operating Officer (COO) of HBUS.  Before Mr. McDonagh, HNAH was headed by Siddharth (Bobby) N. Mehta, who was also head of HSBC Finance Corporation, but left the bank when HSBC Finance Corporation's subprime mortgage portfolio incurred huge losses during the recent financial crisis.

The current HNAH COO is Gregory Zeeman; the current General Counsel is Stuart Alderoty; and the current Chief Auditor is Mark Martinelli, each of whom currently holds the same position at HBUS.[57]  HNAH's Chief Risk Officer is Mark Gunton who holds the same position at both HBUS and HSBC Finance Corporation.

**HBUS Leadership.**  Over the last ten years, HBUS has undergone numerous changes in leadership, with the head of the bank turning over four times.[58]  The current head is Irene Dorner

---

[51] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.
[52] "HSBC appoints Chief Legal Officer," (1/13/12), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2012/chief-legal-officer. Mr. Levey held his position at the Treasury Department from July 2004 to February 2011.  Id.  Mr. Bennett had headed HSBC Group's Legal and Compliance department since 1998; in 2010, he had become General Counsel.
[53] See "HSBC Announces New Leadership Team," (9/24/10), media release prepared by HSBC, http://www.hsbc.com/1/2/newsroom/news/2010/hsbc-announces-new-leadership.
[54] See HSBC Group "Board of Directors," http://www.hsbc.com/1/2/about/board-of-directors (describing Mr. Flockhart as "a career banker, being an emerging markets specialist with over 35 years' experience with HSBC in Latin America, the Middle East, US and Asia").
[55] Id.
[56] See "Leadership:  HSBC North America Holdings Inc.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hnah.
[57] Id.
[58] Information on HBUS' leadership is taken from its SEC annual reports.

who serves as HBUS' Chairman of the Board, President, and CEO.  She was appointed to those positions in 2010, after having served as the CEO of HSBC Bank Malaysia and as a director on the HBUS Board.  Her immediate predecessor was Paul J. Lawrence who headed HBUS from 2007 to 2010.  His predecessor was Sandy L. Derickson who served in the post for less than one year and left the bank along with Mr. Mehta after HSBC Finance Corporation, where he was second-in-command, incurred substantial losses.  His predecessor was Martin J.G. Glynn who headed HBUS from 2003 to 2006, and then retired.

HBUS has a six-person Board of Directors.  Its current members are Ms. Dorner; William R.P. Dalton, former CEO of HSBC Bank plc in London; Anthea Disney, former Executive Vice President of NewsCorporation; Robert Herdman, former SEC Chief Accountant; Louis Hernandez, Jr., CEO of Open Solutions Inc.; and Richard A. Jalkut, CEO of TelePacific Communications.

Within HBUS, the current Chief Operating Officer (COO) is Gregory Zeeman.[59]  His immediate predecessor was David Dew[60] who was preceded by Brendan McDonagh, who served as the COO from 2004 to 2006.   Some other key HBUS executives are Marlon Young, the head of Private Banking Americas; Kevin Martin, the head of Retail Banking and Wealth Management; and Mark Watkinson, the head of Commercial Banking.[61]  Since 2007, the bank's Chief Auditor has been Mark Martinelli. From 2000 to 2011, the head of HBUS Payments and Cash Management (PCM) was Michael Gallagher.  The head of Global Banknotes, from 2001 to 2010, was Christopher Lok.

 HBUS' current General Counsel is Stuart A. Alderoty.[62]  His predecessor was Janet Burak who served as the bank's General Counsel from 2004 to 2010.  In 2007, she was also made the Regional Compliance Officer for North America.[63]

## B.  HBUS AML Program

The compliance and anti-money laundering (AML) programs at HBUS have undergone continual organizational and leadership changes since 2005.  In April 2003, the Federal Reserve and New York State Banking Department, which oversaw HBUS' predecessor bank, cited the bank for multiple, severe AML deficiencies and required it to enter into a written agreement to

---

[59] See "Leadership:  HSBC Bank USA, N.A.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.

[60] Mr. Dew served as HBUS COO from March 2007 to 2008; prior to that, he served for a month as HBUS Chief Administrative Officer from February 2007 to March 2007; prior to that he served as audit head at HUSI and HSBC North America Inc. from 2006 to 2007, and as audit head of HSBC North America Holdings Inc. from 2004 to 2007.  Mr. Dew currently works as Managing Director of the Saudi British Bank which is 40% owned by HSBC. Subcommittee interview of David Dew (3/5/2012).

[61] See "2011 HSBC Annual Report," http://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus, viewed 3/23/12.

[62] See "Leadership:  HSBC Bank USA, N.A.," https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.

[63] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00000230-259, at 256.  [Sealed Exhibit.]

revamp and strengthen its AML program.[64]  It was at that time that HBUS renamed itself and
converted to a national bank charter under the supervision of the OCC.  During its first year
under OCC supervision, HBUS reorganized its AML program, revamping its AML controls,
country and client risk assessment criteria, Know Your Customer (KYC) due diligence
requirements, and systems for detecting and reporting suspicious activity.[65]  HBUS also acquired
a new system for monitoring account activity, called the Customer Activity Monitoring Program
(CAMP) and established criteria to produce alerts requiring additional reviews.  In addition,
HBUS created a system of KYC client profiles with standard due diligence information
requirements for each client and which was updated on a regular basis and had to be approved by
compliance and other bank officials for an account to be kept open.  HBUS also established a
Financial Intelligence Group to conduct enhanced due diligence reviews.

Although the OCC gave positive reviews to the bank's initial efforts,[66] by 2010, the OCC
issued a lengthy Supervisory Letter again citing the bank for numerous AML deficiencies and
requiring HBUS to revamp its AML program a second time.  In response, the bank issued an
action plan to correct identified problems.  HBUS has, for example, acquired a new AML
monitoring system, NORKOM to replace CAMP, and is working to refine its parameters for
detecting suspicious activity.  In its first month of operation, NORKOM detected more than
100,000 transactions needing further review, demonstrating its ability to catch many transactions
that went previously unchecked under CAMP.

HBUS has also revamped its approach to HSBC affiliates, which make up an important
segment of HBUS' correspondent banking, wire transfer, and cash management businesses and
previously operated without due diligence controls and at times with minimal or no AML
monitoring.  Among other changes, HBUS now requires all subsidiaries to conduct due diligence
on all other HSBC affiliates, including by using internal audit information identifying their AML
risks and AML controls; identifies affiliates posing high AML risks; and treats them accordingly,
thus ending all policies exempting affiliates from standard AML account and wire transfer
monitoring.  In addition, HBUS has revamped its country and client risk assessment criteria,
which now identify high risk clients in a more robust manner; reviewed its correspondent
banking business to reduce the number of high risk financial institutions; and closed some high
risk business lines including its U.S. banknotes program.  HBUS has also hired new AML
leadership and significantly expanded its AML staffing and resources.  HBUS currently employs
over 1,000 compliance personnel.[67]

Some of HBUS' changes have been criticized by the OCC as inadequate.  HBUS has
been informed by the OCC that it must do additional work on its monitoring system in order to
implement the requirements of the 2010 Cease and Desist Order.  The individual hired by HBUS
to serve as its Chief Compliance Officer was asked to leave by the bank shortly after starting in

---

[64] See HSBC Bank USA, Federal Reserve Bank of New York, and New York State Banking Department, Docket
No. 03-012-WA/RB-SM (Board of Governors of the Federal Reserve System, Washington, D.C.), Written
Agreement (4/30/2003), OCC-PSI-00907803-811.
[65] See OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2005, OCC-PSI-
00423650.  [Sealed Exhibit.]
[66] Id.  at 10-11 (describing the formal agreement).
[67] See 7/10/2012 HSBC Group News, "HSBC to Testify at U.S. Senate Hearing." letter by HSBC Group Chief
Executive Stuart Gulliver, PSI-HSBC-76-0001-002, at 002.

2010.  Both HBUS and the OCC will have to work hard to ensure that the latest round of changes
will produce a better AML outcome than the changes made in 2004.

### (1)  HBUS Compliance and AML Leadership

Over the last five years, HBUS has experienced high turnover in its Compliance and
AML leadership, making reforms difficult to implement.  Since 2007, HBUS has had four
Compliance heads and five AML directors.  Currently, both positions are held by the same
person, Gary Peterson.  Mr. Peterson has extensive AML experience and was hired in 2010, to be
the AML director, but after the Compliance head was asked to leave in 2010, has since held both
posts.  In 2012, Mr. Peterson is expected to relinquish his duties as AML director to his deputy,
Alan Schienberg, so that the top Compliance and AML positions at HBUS will each have a full
time professional.[68]

The top compliance position at HBUS is the Chief Compliance Officer who oversees all
compliance issues for the bank.  In the AML field, HBUS has specified two posts which have
been held by the same person, the Anti-Money Laundering (AML) Director who is tasked with
ensuring bank compliance with U.S. AML laws and regulatory requirements.[69]  HBUS'
Compliance and AML leadership positions were relatively stable until 2007, after which the
bank has struggled to hire and retain experienced compliance professionals.

HBUS' Chief Compliance Officer from 2000 to 2008 was Carolyn Wind.  Prior to that
position, Ms. Wind worked for Republic Bank of New York as a compliance officer and, before
that, as an OCC bank examiner.  For the first three years she held the job, Ms. Wind also served
as the AML Director.  In 2003, the bank hired a separate AML Director, Teresa Pesce, who
served in that post nearly four years, from 2003 to March 2007.  Before taking the position at the
bank, Ms. Pesce was a Federal prosecutor with the U.S. Attorney's Office in New York.  Ms.
Pesce left the bank in 2007, after which Ms. Wind headed both the Compliance and AML
Compliance functions until she left the bank in 2008.  As discussed below, Ms. Wind was
dismissed by HBUS after raising the issue of inadequate AML resources with the audit
committee of the board of directors of the bank's holding company, HNAH.

In 2007, as part of a "Compliance Transformation Initiative," HSBC established a North
America Compliance department at HNAH headed by a Regional Compliance Officer.[70]  HNAH
appointed Janet Burak, then Regional Legal Department Head for North America, to also serve
as the Regional Compliance Officer; she held both positions from 2007 to 2010.[71]  At the time,
HSBC Group Compliance head David Bagley expressed concern about combining the two roles,
arguing that each required too much effort for a single person, but was overruled.[72]  Two years

---

[68] See HSBC website, "Leadership:  HSBC Bank USA, N.A.,"
https://www.us.hsbc.com/1/2/3/personal/inside/about/corporate-information/leadership/hbus.
[69] The AML Director also serves as HBUS' Bank Secrecy Act Compliance Officer.
[70] See also Federal Reserve, at BOG-A-205485.
[71] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering
('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-
365, at 27.  [Sealed Exhibit.]
[72] See 6/21/2007 email from HSBC David Bagley to HSBC Richard Bennett, HSBC OCC 8873871-5 (conveying to
HSBC Group's most senior legal counsel, Richard Bennett, the concern of HBUS compliance personnel about "the

later, in March 2009, the Federal Reserve issued a negative critique of Ms. Burak's performance, noting in particular that she did not have an adequate understanding of AML risk or controls.[73] The OCC also later criticized her performance as well as the decision to combine the regional legal and compliance roles, noting in 2010, that Ms. Burak "has had to balance a wide range of legal and compliance duties, including establishing the strategic direction for both functions and representing both functions on senior committees at the Group level."[74]  The OCC stated that, as a consequence, Ms. Burak had "not regularly attended key committee or compliance department meetings" and had failed to keep herself and other bank executives "fully informed about issues and risks within the BSA/AML compliance program."[75]  It also placed some of the blame at her feet for a recently discovered backlog of 17,700 alerts indicating possible suspicious activity at the bank, which had not been reviewed, noting that "[b]acklogged alerts needed to receive the highest level of attention from senior bank management at a much earlier stage to ameliorate the problem."[76] Soon after this critique, Ms. Burak left the bank.

In the two years she held the regional posts, Ms. Burak oversaw three functional compliance teams at HNAH called "Compliance Advisory," "Compliance Center of Excellence," and "Compliance Shared Services Utility."[77]  Each team was headed by a senior Compliance manager: Curt Cunningham, Anthony Gibbs, and Lesley Midzain.

Ms. Midzain was hired in 2007 to replace Carolyn Wind and so worked, not only for HNAH, but also for HBUS as both its Compliance head and AML director.  She held these compliance posts for two years, from 2007 until 2009.  Prior to being placed at the helm of the bank's AML program, Ms. Midzain had no professional experience and little familiarity with U.S. AML laws.  In December 2008, HNAH's regulator, the Federal Reserve, provided a negative critique of Ms. Midzain's management of the bank's AML program.  The Federal Reserve wrote that Ms. Midzain did "not possess the technical knowledge or industry experience

---

capability of one person to manage a very large legal function and a compliance function" and  that "compliance will be pushed down below Legal").  See also 7/28/2010 email from HSBC David Bagley to HSBC Michael Geoghegan, HSBC OCC 8873871-75 (expressing to HSBC CEO Michael Geoghegan, that with regard to the 2007 decision to combine the two roles into one:  "I fully accepted that Brendan [McDonagh], Paul [Lawrence] and Richard [Bennett] had the right to make this call, although as I said to you in Vancouver I now wish I had been more vociferous and in the current way my role operates I am confident that I would have a far stronger say.").

[73] The March 2009 Federal Reserve's Summary of Ratings stated: "Interviews conducted as part of our recent governance review revealed that Janet Burak, HNAH Legal and Compliance chief risk officer has only broad understanding of BSA/AML risk and relies on the HNAH BSA/AML officer [Midzain] to manage the risk. … Midzain, as previously stated has weak BSA/AML knowledge and industry experience.  Burak's heavy reliance on the inexperienced Midzain is a concern.  An example of Burak's limited management oversight of BSA/AML was revealed when we recently met with her to clarify a few items from our Governance review she was unable to respond to the question about the distribution and the purpose of annual AML statements.  She subsequently communicated via email that she does not review the annual AML statements provided to her by the HNAH/BSA/AML officer (Midzain).  Burak forwards the statements to Group."  3/25/2009 "Summary of Ratings for HSBC North America Holdings," Federal Reserve Bank of Chicago, OCC-PSI-00899234.

[74] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 27. [Sealed Exhibit.]

[75] Id.

[76] Id.

[77] Id.  See also Federal Reserve, at BOG-A-205485.

to continue as the BSA/AML officer."[78]  It noted that she "was interviewed by OCC examiners
from another team and they supported the conclusion of the OCC resident staff that Midzain's
knowledge and experience with BSA/AML risk is not commensurate to HNAH's BSA/AML
high risk profile, especially when compared to other large national banks."[79]

In 2009, the OCC also concluded that Ms. Midzain did not have the requisite AML
expertise for her position.  An OCC Supervisory Letter echoed the criticisms leveled earlier by
the Federal Reserve:

"Ms. Midzain was selected as the Compliance Director and BSA Officer although she
does not have the qualifications or the experience to manage a BSA program at an
institution with the size and amount of BSA compliance risk that HBUS has.  She is a
Canadian lawyer (a barrister and solicitor) who formerly worked for HNAH.  She is also
a member of Group's executive development program. …  Ms. Midzain's assignment as
HBUS' BSA Officer and Compliance Director has been her first assignment outside of
Canada as a part of that program. … During its 2009 compliance management
examination, the OCC determined that Ms. Midzain lacked the experience and expertise
to be the BSA Officer, and the OCC included an MRA in its supervisory letter that
required the bank to strengthen its BSA/AML compliance leadership by hiring a BSA
Officer who is highly qualified and very experienced."[80]

In response to the Federal Reserve and OCC criticisms, HBUS removed Ms. Midzain
from the AML post, but retained her as head of HBUS' Compliance department.  In the fall of
2009, HBUS hired a new AML Director, Wyndham Clark, a former U.S. Treasury official, who
assumed the post in the middle of an intensifying AML examination by the OCC and a host of
serious AML problems facing the bank.  Mr. Clark was required to report to Curt Cunningham,
an HBUS Compliance official who freely admitted having no AML expertise,[81] and through him
to Ms. Midzain, whom the OCC had also found to lack AML expertise.  Shortly after he arrived,
Mr. Clark began requesting additional resources.[82]  After 30 days at the bank, Mr. Clark sent Mr.
Cunningham a brief memorandum with his observations, noting that HBUS had an "extremely
high risk business model from AML perspective," had seen recent high turnover in its AML
directors, and granted only limited authority to the AML director to remedy problems:

"AML Director has the responsibility for AML compliance, but very little control over
its success.

---

[78] Federal Reserve Bank of Chicago Summary of Ratings for HSBC North America Holdings, March 25, 2009,
OCC-PSI-00899234.
[79] Id.
[80] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML')
Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 28.
[Sealed Exhibit.]
[81] Id. at 28.
[82] See, e.g., 10/19/2009 email exchange between HBUS Wyndham Clark and HBUS Debra Bonosconi, "OFAC
resources," OCC-PSI-00162661 (Mr. Clark commented after Janet Burak had recently approved three new
compliance personnel positions, "Clearly a positive, although I understand that these were requested quite a while
ago.  I hope that isn't the typical response time."  Ms. Bonosconi responded:  "Oh, this was express time.  Trust me
on that.  Usually the response is 'no.'").

Operate under 'crisis' mode, actions are reactive rather than forward thinking.
AML Director unable to manage at high level.
Several AML Directors/BSA Officers in a short period of time."[83]

As he continued his work, Mr. Clark grew increasingly concerned that the bank was not effectively addressing its AML problems.  In February 2010, Mr. Clark met with the Audit Committee of the HNAH board of directors and informed the committee that he had never seen a bank with as high of an AML risk profile as HBUS.[84]  He also informed them that AML resources were "insufficient versus current risks and volumes," and the bank's systems and controls were "inconsistent with AML risk profile."[85]  On May 10, 2010, Mr. Clark wrote to a senior HBUS Compliance official that with regard to the bank's AML compliance program, "With every passing day I become more concerned…if that's even possible."[86]

In July 2010, less than a year after taking the post, Mr. Clark decided to resign.  He sent an email to the head of HSBC Group Compliance David Bagley explaining that he did not have the authority or support from senior compliance managers needed to do his job as AML director:

> "[T]he bank has not provided me the proper authority or reporting structure that is necessary for the responsibility and liability that this position holds, thereby impairing my ability to direct and manage the AML program effectively.  This has resulted in most of the critical decisions in Compliance and AML being made by senior Management who have minimal expertise in compliance, AML or our regulatory environment, or for that matter, knowledge of the bank (HBUS) where most of our AML risk resides.  Until we appoint senior compliance management that have the requisite knowledge and skills in these areas, reduce our current reliance on consultants to fill our knowledge gap, and provide the AML Director appropriate authority, we will continue to have limited credibility with the regulators."[87]

When asked about his experience at the bank, Mr. Clark told the Subcommittee that he did not have either the authority or resources needed as AML director.[88]  After his departure, the bank hired Gary Peterson, who was then an AML consultant to the bank, appointing him as HBUS' new AML director.

---

[83] 10/15/2009 HBUS memorandum from Wyndham Clark to HNAH Curt Cunningham, "30 Day Observations and Recommendations Report from AML Director," HSBC PSI PROD 0065332.
[84] Subcommittee interview of Wyndham Clark (11/30/2011); 2/17/2010 "HNAH AML Program, Board Audit Committee Presentation," by HBUS Wyndham Clark to the Audit Committee of the HNAH board of directors, HSBC OCC 3800290.
[85] 2/17/2010 "HNAH AML Program, Board Audit Committee Presentation," by HBUS Wyndham Clark to the Audit Committee of the HNAH board of directors, HSBC OCC 3900290.
[86] 5/10/2010 email from HBUS Wyndham Clark to HBUS Anne Liddy, "AML Townhall," OCC-PSI-00672582. See also 5/9/2010 email from HBUS Wyndham Clark to HNAH Curt Cunningham, "AML Townhall," OCC-PSI-00672571 ("Essentially AML decisions are now being made without AML SME [subject matter expertise]. This will be very apparent to the regulators.").
[87] 7/14/2010 email from HBUS Wyndham Clark to HSBC David Bagley, OCC-PSI-00676731.  Mr. Clark formally left the bank in August 2010.  Subcommittee interview of Wyndham Clark (11/30/2011).
[88] Subcommittee interview of Wyndham Clark (11/30/2011).  Mr. Clark told the Subcommittee that, prior to his leaving, the bank finally approved a number of new AML hires.  Id.

Around the same time that Mr. Clark left the bank in 2010, Ms. Midzain also departed, leaving open the post of Chief Compliance Officer.  That post remained vacant until 2011, when HBUS hired Eric Larson.  He left after fifteen months on the job.[89]  HBUS then asked Gary Peterson to serve, not only as HBUS' AML Director, but also as its Compliance head, and as HNAH's Regional Compliance Officer following Ms. Burak's departure in 2010.  Mr. Peterson agreed and has served in all three posts since 2010.  Altogether, these personnel changes meant that, over the last five years, HBUS has had four Chief Compliance Officers and five AML Directors.

At HSBC Group, HBUS' parent organization, for nearly ten years, from 2002 to the present, David Bagley has served as the HSBC Group's head of Compliance.  He is located in London and oversees both general and AML compliance issues.  His second-in-command is Warren Leaming, Deputy Head of HSBC Group Compliance, who has been in that position since January 1, 2007.  Susan Wright serves as the head of HSBC's AML efforts.  She is also located in London and has served in that position for more than a decade.  John Root is a senior Group Compliance officer who has concentrated on compliance and AML issues, in part in Mexico and Latin America.  Compliance personnel work with Matthew King who has served as the head of HSBC Group Audit since 2002.

### (2)  HBUS AML Program

Federal law requires banks operating in the United States to have a minimum of four elements, an AML compliance officer in charge of the program, AML internal controls, AML training, and an independent testing of the AML program to ensure its effectiveness.[90]  HBUS' AML program must address a wide range of AML issues, from customer due diligence, to monitoring account and wire transfer activity, to reporting suspicious activity to law enforcement.  It must also cover a wide range of business lines and products, including Correspondent Banking, International Private Banking, Domestic Private Banking, Embassy Banking, Payment and Cash Management, and Banknotes services.

**Inadequate Staffing.**  Despite its high AML risks, millions of customers, and employment of more than 16,500 employees overall, from 2006 to 2009, HBUS' entire Compliance Department numbered less than 200 full time employees; its AML Compliance staff was a subset of that and also included staff in India.[91]  HBUS personnel told the Subcommittee that inadequate AML staffing was one of the biggest problems they faced.[92]  OCC examinations also routinely identified inadequate staffing as a key AML problem, including with respect to

---

[89] Subcommittee interview of OCC Examiner Teresa Tabor (5/17/2012).

[90] See 31 U.S.C. §5318(h); 12 C.F.R. §21.21.

[91] Subcommittee briefing by HSBC legal counsel (6/30/2011).

[92] Subcommittee interview of HBUS Debra Bonosconi (11/17/2011) (Ms. Bonosconi reported to the Subcommittee that staffing was her biggest issue and that by March 2008 it was evident that more staff was needed.  She made several requests for additional resources); Subcommittee interview of HBUS Anne Liddy (2/22/2012) (Ms. Liddy made a request for resources to Carolyn Wind, but was told that there was no appetite to bring on additional staff); Subcommittee interview of HBUS Carolyn Wind (3/7/2012); Subcommittee interview of HBUS Teresa Pesce (3/30/2012) (Ms. Pesce asked for business to provide funding for more AML Compliance positions because Compliance did not have the money).

unreviewed alerts,[93] PCM processing,[94] Correspondent Banking,[95] OFAC reviews,[96] Embassy Banking,[97] and the Compliance Review Unit that tested the bank's AML controls.[98]

Bank documents show that Compliance and AML staffing levels were kept low for many years as part of a cost cutting measure.  In 2007, HBUS announced a "1509 Initiative," to increase the bank's return on equity by 2009, largely through cost cutting measures.  One component of the plan was to ensure that 2007 and 2008 headcounts remained flat.  This hiring freeze caused HBUS Compliance and the AML staffing requests to be denied or unanswered.  At one point, HBUS Compliance and AML management resorted to requesting temporary staff when persistent AML alert backlogs grew to unmanageable levels.  In 2007, HBUS fired its longtime AML head after she raised resource concerns with the HNAH Audit Committee; an AML director hired in 2009 left after being denied the authority and resources he considered necessary to do his job.  After the OCC issued its lengthy Supervisory Letter criticizing multiple aspects of HBUS' AML program, bank management began to significantly increase AML staff and resources.

**AML Staffing Problems.**  In 2006, HBUS Compliance was already struggling to "handle the growing monitoring requirements" associated with the bank's correspondent banking and cash management programs, and requested additional staff.[99]  In October 2006, HBUS Compliance officer Alan Ketley wrote that despite having very efficient processes, each month his Compliance team was "handling an average of 3,800 [alerts] per person and [was] becoming overwhelmed thus potentially placing the business and the bank at risk."[100]  Despite requests for additional AML staffing, HBUS decided to hold staff levels to a flat headcount.[101]

**1509 Initiative and Hiring Freeze.**  In 2007, against the backdrop of losses stemming from its troubled acquisition of Household International and the beginning of the global financial crisis, HBUS launched the 1509 Initiative which sought to achieve a 15% return on equity for the

---

[93] 3/3/2010 OCC Supervisory Letter HSBC-2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542-545.  [Sealed Exhibits.]

[94] 3/18/2009 OCC Supervisory Letter HSBC-2008-40, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624-625.  [Sealed Exhibit.]

[95] 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618-620.  [Sealed Exhibit.]

[96] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962; 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434-436. [Sealed Exhibits.]

[97] See 3/19/2007 OCC Supervisory Letter HSBC-2006-30, "Government and Institutional Banking BSA/AML Examination," OCC-PSI-00107567-571; 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-536.  [Sealed Exhibits.]

[98] See 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-00000341-345.  [Sealed Exhibit.]

[99] See 10/31/2006 email from HBUS Alan Ketley to HBUS Michael Gallagher, Denise Reilly, and Charles DelBusto, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-43, at 341.

[100] Id. at HSBC OCC 0616342.

[101] See, e.g., 10/31/2006 email exchange between HBUS Michael Gallagher and HBUS Tony Murphy, Charles DelBusto, Alan Ketley, and others, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-343;  9/25/2006 email exchange between HBUS Michael Gallagher and HBUS Teresa Pesce, Alan Ketley, Charles DelBusto, and others, "Additional monitoring resources," HSBC OCC 7688655-657.

bank by 2009, primarily by cutting costs.  One facet of the 1509 Initiative was the "$100 Million Dollar Cost Challenge," which set a goal of cutting costs of $100 million in 2007.[102]

The hiring freeze began in September 2007, when HBUS Compliance had a headcount of 198 full time employees, one below its December 2006 level.[103]  When Compliance sought to fill six open positions, David Dew, HBUS Chief Operating Officer (COO), informed Compliance head and AML director Carolyn Wind that the positions could not be filled:

> "This increase will be almost impossible to justify and therefore I must ask you to please cancel the open positions and ensure that your FTE as at 31 Dec 2007 does not exceed 199."[104]

To make the case for increased staffing resources, in September 2007, HBUS Compliance personnel reached out to compliance peers at other banks and learned that at the three major banks that provided some information, each had a greater number of monitoring staff in the correspondent banking area than HBUS.[105]  In addition, HBUS Compliance personnel noted that HBUS Compliance filed many fewer Suspicious Activity Reports (SARs) than its competitors;[106] while HBUS filed three to four per month in the correspondent banking area, its peers filed 30 to 75 per month, and one major international bank disclosed that it filed approximately 250 SARs per month.[107] Despite these statistics, the Compliance department and AML staff remained stagnant.

**Fired After Raising Staffing Concerns to Board.**  After being turned down for additional staff, Carolyn Wind, longtime HBUS Compliance head and AML director, raised the issue of inadequate resources with the HNAH board of directors.  A month after that board meeting, Ms. Wind was fired.

---

[102] See HSBC internal presentation entitled, "1509," HSBC OCC 0616217-254, at 241-45.

[103] 9/14/2007 email from HBUS David Dew to HBUS Carolyn Wind, Janet Burak, and Kathryn Hatem, "HEADCOUNT," HSBC OCC 0616262.

[104] Id.

[105] On 9/6/2007, Mr. Ketley wrote: "Every bank that responded and provided information about monitoring staff has more than HBUS."  9/6/2007 email from HBUS Alan Ketley to HBUS Alan Williamson, Judy Stoldt, and George Tsugranes, "Correspondent survey," HSBC OCC 0616384-385.  See also 9/6/2007 HBUS chart, "Correspondent Banking Survey," HSBC OCC 3400666.  [Sealed Exhibit.]  See also emails indicating HBUS Compliance personnel were not compensated at levels consistent with its competitors, and risked losing qualified personnel.  See, e.g., 2/1/2007 email exchange among HBUS Carolyn Wind, HBUS Teresa Pesce and others, "MIP overages - URGENT," HSBC OCC 0616314-316, at 314 ("We are not at market with our current comp[etitors" and "[t]hese officers and AML officers can get new jobs in a heartbeat"); 2/27/2007 email from HBUS Karen Grom to HBUS Carolyn Wind, Denise Reilly, Teresa Pesce, David Dew and others, "HUSI Compensation Review," HSBC OCC 0616318 ("The banks who are approaching our employees have deep pockets and are willing to pay to get the talent. … In many cases, we are paying under the 'market data point' (50th percentile)." and "The offers from head-hunters are in some cases double base salaries and double bonuses[.]").

[106] 9/6/2007 email from HBUS Alan Ketley to HBUS Alan Williamson, Judy Stoldt, and George Tsugranes, "Correspondent survey," HSBC OCC 0616384-385 (Mr. Ketley wrote "Our competitors all acknowledge filing more SARs than we do."); 9/6/2007 HBUS chart, "Correspondent Banking Survey," HSBC OCC 3400666.  [Sealed Exhibit.]

[107] 8/27/2007 email from HBUS Alan Ketley to HBUS Michael Gallagher, Charles DelBusto,  Chris Davies, and Alan Williamson, "Addressing negative information," HSBC OCC 7688584-587, at 587.

On October 24, 2007, Ms. Wind met with the Audit Committee of the HNAH board of directors and, during the meeting, raised the staffing issue, particularly with respect to the Embassy Banking area which had been the subject of two recent OCC examinations uncovering severe AML deficiencies.  Her supervisor, Regional Compliance Officer Janet Burak, also attended the Audit Committee meeting.  The day after the meeting, in an email to HSBC Group Compliance head David Bagley, Ms. Burak expressed displeasure that Ms. Wind's comments had caused "inappropriate concern" at the Audit Committee:

> "I indicated to her [Ms. Wind] my strong concerns about her ability to do the job I need her to do, particularly in light of the comments made by her at yesterday's audit committee meeting ….  I noted that her comments caused inappropriate concern with the committee around: our willingness to pay as necessary to staff critical compliance functions (specifically embassy banking AML support), and the position of the OCC with respect to the merger of AML and general Compliance."[108]

A month after the board meeting, after seven years as HBUS' Compliance head, Ms. Wind was notified that she was being fired.  In a January 22, 2008 letter to the head of HBUS Human Resources, Ms. Wind wrote:

> "I was told on November 30, 2007 that I was being terminated effective 2/28/08, due to the fact that the Board had lost confidence in me.  …  If the Board has lost confidence in me based on my comments at the October, 2007 Audit Committee, why have I been allowed to continue to run this critical department without additional supervision or any direct follow-up from Group Compliance?"

Ms. Wind also wrote:  "David [Dew] and I disagree on the extent to which my organization can withstand cost cuts and still maintain an effective compliance risk mitigation program.  I also believe in an open dialog with the Board and its committees, which may go against the desires of some in the organization."[109]  When asked about this document, Ms. Wind told the Subcommittee that she believed she was fired for telling the HNAH board about the need for additional Compliance resources.[110]

**Hiring Freeze Continues.**  After her departure, the hiring freeze continued throughout 2008.[111]  In February 2008, prior to her leaving the bank, Ms. Wind discussed the staffing freeze with HNAH COO Anthony Gibbs:

---

[108] 10/25/2007 email from Janet Burak to David Bagley, OCC-PSI-00704789.

[109] January 22, 2008 letter from Carolyn Wind to Jeanne Ebersole, HSBC OCC 7730334.

[110] Subcommittee interview of Carolyn Wind (3/07/2012).  Anne Liddy also reported that Ms. Wind told her in 2007 that she had been terminated due to Ms. Wind raising resource concerns to the board's audit committee.  Subcommittee interview of Anne Liddy (2/22/2010).  Also see, Minutes of the Audit Committee Meeting, October 24, 2007, OCC-PSI-0070680.

[111] On 1/17/08, Jeanne Ebersole, Executive Vice President HBUS Human Resources, wrote to the HBUS Executive Committee [EXCO], "Attached is a draft of the non-hiring freeze note to be sent to all GCBs 0, 1, 2 and the final headcount report for 2007 which we will discuss tomorrow at EXCO." 1/17/2008 email from HBUS Jeanne Ebersole to HBUS Chris Davies, David Dew, Janet Burak and others, "Draft Materials for EXCO," HSBC OCC 0616259-260, at 259.

29

"HBUS Compliance has been required to manage down overall FTE [full time employees] while at the same time redeploying resources to priority needs. We also are in the midst of a 'hiring pause' which means that approval from appropriate EXCO members is required to fill any open position. I do not expect a lot of support for overall HBUS Compliance headcount increasing even if a portion of the time is allocated to other affiliates."[112]

In June 2008, a senior PCM operations manager emailed senior HBUS Compliance official Anne Liddy about growing backlogs in the OFAC Compliance program:

"I have put forth the suggestion of hiring up some first level checkers for OFAC processing in the GSC…we're strapped and getting behind in investigations (on OFAC cases) and have some of our key managers in the queues releasing items… I'm told I cannot hire first level staff unless it's offshored…"[113]

An OCC examination later found that eight Compliance officers were under "rigorous pressure" to complete manual reviews of about 30,000 OFAC alerts per week.[114]

In July 2008, however, HSBC Group senior management determined that the hiring freeze would continue to the end of the year. CEO Michael Geoghegan wrote to HNAH CEO Brendan McDonagh and others: "We have agreed that we will have a headcount freeze until the end of the year."[115]

HBUS Compliance personnel, with the support of their business units, attempted to obtain an exception to the hiring freeze. In a September 2008 email, Michael Gallagher, PCM head at HBUS, requested additional Compliance staff, explaining: "I have expressed considerable concern for some time over the lack of resources both in compliance and within pcm [Payments and Cash Management] to adequately support kyc [Know Your Customer] and related regulatory requirements."[116] Lesley Midzain, then HBUS Chief Compliance Officer, echoed his concerns and requested four additional full time employees:

"Given the hiring freeze in global businesses, I understand that it may also need approval by Paul Lawrence, but this has continued to be an area of notable risk and regulatory attention and which needs some stabilization for Compliance resources."[117]

---

[112] 2/12/2008 email from HBUS Carolyn Wind to HBUS Anthony Gibbs, Curt Cunningham, Denise Reilly and others, "Organizational Changes," HSBC OCC 0616264.

[113] See 6/19/2008 email exchanges among HBUS Anne Liddy and HBUS Nancy Hedges, "OFAC processing in GSC's," HSBC OCC 0616349-350, at 349.

[114] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-01274962 ("the bank's Compliance teams are under rigorous pressure to process alerts and determin[e] a disposition in a timely manner"). [Sealed Exhibit.]

[115] 7/23/2008 email from HSBC Michael Geoghegan to HNAH Brendan McDonagh and others, "2nd Half Costs," OCC-PSI-00727922.

[116] See 9/4/2008 email exchanges among HBUS Michael Gallagher and HBUS David Dew, Lesley Midzain, Andrew Long, Chris Davies and others, "Kyc hires," HSBC OCC 0616352-356, at 356. When asked about this document, Mr. Gallagher said that Mr. Dew had informed him that broader concerns in the U.S. and at Group necessitated a flat headcount. Subcommittee interview of Michael Gallagher (6/13/2012).

[117] Id. at HSBC OCC 0616354.

After expressing concern over how additional hires would impact operating expenses, Mr. Dew, HBUS COO, asked Ms. Midzain if "a couple of temps for two months" would "do the trick."[118]

Hiring did not improve during 2009. Wyndham Clark, who had been hired in 2009, as the new HBUS AML director, noted in an email that Janet Burak had recently approved three new compliance positions. He wrote: "Clearly a positive, although I understand that these were requested quite a while ago. I hope that isn't the typical response time." A senior PCM operations officer responded: "Oh, this was express time. Trust me on that. Usually the response is 'no.'"[119] The Subcommittee was told that in September 2009, the HBUS Compliance department had 130 full time employees handling AML compliance issues.[120]

**OCC Examination.** During late 2009 and the first half of 2010, the OCC expanded and intensified its examination of the bank's AML program as a whole. Mr. Clark made increasing use of temporary employees and contractors to answer OCC inquiries and address AML deficiencies. In August, he left the bank. By then, he was using nearly 100 temporary employees and contractors and had requested 50 additional permanent full time Compliance personnel.[121] Even with those additional resources, the OCC's September 2010 Supervisory Letter identifying AML deficiencies at the bank criticized HBUS' failure "to provide adequate staffing and resources to implement and maintain a BSA/AML compliance program commensurate with the bank's high risk profile."[122] The OCC Supervisory Letter also noted: "Management is still in the process of determining an appropriate level of resources as they consider recommendations from outside consultants and make strategic decisions about the business and risk on a prospective basis."[123] By October 2010, the Compliance department had increased to over 400 full time employees.[124]

**AML Monitoring Deficiencies.** In addition to AML leadership problems and inadequate AML staffing, another key component of HBUS' AML program involved its monitoring systems. During the period reviewed by the Subcommittee, dating from 2004, HBUS used a monitoring system called the Customer Activity Monitoring Program (CAMP). This system had many limitations and often required manual reviews by HBUS Compliance and AML staff.

By 2006, as indicated earlier, HBUS Compliance was already struggling to handle the monitoring alerts generated by the bank's growing correspondent banking and cash management programs and described its personnel as "becoming overwhelmed."[125] Backlogs of unreviewed alerts in different areas of the bank began to accumulate, including with respect to alerts

[118] Id. at HSBC OCC 0616352.
[119] 10/19/2009 email exchange between HBUS Wyndham Clark and HBUS Debra Bonosconi, "OFAC resources," OCC-PSI-00162661.
[120] Subcommittee briefing by HSBC legal counsel (6/30/2011).
[121] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 29. [Sealed Exhibit.]
[122] Id.
[123] Id.
[124] Subcommittee briefing by HSBC and HBUS executives (6/26/2012).
[125] See 10/31/2006 email from HBUS Alan Ketley to HBUS Michael Gallagher, Denise Reilly, and Charles DelBusto, "Additional Compliance headcount needed to support PCM," HSBC OCC 0616340-43, at 342.

generated by CAMP monitoring of client accounts and wire transfer activity; alerts triggered by the OFAC filter on transactions by potentially prohibited persons identified on OFAC lists of terrorists, drug traffickers, and other wrongdoers; and alerts related to potentially suspicious activity in Embassy Banking accounts.

With respect to the general CAMP system alerts for PCM, HBUS Compliance set a goal that no more than 2% of AML alerts should remain in the system for over 120 days without being resolved. In addition, the system notified increasingly senior management if the backlog exceeded certain thresholds. For example, when the CAMP alerts hit 3%, bank compliance officials like Anne Liddy were alerted; when it hit 4%, higher level compliance personnel such as AML director Lesley Midzain were notified; if the backlog hit 6%, HNAH's Regional Compliance Officer Janet Burak was notified.[126] In November 2009, the percentage of AML alerts in the system for longer than 120 days spiked from 4% in October to 9%.[127] The backlog remained at 9 or 10% for the next four months, from December 2010 to February 2010, and then stayed around 6 or 7% from March to May 2010.[128] In early 2010, as part of its expanded AML examination, the OCC discovered the CAMP backlog of more than 17,000 unreviewed alerts as well as a backlog of requests for enhanced due diligence (EDD) reviews.[129] On March 3, 2010, an OCC Supervisory Letter ordered the bank to eliminate the alert and EDD backlog by June 30, 2010.[130] The bank met the deadline using "offshore reviewers in India, HBUS staff in Delaware, HBUS temporary volunteers, [and] outside contractors."[131] A subsequent review by the OCC, however, found "deficiencies in the quality of the work," and required an independent assessment.[132] The independent assessment found that 34% of the alerts supposedly resolved had to be re-done.

As Ms. Wind reported to the board in October 2007, backlogs were also an issue in Embassy Banking. A 2008 OCC examination identified a backlog of over 3,000 alerts identifying potentially suspicious activity in Embassy accounts that had yet to be reviewed.[133] In response, HBUS initiated a concentrated effort to review and resolve those alerts prior to a followup OCC examination in July 2008.[134] The followup examination found a backlog of about 1,800 alerts, some of which dated from 2007. The OCC examiners recommended issuance of a c

---

[126] "Bankwide KRI AML Transaction Monitoring Alert Aging – K02854," HSBC OCC 7688689.

[127] Id.

[128] Id.

[129] 3/3/2010 OCC Supervisory Letter HSBC-2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542. [Sealed Exhibit.]

[130] Id.

[131] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 9. [Sealed Exhibit.]

[132] Id.

[133] 8/14/2008 OCC memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227-233, at 231. [Sealed Exhibit.]

[134] July 31, 2008 Memorandum from HBUS Debra Bonosconi to HBUS David Dew, Lesley Midzain, and Cam Hughes. OCC-PSI-00409095. Also see 7/14/2008 Memorandum from HBUS Debra Bonosconi to HBUS David Dew, Lesley Midzain, Cam Hughes, "As shown in the chart below, we currently (as of 7/15) have a total of 1,793 open alerts which is a reduction of 1,519 from 3,312 on June 27th. There are a total of 203 that are open in excess of 120 days and 147 open in excess of 90 days (350 combined) and we are concentrating our efforts on reducing those first. We are closing an average of 84 alerts daily (including Saturday) and based upon current projections, we should have total of 1,499 pending alerts when the OCC arrives on July 21, 2008." OCC-PSI-00285742

Cease and Desist Order to the bank in part due to the backlog, but the OCC instead issued a Supervisory Letter, identified the backlog as a Matter Requiring Attention by the bank, and required the backlog to be cleared by September 15, 2008.[135]   The bank met that deadline.[136]

A third category of alert backlog involved transactions that were stopped by the OFAC filter as possible violations of OFAC regulations.  Each transaction had to be manually reviewed and resolved by two 4-person OFAC Compliance teams in New York and Delaware.  In July 2007, HSBC introduced a new payment system, GPS, in the United States.[137]  The system had undergone several adjustments just prior to its launch, including changes to its OFAC filters, which caused unexpectedly large backlogs.[138]  HBUS assigned a team to assist with clearing the backlog, but the problem still took weeks to resolve.

In December 2009, HBUS' OFAC Compliance team in New York had accumulated a backlog of greater than 700 OFAC alerts.[139]  The OFAC Compliance team requested five or six people from PCM for ten days to help clear the backlog.[140]  PCM responded that it had no resources to loan, and suggested asking the Compliance team in Delaware for help.  The OFAC Compliance team in New York indicated the Delaware Compliance staff was already "fully deployed" dealing with general alerts from the CAMP monitoring system:

> "We have considered all options at this point[;] the Compliance team in DE is already fully deployed dealing with wire camp alerts and bank examiner requests for the current exam.  There is no bandwidth there at all[;] they are behind on the current alert clearing process which we are also dealing with."[141]

Understaffed, HBUS Compliance and AML staff constantly battled alert backlogs while requesting additional resources.  These requests, if answered, generally resulted in additional temporary staff dispatched only when backlogs grew to unmanageable levels. As the backlog increased, tensions grew, and in February 2010, Mr. Clark, the AML Director who had been on the job only a few months, wrote:  "[W]e are in dire straights [sic] right now over backlogs, and decisions being made by those that don't understand the risks or consequences of their decisions!!!!"[142]

---

[135] See 9/4/2008 OCC Supervisory Letter HSBC-2008-07, "Government and Institutional Banking BSA/AML Examination," OCC-PSI-00107607-611.  [Sealed Exhibit.]
[136] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 9. [Sealed Exhibit.]
[137] See, e.g., 7/29/2007 email from HBUS Andrew Long to HBUS Michael Gallagher, "draft strawman," HSBC OCC 7688680-682; 7/18/2007 email from HBUS Carolyn Wind to HBUS William Johnson, David Dew, Michael Gallagher, Andrew Long, David Bagley and others, "HBUS GPS Day 2 and 3 Update," HSBC OCC 7688676-678, at 677.
[138] Id.
[139] 12/11/2009 email exchange among HBUS Camillus Hughes and HBUS Michael Gallagher, Charles DelBusto, Sandra Peterson, Thomas Halpin, Chris Davies, and Lesley Midzain, "OFAC Payments," HSBC OCC 7688668-670, at 670.
[140] Id.
[141] Id. at HSBC OCC 7688668.
[142] 2/26/2010 email from HBUS Wyndham Clark to HBUS Debra Bonosconi, OCC-PSI-00165898.  In another email the next day, Mr. Clark wrote:  "At this point the businesses are not accepting that they own the risk, I can

The problems with HBUS' AML monitoring system were not limited to the backlogs. Additional issues involved an array of problematic decisions on what clients and countries should be designated high risk and subject to enhanced monitoring; what accounts and wire transfer activity should be subject to or excluded from routine AML monitoring; what parameters should be used to trigger alerts, including dollar thresholds, key words or phrases, and scenario rules that combine specified elements; and what "negative rules" should be used to decrease the number of alerts that would otherwise be generated for review.[143]  The OCC's September 2010 Supervisory Letter identified multiple problems with each of these elements of HBUS' AML monitoring systems.[144]

**Current Status of HBUS AML Program.**  In the two years since the OCC issued its September 2010 Supervisory Letter and both the OCC and Federal Reserve issued October 2010 Cease and Desist Orders to HBUS and HNAH regarding the many AML deficiencies in their programs, both HBUS and HNAH, as well as HSBC, have made commitments to strengthen their AML programs, including by directing more resources to compliance needs.  HBUS told the Subcommittee that Gary Peterson will remain as its Compliance head, and his deputy will take over the duties of AML director, to ensure both positions have a full time executive.[145] HBUS also informed the Subcommittee that as of July 2012, it had increased its Compliance and AML staff to over 1,000 full time employees.[146] It is also in the process of replacing CAMP with an improved AML monitoring system, NORKOM.  Additional reforms include scaling back its correspondent banking and embassy banking relationships by closing higher risk accounts, as well as closing its banknotes business in 2010.[147] With respect to HSBC affiliates, HBUS told the Subcommittee it has initiated due diligence reviews of all such affiliates to identify those that are high risk, enabled all affiliates to obtain internal audit findings and other information to improve affiliate risk assessments, ended any limits on the monitoring of affiliates, and increased affiliate information sharing to strengthen AML compliance.[148]

---

think of one exception, making the difficult decisions and taking the necessary steps to mitigate the risk.  My view is the risks are being ignored by the business, and they are simply waiting for compliance to tell them what the risks are and to convince them as to what actions need to be taken. If they don't know what the risks are, then why are they opening accounts or continuing with the relationship?"  On the same day, Anne Liddy responded:  "[W]e spend a lot of energy pushing our point and holding our ground and certainly Group member referred relationships/transactions have increased our HBUS risk." 2/27/2010 email exchange between HBUS Anne Liddy, Wyndham Clark, and Debra Bonosconi, OCC-PSI-00165932.

[143] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 10-21.  [Sealed Exhibit.]

[144] Id.

[145] Subcommittee briefing by HSBC and HBUS executives (6/26/2012).

[146] Id.  See also, 7/10/2012 HSBC Group News, "HSBC to Testify at U.S. Senate Hearing." letter by HSBC Group Chief Executive Stuart Gulliver, PSI-HSBC-76-0001-002, at 002.

[147] As of June 2012, HBUS had closed all banknotes accounts, 24 embassy accounts, and 326 correspondent relationships.  In August 2010, as part of this review to exit relationships, HBUS CEO Irene Dorner noted that she was recommending closing relationships with 121 international banks that "do not meet either risk or return hurdles." 9/20/2010 email from Irene Dorner to Andrew Long and others, HSBC OCC 8876104-106.

[148] Id.

In addition, on April 30, 2012, HSBC Group issued a new Group Circular Letter (GCL) 120014, announcing the intention of the bank to use the highest global compliance standards for every HSBC affiliate. The HSBC GCL stated:

> "We must adopt and enforce the adherence to a single standard globally that is determined by the highest standard we must apply anywhere. Often, this will mean adhering globally to U.S. regulatory standards, but to the extent another jurisdiction requires higher standards, then that jurisdiction's requirements must shape our global standard."[149]

This new GCL could represent a groundbreaking approach for the bank if it, in fact, pushes its affiliates toward uniform and high compliance standards.

These reforms, like those announced in 2004 after the bank's last AML enforcement action, have the potential to resolve the AML deficiencies at the bank and push HBUS to an improved level of AML compliance. While HBUS has committed to making major changes, the bank made similar commitments under the 2003 enforcement action, which the OCC lifted in 2006, after which the bank's AML program quickly deteriorated. On many occasions since then, HBUS responded to AML problems identified by the OCC by instituting new policies and procedures that appeared to be effective remedies. However, it has often been the case that regulators would subsequently cite HBUS for failing to comply with its own policies and procedures. In 2006, for example, when the OCC lifted the AML enforcement action, HBUS had already incurred over 30 AML-related Matters Requiring Attention, many of which cited AML problems similar to those that had formed the basis of the written agreement.

In addition, not all of the AML reforms proposed since 2010 have proceeded smoothly. The new compliance head hired by the bank left after fifteen months. The bank's new monitoring system has been the subject of OCC criticisms aimed at whether its monitoring parameters have been correctly set to identify suspicious activity and provide adequate AML oversight of client account and wire transfer activity.[150] While the recent GCL could represent an important advance in requiring bank affiliates to adhere to the highest AML standards globally, as this report documents, it can take months, if not years, for HSBC affiliates to come into compliance with HSBC GCL directives. The burden of proof is on HSBC Group to show that its latest directive is taking hold and its affiliates are complying with the highest AML stands, and on HBUS to show that it is moving from an ineffective AML program to one that safeguards the U.S. financial system from abuse.

---

[149] GCL 120014 – HSBC Global Standards.
[150] See 5/25/2012 OCC Supervisory Letter HSBC-2012-19, "Payments and Cash Management (PCM); Bank Secrecy Act and Anti-Money Laundering (BSA/AML) System Examination," PSI-OCC-37-0004. [Sealed Exhibit.] See also 6/25/2012 HSBC response letter, Supervisory Letter HSBC 2012-19 "Payments and Cash Management (PCM); Bank Secrecy Act and Anti-Money Laundering (BSA/AML) System Examination," HSBC-PSI-PROD-0200315-341.

## III.  HBMX:  PROVIDING U.S. ACCESS TO A HIGH RISK AFFILIATE

HBUS has opened correspondent accounts for approximately 80 HSBC affiliates around the world, providing them with access to the U.S. financial system through clearing U.S. dollar wire transfers, cashing U.S. dollar checks, buying and selling physical U.S. dollars, and other services.[151]  Some of those HSBC affiliates operate in high risk countries, provide services to high risk clients, or offer high risk financial products.  Until recently, HSBC Group policy, however, allowed its affiliates to assume that any HSBC affiliate owned 50% or more by the Group met Group AML standards, were low risk, and required no due diligence prior to opening a correspondent account.[152]  In conformance with that HSBC Group policy, for years, HBUS did not conduct any due diligence analysis or risk assessment of an HSBC affiliate prior to supplying it with a U.S. account.  HBUS took that approach, even though U.S. statutory and regulatory requirements explicitly direct U.S. banks to conduct due diligence prior to opening a correspondent account for any foreign financial institution, with no exception for foreign affiliates.[153]

HBMX, an HSBC affiliate in Mexico, illustrates how providing a correspondent account and U.S. dollar services to a high risk affiliate increased AML risks for HBUS.  HBMX was created when HSBC Group purchased a Mexican bank known as Bital in 2002.  A pre-purchase review disclosed that the bank had no functioning compliance program, despite operating in a country confronting both drug trafficking and money laundering.  For years, HSBC Group knew that HBMX continued to operate with multiple AML deficiencies while serving high risk clients and selling high risk products.  HSBC Group also knew that HBMX had an extensive correspondent relationship with HBUS and that suspect funds moved through the HBMX account, but failed to inform HBUS of the extent of the AML problems at HBMX so that HBUS could treat HBMX as a high risk account.  Instead, until 2009, HBUS treated HBMX as low risk.

Contrary to its designation, HBMX engaged in many high risk activities.  It opened accounts for high risk clients, including Mexican casas de cambios and U.S. money service businesses, such as Casa de Cambio Puebla and Sigue Corporation which later legal proceedings showed had been used on occasion, from 2005 to 2007 for Puebla and from 2003 to 2005 for

---

[151]As of February 2010, HBUS had about 2,400 clients in its Payments and Cash Management (PCM) department. See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 7. [Sealed Exhibit.]  In June 2012, HBUS had a total of nearly 1,200 correspondent clients, of which 80 were HSBC affiliates.  The HSBC affiliates had 395 HBUS accounts, of which 7 or 8 related to HBMX.  Subcommittee briefing by HSBC legal counsel (6/20/2012).

[152] See, e.g., 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 2 (citing HBUS's 12/1/2008 AML Procedures Manual at 12:  "The only exception to the KYC Profile requirement is any client who is an HSBC Group affiliate in which HSBC has an ownership interest of 50% or more.").  After the Setember 2010 OCC Supervisory Letter criticizing its practice, HSBC Group changed its policy and now requires all affiliates to perform due diligence on all other affiliates.

[153] See, e.g., 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 2 ("The Bank is obligated to conduct due diligence, and, where necessary, EDD [Enhanced Due Diligence], on foreign correspondent accounts. 31 U.S.C. § 5318(i)(1). … Section 5318(i) does not exempt foreign correspondent accounts that a bank maintains for its affiliates.").

Sigue, to launder funds from illegal drug sales in the United States.  HMBX also offered high risk products, including providing U.S. dollar accounts in the Cayman Islands to nearly 50,000 clients with $2.1 billion in assets, many of which supplied no KYC information and some of which misused their accounts on behalf of a drug cartel.  HBMX was also the single largest exporter of U.S. dollars to HBUS, transferring over $3 billion in 2007 and $4 billion in 2008, amounts that far outstripped larger Mexican banks and other HSBC affiliates.  Mexican and U.S. law enforcement and regulatory authorities expressed concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds that had been brought back to Mexico from the United States.  In addition, for a three-year period from mid-2006 to mid-2009, HBUS failed to conduct any AML monitoring of its U.S. dollar transactions with HSBC affiliates, including HBMX, which meant that it made no effort to identify any suspicious activity, despite the inherent risks in large cash transactions.[154]

HBMX conducted these high risk activities using U.S. dollar correspondent and banknotes accounts supplied by HBUS.  HBMX used those accounts to process U.S. dollar wire transfers, clear bulk U.S. dollar travelers cheques, and accept and make deposits of bulk cash, all of which exposed, not only itself, but also HBUS, to substantial money laundering risks.  HBMX compounded the risks through widespread, weak AML controls, while HBUS magnified them by omitting the due diligence and account monitoring it applied to other accounts.   HSBC Group also compounded the AML risks by failing to alert HBUS to HBMX's ongoing, severe AML deficiencies.

## A.  HSBC Mexico

In November 2002, HSBC Group purchased Mexico's fifth largest bank, Banco Internacional, S.A., then part of Grupo Financiero Bital, S.A. de C.V. (Bital), for about $1.1 billion.[155]  At the time of the purchase, Bital had roughly 6 million customers and 15,400 staff.[156] This acquisition significantly increased HSBC's banking presence in Mexico.[157]  HSBC later changed the name of the bank to HSBC Mexico S.A. Banco (HBMX) and the name of the holding company to Grupo Financiero HSBC, S.A. de C.V. (GF HSBC).  GF HSBC is now one of Mexico's largest financial service conglomerates, owning not only HBMX but also a network of other financial firms.[158]  HBMX currently has over 1,100 branches, $2 billion in assets, and

---

[154] See 9/13/2010 OCC Supervisory Letter HSBC 2010-22, OCC-PSI-00000230, at 2.  [Sealed Exhibit.]

[155] See "HSBC Consuma la Adquision de GF BITAL," (11/25/02),
http://www.hsbc.com.mx/1/PA_1_1_S5/content/home_en/investor_relations/press_releases/infpress/hsbc_consuma.
pdf; "HSBC Buys Mexican Bank Bital," CNN.com (8/25/2002),
http://archives.cnn.com/2002/BUSINESS/asia/08/21/uk.hsbc.

[156] 8/21/2002 "HSBC agrees to acquire Grupo Financiero Bital," HSBC press release,
http://www.hsbc.com/1/2/newsroom/news/2002/hsbc-agrees-to-acquire-grupo-financiero-bital.

[157] Two years earlier, in 2000, HSBC had acquired a smaller bank in Mexico, Republic National Bank of New York (Mexico) S.A.  See 10/21/2011"Doing Business in Mexico," HSBC publication, at 34,
http://www.hsbc.com/1/content/assets/business_banking/111021_doing_business_in_mexico.pdf.

[158] Among other entities, GF HSBC owns a securities firm, insurance company, and pension fund.  See HSBC Mexico website, "Grupo HSBC Mexico," http://www.hsbc.com.mx/1/2/grupo.  Former HBMX head Paul Thurston told the Subcommittee that HBMX experienced rapid growth from its purchase in 2002.  Subcommittee interview of Paul Thurston (5/1/2012).

over 8 million clients.[159]  HBMX and its Mexican parent are headquartered in Mexico City and together have over 19,000 employees.[160]  HSBC typically refers to its Mexican operations as HSBC Mexico.

Since the purchase of Bital, three persons have served as the head of HSBC Mexico.  The first was Alexander (Sandy) Flockhart who served as Chairman and Chief Executive Officer (CEO) of HBMX, and later also as CEO of HSBC's Latin America operations, from 2002 to 2007.[161]  After he was made Latin American regional head,[162] Paul Thurston took the post of HSBC Mexico CEO and later also served as the HSBC Latin America CEO.[163]  Mr. Thurston headed the Mexico operations for just over a year, from February 2007 to May 2008.  When he was promoted and relocated to London,[164] Luis Pena Kegel became the new HSBC Mexico CEO and remains in that post today.[165]

Mexican banks, including HBMX, are regulated by the Comision Nacional Bancaria y de Valores (CNBV) which oversees Mexican banks and securities firms.  The Mexican central bank, Banco de Mexico, the Mexican Ministry of Finance, the Mexican Treasury Department (SHCP), and the Mexican Financial Intelligence Unit (FIU) also perform oversight functions.  Mexico has a well-developed set of AML laws and regulations.  Mexican regulators and law enforcement agencies work with their U.S. counterparts to combat drug trafficking and money laundering in both countries.

HBMX is a large, sophisticated bank offering a full range of banking services, including deposits, checking, foreign exchange, commercial banking services, private banking and wealth management, and correspondent banking.  HMBX offers correspondent accounts to a wide range of financial institutions.  HBMX also maintains correspondent accounts for itself at other banks around the world, including in the United States.  In 2002, at the time Bital was purchased, the bank had $647 million in correspondent banking deposits in Mexico, $700 million in the

---

[159] See 10/21/2011"Doing Business in Mexico," HSBC publication, at 6, http://www.hsbc.com/1/content/assets/business_banking/111021_doing_business_in_mexico.pdf; "Grupo HSBC México," HSBC website, http://www.hsbc.com.mx/1/2/grupo.

[160] See HSBC website, Grupo HSBC México, http://www.hsbc.com.mx/1/2/grupo, viewed 4/2/12.

[161] He was Group General Manager, Chairman and Chief Executive Officer of HBMX from 2002 to 2006, and Group Managing Director Latin America from 2006 to July 2007.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/newsroom/media_kit/biogs/100223_sandy_flockhart.pdf.  HSBC also has affiliates in Colombia, Panama, Peru, and Uruguay, among other Latin American locations.

[162] In July 2007, Mr. Flockhart was appointed CEO of The Hongkong and Shanghai Banking Corporation Limited.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/newsroom/media_kit/biogs/100223_sandy_flockhart.pdf.

[163] In May 2008, Mr. Thurston was appointed head of GF HSBC, and later co-head of the Latin American Region.  See his biography on the HSBC website, http://www.hsbc.com/1/PA_esf-ca-app-content/content/ assets/newsroom/media_kit/biogs/101210_paul_thurston.pdf; "HSBC makes key international appointments," (4/15/2008), http://www.hsbc.com/1/2/newsroom/news/2008/hsbc-makes-key-international-appointments.

[164] In May 2008, Mr. Thurston was appointed Managing Director of UK Banking, in charge of HSBC's retail and commercial banking operations in the United Kingdom.  See "HSBC makes key international appointments," (4/15/2008), http://www.hsbc.com/1/2/newsroom/news/2008/hsbc-makes-key-international-appointments.

[165] Mr. Pena was appointed head of GF HSBC.  Id.  Mr. Pena had previously headed Grupo Financiero Banorte and worked for 25 years at Banamax/Citigroup in Mexico.  Id.  Emilson Alonso was appointed Chief Executive of HSBC Latin America.  Id.

Cayman Islands, and $143 million in New York.[166]  According to CEO Paul Thruston, HBMX experienced rapid growth in the early years after its acquisition.[167]  HBMX also operates a branch in the Cayman Islands, HSBC Mexico S.A, which was established by Bital in 1980, with authority to offer customers U.S. dollar accounts.[168]  At its peak in 2008, the Cayman branch, which has no offices or employees of its own and is run by HBMX personnel in Mexico, had nearly 50,000 client accounts and assets totaling $2.1 billion.[169]

HBMX has had an extensive relationship with HBUS, obtaining U.S. dollar services through both correspondent and banknotes accounts.  HBMX used its HBUS correspondent account primarily to process international wire transfers and clear U.S. dollar monetary instruments such as travelers cheques.  It also made use of HBUS' Remote Deposit Capture service which enabled HBMX to send monetary instruments to HBUS electronically for processing.  HBMX interacted at times with the HBUS Payment and Cash Management (PCM) division regarding this account.  In addition, HBMX interacted with the HBUS Global Banknotes division, until the Global Banknotes business was discontinued in 2010.  HBMX used its banknotes account primarily to sell U.S. dollars received from its customers to HBUS, which HBMX typically transported to HBUS via armed car or aircraft.  In one three-month period from November 2006 to February 2007, HBMX shipped nearly $742 million in U.S. dollars to HBUS; at its peak, HBMX exported $4 billion in bulk cash shipments to HBUS over the course of one year, 2008.  Until it sharply curtailed its U.S. dollar services in Mexico in January 2009, HBMX shipped more U.S. dollars to HBUS than any other Mexican bank or HSBC affiliate.

### B.  Mexico

To understand HBMX's AML risks and, therefore, the risks HBUS incurred as its U.S. correspondent, it is necessary also to understand the AML risks in its home country, Mexico. From 2000 until 2009, HSBC Group and HBUS gave Mexico their lowest AML risk rating, despite overwhelming information indicating that Mexico was a high risk jurisdiction for drug trafficking and money laundering.  In May 2009, HBUS suddenly increased its risk rating for Mexico by three notches, from its lowest to its highest risk level, where it remains today.[170] HSBC Group did not follow suit until 2012 when it raised its risk rating for Mexico from "cautionary" to "high risk."[171]

---

[166]"Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807, at 5.

[167] Subcommittee interview of Paul Thurston (5/1/2012).

[168] This branch operates under a "Class B license," which is given by the Cayman Islands Monetary Authority to offshore banks authorized to do business only with non-residents of the Cayman Islands.  See list of Cayman offshore banks at  http://www.offshore-library.com/banking/cayman_islands/page_3; Subcommittee briefing by HSBC legal counsel on the Cayman accounts (4/20/2012).

[169] See chart at HSBC OCC 8876787, attached to 9/12/2008 email from HSBC John Root to HSBC Adrian Cristiani, "Cayman Accounts," HSBC OCC 8876784.

[170] See 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 484.

[171] Subcommittee briefing by HSBC legal counsel (7/5/2012).

## (1)  U.S. Assessment of AML Risk in Mexico

**INCSR Reports.**  In its annual International Narcotics Control Strategy Reports (INCSRs), which contain a country-by-country assessment of drug trafficking and money laundering risks, the U.S. State Department has consistently classified Mexico as a country of "primary" concern for money laundering, its highest risk rating.[172]  In 2002, the State Department described Mexico's drug trafficking and money laundering risks as follows:

> "Mexico faces a myriad of drug-related problems that include the production and transshipment of illicit drugs, money laundering, consumption and illicit firearms trafficking.  ...  The Government of Mexico's (GOM) longstanding commitment to combat drug trafficking and related crimes resulted in tangible successes against the Arellano Felix Organization (AFO), the Carrillo Fuentes Organization (CFO), and the Gulf Cartel – widely considered the top three drug groups in the country. …  Mexico remains a major supplier of heroin, methamphetamine, and marijuana, and the transit point for more than one half of the cocaine sold in the U.S.  …  The industrial-scale drug trade has transformed narcotrafficking into one of Mexico's deadliest businesses.  …  These organizations have demonstrated blatant disregard for human life as the executions of law enforcement personnel, government officials, and innocent bystanders have increased.  …  In recent years international money launderers have turned increasingly to Mexico for initial placement of drug proceeds into the global financial system."[173]

The State Department also wrote:

> "The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers and armored vehicles, as well as through wire transfers, remain favored methods for laundering drug proceeds.  Mexico's financial institutions engage in currency transactions involving international narcotics-trafficking proceeds that include significant amounts of U.S. currency or currency derived from illegal drug sales in the United States.  Although drug trafficking continues to be the principal source of the laundered proceeds, other crimes including corruption, kidnapping, firearms trafficking, and immigrant trafficking are also major sources of illegal proceeds."[174]

Equally negative assessments of Mexico's drug trafficking and money laundering risks appeared in the State Department's annual INCSR reports over the next four years.  In 2006, for example, the State Department wrote:

> "The illicit drug trade continues to be the principal source of funds laundered through the Mexican financial system.  Mexico is a major drug producing and drug-transit country. Mexico also serves as one of the major conduits for proceeds from illegal drug sales

---

[172] See, e.g., "2000 International Narcotics Control Strategy Report," U.S. Department of State (hereinafter "2000 INCSR"), at 621; 2002 INCSR at XII-60; 2006 INCSR Vol. II at 39; 2008 INCSR Vol. II at 62; 2012 INCSR Vol. II, at 33.

[173] 2002 INCSR, at V-27-V-28.

[174] Id. at XII-161.

leaving the United States.  Other crimes, including corruption, kidnapping, firearms trafficking, and immigrant trafficking are also major sources of illegal proceeds.  The smuggling of bulk shipments of U.S. currency into Mexico and the movement of the cash back into the United States via couriers, armored vehicles, and wire transfers, remain favored methods for laundering drug proceeds.  …

According to U.S. law enforcement officials, Mexico remains one of the most challenging money laundering jurisdictions for the United States, especially with regard to the investigation of money laundering activities involving the cross-border smuggling of bulk currency from drug transactions.  While Mexico has taken a number of steps to improve its anti-money laundering system, significant amounts of narcotics-related proceeds are still smuggled across the border.  In addition, such proceeds can still be introduced into the financial system through Mexican banks or casas de cambio, or repatriated across the border without record of the true owner of the funds."[175]

The State Department's relentlessly negative assessments of Mexico's drug trafficking and money laundering vulnerabilities continued unabated.  In 2008, the State Department wrote that "U.S. officials estimate that since 2003, as much as U.S. $22 billion may have been repatriated to Mexico from the United States by drug trafficking organizations."[176]  Four years later, in 2012, the State Department wrote that drug cartels were using Mexican and U.S. financial institutions to launder as much as $39 billion each year:  "According to U.S. authorities, drug trafficking organizations send between $19 and $39 billion annually to Mexico from the United States."[177]

**Warnings.**  The State Department is far from the only governmental agency to have warned about the money laundering risks in Mexico.  The U.S. Congress has held repeated hearings over the years highlighting money laundering and drug trafficking problems in Mexico.[178]  Witnesses have included the U.S. Justice Department, Homeland Security Department, Federal Bureau of Investigations, Drug Enforcement Administration (DEA), Financial Crimes Enforcement Network (FinCEN) of the U.S. Treasury Department, Internal Revenue Service (IRS), Customs and Border Patrol, and Coast Guard, among others.  From 1996 to 2011, these hearings have painted the same grim picture drawn in the State Department's annual reports regarding the drug trafficking and money laundering threats in Mexico.

---

[175] 2006 INCSR, at 268-269.
[176] 2008 INCSR, at 327.
[177] 2012 INCSR, at 140.
[178] See, e.g., "Money Laundering Activity Associated with the Mexican Narco-Crime Syndicate," U.S. House Banking and Financial Subcommittee on General Oversight and Investigations, Serial No. 104-72 (9/5/1996); "Drug Control:  Update on United States-Mexican Counternarcotics Efforts," Senate Caucus on International Narcotics Control, S.Hrg. 106-60 (2/24/1999); "Federal Strategies to End Border Violence," Senate Judiciary Committee, S.Hrg. 109-556 (3/1/2006); "Antidrug Package for Mexico and Central America:  An Evaluation," Senate Committee on Foreign Relations, S.Hrg. 110-311 (11/15/2007); "Escalating Violence in Mexico and the Southwest Border as a Result of the Illicit Drug Trade," House Judiciary Subcommittee on Crime, Terrorism, and Homeland Security, Serial No. 111-25 (5/6/2009); "Exploring Drug Gangs' Ever Evolving Tactics to Penetrate the Border and the Federal Government's Ability to Stop Them," Senate Homeland Security and Governmental Affairs Ad Hoc Subcommittee on Disaster Recovery and Intergovernmental Affairs, S.Hrg. 112-384 (3/31/2011).

In addition, warnings about money laundering problems in Mexico have been directed specifically to financial institutions operating in the United States.  In 2005, multiple U.S. agencies worked together to produce a U.S. Money Laundering Threat Assessment which identified thirteen key money laundering methods and specifically identified Mexico as a high risk jurisdiction for several of them, including bulk cash smuggling, misuse of money orders, and suspicious funds sent through money service businesses.[179]  In 2006, FinCEN issued an advisory to all U.S. financial institutions to "better guard against an increasingly prevalent money laundering threat involving the smuggling of bulk U.S. currency into Mexico," warning in particular against "the abuse of their financial services" by Mexican casas de cambio.[180]  The advisory explained that drug traffickers were smuggling bulk cash from the United States into Mexico, then depositing the funds with casas de cambios who were sending the cash back to the United States via armored transport or by selling the U.S. dollars to U.S. banks.[181]  The advisory also warned about multiple wire transfers that "bear no apparent business relationship" with a particular casa de cambio, and U.S. deposits by casas de cambio of sequentially numbered monetary instruments.[182]

**Wachovia Prosecution.**  Criminal prosecutions also alerted U.S. financial institutions to the money laundering problems in Mexico.  In 2008, for example, news articles warned how Mexican drug cartels sent millions of dollars in illegal drug proceeds through a major U.S. financial institution, Wachovia Bank.[183]  In 2010, the United States filed a deferred prosecution agreement detailing how Wachovia Bank had been used by Mexican foreign exchange businesses to launder at least $110 million in drug proceeds.[184]  Filings in the case describe how, from 2003 to 2008, Wachovia Bank provided a variety of services for 22 Mexican casas de cambio (CDCs), despite evidence of suspicious activity.  Those services included processing numerous U.S. dollar wire transfers for deposit into bank accounts around the world;[185] clearing large volumes of sequentially numbered U.S. travelers cheques;[186] and accepting numerous bulk cash shipments transported by armored car from the CDCs.[187]  The filings report that, over a three-year period, the wire activity exceeded $374 billion and the bulk cash shipments exceeded $4.7 billion, far exceeding expected volumes.[188]  Wachovia Bank also processed $20 million in

---

[179] See Dec. 2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service.

[180] "Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the United States," FinCEN Advisory No. FIN-2006-A003 (4/28/2006), at 1. http://www.fincen.gov/statutes_regs/guidance/pdf/advis04282006.pdf.

[181] Id. at 1-2.

[182] Id. at 2.

[183] See, e.g., "Wachovia Is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez, Glenn Simpson (4/26/2008)(describing AML cases involving not only Wachovia Bank, but also American Express International Bank, which forfeited $55 million as part of a 2007 Federal deferred prosecution agreement, and Union Bank of California, which forfeited $21.6 million as part of a 2007 Federal deferred prosecution agreement, both of which were also charged with inadequate AML programs and suspected of being used by Mexican drug cartels to launder funds).

[184] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010) and Information (3/12/2010).

[185] See id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶¶ 20, 24(1).

[186] Id. at ¶¶ 22, 24(2), 35.

[187] Id. at ¶ 21, 24(3).

[188] Id. at ¶ 23.

sequentially numbered travelers cheques, the majority of which contained illegible names and unusual markings.[189]  The deferred prosecution agreement and supporting factual statement charged Wachovia Bank with willfully failing to maintain an effective AML program,[190] detailing numerous AML deficiencies including a failure to conduct due diligence on high risk clients; a failure to monitor wire transfers, pouch activities, and bulk cash shipments; and a failure to report suspicious activity to law enforcement.[191]  To avoid prosecution, Wachovia Bank acknowledged responsibility for its conduct, paid $160 million in criminal and civil fines, and agreed to undertake significant AML reforms.[192]  The Wachovia case received widespread media attention, providing further notice of the money laundering dangers in Mexico.[193]

## (2)  HSBC Assessment of Risk in Mexico

Despite the overwhelming information available about substantial money laundering risks in Mexico, from 2002 until 2009, HBUS gave Mexico its lowest risk rating for AML purposes.[194]  As a consequence, under HSBC Group policy, clients from Mexico were not subjected to enhanced monitoring by HBUS, unless they were also designated a Special Category Client (SCC), a relatively rare designation that indicates a client poses high AML risks. Had Mexico carried one of the two highest risk ratings, all Mexican clients at HBUS would have been subjected to enhanced due diligence and account monitoring.  Instead, HBUS failed to conduct AML monitoring of most Mexican client account and wire transfer activity involving substantial funds.

**Risk Rating Process.**  Until recently, HSBC Group and HBUS issued AML country risk assessments using four categories of increasing risk, "standard," "medium," "cautionary," and "high."  HSBC Group created a chart listing its country risk assessments, sent the chart to its affiliates characterizing its assessments as recommendations, and then allowed each HSBC affiliate to make its own assessment decisions.[195]  At HBUS, the country risk assessments were compiled every six months by an AML compliance officer who gathered information from a number of sources, assigned numerical scores to each source, and then compiled aggregate scores for over 200 countries.[196]

Those scores were then supposedly used to assign risk ratings.  In fact, however, countries receiving similar scores often received different risk ratings.  Those differences were attributable, in part, to an "HBUS discretion" factor which was listed as an official factor in the

---

[189] Id. at ¶ 35.

[190] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010), at ¶¶ 3-4.

[191] See id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶¶ 28, 30-35.

[192] Id., at ¶¶ 38-40; Deferred Prosecution Agreement (3/16/2010); "Wachovia Enters into Deferred Prosecution Agreement," U.S. Attorney's Office for the Southern District of Florida press release, (3/17/2010), http://www.justice.gov/usao/fls/ PressReleases/100317-02.html.

[193] See, e.g., "Wachovia is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn Simpson, April 26, 2008; "How a big U.S. bank laundered billions from Mexico's murderous drug gangs," The Observer, Ed Vulliamy, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.

[194] See, e.g., Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397 (rating over 235 countries and territories).

[195] Subcommittee interview of Ali Kazmy (2/29/2012).

[196] Id; See also Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.

risk assessment process, included in the risk assessment chart, and used, according to the OCC, to alter the risk ratings for over 60 countries in 2009.[197]  The OCC noted that HBUS offered "no discussion or documentation as to what constitute[d] permissible reasons to change the risk rating" using the HBUS discretion factor.[198]  The OCC also found that HBUS did not apply its risk-rating methodology "in a consistent manner."  The OCC wrote that, in 2009, of 73 countries that received a zero risk assessment score:

> "32 (44 percent) were rated standard, 32 (44 percent) were rated medium, 1 (1 percent) was rated cautionary, and 8 (11 percent) were rated Unclassified.  The OCC found no documentation or support for the difference between the final ratings and the scores. While the bank elevated the risk ratings versus the scores, the bank has not adopted a repeatable, standardized procedure."[199]

The OCC criticized the HSBC country risk assessment process for not taking into account readily available country-specific information on money laundering and drug trafficking risks, including in the annual State Department INCSR reports.[200]  Although INCSR information was often included in HBUS KYC client profiles, the INCSR country-specific risk ratings were inexplicably excluded from the official HBUS country risk assessment scoring matrix.[201]

Still another OCC criticism was the HSBC Group's "unacceptable practice of assigning an overall risk rating to its non-SCC customers based solely on the risk rating that the bank has given the country where the customer is located."[202]  One result of this practice, according to the OCC, was that HSBC had excluded from its routine AML monitoring "more than $60 trillion of wire transfers each year for customers domiciled in countries risk rated as 'standard' or 'medium,' representing two-thirds of the total dollar volume" of wire transfers at HSBC.[203]  With respect to Mexico, the HSBC policy meant that, due to its low risk rating, all clients based in Mexico were considered low risk, unless rated an SCC, an outcome that the OCC viewed as a critical AML deficiency.  One consequence was that high risk clients residing in low risk countries routinely escaped enhanced due diligence and account monitoring.

**2009 Change in Mexico Risk Rating.**  In February 2009, HBUS issued a chart with its latest country risk assessments.[204]  The chart provided risk scores and categories for 239 countries.[205]  It assigned a score of "2" for Mexico, which was one of the lowest scores.  When asked about this low score, the HBUS compliance officer then responsible for country risk assessments, Ali Kazmy, told the Subcommittee that, since 2006, HBUS' assessments had

---

[197] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 19.  [Sealed Exhibit.]
[198] Id.
[199] Id.
[200] Id.
[201] See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.
[202] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 18. [Sealed Exhibit.]
[203] Id. at 2.
[204] See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.
[205] Id. The risk scores ranged from 0 to 28, and produced ratings of standard, medium, cautionary, and high.

44

inadvertently failed to take into account a 2006 FinCEN advisory related to Mexico that would have added 10 points to its score each year.[206]  As a result of its low score, Mexico was rated a "standard" risk, the lowest of the four risk ratings.[207]

This low risk rating was awarded despite a May 2008 email from Susan Wright, AML Compliance head for the HSBC Group, singling out AML concerns related to Mexico. Referencing "RMM – Country Risk," Ms. Wright wrote to HSBC Group Compliance head David Bagley and other colleagues:

> "I believe you have sight of our Country Reputational Risk Table but, as previously discussed, unless there are some specific concerns it is not proposed to highlight the highest risk countries as a matter of course. …
>
> Mexico – there are specific risks in relation to pressure from the US with regard to the laundering of the proceeds of drug trafficking through Mexican cas[a]s de cambios. HBMX have a number of customers who are cambios/money service businesses (MSBs) with links to the US and consequently payments from HBMX are made through HBUS. … [T]hese are notoriously difficult businesses to monitor …. [T]here is also US concern with regard to the amount of USD cash deposits and transactions between the US and Mexico and HBMX has been identified as one of the banks with the highest level of activity in this area."[208]

This email shows that the head of HSBC AML Compliance was aware of and communicated to other Compliance personnel the serious AML risks related to Mexico involving drug trafficking, suspect casas de cambio, and bulk cash smuggling, yet the February 2009 HBUS country risk assessments again assigned Mexico the lowest possible risk rating.

Three months after issuing the country risk assessments in February 2009, however, on May 1, 2009, HBUS suddenly revised Mexico's risk rating, increasing it by three notches from the lowest to its highest risk rating.[209]  When asked by the Subcommittee about the timing, Mr. Kazmy explained that, "in early 2009," he had been asked by his supervisor, Anne Liddy, to take another look at Mexico's risk rating due to OCC concerns.[210]

Ms. Liddy's request coincided with an intensifying law enforcement interest in Mexican casas de cambio suspected of laundering illegal drug proceeds through U.S. financial institutions, including HBUS.  In February 2008, and again in November 2008, as detailed below, Mexican regulators confronted HBMX with suspicions that drug proceeds were moving through its

---

[206] Subcommittee interview of Ali S. Kazmy (2/29/2012).  See also Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397.  Mr. Kazmy took over the country risk rating process from Lynda Cassell who left HBUS in mid-2006.  The FinCEN Advisory was issued in April 2006, just before Ms. Cassell left.
[207] Mexico had received the same standard rating in 2008.  See 2008 HBUS Country Risk Assessment for Mexico at HSBC-PSI-PROD-0096398-441 and 422.
[208] 5/14/2008 email from HSBC Susan Wright to HBUS David Bagley, HSBC Karl Barclay, HBEU Derek Leatherdale, and others, "RMM – Country Risk," HSBC OCC 8873750.
[209] See 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 484.
[210] Subcommittee interview of Ali S. Kazmy (2/29/2012).

accounts at HBUS.  In January 2009, according to an internal HBUS email, a U.S. Homeland Security Department's Immigration and Customs Enforcement (ICE) agent met with HBUS about a money laundering investigation involving one of their clients in Mexico.[211]  That same month, in response to Mexican AML regulatory concerns, HBMX stopped accepting U.S. dollar deposits at any of its Mexican branches.

In June 2009, ICE also informed the OCC that ICE was investigating possible money laundering activity involving banknote accounts at HBUS.[212]  ICE indicated that Mexican drug traffickers appeared to be using the black market peso exchange in New York to transfer funds through a particular Mexican financial institution, which then sent the funds through its U.S. correspondent account at HBUS.[213]  Dan Stipano, OCC Deputy Chief Counsel, explained the scheme to the OCC Examiner-In-Charge at HBUS as follows:

> "The scheme … is similar to activity that we have seen at Union Bank, Wachovia, and Zions.  Basically, the way it works is that drug money is physically hauled across the border into Mexico, then brought back into the United States through wire transfers from casas de cambio or small Mexican banks, or else smuggled across the border in armored cars, etc., before being deposited in US. Institutions.  According to AUSA [Assistant U.S. Attorney] Weitz, most U.S. banks, recognizing the risks involved, have gotten out of this business, but HSBC NY is one of the last holdouts (although, interestingly, he said that HSBC-Mexico will no longer accept U.S. currency)."[214]

What U.S. law enforcement officials had found was that, because drug traffickers in the United States were having difficulty finding a U.S. financial institution that would accept large amounts of cash, due to strict U.S. AML controls, many were instead transporting large volumes of U.S. dollars to Mexico, and depositing the dollars at Mexican financial institutions.  The drug traffickers could then keep their deposits in U.S. dollars through the Mexican financial institution's correspondent account at a U.S. bank, or exchange the dollars for pesos.  The Mexican banks, casas de cambio, and other financial institutions that were the recipients of the cash typically shipped the physical dollars back to the United States for credit to their own U.S. dollar correspondent accounts at U.S. banks.  HBUS' awareness of the increasing U.S. law enforcement and regulatory interest in Mexico may have contributed to its decision to review and, ultimately, in May 2009, to increase its risk rating for Mexico.

---

[211] See 1/19/2009 email from HBUS Denise Reilly to HBUS Lesley Midzain, "HBMX Banknotes Business – HSBC Mexico Press Release and Q&A," HSBC OCC 3633806-807.  In a Subcommittee interview, HBUS AML Compliance officer Daniel Jack indicated that he attended the meeting, and the ICE agent expressed concern about possible money laundering through Consultoria, a former Mexican casa de cambio that had converted into a bank. Mr. Jack told the Subcommittee that HBUS closed the Consultoria account six months later.  Subcommittee interview of Daniel Jack (3/13/2012).
[212] See 9/29/2009 email from Dan Stipano to Sally Belshaw, at 3, OCC-PSI-00928758; 6/28/2009 notes of telephone conversations, prepared by OCC Jim Vivennzio, OCC-PSI-00928759-761 (noting ICE agents had met with HBUS). [Sealed Exhibit.]
[213] See 6/28/2009 notes of telephone conversations, prepared by Jim Vivenzio, OCC-PSI-00928759.  [Sealed Exhibit.]
[214] See 9/29/2009 email from Dan Stipano to Sally Belshaw, at 3, OCC-PSI-00928758.

One key consequence of the higher risk rating for Mexico was that, under Group AML policy, HBUS was required to conduct enhanced monitoring of all of its Mexican clients. HBUS' higher risk rating may have also put pressure on HSBC Group and other HSBC affiliates to boost their risk rating of Mexico as well.

On June 18, 2009, Ms. Wright sent an email to Ms. Liddy asking her about the higher rating for Mexico.  Ms. Wright wrote:

> "It has been drawn to my attention that in the latest US Country Risk Assessment Mexico has gone from a lower risk to high.  I have received a number of queries from around the Group as to the reason for what they see as quite a dramatic change.
>
> Whilst I appreciate the risks involved in doing business with Mexico I would be grateful for some further and more detailed clarification as to why the change has been so dramatic.  This will enable me to deal with a number of these queries."[215]

In response, Ms. Liddy asked Mr. Kazmy, the AML officer responsible for compiling the country risk ratings, to write up the reasoning for the higher risk rating.  He wrote:

> "A number of sources are reviewed, a majority of which are government and international agencies, such as World Bank, IMF, FATF, CFATF, BIS, Central Banks, Transparency International, etc. in order to determine risk levels ….  The U.S. Department of State issues detailed annual assessment[s] of each country via the International Narcotics Control Strategy Report highlighting, inter alia, money laundering, terrorist financing, corruption, and regulatory regime/oversight.  An excerpt of such a report on Mexico … is attached below. …
>
> As a result of events occurring in Mexico during the past several months with respect to drug trafficking and money laundering, as well as the general unrest these developments have caused, we have downgrade[d] Mexico to 'high' risk.  The deteriorated situation is recognized by the Government of Mexico as evidence through the involvement of agencies tasked with the Anti-Money Laundering and Counter Financing of Terrorist (AML/CFT) efforts towards drafting an AML/CFT National Strategy … expect[ed] to be issued sometime during 2009. … Our rating is in conformity with the view of the U.S. law enforcement."[216]

---

[215] 6/18/2009 email from HSBC Susan Wright to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.  See also 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895 ("I fully acknowledge the level of priority and focus that you and the team have given to these issues and the progress that has been made particularly in Mexico and have taken all of this into account. …  The basis for the rating is however:  The inherent AML risk in Mexico is still very high and [t]here are not many other parts of the Group that have what is effectively a drugs war being conducted on the streets and also have the risk posed by potential sting and other operations by the US authorities.  We have of course remediated our high risk accounts, but the historic weak account opening processes mean that we have overall lower levels of KYC across the customer base as a whole. …  Happy to discuss further.").
[216] 6/19/2009 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

Ms. Liddy asked him how Mexico had been rated by the State Department in 2009, and whether that rating was worse than in the previous report, apparently not realizing that the State Department had consistently given Mexico its highest risk rating for years.[217] Mr. Kazmy told Ms. Liddy, incorrectly, that the State Department INCSR report did not rate countries for risk, but also provided numerous details from the 2009 INCSR report indicating that money laundering and drug trafficking risks had increased.[218]

In 2010, when the OCC sent HBUS a supervisory letter on AML deficiencies at the bank, the letter included criticism of its country rating system.[219] Under the heading, "Inadequate and Ineffective Procedures for Country Risk Ratings," the OCC listed "significant flaws" with the scoring and risk rating methodology, as well as with HBUS' decision not to monitor wire transfer activity for foreign financial institutions or other clients located in a standard or medium risk country, unless designated as an SCC client. The OCC wrote:

> "The bank's country risk ratings for its PCM [Payment and Cash Management division] wire monitoring are critical, due to the bank's unacceptable practice of assigning an overall risk rating to its non-SCC customers based solely on the risk rating that the bank has given the country where the customer is located. However, compounding this deficiency, the bank's procedures for determining the critical country risk ratings are inadequate and ineffective.
>
> To determine the country risk rating, the bank employs a point system based on fifteen factors. HBUS' methodology appears straightforward … [h]owever … there are significant flaws in the implementation of the point system. …
>
> The bank's failure to risk rate countries appropriately has a significant impact on HBUS' BSA [Bank Secrecy Act] compliance, because customers' risk ratings affect a number of variable requirements relating to due diligence for foreign correspondents. For example, these variable requirements include the frequency with which the bank conducts site visits (every 12 months versus every 24 months) and the level of due diligence performed on beneficial owner and the senior management team."[220]

---

[217] 6/22/2009 email from HBUS Anne Liddy to HBUS Ali Kazmy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

[218] 6/24/2009 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Group CRRT and US Country Risk Assessments," OCC-PSI-00652829.

[219] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335-365, at 18-20. [Sealed Exhibit.]

[220] Id. at 18, 20. See also 4/9/2010 memorandum from OCC legal counsel to OCC Washington Supervision Review Committee, "Order of Investigation – HSBC Bank USA, N.A., New York, NY," OCC-PSI-00899482-485, at 3-4. The problems with HBUS' country risk assessments extended beyond Mexico to other countries as well. Some of the countries that should have been rated as having a high risk of money laundering, but were instead rated standard or medium, included Antigua, the Bahamas, Cayman Islands, and Switzerland. See Feb. 2009 "Rating 2009," prepared by HBUS, HSBC-PSI-PROD-0096390-397. As a consequence, clients from those jurisdictions were treated as low risk, and wire transfers involving those countries were not routinely monitored by HBUS.

48

When asked why past risk assessments of Mexico had been so low, Mr. Kazmy told the Subcommittee that he was unable to explain the low ratings prior to 2009.[221]  He indicated that he first saw the 2006 FinCEN advisory on Mexico in 2009.[222]  He also indicated that, if he had known what he later learned, he would have increased the risk rating earlier.[223]

## C. HBMX's History of Weak AML Safeguards

In addition to the substantial money laundering and drug trafficking risks plaguing Mexico for a decade, HBMX itself had a history of weak AML controls and a poor compliance culture, which the HSBC Group worked for years to improve, with limited success.  While HSBC Group officials in London were well aware of HBMX's AML deficiencies and immersed in an effort to strengthen them, it did not inform its worldwide affiliates, including HBUS, of the problems.  From 2002 until recently, HBUS remained largely ignorant of the extent of HBMX's AML and compliance deficiencies, despite providing HBMX with extensive correspondent services and giving it free access to the U.S. financial system.

**Non-Existent Compliance Function in 2002.**  In 2002, as part of its decisionmaking process to purchase Bital, HSBC Group reviewed Bital's compliance function, found it wholly inadequate, and determined that a major effort would be needed for the new bank to meet Group standards.  In an email to his colleagues, David Bagley, head of HSBC Group Compliance, put it this way:

> "Sandy [Flockhart, HSBC Mexico head,] acknowledges the importance of a robust compliance and money laundering function, which at present is virtually non-existent. … There is no recognizable compliance or money laundering function in Bital at present …. Sandy thinks it is important to look both at issues affecting Mexico City, but also closer to the border where there appears to be substantial cross-border flows of monies, including USD [U.S. dollars] in cash."[224]

His comments followed a July 2002 audit performed by HSBC Group auditor prior to purchasing the Mexican bank providing a negative assessment of the bank's compliance program.  The HSBC internal audit report detailed a wide range of specific problems as well as broader AML deficiencies:

- "FRBNY [Federal Reserve Bank of New York] review in 12/2000 identified that 82 of the 248 accounts reviewed lacked full documentation.
- A review … of documentation of accounts booked at the target's Cayman Islands branch … found that 41% of the accounts reviewed (92 of 224 reviewed) lacked full client information.  37 files had no client information. …

---

[221] Subcommittee interview of Ali S. Kazmy (2/29/2012).
[222] Id.
[223] Id.
[224] 7/10/2002 email from HSBC David Bagley to HSBC John Root, with copies to Sandy Flockhart and Richard Bennett, "Bital," HSBC OCC 8877797-798.

- The [monitoring] system does not have any capacity to aggregate transaction activity for any period other than a given day … [and] does not identify high risk clients as such. …
- Private banking operations per se, are not identified. …
- GFB [Grupo Financiero Bital] was involved in Operation Casa Blanca, a US government undercover sting operation undertaken to combat drug trafficking and money laundering activities in the US and Mexico.  A former GFB account executive was found willing to establish fictitious accounts and moved illegal money through them. …  GFB forfeited $3.1 [million] to the US government in 1998. …

Conclusions
The GFB Compliance effort is weak, and it appears that the target organization does not have a strong Compliance culture.

- GFB does not, in reality, have a Compliance Department and one would have to be established and implemented ….
- Reviews of account opening procedures and client documentation are sporadic, and the reviews normally do not encompass large populations of client files or activities.  This effort needs to be strengthened.
- Client transaction and activity monitoring is very limited.  The reliance on account managers to identify and report unusual and suspicious transactions of their clients is a serious internal control shortcoming. … High risk clients receive no special monitoring coverage. …
- Internal and external audit recommendations, and issues raised in regulatory reports do not receive proper respect and action. ...
- Measures to promote and ensure staff discipline are not satisfactory. GFB's Code of Conduct lacks content, detail and spirit. …  Appropriate staff related policies would have to be implemented immediately as part of the overall effort to install a dedicated Compliance and internal control culture throughout the organization."[225]

Despite Bital's weak compliance function, HSBC Group completed the purchase on November 22, 2002.[226]

**Five Years of Effort.**  Over the next five years, from 2002 to 2007, HSBC Group initiated a number of efforts to strengthen Bital's compliance and AML programs.  While improvements were made, significant deficiencies persisted.

In November 2002, immediately before purchasing Bital, John Root, a senior HSBC Group Compliance expert whom David Bagley asked to help work on AML issues at HBMX, visited the bank for a week and prepared a report cataloguing compliance issues and needed

---

[225] July 2002 "Group Internal Audit:  Due Diligence Review – Project High Noon," HSBC audit of Bital, HSBC OCC 8873846 -852.
[226] See 11/29/2002 minutes of HSBC Holdings plc Board of Directors, section 109.3, HSBC-PSI-PROD-0198570.

initiatives.[227]   Among other problems, his report noted the "lack of a 'control culture' at Bital."[228]   The report also described a meeting with one of Bital's chief Mexican regulators who "was extremely critical" of the bank, repeating a number of times that controls "do not exist."[229] The report noted that "some of his harshest criticism" were directed at the Bital Legal Department "which he averred was 'not guilty of bad faith but extreme mediocrity.'"[230] According to the report, the Mexican regulator recommended "sweeping changes in management."[231]

The report noted that Bital had 83 correspondent relationships with other financial institutions, including 20 well known and reputable banks and some institutions that required additional KYC information.[232]   Mr. Root recommended obtaining that added KYC information or closing some of those accounts by March 2003.  The report also noted that Bital had accounts lodged at its own Cayman branch office, which operated as an offshore shell entity and was managed by Bital employees in Mexico City.  The report recommended undertaking an analysis of all of the correspondent banking deposits, "particularly those in the Cayman Islands," by June 2003.  It also recommended an analysis of "all existing Private Banking, with particular attention to USD [U.S. dollar] accounts and fund transfers to New York and the Cayman Islands."[233]   In addition, it recommended developing a better electronic screening system for all account activity to identify suspicious transactions and a better process for investigating suspicious activity "without any tipping off."[234]

In 2002 and 2003, HSBC Group appointed a new Compliance head for HBMX, Ramon Garcia Gibson, formerly AML Director at Citibank's Mexican affiliate, Banamax; established an HBMX Compliance Department; hired additional staff; and installed a new monitoring system known as Customer Account Monitoring Program (CAMP) to detect suspicious activity.  HBMX also hired a Money Laundering Deterrence (MLD) Director Carlos Rochin.  Nevertheless, in 2003, two inspection reports from Mexican authorities in January and August identified ongoing problems with the detection of suspicious transactions and the adequacy of the bank's Money Laundering Deterrence (MLD) handbook, which HSBC was then in the process of revamping.[235]

---

[227] "Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807.  See also 11/25/2002 email from HSBC John Root to HSBC Richard Bennett and HSBC Matthew King transmitting the report, HSBC OCC 8877800 ("There is very little of what we would call a Compliance function. … I did not encounter anybody at Bital who I thought immediately capable of building a Compliance department.").
[228] "Compliance Due Diligence Trip by John Root:  Bital (Mexico City) – 4-8 Nov02," prepared by HSBC John Root, HSBC OCC 8877802-807, at 1.
[229] Id.
[230] Id.
[231] Id. at 2.
[232] Id. at 4.
[233] Id. at 6.  Mr. Root told the Subcommittee that he became aware of the HBMX Cayman accounts at that time, but thought they were servicing Cayman residents.  Subcommittee interview of John Root (4/26/2012).
[234] Id. at 4-5.
[235] See 1/22 and 26/2004 email exchanges among HBMX Ramon Garcia and HSBC John Root, Susan Wright, and David Bagley, "MLD Regulatory Report,"  HSBC OCC 8873393-394

In January 2004, HSBC Group's Board of Directors met in Mexico to allow Board members to familiarize themselves with HBMX.[236]  During the meeting, the Board's Audit Committee reviewed HBMX's ongoing internal control issues.  The Audit Committee's minutes stated that, "after being part of the Group for some 15 months," HBMX had made "very significant progress in raising the standards of its controls.  It will, however, probably take another two years to fully reach Group standards.  From experience with other acquisitions this is not unexpected."[237]

Five months later, in May 2004, HBMX's internal auditors filed a report containing a number of criticisms of the bank's compliance and AML efforts, indicating that much still needed to be done to cure its AML deficiencies.[238]  Finding HBMX's AML function to be operating "Below Standard," the internal audit report stated:

"HBMX has insufficient controls to detect money laundering transactions in all areas of the Group in a timely manner.  The implementation of the CAMP system is in process yet it only includes the Bank's transactions that have been registered in the Hogan system and fails to monitor those registered in other IT systems/HBMX subsidiaries.

Direccion de Prevencion de Lavado de Dinero [Direction of Money Laundering Deterrence] has identified high-risk areas of money laundering transactions, which are not being monitored.

The communication between LCOs [Local Compliance Officers] and Compliance does not enable the timely detection of the needs and weaknesses of the areas and subsidiaries.

There are inadequate internal controls over the IT systems used to send information to the regulator on suspicious or relevant transactions to authorities.

In our opinion, based upon the foregoing, the Direction of Money Laundering Deterrence is operating with a **BELOW STANDARD** level of Control Risk."[239]

Three months later, in August 2004, John Root, a senior HSBC Group Compliance officer, again visited HBMX to examine the status of its compliance and AML efforts, prepared a report, and sent it to senior officials at both HBMX and HSBC Compliance.[240]  The report indicated that, while substantial progress had been made over the past 18 months, AML deficiencies remained:

---

[236] 1/30/2004 minutes of HSBC Holdings plc Board of Directors, section 04/7, HSBC-PSI-PROD-0198571-572.
[237] Id. at 2.
[238] May 2004 "Informe General de Auditoria HBMX GAQ 040026 Compliance-Money Laundering," prepared by HSBC Group's internal audit (Auditoria Interna Del Groupo), HSBC OCC 8874376-381.
[239] Id. at 4 (emphasis in original).
[240] "HBMX Jul04 GHZ CMP Visit Report," prepared by HSBC John Root, HSBC OCC 8875567-575.  See also 8/10/2004 email from HSBC John Root to HSBC David Bagley, Richard Bennett, Matthew King, David Leighton, and Susan Wright, and HBMX Sandy Flockhart and Ramon Garcia,  transmitting the report, HSBC OCC 8875565-575.

"Senior management has made significant progress in introducing Group Compliance Policy and Standards in HBMX.  The head of the Compliance department, Ramon Garcia Gibson, has set the foundation for an effective Compliance function.

HBMX controls are much improved from the situation that existed 12-18 months ago[.]  However, Treasury back-office operations are a source of major regulatory concern, as is accurate and timely reporting to regulators. …

[O]ne of the five commissioners of the CNBV … states, 'In the business area [of HBMX], the resources have arrived.  In the area of controls, the resources have not arrived.'

The CNBV gave us a 'fact sheet' in English with the following 'main concerns' ….

> **Anti-money laundering processes –** Although improvements have been seen, some concerns remain regarding deficiencies in process (no system for unusual operations detection and a poor identification of public figures and high risk customers) and over control of Panama's branch operations. …

In a wide-ranging discussion, CNBV regulators commented that any outsourcing must be able to be audited from Mexico.  They do not want outsourcing to jurisdictions with strong banking secrecy. …

The Trusts department is struggling to improve the poor condition of its files.  Notwithstanding a senior manager's optimism ['Most of them, KYC is okay' and 'Most deficiencies are not related to KYC'], by far the greatest problem *is* missing KYC documentation.

Of a total of 15,434 trusts, only 6,868 (41%) have completed documentation.  2,955 (20%) of trusts have no documentation at all. ...

Around USD 16 billion arrive from the United States each year, mostly through the branch network.  Money laundering risk is mitigated by several factors:  (1) remittances are generally small (US200-300), according to two senior managers; (2) due diligence appears to be adequate on the AML procedures of US third-party money services businesses; and (3) CAMP Retail, a software programme to detect suspicious transactions, is scheduled to be installed in the branch network in NOV04.

**Recommendation:**  HBMX CMP [Compliance] should sample periodically remittances from the United States to determine if, in fact, remittances are generally small and in the ordinary course of business."[241]

In September 2004, the CNBV conducted an inspection of HSBC's AML efforts and, contrary to the more positive tone described by HBMX internally, found them unsatisfactory.

---

[241] "HBMX Jul04 GHZ CMP Visit Report," prepared by HSBC John Root, HSBC OCC 8875567-575 (emphasis in original).

According to an internal HBMX compliance report, a CNBV report summarizing the 2004
inspection criticized HBMX for:

> "not considering the risk exposure of the customer to determine the appropriate visitation
> process, not implementing procedures to update annually the files of high-risk customers
> and politically exposed persons, not defining internal criteria to determine customers' risk
> exposure and a delay in formalizing the Communication and Control Committee …
> responsible for sending SARs to the CNBV … and issuing money laundering deterrence
> policies."[242]

The Communication and Control Committee (CCC Committee, also called the Money
Laundering Deterrence or MLD Committee), which was mandated by a 2004 Mexican law, was
intended to act as the bank's primary internal unit to deter money laundering, so the delay in
getting the committee underway was seen as a major AML deficiency.  CNBV later fined
HBMX more than $75,000 for the AML deficiencies identified in 2004, a fine which HBMX
CIBM Compliance proposed contesting.[243]

In early 2005, an internal HBMX whistleblower hotline disclosed that HBMX
compliance officials had fabricated records of mandatory monthly meetings by the CCC
Committee, and provided the false records to a local CNBV regulator.[244]  An HBMX
investigation determined that the false records consisted of attendance sheets and minutes for
CCC meetings that should have taken place from July to December 2004, but did not.[245]  They
were fabricated by a junior employee at the direction of the HBMX Money Laundering
Deterrence Director, Carlos Rochin, who then tendered his resignation and left the bank.[246]
Ramon Garcia, head of HBMX Compliance and the CCC Committee chair, received a written
warning and was barred from receiving what would have been a substantial bonus for his work in
2004.  David Bagley, head of HSBC Group Compliance, wrote:

> "Overall RG [Ramon Garcia] has performed credibly, has worked very hard, and would
> otherwise be hard to replace.  In the circumstances whilst we will need to keep his
> position under review at this stage I endorse the decision to retain his services given that
> his failure is limited to one of failing to supervise a very senior and trusted
> subordinate."[247]

[242] "1Q07 Compliance Report to the CIBM Audit Committee," prepared by the HBMX Corporate, Investment
Banking and Markets (Private) Audit Committee, HSBC OCC 8873286-287 (describing CNBV criticisms).
[243] Id.
[244] See 1/21/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Compliance
Exception," HSBC OCC 8873671.
[245] See 2/16/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Disclosure Line
– HBMX CMP," HSBC OCC 8873673; Feb. 2005 "HSBC Whistleblower Item 15 – HBMX:  Investigation Report –
Executive Summary," prepared by Head of Group Audit Mexico (GAQ)(hereinafter "Whistleblower Report"),
HSBC OCC 8877877-885.
[246] Whistleblower Report at 5-6.
[247] 2/16/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Disclosure Line –
HBMX CMP," HSBC OCC 8873673.

54

Mr. Bagley's internal report found that the HBMX AML staff was riven by dissension and resentment and may have "exact[ed] retribution" against the MLD director for the dismissal of a colleague.  His report concluded that Mr. Garcia would have to rebuild a "shattered Money Laundering Section."[248]  It also noted that CNBV "reiterated … that, by comparison with other Mexican financial institutions, HBMX CMP [Compliance] appeared to be understaffed" and urged the bank to hire additional compliance personnel.[249]

In May 2005, John Root, a senior HSBC Group Compliance officer, made another visit to HBMX for several days to evaluate its compliance and AML efforts.  As before, he later prepared a report and provided it to colleagues at HSBC Group and HBMX.  In a separate email transmitting the report six weeks later, Mr. Root noted that the HBMX MLD director who resigned in January 2005, had not been replaced despite the passage of six months, and a new director needed to be appointed "as soon as possible in order to reorganize promptly a demoralized department and improve AML controls."[250]  The email noted the importance of "an independent, effective professional in the sensitive role of head of AML in Mexico."  He also observed that "[p]rojects are started but seldom completed, perhaps because of the many ministerial tasks that have accrued since the departure" of the MLD director.  Mr. Root wrote:

> "As you of course know, the work has piled up in the Compliance department, and Ramon needs help with the backlog.  It is true that we have increased staff in the department, but they are mostly entry-level analysts in need of direction.  It is important we hire an MLCO [Money Laundering Control Officer] as quickly as possible, and perhaps also a sort of 'operating officer' for Ramon to enable him to bring the department up to Group Standards."[251]

Mr. Bagley forwarded the Root email to a colleague and commented that "until we have the right amount and mix of resources I cannot see [how] Ramon can make progress."[252]  Later that year, Leopoldo R. Barroso was appointed MLD director for HMBX.

In November 2005, Richard Bennett, then HSBC Group General Manager of Legal and Compliance and the person to whom David Bagley, head of HSBC Group Compliance, reported, paid a brief visit to HMBX.[253]  While there, he met with the bank's CNBV regulators who raised a variety of compliance issues.  According to an email sent by Mr. Bagley, the concerns included the nature of the HBMX accounts in the Cayman Islands; the referral of clients to Mexico by other HSBC affiliates, especially in France; and access to HBMX AML information from other countries, in particular the United Kingdom.

---

[248] Whistleblower Report at 7.

[249] Id. at 8.

[250] 7/6/2005 email from HSBC John Root to HSBC David Bagley, Susan Wright, and David Leighton, "Visit to HBMX – 18 – 25 May 2005," HSBC OCC 8876670-671.

[251] Id.

[252] 7/6/2005 email from HSBC David Bagley to HSBC Richard Bennett, "Visit to HBMX – 18 – 25 May 2005," HSBC OCC 8876670.

[253] See 11/15/2005 email from HSBC David Bagley to HSBC John Root, "HBMX – Compliance Issues," HSBC OCC 8873264-266.

In December 2005, HBMX's internal audit group produced a 55-page report identifying a host of compliance and AML problems at the bank.[254]  It found that HBMX Compliance had improved, but still rated it "Below Accepted Levels."  Major deficiencies included a failure to make full use of the new CAMP monitoring system, a failure to ensure its monitoring parameters met local requirements, inefficient monitoring processes which made detection and analysis of alerts difficult, failure to apply CAMP to foreign remittances and HBMX subsidiaries, inadequate SCC risk profiles, failure to complete a MLD work plan, and inadequate training.[255]

The audit report was actually issued to HBMX in the spring of 2006, and its findings were hotly contested by the HBMX MLD Director, Leopoldo Barroso.[256]  He communicated his views to HSBC Group Compliance and complained that the bank would be required to forward the audit report to the CNBV, which would not only create a "misleading" impression, but also would contradict a recent presentation HBMX had made on how its AML controls had improved.[257]  John Root, senior HSBC Group Compliance officer, forwarded HBMX AML's response to the audit findings to Susan Wright, head of AML and David Bagley, head of Compliance for HSBC Group.[258]  Mr. Root commented:

> "[T]he audit points are being strongly rejected by HBMX AML.  AML is also alleging errors of procedure ….  Many, if not most, of the recommendations were 'rejected' or downgraded in importance by AML, which is certainly a heartfelt, but rather unusual formal reaction, to an audit.  Most of just accept audit recommendations, whether perceived to be 'fair' or not, and proceed to implement them.
>
> I have let the dust settle a bit, as AML management clearly feel aggrieved, but closer monitoring is warranted on the specific audit recommendations.  …
>
> [T]he one that most sticks out is apparent lack of monitoring of the (relatively few) AML staff in the field.  This raises a 'red flag' in a place like Mexico, where the drug cartels are very powerful and ubiquitous. …  To aver, as the audit does, that 'we do not really know what our man in the field is doing' is a warning sign, if true.  AML of course vigorously deny this."

Mr. Barroso's email responding to the internal audit noted that HBMX MLD had also recently been audited by CNBV and expected to receive a satisfactory rating, with only two requirements for improvements and several recommendations.[259]

HSBX's internal audit group continued to conduct compliance and AML examinations of HBMX offices and branches.  In September 2006, for example, it examined operations at four

---

[254] See Dec. 2005 "Informe de Auditoria General: HBMX – Direccion de Compliance," prepared by Mexico Group Audit, HSBC OCC 8876223-280.
[255] Id., Executive Summary.
[256] See 5/17/2006 email from HSBC John Root to HSBC Susan Wright and David Bagley, "Internal Audit Reports," attaching 5/8/2006 email from Leopoldo Barroso and a chart entitled, "Internal Audit Main Findings to MLD," HSBC OCC 8874383-392.
[257] Id.392
[258] Id. 383.
[259] Id. 384.

HBMX district offices, each with more than 15 branches, located in the cities of Puebla, Morelos, and Juarez.[260] All four district offices were found to be operating "Below Standard" with respect to their risk controls, which was the same low rating each had received the prior year. For example, all four were found to have KYC and "file integrity" issues that "failed to comply with Group policies."[261] One district office was found to lack knowledge of the procedures to identify Special Category Clients (SCCs).[262] All four district offices had five or six repeat recommendations from prior audits that had yet to be resolved. All four summary reports were circulated to HSBC Group Compliance senior officials.[263]

In October 2006, HBMX's Compliance head Ramon Garcia informed HSBC Group Compliance that HBMX's Money Laundering Deterrence (MLD) Committee had adopted a policy that would require HBMX to consider closure of an account after four Suspicious Activity Reports (SARs) had been filed with respect to an account's activity.[264] In response, John Root, senior HSBC Group Compliance officer, responded: "4 SARs seems awfully indulgent, even by local standards. At any rate, it is against Group policy, as Susan [Wright] points out, so you will need to seek an official dispensation."[265] A "dispensation" was needed, because HSBC Group Policy No. GPP25 required accounts to be closed after two SARs were filed. The next day, HBMX informed HSBC Group Compliance that, rather than seek an official exception, it had decided to adopt the Group policy and would consider account closure after two SARS were filed, rather than four.[266]

**Unimed and Ye Gon Scandal.** In 2007, HBMX learned that one of its longstanding clients was accused of involvement with illegal drug trafficking. On March 15, 2007, in a joint effort with the U.S. Drug Enforcement Administration (DEA), the Mexican Government seized

---

[260] See September 2006 "Group Audit Mexico Audit Report Summary Schedule: GHQ Reportable Audits," for PFS Puebla Z01 C31 District Office (with 17 branches), PFS Puebla Z01 C23 District Office (17 branches), PFS Morelos Z01 A20 District Office (19 branches and 1 Module), and PFS Ciudad Juarez Z03 B02 District Office (21 branches and 1 custom module), HSBC OCC 8876717-720.

[261] Id.

[262] Id. at HSBC OCC 8876718.

[263] See 10/9/2006 email from HSBC David Bagley to HSBC John Root, forwarding message from HSBC Matthew King, "HBMX B/S and U Audit Report Summary for SEP06," HSBC OCC 8876715 (transmitting audit report summaries). See also August 2005 "General Audit Report: HBMX – PFS Torreon District (Z04 C01)," prepared by Group Audit Mexico, HSBC OCC 8876677-680 (finding a district office with 22 branches operating "Below Standard," with "[n]o significant progress … since the previous audits and 11 repeat recommendations").

[264] See 10/17-18/2006 email exchanges among HBMX Ramon Garcia and Leopoldo Barroso and HSBC John Root, David Bagley, Susan Wright, and Emma Lawson, "2Q06 HBMX Compliance Report," and "Compliance with GPP 25," HSBC OCC 8876711-713.

[265] 10/17/2006 email from HSBC John Root to HBMX Ramon Garcia, with copies to HSBC David Bagley and Susan Wright, "2Q06 HBMX Compliance Report," HSBC OCC 8876713.

[266] See 10/17-18/2006 email exchanges among HBMX Ramon Garcia and Leopoldo Barroso and HSBC John Root, David Bagley, Susan Wright, and Emma Lawson, "Compliance with GPP 25," HSBC OCC 8876711-713. GPP 25 stated: "Where the customer is the subject of more than one validated suspicious transaction/activity report, then serious consideration should be given to closure of the relevant account/s and any other connected accounts." Despite adopting the Group policy generally to close an account after two SARs, HBMX apparently did a poor job of implementation. In November 2007, Mr. Garcia revealed at an HSBC conference that HBMX had "numerous cases of accounts with multiple SARs (16 in one case!!) in Mexico that remain open." In response, Ms. Wright asked Warren Leaming to "follow up with Ramon" to strengthen compliance with the Group policy on closing accounts with SARs. 11/16/2007 email from HSBC Susan Wright to HSBC Warren Leaming, copy to David Bagley, "Mexico," HSBC OCC 8875423.

over $205 million in U.S. dollars, $17 million in Mexican pesos, firearms, and international wire transfer records from the residence of a wealthy Chinese-Mexican citizen, Zhenly Ye Gon.[267] The cash, which had been hidden in a secret locked room in the residence,[268] was described as the largest cash seizure in a drug-related case in history.[269]

Mr. Ye Gon, a prominent businessman, was the owner of three Mexican corporations involved in the pharmaceutical field, Unimed Pharm Chem Mexico S.A. de C.V.; Constructora e Inmobiliaria Federal S.A. de C.V.; and Unimed Pharmaceutical, S.A. de C.V.[270] He was accused of using his corporations to import, manufacture, and sell chemicals to drug cartels for use in manufacturing methamphetamine, an illegal drug sold in the United States.[271] He was also accused of displaying "significant unexplained wealth," despite reporting no gross income for his companies for the years 2005, 2006, and 2007.[272] In June 2007, Mr. Ye Gon was indicted in Mexico on drug, firearm, and money laundering charges, but could not be located.[273] In July 2007, he was arrested in the United States, imprisoned, and indicted by U.S. Federal prosecutors for aiding and abetting the manufacture of methamphetamine.[274] Two years later, in 2009, U.S. prosecutors dismissed the charges, after a witness recanted key testimony.[275] Mr. Ye Gon has remained imprisoned, however, subject to proceedings to extradite him to Mexico to stand trial.[276] Since his arrest, he has continually proclaimed his innocence.[277]

Mr. Ye Gon and his corporations were longtime clients of HBMX as well as other banks and casas de cambio in Mexico. One news article reported that the Mexican Ministry of Finance and Public Credit (SHCP) had determined that, from 2003 to 2006, Mr. Ye Gon and his

---

[267] See In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Complaint for Arrest with a View Towards Extradition (9/15/2008) (hereinafter "Ye Gon Extradition Complaint"), at 13; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[268] See Ye Gon Extradition Complaint at 13.

[269] See, e.g., "Mexico seizes $205.6M from luxury house," Associated Press, Joan Grillo (3/22/2007).

[270] See Ye Gon Extradition Complaint at 6.

[271] Id. at 6-15; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html. See also DEA testimony, "Violence Along the Southwest Border," (3/24/2009), at 8, before the U.S. House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies (describing seizures from a "pharmaceutical company CEO who facilitated the importation of metric-ton quantities of ephedrine for the Sinaloa cartel's methamphetamine-manufacturing operations").

[272] Ye Gon Extradition Complaint at 12. The extradition complaint stated that in addition to transferring millions of dollars in U.S. currency abroad, Mr. Ye Gon engaged in a "lavish lifestyle, which included purchasing expensive cars and jewelry, and gambling (and losing a net sum of approximately $125 million U.S. dollars) in Las Vegas, Nevada." Id. at 12-13.

[273] Ye Gon Extradition Complaint at 3-6 (describing Mexican Criminal Case No. 25/2007); "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[274] In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Indictment (7/26/2007).

[275] See id., Order (8/28/2009); "Mexico, the DEA, and the Case of Zhenli Ye Gon," Washington Post, Jorge Carrasco (10/29/2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/10/28/AR2008102801364_pf.html.

[276] See Ye Gon Extradition Complaint.

[277] See, e.g., "Mexico, the DEA, and the Case of Zhenli Ye Gon," Washington Post, Jorge Carrasco (10/29/2008), http://www.washingtonpost.com/wp-dyn/content/article/2008/10/28/AR2008102801364_pf.html.

companies moved $90 million through 450 transactions involving four major Mexican banks, HBMX, Banamex, BBV Bancomer, and Banco Mercantil Del Norte, and multiple currency exchanges, including Casa De Cambio Puebla and Consultoria Internacional Casa De Cambio.[278]

The March 2007 seizure of cash and weapons from Mr. Ye Gon's residence triggered an intense review of his accounts by HBMX and HSBC Group.[279] According to internal HBMX documents, the Unimed accounts were opened by Bital, retained by HBMX, and housed in HMBX's Personal Financial Services (PFS) division, even though the official clients were corporations and should not have been serviced by the PFS division.[280] The accounts were not designated as high risk, despite unusual transactions that had attracted bank attention several times from 2003 to 2007.[281] John Root told the Subcommittee that during the 2003-2004 timeframe, the Unimed account had attracted the attention of HBMX regulators, and Susan Wright had instructed HBMX to terminate the relationship altogether.[282] He said that the HSBC Group did not realize the account was still open, until he and Ms. Wright saw the press articles regarding Unimed in 2007.

When the scandal broke, Paul Thurston, who had been appointed in February as HSBC Mexico CEO after the former head, Alexander Flockhart, was promoted, wrote: "This is a very serious, and high profile, case which has potential reputational damage to the HSBC Group, and must be given the highest priority."[283]

Mr. Thurston personally oversaw an extensive review of the accounts and HMBX's AML controls.[284] When the head of HSBC Latin American internal audits, Graham Thomson, was asked to summarize the AML deficiencies that contributed to the bank's maintaining such a high risk account, Mr. Thomson wrote in part:

"The main systemic weaknesses in HBMX, which I believe remain outstanding, are as follows:
KYC as identified in branch and continuous audit reports.

[278] 10/13/2007 "Reportan ruta de Ye Gon para 'blanquear' dinero" ("Ye Gon reported path to 'launder' money"), El Universal, Francisco Gómez, http://www.eluniversal.com.mx/nacion/155016.html, cited in 7/18/2008 Report of Findings (Update) for Consultoria Inernacional Banco, prepared by HBUS Financial Intelligence Unit, HSBC OCC 1822420-434, at 422.

[279] See 4/19-20/2007 email exchanges among HBMX Paul Thurston, Sandy Flockhart, Graham Tomson, Ramon Garcia, and others and HSBC David Bagley, Matthew King, and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-014.

[280] See 3/20/2007 email from HBMX Leopoldo Barroso to HSBC Paul Thurston, and others, "[subject redacted by HSBC]," HSBC OCC 8874315-16.

[281] See, e.g., 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, "[subject redacted by HSBC]," HSBC OCC 8874317-318; 4/20/2007 email from HSBC Matthew King to HSBC Michael Geoghegan, and copy to David Bagley, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8874762.

[282] Subcommittee interview of John Root (4/26/2012).

[283] 3/20/2007 email from HMBX Paul Thurston to Leopoldo Barroso, Sandy Flockhart, and others, [subject redacted by HSBC], HSBC OCC 8874316-317.

[284] See, e.g., March and April 2007 email exchanges involving HBMX Paul Thurston and multiple HBMX and HSBC colleagues, "[subject redacted by HSBC]," HSBC OCC 8874315-330 and HSBC OCC 8875010-014.

The lack of adequate documentation and filing systems which remain from the former Bital days ….
Lack of a compliance culture ….”[285]

His criticisms about the lack of a compliance culture and poor KYC documentation echoed the criticisms made five years earlier, when HSBC first purchased Bital.

HBMX's internal review determined that, in 2005 and several times thereafter, concerns about suspicious activity involving the Unimed account had been brought to the attention of the HBMX Money Laundering Deterrence Communication and Control Committee (CCC Committee).[286]   The CCC Committee apparently initially advocated closing the account, but then relented, in part because the Personal Financial Services (PFS) division where the account was located had, as one HBMX email put it, "argued that the client was fine, properly documented, and known by the business."[287]   The key PFS official who vouched for the client apparently later claimed he'd been "lied to" by other bank personnel.[288]   The review also uncovered falsified "KYC visit reports," documenting site visits to the client which had not actually taken place.[289] In addition, the review criticized poor analysis of the alerts which had spotted the "unusual" account activity.[290]   One email noted that other Mexican banks with Unimed accounts "had not reported the customer to the authorities, despite hosting apparently unusual transactions similar in nature to those recorded by HBMX."[291]

As a result of the Unimed scandal, Mr. Thurston developed seven action items to strengthen HBMX's AML and KYC efforts.[292]   They included reviewing the personnel assigned to the HBMX CCC committee and reminding CCC members of the need to take "an independent view" and to be "prepared to challenge their colleagues"; ensuring CCC minutes clearly identified the decisions taken; revamping KYC "analysis, assessment and reporting procedures"

---

[285] 4/2/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Group Audit Committee – APR07," HSBC OCC 8874328-329.

[286] See, e.g., 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-011; 3/20/2007 email from HBMX Leopoldo Barroso to HBMX Paul Thurston and others, "[subject redacted by HSBC]," HSBC OCC 8874315-16; 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, "[subject redacted by HSBC]," HSBC OCC 8874317-318.

[287] 3/16/2007 email from HBMX Leopoldo Barroso to HSBC David Leighton and HBMX Ramon Garcia, "[subject redacted by HSBC]," HSBC OCC 8874317-318.

[288] 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-011.  See also 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8875013-014.

[289] See 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-011; 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8875013-014; Subcommittee interview of Paul Thurston (5/1/2012).

[290] See 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-011; 4/18/2007 email from HSBC Matthew King to HBMX Graham Tomson, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8875013-014.

[291] 4/20/2007 email from HBMX Graham Thomson to HSBC Matthew King and others, "Management Letter: HBMX-[subject redacted by HSBC]," HSBC OCC 8875010-013.

[292] See 4/19/2007 email from Paul Thurston to multiple HBMX colleagues, "[subject redacted by HSBC]," HSBC OCC 8875011-014.

to ensure "higher risk cases are brought to senior management attention"; providing additional training on KYC assessment reports; transferring all corporations out of the Personal Financial Services division; and dismissing all branch staff involved with completing the falsified KYC reports.[293]  Mr. Thurston also described the need to bring individual initiatives to improve KYC procedures, account opening and file maintenance into "one coherent programme" with "appropriate emphasis."[294]  In addition, he described holding a special CCC Committee meeting within a week to review cases with similar patterns and other high risk cases.[295]  He also directed the internal audit group to conduct a review of HBMX's AML and CCC processes.[296]

The most senior levels of HSBC Group were kept informed about the case.  On April 20, 2007, for example, Matthew King, head of HSBC Group Audits, sent an email to HSBC Group CEO Michael Geoghegan with this update:

"I am told the Mexican authorities are taking a relatively benign attitude to our involvement with this customer, which is fortunate because the review has revealed a number of weaknesses.  A series of inaccurate, and possibly fabricated, visit reports seem to have been filed by the business which resisted any reporting of suspicions a number of times.  For its part, the Moneylaundering Department failed to act as a proper check and balance.  I have suggested a thorough review of processes within the Moneylaundering Department and of the Moneylaundering Committee to ensure they are robust. … There are also a number of personnel decisions to be taken."[297]

Neither HBMX nor HSBC Group informed HBUS about the case.[298]

The Unimed scandal broke nearly five years after HSBC first began working to strengthen HBMX's AML controls and create a compliance culture.  It showed that, while progress had been made, HBMX still had multiple AML deficiencies and a poor compliance culture.

**2007 AML Efforts.**  For the rest of 2007, HSBC Group Compliance devoted attention and resources to strengthening AML controls at HBMX, with limited success.

One step taken was to task the new HBMX Chief Operating Officer, John Rendall, with overseeing HBMX's KYC remediation effort for existing client files, an effort mandated by CNBV authorities but far behind schedule.[299]  Mexican regulators had given Mexican banks until

---

[293] Id. at HSBC OCC 8875012.
[294] Id.
[295] Id. at HSBC OCC 8875012-13.  HBMX did not identify any other corporate clients with a similar profile. Subcommittee interview of Paul Thurston (5/1/2012).
[296] This review produced an audit report in December 2007, discussed below.  See Dec. 2007 "General & Transactional Banking Audit:  HBMX – Money Laundering Deterrence," prepared by Group Audit Mexico, HSBC OCC 8874802-810.
[297] 4/20/2007 email from HSBC Matthew King to HSBC Michael Geoghegan, and copy to David Bagley, "Managerial Letter:  HBMX-[redacted by HSBC]," HSBC OCC 8874762.
[298] Subcommittee interview of Paul Thurston (5/1/2012).
[299] See, e.g., 2/27/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan and others, "CNBV/FIU Update," HSBC-PSI-PROD-0198510-511.

2007, to update the KYC information in all customer files; HBMX had obtained an extension until May 2008, but expected to be hard pressed to meet the new deadline.[300]

In June 2007, David Bagley, HSBC Group Compliance head, visited HBMX for several days, met with CNBV officials, and circulated a report on the outstanding compliance and AML issues. In an email transmitting his report, Mr. Bagley wrote:

> "[T]here do appear to be a number of issues to be resolved, particularly those relating to accurate ongoing account opening, prompt effective and complete remediation in accordance with CNBV requirements for existing accounts, and completion of the recommended enhancements to the working of the MLD committee. … [W]e will need on an ongoing basis to consider the nature and extent of the resources currently available in CMP [Compliance]. … I suspect we are already stretched given the apparent growth that has already, or is intended to take place in this area which appears to be growth of both volume and complexity."[301]

His five-page report detailed a number of compliance and AML problems.[302] First was HBMX's anticipated failure to meet a Mexican regulatory deadline for reviewing the KYC information for all existing accounts to ensure compliance with regulatory requirements. The report noted: "There appeared to be differing opinions as to how many accounts were affected, how many accounts were outstanding and therefore no real tracking of the progress being made." The report recommended reaching a consensus on the method for tracking accounts and completing the task. The report also expressed concern about KYC weaknesses in opening new accounts. It noted: "If we are opening new accounts badly it will only add to the remediation exercise required by CNBV …. Accurate and complete account opening is a key AML control, particularly in emerging markets." A third key issue was "confusion as to the stated aims and purpose of the MLD Committee." A fourth was that "the CAMP monitoring system produces significant numbers of 'false' alerts. This is a feature of all AML monitoring systems. Having said this, steps are being taken across the Group to seek to minimize this," and recommended that similar steps be taken in Mexico. A fifth concern was that the compliance team was "lightly resourced."

The report also discussed a "cordial" meeting held with CNBV regulators. It said that the regulators were "overall extremely positive about the bank" but also "had a fairly lengthy list of

---

[300] See 7/27/2007 minutes of LAM Regional Audit Committee, HSBC OCC 8875086-088, at 3 ("CNBV has granted a 1-year extension to MAY08 for HBMX to regularize customer identification files for account[s] opened or contracts signed before MAY04."); 12/2007 audit of "HBMX-Money Laundering Deterrence (MLD)," No. HBMX GAQ 070086, prepared by HSBC Group Audit, Executive Summary, HSBC OCC 8876347 ("HBMI has been given an extension by the Regulator from May 07 to May 08 to ensure that a portion of the client files (known as the UBA project – about 1.8m customers) are completed.").

[301] 6/27/2007 email from HSBC David Bagley to HBMX Paul Thurston and others, "Visit Report," HSBC OCC 8874967-968. Mr. Bagley visited Mexico and Panama from June 11 to June 14, 2007. See 7/27/2007 Minutes of LAM Regional Audit Committee, HSBC OCC 8875086-090, at 3.

[302] June 2007 "Summary of Compliance Issues – Mexico," report prepared by David Bagley, HSBC OCC 8874970-974.

62

issues," most of which focused on compliance matters other than AML issues.[303]  Paul Thurston, head of HSBC Mexico, thanked Mr. Bagley for the "constructive report."  He wrote:

> "I agree with your comment that we need to review the role and resources in the Compliance function. … For all Ramon's strengths, I have equally seen weaknesses in addressing key issues … and in my view the jury is out on his ability to do all that we need in HBMX, let alone try to oversee other countries in the region.  …  [W]e should review between the three of us in a few month's time, when we see what progress is being made."[304]

The very next month, July 2007, John Root, a senior HSBC Group Compliance officer, sent a blistering email to Ramon Garcia condemning HBMX's CCC Committee for "rubber-stamping unacceptable risks":

> "A number of items jump out from your most recently weekly report (02JUL-06JUL) but everything pales in comparison with the ML items on page 4.  It looks like the business is still retaining unacceptable risks and the AML committee is going along after some initial hemming and hawing.  I am quite concerned that the committee is not functioning properly.  Alarmed, even.  I am close to picking up the phone to your CEO.
>
> [Redacted by HSBC] looks like another [Unimed[305]] type of situation – what on earth is an 'assumption responsibility letter' and how would it protect the bank if the client is a money launderer?  Please note that you can dress up the USD10 million to be paid … to the US authorities as an 'economic penalty' if you wish but a fine is a fine is a fine, and a hefty one at that.  What is this, the School of Low Expectations Banking?  ("We didn't go to jail!  We merely signed a settlement with the Feds for $ 10 million!") …
>
> So, [Unimed[306]] is strike one. [Redacted by HSBC] is strike two.  Let's now look at strike three.  (I hope you like baseball.)
>
> The same person who is giving the sancrosanct 'assumption responsibility letter' for [Redacted by HSBC] … is being asked by the CEO to explain why he retained the [Casa De Cambio Puebla[307]] relationship after USC11 million was seized by the authority in [Puebla[308]] account with Wachovia in Miami. What?!  The business was okay with this?

---

[303] Id. at 3.
[304] 6/29/2007 email from HBMX Paul Thurston to HSBC David Bagley and John Rendall, "Visit Report," HSBC OCC 8874965.
[305] Although the client name was redacted from the document by HSBC, John Root confirmed that Mr. Thurston was referring to Unimed.  Subcommittee interview of John Root (4/26/2012).
[306] Id.
[307] Although the client name was redacted from the document by HSBC, the reference to a seizure of $11 million from Wachovia Bank in Miami indicates that the client is Casa de Cambio Puebla.  See discussion below.
[308] Id.

The AML Committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter.  It needs to take a firmer stand.  It needs some cojones.  We have seen this movie before, and it ends badly."[309]

Mr. Garcia responded that he was escalating the two cases involving high risk clients as part of a revised AML procedure in the CCC Committee.[310]  He explained that Mexican law essentially required the CCC committee to give great weight to the opinion of the business side of the bank, because "they are the ones that really know the customer."  He said that he had escalated the cases to the HBMX CEO, because MLD had "a different opinion" from the business "about reporting the case to authorities."  Essentially, he said that the final decision belonged to the HBMX CEO, rather than the CCC Committee.

The next week, Paul Thurston, HSBC Mexico CEO, supported the CCC Committee's recommendation to close one of the accounts, but not the other.  He supported closing the account of Casa de Cambio Puebla, which had been a client for more than 20 years, but whose funds at Wachovia Bank had been seized by the U.S. Justice Department and Drug Enforcement Administration (DEA).[311]  Mr. Thurston cautioned John Rendall, the HBMX Chief Operating Officer, to alert CNBV and to ensure CNBV had "no objection."[312]  Mr. Rendall also suggested alerting their U.S. counterparts since HBUS had the same relationship with the client.[313]  The second account involved a U.S. money services business, Sigue Corporation, which specialized in remitting funds from the United States to Mexico and Latin America.  Mr. Thurston, on the advice of Mr. Rendall and the commercial banking division, kept that account open.[314]

Later in July, the HSBC Latin American (LAM) Regional Audit Committee held a meeting in Mexico.[315]  Participants included HSBC Group Compliance officials Brian Robertson, David Bagley, and Matthew King; LAM/HBMX officials Paul Thurston, Emilson Alonso, and Graham Thomson; HBMX Compliance head Ramon Garcia; and others from HSBC affiliates throughout Latin America.  Mr. Thomson, head of LAM Internal Audit, discussed risk and compliance issues in several countries, and noted that Regional CEOs were now required to "take disciplinary action should a manager record 2 consecutive Below Standard control risk assessments or record significant repeat recommendations."[316]  With respect to Mexico, Mr. Thomson noted that although 96% of HBMX electronic records reportedly met regulatory requirements, there was a "high level of exceptions and variance between the paper and

---

[309] 7/17/2007 email from HSBC John Root to HBMX Ramon Garcia, with copies to Susan Wright, David Bagley, and Warren Leaming, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925-927.

[310] 7/18/2007 email from Ramon Garcia to HBC David Bagley, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925.

[311] See July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC], HSBC OCC 8875132-135.

[312] Id. at 132.

[313] Id.

[314] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC 8875139.  Six months later, in January 2008, Sigue Corporation entered into a deferred prosecution agreement with the U.S. Justice Department, admitting that some of its agents had been laundering drug proceeds.  See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Deferred Prosecution Agreement Factual Statement (1/28/2008).  HBMX's relationship with Sigue Corporation is discussed further below.

[315] See 7/27/2007 Minutes of LAM Regional Audit Committee, HSBC OCC 8875086-090.

[316] Id. at 2.

electronic records" which would require "a large rectification effort" to meet the regulatory deadline of May 2008.[317]  He also noted that branch offices were not sufficiently familiar with SCC requirements, and criticized the CCC Committee for failing to followup on instructions to close client accounts.  Mr. Thurston noted that the CCC Committee was introducing an escalation process to senior management to resolve disputes over closing accounts.[318]  Ramon Garcia also reported that automation problems were causing delays in the issuance of Suspicious Activity Reports (SARs), but that interim manual reviews had not detected activity requiring any SARs to be filed.[319]  He also described a new pilot project at 94 HBMX branches to centralize management and control of account documentation using electronically imaged documents.

**CNBV Escalates Concerns.**  Two months later, in October 2007, the CNBV asked to meet with Paul Thurston, the HSBC Mexico CEO, to express ongoing concerns about HBMX's compliance and AML efforts.  Mr. Thurston summarized the meeting in an email to the HSBC Group CEO Michael Geoghegan.[320]  He wrote:

> "At their request, I met today with the Head of Banking Supervision, and the Supervisor for HSBC, from our regulator, the CNBV, following their on site examination of various aspects of our business, including cards, money laundering, and treasury operations.  …
>
> They walked me through a presentation pack which firstly set out specific points … but then moved on to more general concerns of the CNBV with HSBC in Mexico.  These centered on:
>
> – weaknesses in internal controls … slow progress in tackling KYC data problems and anti money laundering procedures.
>
> – corporate culture, where they comment that … HSBC has driven growth in credit products and launched new products without adequate controls. …
>
> They also expressed concerns at senior management having dual responsibilities for Mexico and the region, stating that 'there are many concerns on how management will be able to implement strong controls within the bank in Mexico, while keeping an eye on other countries.' ...
>
> I indicated to them we were aware of these issues and were progressively tackling them."[321]

---

[317] Id.

[318] Id.  Mr. Thurston explained that if compliance and business personnel disagreed over closing an account, the dispute would be escalated to the HBMX COO, and then to the CEO.  In addition if a business wanted to close an account, a higher ranking Executive Director would have to make the decision.  Subcommittee interview of Paul Thurston (5/1/2012).

[319] Id. at 3.

[320] 10/23/2007 email exchange between HBMX Paul Thurston and HSBC Michael Geoghegan, "CNBV Inspection," HSBC OCC 8873338-342.

[321] Id.

His email then outlined the steps he told CNBV that HBMX was taking, including new hires, "customer file centralizing and imaging which would give us more robust KYC data for anti-money laundering," and working to change the culture of the bank which "would not happen over night."[322]  Mr. Thurston wrote that the CNBV officials told him that was "what they wanted to hear and that they would report back positively" to the head of the CNBV.  Mr. Geoghegan responded:  "This is disturbing and clearly we will need to look at the management structure and practices. … I am copying this to the Group Chairman and Matthew King for their information."[323]

In December 2007, the internal audit group for Mexico issued a report that had been ordered earlier on HBMXs AML efforts.[324]  It found HBMX's AML controls to be "Below Standard" and to pose an overall "high" risk.[325]  It detailed multiple problems, including "[r]egulatory breaches in KYC issues such as the large number of incomplete client files and the inadequate process of SCC identification and monitoring across the network."[326]  It noted that HBMX had a May 2008 deadline for bringing files into compliance with KYC regulations set by the CNBV, and that regulators had been told 86% of client files already met regulatory requirements, while audit work over the past year suggested a much lower percentage, "as low as 46%."  The audit report also noted that the KYC effort was remediating only 1.8 million files involving high risk, excluding another almost 6 million clients "that the Group has in Mexico which are subject to HSBC's own MLD policies."[327]

The 2007 audit report also disclosed SAR filing and alert review backlogs.  It noted "4,890 accounts that reported unusual transactions that took place between APR [April] and AUG07," but which had yet to be reported to Mexican authorities, "thereby breaching the regulations."[328]  It attributed the delay to changed internal criteria for reporting transactions, resulting in an increase in the number of cases to be reported, and "slow decision-making."[329]  The report also noted 7,217 alert warnings of which 858 (12%) had not been reviewed at all, "posing a potential risk that criminal transactions may not be identified which may have an adverse reputational effect on the Institution."[330]  The audit report stated that the failure to review these alerts had been going on for one year due to "insufficient Operations staffing."  The report also criticized "Senior Management" for attending few AML committee meetings, delaying decisions on cancelling accounts, and delaying the imposition of sanctions when cases were not reported to the CNBV on time.[331]  The report also noted a lack of "sufficient understanding" of the AML IT systems and inadequate AML training as evidenced by the "failures regularly identified in branch audits."[332]  In light of the "number and in many cases

---

[322] Id. at HSBC-OC-8873341.
[323] Id. at HSBC-OC-8873338.
[324] See 12/2007 "General & Transactional Banking Audit:  HBMX – Money Laundering Deterrence," No. HBMX GAQ 070086,  prepared by Group Audit Mexico, HSBC OCC 8874802-810.
[325] Id. at HSBC OCC 8874810.
[326] Id.
[327] Id.
[328] Id. at HSBC OCC 8874807.
[329] Id. at HSBC OCC 8874807, 810.
[330] Id. at HSBC OCC 8874808.
[331] Id. at HSBC OCC 8874807.
[332] Id. at HSBC OCC 8874810.

seriousness of the weaknesses identified," the report recommended creating an HBMX Money Laundering Committee to undertake the effort needed to address the widespread AML shortcomings.

Confronted by this long list of AML deficiencies, HSBC Group sent Warren Leaming, HSBC Group Compliance Deputy Head, to Mexico to help determine what should be done.[333]

**CNBV and FIU Dissatisfaction Deepens.** As 2007 drew to a close, HSBC Group and HBMX worked to strengthen HBMX's AML efforts, but CNBV dissatisfaction with the bank seemed to deepen and the list of AML concerns broaden in 2008, encompassing for the first time concerns about HBMX's participation in bulk cash services.

In February 2008, Mr. Thurston, HSBC Mexico CEO, met again with CNBV officials, at their request, along with the Mexican Financial Intelligence Unit (FIU).[334]  According to an email he sent summarizing the meeting, CNBV handed him a draft report detailing multiple compliance concerns.[335]  Mr. Thurston wrote:

> "It is clear in this that our Head of Compliance is not as highly regarded by the CNBV as had been thought by local and Group management, and indeed appears to have misled us about the extent to which the CNBV have been informed of, and/or are satisfied with, our actions."[336]

HSBC Group CEO Geoghegan responded:  "This is most disturbing and we will need to have the most thorough of investigations."[337]

The report provided by the CNBV stated that "[a]s a result of the increase in bank's operations, there has been an increase in deficiencies in internal control."[338]  It described a variety of problems.  With respect to AML issues, the report concluded that "little improvement" in AML controls had occurred since the prior year's on-site inspection.[339]  It noted that, of 110 client files reviewed, "55 files (50%) were incomplete," and 5 files were not provided at all.  It noted a "[l]ack of closer supervision to high profile risk clients"; a lack of risk criteria to classify clients during the account opening process; and missing client updates for high risk customers

---

[333] See, e.g., 12/6/2007 email from HSBC John Root to HSBC Warren Leaming and others, "Warren Leaming HBMX DEC Visit Issues,"  HSBC OCC 8875837 ("I am keeping a list of issues that you might want to raise during your December visit to HBMX," including deteriorating audits of treasury operations, resourcing concerns, "Sinaloa massive money-laundering scheme (+USD 100 million)," "HBMX Trusts backlog," "Banistmo business in regulatory and tax havens," and "AML systems integration").

[334] See 2/18/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Richard Bennett and Matthew King, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331-333.

[335] Id. at HSBC OCC 8873333.

[336] 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 6.  [Sealed Exhibit.]

[337] 2/18/2008 email from HSBC Michael Geoghegan to HBMX Paul Thurston and others, including HSBC Group Chairman Stephen Green, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331.

[338] 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 1.  [Sealed Exhibit.]

[339] Id. at 2.

67

and politically exposed persons.[340]   Another deficiency was that the CAMP and HOGAN monitoring systems did not collect transaction profiles for new accounts, as required by law, and the CCC Committee delayed closing suspicious accounts, citing the example of a $2.8 million account kept open for an entire year after it was supposed to be closed.[341]

The report also described a number of AML deficiencies identified by the FIU, stating: "Evidence obtained by the Financial Intelligence Unit of Mexico (UIF) on a frequent basis has seriously raised its concern on the very high level of ML risk that HSBC may be incurring."[342]   It provided a chart showing that HSBC had much more bulk cash transactions using U.S. dollars than other Mexican banks, and expressed U.S. and Mexican law enforcement concern that the cash represented illegal drug sale proceeds from the United States.[343]   The FIU also noted that HBMX frequently failed to provide requested information, claiming the files or basic account documents could not be located, providing a chart showing HBMX's response record was worse than other Mexican banks.[344]   The FIU also noted that "in the majority of the most relevant ML cases" it had investigated in 2007, "many transactions were carried out through HSBC," and in some cases, the FIU detected ML transactions that HSBC had not reported.[345]   The FIU also noted that it had been able to obtain copies of account documents that HBMX had claimed it could not locate.  "These last cases may imply criminal responsibility of HSBC and its personnel – such as that relating to false statements to administrative authorities and complicity – that the law enforcement and judicial authorities must investigate."[346]

Internal HBMX and HSBC Group documents indicate that senior management immediately began to investigate the allegations.  HSBC Group CEO Michael Geoghegan spoke to HSBC Group Chairman Stephen Green, as well as senior HSBC Group and HBMX personnel, and asked David Bagley to lead the review of HBMX Compliance.[347]   Mr. Bagley left for Mexico immediately for a two-week stay.  Mr. Thurston directed the head of Latin American Security to investigate certain allegations, and the head of Latin American internal audit to examine the other CNBV and FIU complaints.[348]   Mr. Thurston promised an updated report to Mr. Geoghegan prior to an upcoming HSBC Group Board meeting.

Three days later, on February 22, 2008, Matthew King composed a draft email as a way to organize the information that should be conveyed to Mr. Geoghegan in a telephone call, and circulated his self-described "brain dump" to Messrs. Thurston, Bagley, Bennett, and Graham Thomson for their thoughts.[349]   The email indicated that the AML concerns raised by the CNBV

---

[340] Id. at 3.

[341] Id.

[342] Id. at 5.

[343] Id.

[344] Id. at 5-6.

[345] Id. at 6.  Recent examples of such cases included Zhenly Ye Gon, Casa de Cambio Puebla, and Sigue Corporation.

[346] Id.

[347] 2/19/2008 email from HSBC Michael Geoghegan to Paul Thurston, Richard Bennett, Matthew King, with copies to Stephen Green and David Bagley, "HBMX – ML Review," HSBC-PSI-PROD-0198506-507.

[348] 2/19/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan and others, "HBMX – ML Review," HSBC-PSI-PROD-0198505-506.

[349] 2/22/2008 email from HSBC Matthew King to HBMX Paul Thurston, HBMX Graham Thomson, with copies to HSBC Richard Bennett and HSBC David Bagley, "CNBV," HSBC-PSI-PROD-0198508-509.

were "pretty similar" to issues raised earlier, but the CNBV had "suddenly become more aggressive." The email speculated on whether that was due to political pressure, FIU concerns, or possibly a separate disagreement with the FIU regarding reimbursing a public utility for a fraud. Mr. King also wrote: "It is also the case that Mexico is suffering a major problem with drugs dealers and the Government is being very robust about dealing with them."

The King email then went through the issues. It noted that the December 2007 internal AML audit of HBMX was "Below Standard," and that the AML Director Leopolodo Barroso would be replaced, "albeit the FIU apparently regard him as trustworthy" so his replacement would have to be "carefully explained."[350] The email said that the "biggest immediate concern" was account KYC, which had been "a systematic problem for some time." Among other matters, the email noted that a pilot project to centralize account documentation through electronic imaging was underway, but "Audit is continuing to identify a high level of exceptions for that process also (around 30%)."[351] Mr. King wrote:

> "Given the concerns now raised by the CNBV and FIU (which apparently includes tapes of a drug lord recommending HBMX as the place to bank) we now have to decide: whether the imaging process can be made to work to everyone'[s] satisfaction[;] how quickly it can be rolled ou[t] across the whole network[; and] in the meantime, whether we can continue to open accounts using the old, flawed process."[352]

The email also described account documentation as "a problem since we bought Bital," and noted that CNBV had again questioned having HBMX personnel handle compliance issues for the Latin American region in addition to Mexico.[353] On "cross-border cash," the email indicated that trends still needed to be clarified, but he thought the United States had "a general concern rather than a specific one about us."

The next day, February 23, 2008, Paul Thurston sent an email to Michael Geoghegan with additional information. He wrote:

> "Firstly, to answer your question of why is this being raised now? The intelligence that we have been able to gather is that with President Felipe Calderon declaring war on the drugs gangs, crime and corruption the judicial authorities have heightened the focus on financial investigations and have been putting increasing pressure on the bank regulators because the banks have been seen as not providing good enough support. … HSBC has historically, and continues to have, a worse record than the other banks, so we have become a focus of attention. The new Head of the FIU has told us that his staff have told him that HSBC has been the most difficult bank to obtain accurate and timely data from for the past 4 years."[354]

---

[350] Id. at 1.

[351] Id.

[352] Id. at 1-2. Both David Bagley and Paul Thurston told the Subcommittee that they asked the CNBV for a copy of the purported tapes, but none was provided. Subcommittee interviews of David Bagley (5/10/2012) and Paul Thurston (5/1/2012).

[353] Id. at 2.

[354] 2/23/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Stephen Green, Matthew King, Richard Bennet, and David Bagley, "CNBV/FIU Update," HSBC-PSI-PROD-0197872-873.

Mr. Thurston wrote that HBMX had taken more corrective action than the regulators were aware of.[355]  He acknowledged an account documentation problem which would be addressed, in part, by a new centralized electronic imaging procedure which was taking effect Mexico-wide that month.  In addition, he wrote that "stronger disciplinary procedures" were being put in place for branch managers who signed off on account openings without personally ensuring all documents were obtained.[356]  He also noted that HBMX received more than 1,000 letters per week from the CNBV asking for account information, and that more resources had to be dedicated to responding to them.

Finally, on the bulk cash issue, Mr. Thurston wrote that the United States had a general concern, "not aimed specifically at HSBC," about the flow of U.S. banknotes from Mexico and the potential linkage to drug related activity."[357]  He wrote that HBMX had undertaken its own analysis of the cash flows, and initial indications were that its handling of U.S. dollars "had been slowly declining in recent years, rather than rising."[358]

On February 27, 2008, Mr. Bagley conducted an exit interview with the HBMX AML Director Leopoldo R. Barroso, who was being replaced.  Mr. Barroso provided a negative view of HBMX AML performance.  According to a meeting summary written by Mr. Bagley, Mr. Barroso said that, while in his position, he had felt civil and criminal "litigation exposure" due to "the continued poor controls in the bank, the fact that there were allegations of 60% to 70% of laundered proceeds in Mexico went through HBMX and because he did not think that senior management had any commitment to robust AML controls."[359]  Mr. Barroso indicated that "it was only a matter of time before the bank faced criminal sanctions and cited a number of cases."  Mr. Bagley wrote:

> "It was clear that LRB [Leopoldo R. Barroso] felt very strongly that relevant business heads within HBMX had absolutely no respect for AML controls and the risks to which the Group was exposed and had no intention of applying sensible or appropriate approaches.  Again he cited a number of examples where despite strong recommendations with the CMP [Compliance] business heads had failed or refused to close accounts or indeed on occasions file SARs.  He thought that there was a culture that pursuing profit and targets at all costs and in fact had seen no recent improvement in the standard of controls or the types of decisions being taken.
>
> He was critical of the level of resources in his team and felt that his team had done much to keep the bank out of trouble by working extra hours against impossible deadlines and handling significant volumes of alerts including those from CAMP. …
>
> [H]e thought he needed at least 35 new headcount. …

---

[355] Id. at 1.
[356] Id. at 1-2.
[357] Id. at 2.
[358] See also 2/27/2008 email exchange between HBMX Paul Thurston and HSBC Michael Geoghegan, "CNBV/FIU Update," HSBC-PSI-PROD-0198510-512.
[359] 2/27/2008 "Meeting Attendance Note," prepared by David Bagley, HSBC OCC 8874824-825.

He was extremely critical of RG [Ramon Garcia] who he described as being indecisive, weak and desperate to retain his job and lacking any understanding of AML matters."[360]

Mr. Bagley later forwarded his summary of the meeting to Mr. Thurston who responded that "the jury is still out on Ramon" and a discussion was needed on structuring the Latin American regional and Mexican compliance responsibilities.[361]

On March 3, 2008, HBMX issued a 12-page response to the internal control issues raised by the CNBV in its draft report of February 27.[362] The response detailed multiple "corrective actions" being taken by the bank to address each concern.  Among the actions discussed were the new centralized process for ensuring account opening documentation was obtained and electronically recorded; a new effort to centralize PEP files, obtain missing documentation, and strengthen annual PEP reviews; new disciplinary procedures for opening accounts with incomplete documentation; the re-engineering and strengthening of the alert reporting process; replacement of the AML director; and strengthening of the AML staff.  The response also indicated that management changes had been made to split responsibilities for Mexico from the rest of the Latin American region.  On the issue of U.S. banknotes, the response indicated that HBMX U.S. dollar volumes had not increased, but were marginally lower than in 2003.  It also announced a new policy, effective immediately, to deem all customers who deposit more than $100,000 in a month as SCC clients subject to enhanced due diligence.  The response said that 312 customers met that criteria and were being subjected to a KYC review.

Mr. Thurston and Mr. Bagley met with CNBV and FIU officials on March 4, 2008, to deliver the response and discuss the bank's actions.  They reported to Mr. Geoghegan that the meeting was "extremely cordial" and the bank's corrective efforts were "well received."[363]  After Mr. Bagley returned to London, he also discussed the matter with the Financial Services Authority (FSA), HSBC's UK regulator, which had communicated with CNBV.  Mr. Bagley reported that "CNBV confirmed that they were satisfied with the reaction and steps we have taken although will watch implementation closely."[364]  In April 2008, at a meeting of the HSBC Group Board of Directors, Mr. Bagley briefed the HSBC Group Audit Committee about HBMX, indicating that regulators had "expressed their satisfaction with the Group's reaction."[365]

**Restoration Project.**  HBMX spent the next six months working to carry out the corrective actions outlined in its March response to CNBV.  HBMX also underwent personnel changes.  In May 2008, Paul Thurston was promoted and returned to London, having spent a little more than one year in Mexico.  Luis Pena Kegel took over as HSBC Mexico CEO and head of HBMX.  Emilson Alonso was appointed head of HSBC Latin America, carrying out the

---

[360] Id.
[361] 3/7/2008 email exchange among HSBC David Bagley and HBMX Paul Thurston and John Rendall, "HBMX," HSBC OCC 8874821-822.
[362] 3/3/2008 "Internal Control, HSBC Mexico SA," prepared by HBMX, HSBC OCC 8966027-038.
[363] 3/5/2008 email from HSBC David Bagley to HSBC Michael Geoghegan and others, "CNBV/FIU Meeting," HSBC-PSI-PROD-0198513.
[364] 3/15/2008 email from HSBC David Bagley to HBMX Paul Thurston and others, "CNBV," HSBC OCC 8875171.
[365] 4/25/2008 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198539-540.

commitment made to CNBV to split the two sets of responsibilities.  In the summer of 2008, a new HBMX AML director was also hired, Jaime Saenz.[366]

One key AML activity undertaken by the bank was to work on bringing the KYC documentation for existing accounts into compliance with CNBV requirements, an effort HBMX deemed "Projecto Restauracion" or the Restoration Project.  HBMX was supposed to have completed the KYC effort by May 2008, after having obtained a one-year extension, but was far behind schedule.  HBMX appointed John Rendall, HBMX COO, to oversee the new project.  One step he took was to limit the project to high risk accounts.[367]  He also assembled a team and began pressing branch personnel to complete their KYC updates.  John Root, a senior HSBC Group Compliance officer, attended a meeting of the Restoration Project team during a visit to Mexico in July, and was "very impressed" by the progress to date.[368]

Also in July 2008, Mr. Rendall provided a progress report to the Latin American regional audit committee on a number of AML and compliance efforts, outlining "9 workstreams."  He described several milestones, including implementing the centralized account opening process for all HBMX branches, initiating the KYC Restoration Project "focused on high risk accounts," achieving a "90% reduction (from 34,700 to 3,300)" in the 2008 CAMP alert backlog, requiring enhanced KYC for customers with over $100,000 in U.S. dollar deposits, and improving FIU response procedures.[369]

On a more negative note in July, HBMX's internal monitoring system generated a number of alerts identifying "significant USD [U.S. dollar] remittances being made by a number of customers to a US company alleged to have been involved in the supply of aircraft to drugs cartels."[370]  The alerts highlighted account activity in the HBMX Cayman branch.[371]  As a "precaution" pending review of the account activity, HBMX stopped opening new Cayman accounts.[372]  The account activity also prompted HSBC Group to take a closer look at the Cayman accounts.[373]  HSBC Group Compliance head David Bagley wrote that the Cayman accounts should be included in the Restoration Project "as a priority area," and should "be seen as high-risk from an AML and reputational perspective."[374]

In September 2008, HBMX's internal audit group reviewed the Restoration Project and quickly identified multiple, growing problems.  In an email describing the audit findings, Graham Thomson, head of the Latin American internal audit group, wrote:

---

[366] See 7/30/2008 email from HSBC John Root to HSBC David Bagley and others, "HBMX Visit Update," HSBC OCC 8873487-489.
[367] See 6/7/2010 email from HBUS Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.
[368] Id.
[369] See 6/7/2010 email from HBUS Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.
[370] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett with copies to HSBC Michael Geoghegan and others, "HBMX – Cayman Accounts," HSBC OCC 8874832-833.
[371] Id.
[372] Id.
[373] Id.
[374] Id.

> "The key issues … include slow progress with remediating PEPs/SCCs and other high risk customers, with some 40% of the KYC records of PEPs/SCC customer segment … not yet remediated.  These accounts are now in the process of closure by HBMX Legal. …  [C]hecks done by CMP [Compliance] on visit reports … continue to reveal an unacceptable level of 'manufactured' visit reports."[375]

Mr. Alonso, head of HSBC Latin America responded that the audit results were "disappointing" and "not what I was assured by HMBX management."[376]

The audit report found that the Restoration Project had "major weaknesses … that could potentially hinder regulatory compliance and the achievement of the project's overall goals."[377] It said that resources dedicated to the project "appeared insufficient to deliver the quality and timeliness required," and clients engaged in high risk businesses "had not been identified for inclusion" in the project.[378]  It noted that visit reports were incomplete and, in some cases, "created without visits being made."[379]  The audit report also stated:

> "The impact of account cancellation on the business, customers and costs should be analysed against the risks that have been mitigated and accepted, as this will allow having adequate balance between control and business, particularly where cancellations may be attributable to internal errors rather than to the customers."[380]

This recommendation appears to suggest that some high risk accounts not be closed, even where the bank was unable to review the account by the regulatory deadline and KYC deficiencies might exist.  Mr. Thomson's email indicated, however, that unremediated files for PEP and SCC clients subject to the Restoration Project were already in the process of being closed.[381]  In addition, Mr. Rendall reported to the Latin American regional audit committee that "7,941 KYC files for high risk customers had been reviewed & updated, or scheduled for closure."[382]  Mr. Rendall also reported that in the second phase of the project, "47,000 accounts with various risk flags" were being reviewed, with plans for a third phase to examine "83,000 accounts with historic CAMP alert profiles."  These figures were well below, however, the 1.8 million in high risk accounts that were supposed to be reviewed to ensure KYC documentation met CNBV requirements.

**November Meeting with CNBV.**  On November 26, 2008, a high level meeting took place between HSBC and CNBV.  Michael Geoghegan, HSBC Group CEO, traveled to Mexico

---

[375] 10/28/2008 email from HBMX Graham Thomson to HBMX Emilson Alonso, Luis Pena, John Rendall, and others, "HBMX – Projecto Restauracion," HSBC OCC 8873464-465.

[376] 10/28/2008 email from HBMX Emilson Alonso to HBMX Graham Thomson and others, "HBMX – Projecto Restauracion," HSBC OCC 8873463.

[377] Nov. 2008 "Branch Audit Report:  HBMX Special Review of Restoration Project," prepared by HBMX Group Internal Audit, HSBC OCC 8876417-424, at the Audit Report Summary Schedule, HSBC OCC 8876424.

[378] Id.

[379] Id.

[380] Id. at HSBC OCC 8876419.

[381] 10/28/2008 email from HBMX Graham Thomson to HBMX Emilson Alonso, Luis Pena, John Rendall, and others, "HBMX – Projecto Restauracion," HSBC OCC 8873464-465.

[382] 6/7/2010 email from HSBC Paul Lawrence to HSBC Michael Geoghegan, "Mexico Banknotes/High-level Timeline," HSBC-PSI-PROD-0198514-516.

73

to attend.  Along with Emilson Alonso, head of HSBC Latin America, and Luis Pena, head of HSBC Mexico, Mr. Geoghegan met with the President of CNBV, Guillermo Babtz; the head of CNBV bank supervision, Patricio Bustamante; and the head of CNBV AML oversight, Pablo Gomez.[383]  The focus of the meeting was expected to be the actions taken by HBMX to address the CNBV concerns identified in February 2008.

According to an email prepared by the Deputy Head of HSBC Group Compliance, Warren Leaming, who had accompanied Mr. Geoghegan to Mexico and remained there for several days,[384] the CNBV officials acknowledged the "significant progress" made by the bank, but remained "very concern[ed]" about the U.S. dollar accounts at HBMX's Cayman branch, the slow KYC review of those accounts, and the "sheer volume of US Dollars that HBMX repatriates" to the United States.[385]  The email noted that, between January and September 2008, HBMX had repatriated $3 billion to the United States, which represented 36% of the market and double what the biggest bank in Mexico, Banamax, had repatriated, even though HBMX was only the fifth largest bank in the country.[386]  According to the email, CNBV officials were also "concerned that when-ever there is a serious MLD [Money Laundering Deterrence] scheme HSBC seems to be involved" and that "USA authorities are concerned at the very high levels."[387]  Mr. Geoghegan told the Subcommittee that his meeting with the Mexican regulators did not go as he had expected, he told the CNBV that HBMX would address the issues raised, and he immediately took action to ensure that happened.[388]

**Stopping U.S. Dollar Services.**  After the meeting, Mr. Alonso sent an email to Mr. Pena asking him to examine the "export of cash USD to the USA," including the volumes of U.S. dollars being exported, the types of clientele using the HBMX branch network to make U.S. dollar deposits for remittance to the United States, and the branches involved in more frequent deposits or higher volumes.[389]  He also called for the "[i]mmediate elimination of this kind of service in our branches.  Corporate clients that require such service should be approved by you on a very exceptional basis."[390]

Later that same night, Mr. Geoghegan sent an email to Mr. Alonso stating:  "It occurs to me:  We should stop any Dollar remittances or accept any Dollar payments unless they are done via a customer's account.  We should stop shipping Dollars."[391]  He also wrote:  "We should bench mark HBMX CAMP and other search engine systems with HBUS (they have some very

[383] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.
[384] See 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall, "Mexico Visit," HSBC-PSI-PROD-0197874 (indicating Mr. Leaming visited HBMX from Nov. 25 to Nov. 28).
[385] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875606.
[386] Id.
[387] Id.
[388] Subcommittee interview of Michael Geoghegan (5/24/2012).
[389] 11/26/2008 email from HBMX Emilson Alonso to HBMX Luis Pena, with copies to HSBC Michael Geoghegan and others, "Visit to CNBV – Findings and Required Actions," HSBC OCC 8874846-847.
[390] Id.
[391] 11/26/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso, "Money Launderying," HSBC OCC 8874849-850.  Mr. Geoghegan told the Subcommittee that he made a unilateral decision to stop these U.S. dollar services.  Subcommittee interview of Michael Geoghegan (5/24/2012).

sensitive behavior monitors) and see whether we are finding as many suspicious transactions as we should be."  Mr. Alonso forwarded the email to Mr. Pena, who responded the next day:

> "The two immediate actions we are taking are:
>
> Starting December 1. We will no longer buy or sell dollars in cash at ANY branch (customers or non customers).  We will, as an alternative, offer travelers cheques to customers only.  Also customers can withdraw dollars at HSBC ATMs located at airports or from any ATM in the world with their debit card.
>
> Starting January 1.  We will no longer accept deposits of cash dollars to any dollar account at any branch.
>
> We are quantifying the impact of lost revenues.  On the flipside, we will save the operating cost of transporting and exporting dollar bills.
>
> This should take care of the problem."[392]

Mr. Pena also proposed continuing indefinitely the freeze on opening new U.S. dollar accounts through HBMX's Cayman branch, and prohibiting the acceptance of new cash deposits for the existing Cayman accounts.[393]  HSBC Group Compliance Deputy Head Warren Leaming noted in an email to his supervisor, David Bagley, that when Mr. Pena commented that the actions being taken "could result in lost profits of many billions Mike[']s clear response [was] that nothing is worth risk to our reputation."[394]  Mr. Leaming also wrote that the proposed actions were "considered extremely sensitive here in Mexico and local management want to get their ducks in a row … so it will be much appreciated if the above could not be … disseminated without discussing further."

**Account Closing Backlog.**  Mr. Leaming also noted that "there appears to be a huge back-log in closing accounts," with customers continuing to use accounts in November that had been ordered closed eight months earlier in March.  He wrote that those accounts, which were still being used by customers, may be "part of the reasons for multiple SARs" being filed for some accounts, potentially putting HBMX in breach of HSBC policy on account closure after multiple SARs.[395]

Mr. Bagley responded:  "What I find most frustrating is the way in which new issues constantly emerge however much time is spent with HBMX."[396]  He continued:  "The practice of changing USD in the branches pres[u]mably with little or no ID for non customers is in breach of Group policy.  When looking at our USD exposure how can this have been missed."  He also

---

[392] 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.
[393] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.
[394] Id.
[395] Id.
[396] 11/27/email  from HSBC David Bagley to HSBC Warren Leaming and Richard Bennett, "Mexico," HSBC OCC 8875605.

asked Mr. Leaming to consider challenging the involvement of the Legal Department in the account closing process so that it could proceed more quickly.

The next day, November 28, 2008, Mr. Geoghegan sent an email to top HBMX and HSBC Group Compliance officials stating that it should be made clear to all HBMX personnel "that if there are persistent breaches of KYC in a particular branch, the branch will be closed and all staff dismissed regardless of how much business we will lose on account of it."[397]  He also required HBMX's compensation scorecard to include implementing the CAMP monitoring system to the maximum extent possible and closing accounts with two or more SARs.  He wrote: "[I]f you demonstrate zero tolerance of lapses in implementing KYC then the operations standards of the whole business improves at the same time.  What we are doing in Mexico needs to be copied everywhere else in the region."[398]

**AML Shock Plan.**  Mr. Pena responded that in January 2009, he was planning to close two branches and fire all staff "as exemplary measures" and was working to identify the branches.[399]  This measure was later referred to as the "AML Shock Plan."[400]  Mr. Pena also wrote:

> "Last but not least, I will address the issue of funding.  After all, Cayman and Mexican dollar accounts provide us with US$2.6 billion of cheap funding.  We are likely to lose a big portion of this if we tell customers we no longer receive dollar notes.  We have to provide an alternative to our customers for this:  Miami accounts may be an alternative but we will have to talk to HBUS of how we get this ch[eap] funding back to Mexico to lend."[401]

In December 2008, at the conclusion of his latest visit to Mexico, Mr. Leaming drafted a letter to Mr. Pena summarizing a number of AML issues and sought input from other HBMX officials before finalizing it.[402]  His draft letter discussed the late filing of SARs, the backlog in closing accounts, the failure to close accounts after two SAR filings, slow and weak decisions by the CCC Committee, the need to clarify transaction limits, and the need for further refinement of the CAMP alert system.  He noted that the account closing backlog consisted of over 3,600 accounts, of which 675 involved suspicion of money laundering and had been ordered closed by the CNBV, yet were still open.  He also noted that 16 of the accounts remaining open had been ordered closed in 2005, 130 in 2006, 172 in 2007, and 309 in 2008.  He wrote that he'd been advised that the law did not permit the accounts to be blocked pending closure, which meant account activity was continuing.  To speed up closures, he advised that his research had indicated the Legal Department did not have to participate and clients could be notified of the account closing by certified mail.  Mr. Leaming also noted that 3,000 Cayman accounts had been

---

[397] 11/28/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso with copies to HSBC David Bagley, HBMX Luis Pena, and others, "Final draft for Mike's Letter," HSBC OCC 8874857.
[398] Id.
[399] 11/28/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, who forwarded it to HSBC Michael Geoghegan, David Bagley, and Matthew King, "Final draft for Mike's Letter," HSBC OCC 8874856.
[400] 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall with copies to HSBC David Bagley, John Root, Susan Wright, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.
[401] Id.
[402] Id.

proposed for closure which would further stress the process.  In addition, he warned that the switch from U.S. dollar deposits to travelers cheques could also raise AML concerns, advised lowering the $25,000 ceiling on the amount of travelers cheques that could be purchased by a customer, and creating a new limit on the amount of travelers cheques that could be deposited at one time to a client account.  He recommended setting dollar limits on cashiers cheques as well.

Later in December, HBMX prepared to implement the new AML policies and procedures and close suspicious accounts.[403]  December 22 and 24 were set as the dates to close four HBMX branches "as disciplinary actions," with another 10 to 20 branches that, in January, would have all staff dismissed.[404]  January 1, 2009 was set as the date to stop buying or selling U.S. dollars at HMBX branches.[405]  It was also the date set for closing all accounts opened by casas de cambio. January 31 was set as the date to complete the Restoration Project and begin closing accounts that had incomplete documentation or were subject to at least two SAR filings.[406]

On December 22, 2008, an HBMX employee alerted the HBUS regional head of Banknotes, Gyanen Kumar to the HBMX's plan to stop buying and selling U.S. dollars in the new year.[407]  Mr. Kumar forwarded it to the Banknotes head Christopher Lok with the comment: "I have not been told anything firm as to why this decision is being taken as much as it is a drastic change.  My instincts tell me that perhaps this has something to do with compliance."[408]  HBMX apparently did not explain, leaving HBUS uninformed about the compliance and regulatory pressures and AML risks behind HBMX's decision to end its U.S. dollar business.

**Law Enforcement and Regulators Converge.**  In January 2009, HBMX began implementing the planned AML changes.  It stopped buying and selling U.S. dollars and began closing accounts held by casas de cambio.[409]

That same month, U.S. regulators began contacting HBUS to get clarification about HBMX's decision to stop buying and selling U.S. dollars.[410]  When asked, HBMX told HBUS

---

[403] See 12/15/2008 email exchange among HBMX Ramon Garcia and HSBC Warren Leaming, Susan Wright, John Root, David Bagley, and others, "Anti Money Laundering:  Shock plan – Update 081215," HSBC OCC 8875786-790; 12/23/2008 email from HSBC Warren Leaming to HBMX Caterine Bussery, with copies to HSBC David Bagley, John Root, and Richard Bennet, "Anti Money Laundering:  Shock plan – Update 081215," HSBC OCC 8873474-476; 1/27/2009 email from HSBC David Bagley to HSBC Susant Wright, with a copy to Warren Leaming, "Press Release," HSBC OCC 8873485.

[404] 12/15/2008 email exchanges among Ramon Garcia to HSBC Warren Leaming, Susan Wright, John Root, David Bagley, and others, "Anti Money Laundering:  Shock plan – Update 081215," at HSBC OCC 8875786-787.

[405] Id.

[406] Id.  Mr. Leaming expressed skepticism that the proposed closures could be completed by the January 31 deadline. Id.

[407] See 12/22/2008 email from HBMX Mario Langarica to HBUS Gyanen Kumar and others, "USD cash in Mexico," HSBC-PSI-PROD-0095869-870.

[408] 12/23/2008 email from HBUS Gyanen Kumar to HBUS Denis O'Brien and Christopher Lok, "USD cash in Mexico," HSBC-PSI-PROD-0095869.

[409] An email suggests, however, that HBMX had decided to continue to offer U.S. banknotes products to several large reputable Mexican banks, Banamex, Banorte and Ixe, in effect making its first exceptions to the new policy. See 12/22/2008 email from HBMX Mario Langarica to HBUS Gyanen Kumar and others, "USD cash in Mexico," HSBC-PSI-PROD-0095869-870.

[410] See January 2008 email exchanges among  HBUS Christopher Davies, Christopher Lok, Michael Gallagher, Paul Lawrence, Gyanen Kumar, and others, "HBMX Banknotes business," HSBC OCC 3633806-812.

the decision had been based primarily on cost considerations, without mentioning the compliance and AML concerns that led to the decision.[411]  The regional head of HBUS' Banknotes department, Gyanen Kumar, who was traveling to Mexico the next week, was asked by his colleagues to get more information.[412]  On January 13, HBMX sent HBUS a copy of its internal press release describing its decision.[413]  Based upon HBMX's actions, HBUS decided to close banknotes accounts used by two Mexican clients, but to retain accounts with the same clients in the Payments and Cash Management (PCM) division.[414]  Closing the banknotes accounts meant that the Mexican clients could no longer make bulk cash sales of their U.S. dollars to HBUS, but the continued operation of their PCM accounts meant that both Mexican clients could still deposit U.S. dollars, execute U.S. dollar transactions, exchange U.S. dollars for Mexican pesos, and access the U.S. wire transfer system.

Around the same time, the Immigration and Customs Enforcement (ICE) arm of the U.S. Department of Homeland Security (DHS) held a meeting with HBUS in New York, and informed it that ICE was conducting an investigation of a particular Mexican casa de cambio that had accounts at both HBUS and HBMX.[415]  HBUS apparently did not relay that information to HBMX.

Six months later, in June 2009, HSBC Group increased its risk assessment for its Latin American operations to its highest risk rating.[416]  When Emilson Alonso, HSBC Latin America head, protested, HSBC Group Compliance head David Bagley explained:

> "I fully acknowledge the level of priority and focus that you and the team have given to these issues and the progress that has been made particularly in Mexico and have taken all of this into account. …

> The basis for the rating is however:

> The inherent AML risk in Mexico is still very high and [t]here are not many other parts of the Group that have what is effectively a drugs war being conducted on the streets and also have the risk posed by potential sting and other operations by the US authorities. We have of course remediated our high risk accounts, but the historic weak account opening processes mean that we have overall lower levels of KYC across the customer base as a whole."[417]

---

[411] Id. at 810.
[412] Id. at 811.
[413] Id at 809.
[414] Id. at 811, 807.
[415] Id at HSBC OCC 3633806.  HSBC Group Compliance head David Bagley remarked near the end of January: "An obvious learning point for HBMX is that if they were contacted by US authorities then they should have thought to advise HBUS.  They can go round the web, not just through the middle of the web.  1/30/2009 email from HSBC David Bagley to HSBC Susan Wright, "US issues – Various," HSBC OCC 8873759.
[416] See 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895.
[417] Id.

A week or so later, HBUS suddenly reclassified Mexico from its lowest to its highest risk rating. HBMX personnel in Mexico protested, but HBUS did not change its rating.  One consequence was that its Mexican clients were automatically deemed to be located in a high risk country, triggering enhanced scrutiny.

Later in June 2009, ICE contacted HBMX about its investigation into a particular Mexican casa de cambio that had an account at the bank.[418]  A few days later, ICE contacted HBUS' primary U.S. regulator, the OCC, and alerted the OCC to its investigation.[419]  As a result, the OCC began intensifying its regulatory scrutiny of HBUS, in particular with respect to its U.S. banknotes business, which U.S. regulators later said had increased as HBMX's decreased.[420]

In the meantime, AML deficiencies continued to surface at HBMX.  For example, in June 2010, HBMX noted that "certain transaction types were not being captured" by its AML account monitoring system, CAMP, and "therefore were not being monitored."[421]  HBMX also noted that the CAMP software had not been updated "since its installation in 2005."  In September 2010, the OCC issued a Supervisory Letter detailing massive AML deficiencies at HBUS, derived in part from its dealings with Mexico. The OCC followed with a Cease and Desist Order in October.

**Eight Years of HBMX AML Deficiencies.**  HBMX and HSBC Group internal documents demonstrate that HBMX's AML deficiencies were longstanding and widespread. Audit after audit detailed long lists of problems, including inadequate compliance resources, missing KYC information, manufactured site visits, inadequate account monitoring, unread alerts, poor training on the monitoring system and assigning SCC designations, internal disputes over closing accounts with suspicious activity, accounts left open despite multiple SARs and orders by regulators to close them, a SAR filing backlog, and an account closure backlog that spanned three years.  AML leadership at HBMX was also weak.  One AML director was dismissed for manufacturing notes of AML committee meetings that never took place; another was dismissed for inadequate performance; several long periods went by without any AML director in place at all.  Even AML projects with resources and high level backing were unsuccessful, such as the Restoration Project which reported in 2008, that 75% of high risk client files still had inadequate KYC documentation.

The evidence obtained by the Subcommittee shows that HSBC Group was fully aware of the years-long, substantial AML and compliance problems at HBMX, originating with the bank's purchase in 2002.  The evidence also indicates that HSBC Group executives and compliance personnel worked to build a compliance culture, but repeatedly faced a workforce in Mexico that disregarded the Group's AML policies and procedures, delayed obtaining required KYC data, delayed closing suspect accounts, and delayed reporting suspicious activity to regulators.  In 2009, under pressure from regulators, HSBC Group took drastic measures, including prohibiting

[418] See 6/28-29/2009 summary of telephone conversations, prepared by OCC Joseph Boss, OCC-PSI-00928759-761.
[419] Id.
[420] Paul Thurston told the Subcommittee that, in retrospect, while HBMX's banknotes business appeared to be declining, HBUS' banknotes business with Mexico had been increasing at the same time, due to its banknotes business with HBMX and former clients of HBMX.  Subcommittee interview of Paul Thurston (5/1/2012).
[421] See 6/18/2010 email from HBUS Michael Anderson to HBMX Ken Harvey, with a copy to Andrew Zissell, "RMM action point," HSBC OCC 8875492-493 (attaching Compliance Report on Mexico, numbered 53.2.1).

HBMX branches from buying or selling U.S. dollars, shuttering entire branches with checkered histories, and scheduling for closure thousands of accounts with incomplete KYC documentation.  Even with those actions, HSBC Group acknowledged internally that HBMX continued to pose a high risk of money laundering to the Group.[422]

The evidence also indicates that while HSBC Group was fully informed about HBMX's AML and compliance deficiencies, little of that information was conveyed to HBUS, despite HBMX' extensive correspondent relationship with HBUS.  When asked about the lack of communication, HBMX CEO Paul Thurston indicated that he reported HBMX's AML problems to HSBC Group and believed Group would communicate necessary information to HBUS.[423] HSBC Group CEO Michael Geoghegan told the Subcommittee that HBMX problems were discussed at HSBC Group Management Business (GMB) meetings, which HNAH CEO Brendan McDonagh attended, so he thought HBUS was aware of the problems.[424]  HSBC Group Compliance head David Bagley told the Subcommittee that Group Compliance could have informed HBUS Compliance about the problems at HBMX, but "we did not think of it."[425] Instead, he reported the information to HSBC Group's senior management.  Several senior HBUS executives told the Subcommittee that the bank was not informed of the extent of AML problems at HBMX.  The result was, at the same time HBUS was handling hundreds of billions of dollars in cash transactions for HBMX, processing U.S. dollar wire transfers, clearing U.S. dollar travelers cheques, and opening U.S. dollar accounts for HBMX clients, HBUS was left in the dark by its own colleagues about the extensive AML and compliance problems at HBMX.  In addition, in conformance with HSBC Group policy and practice, HBUS conducted no due diligence assessment of HBMX, did not evaluate its riskiness, did not review its audit findings, and did not monitor its wire transfers, cash letter activity, or banknotes transactions for suspicious activity.  HBUS had rendered itself blind to the fact that it was servicing a high risk financial institution.

## D.  HBMX High Risk Clients

HBMX made extensive use of its correspondent relationship with HBUS.  From its acquisition in 2002, HMBX worked with HBUS's Payments and Cash Management (PCM) division and, until 2010, with HBUS' Global Banknotes division, both headquartered in New York.  HBMX used its correspondent and banknotes accounts to process U.S. dollar wire transfers, clear U.S. dollar monetary instruments like travelers cheques, and deposit bulk cash shipments of U.S. dollars on behalf of itself and its clients.  Three examples of HBMX high risk clients help illustrate how HBMX's AML deficiencies also created risk for HBUS.  They include high risk Mexican and U.S. money service businesses, clients using offshore U.S. dollar accounts in the Cayman Islands, and purchasers of millions of dollars in U.S. dollar travelers cheques.

---

[422] See, e.g., 6/9/2009 email from HSBC David Bagley to HBMX Emilson Alonso, with copies to HSBC Michael Geoghegan and others, "GMO Business reviews – LATAM," HSBC OCC 8874895.
[423] Subcommittee interview of Paul Thurston (5/1/2012).
[424] Subcommittee interview of Michael Geoghegan (5/24/2012).
[425] Subcommittee interview of David Bagley (5/10/2012).

### (1)  High Risk Money Service Businesses

Mexican casas de cambio (CDCs) are money service businesses licensed by the Mexican Treasury Department (SHCP), through the CNBV, to exchange foreign currencies for a fee.  In Mexico, CDCs are not licensed as banks and do not hold deposits, maintain checking or savings accounts, or provide other banking services.[426]  Instead, CDCs are typically limited to accepting currency from a customer, exchanging it for another currency, and then either handing it over to the customer or wiring it to a financial institution in another country, such as the United States.[427]

In the United States, some money service businesses perform similar cross-border services, enabling individuals in the United States to wire U.S. dollars to Mexico, where the dollars may be converted into Mexican pesos and paid out to a designated recipient.  Those U.S. money service businesses are sometimes referred to as money remitters.  Both Mexican CDCs and U.S. money service businesses often perform their services for walk-in customers, although they may also have established customers who use their services on a regular basis.  In both Mexico[428] and the United States, [429] CDCs and money service businesses are legally required to establish AML programs to safeguard against laundering criminal proceeds.

### (a)  Casa de Cambio Puebla

Until 2007, Casa de Cambio Puebla (Puebla) was a licensed casa de cambio, founded in 1985, with branch offices throughout Mexico.[430]  On May 16, 2007, the United States obtained a warrant from a Federal court in Florida and froze or seized all Puebla funds on deposit with Wachovia Bank in Miami, as well as with Wachovia Bank in London, affecting funds totaling over $11 million.[431]  In July 2007, Puebla filed a civil complaint seeking the release of those funds.[432]  In 2008, the United States indicted Puebla, two of its officers,[433] and two other individuals on drug smuggling and money laundering charges.[434]  In 2009, one of the defendants was arrested and, in 2010, pled guilty to conspiracy to launder money,[435] and was sentenced to 14 months in prison, while the other defendants, including Puebla, were placed on fugitive status.[436]  In addition, in 2010, Wachovia Bank entered into a deferred prosecution agreement with the U.S. Department of Justice for having failed to maintain an effective anti-money

---

[426] See United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 12.

[427] Id, at ¶ 11.

[428]  See Article 95 *bis* of the General Law of Auxiliary Credit Organizations.

[429]  See 31 USC § 5318(h)(1) and § 5312(J) and (R).

[430] Casa de Cambio Puebla, S.A. v. United States, Case No. 10-20165 (USDC SDFL), Petition for Return of Seized Funds (7/12/2007)(hereinafter "Puebla Petition"), at 4.

[431] Puebla Petition, at 2-3.

[432] Id.

[433] See id., at 19.

[434] See United States v. Casa de Cambio Puebla, S.A., Jose A. Gutierrez de Velasco Hoyos, Amador Cordero Vasquez, Pedro Alfonso Alatorre Damy, a/k/a "Pedro Barraza Uruguastegui," and Leonardo Vasquez Estrada, Case No. 08-20097-CR-Graham (USDC SDFL), Indictment (2/1/2008, unsealed 11/4/2009).

[435] Id., Plea Agreement (7/9/2010), at ¶ 1.

[436] See id., docket entries 12, 34, 38-42.

laundering program[437] in connection with its casa de cambio business, including with respect to Puebla.[438]  Those legal proceedings, which involved a major Mexican CDC and major U.S. bank, received widespread attention.[439]

Puebla was a longtime customer of HBMX, having first begun a relationship with HBMX's predecessor, Bital, in the 1980s.[440]  In 2004, Puebla also opened a U.S. banknotes account with HBUS.[441]  By 2007, Puebla had several accounts at HBMX, as well as an outstanding loan.[442]  After the United States seized the company's funds at Wachovia Bank in May 2007, HBUS suspended the Puebla account two weeks later and closed the account in June 2007.[443]  HBMX did not actually close the account until November 2007, and then only after the Mexican Attorney General served an order on the bank seizing Puebla funds.

**Puebla at HBMX.**  At the time of the May 2007 seizure of more than $11 million in Puebla funds at Wachovia Bank, HBMX was already reeling from another money laundering scandal involving a March 2007 seizure of cash, weapons, and wire transfer records from the Mexican residence of longtime customer, Zhenly Ye Gon and his pharmaceutical companies, Unimed Pharm Chem, Constructora e Inmobiliaria Federal, and Unimed Pharmaceutical.[444]  That seizure had triggered an intensive review by senior HBMX officials of the Ye Gon-related accounts as well as HBMX's overall AML program.  The Puebla case added another high profile problem for HBMX, not least because Puebla also handled Ye Gon funds.[445]

In late May 2007, HBUS learned of the seizure of Puebla funds at Wachovia Bank, and quickly suspended activity in the Puebla correspondent account at HBUS.[446]  It is not clear when

---

[437] United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Deferred Prosecution Agreement (3/16/2010), at ¶ 3.

[438] Id., Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 11.

[439] See, e.g., "U.S. freezes Mexico exchange bureau accounts for money laundering," EFE News Services Inc. (6/9/2007); see also "Wachovia is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn R. Simpson, April 26, 2008.  In addition, the U.S. State Department discussed the Puebla case in its 2009 International Narcotics Control Strategy Report.  See 2009 International Narcotics Control Strategy Report, U.S. Department of State, at 356-357.

[440] See, e.g., July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC], HSBC OCC 8875132-135.

[441] See 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance & Casa de Cambio," HSBC-PSI-PROD-0095913.

[442] See 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.

[443] See 12/20/2007 HBUS Compliance Certificate, OCC-PSI-00148844, at 5.

[444] See In re Zhenly Ye Gon, Case No. 1:07-cr-00181-EGS (USDC DC), Complaint for Arrest with a View Towards Extradition (9/15/2008) (hereinafter "Ye Gon Extradition Complaint"), at 13; "Mexican Fugitive and Co-Conspirator Arrested on U.S. Drug, Money Laundering Charges," U.S. Drug Enforcement Administration press release (7/24/2007), http://www.justice.gov/dea/pubs/states/newsrel/wdo072407.html.

[445] See 10/13/2007 "Reportan ruta de Ye Gon para 'blanquear' dinero" ("Ye Gon reported path to 'launder' money"), El Universal, Francisco Gómez, www.eluniversal.com.mx (reporting that the Mexican agency SHCP had determined that, from 2003 to 2006, Mr. Ye Gon and his companies had moved $90 million through four major Mexican banks and multiple casas de cambio, including HBMX and Puebla), cited in 7/18/2008 Report of Findings (Update) for Consultoria Inernacional Banco, prepared by HBUS Financial Intelligence Unit, OCC-PSI-00247712.

[446] See 5/31/2001 email from HBUS Alan Ketley to HBUS Gyanen Kumar and others, "With immediate effect we are suspending all activity with the subject client," HSBC PSI PROD 0095908-910; 6/6/2007 email from HBUS

82

HBMX first learned of the seizure, but by early June, both banks were considering whether to close their Puebla accounts.  On June 5, 2007, Leopoldo Barroso, HBMX's AML head, received an email from a senior AML Compliance officer at HBUS, Daniel Jack, asking if Mr. Barroso was the new AML director at HBMX and "wonder[ing] what relationships" HBMX had with Puebla.[447]  Mr. Barroso responded that HBMX had "a few DDAs [Demand Deposit Accounts] and a loan" with Puebla.[448]  He also indicated that HBMX planned to "decide within the next 5 days" whether to terminate its relationship with Puebla, and asked Mr. Jack to let him know if HBUS decided to take that action.[449]

Mr. Jack noted in a later email that he did not tell Mr. Barroso during the June 5 email exchange about "the DEA seizure or Wachovia closing [Puebla] acc[oun]ts," although it is possible that HBMX already knew.[450]  Mr. Jack also did not disclose that HBUS had already suspended Puebla's account activity a week earlier, on May 31, 2007.[451]  Mr. Jack told the Subcommittee that, soon after the June 5 email exchange, he told Mr. Barroso that HBUS had shut down its account with Puebla.[452]  When Mr. Barroso asked if HBUS could provide him with a list of their banknote customers in Mexico and the amount of U.S. dollars they exported from Mexico to the United States, Mr. Jack demurred, responding that there were "privacy issues" but that he would "see what info" he could share.[453]  This exchange between senior AML Compliance personnel at HBUS and HBMX suggests that information sharing between the two banks was guarded, rather than automatic.

In early July 2007, HBMX Compliance head, Ramon Garcia, disclosed in an internal weekly report that went to HSBC Group Compliance that the HBMX CCC Committee had considered closing the Puebla account, but decided instead to retain the client.  In response, John Root, a senior HSBC Group Compliance officer, sent him a blistering email criticizing the CCC Committee for "rubber-stamping unacceptable risks."  This email, cited earlier in a discussion of HBMX's CCC Committee, is relevant again, because it applies to the Puebla account.  Mr. Root wrote:

"It looks like the business is still retaining unacceptable risks and the AML committee is going along after some initial hemming and hawing.  I am quite concerned that the

Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

[447] 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance and Casa de Cambio," HSBC-PSI-PROD-0095914.

[448] 6/6/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

[449] Id.

[450] Id.

[451] See 5/31/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, "N-NY & Casa de Cambio Puebla in Mexico," HSBC-PSI-PROD-0095908; 5/30/2007 email from HBUS Gyanen Kumar to "US Banknote Dept Sales Team," "Casa de Cambio Puebla," HSBC OCC 7688742.

[452] Subcommittee interview of Daniel Jack (3/13/2012).

[453] 6/6/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, Re: HSBC in Mexico – AML Compliance and Casa de Cambio, HSBC-PSI-PROD-0095912.

83

committee is not functioning properly.  Alarmed, even.  I am close to picking up the phone to your CEO."[454]

Mr. Root's email went on to harshly criticize the CCC Committee's decisions to keep open accounts for Mr. Ye Gon and another accountholder under suspicion for money laundering, before describing as "strike three," the decision to retain the Puebla "relationship after USD11 million was seized by the authority in [Redacted by HSBC] account with Wachovia in Miami."  Mr. Root continued:

> "What?!  The business was okay with this?  The AML Committee just can't keep rubber-stamping unacceptable risks merely because someone on the business side writes a nice letter.  It needs to take a firmer stand.  It needs some cojones.  We have seen this movie before, and it ends badly."[455]

Mr. Garcia responded that he was escalating the decision on Puebla to the HSBC Mexico CEO, since the relevant HBMX business division had disagreed with a Compliance recommendation to close the account.[456]  The next week, HSBC Mexico CEO Paul Thurston agreed with closing the account.[457]  Mr. Rendall suggested alerting their U.S. counterparts at HBUS, since HBUS also had a correspondent relationship with Puebla.[458]

Despite Mr. Thurston's July 2007 decision to close the Puebla account, HBMX did not actually close or freeze its Puebla account for another four months, allowing Puebla continued use of HBMX's correspondent account at HBUS.[459]  HBMX finally closed the account in November 2007, after receiving a seizure warrant from the Mexican Attorney General seeking all funds in accounts opened in the name of Puebla or related parties.[460]

The seizure warrant named 91 parties related to Puebla, of which 81 were HBMX customers who presumably were also using the HBMX correspondent account at HBUS.[461]  HBMX later determined that, from January 1 though October 31, 2007, a period of ten months, approximately 650 wire transactions had cleared through the "HBSC Mexico correspondent

---

[454] 7/17/2007 email from HSBC John Root to HBMX Ramon Garcia, with copies to Susan Wright, David Bagley, and Warren Leaming, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925-927.
[455] Id.
[456] See 7/18/2007 email from Ramon Garcia to HBC David Bagley, "Weekly Compliance Report 02JUL-06JUL07," HSBC OCC 8875925.
[457] See July 2007 email exchanges among HBMX Paul Thurston, John Rendall, Ramon Garcia, and others, "[subject redacted by HSBC], HSBC OCC 8875132-135.
[458] Id.
[459] See, e.g., 10/27/2007 Compliance Certificate, prepared by HBUS Compliance and provided to HSBC Group Compliance, HSBC PSI PROD 0095916-922, at 919 (listing major HBUS compliance issues, including "HBUS Ban[k]notes/Casa De Cambio Puebla (RED 3870):  No transactions have been conducted with Casa de Cambio Puebla SA de CV in Mexico since 1JUN07.  Although HBMX continues to deal with this Money Services Business, HBUS plans to formally terminate the Banknotes relationship soon.").
[460] See 12/11/2007 email from HBMX Leopoldo Barroso to HBUS Daniel Jack, "HSBC & Casa de Cambio Puebla in Mexico – Negative Press," HSBC OCC 7688750.  The Attorney General identified 91 related parties.
[461] See 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.

84

account" at HBUS, where Puebla was either the originator or the beneficiary.[462]  Of those transactions, 170 wire transfers totaling $7.3 million were conducted by six individuals or entities linked to Puebla.[463]  All of those wires were later traced back to the Puebla accounts frozen at Wachovia.[464]  The OCC later observed:  "[T]hese discoveries about the level of CDC activity should have raised concerns for HBUS and alerted the bank to the need to obtain basic due diligence for HSBC Mexico and other Group Entities."[465]

**Puebla at HBUS.**  While HBMX exposed HBUS to considerable money laundering risk through the transactions it conducted for Puebla, HBUS also incurred risk from its own direct dealings with Puebla, including a U.S. banknotes account it opened for Puebla in 2004.  In just three years, Puebla substantially boosted its use of that U.S. banknotes account, swelling its sales of U.S. dollars to HBUS from $18 million in February 2005, to $113 million in March 2007, a tenfold increase.[466]

When AML monitoring alerts raised red flags about the growing flood of U.S. dollars from Puebla, HBUS bankers provided a number of explanations for the increases, none of which considered whether Puebla might be accepting illegal drug proceeds that drug cartels were then smuggling into Mexico from the United States.  For example, when Puebla's U.S. dollar volumes increased by $3 million between November 2005 and February 2006, an HBUS banker wrote that the "[c]lient is slowing [sic] growing its business volume as a result of better cash flow thanks to dealing with HSBC i.e., faster turnaround of banknotes."[467]  When the volume jumped by another $13 million the very next month, the HBUS banker offered the same explanation, typo and all:  "[c]lient is slowing [sic] growing its business volume as a result of better cash flow thanks to dealing with HSBC i.e., faster turnaround of banknotes."  This cut-and-paste explanation offers no evidence that the banker used due diligence to analyze the sudden multi-million-dollar increase.  When the volume climbed again, by more than $20 million from April 2006 to September 2006, to over $76 million, the HBUS banker asked for an explanation wrote: "Mexico as a whole and more specifically [Puebla] is the premier country/msb [money service business] USD [U.S. dollar] remitter.  There is [a] large population of Mexican[s] working in the U.S. during the summer months (landscaping) that send money back home (religiously) to their families."[468]  While that might have been true, it was equally true when Puebla transmitted just $27 million back to Mexico around the same time the previous year, a nearly $50 million

---

[462] Id.; 9/13/2010 OCC Supervisory Letter HSBC-2010-22,  "Bank Secrecy Act/Anti-Money Laundering ('BSA-AML') Examination – Program Violation (12 U.S.C. §1818(s); 12 C.F.R. §21.21)," at 24.  [Sealed Exhibit.]
[463] Id.  See also 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.
[464] 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358515.
[465] 9/13/2010, Supervisory Letter HSBC-2010-22, OCC Sally Belshaw to HBUS Irene Dorner and David Bagley, Re:  Bank Secrecy Act/Anti-Money Laundering ('BSA-AML') Examination – Program Violation (12 U.S.C. §1818(s); 12 C.F.R. §21.21)," at 25.
[466] Spreadsheet:  Banknotes – NY Selected Customers' Activity Alerts & Traders' Explanations for USD Purchases & Sales from 2005-2009, OCC-PSI-0005890-894.
[467] Id. at 892.
[468] Id. at 893.

difference.[469]  By the end of March 2007, the month before Puebla funds were seized at Wachovia Bank, its monthly U.S. dollar transactions at HBUS had exceeded $113 million.[470]

On May 30, 2007, two weeks after the seizure of Puebla funds on May 16, HBUS ordered all activity in the Puebla account to be suspended with "immediate effect."[471]  A week later, on June 5, 2007, HBUS AML Compliance officer Daniel Jack contacted HBMX to ascertain whether Puebla also had accounts there, which would continue to expose HBUS to the money laundering risks associated with Puebla through the HBMX correspondent account.[472]

HBUS terminated its Banknotes relationship with Puebla after conducting a site visit on June 11, 2007.[473]  In June and July 2007, HBUS was contacted by multiple U.S. law enforcement agencies regarding its correspondent accounts with financial institutions in Mexico, including Puebla.  On June 25, 2007, for example, the Drug Enforcement Administration and other law enforcement told HBUS of their interest in its "banknote trading" with Puebla.[474]  On July 17, 2007, HBUS met with "an analyst from the National Drug Intelligence Center of the US Dep[artmen]t of Justice to explain our business and AML program along with discussing cross-border issues."[475]  On July 20, 2007, HBUS met with FinCEN specialists "to discuss our wholesale banknotes business with clients in Mexico as well as our AML program, CTR filing and related issues."[476]  The extent to which HBUS informed HBMX about the level of U.S. law enforcement interest in Puebla is unclear.

### (b)  Sigue Corporation

Another HBMX client that used HBMX's correspondent account at HBUS was Sigue Corporation (Sigue), a U.S. licensed money service business incorporated in Delaware but headquartered in California.[477]  Sigue's primary business activity was transmitting funds on behalf of third parties from the United States to Mexico and Latin America.[478]  Acting through its operating company, Sigue LLC, it arranged for the remittance of U.S. dollars through a network of more than 7,500 "authorized delegates" or agents across the United States, most of which were small businesses under contract to offer Sigue's money transmission services.[479]

---

[469] Id. at 892.

[470] Id. at 893.

[471] 5/31/2007 email from HBUS Gyanen Kumar to HBUS Alan Ketley and others, "Casa de Cambio Puebla," HSBC-PSI-PROD-0095910.  See also 5/31/2007, email from HBUS Daniel Jack to HBUS Alan Ketley, "N-NY & Casa de Cambio Puebla in Mexico," HSBC-PSI-PROD-0095908.

[472] See 6/5/2007 email from HBUS Daniel Jack to HBMX Leopoldo Barroso, "HSBC in Mexico – AML Compliance and Casa de Cambio," HSBC-PSI-PROD-0095914.  See also 10/26/2007 memorandum from HBUS Carolyn Wind to HNAH Janet Burak and others, HSBC-PSI-PROD-0095919.

[473] See 12/20/2007 "Money Laundering Report for Half-year Ended:  December 31, 2007," prepared by HBUS, OCC-PSI-00148844, at 5.

[474] Id.

[475] 12/20/2007 "Compliance Certificate," prepared by OCC, OCC-PSI-00148844, at 2.

[476] Id.

[477] See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Deferred Prosecution Agreement Factual Statement (1/28/2008), at 1.

[478] Id.

[479] Id.

On January 28, 2008, Sigue entered into a deferred prosecution agreement with the U.S. Department of Justice, Drug Enforcement Administration, and Internal Revenue Service, admitting that it had failed to maintain an effective anti-money laundering program.[480]  As part of the agreement, Sigue admitted to "serious and systemic" violations of U.S. AML requirements from 2003 to 2005, which "allowed tens of millions of dollars of suspicious financial transactions to be conducted through Sigue, including transactions involving funds represented by undercover U.S. law enforcement agents to be drug proceeds."[481]  The drug proceeds which U.S. undercover agents transmitted through Sigue totaled more than $500,000, and were sent through 59 separate Sigue agents in 22 states.[482]  The undercover federal agents had explicitly informed Sigue agents that they were transmitting illegal drug proceeds, structured the transactions to evade U.S. reporting obligations, and wired the funds to seven law enforcement agents in Mexico City, creating a money laundering pattern that Sigue should have detected and reported as suspicious activity, but did not.[483]  Sigue admitted its failure to adequately supervise and control its agents, "effectively monitor and manage high risk transactions," "establish an effective risk-based AML program," and "exercise sufficient enhanced due diligence for high-risk transactions and customers."[484]  As part of the agreement to defer prosecution of the company, Sigue agreed to forfeit $15 million in suspect funds and spend $9.7 million to strengthen its AML program.[485]

The day after the deferred prosecution agreement was made public in court, an article discussing Sigue's misconduct and "record penalty" for a money service business concluded that a "case such as that against Sigue gives banks yet another reason to treat MSBs [money service businesses] as pariahs."[486]  David Bagley, HSBC Group Compliance head, sent a copy of the article to Susan Wright, head of AML Compliance for HSBC Group, with a handwritten note: "Obvious question – I assume they are not our customer."[487]  His assumption, however, was incorrect.

After learning that Sigue was, in fact, a client of HBMX, on February 1, 2008, Ms. Wright sent an email to HBMX Compliance head Ramon Garcia about the account.[488]  She noted that, despite the deferred prosecution agreement and Sigue's admission of wrongdoing, HBMX's commercial banking division wanted to retain the account.  She warned that, if the account were retained, it:

> "will need to be closely monitored and subject to frequent reviews (recommendation for quarterly reviews in current circumstances).  The actions by the US regulators should be

---

[480] Id.
[481] Id.
[482] Id.
[483] Id. at 1-3.
[484] Id. at 6.
[485] Id. at 12-15; Deferred Prosecution Agreement at ¶¶ 5, 9.
[486] "Money Laundering 'Sting' led to MSB's Record Penalty, Says Legal Pact," Complinet, Brett Wolf, (1/29/2008), reprinted at HSBC OCC 8875020.
[487] See handwritten note on copy of article, "Money Laundering 'Sting' led to MSB's Record Penalty, Says Legal Pact," Complinet, Brett Wolf, (1/29/2008), HSBC OCC 8875020.
[488] 2/1/2008 email from HSBC Susan Wright to HBMX Ramon Garcia, with copies to HSBC Warren Leaming and John Root, no subject line, HSBC OCC 8875017-018.

used as a trigger event and our due diligence on this client updated.  In this connection
the high risk profile that is in place for Financial Institutions should be used. … If we
only see batched transactions then we are relying on the screening undertaken by [Sigue].
It would be helpful to understand the nature of these transactions and currencies involved
– could you provide me with an overview?  We should also monitor the volume – you
mentioned that we are not [Sigue's] only bankers in Mexico.  If, however, any of the
other banks withdraw then we may well see the volume of transactions through us rise
and our exposure/risk will increase with a corresponding increase in the cost of
monitoring, etc."[489]

Her email was forwarded to HSBC Compliance head David Bagley who, on February 4,
2008, forwarded it to HBMX CEO Paul Thurston and recommended closing the Sigue
account.[490]  Mr. Bagley noted Sigue's "serious and systemic violations and a record fine" due in
part to the fact that Sigue "had little control over its numerous agents."  He wrote:  "Whilst the
company will now need to take steps to address these deficiencies this will inevitably take some
time, and instilling the appropriate culture within the business even longer."

Mr. Thurston forwarded Mr. Bagley's recommendation to John Rendall, HBMX COO,
and asked for more information about the account.[491]  Mr. Rendall reminded him that "a couple
of months back," HBMX Compliance had recommended closing the Sigue account, but was
opposed by the HBMX commercial banking division (CMB) that wanted to keep the account
open.[492]  The issue was then elevated to Mr. Thurston who decided against closing the
account.[493]  Mr. Rendall explained:

"Our recommendation, which you supported, was to maintain this relationship.  It was
based on the following factors:  A) our CMB team in Tijuana were relatively on the top
of the case; B) the events for which [Sigue] have been fined were relatively historic –
from memory, 2-3 years ago, and significant improvements had been made since
then."[494]

Despite Sigue's admission of wrongdoing, its admission of lax controls over the actions taken by
its agents, and the recommendation of the head of HSBC Group Compliance to close the
account, Mr. Thurston decided once again to retain it and to continue to provide Sigue with U.S.
dollar transactions through the HBMX accounts at HBUS.

---

[489] Id.
[490] 2/4/2008 email from HSBC David Bagley to HBMX Paul Thurston, [subject redacted by HSBC], HSBC OCC
8875016.
[491] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC
8875139.
[492] See 2/4/2008 emails from HBMX John Rendall and HBUS David Bagley, "[redacted by HSBC]," HSBC OCC
8875139-40.
[493] See 2/4/2008 email from HBMX John Rendall to HBMX Paul Thurston, "[redacted by HSBC]," HSBC OCC
8875139.
[494] See 1/2/2008 email from HBUS Susan Wright to HBMX Ramon Garcia, "[redacted by HSBC]," HSBC OCC
8875141.

Mr. Thurston told the Subcommittee that Sigue was one of the few accounts he decided to retain over the objection of HBMX Compliance.  He explained that he did so, because he believed the issues were in the past, and Compliance head Ramon Garcia had met with Sigue and believed it was meeting its commitment to strengthen its AML program.[495]

Also on February 4, 2008, after reviewing an earlier media report identifying HBMX as a "pay partner" for Sigue,[496] the OCC AML Examiner then reviewing HBUS' AML program "requested HSBC management to determine what, if any, involvement HSBC had with Sigue."[497]  The OCC inquiry triggered an inquiry into the Sigue account by HBUS, which had not been privy to the exchanges between HSBC Group and HBMX about the account.[498]

On February 5, 2008, HBUS informed the OCC AML Examiner that while Sigue was not an HBUS client, it was a client of HBMX and had executed U.S. dollar wire transfers through HBMX's correspondent accounts at HBUS.[499]  In an internal memorandum summarizing the information, the OCC AML Examiner wrote that HBUS "acts as a pass-through for wire transfers for Sigue."[500]  He noted that, for "the period of January through December 2007 159 wire transfers passed through HSBC originated by Sigue for the benefit of" HBMX, involving more than $485 million.[501]  He wrote that HBUS management had agreed that those wires should have triggered a review of the account activity.[502]

The OCC AML examiner saw the events surrounding the Sigue account as emblematic of a broader problem involving inadequate monitoring and weak AML investigations by HBUS of clients using correspondent accounts to conduct suspect transactions.  In the internal memorandum, the OCC AML examiner wrote:

> "Over the past few years, there have been a number of instances where the OCC has brought to the attention of HSBC management negative media events, publicized indictments, etc., resulting in the need for HSBC management to conduct ad-hoc reviews to determine potential reputational risk.  In the majority of these instances, HSBC management was either not aware of these events or had not been pro-active in determining the level of potential exposure due to these events."[503]

---

[495] Subcommittee interview of Paul Thurston (5/1/2012).

[496] See "California MSB Faces Record Fine From Justice Department in AML Case," Fortent Inform, Brian Monroe (1/11/2008); see also 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736 [sealed exhibit].

[497] 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736, at 2.  [Sealed Exhibit.]

[498] The OCC Examiner noted internally at the time:  "Although HSBC management was previously aware of media reports concerning Sigue, up to the time of our request, HSBC management had not conducted any enhanced due diligence and/or in-depth analysis to determine HSBC's potential exposure resulting from the prosecution of Sigue." Id. at 2 (emphasis in original omitted).

[499] See 2/5/2008 OCC memorandum to files, "HSBC Monitoring/Reputation Risk," OCC-PSI-01416736, at 3. [Sealed Exhibit.]

[500] Id.

[501] Id.  HBUS apparently provided this wire transfer information to the OCC, in response to the OCC request for more information about HBUS' involvement with Sigue.

[502] Id.

[503] Id.

He concluded that if he had "not intervened it is highly unlikely that HSBC management would have performed the proper level of due diligence, [or] determined the potential exposure to risk" in the Sigue matter.[504]

Two months later, on April 26, 2008, a major U.S. newspaper published an article describing an ongoing Federal probe of allegations that Wachovia Bank was laundering drug proceeds supplied by Mexican casas de cambio.[505]  The article also mentioned Sigue, triggering a second round of inquiries at HBUS into the status of the Sigue account which remained open at HBMX and continued to execute U.S. dollar transactions through the HBMX correspondent account at HBUS.

HBUS AML Compliance officer Judy Stoldt and HBUS investigator Gloria Stazza sent a memorandum to their supervisor Denise Reilly, a senior HBUS AML Compliance officer, summarizing the article and discussing HBUS' exposure to the casas de cambio named in the article.[506]  The memorandum began:

> "HBUS does not hold any account for any casa de cambio mentioned in the WSJ article. The only HBUS connection to activity involving those named casas de cambio is activity that was conducted through our correspondent accounts, and most notably through our account with HSBC Bank Mexico (HBMX)."[507]

The May 2008 memorandum described Sigue as a money service business that had allegedly processed $24.7 million in "suspicious money remittances related to drug-trafficking proceeds."[508]  It explained that HBUS had first taken note of Sigue when it entered into a record $25 million settlement with the Justice Department in January 2008, and, as a result, conducted a review of the Sigue accounts, wire transfer activity, and whether either Sigue or its founder, Guillermo de la Vina, had been "the subject of any other negative news or law enforcement activity."[509]  The memorandum reported that, despite having no direct account with Sigue, a "wire review" found that, during 2007, Sigue had sent 159 wire transfers for $485 million through HBMX's correspondent account, all of which were originated by Sigue and sent to its own account at HBMX, which HBUS viewed as suspicious.[510]  The memorandum noted that

---

[504] Id. at 1.

[505] See "Wachovia Is Under Scrutiny in Latin Drug-Money Probe," Wall Street Journal, Evan Perez and Glenn Simpson (4/26/2008).

[506] See 5/1/2008 memorandum [carrying incorrect date of  5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517.

[507] Id. at 1.

[508] Id. at 3.  See also 1/28/2008 "Sigue Corporation and Sigue LLC Enter into Deferred Prosecution Agreement and Forfeit $15 Million to Resolve Bank Secrecy Act Violations," press release issued by U.S. Department of Justice, http://www.justice.gov/opa/pr/2008/January/08_crm_068.html (stating that "more than $24.7 million in suspicious transactions were conducted through registered agents of Sigue, including transactions conducted by undercover U.S. law enforcement agents using funds represented to be proceeds of drug trafficking").

[509]  5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517, at 3.

[510] Id. at 4.  The memorandum did not mention that this wire analysis was compiled for the OCC, at its request, in February 2008.  According to Sigue, altogether during 2007, it sent a total of more than $1.8 billion in wire transfers through its HBMX account to a Sigue affiliate in Mexico.  Subcommittee briefing by Sigue (7/25/2012).

HBUS had contacted HBMX to discuss Sigue, and HBMX disclosed that it had imposed "parameters" on its relationship with Sigue, including limiting Sigue to "conducting transactions for individual customers to $2,000 USD per transaction."[511]   The memorandum did not explain, however, how that $2,000 limit affected the actual wire activity in 2007, in which each wire transfer apparently batched numerous underlying wires without identifying individual client transactions.  The memorandum also stated that HBUS had found that a Sigue employee had been indicted for assisting drug traffickers with money laundering,[512] and on another occasion Sigue was described as having allowed $295,000 to be transferred from an account at another bank to an illegal alien deported to Mexico,[513] while also noting that Sigue itself had not been implicated in either matter.  Despite this cascade of troubling information, for the next two years, little or no action appears to have been taken by HBUS or HBMX with respect to the Sigue account at HBMX.

On January 30, 2009, having determined that Sigue satisfied the requirements of the Deferred Prosecution Agreement the Justice Department requested and the court granted dismissal of the criminal case against the company.[514]

In 2010, as part of an OCC AML examination, an OCC AML examiner reviewed the May 2008 memorandum regarding Sigue and asked what followup actions had been taken in response to it, in particular whether Sigue had ever been added to the HBUS "wire filter" for purposes of enhanced due diligence and whether any further analysis had been done of Sigue account activity.[515]  HBUS personnel responded that Sigue had not been added to the wire filter, the 2008 memorandum had not been "passed to anyone," and the HBUS Financial Intelligence Group had not conducted any additional due diligence with respect to Sigue.[516]  HBUS explained that "Sigue was not added to the wire filter as Sigue entered into a written agreement with the Department of Justice to enhance its AML program and was not (per the investigative search) the

---

[511] 5/1/2008 memorandum [carrying incorrect date of  5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517,  at 4.

[512] Id. at 3.  The Subcommittee has not obtained evidence of an instance in which a Sigue employee has been indicted for assisting drug traffickers with money laundering; however, in 2006, a Sigue agent pled guilty to money laundering and conspiracy to distribute illegal drugs, and a factual statement supporting his guilty plea described his use of Sigue wire transfers to launder illegal drug proceeds from 2003 to 2005.  See United States v. Gerardo Alvarado Alvarado, Case No. 1:05CR354-1 (USDC MDNC), Plea Agreement (2/24/2006) and Factual Basis in Support of Guilty Plea (2/24/2006).

[513] 5/1/2008 memorandum [carrying incorrect date of 5/1/2007] from HBUS Judy Stoldt and Gloria Stazza to HBUS Denise Reilly, "Wall Street Journal Article Regarding Wachovia," OCC-PSI-01358516-517, at 3-4.  The memorandum  referred to an article as the source of this information.  Id. at 3; see also "Suspicious wire transfers, documents lead to raids in NW Ark," Associated Press, Jon Gambrell (5/25/2007).  The referenced matter involves criminal proceedings in which the employee of a Sigue agent (who had been deported to Mexico) was charged with conducting an unlicensed money transmitting business and supporting illegal aliens in the United States; no drug proceeds were involved.  See United States v. Honorato Pedroza, Case No. 5:07-cr-50050-JLH (USDC WDAK), Indictment (6/27/2007).

[514] See United States v. Sigue Corp. and Sigue LLC, Case No. 4:08CR54 (USDC EDMO), Order for Dismissal with Prejudice (1/30/2009).

[515] See 2/16-18/2010 exchange of emails among Federal Reserve Patricia Brunner, HBUS Denis O'Brien, Judy Stoldt, and others and OCC Joseph Boss, "June 2008 Audit – Payment Services," OCC-PSI-00378989.

[516] Id.

subject of any other money laundering investigations."[517]  Essentially, despite Sigue's deferred prosecution in 2008, admission of wrongdoing caused in part by an inadequate AML program, past HBMX alerts flagging unusual transactions, past HBUS wire transfer analysis identifying suspicious activity, past recommendations by Compliance to close the account, and past regulatory inquiries, HBUS did not conduct any enhanced monitoring or analysis of the Sigue account.

HBMX's relationships with Puebla and Sigue, a Mexican casa de cambio and a U.S. money service business that remitted funds to Mexico and Latin America, demonstrate its tolerance for high risk clients, and how those clients subjected, not only HBMX, but also HBUS to substantial money laundering risks.  The accounts also disclose how both banks failed to conduct effective monitoring of some financial institution accounts and transactions, even when faced with evidence of lax AML controls and criminal proceedings involving money laundering. They also expose an absence of regular information sharing and coordinated AML efforts between HBUS and HBMX to address common AML problems, including limited communications about particular clients and actions taken to restrict or close accounts.

### (2)  Cayman Island U.S. Dollar Accounts

A second example of high risk HBMX clients posing money laundering risks to HBUS are the tens of thousands of U.S. dollar accounts maintained by HBMX through its branch office in the Cayman Islands.  This branch office is a shell operation with no physical presence in the Caymans, and is managed by HBMX personnel in Mexico City who allow Cayman accounts to be opened by any HBMX branch across Mexico.  Total assets in the Cayman accounts peaked at $2.1 billion in 2008.  Internal documents show that the Cayman accounts had operated for years with deficient AML and KYC controls and information.  An estimated 15% of the accounts had no KYC information at all, which meant that HBMX had no idea who was behind them, while other accounts were, in the words of one HBMX compliance officer, misused by "organized crime."  Because a primary feature of the Cayman accounts is their use of U.S. dollars, HBMX has maintained the account assets and conducted account transactions through its U.S. dollar correspondent accounts at HBUS.  There is no documentation showing that HBUS knew or was informed that, by providing HBMX with correspondent accounts, it was also providing access to the U.S. financial system to high risk accountholders in the Caymans.  By moving the Cayman transactions through its HBUS accounts, HBMX exposed not only itself, but also HBUS to the money laundering risks inherent in its Cayman clients.

**Cayman Accounts.**  HSBC acquired the Cayman branch through its purchase of Bital in November 2002.  According to a letter from HSBC legal counsel:

> "Bital received authorization from Mexican and Cayman authorities to offer Cayman USD [U.S. dollar] accounts to its customers in 1980.  Bital's license and authorization to offer Cayman USD accounts was inherited by HBMX when HSBC acquired Bital in 2002."[518]

---

[517] 5/1/2008, memorandum [dated 5/1/2007, sic] from HBUS Judy Stoldt and HBUS Gloria Stazza to HBUS Denise Reilly, Re: Wall Street Journal Article Regarding Wachovia, OCC-PSI-01358517.
[518] 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 4.

After the acquisition, the Cayman branch of Bital was renamed HSBC Mexico S.A. and continued to operate under a Cayman Class B banking license, restricting the branch to operating only "offshore" and open accounts exclusively for non-Cayman residents.[519]  From its inception, the branch had no physical office or employees in the Cayman Islands, and operated in that jurisdiction solely as a shell entity.[520]  The Cayman accounts were actually opened and maintained by HBMX personnel in Mexico.  Any HBMX branch across Mexico had the authority to open a Cayman account for a client.[521]

To enable the Cayman branch to provide U.S. dollar accounts to clients, HBMX used its correspondent accounts at HBUS to supply the needed dollars, process U.S. dollar wire transfers, cash U.S. dollar travelers cheques, and perform similar U.S. dollar services.  HBMX did not open a separate correspondent account for the Cayman branch, but included Cayman account transactions within its general correspondent account at HBUS.  The documents and other evidence reviewed by the Subcommittee contain no indication that, until recently, HBMX ever informed HBUS about its Cayman branch or the Cayman U.S. dollar denominated accounts being serviced through the HBMX correspondent accounts at HBUS.[522]

The number of accounts and the volume of assets held in the Cayman accounts have fluctuated over time.  Documentation associated with the 2002 Bital purchase do not indicate how many Cayman accounts then existed or the total amount of assets they held.  A 2006 audit of the Cayman accounts reported just 1,500 accounts in 2005, with no mention of the account balances.[523]  In September 2008, HBMX reported a remarkable increase, over 60,000 Cayman accounts for nearly 50,000 customers, with total assets approaching $2.1 billion.[524]  Three years later, however, those totals dropped significantly.  According to HSBC legal counsel, as of January 2012, the Cayman branch held about 24,000 Demand Deposit and Term Deposit Accounts for nearly 21,000 customers, with a total dollar value of approximately $657 million.[525]  About 9,000 Cayman accounts had been closed in 2009, due in part to insufficient Know Your Customer (KYC) information for the accounts as well as regulatory concerns about their high risk nature.

---

[519] See, e.g., 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874827-33.  See also list of Cayman offshore banks at  http://www.offshore-library.com/banking/cayman_islands/page_3.  According to HSBC, HBMX policy is not to offer the accounts to either Cayman or U.S. residents.  See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.

[520] See, e.g., 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, "HBMX-CAYMAN ACCOUNTS," HSBC OCC 8874827-33.

[521] See, e.g., 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1. This audit reviewed files for Cayman accounts that had been opened by 26 HBMX branches in Mexico City.  Id.

[522] Michael Gallagher, for example, who headed the HBUS PCM division that helped handle correspondent accounts, told the Subcommittee he had been unaware of the U.S. dollar Cayman accounts at HBMX.  Subcommittee interview of Michael Gallagher (6/13/12).

[523] See 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1.

[524] See chart at HSBC OCC 8876787, attached to 9/12/2008 email from HSBC John Root to HSBC Adrian Cristiani, "Cayman Accounts," HSBC OCC 8876784.

[525]  See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.

**Inherent Riskiness of Accounts.**  HBMX and HSBC Group were well aware that the Cayman accounts had an inherently higher AML risk than other Mexican accounts, since they were offered in an offshore jurisdiction with strong secrecy laws and a limited tax regime, and permitted accountholders to hold assets in U.S. dollars in contravention of normal Mexican legal restrictions.

In 2008, HSBC Group Compliance head David Bagley noted in an email to senior HSBC Group officials that Mexican regulators knew of the Cayman accounts, which apparently circumvented certain Mexican banking regulations, but nevertheless allowed them to operate:

> "The [Cayman] license, inherited from Bital, allows HBMX to provide USD-denominated services to persons domiciled in Mexico.  Mexican regulation apparently prohibits individual Mexicans (i.e. non-corporate) to hold USD-denominated deposit accounts in Mexico.  …  Although HBMX were recently fined USD50,000, for the inappropriate promotion of these services in Mexico, I am advised that CNBV are aware of the existence of the accounts and services and have raised no concerns."[526]

Mr. Bagley also warned:

> "There continues to be a real focus on the level of USD-denominated activity in Mexico by CNBV and other bodies, and the extent of HBMX's activity in this area.  This account base has to therefore be seen as high-risk from an AML and reputational perspective."[527]

In November 2005, an email from HBMX Compliance head Ramon Garcia to senior HSBC Group Compliance officer John Root flagging compliance issues at HBMX provided this explanation for the Cayman accounts:

> "There is a Cayman Island branch for HBMX.  Since there is a restriction by Mexican Law to open accounts to nationals in USD except for those residing in the Mexico's border, as an alternative, [Bital] decided to open this branch where cheques accounts to Nationals could be opened in USD.  It is also known that these USD accounts were issued also to non Mexican Nationals."[528]

A January 2006 HBMX internal audit report explained the demand for the accounts this way:  "HBMX offers their clients the option to open USD current and investment accounts in Grand Cayman so that clients profit [from] the advantages of that country, such as tax free investments, under confidentiality terms."[529]  In a 2007 email discussing the sale of cross-border financial products in Mexico, HSBC Group Compliance Deputy Head Warren Leaming also

---

[526]  7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN ACCOUNTS," at HSBC OCC 8874832.
[527] Id.
[528]  11/22/2005 email from HBMX Ramon Garcia to HSBC John Root, "HBMX – COMPLIANCE ISSUES," HSBC OCC 8873261.
[529]  1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307-310, at 1.

noted:  "Because Mexico's tax scheme is relatively penal (worldwide income) there is a high demand for off-shore products."[530]

**Below Standard AML and KYC Controls.**  The riskiness of the Cayman accounts was magnified by weak AML controls and inadequate KYC information.  Those AML deficiencies meant that HBMX had little real knowledge about the customers using the Cayman accounts.

HSBC Group knew about the weak state of the Cayman AML and KYC controls from the time Bital was purchased in 2002, and it inherited the Cayman branch.  An audit prior to the acquisition found that Bital had no functioning Compliance Department, limited client transaction and activity monitoring, and no KYC focus on high risk clients.[531]  The audit specifically noted the poor state of KYC information in the Cayman accounts:  "41% of the accounts reviewed (92 of 224 reviewed) lacked full client information.  37 files had no client information."[532]

In 2004, Mexico strengthened KYC requirements for Mexican financial accounts and required Mexican banks to update the KYC information in all customer accounts by 2007.  In January 2006, HBMX's audit group conducted an audit of the KYC controls in place for the Cayman accounts and rated them "**Below Standard**."[533]  Of the Cayman accounts reviewed, the audit found that 13% of the files lacked material KYC information; more than 50% lacked a visit report with the client; some foreign clients were incorrectly described as Mexican nationals; and 15% of the account files were missing altogether:

"More than 50% of account files that were reviewed lacked the relevant visit report, which weakens the position of HBMX in terms of KYC process for these types of accounts (Grand Cayman), particularly those accounts opened by foreigners.  In addition, in 13% of files reviewed the visit reports failed to include material information enabling to have adequate KYC.

Weaknesses were noted in the supervision over the account opening process, which also impeded to detect promptly any information missing in account files or inconsistencies between the information produced by the client and the data captured in Cis-Hogan [[HBMX data system].  ...  In addition, the auditors indentified foreign clients who were input to the system as nationals.

In addition to the foregoing, c[irca] 15% (10) of account files were not found at the Branches.  No actions had appeared to be taken to instruct RMs [Relationship Managers] to complete client's file again.

---

[530] 5/24/2007 email from HSBC Warren Leaming to HSBC David Bagley, "He advises that his own compliance team are advising him that such cross border activities should cease.-HBMX," HSBC OCC 8875007.
[531] July 2002 "Group Internal Audit:  Due Diligence Review – Project High Noon," prepared by HSBC internal audit group, HSBC OCC 8873846-852.
[532] Id. at HSBC OCC 8873847.
[533] 1/2006 "General Audit Report, HBMX – KYC of USD Current Accounts in Grand Cayman," prepared by Group Audit Mexico, HSBC OCC 8874307, at 1 (emphasis in original).

In particular the auditors indentified that for accounts opened by foreign clients these had produced expired immigration forms and that Branch staff did not maintain a copy of all the pages composing such a document.  This situation was due, in part, to the fact that circular letter Depvist045 (procedure to open current and term accounts) is not clear in the procedure to open these types of accounts (Grand Cayman)."[534]

The audit concluded with the recommendation: "Branch should ensure that KYC and account opening documentation is complete and in compliance with regulations."[535]

The 2006 audit uncovered severe AML and KYC deficiencies in the Cayman branch requiring remedial action to comply with the Mexican deadline for improving customer file KYC information, but those audit results appear to have been ignored.  The audit recommendations were recorded in HBMX's electronic system, but later closed out without any apparent actions having been taken in response, which does not comport with Group policy.[536]  Two years later, in 2008, John Root, senior HSBC Group Compliance officer, rediscovered the 2006 audit when examining KYC problems in the Cayman accounts.  He wrote:  "The real surprise was the existence of an HBMX audit in January 2006 on KYC for the USD Cayman accounts.  It is not clear who in AML responded, and how.  Blank looks all around."[537]  His supervisor, Mr. Bagley, later jokingly remarked to the Head of Group Audit for Latin America and the Caribbean, Graham Thomson:  "I do find it surprising that there can have been no response and yet the audit was closed out.  Is this a breach or are you in audit becoming softer."[538]

**Project Restoration.**  As the 2007 deadline approached for completing the KYC updates mandated by Mexican law and internal reports showed that HBMX's KYC documentation remained in poor condition, HBMX obtained a year-long extension from Mexican regulators, to May 2008, to clean up its files, including client files for the Cayman accounts.[539]

In February 2008, Mexican regulators met with the HBMX CEO and, among other issues, criticized the bank's poor KYC documentation, leading HBMX to initiate "Project Restoration" to intensify its KYC remediation efforts.[540]  John Rendall, HBMX Chief Operating Officer, was put in charge of the project with the understanding that files containing inadequate KYC would be closed.[541]  Project Restoration was closely monitored by senior HBMX and HSBC Group officials.

---

[534] Id. at 3.

[535] Id. at 4.

[536] See 7/30/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-782; 8/5/2008 email exchange among HSBC David Bagley, HSBC John Root and HBMX  Graham Thomson, "HBMX - Cayman accounts," HSBC OCC 8874829-830.

[537] 7/30/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-782.

[538] 8/5/2008 email from HSBC David Bagley to HBMX Graham Thomson, "HBMX Cayman accounts," at HSBC OCC 8874829.

[539] See 7/27/2007 minutes of HSBC LAM Regional Audit Committee, HSBC OCC 8875086-090  (noting extension of time for the KYC effort until May 2008).

[540] See 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 2.

[541] See, e.g., 10/28/2008 email from Graham Thomson to Emilson Alonso, Subject: "HBMX – Projecto Restauracion," HSBC OCC 8873464.

At first, the Cayman accounts were excluded from the project.  Then, in July 2008,
HBMX's monitoring system suddenly began generating alerts for a number of Cayman accounts.
These alerts, which highlighted suspicious account activity, were brought to the attention of
senior Compliance personnel.  The head of HSBC Group Compliance David Bagley told the
Subcommittee this incident was the "first point that the Cayman Islands were brought into sharp
focus" for him.[542]   He sent an email informing senior HSBC Group and HBMX officials about
the alerts which had identified "significant USD [U.S. dollar] remittances being made by a
number of [HBMX Cayman] customers to a US company alleged to be involved in the supply of
aircraft to drug cartels."[543]   The company was Cabello Air Freight Inc. of Miami.[544]   Mr. Bagley
wrote that "[a]s a precaution HBMX have issued instructions that no new [Cayman] accounts are
opened pending a review of these activities."[545]   This step was taken with respect to the Cayman
accounts, in the words of one HBMX compliance officer, "due to the massive misuse of them by
organized crime."[546]

The decision to suspend new Cayman accounts was made by then HBMX CEO Luis
Pena who did not specify when the suspension would be lifted.[547]   He also instructed HBMX
staff to engage in "a process of enhanced due diligence KYC" for all Cayman accountholders to
"end by December 1."  He wrote:

> "After this date we will cancel all the accounts that we were not able to complete files on
> and will send cashiers checks to all the respective customers.  For the future, Mexicans
> who wish to open a dollar denominated account will undergo a referencing process, in
> which the accounts will be … opened by the bank's staff in a proper offshore book as we
> do in our Premier offering. …  Unfortunately we will likely lose some deposits as we do
> not expect the KYC process to succeed 100%, but we will offset a significant control and
> regulatory risk."[548]

Also in July 2008, after reviewing the 2006 audit of the Cayman accounts, Mr. Root
informed Mr. Bagley that "a sampling showed that15% of the customers did not even have a
file."[549]   Mr. Root wrote:  "Fixing the Cayman accounts will be a struggle.  How do you locate

---

[542] Subcommittee interview of David Bagley (5/10/2012).

[543] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael
Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN
ACCOUNTS," HSBC OCC 8874832-33.

[544] See also Sealed Exhibits.

[545] 7/31/2008 email from HSBC David Bagley to HSBC Richard Bennett, with copies to HSBC Michael
Geoghegan, Matthew King, and HBMX Emilson Alonso, Luis Pena, and John Rendall, "HBMX-CAYMAN
ACCOUNTS," HSBC OCC 8874832-33.

[546] 11/27/2008 email from HBMX employee to HBMX Jaime Saenz and Ramon Garcia, "Seriously consider
restricting the product Dollars accounts in the zona frontera Product 63," HSBC OCC 8875736-738.

[547] See 7/31/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, HSBC David Bagley, and others,
"HBMX - CAYMAN ACCOUNTS," HSBC OCC 8873503-504.  See also undated HSBC presentation,
"Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control
Risk arising from Grand Cayman Accounts," HSBC OCC 8874561.

[548] 7/31/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, HSBC David Bagley, and others, "HBMX -
CAYMAN ACCOUNTS," HSBC OCC 8873503-504.

[549] 7/31/2008 email from HSBC John Root to HSBC David Bagley, "HBMX Visit Update," HSBC OCC 8876780-
782.

clients when there is no file?"  Missing client files, combined with accounts misused by drug cartel operatives, provided stark evidence of the high risk character of the Cayman accounts and the need for HBMX to get a better sense of the clients using them.  In the meantime, the documents contain no indication that either HSBC Group or HBMX informed HBUS about the suspect account activity or the Cayman KYC deficiencies, even though the Cayman accounts were operating solely through the HBMX correspondent account at HBUS.[550]

As a result of the AML alerts regarding money laundering involving some of the Cayman accounts and re-discovery of the 2006 audit exposing the poor state of the Cayman account files, the Cayman accounts were added to the Restoration Project.[551]  Mr. Root told the Subcommittee that, in July 2008, the Cayman accounts "went to the top of the list" at the project.[552]

One of the first steps taken with regard to the Cayman accounts was that HBMX Compliance personnel analyzed their risk levels, and sorted customers into three categories:  red, yellow, and white.  Red status indicated that a customer was a "Special Category Client" (SCC), on a "black list," or the subject of a SAR; yellow status indicated that a customer had been flagged by HBMX's internal AML monitoring system with one or more alerts, but no SAR had been filed; white status indicated that the customer had no such derogatory information on file.[553]  Out of a total of 49,935 customers with 61,586 accounts worth about $2.1 billion, HBMX categorized 1,314 customers as "red" status, representing 2,240 accounts worth about $205 million.  HBMX also flagged 2,027 customers as "yellow" status, representing 2,084 accounts worth about $180 million.[554]  HBMX then largely limited its KYC remediation efforts to the 3,341 "red" and "yellow" customers.  The other 46,000 accountholders were not included in the project.[555]

Two months later, in September 2008, senior HSBC Group Compliance officer John Root offered a negative assessment of the KYC remediation efforts directed at the Cayman accounts:

> "The HBMX 'Restoration' project chaired by John Rendall, HBMX COO, is endeavoring to regularize these accounts on a risk-basis.  Account opening documentation is generally

---

[550] Another example of a Cayman U.S. dollar account that HSBC Group and HBMX were aware of and expressed concerns about, but apparently did not inform HBUS, were accounts opened for two embassies, one of which was for a country in the Middle East.  See 12/2/2005 email exchange between HSBC David Bagley and John Root, "OFAC," HSBC OCC 8876612-613.  Mr. Bagley told the Subcommittee that although there was no indication of any "sinister" activity, these accounts were later closed, because the bank "did not want the risk."  Subcommittee interview of David Bagley (5/10/12).

[551] Subcommittee interview of David Bagley (5/10/12).

[552] Subcommittee interview of John Root (4/26/12).

[553] See 9/12/2008 email from HBMX Ramon Garcia to HSBC John Root, "Cayman Accounts," HSBC OCC 8876784.

[554] See Attachment to 9/12/2008 email from HBMX Ramon Garcia to HSBC John Root, "Cayman Accounts," HSBC OCC 8875462-465, at 465.

[555] See undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566, at 561 ("It is considered that it will not be possible to complete 50,000 enhanced KYC by 01DEC08.").

poor or non-existent and there is a lot of work to do.  Money-laundering risk is consequently high."[556]

An HSBC presentation, which is undated but appears to have been prepared in October 2008, summarized the ongoing Cayman KYC problems and presented a new strategy to address them.[557]  The presentation was entitled, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts."[558]  One key slide noted that "almost no progress [had] been made in enhanced KYC completion" and that only 25% of the files would have complete KYC information by December 1, 2008:

> "• The Bank has been recently been fined for offering this product in Mexico, and money laundering red flags have been identified.
> • On 28JUL, CMP [Compliance] gave instructions to suspend this product.
> • On 31JUL08, Segment Directors were requested by CEO that an enhanced KYC will be completed for all Grand Cayman accounts before 01DEC08.
> • As of JUL08, in Grand Cayman CDA/DDA 49,937 customers, and its portfolio was approximately USD 1,500 million.[559]
> • Currently, this product is expected to be re-opened, as long as necessary adjustments to systems, processes and documentation are made, with stricter controls, and if Group Compliance's sign-off is obtained.
> • On 26SEP, Segment directors reported that almost no progress has been made in enhanced KYC completion.  In addition, a central validation of enhanced KYC quality is not in place.
> • According to Remediation Project results, success rate in file completion is approximately 25%.  This means that if this strategy is followed, it will not be possible to complete more that 25% of required enhanced KYC forms by 01DEC08."[560]

This October 2008 assessment indicates that at least 75% of the Cayman files still had incomplete KYC information six years after HBMX assumed control of the accounts.

Despite this grim assessment, the Strategy also noted efforts underway to allow new Cayman accounts to be opened.[561]  As Graham Thomson, head of Group Audit for Latin America and the Caribbean, explained in an email to colleagues, the accounts needed to continue due to the income they produced:

---

[556] 9/12/2008 email from HSBC John Root to Adrian Cristiani and others, "Cayman Accounts," HSBC OCC 8875462-465, at 462.

[557] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566.  Because of dates mentioned in the presentation, it seems to have been completed between September 27 and October 30, 2008.

[558] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560.

[559] The figure of $1,500 million seems to refer to the Cayman certificates of deposit and does not include additional funds in Cayman Demand Deposit Accounts.

[560] Undated HSBC presentation, "Conducting an Enhanced KYC for Grand Cayman Accountholders: Proposal to Update the Strategy to Control Risk arising from Grand Cayman Accounts," HSBC OCC 8874560-566, at 561.

[561] Id. at 561.

"Currently the business owner and compliance are still discussing with GMO CMP [Compliance] the product parameters that are to be applied to lift the current embargo and relaunch the CI [Cayman Island] product.  It is important that these discussions result in practical product parameters as the CI portfolio is an important source of funds for HBMX and it is hoped the replacement product will be shortly submitted to the new products committee and then relaunched."[562]

Internal documents show that HSBC Group and HBMX officials considered a variety of criteria to determine when a new Cayman account could be opened, including requirements that the client be an existing HBMX customer for six months, complete an "enhanced KYC Questionnaire," undergo screening against the OFAC list and other "blacklists," and agree to limits on cash deposits.[563]

**U.S. Dollar Restriction.**  In November 2008, HSBC Group CEO Michael Geoghegan traveled to Mexico and met with senior Mexican regulators who were highly critical of HBMX's AML and KYC efforts, the huge volume of U.S. dollars that HBMX was exporting to the United States, and the possibility that a portion of those funds were associated with drug trafficking and money laundering.[564]  The regulators explicitly mentioned the U.S. dollars sent from the Cayman accounts.[565]  In response, Mr. Geoghegan proposed prohibiting all HMBX branches, including the Cayman branch, from offering U.S. dollars to customers, except at automated teller machines in Mexican airports.[566]  Since the Cayman accounts relied on U.S. dollars, the proposed new policy directly impacted Cayman accountholders.  HBMX CEO Luis Pena nevertheless agreed with the proposal, and also ordered the freeze on opening new Cayman accounts to continue indefinitely and prohibiting new cash deposits for existing Cayman accounts.[567]  Mr. Pena noted that the new measures would cost HBMX a lot of money:  "Cayman and Mexico dollar accounts provide us with US$2.6 billion of cheap funding.  We are likely to lose a big portion of this if we tell customers we no longer receive dollar notes."[568]  The new policies took effect in January 2009.

**9,000 Accounts Closed.**  According to HSBC's legal counsel, HBMX took nearly another year to complete KYC remediation of the Cayman accounts, finally completing the work in July 2009.[569]  As part of that KYC effort, HBMX closed approximately 9,000 Cayman

[562] 10/20/2008 email from Graham Thomson to HSBC Emilson Alonso and others, "HBMX – Projecto Restauracion," HSBC OCC 8874595-600, at 596-597.

[563] See Sept.-Oct. 2008 email exchanges among HBMX Ramon Garcia, John Rendall, Maria Salazar and HSBC David Bagley, Warren Leaming, Susan Wright, John Root, and Adrian Cristiani, HSBC OCC 8875818-829, at 829.

[564] See 2/18/2008 email from HBMX Paul Thurston to HSBC Michael Geoghegan, with copies to Richard Bennett and Matthew King, "Confidential – CMBV/FIU Meeting," HSBC OCC 8873331-333; 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026.

[565] See, e.g., 11/26/2008 email from HSBC David Bagley to HSBC Richard Bennett and Warren Leaming, "Mexico," HSBC OCC 8875605-607, at 607.

[566] See 11/26/2008 email from HSBC Michael Geoghegan to HBMX Emilson Alonso, "Money Launderying," HSBC OCC 8874849-850.

[567] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[568] 11/28/2008 from HBMX Luis Pena to HSBC Emilson Alonso, HSBC OCC 8874856.

[569] 6/5/2012 letter from HSBC legal counsel to the Subcommittee, at 5.

accounts, due in many cases to incomplete KYC information.[570]  At the same time, HBMX allowed the Cayman branch to remain in operation and lifted the ban on new accounts.  Today, over 20,000 HBMX clients have over $657 million in Cayman U.S. dollar denominated accounts.

Because the HBMX Cayman branch continues to offer U.S. dollar accounts, despite a history of poor KYC controls and deficient KYC documentation, and despite the inherent riskiness associated with operating offshore accounts in a secrecy tax haven, the Cayman accounts continue to pose ongoing money laundering risks to HBUS.  Because HBUS is now aware of the Cayman accounts, it will have to evaluate the risk and determine whether to continue to process Cayman account transactions through the HBMX correspondent account.

### 3)  Cashing U.S. Dollar Travelers Cheques

A third example of how HBMX has introduced risk into HBUS involves its issuing and cashing millions of dollars in U.S. dollar travelers cheques through its correspondent accounts at HBUS, at times under suspicious circumstances.

Travelers cheques are paper monetary instruments which, for a fee, are issued and administered by a financial institution.  They can be issued in a variety of currencies and denominations, and carry serial numbers so that, if the cheques are lost or stolen, the issuing financial institution can trace back the purchase and either replace the cheques or refund the money used to purchase them.  Individuals often use travelers cheques to minimize carrying hard currency while traveling and as a way to safeguard their funds.  Some financial institutions issue such cheques only to pre-existing customers; others issue the cheques to anyone who pays the fee.  U.S. financial regulators have long warned financial institutions about the money laundering risks associated with travelers cheques, especially when purchased with cash by a non-customer and used to move substantial funds across international borders in ways that are difficult to trace.[571]  Travelers cheques have been used by terrorists,[572] drug traffickers,[573] and other criminals.[574]

---

[570] Id.

[571] See, e.g., Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Examination Manual, "Core Overview:  Purchase and Sale of Monetary Instruments," (6/23/2005) at 59; FFIEC BSA/AML Examination Manual, "Purchase and Sale of Monetary Instruments-Overview," (8/24/2007) at 212 ("The purchase or exchange of monetary instruments at the placement and layering stages of money laundering can conceal the source of illicit proceeds.  As a result, banks have been major targets in laundering operations because they provide and process monetary instruments through deposits.").

[572] See, e.g., United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005); "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11) at 1 (describing how the convicted defendant cashed $130,000 in U.S. dollar travelers cheques at a bank in Saudi Arabia and then provided the funds to support violent extremists in Chechnya).

[573] See, e.g., United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 35 (describing how Wachovia Bank processed $20 million in suspicious travelers cheques, some portion of which was suspected to include illegal drug proceeds); "How a Big U.S. Bank Laundered Billions from Mexico's Murderous Drug Gangs," The Guardian, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.  See also Albajon v. Gugliotta, 72 F. Supp. 2d 1362, 1365 (S.D. Fla. 1999) (admitting travelers cheques as evidence of drug trafficking

HBMX has issued a large number of U.S. dollar travelers cheques, at times selling them to anyone willing to pay the fee and cashing them for customers and non-customers alike.  In 2004, John Root, senior HSBC Group Compliance officer, sent an email to HBMX's Compliance head, Ramon Garcia, and AML head, Carlos Rochin, noting the huge volume of travelers cheques pouring in from Mexico and seeking assurances that HBMX was on guard against money laundering:

> "I note that in the year through 3Q04 [third quarter of 2004], HBMX has sold over USD 110 million of travelers cheques, an amount that eclipses that of HBEU [HSBC Europe] here in the UK, and that is several orders of magnitude higher than any other non-UK entity, including Hong Kong and the US.  In fact, it represents one-third of the Group's total global traveller's cheque business (with the UK representing another third).

> Could you kindly prepare a report for GHQ [Group Headquarters] summarizing the money laundering procedures currently in place for such a booming business.  Please include in this report KYC controls, number of SARs in the YTD [year to date], breakdown by region and branch, etc., etc."[575]

Mr. Garcia responded with preliminary information and a recent case involving travelers cheques, but in response to Mexican legal requirements regarding client-specific information, HSBC has so heavily redacted copies of those documents, as well as a longer report requested by Mr. Root, that they do not provide additional information.[576]

In 2008, when HBMX decided to stop offering U.S. dollars at its branches in most cases, the HBMX CEO Luis Pena recommended greater use of U.S. dollar travelers cheques instead, sold only to pre-existing customers.[577]  In response, the Deputy Head of HSBC Group Compliance, Warren Leaming, warned that travelers cheques also raise AML concerns, and advised lowering the existing $25,000 ceiling on the amount of travelers cheques that could be purchased by one customer at a time, and creating a new limit on the amount of travelers cheques that could be deposited at one time to a client account.[578]

In 2009, after CNBV expressed concerns about HBMX's weak AML controls, among other steps, HBMX tightened its policies on travelers cheques.  As of January 1, 2009, HBMX

---

proceeds); United States v. $41,305.00 in Currency & Travelers Checks, 802 F.2d 1339, 1343 (11th Cir. 1986) (finding travelers cheques could be seized as drug trafficking proceeds).
[574] See, e.g., Folk v. State, 192 So. 2d 44, 46 (Fla. Dist. Ct. App. 1966) (upholding conviction for signing a false name on travelers cheques and cashing them); United States v. Sebaggala, 256 F.3d 59, 63 (1st Cir. 2001) (upholding conviction for using undeclared travelers cheques to attempt to move money fraudulently through U.S. customs).
[575] 11/8/2004 email from HSBC John Root to HBMX Ramon Garcia and Carlos Rochin, with copies to HSBC David Bagley and Susan Wright, "Travellers Cheques," HSBC OCC 8876645-646.
[576] See 11/30/2004 email from HBMX Ramon Garcia to HSBC John Root, David Bagley, Susan Wright, and HBMX Carlos Rochin, "Travellers Cheques," HSBC OCC 8876645-664.
[577] See 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.
[578] See 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall with copies to HSBC David Bagley, John Root, Susan Wright, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.

102

determined that it would sell its travelers cheques only to pre-existing customers and would place a limit on the amount that could be sold to any one customer at a time.[579]  Warren Leaming, Deputy Head of HSBC Group Compliance, who supported those changes, noted in an email: "There remain AML issues in respect of travellers cheques which historically are very high risk from an AML perspective and accordingly we would expect that the limits are reasonably low and that there are very strong controls in place to ensure that branches do not abuse the rules."[580]

At HBUS, the documents reviewed by the Subcommittee indicate that, despite their large volume, HBMX travelers cheques attracted little AML review or attention, even though the travelers cheques would have been presented for payment at HBUS' processing centers in New York and subjected to review.  The HBUS processing centers segregated and reviewed all travelers cheques and were required to send blocks of sequentially numbered cheques exceeding $10,000 to HBUS AML Compliance for review.[581]  At the same time, the processing centers had no information on expected account volume, conducted no trend analysis to identify suspicious transactions, and conducted no due diligence on the persons cashing the cheques.[582]  A 2007 OCC examination of HBUS' pouch activities, which included clearing U.S. dollar travelers cheques, identified numerous deficiencies in the AML policies and procedures and called for stronger AML controls, but it did not appear to result in any greater review of the HBMX travelers cheques.[583]  To the contrary, a 2007 HBUS policy change appears to have further limited AML reviews of travelers cheques presented by HSBC Group affiliates in non-high risk countries, restricting them to cases where the deposits exceeded $1 million.[584]  At that time, HBUS deemed both Mexico and HBMX to be at low risk of money laundering.

In 2009, the OCC conducted a second review of HBUS' pouch activities, including procedures to clear U.S. dollar travelers cheques.[585]  As part of that examination, HBUS produced to the OCC a lengthy description of its AML policies and procedures for foreign financial institutions that present items for processing through a correspondent account, including travelers cheques.[586]  Those procedures contained a number of restrictions or conditions, but did not impose a ceiling on the amount of money that HBUS would provide to a

---

[579] 12/8/2008 email from HSBC Warren Leaming to HBMX Ramon Garcia and John Rendall, with copies to HSBC David Bagley, Susan Wright, John Root, and others, "Mexico Visit," HSBC-PSI-PROD-0197874-876.
[580] Id.
[581] See 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," OCC-PSI-00885828, at 1 [Sealed Exhibit.].  HBUS' AML policies and procedures regarding travelers cheques are discussed in more detail in the Report Section on Hokuriku Bank:  Cashing Bulk Travelers Cheques, supra.
[582] See 4/27/2007 email from HBUS Robert Guthmuller to HBUS Alan Ketley, "Visit to Brooklyn OpsLink," OCC-PSI-00312153, at 4.
[583] See 3/31/2007 OCC Report of Examination, OCC-PSI-00304077 [Sealed Exhibit]; 9/13/2007 OCC Supervisory Letter, "Pouch Services and Middle Market at HBUS," OCC-PSI-00000391-394.  [Sealed Exhibit.]
[584] See 5/7/2007 email from HUBS George Tsugranes to HBUS Alan Ketley and others, "Visit to Brooklyn Ops," OCC-PSI-00312153, at 3.
[585] See, e.g., 2/15/2010 email from HBUS Jane Burak to HBUS Lesley Midzain, "Advice Requested," OCC-PSI-00256833 (describing banknotes examination that included reviews of travelers cheques); 2/11/2010 minutes of a "OCC & Chicago FED update Meeting," prepared by HSBC, OCC-PSI-00256916 (noting that HSBC made a presentation to the OCC on 2/9/2010, on enhancements to its cash letter process and an "internal look-back of cash letter activity for Travelers Checks and Money Orders").
[586] See undated "Request No. 7," prepared by HSBC, OCC-PSI-00000075-195 at 123-130 (providing detailed information  in response to OCC questions regarding HBUS' remote deposit capture and cash letter pouch transactions).  [Sealed Exhibit.]

correspondent client through the cash letter process.  The procedures did, however, require
transactions over a certain amount to be reported to HBUS AML Compliance before processing.
The reporting triggers were linked to the risk rating of the foreign financial institution presenting
the monetary instrument for payment.  The five relevant risk ratings, from highest risk to lowest,
were:  Special Category Client (SCC), high risk, cautionary risk, medium risk, and standard risk.
The reporting triggers were as follows:

> For SCC customers – $1,000 for an individual item, and $10,000 in total deposits.
> For high risk customers – $10,000 for an individual item, and $100,000 in total.
> For cautionary risk customers – $50,000 for an individual item, and $200,000 in total.
> For standard and medium risk customers – $50,000 for an individual item and $250,000
> in total.

Clients seeking to cash travelers cheques in excess of the reporting threshholds were not
automatically prohibited from proceeding; instead, their transactions were reported to HBUS
AML Compliance which was then supposed to make a case-by-case decision on whether to
allow the transactions to proceed.

By 2009, Mexico and HBMX were considered high risk and, due to the large volume of
HBMX travelers cheques it sold, HBMX cheques should have regularly triggered the AML
reporting requirement and AML reviews.  In addition, HBMX travelers cheques should have
produced numerous alerts due to the large amounts, sequentially numbered cheques, and
structuring patterns involved.  Instead, the documentation suggests that few alerts issued and
very little review of HBMX travelers cheques took place.

As part of its 2009 examination, the OCC expressed concern that, based on samples taken
from 2007, 2008, and 2009, HBUS' monitoring of travelers cheques required too few AML
reviews and was inadequate to detect suspicious activity.[587]  In response, HBUS undertook a
detailed review of all cash letter items in 2009.[588]  HBUS determined that 280 items had been
flagged for review, a tiny number in comparison to the huge number of transactions cleared per
year.  In addition, according to HBUS, of those 280 items, less than a handful contained
information suggesting suspicious activity.[589]  While HBUS presented that result as evidence of
minimal AML risk, it is possible that the criteria used to flag transactions for review were too
narrow to catch suspicious transactions.

One reason to think the latter might be the case is that, from 2007 to 2012, other financial
institutions have reported significant instances of suspicious activities involving U.S. dollar
travelers cheques either issued or cleared by HBMX.[590]  These reports generally describe
coordinated teams of individuals, each of whom purchased large numbers of travelers cheques
from HBMX, and then cashed or deposited the cheques in suspicious patterns.  Some of the U.S.
dollar travelers cheques identified by these financial institutions had a combined value in excess

---

[587] See 2/15/2010 email from HBUS Janet Burak to HBUS Lesley Midzain, "Advice Requested," OCC-PSI-
00256833.
[588] Id.
[589] Id.
[590] See Sealed Exhibits.

of $1 million, and some of the suspicious activity occurred over an extended period of time. Many of the suspicious transactions involved sequentially numbered cheques, illegible signatures, or difficult to understand markings or numbers on the cheques.  In some cases, groups of cheques were made payable to the same health food business, toy company, or automobile auction house.

Four examples illustrate the issues.  In the first example, nearly 1,500 U.S. dollar travelers cheques were purchased from the same HBMX branch in Mexico over a seven-month period from 2007 to 2008, and cashed shortly thereafter at several automobile auctions in the United States.   Money launderers have been shown in the past to utilize the purchase of expensive, but liquid items, such as cars to hide illicit funds.  The travelers cheques had a combined value of $900,000.  In a second instance from 2008, on four occasions over a period of 16 days, individuals purchased from an HBMX branch in Mexico travelers cheques which, each time, had a combined value of $20,000 to $30,000, and altogether added up to $109,000.  All of the cheques were then signed and countersigned with the same illegible signature, and made payable to the same toy business in Mexico.  Ten months later, in a coordinated effort over a two-week period, all of the cheques were either cashed or deposited.  In a third instance, 188 travelers cheques in denominations of $500 and $1000, totaling $110,000, were purchased in nine large blocks of sequentially numbered cheques from a major U.S. bank.  Then, over a three-month period from April to June 2011, all 188 cheques were negotiated for payment at the same HBMX branch in Mexico, using illegible signatures so that the cheques provided no information about the payees.

In the fourth instance, two men purchased groups of travelers cheques from the same HBMX branch in Mexico.  On 14 occasions over a three month period in 2011, the two men purchased the travelers cheques in batches which, each time, had a combined value of $10,000, and altogether added up to $140,000.  All of the cheques were then signed with the same illegible signature.  Over time, small groups of the travelers cheques, often with consecutive serial numbers, were cashed or deposited, with the majority of cheques failing to bear a stamp indicating exactly where they were negotiated.  The 2011 transactions were part of a larger pattern in which the same HBMX branch sold travelers cheques to the same two men over a three year period from 2009 to 2011, for a combined value of $1.9 million.

While HBMX has tightened its travelers cheque policies by restricting the sale of travelers cheques to pre-existing customers and limiting the dollar amount of travelers cheques that can be provided to one customer at a time, HBMX travelers cheques continue to surface in reports of suspicious activities filed with U.S. authorities.  Because many if not all of the cheques are cashed through the HBMX correspondent accounts at HBUS, HBMX continues to expose HBUS to money laundering risks through its issuance and cashing of U.S. dollar travelers cheques.

HBMX's money service business clients, Cayman accountholders, and travelers cheque purchasers all relied on the U.S. dollar services that HBMX was able to provide through its correspondent accounts at HBUS.  In some cases, it appears those HBMX clients used HBMX's U.S. dollar correspondent account at HBUS to commit criminal acts.  For its part, HBUS should have known of the money laundering risks it was incurring from those and other high risk

HBMX clients, accounts, and products. Because HBMX was an HSBC affiliate and was also categorized for many years as located in a low risk jurisdiction, however, until recently, HBUS did not perform the KYC due diligence or account monitoring needed to uncover HBMX's high risk activities.

### E.  Bulk Cash Movements

In addition to using HBUS correspondent accounts to execute wire transfers, clear cash letter instruments, and conduct other U.S. dollar transactions, in 2007 and 2008, HBMX used its HBUS banknotes account to supply more physical U.S. dollars to HBUS than any other Mexican bank or HSBC affiliate. The documents indicate that both HBMX and HBUS were unaware of the flood of dollars HBMX was pouring into the United States through HBUS, in part because HBUS had stopped monitoring HSBC affiliates' banknotes accounts for a three-year period, from mid-2006 to mid-2009. HBUS policy was also consistent with the HSBC Group policy of not performing due diligence or account monitoring for HSBC affiliates. When, in 2008, Mexican and U.S. regulators began pressing both HBMX and HBUS to explain the huge flow of U.S. dollars from Mexico and whether the funds included illegal drug proceeds, both banks were caught by surprise and eventually took action to turn off the spigot. In 2009, HBMX stopped accepting U.S. dollar deposits at its branches in Mexico, and then in 2010, HBUS exited the banknotes business.

### (1)  HBUS' Global Banknotes Business

Prior to its exit, HBUS operated a very large U.S. banknotes business which the Federal Reserve estimated in 2010, to be worth approximately $300 billion annually.[591] As part of that business, HBUS supplied physical U.S. dollars and accepted bulk cash shipments from financial institutions around the world, including over two dozen HSBC affiliates.[592]

Bulk cash shipments typically use common carriers, independent carriers, or U.S. Postal Service carriers to ship U.S. dollars by air, land, or sea to a bank located in the United States.[593] Shipments have gone via airplanes, armored trucks, ships, and railroads. Most shipments are transported via containerized cargo. Shippers may be "currency originators," such as businesses that generate cash from sales of goods or services; or "intermediaries" that gather currency from originators or other intermediaries to form large shipments. Intermediaries are typically central banks, commercial banks, money service businesses, or their agents.[594] Bulk cash shipments can be made directly to a bank in the United States, or to a U.S. Federal Reserve Bank or branch, which will accept the cash and credit it to the account of the intended recipient bank.[595] Banks that receive bulk cash shipments via common carriers or the Postal Service have no obligation to

---

[591] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA') Bank Note Business (Revised)," BOG-SR-000442-443, 001402-409. [Sealed Exhibit.]
[592] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 342. [Sealed Exhibit.]
[593] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA') Bank Note Business (Revised)," at BOG-SR-001404. [Sealed Exhibit.]
[594] Id.
[595] Id.

report the amount of the cash received to U.S. authorities, though they still must report any suspicious activity.[596]

Until 2010, HBUS was one of about 30 U.S. financial institutions that bought and sold physical currency on a wholesale basis around the world.[597]  The headquarters of HBUS' Global Banknotes business was located in New York, headed by Christopher Lok, with offices in London, Hong Kong, Singapore, and other locations.[598]  Until 2010, HSBC was also one of a relatively small number of international banks that contracted with the Federal Reserve Bank of New York (FRBNY), under the Extended Custodial Inventory (ECI) Program, to manage the FRBNY's U.S. currency vaults.  The ECI Program facilitates the international distribution of U.S. dollars, repatriates old dollars, circulates new designs, and provides information on the international use of U.S. currency.[599]  HSBC operated FRBNY currency vaults in London, Frankfurt, and Singapore.[600]  The currency in those vaults remained on the books of the Federal Reserve, and was used to fill orders from third parties or the operator itself.[601]  When distributing U.S. dollars, HSBC was obligated to comply with U.S. AML and Office of Foreign Assets Control (OFAC) requirements.[602]

While bulk cash shipments are a normal and legitimate part of international banking, they are also vulnerable to misuse by money launderers and other criminals.  In 2001, the U.S. Congress made smuggling large amounts of physical U.S. dollars across U.S. borders a crime.[603]  In 2005, a U.S. Money Laundering Threat Assessment identified bulk cash smuggling as a key method used to launder criminal proceeds and highlighted how drug traffickers were smuggling U.S. dollars obtained from illegal U.S. drug sales across the border into Mexico and then using various means to arrange for their deposit into a U.S. bank.[604]  In 2006, the U.S. Financial Crimes Enforcement Network (FinCEN) issued an advisory to U.S. financial institutions warning them in particular about money laundering associated with bulk cash shipments from Mexican casas de cambios.[605]

---

[596] Id., citing 31 CFR §103.23.

[597] Id. at BOG-SR-001405.  [Sealed Exhibit.]

[598] See 11/2006 HBUS presentation, "Banknotes Trading A Global Reach Organizational Chart as of November 2006," OCC-PSI-00000501-512.

[599] 1/12/2010 memorandum from the Federal Reserve, "US Department of Justice Investigation of HSBC Bank USA NA's ('HSBC Bank USA'Bank Note Business (Revised)," at BOG-SR-001405. [Sealed Exhibit.]

[600] Id.

[601] Id.

[602] Id.

[603] See Section 371 of the USA Patriot Act, P.L. 107-56, codified at 31 U.S.C. §5332 (outlawing the smuggling or attempted smuggling of over $10,000 in currency or monetary instruments into or out of the United States, with the specific intent to evade U.S. currency reporting requirements).

[604] See Dec. 2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and U.S. Postal Service, Chapter 5 on "Bulk Cash Smuggling" ("Upon leaving the country, cash may stay in Mexico, continue on to a number of other countries, or make a U-turn and head back into the United States as a deposit by a bank or casa de cambio.").

[605] 4/28/2006 "FinCEN Guidance to Financial Institutions on the Repatriation of Currency Smuggled into Mexico from the U.S.," No. FIN-2006-A003.

As of 2010, 29 HSBC affiliates had banknotes accounts with HBUS.[606]  Some of those affiliates operated in high risk countries plagued by drug trafficking, corruption, money laundering, or other criminal enterprises, including Angola, Bangladesh, Colombia, Democratic Republic of Congo, Haiti, Mexico, Panama, Paraguay, Saudi Arabia, and Ukraine.  HBUS did not distinguish, however, between high and low risk affiliates with banknotes accounts.[607]

### (2)  HBMX U.S. Dollar Sales to HBUS

For a three-year period, from mid-2006 until mid-2009, HBUS accepted more than $15 billion in physical U.S. dollars from other HSBC affiliates, but failed to conduct any AML monitoring of the bulk cash transactions.[608]  HBUS had performed AML monitoring both prior to and following that time period.  HBUS personnel have been unable to explain why all AML monitoring of its banknotes accounts ceased during that period and then resumed later, but the OCC has noted that the monitoring ceased when a formal AML oversight agreement applicable to HBUS expired, and resumed when an OCC AML examination of the banknotes operations was launched in July 2009.[609]  The absence of AML monitoring meant that HBUS did not track for AML purposes its growing dollar traffic with HBMX, which reached $3 billion in 2007, and then jumped another 25% in 2008 to $4 billion.[610]

In February 2008, Mexican regulators held a private meeting with HBMX CEO Paul Thurston and informed him that HBMX was repatriating more U.S. dollars to the United States than any other Mexican bank – more than each of the four largest Mexican banks, all of which were larger than HBMX.[611]  The CNBV also informed Mr. Thurston that the Mexican Financial Intelligence Unit (FIU) was very concerned about the "high level of ML [money laundering] risk" involved.[612]  The FIU indicated that in the "majority of the most relevant ML cases" they had investigated in 2007, "many transactions were carried out through" HBMX.[613]

In November 2008, the CNBV and FIU held a second private meeting, not only with the HBMX CEO, then Luis Pena, but also with the HSBC CEO of Latin America, Emilson Alonso, and the CEO of the HSBC Group, Michael Geoghegan.[614]  Again, the regulators expressed their alarm at the volume of U.S. dollars that HBMX was sending to the United States and described

---

[606] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 342.  [Sealed Exhibit.]
[607] Id. at OCC-PSI-00864336.
[608] Id. at 336.
[609] See id. at 360.  When asked why HBUS stopped monitoring its affiliates' banknotes activity, HBUS personnel offered conflicting reasons.  Daniel Jack, in charge of HBUS compliance for banknotes, thought that his supervisor, Alan Ketley, had approved the decision to stop monitoring affiliates, but Alan Ketley did not recall the decision. Neither did their superior, Teresa Pesce.  David Bagley called the decision to stop monitoring banknotes for affiliates "inexplicable."  Subcommittee interviews of Daniel Jack (3/13/2012), Alan Ketley (2/16/2012), Teresa Pesce (3/30/2012) and David Bagley (4/12/2012).
[610] Id.; 6/29/2009 OCC notes of telephone conversations, prepared by OCC AML Examiner Joseph Boss, OCC-PSI-00928760.
[611] See 2/18/2008 draft report entitled, "Internal Control, HBC Mexico, S.A.," prepared by CNBV, HSBC OCC 8966021-026, at 5.
[612] Id.
[613] Id. at 6.  Examples of these cases included Zhenly Ye Gon, Casa de Cambio Puebla, and Sigue Corporation.
[614] See 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.

law enforcement concerns about the extent to which those dollars may be the proceeds of illegal drug trafficking in the United States.  A November email from the HSBC Group Compliance Deputy Head summarizing the meeting stated that, between January and September 2008, HBMX had repatriated $3 billion to the United States, which represented 36% of the market volume and double what the biggest bank in Mexico, Banamax, had repatriated, even though HBMX was only the fifth largest bank in the country.[615]  According to an internal OCC document, the Department of Homeland Security's Immigration and Customs Enforcement (ICE) division conveyed that, within Mexico, HBMX "led the market in cash repatriation in 2007 and 2008," with "$3.2 billion repatriated in 2007 and $4.2 billion repatriated in 2008."[616]

A quick analysis undertaken by HBMX immediately after the November meeting found that while HMBX was "very good at buying/acquiring dollars," it did "not seem to sell them and hence our very high repatriation figures."[617]  The analysis also determined that "80% of our dollars come from money exchange business at branches."[618]  It noted further that "there is no limit on the amount of dollars that c[u]stomers can convert to pesos," and that with respect to non-customers, HBMX branches would "convert up to 3000 dollars, and do not require any KYC."[619]  HSBC Group Compliance head David Bagley responded:  "The practice of changing USD in the branches pres[u]mably with little or no ID for non customers is in breach of Group policy.  When looking at our USD exposure how can this have been missed."[620]

At HBUS, an undated analysis was conducted of its banknotes traffic with Mexican financial institutions over a three-month period, from November 2006 to February 2007.[621]  The analysis disclosed that HBUS was doing far more business with HBMX than any other Mexican financial institution.  It showed that during the three-month period:

–HBUS had purchased about $470 million in U.S. dollars from Banco Mercantil Del Norte, a major Mexican bank, while selling it only about $22 million in U.S. dollars.

–HBUS had purchased about $281 million in U.S. dollars from BBVA Bancomer, another major Mexican bank, while selling it only about $5 million.

–HBUS had purchased about $196 million in U.S. dollars from Case de Cambio Puebla, and $194 million from Consultoria International, without selling either any U.S. dollars.

---

[615] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[616] 6/29/2009 OCC notes of telephone conversations, prepared by OCC AML Examiner Joseph Boss, OCC-PSI-00928760.

[617] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607, at 606.

[618] Id.

[619] Id.

[620] 11/27/2008 email from HSBC David Bagley to HSBD Warren Leaming, copy to Richard Bennett, "Mexico," HSBC OCC 8875605.

[621] See undated "HBUS Banknotes NY – USD Bought from or Sold to Customers in Mexico:  3-Month Period (Nov-06 to Feb-07)," prepared by HBUS, OCC-PSI-00151506.  See also undated "Banknotes-NY Selected Customers' Activity Alerts & Traders' Explanations for USD Purchases & Sales from 2005-2009," prepared by HNAH, OCC-PSI-00005890-904.

–During the same period, HBUS had purchased about $742 million in U.S. dollars from HBMX, while selling it only a little more than $1.3 million.

These figures indicate that HBMX was, by far, HBUS' largest banknotes customer in Mexico.

In July 2009, the OCC initiated an AML examination of HBUS' global banknotes operations, and soon discovered that the bank was not monitoring the banknotes activities of its affiliates.[622] That same month, HBUS resumed monitoring its banknote accounts.[623] In September, the OCC requested documentation related to banknotes accounts for 25 Latin American financial institutions, including ten in Mexico. In November 2009, the examination team added examiners from the Federal Reserve. Additional requests for information were made, including with respect to HSBC affiliates with banknotes accounts, HBMX, Mexican casas de cambios, and HBMX's U.S. dollar accounts in the Cayman Islands.

In August 2009, the OCC summarized some of the information in an internal memorandum.[624] According to the OCC, due to transaction costs, banknotes transactions at HBUS typically occurred only about once per month and involved large shipments.[625] In addition, transaction volumes often fluctuated on a seasonal basis, increasing during holidays or tourist seasons.[626] According to the OCC, HBUS said that it conducted AML monitoring on a monthly basis, examining banknotes transactions by customer and inquiring when significant changes in the volume of U.S. dollar sales or purchases took place.[627]

When the OCC conducted tests on the 2009 HBUS banknotes data, however, it determined that the volume data was not always accurate, and HBUS did not keep records of its reviews or actions:

"When volumes changed significantly, the bank did not seem to be aware of these changes, and it does not appear that the bank took any action as a result. For example, even though transactions volumes for customers in Mexico increased significantly from the first 6 months of 2008, over the first 6 months of 2009, there was no documentation in the files that the bank noted the change or took any action. … Bank employees … assured us that adequate monitoring takes place within the business line and Compliance. However, we were unable to find anything in the files that this was the case. They also cautioned that too much documentation results in increased legal risk. We explained to the bank that written documentation is necessary, for institutional memory, and to ensure that controls are exercised. We noted the bank's appetite for risk, as well as the risk

---

[622] See 2/6/2010 email from HBUS Janet Burak to HBUS Brendan McDonagh, "Expanded 'Banknotes Exam,'" OCC-PSI-00787479 (summarizing the banknotes examination effort). See also Subcommittee interview of Joseph Boss (1/30/2012).
[623] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, OCC-PSI-00864335-365, at 360. [Sealed Exhibit.]
[624] See 8/13/2009 OCC memorandum to OCC AML Examiners from the OCC Compliance Risk Analysis Division, "HSBC Global Banknotes, Compliance RAD assistance," OCC-PSI-00846642. [Sealed Exhibit.]
[625] Id. at 4.
[626] Id.
[627] Id.

inherent in the Banknotes business.  The business line seemed to resist this message, but Compliance staff seemed to eventually grasp the importance of better documentation."[628]

As the data confirmed that HBMX was the single largest supplier of U.S. dollars to HBUS, transferring billions of dollars that far outstripped the volumes being supplied by larger Mexican banks and other HSBC affiliates, Mexican and U.S. law enforcement and regulatory authorities continued to express concern that HBMX's bulk cash shipments could reach that volume only if they included illegal drug proceeds.  In a January 2010 meeting, U.S. law enforcement and regulators also expressed concern that the problem extended beyond Mexico:

"The bulk cash receipts by HSBC's Bank Note Business from certain correspondent accounts based in Central and South America exceed reasonably expected volumes of USDs that should be within those countries from tourism, foreign business, etc."[629]

### (3)  Remedial Action

In response to the concerns expressed by regulators and law enforcement, HBMX took a number of steps to gain a better understanding and control of its U.S. dollar transactions.  The first set of actions, in February 2008, focused on gaining better information.  HBMX announced a new policy, effective immediately, to deem all customers who deposited more than $100,000 in a month as SCC clients subject to enhanced due diligence.  HBMX identified 312 customers that met that criteria and subjected them to a KYC review.[630]  HBMX also undertook a review of its branches to identify the nature and volume of their U.S. dollar transactions,[631] and a review of its money service business clients to determine whether each relationship should continue.[632]  Still another action HBMX took was to change its account monitoring criteria to increase scrutiny of U.S. dollar deposits by customers.[633]

In November 2008, after another meeting with regulators critical of its U.S. dollar transactions, HBMX went further.  It ordered its branches to stop providing physical U.S. dollars

---

[628] Id. at 4-5.

[629] 1/11/2010 meeting memorandum, prepared by the Federal Reserve Bank of Chicago, "DOJ Concerns with HSBC Bank Notes Activities," BOG-SR-001402-1409, at 402 [Sealed Exhibit.]

[630] See undated "Actions taken since 18FEB," prepared by HBMX, HSBC OCC 8875040-041(describing actions taken after a Feb. 18, 2008 meeting with the CNBV); 3/3/2008 "Internal Control, HSBC Mexico SA," prepared by HBMX, HSBC OCC 8966027-038.  But see 7/28/2008 email from HBMX Luis Alverez to HSBC John Root and HBMX Ramon Garcia, "Major Issues Outstanding," HSBC OCC 8873598 ("In order to mitigate risk in HBMX, 100K process was implemented (customers which make USD cash deposits exceeding 100k within a one-month period).  It has been identified that 974 customers made cash deposits for a total amount of USD308 Million from Jan to May.  These customers are classified in our monitoring systems as high-risk customers and an enhanced KYC must be performed for them.  If any customers do not meet requirements, accounts are closed.").

[631] See, e.g., undated "Rectification Programme – 12 major projects in 6 categories," prepared by HBMX, HSBC OCC 8875046 (listing as item 5, on "USD Banknotes": "Review of USD intensive customers" and "Analysis of transaction patterns through branches").

[632] 7/28/2008 email from HBMX Luis Alverez to HSBC John Root and HBMX Ramon Garcia, "Major Issues Outstanding," HSBC OCC 8873598.

[633] Undated "Actions taken since 18FEB," prepared by HBMX, HSBC OCC 8875040-041(describing actions taken after a Feb. 18, 2008 meeting with the CNBV).

111

to customers and non-customers alike, other than through ATMs at airports.[634]  It also prohibited branches from accepting U.S. dollar cash deposits from customers.[635]  In addition, HBMX stopped opening new U.S. dollar accounts at its Cayman branch, and prohibiting the acceptance of new cash deposits for existing Cayman accounts.[636]  All of these actions led to a steep drop in the number and volume of HBMX U.S. dollar transactions.

As HBMX cut back dramatically on its U.S. dollar business beginning in early 2009, OCC AML examiners found that HBUS appeared to be increasing its U.S. dollar transactions with Mexican clients, including some of the high risk casas de cambio that could no longer engage in the same volume of U.S. dollars with HBMX.[637]  HSBC Group Compliance knew about HBUS' Mexican casa de cambio clients.  Rather than press HBUS to close the accounts, however, HSBC Group Compliance head David Bagley merely observed to a colleague in January 2009:  "I am surprised that HBUS still have cambio clients."[638]

A year later, in June 2010, HBUS decided to exit the U.S. banknotes business.  It closed the Global Banknotes offices in New York, London, Hong Kong, and Singapore, and later sold portions of the banknotes business to other banks.[639]  HBUS also declined to renew its contract to operate U.S. currency vaults for the Federal Reserve Bank of New York when that contract expired in 2010.  In September 2010, the OCC issued a supervisory letter identifying multiple AML deficiencies at HBUS, including with respect to its banknotes business, and followed with a cease and desist order in October.

## F.  Analysis

Over the years, HBUS maintained correspondent accounts for at least 80 HSBC affiliates and banknotes accounts for at least 29 HSBC affiliates, which accounted for a large portion of its U.S. dollar activities.  In 2009, for example, HSBC determined that "HSBC Group affiliates clear[ed] virtually all USD [U.S. dollar] payments through accounts held at HBUS, representing 63% of all USD payments processed by HBUS."[640]  HSBC also calculated that, over an eight-year period, its U.S. dollar clearing business had increased over 200%, from processing an average daily amount of $185 billion in 2001, to $377 billion in 2009.[641]  HBUS functioned as the U.S. nexus for the entire HSBC global network of financial institutions.  Some of those

---

[634] See 11/27/2008 email from HBMX Luis Pena to HBMX Emilson Alonso, copy to HSBC Michael Geoghegan, "Money Launderying," HSBC OCC 8874849.

[635] Id.

[636] 11/27/2008 email from HSBC Warren Leaming to HSBC David Bagley and Richard Bennett, "Mexico," HSBC OCC 8875605-607.

[637] See, e.g., 9/1/2009 OCC memorandum  to the Files, "Washington Meeting," OCC-PSI-01416833 ("[O]nce HSBC Mexico ceased its operations, HBUS began significant volume of Banknote activity directly with some of HSBC Mexico's former Banknote clientele.").  [Sealed Exhibit.]

[638] 1/27/2009 email from HSBC David Bagley to HSBC Susan Wright and Warren Leaming, "Press Release," HSBC OCC 8873485.

[639] Id.  In 2010, HSBC Holdings plc sold its U.S. wholesale banknotes business in Asia to United Overseas Bank Limited (UOB) for $11 million, and in 2011, sold its European banknotes business to HSBC Bank plc.  It recorded total closure costs of $14 million during 2010.  Id.

[640] See 9/9/2009 chart entitled, "HSBC Profile," included in "HSBC OFAC Compliance Program," a presentation prepared by HSBC and provided to the OCC, at HSBC OCC 8874197.

[641] Id. at "USD Payment Statistics – Fact Sheet," HSBC OCC 8874211.

institutions used their access to the U.S. financial system as a selling point to attract clients.[642]
Not all of those affiliates operated in high risk jurisdictions like Mexico; not all had high risk
clients like casas de cambio; not all had high risk products like U.S. dollar Cayman accounts; and
not all had weak AML controls.  But some HSBC affiliates operated under those circumstances,
and HBMX provides a case history of the money laundering risks that followed.  HBMX
illustrates how the U.S. affiliate of a global bank can better protect itself by conducting careful
due diligence of fellow affiliates, as already required by law, identifying higher risk institutions,
and understanding their high risk clients, high risk products, AML controls, and money
laundering vulnerabilities.  HBMX also illustrates the need for ongoing, effective account
monitoring to detect, prevent, and report suspicious activity.  Effective monitoring and SAR
reporting require adequate resources and personnel.  Still another lesson is that AML personnel
at the parent and affiliates of a global bank should consider all legal avenues for systematically
sharing information with each other about suspicious clients and transactions in order to combat
misuse of their network by drug traffickers, organized crime, and other wrongdoers.

---

[642] Subcommittee interview of Michael Geoghegan (5/42/2012).

## IV.   HSBC AFFILIATES:   CIRCUMVENTING OFAC PROHIBITIONS

The United States prohibits doing business with certain persons and entities, including terrorists, persons engaged in nuclear proliferation, drug kingpins, and persons associated with rogue jurisdictions such as Iran, North Korea, and Sudan.  To implement the law, the U.S. Treasury Department's Office of Foreign Assets Control (OFAC) has developed a list of those prohibited persons and countries which banks use to create an "OFAC filter" to identify and halt potentially prohibited transactions.  Transactions stopped by an OFAC filter typically undergo an individualized review to see if the transaction can proceed.

Foreign banks that engage in U.S. dollar transactions typically execute them through the account of a bank in the United States, subject to the U.S. bank's OFAC filter.  While most processing takes less than 24 hours, transactions stopped by the OFAC filter for further review may undergo substantial processing delays and, in some cases, payments may be blocked and held for years.  Because of the additional time and expense involved when transactions are subjected to review, some foreign banks have developed a variety of tactics to avoid the OFAC filter.  Common tactics included intentionally stripping information from the transaction documentation to conceal the participation of a prohibited country or person, or using "cover payments."  In the context of Iranian transactions, cover payments are transfers between correspondent banks in non-sanctioned jurisdictions which lack underlying payment details, including information about a party that is a prohibited country or person.  In the case of Iranian U.S. dollar transactions, some banks used one or both of these practices when conducting so-called "U-turn" transactions, a type of transaction that was allowed under OFAC regulations prior to November 2008, but because the transactions referenced Iran, routinely triggered the OFAC filter and required an individualized review which delayed the transaction's processing.  In recent years, U.S. law enforcement has penalized some international banks that used willfully deceptive tactics to circumvent the OFAC filter and process prohibited transactions.

The Subcommittee conducted a review of issues related to the sending of OFAC sensitive transactions through HBUS' correspondent accounts from 2000 to 2010, by HSBC affiliates.  The evidence indicates that, for years, some HSBC affiliates sending OFAC sensitive transactions involving Iran through their U.S. dollar correspondent accounts at HBUS took steps to conceal them, including by deleting references to Iran from the payment instructions or by characterizing the transaction as a transfer between banks in permitted jurisdictions without disclosing any Iranian connection.  More specifically, from at least 2001 to 2007, two HSBC affiliates, HSBC Europe (HBEU) and later HSBC Middle East (HBME), repeatedly conducted U-turn transactions involving Iran through HBUS, many of which were not disclosed to the bank, even though they knew HBUS required full transparency to process U-turns.  To ensure HBUS cleared the transactions without delay, HBEU routinely altered transaction documentation to delete any reference to Iran that might trigger the OFAC filter at HBUS and also typically characterized the transaction as a transfer between banks in permitted jurisdictions.   The aim of the affiliates' efforts appeared to be to ensure the Iranian transactions utilized HBUS' automated processing procedures and avoided any human intervention or manual review, a process known as straight through processing or STP.  Internal bank documents also indicate that the affiliates viewed the U-turns they sent through HBUS' accounts as permitted by OFAC rather than

prohibited transactions under U.S. law, but their failure to provide full transparency prevented any individualized review by HBUS to confirm their legality.

Internal bank documents show that HSBC Group Compliance knew of HBUS' insistence on full transparency for U-turns and the practice of HSBC affiliates to conceal the Iranian transactions sent through their U.S. dollar correspondent accounts at HBUS. HSBC Group Compliance, as well as other senior HSBC Group executives, allowed the HSBC affiliates to continue to engage in these practices, which even some within the bank viewed as deceptive, for more than five years without disclosing the extent of the activity to HBUS. The bank documents show that, from 2000 to 2005, the practice of altering U-turn transaction documentation was repeatedly brought to the attention of HSBC Group Compliance, including by HBEU personnel who objected to participating in the alteration of documents and twice announced deadlines to end the activity. Despite receiving this information, HSBC Group Compliance did not stop HSBC affiliates from sending concealed Iranian transactions through HBUS' accounts until the bank decided to exit Iran altogether in 2007.

At the same time, while some at HBUS claimed not to have known they were processing undisclosed Iranian transactions from HSBC affiliates, internal documents show key senior HBUS officials were informed as early as 2001. In addition, on several occasions, HBUS' OFAC filter stopped Iranian transactions that HBUS had indicated should be disclosed by HSBC affiliates, but were not. Despite the evidence of what was taking place, HBUS failed for years to demand a full accounting of what HSBC affiliates were doing. While HBUS insisted, when asked, that HSBC affiliates provide fully transparent transaction information, when it obtained evidence that some affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to confront those affiliates, stop the conduct, and ensure all Iranian U-turns were subjected to individualized reviews to gauge whether they complied with the law.

In addition to Iranian transactions, HBUS documents indicate that, from at least 2002 to 2007, some HSBC affiliates also sent potentially prohibited transactions through HBUS involving Burma, Cuba, North Korea, or Sudan, although none of the affiliates employed the same type of systematic effort used for transactions involving Iran. In recent years, HBUS' OFAC compliance program as a whole has also displayed AML deficiencies.

In 2010, HBUS hired an outside auditor, Deloitte LLP, to identify and examine the OFAC sensitive transactions involving Iran and other prohibited countries or persons that went through the bank.[643] That review, which is ongoing and has yet to review all relevant transactions, has so far identified, over a seven-year period from 2001 to 2007, more than 28,000 OFAC sensitive transactions sent through HBUS involving a total of $19.7 billion. Of those 28,000 transactions, more than 25,000 totaling more than $19.4 billion involved Iran, while 3,000 involved other prohibited countries or persons. The Deloitte review characterized 2,584 of those transactions, involving assets in excess of $367 million, 79 of which involved Iran, as "Transactions of Interest" requiring additional analysis to determine whether violations of U.S.

---

[643] See Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919 -989, at 930.

law occurred. [644]  HBUS is currently in the process of analyzing those transactions, which could lead to financial penalties if it is found to have violated OFAC regulations.

Finally, another issue involves actions taken by some HSBC Latin American affiliates, with the approval of HSBC Group Compliance, to send non-U.S. dollar payment messages through a U.S. server whose OFAC filter was not turned on to screen them for terrorists, drug kingpins, or other prohibited persons.  HSBC Group Compliance allowed those payment messages to move through the United States and utilize U.S. facilities while bypassing the OFAC filter, despite HBUS concerns that such messaging traffic might require OFAC screening to block transfers involving terrorism, drug trafficking, or other wrongdoing.  The transactions were later screened by HSBC Group's WOLF filter.

## A.  Background on OFAC Prohibitions

**OFAC.**  The Office of Foreign Assets Control (OFAC) within the U.S. Department of Treasury administers and enforces economic and trade sanctions stemming from U.S. foreign policy and national security goals, and other threats to the foreign policy, national security, or economy of the United States. [645]  The office was formally established in December 1950, when President Truman blocked all Chinese and North Korean assets subject to U.S. jurisdiction. [646] Its programs seek to prohibit U.S. persons and entities from engaging in trade or financial transactions with terrorists, persons engaged in activities related to the proliferation of weapons of mass destruction, international narcotics traffickers, and rogue jurisdictions.

OFAC's regulatory authority is exercised under Presidential national emergency powers and laws enacted by the U.S. Congress to impose controls on transactions and authorize the freezing of assets under U.S. jurisdiction.  According to OFAC, "[m]any of the U.S. sanctions are based on United Nations and other international mandates, are multilateral in scope, and involve close cooperation with allied governments." [647]  The freezing of assets "immediately imposes an across-the-board prohibition against transfers or dealings of any kind with regard to the property," and the owner of the asset must contact OFAC directly to request the release of a frozen asset.  OFAC prohibitions support U.S. and international efforts to combat terrorism, nuclear proliferation, drug trafficking, and other wrongdoing.

OFAC administers both comprehensive and selective sanctions programs. The comprehensive U.S. programs apply to persons and entities within a designated jurisdiction and have applied to Burma (Myanmar), Cuba, Iran, Sudan, and Syria.  The non-comprehensive programs target specific individuals and entities rather than impose broad prohibitions involving an entire country.  These programs have applied at times to persons and entities associated with Iraq, Libya, North Korea, Somalia, and Zimbabwe.  To carry out U.S. sanctions programs, OFAC has developed a list of Specially Designated Nationals and Blocked Persons (SDN).  The

---

[644] Id.

[645] See U.S. Department of Treasury Office of Foreign Assets Control (OFAC), http://www.treasury.gov/about/organization-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

[646] Id.  OFAC is the successor to the Office of Foreign Funds Control (the "FFC") that was established at the beginning of World War II in 1940.  However, the Treasury Department administered sanctions as far back as the War of 1812 when sanctions were imposed against Great Britain.  Id.

[647] Id.

SDN designation covers both individuals and entities in which SDN persons have a direct or indirect ownership interest of 50% or more.  The SDN designation applies to covered entities whether or not the entity is named on the SDN list.[648]  U.S. persons are prohibited from dealing with persons and entities on the SDN list, and all SDN assets in the United States are supposed to be blocked.  OFAC also has authority to grant general and specific "licenses," which authorize exceptions for certain categories of transactions, such as those related to humanitarian efforts.[649]

OFAC regulations apply to all U.S. persons, both citizens and permanent resident aliens, regardless of where they are located, as well as all persons and entities within the United States, and all U.S. incorporated entities and their foreign branches.[650]  Fines for violating U.S. sanction laws and OFAC regulations can be substantial.  Criminal penalties can result in fines ranging from $50,000 to $10 million and imprisonment for 10 to 30 years for willful violations.  Civil penalties in various matters range from $250,000 or twice the amount of each underlying transaction to $1,075,000 for each violation.[651]

**Iran and U-turn Transactions.**  For more than thirty years, dating back to 1979, the United States has applied sanctions programs to Iran, enforced by OFAC.[652]  These programs have generally prohibited U.S. persons from engaging in transactions with anyone associated with Iran, and the OFAC filter has stopped any financial transaction including an Iranian reference.

Between 1995 and November 10, 2008, however, OFAC regulations also included an exception to the prohibition on Iranian transactions commonly referred to as "U-turns."  U-turn transactions were authorized by OFAC under regulations issued in 1995.  In that year, President Clinton declared that Iran was an international threat for its attempt to obtain a nuclear weapon as well as its role in undermining ongoing peace talks in the Middle East.  As such, U.S. financial institutions were generally barred by OFAC from processing transactions involving Iran.  In their place, OFAC allowed only those Iran-related transactions that began and ended in non-Iranian foreign banks.  According to Treasury:

"This is commonly referred to as the 'U-turn' authorization.  It is so termed because it is initiated offshore as a dollar-denominated transaction by order of a foreign bank's customer; it then becomes a transfer from a correspondent account held by a domestic bank for the foreign bank to a correspondent account held by a domestic bank for another

---

[648] See OFAC website, FAQ #10: http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/ques_index.aspx.
[649] Id.
[650] See OFAC website, FAQ #11: http://www.treasury.gov/resource-center/faqs/Sanctions/Pages/answer.aspx#10
[651] See U.S. Department of Treasury Office of Foreign Assets Control (OFAC), http://www.treasury.gov/about/ organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.
[652] See 31 C.F.R. Part 535, Iranian Assets Control Regulations, and 31 C.F.R. Part 560, Iranian Transactions Regulations, which together comprise the Iranian sanctions program.  Initial Iranian sanctions regulations, now detailed in Part 535, were created on November 14, 1979, after U.S. diplomats were taken hostage in Tehran, and President Carter blocked assets located in the United States belonging to the Government of Iran.  On October 29, 1987, following Iran's expressions of support for international terrorism and aggressive actions against non-hostile shipping in the Persian Gulf, President Reagan issued Executive Order 12613, the predecessor to Part 560.  From 1995 to 1997, President Clinton issued three additional Executive Orders, numbered 12957, 12959, and 13059, which culminated in a prohibition of nearly all trade and investment activities with Iran by U.S. persons, regardless of location.

foreign bank; and it ends up offshore as a transfer to a dollar-denominated account of the second foreign bank's customer."[653]

In essence, the new regulations only allowed U.S. financial institutions to clear U.S. dollar transactions involving non-Iranian intermediaries, even if they involved Iranian clients. This restriction meant transactions involving Iran could be processed only if the beginning and ending points were non-Iranian foreign banks.  The purpose of U-turn transactions was to allow U.S. dollar-denominated transactions to continue throughout the world – benefitting both U.S. commerce and the value of the dollar – but to prevent U.S. citizens and institutions from doing business with Iran.  This goal was accomplished by ensuring that the only point such transactions touched the United States was in clearing them for foreign banks.

The U-turn exception was widely used to carry out U.S. dollar Iranian transactions in the United States for many years.  In November 2008, the exception was revoked, and it was no longer legal under OFAC regulations to clear Iran-linked transactions even for foreign banks, although U.S. banks were still permitted to handle Iranian funds in limited circumstances, including transactions supporting humanitarian relief.[654]  U.S. persons were explicitly prohibited, however, from engaging in any transaction or dealing in any property or property interest with any Iranian bank designated under the Nonproliferation of Weapons of Mass Destruction or Specially Designated Global Terrorist programs.[655]

The U-turn exception for Iran in OFAC regulations until 2008 does not appear in any other OFAC regulation, and so does not affect transactions involving any other prohibited country or person.

**Prosecutions for OFAC Violations.**  In recent years, a number of large, international banks have been prosecuted for systematically violating OFAC prohibitions.  In most cases, the violations involved the practice of stripping information from wire transfer documentation to hide the participation of a prohibited person or country, and executing the prohibited transaction through a U.S. dollar account at a U.S. financial institution.  For example, in December 2009, Credit Suisse was fined $536 million by the Department of Justice for altering wire transfer documentation from 1995 to 2006, in transactions involving Burma, Cuba, Iran, and Libya.  That same month Lloyd's Bank was fined $217 million for stripping information from wire transactions over a ten-year period, from the mid 1990s through September 2007.  In May 2010, ABN Amro was fined $500 million for removing information from wire transfers involving OFAC sanctioned countries between 1995 and 2005.

Most recently, on June 12, 2012, the U.S. Justice Department and New York County District Attorney's Office entered into a deferred prosecution agreement with ING Bank N.V.

---

[653] See Treasury website, http://www.treasury.gov/resource-center/sanctions/Documents/fr73_66541.pdf; OFAC website, http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx,  at 2.
[654] See OFAC website, http://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx, at 2.
[655] Id. at 2.

and imposed the largest fine ever levied against a bank for OFAC violations.[656]  For processing more than $2 billion in transactions on behalf of Cuban, Iranian, and other prohibited persons, ING Bank agreed to a criminal forfeiture of $619 million.  The Treasury Department's press release revealed that ING Bank had "intentionally manipulated financial and trade transactions to remove references to Iran, Cuba, and other sanctioned countries and entities."[657]  It noted that ING Bank's methods included not referencing a payment's origin, utilizing "misleading" payment messages, and using shell companies.  According to court filings, between the early 1990s and 2007, ING Bank processed more than 20,000 transactions in violation of OFAC prohibitions, "with the knowledge, approval and encouragement of senior corporate managers and legal and compliance departments."[658]

A summary of recent prosecutions and legal actions related to OFAC violations follows.

**Recent Prosecutions and Legal Actions Related to OFAC Violations**

| Bank | Date | Fine | Link | Brief Summary |
|------|------|------|------|---------------|
| ING Bank N.V. | 6/12/2012 | $619 million | • DOJ Press Release | The Department of Justice and the New York County District Attorney's Office entered into simultaneous deferred prosecution agreements with ING Bank relating to 20,000 transactions totaling $1.6 billion processed through the U.S. financial system on behalf of Cuban and Iranian entities from the early 1990s through 2007. |
| Barclays Bank | 8/18/2010 | $298 million | • DOJ  Press Release<br>• Wall Street Journal, Probe Circles Globe to Find Dirty Money | The Department of Justice and the New York County District Attorney's Office entered into deferred prosecution agreements with Barclays Bank for activity relating to transactions illegally conducted for customers in Cuba, Iran, Libya, Sudan, and Burma from the mid-1990s until September 2006. |
| ABN Amro Bank | 5/10/2010 | $500 million | • DOJ Press Release<br>• Wall Street Journal, RBS, DOJ to End Deferred Prosecution Agreement over ABN Amro | The Department of Justice entered into a deferred prosecution agreement with ABN Amro Bank for removing information from wire transfers from 1995-2005 for customers in Iran, Libya, the Sudan, Cuba, and other OFAC- listed countries. |
| Credit Suisse Bank | 12/16/2009 | $536 million | • DOJ Press Release<br>• DOJ Statement of Facts | The Department of Justice entered into a deferred prosecution agreement with Credit Suisse.  The fines related to alterations on wire transfers from 1995 to 2006 from Iran, Cuba, Burma, and Libya. |

---

[656] See, e.g. United States v. Ing Bank, N.V., Case No. 1:12cr136 (USDC DDC), Information (6/12/2012) and Deferred Prosecution Agreement (6/12/2012).

[657] 6/12/2012 "ING Bank N.V. Agrees to Forfeit $619 Million For Illegal Transactions With Cuban and Iranian Entities," Treasury press release, www.treasury.gov/press-center/press-releases/Pages/tg1612.aspx.

[658] Id.

| Lloyd's Bank | 01/09/2009 | $217 million | • DOJ Press Release | The Department of Justice and the New York County District Attorney's Office entered into deferred prosecution agreements with Lloyd's Bank for wire stripping transactions from the mid-1990s through September 2007. |
|---|---|---|---|---|
| Australia and New Zealand Bank Group Ltd. | 8/24/2009 | $5.75 million | • Treasury Settlement Statement<br>• Enforcement Documents | The Treasury Department entered into a settlement with the Australia and New Zealand Bank Group relating to currency exchanges from 2004 to 2006, for transactions processed through U.S. correspondent accounts for customers in Cuba and Sudan. |

Prepared by U.S. Permanent Subcommittee on Investigations, July 2012

HSBC is currently under investigation by the U.S. Justice Department and several Federal financial regulatory agencies for engaging in similar practices in possible violation of OFAC regulations.[659]  In October 2010, an internal Federal Reserve email discussing HSBC's decision to hire an outside auditor to review its records "presumably to find problematic transfers," noted that "HSBC was one of the two major UK banks for Iranian banks during the early 2000s (Lloyds being the other), so we can imagine what will be found."[660]

## B. Executing OFAC-Sensitive Transactions

### (1) Transactions Involving Iran

#### (a)  Overview

Documents collected by the Subcommittee do not pinpoint when undisclosed Iranian transactions began moving through HBUS in potential violation of OFAC regulations.  HSBC officials were aware of the practice generally as early as 2000, as seen in an email discussion between HSBC Group's Compliance head, then Matthew King, and AML head Susan Wright. Ms. Wright criticized actions taken by a bank client to alter transaction documentation to disguise a wire transfer moving through the United States, but their email exchange does not disclose whether such transactions were already taking place at HBUS.[661]  By 2001, they clearly were, as described in an email from HBEU to HBUS.[662]

In 2001, when HSBC Europe (HBEU) raised the issue of processing U-turn transactions through its U.S. account in compliance with U.S. requirements, HBUS personnel made it clear that any such transactions would need to be fully transparent and include all underlying payment details to enable HBUS to evaluate whether they qualified as permissible U-turns.  From at least 2001 to 2007, however, despite repeated HBUS requests for full transparency, HBEU and later HSBC Middle East (HBME) sent transactions involving Iran through their U.S. dollar

---

[659] See 2/27/2012 HSBC Holdings plc 6-K filing with the Securities and Exchange Commission, item 13, http://sec.gov/Archives/edgar/data/1089113/000119163812000216/hsba201202276k7.htm.
[660] 10/07/2010 email from Federal Reserve Stephen Meyer to Federal Reserve Kwayne Jennings, and others, "HSBC OFAC."
[661] See 6/16/2000 email from HSBC Susan Wright to HSBC Matthew King, HSBC OCC 8875191-92.
[662] See 6/28/2001 email from HBEU John Wilkinson to HBUS Denise Reilly and others, "Bank Melli," HSBC OCC 8876132-133, discussed below.

correspondent accounts at HBUS without full disclosure of the transaction details.  In some instances, the HSBC affiliate simply stripped the identifying Iranian information from the transaction documentation.  In others, the HSBC affiliate also sent the transaction as a transfer between banks in permitted jurisdictions, a tactic sometimes referred to as a "cover payment," since the bank-to-bank transfer acted as a cover for the underlying transaction.[663]  Both methods sought to ensure that a transaction would not be stopped by HBUS' OFAC filter and delayed for individualized review to determine whether it, in fact, qualified as a permissible U-turn, but would instead benefit from "straight through processing" or STP.

From 2001 until 2005, the two HSBC affiliates frequently discussed processing Iranian U.S. dollar transactions for various Iranian financial institutions and entities through their HBUS correspondent accounts.  Numerous emails among HBEU, HBME, HBUS, and HSBC Group discuss whether HBUS would be willing to process Iranian U-turn transactions and, if so, how.  At the same time, HSBC Group, HBEU and HBME bankers were pushing to expand contacts with Iran.  The Senior Payments Manager in HBUS reported being told in a July 2001 conference call that the HSBC Group, with backing from the Chairman, was seeking to "significantly grow our presence in Iran."[664]  In 2003, an HBME business proposal estimated that processing 700 U.S. dollar payments for Iranian banks per day using U-turn transactions would produce income of $4 million, while failing to process them would threaten HSBC's current Iranian business which produced annual bank income of $2 million.[665]  HBME also noted that it already had a "number of existing USD accounts for Iranian banks."[666]

Even though discussions with HBUS over processing the transactions continued in 2002 and 2003, documentation shows that HBEU had already begun to send U-turn transactions through HBUS without disclosing an Iranian connection for many of them.[667]  Some HBUE compliance and payments personnel objected to altering payment instructions in connection with the Iranian transactions, and a key payments official even announced deadlines in January 2004 and September 2004, after which no Iranian payment instructions would be altered, but both deadlines were ignored.  HBUS finally approved a protocol to process transparent U-turns in December 2004.[668]  Even after that protocol was approved, however, HBEU continued to send undisclosed U-turn payments through HBUS using cover payments, failing to provide requested information to its own affiliate.

---

[663] The cover method utilizes the MT202 SWIFT message or payment instruction format, which provides a U.S. bank with the names of the foreign banks acting as the originator or beneficiary of the immediate transfer, but is not required also to provide the underlying origination and beneficiary customer information.

[664] 7/12/2001 email from HBUS Denise Reilly to Douglas Stolberg and others, "Bank Melli," HSBC OCC 8876128-129. HSBC legal counsel told the Subcommittee that the HSBC affiliates were already doing business with Iran, but they wanted to increase that business by doing it with Bank Melli.  Subcommittee meeting with HSBC legal counsel (6/20/12).

[665] 1/2003 memorandum from HBME Rick Pudner to HBUS Denise Reilly, HBEU Malcolm Eastwood, and others, "Business Case-USD Payment From Iranian Banks/Entities," HSBC OCC 8876490.

[666] Id.

[667]  See, e.g., 12/30/2001 email from Protomastro to Carolyn Wind and others, HSBC OCC 8873909.

[668] See 12/2/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-Turns," HSBC OCC 3407526-527; 12/15/2004 email from HSBC David Bagley to HSBC Marilyn Spearing and HBME David Hodgkinson, "Iran – OFAC," HSBC OCC 8874039; and 5/4/2005 email from HBUS Elizabeth Protomastro to HBUS Teresa Pesce and others, "Wire Payments Suspended," HSBC OCC 8874710.

At HBUS, during the same time period, internal documents show that, as early as 2001, senior HBUS payments, compliance, and business managers were informed that Iranian U.S. dollar payments were being sent by HBEU through HBUS after deleting references to Iran. They were also informed of an HBEU proposal to streamline the processing of U-turn transactions by omitting references to Iran so the transactions would not be halted by the OFAC filter in the United States.  Emails at the time show that senior HBUS officials expressed discomfort with the HBEU proposal, but took no other action to stop or prevent the activity already occurring.[669]  In addition, HBUS' OFAC filter occasionally caught an Iranian-related transaction, sent by an HSBC affiliate, in which the identifying information had not been fully removed, demonstrating that undisclosed U-turns continued to be sent through HBUS correspondent accounts, but again, no HBUS personnel took further action to stop the activity. In 2003, the Iranian issue was discussed again when a new HBUS AML Director arrived, but once more, no decisive action was taken to put a stop to undisclosed U-turns.

Although HSBC Group Compliance was aware of HBUS' concerns, HBEU's practice of stripping information or using cover payments to conceal U-turn transactions involving Iran, and the fact that such undisclosed transactions were routinely slipping through HBUS accounts, HSBC Group did not prohibit the practice for years.  In July 2005, HSBC Group issued a Group-wide directive, Group Circular Letter (GCL) 050047, barring all HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC regulations, but continued to allow their use of cover payments for permissible U-turn transactions, which meant the transactions would continue to circumvent the OFAC filter and individualized review by recipient U.S. banks.  In April 2006, HSBC Group issued a second Group-wide directive, GCL 060011, requiring HSBC affiliates and other financial institutions to use fully transparent payment instructions when sending transactions through HBUS accounts, but again allowed U-turns "to be made as cover payments."  In 2007, HSBC Group decided to exit Iran.

In recent years, OFAC has sent over a dozen so-called Cautionary Letters to HBUS about incidents in which it failed to block a prohibited transaction, including transactions involving Iran.  In 2010, HSBC Group employed an outside auditor, Deloitte LLP, to identify and review OFAC sensitive transactions at HBUS over a seven-year period from 2001 to 2007.  That review has so far examined 58 million payment messages involving assets of $37 billion that passed through the key server, located in the United Kingdom, during that timeframe and identified OFAC sensitive U.S. dollar transactions involving assets totaling $19.7 billion.  The review identified almost 25,000 U.S. dollar transactions involving Iran, involving assets in excess of $19.4 billion.[670]  The vast majority of the Iranian transactions, ranging from 75% to 90% over the years, were sent through HBUS and other U.S. dollar accounts without disclosing any connection to Iran.  While the affiliates may have viewed these U-turns as permissible under U.S. law, the absence of identifying information meant they did not trigger the OFAC filter or an individualized review by HBUS to make sure.

---

[669] 7/11/2001 email from HBUS Douglas Stolberg to HBUS Denise Reilly, HBUS Joe Harpster, and HBUS Michael Gallagher, " Bank Melli," HSBC OCC 8876129.
[670] Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 930.

### (b)   Concealing Iranian Transactions

**2000 Notice Regarding Iranian Transactions.**  On June 9, 2000, the HSBC Group AML Compliance head Susan Wright learned in an email that a client bank was using deceptive practices to send OFAC sensitive U.S. dollar transactions through U.S. correspondent accounts while evading detection by the OFAC filter.

In the June 9, 2000 email to Ms. Wright from an HSBC colleague, she was informed that a particular bank, whose name was redacted by HSBC from the email, was "automatically replacing a remitter's name with that of" the bank.[671]  The email stated that the bank planned to cease the practice by the end of June, but in the future, for OFAC sensitive transactions, would "arrange cover for the payment using MT202/203 remittances."  "MT202/203" refers to the SWIFT message or payment instructions used to execute bank-to-bank transfers.  The email explained that bank-to-bank transfers did not require identifying the underlying party who originated the transaction or the ultimate beneficiary of the payment.[672]  It also indicated that the bank planned to send a separate "MT100 message" to the recipient bank providing full payment details for the originator and ultimate beneficiary.  The email stated:  "In this way a payment, in US$ can be made for an individual or company on the OFAC list, without the name being 'detected' by the OFAC filters that all US banks would apply."[673]

Ms. Wright forwarded the June 2000 email to Matthew King, then head of HSBC Group Compliance, describing the client bank's past procedure of altering transaction documentation when processing OFAC sensitive wire transfers.  She wrote:  "We advised them that this was contrary to SWIFT guidelines (drawn up to address FATF[674] concerns re money laundering via wire transfers) which required that the full details (names and addresses) of remitters and beneficiaries are included."[675]  She also described the client bank's future plan to conceal OFAC sensitive transactions behind bank-to-bank transfers.  Ms. Wright wrote: "From a Group perspective I consider the continuation of this practice to be unacceptable and as a deliberate and calculated method to avoid the US OFAC sanctions has the potential to raise serious regulatory concerns and embarrass the Group."[676]

Ms. Wright's reaction indicates that as early as 2000, HSBC Group Compliance learned of practices being used to avoid detection by the OFAC filter, and viewed them as "unacceptable" and raising potential regulatory concerns that were capable of embarrassing HSBC.

**2001 Bank Melli Proposal.**  Six months later, in January 2001, HBEU approached HBUS with a proposal to use its U.S. dollar correspondent account at HBUS to clear U.S. dollar

---

[671] 6/9/2000 email from HSBC Bob Cooper to HSBC Susan Wright, "Significant Exception 2Q00-04," HSBC OCC 8875192-193.

[672] Id.

[673] Id.

[674] FATF is the Financial Action Task Force, the leading international body that set standards for combating money laundering and terrorist financing.

[675] 6/14/2000 email from HSBC Susan Wright to HSBC Matthew King, "Memo: Significant Exception 2Q00-04," HSBC OCC 8875191-192.

[676] Id.

transactions for Bank Melli, the largest commercial retail bank in Iran.[677]  At that time, Bank
Melli's London Branch maintained a U.S. dollar account with several other major international
banks, but was interested in establishing a relationship with HSBC that would give the bank the
majority of Bank Melli's U.S. dollar clearing business.  HBEU conducted an extensive review,
with advice from two outside U.S. law firms, to determine whether transactions originated by
Bank Melli would meet the definition of a permissible U-turn transaction under OFAC
regulations, and concluded that they would, in fact, be permissible.

Even though the proposed U-turns would be permissible under OFAC regulations, HBEU
proposed carrying them out in the form of bank-to-bank transfers, without any reference to the
underlying originator or ultimate beneficiary and, so without any reference to Iran.[678]  The aim
was to ensure that the transactions would not be delayed by triggering an OFAC filter and having
to undergo individualized review.  HBUS compliance personnel responded that any such
transactions would have to be done in a more transparent manner, with detailed payment
information specifying the underlying originating and beneficiary customer information.  HBUS
employees expressed concern about using cover payments, since the limited payment
instructions would not enable HBUS to know whether it was processing a valid U-turn
transaction involving Iran or whether it was even processing a U-turn transaction at all.[679]  It
would see only two banks making the transfer on the payment instructions and would have no
knowledge of the underlying customers for whom the transaction was being processed, including
whether they were prohibited persons.

**Legal Advice.**  In January 2001, HBUS OFAC Compliance officer Elizabeth
Protomastro asked outside legal counsel, Tom Crocker, for an opinion as to whether HBUS
could process U.S. dollar transactions from HBEU on behalf of either Bank Melli or Iran's
Central Bank, Bank Markazi.[680]  After extensive consultations involving two law firms and
OFAC, HBUS was advised that the Bank Melli transactions could qualify as permissible U-turn
transactions.[681]

---

[677] HSBC had established a relationship with Bank Melli's office in Tehran in 1999.  7/11/2001 email from HBUS
Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC-PSI-PROD-0096130-132.
[678] Id. at 0096130.  Under international banking practice, it was legal for bank-to-bank transactions to omit
underlying payment details for the originator and ultimate beneficiary.  Subcommittee briefing by OFAC
(5/8/2012).
[679] Id. at 0096130-131.
[680] See 1/31/2001 email from Elizabeth Protomastro to Tom Crocker, HSBC OCC 8903860.
[681] On February 1, 2001, HBEU provided Ms. Protomastro with more information about the type of U.S. dollar
transactions that would be sent through HBEU's correspondent account at HBUS, explaining that they would
include 25 treasury-related payments involving about $750 million per day, 25 treasury-related receipts involving
about $750 million per day, and 100 commercial payments involving $200 to $300 million per day, none of which
would be related to letters of credit for military goods. (See 2/1/2001 email from HBEU Peter Blenk to HBUS
Elizabeth Protomastro, "Central Bank of Iran," HSBC OCC 8903864-865.)  On February 2, 2001, Mr. Crocker
advised that the scenario outlined by HBUE did not appear to qualify for the U-turn exception as stipulated in the
OFAC Iranian Transactions Regulations, because HBEU could not serve as both the originating and receiving
foreign bank.  (See 2/2/2001 email from Tom Crocker to HBUS Elizabeth Protomastro, "Central Bank of Iran,"
HSBC OCC 8903859-860.)
    In response to Mr. Crocker's opinion, on February 19, 2001, HSBC Group Compliance head Matthew King
contacted a second law firm, Winthrop Brown, to obtain a second opinion.  (See 2/19/2001 email from HSBC
Matthew King to Winthrop Brown and HBME John Richards, "Memo: OFAC constraints in the Central Bank of
Iran operating a USD Clearing account with HSBC Bank plc in London," HSBC OCC 8903876-877.)  One of the

HSBC Group Compliance head Matthew King forwarded the legal advice to HBME officials Brian Richards and John Richards, stating: "I confirm I am happy for the business to be undertaken on this basis." He also wrote: "I am assuming this business will be booked in HBEU, hence I am copying Chris Couldrey. If any other Group entity is likely to be involved, could you let me know."[682] Brian Richards responded the following day to confirm that payment orders from Bank Melli's account would originate from HBEU, and credits in favor of Bank Melli would be credited to their account at HBEU. He stated that the payment orders would not mention Bank Melli, and HBUS would not receive payment orders or receipts directly from an Iranian entity. Mr. Richards concluded that the payment chain would meet the U-turn definition provided by Mr. Simons.[683]

**HBEU Payment Instructions.** HBEU, HBUS, and HSBC Group Compliance continued to discuss HBEU's proposal to process U.S. dollar transactions for Bank Melli.

In a letter dated April 30, 2001, HBEU's Multicurrency Payments Department (MPD) sent Bank Melli a proposal to process their payments with "minimal manual intervention."[684] The letter included payment templates with specific instructions on how to format U.S. dollar transactions so the paperwork would not have to be altered by HBEU. MPD proposed that Bank Melli use the provided templates to complete payments fields for both MT202 and MT100 SWIFT messages[685] and to test the proposal.[686] In the letter, MPD Business Development Manager John Fowle advised the Bank Melli Cash and Payments Manager in London, Saeed Pourjam:

> "[F]ollowing tests in our payments environment we are confident that we have found a solution to processing your payments with minimal manual intervention. The key is to **always** populate **field 52** – if you do not have an ordering party name then quote "One of our Clients", **never leave blank**. This means that the outgoing payment instruction from

---

firm's lawyers, John Simons, consulted with OFAC and obtained a copy of the payment processing procedure for qualified "U-Turn Dollar Clearing" transactions. He explained he was waiting to confirm with OFAC's Chief Counsel Office about whether a second U.S. bank was required to process permissible U-turn transactions. The email indicated that they had also determined that a requirement in Section 560.516 (b) for U.S. depository institutions to determine if an underlying transaction was prohibited by OFAC, "prior to initiating a payment on behalf of any customer or crediting a transfer to the account on its books of the ultimate beneficiary," did not apply to U-turns. (See 2/2001 email from John Simons to Winthrop Brown, "Memo: OFAC constraints in the Central Bank of Iran operating a USD Clearing account with HSBC Bank plc in London," HSBC OCC 8903875-876.)
    In April 2001, Mr. Simons emailed Mr. King that OFAC had confirmed that a second U.S. bank was not required when processing permissible U-turn transactions and no specific OFAC license was required to engage in U-turn transactions. (See 4/26/2001 email from John Simons to HSBC Matthew King and others, OFAC – Iran," HSBC OCC 8903868-870.
[682] 4/26/2001 email from HSBC Matthew King to HBME Brian Richards and others, "OFAC – Iran," HSBC OCC 8903868.
[683] 4/27/2001 email from HBME Brian Richards to HSBC Matthew King and others, "OFAC – Iran," HSBC OCC 8903874.
[684] See 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC OCC 8876130-136, at 135-136 (including a copy of the April letter).
[685] MT202 and MT100 are examples of SWIFT messages used by financial institutions to facilitate payment processing. Different messages utilize specialized formats, dependent on the type of transaction, to process the payments. Subcommittee briefing by OFAC (5/8/2012); Subcommittee briefing by Deloitte (5/51/2012).
[686] 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King, "Bank Melli" HSBC OCC 8876130-136, at 133-136.

HSBC will not quote "Bank Melli" as sender – just HSBC London and whatever is in
Field 52.  This then negates the need to quote "DO NOT MENTION OUR NAME IN
NEW YORK" in field 72."[687]

This email shows HBEU designed a payment method to avoid the OFAC filter by preventing the
inclusion of information about the participation of the Iranian bank.  The method developed by
HBEU ensured that no language that would normally trigger an OFAC review – such as "do not
mention our name in New York" – appeared in the transaction documentation.

On May 25, 2001, in an email to colleagues, Michael Gallagher, an HBUS senior official
at the Payments and Cash Management (PCM) division, expressed discomfort with the Bank
Melli proposal to colleagues, including his supervisor, Douglas Stolberg, head of Commercial
and Institutional Banking (CIB):  "I wish to be on the record as not comfortable with this piece
of business."[688]  His statement did not elicit any immediate response.  When interviewed, Mr.
Gallagher told the Subcommittee that he sent this email to express his concerns to his colleagues,
including his supervisor, and then left it to them to determine what should be done.[689]

In the meantime, HBEU had already begun processing Bank Melli U-turns through its
account at HBUS, using cover payments so that the transactions would not trigger HBUS' OFAC
filter.  This fact was disclosed in a June 28, 2001 email from the HBEU Institutional Banking
Relationship Manager who handled the Bank Melli account, John Wilkinson.[690]  In the email, he
was discussing the Bank Melli proposal with the head of HBUS' payment services, Denise
Reilly.  Mr. Wilkinson explained that once the proposal "goes live," Bank Melli was instructed
"to alter the format" of their payments to achieve straight through processing.  Mr. Wilkinson
wrote:

"[W]e have further asked them to only put 'One of our clients' in field 52, thus removing
the chance of them inputting an 'Iranian referenced' customer name, that causes fall out
of the cover payment sent to HBUS and a breach of OFAC  regulations."[691]

He also explained that using "One of our clients" in field 52 "is a standard phrase used by MPD
[HBEU's Multicurrency Payments Department] in these situations."[692]  Acknowledging Ms.
Reilly's concerns following "a recent formatting error" detailed in an earlier email of June 15,

---

[687] Id. at 135 (emphasis in original).  Two months earlier, on May 21, 2001, HBEU Institutional Banking (CIB IBL)
conducted a call with Bank Melli to inquire about the names of the principal beneficiaries of their payments.  The
resultant call report indicated that "as expected," Bank Melli was unable to answer with the reasoning that Iran
imports from many countries and suppliers worldwide.   This information had been previously requested by a Senior
Manager in Payment Operations at HBUS, Denise Reilly.   An Area Manager within HBEU CIB IBL, Brian
Richards, forwarded the response to Ms. Reilly the following day.   Ms. Reilly then forwarded Mr. Richard's email
to HBUS Compliance personnel.  5/22/2001 email from HBUS Denise Reilly to HBUS Carolyn Wind and others,
"Bank Melli," HSBC-PSI-PROD-0096138-142.
[688] 5/25/2001 email from HBUS Michael Gallagher to HBUS Denise Reilly and Douglas Stolberg, "BANK
MELLI," HSBC-PSI-PROD-0096138.
[689] Subcommittee interview of Michael Gallagher (6/13/2012).
[690] 6/28/2001 email from HBEU John Wilkinson to HBUS Denise Reilly and others, "Bank Melli," HSBC OCC
8876132-133, at 133.
[691] Id.
[692] Id.

2001, Mr. Wilkinson noted that Bank Melli had not yet begun to use the new formatting method
detailed in the April letter:

> "Bank Melli are still formatting payments in their usual method, in this instance MPD
> failed to spot the poor input and did not follow their normal procedure of altering the
> payment, hence it was blocked.  MPD have again confirmed the new formatting method
> will achieve straight through processing and overcome these difficulties."[693]

Mr. Wilkinson's email shows that Bank Melli was already processing undisclosed U-turn
transactions through HBEU's account at HBUS, using what he calls "their usual method" for
formatting the payments, prior to the proposed changes.  His email also described HBEU's
"normal procedure" as "altering" Bank Melli's payments to prevent the payments from being
blocked.  The proposed new procedure was aimed at eliminating those manual interventions on
the part of HBEU to both expedite payments, potentially saving time and therefore money.

This June 2001 email put HBUS on notice that HBEU had at times altered transactions
involving Bank Melli in Iran, a practice already so commonplace at HBEU it was called its
"normal procedure."  This email was sent to the head of HBUS' payment service operations,
who then alerted other HBUS executives.  When asked about this document describing the
alteration of documents being engaged in by an HSBC affiliate, senior HBUS Compliance
official Anne Liddy, who oversaw HBUS' OFAC compliance program, told the Subcommittee
that it would have been a problem if U-turns were being processed in 2001, since HBUS did not
then have a process in place to conduct U-turns appropriately.[694]

**HBUS Objections.**  On July 11, 2001, after HBUS Compliance head Carolyn Wind
learned of the HBEU proposal, she sent an email to HSBC Group Compliance head Matthew
King objecting to it.[695]  What followed was a growing consensus that HSBC should not be
pursuing its business in this fashion.  Ms. Wind included the Wilkinson email from June and a
copy of the April letter sent to Bank Melli providing payment message instructions.  Ms. Wind
expressed several concerns, including whether the transactions sent via the cover payments
would be permissible under OFAC regulations and that "HBUS will not be able to confirm
whether or not the underlying transaction actually meets the 'U-Turn' requirement."  She noted
further that it was "not apparent that HBEU will be able to confirm that each payment meets the
requirements."  She wrote:

> "In an effort to facilitate 'straight-through processing', it now appears that HBEU will
> train Bank Melli on formatting the payments and that we will be relying on Bank Melli to
> ensure that only qualifying payments are processed through HBEU's account with
> HBUS."[696]

---

[693] Id.
[694] Subcommittee interview of Anne Liddy (2/22/2012).
[695] 7/11/2001 email from HBUS Carolyn Wind to HSBC Matthew King and others, "Bank Melli," HSBC OCC
8876130-136.
[696] Id. at 130.

Ms. Wind also expressed concern about how it might appear to U.S. regulators that HBEU
trained Bank Melli to write payment instructions in such a way, pointing out that if OFAC were
to identify a transaction that did not qualify as a permissible U-turn, OFAC might consider
"HSBC's actions due to the non-disclosure as having involved willful disregard or evasion."[697]

HBUS payment services head Denise Reilly forwarded Ms. Wind's email to Douglas
Stolberg, head of HBUS Commercial and Institutional Banking (CIB).  He responded: "With the
amount of smoke coming off of this gun, remind me again why we think we should be
supporting this business?"[698]

Ms. Reilly responded by sending Mr. Stolberg a memorandum prepared by the HSBC
Group Representative for Iran, John Richards, which stated that HSBC Group "with the backing
of Bond" – referring to the HSBC Chairman of the Board of Directors – wanted to "significantly
grow our presence in Iran" with current lines of credit reported to be $800 million, trade lines of
$150 million, and growth anticipated in trade, cash management and Internet banking.  The
memorandum indicated that HSBC Group and HBEU wanted to expand the bank's presence in
Iran and viewed clearing U.S. dollar transactions for Bank Melli as a profitable venture that
could help win additional business in Iran, despite U.S. sanctions and HBUS concerns.[699]

These email exchanges show that, by July 2001, senior HBUS compliance, payments,
and business managers, as well as the HSBC Group Compliance head, were aware that Iranian
U.S. dollar transaction documentation was being altered by HBEU and the transactions were
being processed through HBUS.[700]  HBUS Compliance head Carolyn Wind complained to
HSBC Group Compliance head Matthew King, but neither stopped the practice, nor did HSBC
Group obtain a legal opinion about whether its U.S. dollar cover payments were in compliance
with OFAC regulations.

**HBUS' Payments Proposal.**  In August 2001, HBUS offered its own proposed
procedures to clear U.S. dollar transactions involving Bank Melli.[701]  Uncomfortable with the
formatting solution proposed by HBEU a few months prior, HBUS proposed that Bank Melli be
listed as the originator in the payment instructions and proposed establishing a segregated
account for the transactions so HBUS could ensure that all Bank Melli payments would be
stopped by the OFAC filter for further review and approval.

---

[697] Id. at 131.
[698] See 7/11/2001 email exchanges among HBUS Douglas Stolberg and HBUS Denise Reilly, Joe Harpster, and
Michael Gallagher, "Bank Melli," HSBC OCC 8876128-130.
[699] Id. at 128-129.
[700] 7/11/2001 email exchange among HBUS Carolyn Wind, HBUS, Paul Lee, HBUS Anne Liddy, HBUS Douglas
Stolberg, HBUS Michael Gallagher, and HBUS Denise Reilly, HSBC OCC 8876129.
[701] The procedures consisted of a two-step debit process and a five-step OFAC review process, and committed to
same day processing for transactions determined to be U-turn compliant.  The procedures required that Bank Melli
transactions be segregated in an "HBEU Special Account" with the account number entered into the OFAC filter so
that every Bank Melli transaction would be stopped in the OFAC queue for two reviews and two approvals prior to
processing.   Bank Melli would appear as the originator for all related transactions.  8/29/2001 email from HBUS
Denise Reilly to HBAP Alan Wilkinson and others, "Bank Melli," HSBC OCC 7687346-348.

On August 30, 2001, HSBC's John Richards expressed his support for the procedures, noting it would be the first time that an Iranian bank name was mentioned in the payment message.[702]

On September 6, 2001, HBUS met with the Director of the Office of Foreign Assets Control (OFAC) to discuss clearing Bank Melli U-turn transactions.  Carolyn Wind commented that although OFAC did not approve or reject the proposal, she walked away from the meeting thinking that OFAC was "okay with it."[703]

**HBME's Iranian Transactions.**  While HBEU was processing U-turn transactions for Bank Melli, a second HSBC affiliate, HSBC Middle East (HBME), was also carrying out OFAC sensitive transactions for other clients, using its own and HBEU's U.S. dollar correspondent accounts at HBUS apparently without alerting HBUS to the transactions.  In an October 2001 email, David Bagley, then HBME Regional Head of Legal and Compliance, sought guidance from HSBC Group Compliance head Matthew King about how OFAC sensitive transactions should be handled.[704]  Mr. Bagley wrote:  "As I understand the current position we do routinely, and across the Group, adopt differing approaches to payments potentially subject to OFAC sanctions."  Mr. Bagley wrote that, at HBME, payments were not structured "against a specific request from the customer, rather we undertake this structuring as a routine," and that he was not clear about whether those procedures were viewed "as being inappropriate, and thus should be disallowed."  He also noted:  "I am advised that there may even be software in the UK which filters such payments for restructuring in the event that the original message has been structured in such a way that it will be caught by the OFAC filters."

Mr. Bagley cautioned that subjecting all OFAC sensitive payments to the OFAC filter for further review and approval would likely hurt business.  He wrote:  "disallowing all payments which are potentially subject to the OFAC process," or the alternative of forwarding "messages in such a way that they would be caught," would have a "significant affect" upon HBME's business within the Middle East and the Group's business within correspondent banking.   He also wrote: "given the likely volumes it is impractical to submit each payment to a process of referral to HBUS," as HBUS had proposed.  He concluded with a request for clear guidance:  "I would be grateful for your clarification as to whether what is currently going on is acceptable, or whether we should be adopting a different practice."[705]

Mr. King responded that the September 11, 2001 terrorist attack on the United States required a reassessment.  He wrote: "some of the routes traditionally used to avoid the impact of US OFAC sanctions may no longer be acceptable."  Mr. King indicated that an automated screening system was being looked into, and in the interim asked that OFAC sensitive payments be vetted manually.[706]

---

[702] 8/30/2001 email from HSBC John Richards to HBUS Denise Reilly and others, "Bank Melli," HSBC-PSI-PROD-0096147-148.
[703] Subcommittee interview of Carolyn Wind (3/7/2012).
[704] 10/10/2001 email exchange among HSBC Matthew King and HBME David Bagley and others, "OFAC Sanctions," HSBC OCC 8873890-893, at 892.
[705] Id. at 892.
[706] Id. at 890.

Mr. Bagley's email alerted Mr. King to the fact that HBME, like HBEU, was routinely sending U.S. dollar transactions through its correspondent account at HBUS using methods intended to circumvent HBUS' OFAC filter. His email did not limit those transactions to Iranian U-turns, but sought broader guidance on acceptable practice. Mr. King wrote back: "all we can do is ask that payment from the affected countries are vetted manually."[707]

### (c) Pressuring HBUS on Iran

In April 2002, HBME asked HBUS to re-circulate its proposed procedures for processing Iranian U-turn transactions,[708] indicating that the two affiliates were still attempting to reach agreement on the procedures to be used.[709]

**HBEU Draft Guidelines.** While the HBEU Relationship Manager for Institutional Banking in HBME, John Wilkinson, was trying to streamline the cover payments procedure used to send Iranian U-turns through HBEU's correspondent account at HBUS, HBEU Compliance was trying at the same time to put a stop to the practice altogether. On July 15, 2002, an HBEU Compliance officer forwarded draft guidelines for handling OFAC sensitive transactions to HBEU Compliance manager Julie Clarke and HBEU Multicurrency Payments Department (MPD) head Malcolm Eastwood and requested their approval.[710] The proposed guidelines stated in part that, although HBEU was not legally required to comply with U.S. OFAC prohibitions, "It is strongly recommended … that RMs [Relationship Managers] do not deliberately take action aimed at assisting a customer to circumvent OFAC sanctions. For example payment instructions should not be amended by IBL staff." The proposed guidance also stated: "On no account should you deliberately guide, encourage or coerce the sender into amending the payment details so as to circumvent the OFAC sanctions. … We will simply process as instructed."[711] The draft guidance relied on the following Group Policy:

> "Group members should comply with both the letter and spirit of all relevant laws, codes, rules, regulations and standards of good market practice in each jurisdiction around the world where they conduct business."[712]

---

[707] Id. at 890-891.

[708] 4/15/2002 email from HBUS Denise Reilly to HBEU John Wilkinson and others, "Bank Melli," HSBC OCC 7687376-377.

[709] According to Mr. Bagley, the HBEU Payment Services' December 2002 Compliance Certificate made explicit reference to its practice of altering Iranian U.S. dollar payments. Subcommittee interview of David Bagley (4/12/2012). Compliance Certificates from affiliates are normally consolidated and sent to HSBC Group Compliance for review, which would have provided a formal channel for addressing the issue. David Bagley told the Subcommittee, however, that the reference to U-turn transactions in HBEU's 2002 certificate was not incorporated into the consolidated Compliance Certificate and therefore was not formally escalated to Group Compliance for review. Id.

[710] 7/15/2002 email from HBEU Paul Proctor to HBEU Julie Clarke, HBEU Malcolm Eastwood, and others, "Monitoring of payment transactions against sanctions," HSBC OCC 8877103-106.

[711] Id. at 106.

[712] Id. at 105. The guidelines also noted that the responsibility for "policing payment and cheque clearings against sanctions" would move to Payment Services in the future.

These guidelines were later approved and became effective in the fall of 2003.[713]  They show that HBEU Compliance and business personnel were aware of and concerned about potentially deceptive practices some could use to circumvent OFAC prohibitions.

**HBME Negotiations.**  While HBEU Compliance developed the OFAC guidelines, Gary Boon, HBME Payment and Cash Management (PCM) sales manager in Dubai, spent the second half of 2002, making a concerted effort to reach agreement with HBUS on how to process U-turn transactions.  On August 29, 2002, Mr. Boon emailed Denise Reilly and Nancy Hedges in HBUS Payment Operations, to encourage HBUS to officially approve the processing of U-turn transactions involving Iranian banks.  He wrote:  "I can now confirm that HSBC Bank plc, London does not have any processing or compliance issues in respect of USD payments from existing or new opportunities with Iranian Banks."[714]  He also wrote that HBEU wanted "to ensure the payments are STP [straight through processing]," and HBEU would provide its clients with guidelines for formatting transactions to "ensure that our Iranian clients fully understand, when or how, payments could be rejected."[715]  He indicated that he was seeking HBUS' formal agreement to process the U-turn transactions, from both a resource and reputational risk standpoint, "before I attempt to sell a USD clearing proposition."[716]

On October 8, 2002, Mr. Boon sent an email to senior HBUS Compliance official, Anne Liddy, seeking feedback on the HBEU proposal.[717]  Ms. Liddy responded that the position of HBUS Compliance remained unchanged "in that all transactions involving Bank Melli must be fully disclosed and represented in one single transaction that reflects the complete flow of funds."[718]  Ms. Liddy noted that the HBUS proposed procedures had been approved by Legal Counsel as meeting OFAC requirements.  She also stated that HBUS and HBEU needed to reach agreement on the payment procedures before HBUS Compliance would present an official proposal to HBUS' Senior Management Committee or OFAC for approval.  Ms. Liddy was also clear that these steps had to be taken prior to HBEU's making any proposal to Bank Melli or another Iranian bank.[719]

Mr. Boon responded on the same day that HBEU would soon be complying with the Financial Action Task Force (FATF) regulations requiring full disclosure of payment details on MT100/MT103 message formats, which was already part of the HBEU proposal since HBEU sent those messages to the bank receiving a U-turn payment in addition to sending a cover payment on a MT202 form.  He indicated that the payments sent to HBUS fall into the category of permissible U-turn transactions, and noted that HBUS was already processing U.S. dollar transactions through two existing accounts in London.[720]  Mr. Boon wrote:  "The majority of

---

[713] See 9/8/2003 email from HBEU Julie Clarke to HBEU Paul Proctor and others, "OFAC sanctions evasion – Iranian payments," HSBC OCC 8876819-820.
[714] 8/29/2002 email from HBME Gary Boon to HBUS Nancy Hedges, HBUS Denise Reilly, and others, "IRAN-USD PAYMENTS," HSBC OCC 0948193-195.
[715] Id. at 194.
[716] Id.
[717] See 10/08/2002 email exchanges among HBUS Anne Liddy, HBME Gary Boon, and others, "Bank Melli," HSBC OCC 7687374-375.
[718] Id. at 375.
[719] Id.
[720] Id. at  374-375.

payments will be processed with HBEU sending a MT100/MT103 to the beneficiary bank and HBUS will receive the MT202 cover payment (again your already doing this)."[721]  He indicated that, due to "massive opportunities," he would like to resolve the procedural issues prior to a scheduled visit to Iran in November 2002.[722]  In response, Ms. Liddy reluctantly set up a conference call with Mr. Boon and included Carolyn Wind and Denise Reilly.[723]

When asked about this email, Ms. Liddy told the Subcommittee that she did not understand his email and may have misinterpreted Mr. Boon's assertion that HBUS was already processing Iranian payments through existing accounts in London to mean that the issue affected London accounts, but not accounts in the United States.[724]  She said that she became more concerned two months later, in December 2002, when a Bank Melli payment was caught in HBUS' OFAC filter.[725]  Carolyn Wind told the Subcommittee that she was surprised by Mr. Boon's email and didn't know what his comments meant.  Ms. Wind said that she contacted HSBC Group Compliance head Matthew King to follow-up, but didn't know what action he took, if any.[726]

The results of the conference call between HBME and HBUS were discussed in email correspondence later that month.  On October 28, 2002, Mr. Boon wrote to Denise Reilly requesting an update.  Ms. Reilly responded that HBUS had spoken with OFAC; the "MT100/MT103 and MT202 normal cover payment process has been deemed unacceptable"; and OFAC required "full disclosure of the transaction."[727]  Mr. Boon and Ms. Reilly then agreed that HBEU should open a separate "Special nostro account" for all U-turn transactions to ensure each transaction would be caught by the OFAC filter for review and approval.[728]  Mr. Boon requested confirmation that if HBEU met those terms and the HBUS committee approved the proposal, that "HBUS would be in a position to potentially become Iran's USD Clearing Agent, HBEU would be their USD Correspondent Bank?"[729]  Ms. Reilly responded that the current proposal was to "process transactions on behalf of Bank Melli" and if the proposal were broader "then it should be included in the business rationale that we requested in our conference call earlier this week for presentation to HBUS senior management."[730]  She indicated that the HBUS Senior Management Committee was comprised of the President of the bank, key business heads, and the head of key support units.  While these emails suggest HBUS Compliance was poised to present the Iranian U-turn proposal to the HBUS Senior Management Committee, there is no indication in the documentation that the committee ever received or approved it.

---

[721] Id. at 375.
[722] 10/17/2002 email from Gary Boon to Anne Liddy, "IRAN," HSBC OCC 7687373.
[723] 10/21/2002 email from Anne LIddy to Carolyn Wind and Denise Reilly, "IRAN," HSBC OCC 7687373.
[724] Subcommittee interview of Anne Liddy (2/22/2012).
[725] Id.  See also 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.
[726] Subcommittee interview of Carolyn Wind (3/07/2012).
[727] 10/29/2002 email from HBUS Denise Reilly to HBME Gary Boon and HBUS Nancy Hedges, " IRAN-USD Payments," HSBC OCC 0948192-193.
[728] Id. at 192.
[729] Id.
[730] Id.

**Eastwood Memorandum.**  In November 2002, HBEU Multicurrency Payments
Department (MPD) head Malcolm Eastwood sent a memorandum to HBUS Payments Services
head Denise Reilly and Geoff Armstrong expressing concern that HSBC was exposing itself to
unnecessary risk by handling OFAC sensitive payments.[731]  He wrote:

> "I currently feel that we may be exposing ourselves to unnecessary and unacceptable
> Reputational and Operational Risk when we are handling payments originating from FIs
> [financial institutions] domiciled in or who are a local branch of an FI domiciled in an
> OFAC regulated country."

Mr. Eastwood stated that HBEU's current process was to send OFAC sensitive payments to
HBUS via the "cover" payment method that made no mention of Iran or other prohibited
countries.[732]  He noted that two payments, one from Iran and one from Cuba, had recently been
caught by HBUS's OFAC filter.  Mr. Eastwood stated that he wanted to resolve the situation,
and "we therefore need to seek clarification of HBUS/OFAC's stance so that we can determine
our future payments strategy."[733]

The Eastwood memorandum again put HBUS on notice regarding HBEU's practice of
concealing U-turn transactions behind cover payments and altering the payment instructions
received from Iranian banks.  Mr. Eastwood wrote:  "The Iranian banks continue to send us what
I describe as conditional payment instructions which for HBEU require an element of
amendment by ourselves."[734]  Mr. Eastwood warned: "If we cannot achieve this [a resolution on
how to handle U-turn transactions] I will have to recommend to my General Manager a view that
processing these payments is 'unsafe' and that these items should be filtered out and cancelled.
This would have severe repercussions for our Group relationship within the Iranian FIs."[735]

That same day, HBUS Payments Services head Denise Reilly forwarded the Eastwood
memorandum to HBUS PCM head Michael Gallagher and HBUS Compliance head Carolyn
Wind, with the note: "We need to discuss."[736]  HBUS records do not indicate whether that
discussion took place.  When asked about this email, Mr. Gallagher told the Subcommittee that
he wasn't sure he received Mr. Eastwood's memorandum because he wasn't named on it.[737]
When shown another email indicating he had discussed the Eastwood memorandum again in
December 2003, with the new HBUS AML head,[738] he told the Subcommittee that he did not
recall the memorandum, any discussion of it, or taking any action in response to it.[739]  When

---

[731]  11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff
Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.
[732] Id. at 825.
[733] Id.
[734] Id. at 826.
[735] Id.
[736] 11/14/2002 email from HBUS Denise Reilly to HBUS Carolyn Wind and HBUS Michael Gallagher,
"Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688822-827.
[737] Subcommittee interview of Michael Gallagher (6/13/2012).
[738] See 12/17/2003 email from HBUS Denise Reilly to HBUS Teresa Pesce, "Compliance – OFAC Issues in General
and Specific to Iran," HSBC OCC 3407517-522 ("Attached is the memo that we discussed yesterday in our meeting
with Michael Gallagher.").
[739] Subcommittee interview of Michael Gallagher (6/13/2012).

Carolyn Wind was asked about the Eastwood memorandum, she told the Subcommittee that HBUS kept "pushing back on U-turns."[740]

**Do Not Mention Our Name.**  In late December 2002, HBUS OFAC Compliance officer Elizabeth Protomastro notified Carolyn Wind, Denise Reilly, and Anne Liddy that, on December 27, 2002, the HBUS OFAC filter had stopped and rejected a payment listing Bank Melli as the originator of the payment and containing a field that read, "Do not mention our name in NY." Ms. Protomastro advised rejecting all U-turn transactions containing such language.  The language on the stopped transaction shows how information related to Iranian payments was intentionally withheld from HBUS.  In response, Ms. Liddy went to Carolyn Wind's office and spoke with her, Denise Reilly, and Paul Lee, HBUS' Legal Counsel, about the transaction.  She was told to alert David Bagley, who had become head of HSBC Group Compliance in January 2002.[741]  That same day, Anne Liddy forwarded Ms. Protomastro's email to Mr. Bagley.[742]  Ms. Liddy told the Subcommittee that she was concerned about the Bank Melli payment, because HBEU still had not obtained approval to do those types of transactions.[743]  She told the Subcommittee that neither Mr. Bagley nor Ms. Wind provided any feedback on the incident, and she didn't know what action, if any, Mr. Bagley took.[744]

The 2002 Eastwood memorandum again put senior HBUS compliance and business officials on notice that HBEU was sending undisclosed OFAC sensitive transactions through its U.S. dollar correspondent accounts at HBUS.  Again, HBUS officials alerted their superiors, but no further action was taken.

### (d)  Continuing Pressure on HBUS to Process Iranian Transactions

Although HBEU handled the Bank Melli account, it was HSBC Middle East (HBME) that was at the center of efforts to pressure HBUS to process Iranian transactions without triggering the OFAC filter.  HBME took the lead in dealing with Iran and selling bank services to Iranian banks.  In January 2003, HBME Group Relationship Manager for the Middle East, Nigel Weir, sent HBUS Payments Services head Denise Reilly and HBEU MPD head Malcolm Eastwood a memorandum entitled, "Business Case-USD Payments from Iranian Banks/Entities."[745]  This HBME memorandum laid out the "business case" for HBUS'

---

[740] Subcommittee interview of Carolyn Wind (3/7/2012).
[741] Subcommittee interview of Anne Liddy (2/22/2012).  Mr. Bagley assumed the duties of HSBC Group Compliance head in January 2002, but his appointment did not become official until May 2002, after the U.K. Financial Services Authority approved it.  Subcommittee interview of David Bagley (5/10/2012); Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012).
[742] See 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.
[743] Subcommittee interview of Anne Liddy (2/22/2012).
[744] Id.  See also 12/30/2002 email exchanges among HBUS Elizabeth Protomastro, HBUS Carolyn Wind, HBUS Anne Liddy, HBUS Denise Reilly, and HSBC David Bagley, "OFAC: PLC wire on behalf of Melli Bank PLC," HSBC OCC 8873909.
[745] 1/2003 memo from HBME Rick Pudner to HBUS Denise Reilly and HBEU Malcolm Eastwood and others, "Business Case-USD Payments From Iranian Banks/Entities," HSBC OCC 8876490-493; 1/21/2003 email exchanges among HBUS Anne Liddy, HBUS Carolyn Wind, HBUS Denise Reilly, and others, HSBC OCC 3407510.  Nigel Weir and Rick Pudner were joint authors of the memorandum.

processing Iranian transactions using the procedures proposed by HBEU back in August 2001.[746] The memorandum stated:

"Currently, it is estimated that Iranian banks issue up to 700 USD payments a day using their USD service providers, mainly banks in the UK and Europe, which in turn use their New York USD correspondents to effect the payments. It is believed that some service providers amend the payments to ensure Iran is not mentioned in the body of the payment instruction to their USD correspondent. This process minimizes the risk of payment being referred to OFAC."[747]

The memorandum did not state explicitly that both HBME and HBEU were already engaged in the same practice using their U.S. dollar accounts at HBUS.

The HBME memorandum stated that HBME "believe[s] there is a substantial income opportunity to see a USD payments proposition to Iranian Banks," and provided an appendix detailing existing and potential business opportunities in Iran, while noting HBEU already had a "number of existing USD accounts for Iranian banks, which are used for payments clearing purposes."[748] The memorandum concluded:

"It is anticipated that Iran will become a source of increasing income for the group going forward and if we are to achieve this goal we must adopt a positive stance when encountering difficulties. We are aware of the concerns expressed by HBUS but strongly believe that by working together we can overcome them using means which are perfectly legitimate and in accordance with rules laid down by the relevant regulatory bodies. I hope we will be able to resolve this issue otherwise I fear we will destroy future value in a market which has substantial potential for the group."[749]

HBME asked that the business case be presented to HBUS' Senior Management Committee at the earliest opportunity.

On January 16, 2003, Denise Reilly forwarded the HBME memorandum to HBUS Compliance officials Carolyn Wind and Anne Liddy.[750] On January 21, 2003, Ms. Liddy forwarded it to Tom Crocker, the outside legal counsel advising HBUS on OFAC matters.[751]

---

[746] Id. at 1. The memorandum stated: "This paper has been produced in order for the Senior Management Committee (SMC) of HSBC Bank USA (HBUS) to evaluate whether or not HBUS will process US dollar (USD) payments initiated by Iranian Banks via accounts held with HSBC Bank Plc (HBEU)." Id.
[747] Id. at 490.
[748] Id. at 493. Internal bank documents indicate that HBEU cleared U.S. dollar transactions through its correspondent account at HBUS for at least six Iranian banks, Bank Melli, Bank Kesharvazi, Bank Markazi, Bank Sepah, Bank Tejarat, and the Export Development Bank of Iran. See, e.g., 10/23/2003 email from HSBC John Root to HSBC David Bagley and others, "USD Clearing – Iranian Banks," HSBC OCC 8875217. HBEU senior payments official Rod Moxley told the Subcommittee that he believed seven or eight Iranian banks used HSBC for U.S. dollar correspondent services. Subcommittee interview of Rod Moxley (6/07/2012).
[749] 1/2003 memo from HBME Rick Pudner to HBUS Denise Reilly and HBEU Malcolm Eastwood and others, "Business Case-USD Payments From Iranian Banks/Entities," HSBC OCC 8876-493, at 492.
[750] Subcommittee interview of Anne Liddy (2/22/2012).
[751] See 1/21/2003 email from HBUS Anne Liddy to External Counsel Tom Crocker and others, "USD Payments from Iranian Banks," HSBC OCC 3407510-511.

When asked about the memorandum, Ms. Liddy told the Subcommittee she did not recall it or the outcome of Mr. Crocker's review.[752]

On February 3, 2003, HSBC Group Compliance head David Bagley sent an email to HBME, where he used to work, discussing the issue.[753]  He conveyed that he had asked senior Compliance official John Root to review the OFAC issue from a Group perspective.  He also wrote that he "would be grateful if we could exercise greater care with regard to the content of written material" being sent to HBUS, explaining:  "The business case includes a number of express references to practices which may constitute a breach of US sanctions, including the OFAC provisions, and could provide the basis for action against the HSBC Group for breach of those sanctions, or seeking to facilitate a breach."[754]  Mr. Bagley requested that future communications regarding this subject be cleared through him or John Root "to avoid relative sensitive references," prior to involving HBUS.[755]  The recipient of the email, Nigel Weir, responded that the memorandum was intended to recommend pursuing a significant business opportunity, while complying with applicable regulations.[756]  Mr. Bagley told the Subcommittee that this was the first time, in his role as head of HSBC Group Compliance, he addressed the OFAC issue.  He noted that HBME's actions could potentially "constitute a breach of US sanctions," yet it would take him two more years, until July 2005, to establish Group policy prohibiting such conduct.

Again, there was no indication that a proposal for handling Iranian U-turn transactions was ever presented to or approved by HBUS' Senior Management Committee.  At the same time, undisclosed transactions continued to be sent by HSBC affiliates through their correspondent accounts at HBUS.  A later analysis performed by an outside auditor at HBUS' request found that, in 2002 alone, HBEU sent at least 1,900 and HBME sent at least 400 Iranian transactions through U.S. dollar accounts in the United States.[757]

**Caught in the OFAC Filter.**  On June 13, 2003, another Bank Melli transaction was caught in the HBUS OFAC filter, containing not only a reference to the bank, but also the words "do not mention our name."[758]  On June 16, 2003, HBUS OFAC Compliance officer Elizabeth Protomastro alerted both Carolyn Wind and Anne Liddy.[759]  Ms. Wind forwarded the email to HSBC Group Compliance officer John Root, and Ms. Protomastro provided him with additional details about the payment, including that it involved $150,000.  She explained that when the HBUS Funds Transfer staff saw the message "do not mention our name," they rejected the

---

[752] Subcommittee interview of Anne Liddy (2/22/2012).

[753] 2/3/2003 email from HBUS David Bagley to HBME Rick Pudner and others, "Business Case-US Payments From Iranian Banks/Entities," HSBC OCC 8876487-488.

[754] Id.

[755] Id. at 488.

[756] 2/3/2003 email from HBME Nigel Weir to HSBC David Bagley and others, " Business Case-US Payments From Iranian Banks/Entities," HSBC OCC 8876487.

[757] Deloitte, Results of the transactions Review – UK Gateway, March 29, 2012. HSBC-PSI-PROD-0197919, at 62. The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at both HBUS and JPMorgan Chase.

[758] See 6/17/2003 email from HBUS Elizabeth Protomastro to HSBC  John Root and HBUS Carolyn Wind, "Re: PLC-Re "do not mention our name," at HSBC OCC 8873922.

[759] 6/16/2003 email from HBUS Elizabeth Protomastro to HBUS Carolyn Wind and HBUS Anne Liddy, "PLC-Re "do not mention our name," HSBC OCC 8873925.

payment in accordance with HBUS policy, "due to concerns about evasion issues under the OFAC regulations."[760]  Ms. Protomastro explained that HBUS would not process a payment containing such a message, even if it qualified as a permissible U-turn transaction.

On June 17, 2003, Mr. Root forwarded the payment details to HSBC Group Compliance head David Bagley.[761]  Mr. Bagley responded by asking if they should allow a payment "with this sort of instruction to be passed to HBUS, regardless of the wider issue as to the applicability of OFAC to non us persons."[762]

The June 2003 transaction once again made several senior officials at HBUS and HSBC Group aware that HSBC affiliates were sending undisclosed OFAC sensitive transactions through HBUS accounts, even though HBUS had yet to approve a U-turn protocol.  When asked about this incident, Ms. Wind told the Subcommittee that she did not recall what HSBC Group Compliance said or did about the payment.[763]  She also did not recall whether there was an inquiry made to identify similar transactions, whether the transaction was reported to OFAC, or whether a SAR was considered or filed.  When asked who in HBUS was responsible for following up on the incident, she replied that from the business side, Denise Reilly and her supervisor Michael Gallagher, and from the compliance side, herself and Anne Liddy.[764]  When Mr. Gallagher was asked about the incident, he responded that it was not his responsibility to take action, because blocked payments are an operational and compliance effort, not a PCM issue.[765]  He stated that he would not have had the authority to either stop or release a suspect payment; operations staff, including Denise Reilly, did not report to Mr. Gallagher in 2003.

**Using "Selves" Instead of Client Names.**  In August 2003, internal bank documents show that Compliance personnel in HSBC Group and HBEU learned of, and objected to, the practice of some HBEU personnel, when sending Iranian U-turn transactions, to alter the payment instructions and identify HBEU itself as the active party in the transaction, rather than use a client name that might trigger HBUS' OFAC filter.  Despite their objections, the practice continued for years.

On August 20, 2003, the head of HSBC Group Audit Matthew King informed HSBC Group Compliance head David Bagley that "HBEU continues to send remittances to the US with 'selves' noted as the ordering party when the transfer would otherwise be filtered out for OFAC sanctions reasons."[766]  He wrote:  "I recall that this has been raised in the past, but I thought we had agreed the practice would cease.  Are you aware of the current position?"[767]

---

[760] 6/17/2003 email from HBUS Elizabeth Protomastro to HSBC John Root and HBUS Carolyn Wind, "Re: PLC-Re "do not mention our name," HSBC OCC 8873922-923.
[761] Id.
[762] Id.
[763] Subcommittee interview of Carolyn Wind (3/7/2012).
[764] Id.
[765] Subcommittee interview of Michael Gallagher (6/13/2012).
[766] 8/20/2003 email from HSBC Matthew King to HSBC David Bagley and others, "OFAC," HSBC OCC 8876504-505.
[767] Id. at 505.

On September 1, 2003, Mr. Bagley forwarded Mr. King's email to John Root and asked him to investigate.[768] Mr. Bagley wrote that there is now "some clarity" that OFAC prohibitions do not apply to non-U.S. persons, even when payments are denominated in U.S. dollars.[769] He also wrote that an established payment mechanism exists for bank-to-bank transfers, which did not require underlying payment information and which might apply to HBEU transfers to HBUS.[770] Mr. Root agreed to look into the matter.

On September 2, 2003, HBEU Compliance manager Julie Clarke sent an email to an individual whose name was redacted by HSBC seeking more information about the transactions that triggered the inquiry by HSBC Group Audit head Matthew King.[771] The email recipient responded:

> "During the conversation, I mentioned that historically we used 'selves' but that I had stopped the practice as soon as I had discovered it in mid-2000. He stated that it was still done in HBEU. This was not in connection with [redacted] payments and I have no examples."[772]

The following day Ms. Clarke forwarded the email to Rod Moxley in HBEU's Multicurrency Payment Department (MPD), and asked him for more information regarding the practice of using "ourselves" in a payment message.[773]

On September 8, 2003, Mr. Moxley responded to Ms. Clarke.[774] He explained that the OFAC sanctions issue had been "under discussion for some time" within MPD.[775] He forwarded to her an August email that he had sent to Pat Conroy, Malcolm Eastwood's supervisor, addressing various issues related to OFAC sensitive transactions. The August email indicated that a certain person, whose name was redacted by HSBC, had brought "our current practice regarding the alteration of the remitter field on Iranian payments to the attention" of Matthew King and David Bagley.[776] The August email also stated that "[t]he specific issue with Iran had been formally raised with the RM [Relationship Manager], John Wilkinson" who had been "given a deadline of 31 December 2003 to remedy this situation." The August email also noted:

---

[768] 9/1/2003 email from HSBC David Bagley to HSBC John Root and HSBC John Allison, "OFAC," HSBC OCC 8876504.

[769] Id. Mr. Bagley told the Subcommittee that the applicability of OFAC prohibitions to non-U.S. persons was an undecided issue in 2003, with legal opinions offering differing conclusions. Subcommittee interview of David Bagley (4/12/2012). OFAC now takes the position that its prohibitions apply to all U.S. dollar transactions, including those involving non-U.S. persons.

[770] 9/1/2003 email from HSBC David Bagley to HSBC John Root and HSBC John Allison, "OFAC," HSBC OCC 8876504. As explained earlier, at that time, bank-to-bank transfers could be executed on forms which required information on the remitting and beneficiary banks, but not the underlying customers.

[771] 9/2/2003 email from HBEU Julie Clarke to [redacted], "OFAC sanctions," HSBC OCC 8876824-825.

[772] Id. at 8876824.

[773] 9/3/2003 email from HBEU Julie Clarke to HBEU Rod Moxley and Chris Pollard, "OFAC Sanctions," HSBC OCC 8876824.

[774] 9/8/2003 email from HBEU Rod Moxley to HBEU Julie Clarke, "OFAC Sanctions," HSBC OCC 8876820-821.

[775] Id. at 8876821.

[776] 8/22/2003 email from HBEU Rod Moxley to HBEU Pat Conroy, "Project Wolf," HSBC OCC 8876821-822.

"Malcolm's stance, I understand, is that any payments after 31 December 2003 will not be processed unless signed off at a very senior level."[777]

That same day, September 8, 2003, Ms. Clarke forwarded the email chain to HBEU Compliance officer Paul Proctor and wrote:  "It appears that John Wilkinson has been allowed to continue (to 31/12/03) to use 'selves' as the remitter name for Iranian payments which I believe contravenes your recently issued guidelines."[778]  Mr. Proctor responded:

> "This is the first time I have seen in writing, an admission that Payments Services are amending payments by removal of either the remitter's name or country to prevent the probable trigger of the US filter and the subsequent freezing of funds.
>
> You indicate that Group Compliance have now forbidden you to tamper with such payments, which I would fully support as it flies in the face of Group policy re complying with the spirit and letter etc."[779]

This email indicates that HBEU Compliance had not been aware that some HBEU personnel were continuing to alter documentation connected to OFAC sensitive transactions, in defiance of new guidelines prohibiting such conduct.  The email also indicates that HSBC Group Compliance had instructed HBEU Compliance that HBEU personnel were "forbidden" to "tamper" with the documentation.

When asked about these emails, Mr. Bagley told the Subcommittee that, in October 2003, Mr. Root reported to him that HBEU Compliance had admitted HBEU was still altering Iranian U-turn transaction documentation, despite a recommendation by HBEU Compliance that it cease.[780]  Mr. Bagley told the Subcommittee that HBEU had explained that it had been sued when payments were blocked by the HBUS filter, so it was using cover payments to avoid additional operational losses.[781]  Mr. Bagley also explained that neither HBEU Compliance nor HSBC Group Compliance could simply order a business unit to cease a particular practice; each could only "recommend" a course of action which it had done.

The internal bank documents show that, in the fall of 2003, Mr. Eastwood and Mr. Moxley in MPD, HBEU Compliance manager Julie Clarke and Compliance officer Paul Proctor, as well as the heads of HSBC Group Audit and Compliance, expressed repeated concern about actions taken by persons like the HBEU Relationship Manager for Bank Melli John Wilkinson to alter U-turn transaction documentation in a way that would avoid the OFAC filter; all agreed the practice should stop.  HBEU Compliance took the step of issuing guidelines recommending against such conduct, but HBEU personnel apparently ignored the guidance.

---

[777] Id.

[778] 9/8/2003 email from HBEU Julie Clarke to HBEU Paul Proctor and others, "OFAC sanctions evasion – Iranian payments," HSBC OCC 8876819-820.

[779] 9/8/2003 email from HBEU Paul Proctor to HBEU Julie Clarke and others, "Re: OFAC sanctions evasion – Iranian payments," HSBC OCC 8876818-819.

[780] Subcommittee interview of David Bagley (5/10/2012).

[781] Id.

**Proposal to Expand U.S. Dollar Clearing for Iranian Banks.**  In October 2003, HBME increased the pressure on HBUS to process Iranian transactions by proposing to expand its U.S. dollar clearing business in Iran.  In early October, HBME Planning head Steve Banner circulated a document entitled, "Iran - Strategy Discussion Paper," to several senior bank executives, including HBME Deputy Chairman David Hodgkinson; HBME Global Relationship Manager for the Middle East Nigel Weir; HSBC Group Compliance deputy head Warren Leaming, HBUS General Counsel Paul Lee, and HBUS Compliance head Carolyn Wind.[782]  The strategy essentially sought approval for HBME offering U.S. dollar payment services to more Iranian banks since, as the strategy noted, "the Iranian market offers substantial untapped potential for the HSBC Group."[783]

The strategy listed "significant business wins" involving Iran, in the Project and Export Finance, Trade Finance, and Treasury and Capital Markets areas with an estimated $7 million per year in revenues generated by Iranian businesses for "various Group entities."[784]  In a section entitled, "Phase 1 – Immediate Opportunities," the strategy stated that Iran's annual international trade business was valued at $25 billion, 80% of which was denominated in U.S. dollars.  It stated that HBEU PCM currently offered U.S. dollar payment services to four Iranian banks, and could market the same services "to other Iranian commercial banks, including Iran's Central Bank (Bank Markazi)."  It estimated the potential business as worth up to $4 million per year.

The strategy also noted an upcoming change in U.K. law that would require U.K. bank-to-bank transfers to identify, not only the banks involved in the transfer, but also their underlying customers.  It stated that the impending U.K. legislation, together with U.S. sanctions laws, would "significantly complicate the USD payments process for Iranian counter-parties," and if "the Group decides to pro-actively promote USD payments services to Iranian banks the payments will need to be processed by HBUS with full details to satisfy OFAC requirements."[785]  To facilitate the process, the strategy said that HBME planned to prepare a paper for HSBC Group requesting an increase in the country risk limits for Iran.[786]  The strategy concluded by asking for HSBC Group's approval and HBUS' "no objection" to HBEU's providing U.S. dollar services to additional Iranian banks.[787]

The strategy stated clearly that, "HBEU PCM currently offer[s] USD [U.S. dollar] payment services to 4 Iranian banks."[788]  It once again alerted HBUS to the fact that HBEU was already processing U.S. dollar transactions for Iranian banks through its account at HBUS.  The strategy was sent to both HBUS' legal counsel and top compliance officer.

On October 15, 2003, the HBUS CEO at the time, Youssef Nasr, sent an email to HBUS PCM head Michael Gallagher noting that with regard to Iranian U-turns, "there remain serious political and reputational risks within the USA if they proceed with this and that he should ensure that Paul Lee is kept in the loop at all times because of the prior work he has done both on

---

[782] Undated HSBC document, "Iran – Strategy Discussion Paper," HSBC OCC 8873949-956.
[783] Id. at 949.
[784] Id. at 951.
[785] Id. at 954.
[786] Id. at 952.
[787] Id. at 955.
[788] Id. at 952.

this and some recent approaches from Group offices about opportunities in Libya."[789]  When asked if Mr. Gallagher discussed the strategy paper with Mr. Nasr, Mr. Gallagher told the Subcommittee that he did not recall seeing it.[790]  On October 21, 2003, HBUS General Counsel Paul Lee contacted HSBC Group Compliance head David Bagley "expressing some concerns" about the Iranian strategy.[791]

On October 21, 2003, Mr. Bagley sent an email to HBME officials indicating several issues surrounding the U-turn transactions needed clarification and asked whether the costs associated with incurring U.S. legal fees made it worthwhile to continue the discussion.  Mr. Bagley also wrote:

> "I am not sure that HBUS are aware of the fact that HBEU are already providing clearing facilities for four Iranian banks, presumably including USD [U.S. dollar] clearance. Bank Markazi is named in the OFAC sanctions as a government owned bank and thus on the face of it not able to benefit from U-turn exemptions."[792]

On October 26, 2003, HBME Deputy Chairman David Hodgkinson sent an email in response to Mr. Bagley.  He wrote:  "HSBC earns USD7.5m a year from its business dealings with Iran and we believe that there is significant long-term potential for growth."[793]  Mr. Hodgkinson indicated that he was willing to incur costs to investigate the options and find "an acceptable way to offer the maximum range of services possible without jeopardizing the Group's position in the U.S."[794]  Mr. Bagley then directed senior Compliance official John Root to work with Gary Boon at HBME on a payment solution.[795]

**Root Report.**  As he had been instructed to do by Mr. Bagley, John Root looked into the Iranian U-turn issue. On October 23, 2003, Mr. Root sent an email to Mr. Bagley, HSBC Group AML head Susan Wright, Money Laundering Control Officer John Allison, and HBEU Compliance officer Paul Proctor.  Mr. Root wrote that the Iranian relationship at HBEU consisted of a U.S. dollar clearing service volume of approximately 11 payments every business day for six banks: Melli, Keshavarzi, Markazi, Sepah, Tejarat, and the Export Development Bank.[796]  His email again confirmed that HBEU was altering the payment documentation, despite HSBC Group Audit head, Matthew King's having expressed concerns about the practice, and the HBEU Compliance guidelines calling for the practice to stop by the end of the year.  Mr. Root wrote:

[789] 10/15/2003 email from HBUS Youssef Nasr to HBUS Michael Gallagher, "Subject, Re: Iran-USD Payments," HSBC OCC 8873942.
[790] Subcommittee interview of Michael Gallagher (6/13/2012).
[791] See 10/21/2003 email exchange among HSBC David Bagley, HBME Steve Banner, and others, "Iran-Strategy Discussion Paper," HSBC OCC 8873946-947.
[792] Id.
[793] 10/26/2003 email from HBME David Hodgkinson to HSBC David Bagley, "Iran-Strategy Discussion Paper," HSBC OCC 8873959.
[794] Id.
[795] Subcommittee interview of David Bagley (5/10/2012).  See also 10/28/2003 email from HSBC David Bagley to HBME Ajay Bhandoola, "Memo: Iran-Strategy Discussion Paper," HSBC OCC 8873958.
[796] Mr. Root identified two more banks than were referenced in the October Iran strategy paper.

"EPS [the payment services team within MPD where Mr. Eastwood and Mr. Moxley worked] HBEU have been manually intervening in the processing of Iranian bank payment instructions by removing the remitter's name and country to prevent the probable trigger of a filter in the US, and the subsequent declaration to OFAC (and possible freezing) of the funds."[797]

Mr. Root wrote that he believed EPS had been instructed by HBEU Compliance to cease this practice, but was unclear when the instructions were given or by whom.  He noted that HBEU Institutional Banking (IBL) had negotiated an extension until December 31, 2003, due to "long-standing valuable relationships."  After the December 31, 2003 deadline, Mr. Root stated that cover payments would be considered unacceptable, and EPS would have to send HBUS fully formatted payment instructions on a MT100/103 serial basis.

Mr. Root also noted that Project WOLF, an HSBC Group project developing an automated payment filter to screen transactions for terrorists, would not ensure HBEU compliance with U-turn regulations in the United States.  As a result, he said that HBUS would continue to be responsible for screening all U.S. dollar transactions with regard to OFAC prohibitions.[798]

**Moxley Deadline.**  The following day, John Root forwarded David Bagley, Susan Wright, and John Allison an email from Rod Moxley in HBEU's Multicurrency Payments Department (MPD) expressing Mr. Moxley's  objection to participating in procedures designed to conceal U-turn transactions.   In his October 24, 2003 email, Mr. Moxley first objected to the notion that the MPD procedures being used for Iranian transactions were new or unknown:

"I have been alarmed by recent inferences that Payment Services have been amending the Iranian banks' payments without the knowledge or consent of IBAl RIM or IBL Compliance.  This has been a long standing practice and to avoid future doubt, I will reiterate the points made in Malcolm Eastwood's memo to Niger Weir of 22 Jan. 03."[799]

Mr. Moxley also stated that the position of his office in terms of processing the Iranian payments was becoming "increasingly untenable."  He wrote that HBEU Risk Management Services[800] would be controlling the new WOLF filter, but "we have been requested to find ways to circumnavigate our own and other institutions' compliance filters."[801]  He described his role as protecting the bank from reputational risk, but "I now feel uncomfortable in compromising my position by leading IBL, PCM or Iranian counterparties down certain routes which may directly contravene the spirit of the Compliance framework."[802]  Mr. Moxley warned that, given the

---

[797] 10/23/2003 email from HSBC  John Root to HSBC David Bagley and others, "USD Clearing – Iranian Banks," HSBC OCC 8875217.
[798] Id. at 217.
[799] 10/24/2003 email from HBEU Rod Moxley to HBEU John Wilkinson and others, "Iran," HSBC OCC 8874661-663.  Mr. Moxley then outlined a new procedure that he advocated for Iranian payments, the result of which would be that the Iranian banks would enter the payment information instead of HBEU.
[800] RMS was located within HBEU's Payment Services.  Subcommittee interview of Rod Moxley (6/7/2012).
[801] 10/24/2003 email from HBEU Rod Moxley to HBEU John Wilkinson and others, "Iran," HSBC OCC 8874661-663.
[802] Id. at 662.

internal HBEU deadline to stop processing concealed Iranian transactions, beginning January 1, 2004, "no Iranian payments will be amended."[803]

On November 11, 2003, HSBC Group Money Laundering Control Officer John Allison sent an email to HSBC Group AML head Susan Wright about his visit to HBEU's Multicurrency Payments Department (MPD) the week prior to discuss Iranian payments.[804]  He wrote that Iranian correspondent bank customers entered payment information on a form, and MPD staff were then expected to review the form to ensure the phrases  "Iran," "do not mention Iran," or any other compromising reference were not included in the MT202 payment message transmitted to HBUS.  He described this process as "established custom" rather than a documented procedure, "believed by MPD to be at the request of relationship management."  He also wrote that the new MPD Compliance manager was "not comfortable with the custom which he has inherited, neither from a moral compliance perspective, nor from the operational loss/embarrassment factor."  Mr. Allison also wrote that MPD Compliance is "very uncomfortable" about periodically being asked by Nigel Weir and Gary Boon in HBME whether a specific payment format will pass through an OFAC filter.[805]  He stated that MPD Compliance viewed all of the Iranian payments they processed as meeting the requirements for a permissible U-turn transaction,[806] and wanted to move toward the legitimate execution of these payments in light of what Mr. Root described as an "instruction" from Mr. Bagley "to cease processing Iranian bank payments."[807]

On November 27, 2003, Mr. Moxley sent Ms. Wright a draft proposal to process Iranian U.S. dollar transactions.  Although the proposal would prohibit altering a transaction document to remove the name of a prohibited country or town, and required a review for OFAC compliance, it did not require the transaction to include full payment details for the originator and ultimate beneficiary as outlined in the HBUS August 2001 U-turn payment procedure.[808]

On December 10, 2003, after having consulted HBUS Compliance head Carolyn Wind, Ms. Wright sent Mr. Moxley an email updating him on the Iranian U-turn payment proposal.[809]  Ms. Wright indicated that the issue of processing payments through HBUS had been "discussed at length" among HBUS Compliance, outside legal counsel Tom Crocker, HBUS payments personnel, and HBEU during the summer of 2001.  She indicated she had asked Ms. Wind to forward the 2001 HBUS proposal for consideration.  The following day, Nigel Weir wrote to Ms. Wright that the HBUS proposal required a method for processing payments that was not HBME's preferred solution.[810]  He also expressed concern that HBEU would be unable to advise

---

[803] Id..

[804] 11/11/2003 email from HSBC John Allison to HSBC Susan Wright, "Iran payments," HSBC OCC 8877136-137.

[805] Id. at 136.

[806] Id. at 137.  The email did not address the issue of whether Bank Markazi, as a government owned Central Bank, was unable to utilize the U-turn exception.  Bank Markazi was added to the OFAC list in 2007.

[807] Id. at 137.  Although Mr. Root indicated that Mr. Bagley had ordered the MPD payments to "cease," they continued for another two years.

[808] 11/27/2003 email from HBEU Rod Moxley to HSBC Susan Wright, "Draft Iranian – USD Payment Procedures," HSBC OCC 8875225-232.

[809] 12/10/2003 email from HSBC Susan Wright to HBEU Rod Moxley and others, HSBC OCC 8875508.

[810] See 12/11/2003 email exchange between HSBC Susan Wright, HBME Nigel Weir, and others, "Iran – U-Turn Payments," HSBC OCC 8877150-154.

their customers of the proposed processing changes before the December 31 deadline and requested an extension.  Ms. Wright forwarded the correspondence to Mr. Bagley.

On December 12, 2003, Mr. Bagley emailed Mr. Weir that if HBUS felt it could agree to processing the Iranian transactions only on the basis of fully transparent documentation, then its views would have to be taken into account.  He also wrote that HBUS "must be comfortable" with the approach.

HBEU continued, however, to object to the new payment procedure.  On December 18, 2003, HBEU wrote to HSBC Group Compliance that HBUS' procedure, which it referred to as "the serial method," " requires a large amount of work prior to commencement, a disproportionate amount of expense and a higher than average risk to the banks reputation being damaged by a future payment."[811]

At the same time HBEU and HBUS were arguing over payment procedures, HBEU and HBME continued to send transactions involving Iran through their correspondent accounts at HBUS, the vast majority of which were undisclosed.  A later analysis performed by an outside auditor at HBUS' request found that, in 2003, HSBC affiliates sent at least 5,400 Iranian transactions to U.S. dollar accounts in the United States, of which about 90% were not disclosed.[812]

Also in December, HBUS payments services head Denise Reilly spoke with HBUS' new AML Director Teresa Pesce, who began work in September 2003, about the Iranian issue and sent her a copy of the 2002 Eastwood memorandum describing how HBEU altered documentation and used cover payments to send U.S. dollar transactions involving Iran through their correspondent account at HBUS without HBUS' knowledge.[813]  Ms. Reilly's email indicated that Ms. Pesce had also discussed the issue with Mr. Gallagher the previous day, although Mr. Gallagher told the Subcommittee he did not recall either seeing the memorandum or discussing it with Ms. Pesce.[814]

---

[811] 12/18/2003 email from HBEU Tony Collins to HSBC John Allison and others, "Memo: Re: Iran – U-Turn Payments," HSBC OCC 8873974-975.  Group Compliance John Allison and John Root sought legal advice from outside counsel Tom Crocker of Alston & Bird and Mr. Crocker determined that "it is not clear that the cover payments meet the requirement of the U.S. Dollar u-turn exception to the Regulations." 1/8/2004 memo from Thomas Crocker to John Root and John Allison, "Iranian U.S. Dollar U-Turn Transactions and Cover Payments," HSBC OCC 8903992-000.

[812] Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.

[813] See 12/17/2003 email from HBUS Denise Reilly to HBUS Teresa Pesce, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 3407517-522 ("Attached is the memo that we discussed yesterday in our meeting with Michael Gallagher.").  See also 11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.

[814] Id.  Subcommittee interview of Michael Gallagher (6/13/2012).

### (e) Reaching Agreement

Despite the HBEU deadline announced by Rod Moxley, that MPD would stop processing concealed Iranian transactions after December 31, 2003, no agreement was reached by that date on how to process the transactions.  Documents obtained by the Subcommittee indicate that HBEU did not adhere to its deadline, but continued to process Iranian transactions using cover payments and deleting any references to Iran in the payment instructions.

On March 10, 2004, after an Iranian transaction was detected and halted in London, HBEU MPD head Malcolm Eastwood wrote:  "I remain extremely uncomfortable with the practice of amending Iranian payment orders for whatever means."[815]  Mr. Eastwood advised HBEU Compliance and Institutional Banking to resolve the issue as soon as possible and remarked that his Compliance certificate is "heavily caveated to reflect that we are not compliant in respect of Iran."[816]  Mr. Eastwood sent a copy of his email to HSBC Group AML head Susan Wright who forwarded it to David Bagley.

The following day, Mr. Bagley responded to Mr. Eastwood by writing that he understood and shared his concerns, but believed his comments underestimated "the complexity of the OFAC regulation, and the competing competitive pressures across the Group."[817]  Mr. Bagley also wrote that one reason for the slow resolution was that "HBUS was unaware that any arrangements existed with Iranian banks."

On March 22, 2004, more than two years after becoming head of HSBC Group Compliance, David Bagley confronted HBME Deputy Chairman David Hodgkinson about the need to change how HBME was handling U.S. dollar clearing activity for Iranian banks.[818]  Mr. Bagley wrote that he was "uncomfortable with this activity in its current form," and "the amount of revenue may not justify" the "additional work and investment" required, "nor would it justify ru[n]ning the reputational and regulatory risk in the US."  He expressed his willingness to discuss the issue further, but suggested "that any such conversation take place over the telephone, as we are seeking to avoid correspondence with HBUS on this sensitive issue other than through lawyers so as to preserve privilege."[819]

**WOLF Filter Announced.**  On March 23, 2004, HSBC Group issued a new Group Circular Letter 040021 implementing a major new initiative on "Payment screening."[820] The circular announced that HSBC Group had developed an internal filter called "WOLF" to screen against terrorists and sanctioned countries and persons.  The circular explained:

---

[815] 3/10/2004 email from HBEU Malcolm Eastwood to MDBK (Midland Bank) Quentin Aylward and others, "BankMarkazi Payment," HSBC OCC 8873979-980.
[816] Id. at 8873980.
[817] 3/11/2004 email from HSBC David Bagley to HBEU Malcolm Eastwood and others, "Bank Markazi Payment," HSBC OCC 8873985-986.
[818] 3/22/2004 email from HSBC David Bagley to HBME David Hodgkinson and HSBC Warren Leaming, "Iran – Correspondent Banking Services," HSBC OCC 8873995-997.
[819] Id.
[820] 3/23/2004 "GCL 040021: Payment screening," prepared by HSBC Group, HSBC OCC 0953080-084.

"As part of the international effort to combat terrorism, Competent Authorities in numerous countries have published lists of names that are known to be, or are believed to be involved in terrorist activity. … In addition … sanctions against a number of countries and names are imposed …. Compliance with these sanctions and orders has to date relied upon manual processes to identify when relevant names are contained in payment instructions. In order to ensure that compliance with the restrictions … is achieved consistently across the Group, an automated payment screening utility named WOLF has been developed. When installed … WOLF will, before execution, search all fields of a payment message for matches with listed terrorist/sanctioned names. Once a potential match with a word or words … is identified, the unexecuted payments must be reviewed to establish whether the match is actually a true match, with appropriate action taken if it is. WOLF is the Group solution for real-time pre-execution payment screening."[821]

The circular indicated that globally, WOLF would screen against terrorists listed by the United Nations, United States, United Kingdom, European Union, and Hong Kong, as well as countries or persons sanctioned by the United Nations. It indicated that compliance and payment operations personnel in HSBC affiliates were responsible for ensuring WOLF was loaded with other sanctioned names that were applicable locally.[822] It indicated that the screening would be applied first to international transactions, and later to domestic ones. The circular required affected HSBC entities to install the WOLF filter by the end of 2004.

**HBME Extension.** On April 17, 2004, HBME Deputy Chairman David Hodgkinson contacted David Bagley about the unresolved issues involving HBME's U.S. dollar clearing business for Iran, because he anticipated having to explain HSBC's position to the Central Bank during a visit to Tehran in May. Mr. Hodgkinson noted: "The current position as briefed to me last week was that we have not yet found a way to handle major USD clearing business."[823] He informed Mr. Bagley that he had directed his staff to develop a proposal to undertake this business while minimizing risk, "so that if circumstances change we know our preferred way forward." [824]

Mr. Bagley forwarded the email to his supervisor, HSBC Group legal counsel Richard Bennett. Mr. Bagley wrote: "[T]he most pressing issue to be resolved is that relating to the limited number of existing relationships that we have (for two small Iranian Banks) where I suspect that HBUS are not aware that payments may be passing through them. Do not believe that we can allow this situation to continue very much longer, which is the point I will make to David in my response."[825]

---

[821] Id.

[822] Id. HSBC added the OFAC SDN list to the WOLF filter in 2004, and added the OFAC country list in August 2005. Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012).

[823] 4/17/2004 email from HBME David Hodgkinson to HSBC David Bagley and HSBC Warren Leaming, "Iran – Correspondent Banking Services," HSBC OCC 8874671.

[824] Id. at 671.

[825] 4/19/2004 email from HSBC David Bagley to HSBC Richard Bennett, "Iran Correspondent Banking Services – OFAC," HSBC OCC 8873994 and HSBC OCC 8966146. Mr. Bagley had allowed these payments to continue by granting a dispensation since they ran afoul of Group policy. However, an increase in business, which is what HBME was seeking, was on hold pending an agreement between HBUS, HBEU, and HBME.

This email is the third[826] in which Mr. Bagley indicated that HBUS might be unaware it was processing Iranian U-turn transactions that, in his own words, "may constitute a breach of U.S. sanctions," yet contained no indication that Mr. Bagley planned to inform HBUS about the risks it was incurring.

Two days later, on April 19, 2004, Mr. Bagley again pressed HBME to resolve the issue. In an email to Mr. Hodgkinson, Mr. Bagley expressed concern about the correspondent relationships operating through HBME "which do not currently meet the requirement of the US Legal opinion that has now been obtained."[827]  He continued:  "I have sanctioned the continuation of these services pending an early resolution of the way forward, but it is clear from your note that we are some distance away from finalizing our thinking such that we can go to HBUS with any proposal with regard to a way forward."  Mr. Bagley warned:  "I feel that there is little option other than for me to recommend to HBEU that the existing activity be discontinued given the risk that we are posing for HBUS, unless the solution under consideration at your end gives us a satisfactory option."

HBME's Nigel Weir responded to Mr. Bagley's email at the request of Mr. Hodgkinson, stating that he had already spoken with Gary Boon at HBME and John Allison at HSBC Group to develop a solution.  He also requested that Mr. Bagley extend the dispensation from the HBEU decision to stop altering Iranian documentation until June 30, 2004.[828]  Two days later, Mr. Bagley told John Allison that he was reluctant to extend the dispensation "unless there is a clear and agreed solution with a definite and proximate implementation date," and requested an update the following week.[829]  Despite Mr. Bagley's indication that he would not grant an extension without an agreement, the same practices continued amid ongoing negotiations over the agreement's provisions.

**Second Moxley Deadline.**  About eight months after Mr. Moxley had raised strong objections to continuing to alter Iranian payments, no agreement had been reached among HSBC affiliates on increasing the transparency of the transactions.  HBEU continued to delete references to Iran from the payment instructions, generate cover payments with incomplete payment information, and send undisclosed Iranian payments to HBUS.  To break the impasse, in June 2004, outside legal counsel in the United States proposed a new payments solution, which essentially required that all U-turns be processed by HBUS in a transparent or "serial" manner that identified the underlying originators and beneficiaries.

---

[826] The other two were a 10/21/2003 email from HSBC David Bagley to HBME Steve Banner, and others, "Iran-Strategy Discussion Paper," HSBC OCC 8873946-947 ("I am not sure that HBUS are aware of the fact that HBEU are already providing clearing facilities for four Iranian banks, presumably including USD clearance."); and a 3/11/2004 email from HSBC David Bagley to HBEU Malcolm Eastwood and others, "Bank Markazi Payment," HSBC OCC 8873985-986 ("The complexity of the OFAC regulations, and the fact that HBUS were unaware that any arrangements existed with Iranian Banks, has made speedy resolution of this issue difficult.").
[827] 4/19/2004 email from HSBC David Bagley to HBME David Hodgkinson, "Iran – Correspondent Banking Services," HSBC OCC 8966135.
[828] 5/2/2004 email from HBME Nigel Weir to HSBC David Bagley and others, "Iran – Correspondent Banking Services," HSBC OCC 8874673-674.
[829] 5/4/2004 email from HSBC David Bagley to HSBC John Allison, "Iran – Correspondent Banking Services," HSBC OCC 8874673.

On June 9, 2004, HBEU senior payments official Rod Moxley reacted negatively to the proposal due to operational difficulties.  At the same time, he wrote: "I feel very uncomfortable recommending that we continue to process Iranian payments."[830]  He requested a formal response by June 18, 2004, and stated that "unless compelling commercial reasons" approved by HSBC Group Compliance and HBUS exist, he would stop handling Iranian payments after September 30, 2004.[831]  This email represented his second attempt to cut off Iranian payments that MPD was uncomfortable processing.

On June 30, 2004, Nigel Weir wrote to Mr. Moxley and asked him to revisit the issue and work with HSBC Group Compliance on a solution enabling HBEU to execute U.S. dollar payments for Iranian banks in accordance with U.S. regulations.[832]  Mr. Weir told Mr. Moxley that if the payments were stopped, "we will be effectively insulting the Government and State of Iran."  Mr. Weir stated that the bank had declined new U.S. dollar payment business from Iranian banks due to the sensitive political situation, "but to exit business which we have been conducting for many years would jeopardize all other existing business activities."  He estimated that the Group profit from existing Iranian business activities amounted to $10 million per year.

Also on June 30, 2004, HBME Deputy Chairman David Hodgkinson forwarded the correspondence between Mr. Moxley and Mr. Weir to then HBEU CEO Michael Geoghegan, asking for his "intervention and support" in positively resolving the long-standing issue, and noting Iran's "significant strategic importance" to the Group.[833]  Mr. Hodgkinson also noted that the volume of Iranian payments was small at 20 per day.  When asked about this email, Mr. Moxley told the Subcommittee that it resulted in HBEU and HBME's obtaining a "dispensation" from having to end the alteration of Iranian transactions until the end of 2004.[834]  When asked about the dispensation approval process, he said that he thought that HSBC Group Compliance approval was needed along with secondary approval from either HSBC Group Audit or another manager.

Later that day, another HBEU official John Ranaldi sent an email to Mr. Geoghegan stating that he was aware of the Iranian situation and would get an update.  He wrote: "[B]asically, our interpretation was that we were being asked to 'fudge' the nature of the payments to avoid the U.S. embargo and seizure."[835]  When asked about this email, Mr. Geoghegan told the Subcommittee that he could not explain what Mr. Ranaldi meant by using the word "fudge," except that it related to Iran.[836]  He said that, at the time, he was unaware that HBEU was altering transaction documentation or using cover payments.  Having since learned what was going on, he told the Subcommittee that he assumed that's what Mr. Ranaldi was talking about.  When asked whether it raised alarm bells at the time, he remarked that he got

---

[830] 6/9/2004 email from HBEU Rod Moxley to HSBC John Allison and others, "Iran," HSBC OCC 8874002-004.
[831] Id.
[832] 6/30/2004 email from HBME Nigel Weir to HBEU Rod Moxley and others, "Memo: Re: Iran," HSBC OCC 8874001-002.
[833] 6/30/2004 email from HBME David Hodgkinson to HBEU Michael Geoghegan, "Memo: Re: Iran," HSBC OCC 8874001.
[834] Subcommittee interview of Rod Moxley (6/7/2012).
[835] 6/30/2004 email from HBEU John Ranaldi to HBEU Michael Geoghegan, "Memo: Re: Fw: Iran," HSBC OCC 8873999.
[836] Subcommittee interview of Michael Geoghegan (5/24/2012).

many emails and Mr. Ranaldi used colorful language.  He said that he also knew Mr. Ranaldi
would follow-up with him in a few days.

   **HBEU Proposal.**  On July 6, 2004, HBEU's Rod Moxley produced a specific proposal
as a potential way forward using his preferred solution of serial payments.[837]  The extensive
proposal also shed light on existing practices at HBEU.[838]

   The proposal noted that HBEU had been trying to come up with a solution for two years
after an HBEU compliance officer challenged the practice of altering Iranian payment
instructions in June 2002.  It noted that Bank Melli, Bank Markazi, Bank Tejarat, Bank
Kesharvazi, and the Export Development Bank of Iran were the five Iranian financial institutions
that took advantage of this practice to effect U.S. dollar payments with a daily volume estimated
at between 10 and 50 payments per day at an approximate total value of $500,000 to $1 million.
The proposal also noted that the Central Bank payments were much larger, in the range of $10
million, and were typically made at certain times of the month.[839]  The proposal stated that the
"vast majority of payments are valid, falling within the U-turn exception."[840]

   The proposal discussed two potential payment options that would meet HBUS'
requirement for transparency.  It noted that HBEU preferred the "serial payment" option which
would allow the Iranian banks to format their payments in a way that would not require
intervention from HBEU.  HBEU believed this aspect of the proposal would relieve it of any
responsibility to review the payments, leaving it up to HBUS, or another U.S. bank where a
payment was directed, to verify that the payment met the U-turn exception requirements.  The
proposal indicated that HBEU would continue to utilize WOLF and other filters to screen the
payments, but the Iranian financial institutions would be responsible for ensuring they submitted
only valid U-turn payments "permissible under the terms of US legislation."  The proposal
indicated this solution would also transfer the risks associated with blocked payments to the
Iranian banks.[841]  The proposal acknowledged that HBUS would need to agree to this solution,
and HBEU and Group Compliance would need to "sign-off" on it prior to moving forward.

   On July 6, 2004, HBEU MPD head Malcolm Eastwood forwarded Mr. Moxley's
proposal to John Ranaldi, noting that he continued to have serious concerns about the Iranian
U.S. dollar clearing business.[842]  Mr. Ranaldi forwarded the email to then HBEU CEO Michael
Geoghegan, writing:  "reference your earlier query."[843]  According to Mr. Ranaldi, Mr.
Eastwood's department was being asked to "amend instructions or assume responsibility that the

---

[837] See 7/2004 discussion paper, "HSBC Bank PLC Iranian Payment Processing Proposals," HSBC OCC 8874692-
701.
[838] Id.  For example, according to the document, the existing HBEU practice was that if an Iranian financial
institution included a cautionary statement, such as "Do not mention Iran," in Field 72 of the payment instructions,
the payment would drop out to what was called a repair queue.  Once in the repair queue, HSBC personnel would
alter the payment instructions by deleting any reference to Iran.
[839] 7/2004 discussion paper, "HSBC Bank PLC Iranian Payment Processing Proposals," HSBC OCC 8874692-701.
[840] Id.
[841] Id. at 696.
[842] 7/6/2004 email from HBEU Malcolm Eastwood to HBEU John Ranaldi and others, "HBEU Iranian Payments
Business," HSBC OCC 8876861
[843] Id.

149

contents of the payment message do not attract the Fed's attention and seize the payment." He explained that a "payment clerk is asked to judge upon a payment kicked out by the filtering system, whether to release, or return." He wrote, "there is an irony; someone could argue that by returning payments to Iran that we are contravening the ofac rules."[844] Mr. Ranaldi characterized the risks associated with the existing practice as including operational losses due to payment seizure, threats to HSBC's reputation, and "incurring hefty fines." He told Mr. Geoghegan that Lloyds Bank had been fined "and few if any u.k. banks are in the business."

When asked about this email, Mr. Geoghegan told the Subcommittee that he was "puzzled" that he didn't act to stop the practice immediately or get out of the business. He remarked that he did respond that way with Mexico, so thought it was odd that he didn't in this case. He couldn't recall whether he talked to any other senior HSBC Group executives about the issue.[845]

Emails in early August 2004 show HBEU and HBME reviewing and discussing the Moxley proposal.[846] On August 6, 2004, Mr. Bagley commented: "My initial reaction is that the proposals are more robust, and therefore more likely to be acceptable that we originally contemplated or proposed."[847] He also said the proposal had to be sent to HBUS' outside legal counsel for confirmation it would meet OFAC requirements.[848] Later that day, the HSBC Global head of Payments and Cash Management, Iain Stewart, forwarded Mr. Bagley's email to Mr. Geoghegan and Mr. Hodgkinson with a note: "Progress report. This will delay it a bit but we are getting there."[849] When asked about this email, Mr. Geoghegan surmised that HBUS was involved and legal opinions were being obtained.[850]

On September 22, 2004, HBEU Nigel White informed Mr. Stewart and others, including Mr. Bagley, that "all involved parties have signed off on the proposal," and the next step was for HSBC Group Compliance to obtain agreement from HBUS.[851] At the same time these negotiations were ongoing, HBEU and HBME continued to send undisclosed Iranian transactions to HBUS with the tacit approval of HSBC Group Compliance.

**HBUS Approval.** The revised Moxley proposal was sent to HBUS in November 2004. On November 30, 2004, HBUS' AML Director Terry Pesce, PCM head Michael Gallagher, and Payment Services head Denise Reilly met with HBUS CEO Martin Glynn, about HBUS processing U-turn transactions. Prior to the meeting, Ms. Reilly circulated the HBUS procedures

---

[844] 7/6/2004 email from HBEU John Ranaldi to HBEU Michael Geoghegan, "HBEU Iranian Payments Business," HSBC OCC 8876861.

[845] Subcommittee interview of Michael Geoghegan (5/24/2012).

[846] See 8/4/2004 email exchanges among MDBK Phil Baines to HBEU Nigel White and others, "Iranian – Payment Processing Proposals," HSBC OCC 8874705-708.

[847] 8/6/2004 email from HSBC David Bagley to HBEU Nigel White and others, "Iranian – Payment Processing Proposals," HSBC OCC 8874703-704.

[848] Id.

[849] 8/6/2004 email from HSBC Iain Stewart to HBEU Michael Geoghegan and HBME David Hodgkinson, "Iranian – Payment Processing Proposals," HSBC OCC 8874703.

[850] Subcommittee interview of Michael Geoghegan (5/24/2012).

[851] 9/22/2004 email from HBEU Nigel White to HSBC Iain Stewart and others, "Iranian U Turn Payments," HSBC OCC 8874023-037.

that were developed in 2001, "when the topic was last active."[852]  The internal emails suggest that one HBUS employee may have been under the impression that the processing of Iranian transactions had not yet begun and did not know that HBUS had already been processing Iranian U.S. dollar transactions for at least three years.[853]

A few days after the high level meeting among HBUS officials, Ms. Reilly sent Mr. Gallagher a description of "the conditions under which HBUS will accept U-Turn transactions."[854]  Those conditions included that transactions would be formatted to be fully transparent serial payments; HBEU would agree not to alter payment instructions and abide by the U-turn processing requirements; HBUS would not be liable for penalties resulting from OFAC sanction violations; a separate "HBEU Special Account" would be established at HBUS to handle Iranian originated transactions and the account number would be added to the HBUS OFAC filter so all transactions could be reviewed and approved prior to processing; HBUS would be reimbursed for the additional employees needed to handle review of these payments; and fees for the transactions would reflect the processes and risk.[855]  Whereas the 2001 protocol was specific to Bank Melli, this protocol applied to all Iranian transactions.[856]

On December 15, 2004, Mr. Bagley informed the HSBC Global Head of PCM Marilyn Spearing and HBME Deputy Chairman David Hodgkinson that he had advised then HSBC Group CEO Stephen Green "that a compliant solution had been agreed in principle with HBUS." While this agreement was a significant milestone, Mr. Bagley said Mr. Green wanted to consider the issue and possibly discuss it with then HSBC Group Chairman John Bond.

Mr. Bagley asked Ms. Spearing to provide him data on the potential commercial value of the Iranian U.S. dollar transactions to the Group, considering both existing and future business. He wrote:

"I would not suggest that we seek to try and influence the debate at this stage….but it might be helpful if I was armed with the likely value to the Group if we are in effect making a reputational risk over possible reward type judgment."[857]

Mr. Bagley concluded by writing that it would probably be "sensible" to "gently" proceed "assuming that we may get sign-off."[858]

---

[852] 11/30/2004 email from HBUS Denise Reilly to HBUS Sandra Peterson and HBUS Michael Gallagher, "U-turns," HSBC-PSI-PROD-0096166; 11/29/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-turns," HSBC-PSI-PROD-0096167.

[853] See, e.g., 11/30/2004 email from HBUS Sandra Peterson to HBUS Denise Reilly and HBUS Michael Gallagher, "U-turns," HSBC-PSI-PROD-0096165 (Ms. Peterson:  "Is this proposal for Bank Melli only or is the intent to grow this business?  When this topic first arose it was to support Bank Melli but my understanding is that the business under discussion now is more general, with no specific clients named to date.").

[854] 12/2/2004 email from HBUS Denise Reilly to HBUS Michael Gallagher and others, "U-Turns," HSBC OCC 3407526-527.

[855] Id. at 527.

[856] Subcommittee meeting with HSBC legal counsel (4/12/12).

[857] 12/15/2004 email from HSBC David Bagley to HSBC Marilyn Spearing and HBME David Hodgkinson, "Iran – OFAC," HSBC OCC 8874039.

[858] Id. at 039.

An internal OCC memorandum indicates that, in early 2005, HBUS contacted the OCC about a proposal to process Iranian U-turns.[859]  In the memorandum, an OCC examiner described how legitimate U-turns could be processed and wrote:  "[W]e notified Ms. Pesce that we believed the transactions to be permissible.  However, we also informed her that the bank would have to maintain extremely tight controls over the transactions as well as a comprehensive system of controls for monitoring purposes."[860]  Later in the same memorandum, the OCC examiner wrote:  "[O]n February 23, 2005 Ms. Pesce informed the writer that the decision to process the u-turn transactions was not to go forward and that the area business had made the decision not to undertake such processing."[861]

The documentation suggests that even after reaching agreement with HBUS on how to process Iranian transactions, HBEU and HBME continued to send undisclosed Iranian transactions through their HBUS accounts.  A later analysis performed by an outside auditor at HBUS' request found that HSBC affiliates sent about 7,800 Iranian transactions through U.S. dollar accounts in the United States during 2004, of which more than 90% continued to be undisclosed.[862]

### (f)  Processing the Iranian Transactions

The 2004 agreement reached among HSBC affiliates on how to process Iranian U-turn transactions did not end the controversies or new developments affecting those transfers.

**Considering an Exit.**  Four months after agreement was reached with HBUS on how to process Iranian transactions, on April 8, 2005, David Bagley reached out to Mr. Hodgkinson to request an assessment of the nature and extent of Iranian business for an analysis Mr. Bagley was asked to prepare for the HSBC Group Chairman.  It appears that at the top levels of HSBC, there was some discussion about exiting the Iranian business entirely due to a "specific transaction for NPC" about which Mr. Bagley had spoken with Mr. Green.[863]  In the same email, Mr. Bagley wrote, "This is needed partly as part of the risk over reward equation, but also because we will need to both analyze each different type of business and assess how we will deal with legacy issues."[864]  He continued:  "It is not all as bad as it seems as the conversation today gave some clear possible alternative approaches to an outright ban."[865]

Two days later, on April 10, 2005, HBME official Ajay Bhandoola provided Mr. Bagley with a paper discussing payment alternatives for Iran.[866]  The paper laid out two proposals for

---

[859] See 2/28/2005 OCC memorandum, "Issues Update," OCC-PSI-00903648-650, at 2.  [Sealed Exhibit.]
[860] Id.
[861] Id.
[862] Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.
[863] 4/8/2005 email from HSBC David Bagley to HBME David Hodgkinson and HBME Nasser Homapour, "Iranian Business – OFAC," HSBC OCC 8874052.  The reference to NPC is unclear.
[864] Id.
[865] Id.
[866] 4/10/2005 email from HBME Ajay Bhandoola to HSBC David Bagley and others, "Iranian Business – OFAC," HSBC OCC 8874051-057.

continuing payments from Iranian bank accounts with HSBC "to protect our Iranian franchise while minimizing any possible legal, regulatory or reputational risk to HBUS." The two alternative solutions provided were to use another U.S. dollar correspondent (other than HBUS) for HBME, and to limit U.S. dollar accounts for Iranian banks to specific purposes.[867] HBME did not explain why it was considering using a third party correspondent since HBUS had already agreed to process the Iranian transactions using transparent procedures.[868]

**Stopping Payments.** On April 19, 2005, HBUS' OFAC filter stopped a $362,000 payment from Bank Melli because it contained the phrase "do not mention our name in New York."[869] When asked in general about why payments would be stopped in the HBUS filter, Rod Moxley told the Subcommittee that messages like the one mentioned above should have been deleted in the processing area but was errantly left on the outgoing instructions.[870] This incident indicated that HBEU's MPD was still altering Iranian payment instructions in April 2005, one year after Mr. Moxley had threatened to stop processing all payments if forced to continue altering them, and four months after HBEU and HBUS reached agreement on using fully transparent Iranian U.S. dollar transactions. HBEU resubmitted the payment on April 22, 2005, but HBUS stopped it again and sent a SWIFT message requesting full disclosure of the name and address of the underlying originator and ultimate beneficiary. Two follow-up requests were sent by HBUS on April 28 and May 4, 2005. As of May 5, 2005, no response had been received.[871]

In early May 2005, a $6.9 million wire payment involving Iran was also stopped by HBUS because the payment details included the phrase, "Bank Melli Iran."[872] HBUS OFAC Compliance officer Elizabeth Protomastro sent an email to HBEU, as well as HSBC Group, stating:

> "Though the payment appears to meet the U-turn under the Iranian Transactions Regulations, we require that the payments should be fully disclosed as to the originator and beneficiary information before processing. We know that this policy is in line with the stance of other U.S. financial institutions …. You are also aware, from past discussions, that this is required by HBUS.

> Let us know if you have any questions. Please advise on your side of the delay in processing."[873]

The email chain regarding the stopped payment was forwarded to Mr. Bagley, who then contacted HBUS AML head Teresa Pesce to ask whether HBUS' action "denotes a change of

---

[867] Undated "Iranian Accounts and USD Payments," prepared by HBEU, HSBC OCC 8874055-057.
[868] Id. at 056-057.
[869] 5/5/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison and others, "Payment rejected re Melli Bank PLC – USD 362,000," HSBC-PSI-PROD-0096170-171.
[870] Subcommittee interview of Rod Moxley (6/7/2012).
[871] 5/5/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison and others, "Payment rejected re Melli Bank PLC – USD 362,000," HSBC-PSI-PROD-0096170-171.
[872] 5/3/2005 email from HBUS Elizabeth Protomastro to HSBC John Allison, HSBC Susan Wright, HBEU Rod Moxley, and others, "Wire payment suspended re 'Iran' – USD 6,912,607.82," HSBC OCC 8874710-712, at 711.
[873] Id. at 712.

policy and approach within HBUS to what I would normally expect to be cover payments."[874] Mr. Bagley wrote:

> "As you are aware, there are no Group standards which require that the originator and beneficiary details go in all payments. Accordingly, Group Operation globally will not habitually require or input this information if the underlying customer instruction is received on a basis permitted by the SWIFT format and by local regulation."

He noted that if the payment were suspended due to a reference to Iran, he understood. But if the action taken by HBUS denoted a change of policy on what information had to be included in payment instructions, that change may not have been communicated across the Group and vetted with business colleagues. This email was sent in 2005, by Mr. Bagley, after more than two years of negotiations to increase transparency with regard to Iranian transactions.

Ms. Pesce forwarded Mr. Bagley's email to HBUS OFAC Compliance officer Elizabeth Protomastro and senior HBUS Compliance official Anne Liddy. Ms. Protomastro responded that "for the most part" the U-turns being processed by HBUS for HBEU had been fully disclosed in compliance with the conditions specified in December 2004.[875] Ms. Protomastro stated that the remitter involved in the $6.9 million transfer was Credit Suisse Zurich, which was "well aware of the u-turn practices of other U.S. organizations and the requirement for full disclosure of the name and address of the originator and the beneficiary."[876]

On June 3, 2005, Ms. Protomastro informed HSBC Group about two more HBEU transfers, for $1.9 million and $160,000, that had been stopped by HBUS due to the lack of full disclosure of the originator, beneficiary, and purpose of the payment.[877] HBEU responded that both payments were foreign exchange related, the originators were Bank Tejarat and Bank Melli, and the beneficiaries were Persia International Bank and Credit Suisse Zurich, respectively.[878] Ms. Protomastro responded by requesting that HBEU follow up with the banks to obtain the names and addresses of the initial originators and ultimate beneficiaries, as well as confirmation of the underlying purpose of the payments, in accordance with the "agreement reached in the past" between HBUS and HBEU requiring full disclosure for U-turn payments.[879] According to information provided by Bank Melli through HBEU, the $160,000 payment denoted an internal transfer from Bank Melli's account with HBEU to Bank Melli's account with Credit Suisse Zurich.[880] This information allowed the payment to be released.[881] Mr. Marsden stated that he

---

[874] 5/4/2005 email from HSBC David Bagley to HBUS Teresa Pesce, "Wire Payments Suspended," HSBC OCC 8874710-711.
[875] 5/4/2005 email from HBUS Elizabeth Protomastro to HBUS Teresa Pesce and others, "Wire Payments Suspended," HSBC OCC 8874710.
[876] Id.
[877] 6/3/2005 email between HBUS Elizabeth Protomastro and HSBC John Allison and others, "Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407547.
[878] 6/6/2005 email from HBEU Rod Moxley to HBUS Elizabeth Protomastro and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407546-547.
[879] 6/6/2005 email from HBUS Elizabeth Protomastro to HBEU Stephen Cooper and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407544-545.
[880] 6/7/2005 email from HBEU Anthony Marsden to HBUS Grace Santiago-Darvish, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407543-544.

was in the process of contacting Bank Tejerat for additional information about the $1.9 million transfer.

On June 6, 2005, Anne Liddy sent HBUS AML head Teresa Pesce the email correspondence about the two Iranian payments that had been suspended.[882]  She also informed Ms. Pesce that 44 of the approximately 60 payments stopped by the HBUS OFAC filter the previous month, May 2005, and forwarded for review, referenced Iran.  She remarked that this was "quite a lot."  The following day, HBUS OFAC Compliance officer Grace Santiago-Darvish informed HBUS' Payment Services head Denise Reilly that they would be sending a message to all HSBC locations to remind them about the need to fully disclose underlying information in U-turn payments.  She wrote:  "We, in Compliance have noticed that, other locations could be more forthcoming about disclosing orig[inator], and bene[ficiary] information."[883]

**Switch from HBEU to HBME.**  On May 20, 2005, HBME Deputy Chairman David Hodgkinson sent an email to HSBC business heads that, after a meeting with the HSBC Group Chairman and Group CEO, a decision had been made to transfer all Iranian bank U.S. dollar accounts held by HBEU to HBME, and utilize a "third party correspondent in the US for cover and other valid U turn payments."[884]  When asked about this decision, David Bagley told the Subcommittee that the processing of the payments was moved to HBME because that was where the locus of business was located.[885]  In addition, HBME set up a special team to review the transactions to ensure consistent treatment.  Mr. Hodgkinson also informed HSBC business heads that they should suspend new business and the expansion of current activities with Iran until the political situation improved, but that "existing business and commitments with Iran" were allowed to continue.[886]

**JP Morgan Chase.**  On June 20, 2005, David Bagley informed David Hodgkinson that Iranian payments had been discussed in a meeting he had with HSBC Group CEO Stephen Green and HSBC Group legal counsel Richard Bennett.[887]  He wrote that it was decided that all U-turns, whether passing through HBUS or another U.S. correspondent, would have to comply with the U-turn requirements in OFAC regulations.  He wrote that Mr. Green also wanted confirmation that the "agreed arrangements in relation to Iranian payments had been put in place," and that payments, including any cover payments, passing through the United States would comply with OFAC regulations.  Mr. Bagley wrote:

[881] 6/7/2005 email from HBEU Anthony Marsden to HBEU Rod Moxley and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407544-545.
[882] 6/6/2005 email from HBUS Anne Liddy to HBUS Teresa Pesce and others, "Fw: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407537.
[883] 6/7/2005 email from HBUS Grace Santiago-Darvish to HBUS Denise Reilly and others, "Re: Wire payments from HSBC Bank PLC suspended – USD 1,900,000 and USD 160,000 (Iran)," HSBC OCC 3407536.
[884] 5/20/2005 email from HBME David Hodgkinson to HBME Nasser Homapour and others, "Iran," HSBC OCC 8874714.
[885] Subcommittee interview of David Bagley (4/12/2012).
[886] 5/20/2005 email from HBME David Hodgkinson to HBME Nasser Homapour and others, "Iran," HSBC OCC 8874714.
[887] 6/20/2005 email from HSBC David Bagley to HBME David Hodgkinson, "Iranian Payments," HSBC OCC 8878027-029.

"Although I may have misunderstood our discussions I was not previously aware that this was a precondition nor did my original paper envisage that if we used a non-Group correspondent we would necessarily consider passing only U-turn exempt payments through them.  In fact in such circumstances there would be no reason to use anyone other than HBUS given that HBUS could not be criticized were it to carry out exempt payments."[888]

Mr. Bagley's comments suggest that he was under the impression that using a non-Group correspondent would have allowed HSBC to process Iranian payments that did not meet the U-turn exception.  However, after his discussion with Mr. Bennett and Mr. Green, he requested that Mr. Hodgkinson confirm they would be sending only compliant U-turn transactions through the United States, regardless of "whether or not through our own correspondent."[889]

On June 27, 2005, David Hodgkinson responded that HBME was attempting to open a U.S. dollar correspondent account with JPMorgan Chase (JPMC) for the purpose of processing Iranian U.S. dollar payments.  Later in the email he wrote: "we never envisaged anything other than U-Turn compliant payments being processed," and confirmed agreement that "there is no reason to use anyone other than HBUS."  He clarified that the only reason they had considered another U.S. correspondent for these payments was due to HBUS being unwilling to process them for reputational risk reasons.[890]  When Michael Gallagher, the head of HBUS PCM, was asked whether he was aware that HBME opened a U.S. dollar account with JPMorgan Chase in 2005, he could not recall.[891]  He further explained that HBME must have thought that HBUS' standards were higher if they went to JPMorgan Chase to do the same service.

Despite that email, HBME did open a U.S. correspondent account with JPMC.  Mr. Bagley alerted HSBC Group CEO Stephen Green to the account on September 19, 2005, writing that HBME had opened a correspondent account with JPMC "through which the pre-screened compliant U-turn Iranian Payments can be made."[892]  A later analysis conducted by an outside auditor at HBUS' request found that HBME sent about 1,800 U-turns to its JPMorgan Chase account in 2005 and 2006.[893]

---

[888] Id.

[889] Id. at 8878028.  With regard to cover payments, Mr. Bagley wrote that failing to consider an entire transaction ("both the cover payment instruction and any linked bank to bank message"), which if considered together "would lead to a different determination in terms of that U-turn exemption," needed to be included in the risk determination. Mr. Bagley also referenced heightened concerns about the level of scrutiny from U.S. authorities regarding cover payments and OFAC compliance by "US banks offering correspondent banking services," stemming from discussions held at a recent Wolfsberg meeting.  The Wolfsberg Group consists of major international banks that meet regularly and work together to combat money laundering.  See http://www.wolfsberg-principles.com/index.html.

[890] 6/27/2005 email from HBME David Hodgkinson to HSBC David Bagley and HSBC Richard Bennett, "Iranian Payments," HSBC OCC 8878026-027.

[891] Subcommittee interview for Michael Gallagher (6/13/2013).

[892] 9/19/2005 email from HSBC David Bagley to HSBC Stephen Green and HSBC Richard Bennett, "GCL050047 "Compliance With Sanctions," HSBC OCC 8874360-361.

[893] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012); Deloitte presentation, "March 29, 2012," HSBC-PSI-PROD-0197919, at HSBC OCC 8966143.  The Deloitte review examined HBEU and HBME Iranian transactions sent through U.S. dollar accounts at HBUS and other U.S. banks.

### (g)  Establishing Group-wide Policy

In July 2005, HSBC Group Compliance issued a Group Circular Letter (GCL) that for the first time established Group-wide policy on processing OFAC sensitive transactions, including U-turns involving Iran.  GCL 050047 explicitly barred all HSBC affiliates and offices from participating in any U.S. dollar transaction, payment, or activity that would be prohibited by OFAC regulations.[894]  The GCL also explicitly acknowledged the U-turn transactions permitted under OFAC regulations and required all compliant U-turn transactions be routed through an HBME "Center of Excellence" in Dubai for processing.  While the policy directed all HSBC affiliates to use only permissible Iranian U-turns, the GCL also allowed HSBC affiliates to continue to use cover payments when sending them through U.S. accounts for processing, which meant the transactions would continue to circumvent the OFAC filter and any individualized review by the recipient U.S. bank, including HBUS.[895]

The 2005 GCL also required local U.S. dollar clearing systems, located in Hong Kong and the United Arab Emirates, to implement WOLF screening for all U.S. dollar payments to ensure that non-compliant payments were rejected.  The GCL stated:  "Any dispensation from the terms of this GCL requires GHQ CMP [Group Compliance] concurrence."[896]  Mr. Bagley described the GCL as being "necessary and urgent to protect the Group's reputation."[897]

About a month after the GCL was issued, the HSBC Group head of Global Institutional Banking, Mark Smith, issued a managerial letter, in August 2005, providing guidance on implementing the new policy.[898]  The letter provided a brief summary of Group's relationship with each of the OFAC sanctioned countries.[899]  With respect to Iran, Mr. Smith wrote:  "Iran – extensive relationships with a number of Iranian institutions.  Group Compliance had re-affirmed that OFAC sanctions, including the U-turn exception, apply to all transactions."[900]  The guidance also clarified that the revised policy applied only to U.S. dollar transactions and continued to permit non-U.S. dollar business with prohibited countries and persons on the OFAC list.[901]

---

[894] See 7/28/2005 GCL 050047, "Compliance with Sanctions," HSBC OCC 3407560-561.
[895] Id.
[896] Id.
[897] 7/26/2005 email from HSBC David Bagley to HSBC Mansour Albosaily and others, "OFAC GCL," HSBC OCC 3407550-555. Upon receipt of the GCL, on July 26, 2005, Anne Liddy wrote that she would discuss the need for OFAC training with John Allison and Susan Wright at their monthly meeting the following day to ensure HBEU and HBME "clearly understand OFAC" and "how to identify a true U turn."  7/26/2005 email from HBUS Anne Liddy to HBUS Grace Santiago-Darvish and others, "OFAC GCL," HSBC OCC 3407549.
[898] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[899] 8/25/2005 Managerial Letter from Mark Smith, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[900] Id. at 568.
[901] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.

Also in August 2005, HBUS circulated an email identifying correspondent relationships affected by the new policy.[902]  The email identified the number of open correspondent accounts with financial institutions in affected countries, including Iran.  It also explained:

> "The revised policy does not represent an automatic exit strategy with regards to affected clients.  Non-USD business (and for Iran, U-turn exempt transactions) may continue to be undertaken.  …  Verbal discussions with affected clients would be preferable.  Any written correspondent seeking to clarify the Group's revised policy should be cleared with local Compliance."[903]

Once the policy was in place, HSBC personnel took a closer look at some of the Iranian transactions.  On August 10, 2005, HBME sales manager Gary Boon sent John Root an email which included an excerpt from an email sent by David Bagley to David Hodgkinson.[904]  In it, Mr. Bagley noted that Mr. Hodgkinson had conveyed that a "significant number" of the trade and other transactions involving HBME would be U-turn compliant.  In response, Mr. Bagley wrote:  "I have to say that a number of potential payments resulting from trade transactions from other Group offices that John Root and I have looked at since the issuance of the GCL are not in our view U-turn compliant."

In September 2005, HBEU senior payments official Rod Moxley completed an analysis of U.K. transactions over a ten day period that were stopped by the HSBC WOLF filter and involved prohibited countries, including Iran.[905]  He forwarded the results to senior HSBC Group Compliance officials John Root and John Allison, noting that over just ten days, 821 of the transactions had involved Iran.[906]

In mid-September 2005, David Bagley provided an update to HSBC Group CEO Stephen Green on implementation of the July 2005 GCL.  He explained that the "required specialist 'U-turn' team" had been established at HBME in Dubai, and a correspondent account with JP Morgan Chase had been opened to process compliant U-turn payments.  He indicated that HBME was also using HBUS to process U-turns, as was HBEU.  Mr. Bagley stated that "a number of Group Offices" had opened U.S. dollar accounts with HBME for routing Iranian payments, but added that he was not convinced that all HSBC affiliates had done so.  As a result, he issued a reminder to the Regional Compliance Officers to discuss the matter with their business heads and requested confirmation by September 23, 2005.

Despite the issuance of the GCL and the existing arrangement with HBUS, an undisclosed Iranian-related transaction was discovered, leading an HBUS executive to believe the practice was ongoing.  In November 2005, another bank stopped a transaction after HBUS had already processed it, without knowing the transaction had involved Iran.  HBUS OFAC

---

[902] See 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.

[903] Id. at 568.

[904] 8/25/2005 email from Gary Boon to John Root, HSBC OCC 8876581.  See also HSBC OCC 8876580.

[905] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.

[906] 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and others, "OFAC sanctions," HSBC OCC 8877213-214.

Compliance officer Elizabeth Protomastro notified Mr. Moxley at HBEU that, on November 7, 2005, a $100,000 transaction involving Bank Melli had been processed through HBEU's account at HBUS without transparent documentation.  She wrote:

> "We are bringing this to your attention as this situation indicates that cover payment involving Iran are still being processed by PLC [referring to HBEU].  It was our understanding that Group payments involving Iran would be fully disclosed as to the originators and beneficiaries."[907]

The payment had not been stopped by the HBUS OFAC filter because it did not contain any reference to Iran.  She explained that four days later HBUS received a SWIFT message from HBEU stating that after contacting the remitter, the correct SWIFT should have been "MelliRTH94."  Since a U.S. bank cannot directly credit an Iranian bank, the payment was stopped and rejected by an unrelated bank.  However, HBUS did not have the funds because Credit Suisse had already been paid through another correspondent bank owned by Credit Suisse.  Ms. Protomastro explained that if the payment did involve Bank Melli, it met the U-turn exception.  However, she wanted to know why HBEU continued to submit cover payments involving Iran which ran afoul of the new HBUS agreement.[908]  Mr. Moxley responded that the transaction had uncovered a transparency issue with their payment system, which HBEU would work to address.[909]

A later review performed by an outside auditor at HBUS' request found that, even after the 2004 HBUS agreement, HSBC affiliates continued to send thousands of undisclosed Iranian U-turn transactions through their U.S. dollar accounts at HBUS and elsewhere.  The auditor's review found that, from July 2002 to June 2005, HBEU and HBME together sent about 18,000 Iranian U-turn transactions through their U.S. dollar accounts of which about 90% did not disclose any connection to Iran.[910]  The review found that, from July 2005 to June 2006, HBME sent about 3,000 Iranian U-turns through its U.S. dollar accounts of which about 95% were undisclosed.  The comparable figures for HBEU were 1,700 U-turns of which 75% were undisclosed.[911]

---

[907] 11/23/2005 email from HBUS Elizabeth Protomastro to HBEU Rod Moxley and others, "Cover payment processed to Credit Suisse re 'Bank Melli' – USD 100,000," HSBC OCC 8876886-887.

[908] Id.

[909] Id.  Mr. Moxley explained that when a customer directly inputs a transaction through an approved electronic channel, such as Hexagon, and the transaction achieves straight through processing, the cover MT202s are automatically generated by the HBEU payments system by the time the transactions hit the HBEU WOLF queue.  He explained that the WOLF team was reviewing these payments to ensure the U-turn requirements were met, but acknowledged the lack of transparency for HBUS and indicated that a paper had already been submitted to the Head of Payment Services, Malcolm Eastwood, regarding the matter.  Id.

[910] Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113-150, at 143.

[911] Id. at 143.  The figures for 2005 alone, were that HBEU and HBME together sent about 6,300 Iranian payments through U.S. dollar accounts in the United States, of which more than 90% were undisclosed.  Id.

### (h)  Shifting Iranian Transactions from HBUS to JPMorgan Chase and Back Again

In 2006, HBME sent a number of Iranian U-turn transactions through its new U.S. dollar account at JPMorgan Chase.  When JPMorgan Chase decided to exit the business later in the year, HBME turned to HBUS to process them.  Again, most of the U-turns HBME sent to HBUS were undisclosed.

**GCL 060011 Barring Cover Payments.**  On April 6, 2006, less than a year after GCL 050047 was issued, HSBC Group issued another Group Circular Letter, entitled "U.S. Dollar Payments," essentially barring non-transparent cover payments for most OFAC sensitive transactions.  It followed an enforcement action by the Federal Reserve Board on December 19, 2005, charging ABN AMRO Bank with OFAC violations for modifying payment instructions on wire transfers used to make OFAC sensitive transactions and using special procedures to circumvent compliance systems used to ensure the bank was in compliance with U.S. laws.[912] About two weeks after the enforcement action, an email exchange among HBEU, HBME, HBUS, and HSBC Group Compliance officials revealed:

> "Group compliance is having a closer look at the [2005] GCL, with more specific reference to the recently published details of the ABN AMRO Enforcement Action. They are consider[ing] whether it is appropriate, for us to move to use of serial payment methodology.  Group compliance needs to give opinion to Group CEO by next friday."[913]

That same day, an HBUS Global Payments and Cash Management employee sent an email suggesting that commercial U.S. dollar payments be executed as "serial payments in which all payment party details are advised through HSBC Bank USA, your USD correspondent."  The HBUS employee also wrote:  "This will allow our automated transaction monitoring system to appropriately analyze all group transactions for suspicious activity that would otherwise be hidden with the cover payment method.  This system goes beyond simple OFAC checking to

---

[912] See 12/19/2005 Federal Reserve Board, Financial Crimes Enforcement Network, Office of Foreign Assets Control, New York State Banking Department, and Illinois Department of Financial and Professional Regulation press release and Order of assessment of a civil money penalty, http://www.federalreserve.gov/boarddocs/press/enforcement/2005/20051219/121905attachment2.pdf.   Five years later, in May 2010, the Justice Department imposed a $500 million file on ABN Amro for removing information from wire transfers involving prohibited countries.  See 5/10/2010 U.S. Department of Justice press release, http://www.justice.gov/opa/pr/2010/May/10-crm-548.html ("According to court documents, from approximately 1995 and continuing through December 2005, certain offices, branches, affiliates and subsidiaries of ABN AMRO removed or altered names and references to sanctioned countries from payment messages.  ABN AMRO implemented procedures and a special manual queue to flag payments involving sanctioned countries so that ABN AMRO could amend any problematic text and it added instructions to payment manuals on how to process transactions with these countries in order to circumvent the laws of the United States.  Despite the institution of improved controls by ABN and its subsidiaries and affiliates after 2005, a limited number of additional transactions involving sanctioned countries occurred from 2006 through 2007.").

[913] 1/6/2006 email from HBEU Michele Cros to HBUS Bob Shetty and other HSBC, HBUS, HBEU, and HBME colleagues, "OFAC – Compliance with Sanctions GCL," HSBC OCC 7688873.

detect repetitive transaction trends indicative of money laundering or terrorist financing.  This
will assure regulators we are doing everything possible to comply with their requirements."[914]

      The new GCL 060011 required all HSBC Group affiliates to use fully transparent "serial"
payments when sending U.S. dollar transactions through HBUS or any other U.S. correspondent,
with full disclosure of all originators and beneficiaries.[915]  Essentially, it required all HSBC
affiliates to use the same procedure already established at HBUS.  The GCL made an exception,
however, for Iranian U-turns.  Instead of requiring full disclosure in the transaction documents
sent to a U.S. bank, the GCL allowed U-turns to "continue to be made as cover payments."
HSBC affiliates were required, however, to obtain the underlying payment details to ensure the
transaction was permissible under OFAC regulations.[916]  In addition, the GCL required all U-
turn transactions to continue to be directed through HBME, which had established a dedicated
team in Dubai for processing Iranian transactions.  Because the GCL created an exception for
Iranian U-turns, it did not stop the use of undisclosed transactions being sent by HBME and
HBEU to HBUS.[917]

      The policy's effective date was April 30, 2006, and directed HBUS to require all third-
party banks for which it provided U.S. dollar correspondent banking services to utilize the same
fully transparent payment procedures by December 31, 2006.[918]  The GCL also stated that
dispensations from the deadlines could be obtained only from HSBC Group Compliance, with
the concurrence of HBUS Compliance.

      Soon after the GCL was announced, several HSBC affiliates requested and received
dispensation from the April 2006 deadline, the most notable of which ended up giving HBEU
more than a year to come into compliance with the new GCL.[919]  HBEU obtained an initial

---

[914] 1/6/2006 email from HBUS Richard Boyle to HBEU Michele Cros and HBUS Bob Shetty, "OFAC –
Compliance with Sanctions GCL," HSBC OCC 7688871-873.  The email explained that ABN AMRO used their
"USD nostro [account] with ABN AMRO New York to process USD payments originated through 'special
procedures'," and that cover payments were used "as a method of masking Iranian and Libyan financial institutions
as the originators of USD wire transfers."  It also discussed the recent regulatory actions as establishing "a precedent
that the U S entity of a global group will be held responsible for the transactions in USD that may take place any
where in the Group," and mentioned other banks where regulatory action had been taken, including one that led to a
cease and desist order prohibiting cover payments.
[915] See "GCL 060011 – US Dollar Payments (06/Apr/2006)," HSBC OCC 3407587.[916] The GCL stated that "serial
payments cannot qualify as U-turn payments," but OFAC confirmed to the Subcommittee that U-turn payments
could, in fact, be processed as serial payments.  Subcommittee briefing by OFAC (5/8/2012).
[916] The GCL stated that "serial payments cannot qualify as U-turn payments," but OFAC confirmed to the
Subcommittee that U-turn payments could, in fact, be processed as serial payments.  Subcommittee briefing by
OFAC (5/8/2012).
[917] From April through June 2006, about 90% of the Iranian payments sent by HBME to U.S. dollar accounts at
HBUS and elsewhere did not disclose their connection to Iran.  In July 2006, an internal HSBC policy was issued
that required HBME to send Iranian payments received from Group affiliates to HBUS on a serial basis.  After July
2006, nearly 100% of the Iranian payments sent by HBME to the U.S. disclosed their connection to Iran.  This
internal policy did not apply to HBEU until late in 2007.  From April 2006 through December 2007, about 50% of
the 700 Iranian payments sent by HBEU to U.S. dollar accounts at HBUS and elsewhere did not disclose their
connection to Iran.  Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113-150, at 143.
[918] 4/6/2006 GCL 060011, "US Dollar Payments," HSBC OCC 3407587.
[919] See 4/25/2006 – 5/5/2006 email exchanges among HSBC David Bagley, Group offices, and HBEU Rod Moxley,
"Serial Payments – USD – GCL," HSBC OCC 8877231-239.  The emails indicate HSBC Asia Pacific requested
dispensation for 19 specific countries until August 31, 2006, to allow time to change its payment systems.  HBEU

dispensation until October 31, 2006.  On November 21, 2006, HBEU MPD head Malcolm Eastwood requested a second extension until after installation of a new GPS system scheduled for July 1, 2007.  In July, due to "the huge volume of HBEU traffic and the potential resolution of the problem by an impending global system change," HBEU received a third extension until November 2007.[920]  Since HBEU was one of the top processors of payments for HSBC affiliates, its year and a half dispensation delayed full implementation of the new GCL until November 2007.[921]

The month after the new GCL was issued, HBUS Compliance official Anne Liddy sent an email to HSBC Group AML head Susan Wright indicating she had heard that David Bagley had "issued a dispensation" in relation to the new GCL.  Ms. Liddy said that while she recalled discussions about how HSBC Group was "having a difficult time getting our Group offices to switch (mainly due to systems issues)," and the need to provide more time for clients to convert, she did not recall any dispensations being issued.  She asked Ms. Wright for more information.  Ms. Wright responded:  "There have been a limited number of dispensations granted re HSBC's own customers – John is the keeper of the dispensations and so will provide you with more detail."[922]  Based on Ms. Liddy's email, it appears that Group Compliance may have granted dispensations, which then allowed cover payments to continue, without obtaining HBUS Compliance's agreement, as the GCL required.

**JPMC Pulls Out.**  In May 2006, about six months after HBME opened an account with JPMorgan Chase to process Iranian U-turns, JPMorgan Chase decided to stop processing them.  On May 25, 2006, a JPMC representative informed HBME official Gary Boon that they would continue to process HBME's dollar payment transactions, with the exception of Iranian transactions that reference details in the payment narrative.[923]  On May 26, 2006, Mr. Bagley wrote to HSBC Group CEO Stephen Green that "JMPC have indicated that they are not willing to process these payments, I assume for reputational rather than regulatory reasons (given that they are within the U-turn exemption)."  He continued that HBME would have to "pass these payments through HBUS."  He noted that they had previously received concurrence from HBUS to process the transactions, confirmed by HBUS CEO Martin Glynn.[924]  That same day Mr.

---

requested a dispensation until the end of October 2006 for MPS, citing a reconfiguration of the new GPP system that was expected by December 31, 2006.  Michael Grainger in GTB – PCM, in conjunction with Operations and IT, requested a dispensation for HBEU sites through HUB until the end of 2006 to allow system changes to be implemented and piloted.  David Bagley forwarded this email correspondence to John Allison with a request for consideration.  He also noted that the serial methodology would put HBEU at a competitive disadvantage with regard to fees charged and the volume of customer complaints.  Id.

[920] 7/4/2007 email from HBEU Rod Moxley to HBEU Tony Werby and Andy Newman, "[redacted] – HSBC arrangements for payment of the consideration," HSBC OCC 8876901.

[921] A Deloitte review later determined that HBEU continued to send U-turns without any reference to Iran through the end of 2007, reflective of the dispensation granted to HBEU until November 2007.  Deloitte Review of OFAC transactions, "March 29, 2012," HSBC OCC 8966113, at 8966143.  See also 11/21/2006 memorandum from HBEU Malcolm Eastwood to HSBC David Bagley and others, "GCL 060011 Dispensation," HSBC OCC 8876896-899.

[922] See 7/16/2007 – 7/25/2007 email exchanges among HBUS Anne Liddy, HSBC Susan Wright, and HSBC John Allison, "Conversion of Clients to Serial Payment Method," HSBC OCC 8875256.

[923] 5/25/2006 email from JPMC Ali Moosa to HBME Gary Boon and others, "US Dollar Transactional Activities via DDA at JPM," HSBC OCC 3243782-787, at 786.  .

[924] 5/26/2006 email from HSBC David Bagley to HSBC Stephen Green, "US Dollar Transactional Activities via DDA at JPM," HSBC OCC 3243782-787, at 784.

Bagley alerted HBUS AML head Teresa Pesce that "HBME have no choice but to now pass" U-turn exempt payments through HBUS.[925]

**Iranian Transactions Shift to HBUS.**   HBUS was already processing Iranian U-turn transactions for HBEU, but HBME's decision to route its Iranian U-turns through HBUS as well represented an increase in the volume of transactions that HBUS would have to identify and review.

On May 26, 2006, the same day he learned HBME would begin routing U-turns through its U.S. dollar account at HBUS, HBUS AML officer Alan Ketley emailed HBME's Alan Kerr to clarify how HBUS would process the new volume of payments.[926]   On May 30, 2006, Mr. Ketley wrote to HBME Gary Boon, copying HBUS AML head Teresa Pesce:  "I'm unclear why you would be seeking to have HBUS handle this activity at no notice and am uncomfortable making arrangements for such sensitive activity in this fashion."  He requested examples of payment orders for routing through HBUS and asked for confirmation that HBME would not begin routing U-turns through HBUS until they had the "appropriate controls in place."  He was also concerned from a resource perspective, and stated that HBME intended to pass as many U-turns in a day as HBUS would normally handle in a busy month.[927]   That same day, in response to his email to Mr. Boon, Ms. Pesce wrote:  "Alan – we have no choice.  JPMC won't take them."[928]

HBUS' effort to ensure it had adequate staffing to review OFAC-related alerts from the HBME U-turns was made more difficult by varying information from HBME on the number of transactions to expect.  On June 22, 2006, HBUS Compliance officials Anne Liddy and Alan Ketley reacted to an email exchange involving HBME's Gary Boon discussing U-turn payment volumes being processed through HBUS as between 10 and 25 per day.  Ms. Liddy wrote:

> "[B]efore it was about 40.  Yesterday 10.  Now 25ish.  BTW I am going to set up a m[ee]t[in]g with Terry and Denise (as our financier) to discuss resourcing for OFAC.  It is out of hand."[929]

In July 2006, HBME made a policy decision to go beyond the requirements of the Group-wide 2006 GCL and require all of its Iranian transactions to provide fully transparent payment information to its U.S. correspondents.[930]

In addition to the HBME transactions moving to HBUS, one other notable transaction involving Iran in 2006, pertained to 32,000 ounces of gold bullion valued at $20 million.  In May 2006, the HBUS London branch cleared the sale of the gold bullion between two foreign banks

---

[925] 5/26/2006 email from HSBC David Bagley to HBUS Teresa Pesce and others, HSBC OCC 3243782-783.
[926] 5/26/2006 email from HBUS Alan Ketley to HBME Alan Kerr and HBME Gary Boon, "U-Turns," OCC-PSI-00179654
[927] 5/30/2006 email from HBUS Alan Ketley to HBME Gary Boon and HBME Alan Kerr, "U-Turns," OCC-PSI-00179654.
[928] 5/30/2006 email from HBUS Teresa Pesce to HBUS Alan Ketley, "U-Turns," HSBC OCC 3243965.
[929] 6/22/2006 email from HBUS Anne Liddy to HBUS Alan Ketley, "You Turn Payments," HSBC OCC 3250730-732.
[930] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012)

for the ultimate benefit of Bank Markazi, Iran's Central Bank.  HSBC indicated that it had been
aware that Bank Markazi was the beneficiary, but had viewed the transaction as a permissible U-
turn.[931]  OFAC later told HBUS that it considered the transaction to be a "non-egregious"
violation of law, and provided HBUS with an opportunity to explain why it should not be
penalized for it; HBUS is still awaiting a final determination as to whether it will be penalized.[932]

### (i)  Getting Out

In October 2006, HSBC Group reversed course and decided to stop handling Iranian U-
turns.  In 2007, it went further and exited all business with Iran, subject to winding down its
existing obligations.

**Increasing Risks.**  In October 2006, Mr. Bagley provided a warning to his superiors that
HSBC might want to reconsider processing U-turns.  In an email on October 9, 2006, Mr. Bagley
informed Stephen Green, who had become HSBC Group Chairman, Michael Geoghegan, who
had become HSBC Group CEO, and David Hodgkinson, who used to head HBME but had
become HSBC Group COO, that the risks associated with U-turns had increased due to "actions
taken by the US government in withdrawing the U-Turn exemption from Bank Saderat."[933]  The
prior month, in September 2006, HBUS had stopped an undisclosed transaction that involved
Bank Saderat in Iran, which was added to the OFAC SDN list that same month.[934]

Mr. Bagley wrote:

"During my recent visit to the US to attend a Wolfsberg meeting I was discretely advised
of the following by a reliable source:

[U.S. Treasury] Under Secretary [Stuart] Levey … and the more hawkish elements within
the Bush administration were in favour of withdrawing the U-Turn exemption from all
Iranian banks.  This on the basis that, whilst having direct evidence against Bank Saderat
particularly in relation to the alleged funding of Hezbollah, they suspected all major
Iranian State owned banks of involvement in terrorist funding and WMD [weapons of
mass destruction] procurement.  …

Certain US Government bodies have however made it known to a number of US banks
that, as WMD related transactions are impossible to detect they would run an
unacceptable reputational and regulatory risk were they to continue to process U-Turn
transactions.  The essence of the statement appears to be that as WMD related
transactions would be heavily disguised (where even as a trade transaction documents

---

[931] 1/1/2010 – 5/31/2010 Compliance Certificate from HSBC David Bagley to HNAH Brendan McDonagh and Niall
Booker, OCC-PSI-01754176, at 17.
[932] See draft HSBC response to pre-penalty notice, OCC-PSI-00299323.
[933] 10/9/2006 email from HSBC David Bagley to HSBC Stephen Green, HSBC Michael Geoghegan, and HBME
David Hodgkinson, "Iran – U-Turn Payments," HSBC OCC 8874731-732.
[934] See 9/11/2006 email from HBUS Anne Liddy to HBUS Teresa Pesce, "HBME Wire payment USD 586.00 (Iran-
Bank Saderat) – Reject & Report to OFAC," HSBC OCC 4844209 and 12/14/2006 email from Elizabeth
Protomastro to John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD
32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

would in effect be falsified) there is no safe way for a US bank to be involved in even a U-turn exempt transaction however stringent the scrutiny or monitoring.  The clear implication made was that being found to be involved in a WMD related transaction, even if wholly innocently, would result in significant and severe action being taken against such a bank.

There were very strong indications that a number of US banks were therefore considering withdrawing from all U-turn related activity.  If this happens those continuing in this market are likely to have an increased concentration.

Although I am satisfied that we have put appropriate controls in place to manage the U-Turn transactions, I am concerned that there are now increased risks in continuing to be involved in U-Turn USD payments which would justify our reconsidering our approach.  I do recognize that the significance that tightening our policy to withdraw from U-Turn permitted transactions would have in terms of our Middle Eastern and Iranian business."[935]

**GCL 060041 Ending U-turns.**  Shortly after Mr. Bagley's email, HSBC decided to stop processing U-turns entirely.  On October 25, 2006, HSBC Group Compliance issued Group Circular Letter 060041 which directed all Group offices to immediately stop processing U-turn payments.[936]  An exception was made for permissible U-turn payments in connection with legally binding contractual commitments.  HSBC decided to stop utilizing the U-turn exception two years before OFAC actually revoked the exception in November 2008.

Despite this decision, HSBC maintained a number of existing Iranian relationships.[937]  On March 13, 2007, as a result of a "letter recently filed with the SEC "relating to the extent of our exposure to business in the so-called named countries (Sudan, Syria, and Iran),"[938] HSBC Group Compliance head David Bagley updated HSBC Group CEO Michael Geoghegan on HSBC's relationships with Iranian banks.  He wrote:

"The existing levels of business, much of which is historic and subject to ongoing commitments, has been reviewed by CMP [Compliance] as against the requirements of Group policy, particularly where transactions are denominated in USD.  Some of this activity related to pre-existing committed obligations which are binding on an ongoing basis.  Group policy recognizes that we will have to allow such arrangements to run off.  Relevant business colleagues are however aware of the Group's stance in terms of having no appetite for new or extended business activity involving Iranian counterparties.  Where transactions appear to potentially conflict with Group policy those transactions are referred to GHQ CMP for determination and sign-off."[939]

---

[935] 10/9/2006 email from HSBC David Bagley to HSBC Stephen Green, HSBC Michael Geoghegan, and HBME David Hodgkinson, "Iran – U-Turn Payments," HSBC OCC 8874731-732, at 732.
[936] 10/25/2006 GCL 060041, "US OFAC Sanctions against Iran – U-Turn Exemption," HSBC OCC 3407606.
[937] See 2/6/2006 Project and Export Finance presentation, "Iranian portfolio," HSBC OCC 8876050-057.  This presentation indicated that Project and Export Finance had not taken on any new Iranian business since 2005.
[938] 3/13/2007 email from HSBC David Bagley to HSBC Michael Geoghegan and others, "Iran," HSBC OCC 8878037-038.
[939] Id.

The subject of Iran arose again a few months later, in June 2007, when Mr. Bagley informed HSBC Group CEO Michael Geoghegan that he had a private meeting with U.S. Treasury Under Secretary for Counter Terrorist Financing and Sanctions, Stuart Levey, during a recent Wolfsberg Group conference.  Mr. Bagley indicated that Mr. Levey had questioned him about a HSBC client who, according to Mr. Levey, "had clearly been identified as having acted as a conduit for Iranian funding of" an entity whose name was redacted from the document by HSBC.[940]  Mr. Bagley wrote:  "Levey essentially threatened that if HSBC did not withdraw from relationships with [redacted] we may well make ourselves a target for action in the US."  Mr. Geoghegan responded: "This is not clear to me because some time ago I said to close this relationship other than for previously contractually committed export finance commitments."[941]  Mr. Bagley replied that the bank had only "limited relationships with [redacted] and in fact overall with Iranian banks."

Mr. Bagley also wrote that he had discussed the matter with David Hodgkinson, and they agreed that HSBC "should immediately withdraw from [redacted] and also withdraw from all Iranian bank relationships in a coordinated manner."  He noted that the bank would have to honor "legally binding commitments" such as Project and Export Finance facilities.[942]  These communications indicate that HSBC officials had previously known about problems with one particular Iranian client but that it did not end the relationship until after a warning from the U.S. Government.

**GCL 070049 on Exiting Iran.**  On September 24, 2007, HSBC Group Compliance issued another Group Circular Letter, this one announcing the bank's decision to exit Iran.  GCL 070049 directed all account relationships with Iranian banks to be "closed as soon as possible" with sufficient notice as required by local law and to "allow an orderly run down of activity" and the "run-off of any outstanding exposures."  The GCL allowed ongoing payments involving existing facilities and transactions "where there are legally binding commitments," such as Project and Export Finance facilities, to continue to be made as serial payments.[943]  The deadline for closure of all Iranian accounts was November 30, 2007.

**2008 and 2009 Iranian Transactions.** After the GCLs terminating most business with Iran, internal bank documents show that hundreds of Iranian transactions per month continued to surface at HBUS during 2008 and 2009.  These transactions were not, however, the type of undisclosed U-turn transactions that HSBC affiliates had been routinely sending through HBUS accounts prior to HSBC's decision to exit Iran, but represented other types of transactions.

In 2008 and 2009, for example, HBUS' London Banknotes office conducted a series of apparently prohibited transactions benefitting the Iranian Embassy in London.  From July 22, 2008 to February 12, 2009, in more than 30 transactions, HBUS sold over €455,000 to HBEU

---

[940] See 6/8/2007 email exchanges among HSBC David Bagley, HSBC Michael Geoghegan and others, "Iran," HSBC OCC 8878214-216, at 215.
[941] Id. at 215.
[942] Id. at 214.
[943] 9/24/2007 GCL 070049, "Sanctions Against Iran," OCC-PSI-00141529-531 and HSBC OCC 8876013-015.

which, in turn, sold them to the Embassy of Iran in the United Kingdom.[944]  According to HBUS, "the funds were used to meet salary obligations" of the Iranian Embassy.[945]  In addition, from December 5, 2008 to February 5, 2009, HBEU purchased over $2,500 from the Embassy of Iran and resold the U.S. dollars to HBUS.[946]  In 2009, after HBUS discovered that the London Banknotes office was engaging in currency transactions with the Iranian Embassy, it reported the transactions to OFAC and ended the activity.[947]

Other transactions involving Iran processed through HBUS' correspondent accounts from 2008 to 2009, included a March 2009 wire transfer for $300,000, which was mistakenly processed because a HBUS compliance officer did not realize a transaction reference to "Persia" implied a connection to Iran; and two wire transfers totaling over $55,000 which involved a vessel owned by "NITC" which, until it was updated, HBUS' OFAC filter did not recognize as the National Iranian Tanker Company.[948]

### (j)  Looking Back

According to an ongoing outside audit requested by HSBC, from 2001 to 2007, HBEU and HBME sent through their U.S. dollar accounts at HBUS and elsewhere nearly 25,000 OFAC sensitive transactions involving Iran totaling $19.4 billion.[949]  While some of those transactions were fully disclosed, most were not.  According to the review conducted by Deloitte, from April 2002 to December 2007, more than 85% of those payments were undisclosed.[950]

Despite HBUS pleas for transparency and a 2004 internal agreement to use fully transparent procedures, HSBC affiliates HBEU and HBME often took action, including by deleting references to Iran or using cover payments, to prevent the Iranian transactions sent through their U.S. dollar correspondent accounts at HBUS from being caught in the OFAC filter.  Despite the fact that they viewed most of the transactions as permissible under U.S. law, concealing their Iranian origins helped avoid delays caused when HBUS' OFAC filter stopped the transactions for individualized review.  HBME, in particular, requested that HBUS allow the use of cover payments to conceal Iranian transactions and circumvent the OFAC filter.  When HBUS insisted on fully transparent transactions, the HSBC affiliates sent undisclosed transactions through their HBUS accounts anyway.  HSBC Group leadership, including the

---

[944] 3/20/2009 letter from HBUS Elizabeth Protomastro to OFAC, HSBC OCC 0630892.  See also 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561, at Attachment (describing the transactions as involving over $606,000 in U.S. dollars).  [Sealed Exhibit.]
[945] Id.
[946] Id.
[947] See 3/24/2009 "Compliance Report for 1Q09-HUSI Businesses," sent by HBUS Lesley Midzain, to HNAH Janet Burak, HSBC David Bagley, and HBUS Paul Lawrence, HSBC OCC 3406981; 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566, at Attachment.  [Sealed Exhibit.].
[948] See 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566, at Attachment.  [Sealed Exhibit.]
[949] See Deloitte Review of OFAC transactions, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919, at 930.
[950] Subcommittee briefing by Cahill Gordon & Reindel LLP (6/20/2012); Deloitte presentation, "March 29, 2012," at HSBC OCC 8966113.  These payments were sent to the U.S. bank as cover payments, serial payments, or payments that were cancelled and then re-submitted by either an HSBC affiliate or the client without disclosing the connection to Iran in the payment message.  Id. at 8966118 and 8966143.

heads of Compliance and AML, were aware in varying degrees of what the affiliates were doing, but for years, took no steps to insure HBUS was fully informed about the risks it was incurring or to stop the conduct that even some within the bank viewed as deceptive.  The HSBC Group Compliance head took no decisive action even after noting that the practices "may constitute a breach" of U.S. sanctions.  At HBUS, senior executives in the Compliance and payments areas knew about the actions being taken by HSBC affiliates to send concealed Iranian transactions through their U.S. dollar correspondent accounts, but were unable or unwilling to obtain information on the full scope of the problem, bring the issue to a head, and demand its resolution at the highest levels of the bank to ensure all U-turns were reviewed for compliance with the law.

### (2)  Transactions Involving Other Countries

Iranian transactions were not the only potentially prohibited transactions sent through HBUS.  Transactions involving Burma, Cuba, North Korea, and Sudan, as well as persons named on the SDN list, were also sent through HBUS accounts, although to a much lesser extent than those related to Iran.  HSBC affiliates were one major source of the transactions, due to poor compliance with HSBC Group policy barring U.S. dollar transactions with prohibited countries or persons, and requiring transparent transactions, but the majority of these transactions appear to have been sent through HBUS by unrelated financial institutions.  The transactions sent by HSBC affiliates also do not appear to be the product of the same kind of systematic effort to avoid the OFAC filter as was the case with the Iranian U-turns.  Some of the transactions sent through HBUS had references to a prohibited person or country deleted or used cover payments, and passed undetected through the OFAC filter.  Others openly referenced a prohibited country or person, but escaped detection by HBUS' OFAC filter or HSBC's WOLF filter due to poor programming.  Still others were caught by a filter, but then released by HBUS personnel, apparently through human error.  An ongoing review by an outside auditor, examining HBUS transactions over a seven-year period from 2001 to 2007, has so far identified about 2,500 potentially prohibited transactions involving countries other than Iran, involving assets totaling about $322 million.[951]

### (a)  2005 and 2006 GCLs

The documents examined by the Subcommittee show that HBUS' OFAC filter blocked a transaction involving a prohibited country other than Iran as early as 2002.[952]  Internal bank documents indicate, however, that transactions involving prohibited persons or countries other than Iran did not receive the same level of attention as the Iranian transactions, until issuance of

---

[951] Deloitte presentation, "Results of the Transactions Review – UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 930.  Since the Deloitte review has yet to examine an additional set of U.S. dollar transactions and does not include any transactions during the period 2008 to 2010, its figures represent a conservative analysis of the potentially prohibited transactions transmitted through HBUS.

[952] On May 21, 2002, a $3 million payment from HBEU was blocked by HBUS' OFAC filter due to a reference in the payment details to Cuba.  See 4/24/2006 email from HBUS Charles Delbusto to HBUS Michael Gallagher, "ING Writeup," HSBC OCC 1933599-601. See also 11/14/2002 memorandum from HBEU Malcolm Eastwood to HBUS Denise Reilly and HBEU Geoff Armstrong, "Compliance – OFAC Issues in General and Specific to Iran," HSBC OCC 7688824.

the July 28, 2005 Group Circular Letter 050047 which barred HSBC affiliates from executing U.S. dollar transactions involving any person or country prohibited by OFAC.[953]

Shortly after the GCL was issued, the HSBC Group head of Global Institutional Banking, Mark Smith, issued a managerial letter, in August 2005, providing guidance on implementing the new policy.[954]  His letter summarized the Group's relationships with Burma, Cuba, Iran, North Korea, Sudan, and Zimbabwe.  He explained that most of HSBC Group's business with Sudan and Cuba was conducted in U.S. dollars and "discussions already initiated with the affected banks will dictate the extent of our ongoing relationship."  The guidance also clarified that the revised policy applied only to U.S. dollar transactions.[955]

In addition, the managerial letter identified correspondent relationships affected by the new policy.[956]  It provided the number of open correspondent accounts with financial institutions in Cuba, Burma, Iran, North Korea, and Sudan.  It also explained:

"The revised policy does not represent an automatic exit strategy with regards to affected clients.  Non-USD business (and for Iran, U-turn exempt transactions) may continue to be undertaken.  However, for a number of reasons eg. operational simplicity, where the remaining non-USD business is uneconomic or where the client concludes they will have to conduct their business with an alternative provider, the ultimate outcome may be the closure of certain relationships.  Verbal discussions with affected clients would be preferable.  Any written correspondent seeking to clarify the Group's revised policy should be cleared with local Compliance."[957]

The letter noted that "any dispensation from the terms of the GCL require[d] Group Compliance concurrence."[958]

In September 2005, senior HBEU payments official Rod Moxley completed an analysis of U.K. transactions over a 10-day period that were stopped by HSBC's WOLF filter and involved Burma, Cuba, or Sudan.[959]  He forwarded the results to senior HSBC Group Compliance officials John Root and John Allison, noting that there were "a considerable number of USD denominated transactions" for Sudan, and "also to a lesser extent" Cuba and Burma.  He also noted that prior to the effective date of the new GCL, these payments would have been stopped by the WOLF filter but then allowed to proceed, "providing they did not infringe on UN/EU sanctions or terrorist parameters," since HBEU was "not affected directly by OFAC sanctions," but the new GCL would require these payments to be blocked due to OFAC prohibitions.

---

[953] 7/28/2005 GCL 050047, "Compliance with Sanctions," HSBC OCC 3407560-561.
[954] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569.
[955] Id at 566.
[956] Id.
[957] Id. at 568.
[958] Id.
[959] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.

Mr. Moxley also wrote:

"Since the issuance of the GCL, it has been made clear that US interests are of paramount importance and we should do nothing, when processing payment transactions, which would leave HBUS in a vulnerable position.  The issues surrounding Iran have overshadowed other OFAC payments recently, however, I can advise that we have not so far physically returned any USD payments involving Sudan, Cuba or Burma.  I feel we now need to look far more closely at these payments to ensure compliance with the GCL."[960]

Mr. Moxley asked about two alternative responses to transactions stopped by the WOLF filter and barred by the new GCL.  One was to continue processing the transactions but ensure that the payment was routed in such a way "that they are not frozen in the US."  He explained: "This will involve intelligent usage of the routing system but may perpetuate similar scenarios to those encountered with Iran (customer instructions saying Do not mention Sudan or routing which does not make it apparent that these are Sudanese payments)."  This alternative seems to suggest that HSBC would engage in Iran-style transactions in which transaction details are stripped out to avoid triggering the OFAC or WOLF filters.  His second alternative was to "strictly" apply the GCL "and return the payments unprocessed."  He wrote that his "instinct" was to "return all such USD payments … so that our US colleagues' position is not compromised," but wanted confirmation from HSBC Group Compliance before taking that action.[961]  The documents reviewed by the Subcommittee do not indicate what response he received.  When asked about his email, Mr. Moxley told the Subcommittee that he could not recall how his inquiry was resolved.[962]

About a year later, on April 6, 2006, HSBC Group issued another Group Circular Letter, GCL 060011, which required all HSBC affiliates, when sending U.S. dollar transactions through a correspondent account at HBUS or another U.S. financial institution to use so-called "serial payments" specifying the transaction's chain of originators and beneficiaries.[963]  This policy change was intended to stop HSBC affiliates from using cover payments, which provide less information for banks when processing payments and which can mask potentially prohibited transactions sent through HBUS or other U.S. banks.  Its effective date for HSBC affiliates was April 30, 2006; HBUS was required to impose the policy on all third-party banks for which it provided U.S. dollar correspondent banking services by December 31, 2006.[964]  At the same time, HSBC Group Compliance granted a year-long extension to HBEU, giving it until November 2007, before it was required to use serial payment instructions.[965]

Internal bank documents indicate that OFAC sensitive transactions involving countries other than Iran took place both before and after the 2005 and 2006 GCLs.

---

[960] Id.
[961] Id. at 214.
[962] Subcommittee Interview of Rod Moxley (6/7/2012).
[963] 4/6/2006 GCL 060011, "US Dollar Payments," HSBC OCC 3407587.
[964] Id.
[965] See 4/25/2006 - 5/5/2006 email exchanges among HSBC David Bagley, Group offices, and HBEU Rod Moxley, "Serial Payments – USD – GCL," HSBC OCC 8877231-239. Subcommittee briefing by OFAC (5/8/2012).

### (b)  Transactions Involving Cuba

Internal bank documents indicate that, from at least 2002 through 2007, HBUS processed potentially prohibited U.S. dollar transactions involving Cuba.  HSBC affiliates in Latin America, in particular, had many Cuban clients and sought to execute transactions on their behalf in U.S. dollars, despite the longstanding, comprehensive U.S. sanctions program and the OFAC filter blocking such transactions.[966]

In August 2005, a month after HSBC Group issued its new GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HBUS circulated an email identifying correspondent relationships that would be affected.[967]  The email stated:  "An overriding observation is that the revised policy will most significantly impact the Cuban and Sudan correspondent bank relationships."  It also observed:  "For Sudan and Cuba, most of our business is conducted in USD and the discussions already initiated with the affected banks will dictate the extent of our ongoing relationships."[968]

In September 2005, HSBC Group Compliance head David Bagley told HSBC Group CEO Stephen Green that they had closed "a number of USD correspondent relationships with Cuban … banks."[969]  On October 3, 2005, Mr. Bagley sent an email to Matthew King, then head of HSBC Group Audit, that Mr. Green was "particularly concerned" about ensuring the 2005 GCL was "properly and fully implemented across the Group."[970]  Mr. Bagley asked Mr. King to use HSBC's internal audits to help gauge compliance with the new GCL.  Mr. King relayed the request to various HSBC auditors and, in response, learned from HSBC Mexico (HBMX) Compliance that the OFAC list had not been fully integrated into HBMX's monitoring system and would not be for another six months, until April 2006.[971]  HBMX reported that, pending the systems integration, it had set up "manual controls" in several divisions to implement the new GCL, but "no automated means exists to ensure that these controls are properly being carried out."[972]  HBMX explained further that its "greatest exposure" was "the volume of business historically carried out by HBMX customers with Cuba in US dollars."[973]

Mr. King responded that the HBMX transactions raised two sets of concerns, one with respect to the U.S. dollar transactions involving Cuba being run through HBMX's correspondent account at HBUS, and the second with respect to non-U.S. dollar transactions being "transmitted through the HBUS TP gateway," referring to a U.S.-based server that handled transfers from

---

[966] See OFAC "Sanctions Programs and Country Information," Cuba sanctions (last updated 5/11/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/cuba.aspx.

[967] See 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.

[968] Id. at 3407568.

[969] 9/19/2005 email from HSBC David Bagley to HSBC Stephen Green and HSBC Richard Bennett, "GCL050047 "Compliance With Sanctions," HSBC OCC 8874360-362.

[970] 10/3/2005 email from HSBC David Bagley to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874359-360.

[971] 10/14/2005 email from HBMX Graham Thomson to HSBC Matthew King, "GCL 050047 – Compliance with Sanctions," HSBC OCC 8874358-359.

[972] Id.

[973] Id.

Mexico and South America.[974]  Since the United States prohibited transactions involving Cuba, both types of transactions raised questions about whether they ran afoul of the OFAC list and the 2005 GCL.  Mr. King responded:

> "I note HBMX continues to process USD payments involving Cuba.  It is very important that is stopped immediately as the regulators are getting very tough and the cost to the Group could be considerable if a breach occurs, both in terms of the fine and the rectification work which is likely to be a pre-requisite to any settlement.
>
> With regard to non-USD payments as described above, GHQ CMP [Group Headquarters Compliance] are urging HBUS to screen out these transactions to avoid any risk, and HBMX would have to put measures in place to p[re]-empt customer dismay."[975]

  HSBC affiliates from outside of Latin America also occasionally sent potentially prohibited transactions involving Cuba through their HBUS accounts.  For example, in December 2006, a payment for $15,350 that had been sent by an HSBC affiliate in the Asia-Pacific region was blocked by HBUS, because the transaction documents referred to "Air Tickets Moscow Havana Moscow 3Pax."[976]

  In 2007, an internal HSBC document entitled, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," revealed that, as of May 2007, HSBC affiliates in Mexico and Latin America were still providing U.S. dollar accounts to Cuban clients, in apparent violation of HSBC Group GCL policy and OFAC regulations.[977]  The document indicated that HBMX had 23 Cuban customers with U.S. dollar accounts containing assets in excess of $348,000, and 61 Cuban customers holding both U.S. dollar and Mexican peso accounts with assets totaling more than $966,000.[978]  In addition, the report disclosed that HSBC affiliates in Colombia, Costa Rica, El Salvador, Honduras, and Panama were also providing U.S. dollar accounts to Cuban nationals or the Cuban Embassy.  The document also indicated that arrangements had been made to "cancel all business relationships with" Cuban clients, in relation to U.S. dollar accounts or commercial relationships for the entire region.[979]  These steps were being taken almost two years after the July 2005 GCL had prohibited HSBC affiliates from executing U.S. dollar transactions involving OFAC sensitive persons.

---

[974] 10/17/2005 email from HSBC Matthew King to HBMX Graham Thomson, HSBC David Bagley, and others, "GCL 050047 "Compliance With Sanctions," HSBC OCC 8874357-358.

[975] Id.

[976] 12/17/2006 email from HBAP Donna Chan to HBUS Alan Ketley and others, "TT NSC770937 Dated 13Dec06 For USD15,350.21," HSBC OCC 3287261-262.

[977] 5/18/2007 HSBC document, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095, at 8876093-095.

[978] Id.  In addition, 1, 284 Cuban clients had nearly 2250 HBMX accounts holding solely Mexican pesos, with assets exceeding a total of $8.9 million.  Id. at 8876093.

[979] 5/18/2007 HSBC report, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095 at 8876093-095.

### (c)  Transactions Involving Sudan

A second set of OFAC sensitive transactions involved Sudan, a country which is also subject to a comprehensive sanction program in the United States.[980]  Internal bank documents indicate that, from at least 2005 to 2008, HBUS processed a considerable volume of U.S. dollar transactions involving Sudan that, once the new GCL took effect, should have decreased.  The reasons they continued include a wide range of factors, from inadequate bank staffing reviewing OFAC transactions, to deceptive wire transfer documentation, to ongoing actions by HSBC affiliates to send these potentially prohibited transactions through HBUS.

In August 2005, a month after HSBC Group issued the GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter identifying correspondent relationships that would be affected.[981]  The letter stated:  "An overriding observation is that the revised policy will most significantly impact the Cuban and Sudan correspondent bank relationships."  It also observed:  "For Sudan and Cuba, most of our business is conducted in USD and the discussions already initiated with the affected banks will dictate the extent of our ongoing relationships."[982]  In September 2005, a senior HBEU payments official Rod Moxley completed an analysis of U.K. transactions over a 10-day period that were stopped by the WOLF filter and noted "a considerable number of USD denominated transactions" for Sudan.[983]

A year after the GCL took effect, however, one affiliate attempted to clear a Sudan-related transaction through HBUS in violation of company policy.  On December 6, 2006, HBUS blocked a $2.5 million payment originating from an HSBC branch in Johannesburg because the payment details referenced the "Sudanese Petroleum Corporation."[984]  Although the payment had also been stopped by the WOLF filter in HSBC Johannesburg, an employee there had approved its release and sent the transaction through their correspondent account at HBUS.  An internal email from HSBC Johannesburg explained that the release of the funds was:

> "a genuine error in an attempt to push the day[']s work through before the cut-off time.  I believe the loss of three staff in the department leaving only two permanent staff remaining is causing the[m] to work towards clearing their queues rather than slow down

---

[980] See OFAC "Sanctions Programs and Country Information," Sudan sanctions (last updated 2/1/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/sudan.aspx.
[981] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.
[982] Id. at 568.
[983] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.
[984] See 12/14/2006 email from HBUS Elizabeth Protomastro to HBUS John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

to read the warnings such as these. …  Having said that I also feel it is a matter of training where seeing the word 'Sudan' alone should have been warning enough."[985]

The email also noted that the transaction had been sent by Commercial Bank of Ethiopia, which was "aware that this payment may not go through as they have attempted to make this payment via their other correspondent banks and failed."[986]

In July 2007, HBUS discovered that another client, Arab Investment Company, had been sending "multiple Sudan-related payments" through its U.S. dollar account at HBUS, that other banks later blocked for specifying a Sudanese originator or beneficiary, "suggesting that HBUS has been processing cover payments for this client."[987] An email identified seven wire transfers over a one-year period, collectively involving more than $1.1 million, in which the documentation provided to HBUS made no reference to Sudan, preventing the transfers from being stopped by HBUS' OFAC filter.[988]  The email noted that two of the wire transfers later blocked by other banks had resulted in letters from OFAC seeking an explanation for HBUS' allowing the transfers to take place, and suggested closing the client account to prevent more such incidents.[989]  On another occasion, HBUS identified five wire transfer payments between January and November 2007, totaling more than $94,000, that turned out to be intended for a Sudanese company, but had been processed as straight through payments at HBUS, because "there was no beneficiary address and no mention of 'Sudan'."[990]

In still other cases, wire transfers clearly referencing Sudan were stopped by HBUS' OFAC filter for further review, but then allowed by HBUS staff to proceed.  An HBUS internal report on OFAC compliance noted, for example, two blocked wire transfers involving Sudan, one for over $44,000 and the other for over $29,000, blocked on November 5 and December 7, 2007, respectively, by HBUS' OFAC filter, but subsequently "released due to human error."[991]

In August 2008, HBUS noted that it was then holding over $3.2 million in Sudan-related payments sent to the bank from other HSBC affiliates.[992]  The bulk of the funds came from blocking a $2.5 million payment from HSBC Johannesburg destined for the Sudanese Petroleum Corporation, but three other Sudan-related payments from HSBC affiliates were also identified, a $300,000 payment sent by HSBC Hong Kong; a payment for more than $367,000 payment from HSBC Dubai, and a payment for more than $58,000 from British Arab Commercial Bank Ltd. The email listing these blocked funds noted that a court order was seeking transfer of the funds

---

[985] 12/15/2006 email from HSBC Gimhani Talwatte to HSBC Krishna Patel, "PCM Operational error.  Funds frozen in USA – payment on behalf of Commercial Bank of Ethiopia," OCC-PSI-00610597, at 8.
[986] Id.
[987] 7/8/2007 email from HBEU Joe Brownlee to HBEU Giovanni Fenocchi, forwarded by HBEU Peter May to HBUS Anne Liddy and HBUS Alan Ketley, "Arab Investment Company Reportable Event #3948 Notification Entity," OCC-PSI-00620281, at 2.
[988] Id.
[989] Id.
[990] Undated Global Transaction Banking report, "All Open Reportable Events," OCC-PSI-00823408, at 7.
[991] 4/2/2008 HBUS memorandum, "Management Report for 1Q2008 for OFAC Compliance," OCC-PSI-00633713.
[992] 8/8/2008 email from HBUS Anne Liddy to HSBC Susan Wright and others, "USS Cole Case," OCC-PSI-00304783, at 2-3.

to a Federal court in the United States in connection with a lawsuit seeking compensation for the families of 17 U.S. sailors killed in a 2000 terrorist attack on the USS Cole in Yemen.[993]

In August 2010, in connection with an effort to exit correspondent relationships with 121 international banks that HBUS determined it could no longer support, HBUS CEO Irene Dorner sent an email noting references to 16 banks in Sudan.  Ms. Dorner wrote:

> "In Phase 2 there will be Trade names the exit for which may be more complicated but to give you a flavo[u]r of the problem we seem to have 16 correspondent banks in Sudan which cannot be right."[994]

### (d)  Transactions Involving Burma

Another set of OFAC sensitive transactions involved Burma, also referred to as Myanmar, a country which, like Cuba and Sudan, was subject to a comprehensive sanctions program in the United States.[995]  This program, first imposed in 1997, remains in effect today, although certain aspects of the program were suspended in May 2012.[996]  Internal bank documents indicate HBUS processed potentially prohibited transactions involving Burma from at least 2005 to 2010.

One of the earliest references to transactions with Burma in the documents reviewed by the Subcommittee is a January 2005 email involving HBUS' Global Banknotes business, which involves the buying and selling of large quantities of physical U.S. dollars to non-U.S. banks.[997]  The email, written by HSBC Group Compliance head David Bagley, described a transaction in which HBUS purchased $2.9 million in U.S. dollars from a client, determined that the dollars had come from a certain party whose name was redacted by HBUS, and noted: "Myanmar is currently subject to OFAC regulations prohibiting any transactions by US persons relating to Myanmar counterparties."  Mr. Bagley wrote:

> "There appears little doubt that the transaction is a breach of the relevant OFAC sanction on the part of HBUS, that it will need to be reported to OFAC and as a consequence there is a significant risk of financial penalty.  It does not appear that there is a systemic issue, rather we are dealing with an individual incident, although given the potential seriousness of the breach external lawyers have been instructed to assist with the process of resolving matters with OFAC."[998]

---

[993] Id.

[994] 8/20/2010 email from HBUS Irene Dorner to HSBC Andrew Long and others, "Project Topaz US Urgent Requirements," HSBC OCC 8876105-106.

[995] See OFAC "Sanctions Programs and Country Information," Burma sanctions (last updated 4/17/2012), http://www.treasury.gov/resource-center/sanctions/Programs/pages/burma.aspx.

[996] Id.  The U.S. Government suspended certain aspects of the Burma sanctions on May 17, 2012.  See "U.S. Eases Myanmar Financial Sanctions," Wall Street Journal, Jay Solomon (5/17/2012), http://online.wsj.com/article/SB10001424052702303879604577410634291016706.html ("[T]he U.S. Treasury Department is maintaining and updating its list of sanctioned Myanmar military companies, business tycoons and generals who allegedly engaged in human-rights violations and corruption.").

[997] See 1/21/2005 email from HSBC David Bagley to HSBC Stephen Green and Richard Bennett, "Compliance Exception," HSBC OCC 8873671.

[998] Id.

In July 2005, HSBC Group issued its new GCL policy barring all HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions.  A few days later, on August 25, 2005, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter, referenced previously, identifying correspondent relationships that would be affected.[999]  The letter noted that the "Group has 2 account relationships with Myanmar entities," and stated that the "GCL applies in full," implying both relationships would have to be terminated.  In September 2005, a senior HBEU payments official, Rod Moxley, who analyzed U.K. transactions stopped by the WOLF filter over a 10-day period noted that a number of the U.S. dollar transactions involved Burma.[1000]

After the GCL's 2005 effective date, Burma-related transactions appear to have been reduced, but continued to occur.  One example is a $15,000 payment that originated in Burma on January 18, 2008, was processed as a straight-through payment at HBUS, and blocked by the OFAC filter at another bank involved with the transaction.[1001]  An HBUS email explained that the payment had not been blocked at HBUS, because its OFAC filter didn't recognize "Yangon," the former capital of Burma, also called "Rangoon," as a Burma-related term.  According to the email, it was the second payment involving "Yangon" that was missed by the HBUS filter.  HBUS Compliance head Carolyn Wind requested that the filter be fixed immediately:  "We are running too much risk that these misses will cause OFAC to start questioning the effectiveness of our controls."[1002]

Four months later, HBUS blocked an April 2008 wire transfer for $12,060 headed for the account of an SDN-listed entity at Myanmar Foreign Trade Bank.  An internal bank document noted that the payment had been blocked by HBUS due to "references to Yangon and Myanmar, rather than blocking it due to the sanctioned entity[']s involvement."  The document noted that the bank code "for the sanctioned entity was not included in the payments filter, as per agreed upon procedure with the UK WOLF team," and a systems fix was implemented in October 2008.[1003]

In May 2010, two additional Burma-related U.S. dollar transactions were processed by HBUS, due to limitations in the WOLF filter.  In one instance, a payment was not blocked, because "the filter did not list 'Burmese' as an a.k.a. [also known as] for Burma."  In the other instance, the "filter did not identify 'Mynmar' as a possible reference to Myanmar."[1004]

---

[999] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.

[1000] See 9/23/2005 email from HBEU Rod Moxley to HSBC John Allison and HSBC John Root, "OFAC sanctions," HSBC OCC 8877213-214.

[1001] See 1/25/2008 email exchanges among HBUS Carolyn Wind, HBUS Mike Ebbs, and others, "Myanmar-related payment – Missed by filter ('Yangon')," HSBC OCC 0616168-178, at 169.

[1002] Id. at 168.

[1003] Undated Global Transaction Banking report, "All Open Reportable Events," OCC-PSI-00823408, at 4.

[1004] 1/1/2010 – 5/31/2010 Compliance Certificate from HSBC David Bagley to HNAH Brendan McDonagh and HNAH Niall Booker, OCC-PSI-01754176, at 4.

### (e)  Transactions Involving North Korea

Still another set of OFAC sensitive transactions involved North Korea which, unlike Burma, Cuba and Sudan, is not subject to a comprehensive U.S. sanctions program, but has particular persons and entities included in the OFAC SDN list.[1005]

In August 2005, a month after HSBC Group issued the GCL policy barring HSBC affiliates from engaging in U.S. dollar transactions in violation of OFAC prohibitions, HSBC Group head of Global Institutional Banking, Mark Smith, circulated a managerial letter identifying correspondent relationship that would be affected. [1006]  The letter stated:  "The Group has 3 account relationships with North Korean entities.  These are all inhibited.  We have been seeking to close the accounts, and will continue to do so, for some time but have not been able to elicit a response from the banks concerned."[1007]

Nearly two years later, in 2007, an internal HSBC document entitled, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," revealed that, as of May 2007, HSBC affiliates in Mexico and Latin America were providing U.S. dollar accounts to North Korean clients.[1008]  The document indicated that HSBC Mexico (HBMX) had nine North Korean customers with nine U.S. dollar accounts holding assets exceeding $46,000, and seven North Korean customers with both U.S. dollar and Mexican peso accounts whose assets totaled more than $2.3 million.[1009]  The document indicated that arrangements had been made to "cancel all business relationships with" North Korea, in relation to U.S. dollar accounts or commercial relationships for the entire region.

In addition, HBUS did not close a U.S. dollar account with the Foreign Trade Bank of the Democratic People's Republic of Korea until April 28, 2010, although a review of the account indicated that no U.S. dollar activity had taken place in it since 2007.[1010]

### (f)  Other Prohibited Transactions

In addition to transactions involving jurisdictions subject to U.S. sanctions programs, some transactions sent to HBUS involved prohibited individuals or entities named on the OFAC SDN list.  While many of these transactions were not sent by HSBC affiliates, some were.

---

[1005] See OFAC "Sanctions Programs and Country Information," North Korea sanctions (last updated 6/20/2011), http://www.treasury.gov/resource-center/sanctions/Programs/pages/nkorea.aspx.
[1006] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569; 8/25/2005 email from HBUS Alan Ketley to multiple HSBC colleagues, "GCL050047 – Compliance with OFAC Sanctions," HSBC OCC 3407565-569.
[1007] 8/25/2005 managerial letter from HSBC Mark Smith to HBUS Aimee Sentmat, HBME Alan Kerr, and others, "GCL050047 – Compliance with OFAC sanctions," HSBC OCC 3407565-569, at 567.
[1008] 5/18/2007 HSBC document, "Information Requested in Connection With: (North Korea, Cuba, and Myanmar)," HSBC OCC 8876088-095, at 093-095.
[1009] Id.  In addition, 92 North Korean clients had 137 HBMX accounts holding solely Mexican pesos, with assets exceeding a total of $697,000.  Id. at 093.
[1010] See 2007 Deloitte OFAC review, "Results of the Transactions Review-UK Gateway, March 29, 2012," HSBC-PSI-PROD-0197919-989, at 988; Subcommittee briefing provided by Deloitte representatives (5/5/2012).

HBUS did not allow such transactions to proceed, showing the effectiveness of the OFAC filter when all appropriate transactions are run through it.

On November 9, 2006, for example, "at the direction of OFAC," HBUS blocked for further review a $32,000 payment that had been originated by HBME, because the underlying payment details indicated the funds were to be credited to Al Aqsa Islamic Bank.[1011]  This bank had been designated as a "specially designated global terrorist" by OFAC in December 2001, because it was a "direct arm of Hamas, established and used to do Hamas business."[1012]  On November 20, 2006, HBME asked HBUS to cancel the payment, because "it was sent in error."  On December 7, 2006, however, OFAC instructed HBUS to continue to block the funds.  HBUS AML Compliance head Teresa Pesce wrote:  "How is it that these payments continue to be processed by our affiliates in light of the GCLs?"[1013]

A report prepared by Deloitte at HBUS' request, examining the period 2001 to 2007, also disclosed that one U.S. dollar correspondent account located in the United Kingdom had been opened for a bank located in Syria, while two U.S. dollar correspondent accounts in the United Kingdom had been established for the "Taliban."[1014]  When asked about the correspondent account for a bank established for the Taliban, HSBC legal counsel told the Subcommittee that HBEU had maintained an account for Afghan National Credit and Finance Limited, the London subsidiary of an Afghan bank that, from October 22, 1999 to February 2, 2002, was designated under OFAC's Taliban sanctions.[1015]  An HBUS representative told the Subcommittee that HBUS was unable to go back far enough in its records to uncover whether or not the Afghan account at HBEU sent transactions through HBUS during that time.[1016]  The fact that HBEU had this account after the 9/11 terrorist attack on the United States again demonstrates how HSBC affiliates took on high risk accounts that exposed the U.S. financial system to money laundering and terrorist financing risks.  These U.S. dollar accounts may also have contravened the 2005 GCL and OFAC regulations by enabling banks in Syria and Afghanistan when it was controlled by the Taliban to engage in U.S. dollar transactions through HBUS.

Another account involving an individual on the OFAC list was housed at HSBC Cayman Islands.  On February 21, 2008, a Syrian businessman by the name of Rami Makhlouf was

---

[1011] 12/14/2006 email from HBUS Elizabeth Protomastro to HBUS John Allison and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608-609.

[1012] 1/9/2007 email from HBUS Elizabeth Protomastro to HSBC John Allison, HBUS Teresa Pesce, Anne Liddy, and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," OCC-PSI-00610498, at 2.

[1013] See 12/15/2006 email from HBUS Teresa Pesce to HBUS Elizabeth Protomastro and others, "OFAC – Wire payments blocked from HSBC offshore entities – USD 32,000 (re SDGT) and USD 2,538,939.33 (re Sudan)," HSBC OCC 3407608.

[1014] 10/18-10/19/2011 "Transaction Review Progress and Results Reporting," prepared by Deloitte LLP, HSBC-PSI-PROD-0096628-672, at 649.

[1015] Subcommittee briefing by HSBC legal counsel (7/9/2012).  See also "UK Observer Reports Taliban Banks Still Operating in London," London The Observer, Sunday edition of The Guardian (10/1/2007); "Schwerer Schlag": Ein kleines Geldhaus in London diente offenbar als Hausbank der Taliban," [Serious Blow:  A small Financial Institution in London apparently served as Taliban's main bank"], Der Spiegel, Christoph Von Pauly (10/8/2001).

[1016] Id.

placed on the SDN list by OFAC.[1017]  One week later, HSBC Cayman Compliance personnel contacted HBUS to report that HSBC Cayman Islands currently held a trust relationship with Mr. Makhlouf and to inquire as to "what actions if any HSBC Group has taken in relation to the above mentioned individual."[1018]  An HBUS Compliance officer asked the Cayman Compliance officer for more information about the Makhlouf accounts, and the head of HSBC Cayman Compliance responded:  "The Trust is administered by HSBC Geneva.  We raised concerns with this client in August 2007 however we were assured by David Ford that the relationship had been reviewed at a Group level and a decision had been taken to continue with the relationship."[1019]  Ultimately, HBUS determined that it did not have any connection to Mr. Makhlouf and did not need to report any information to OFAC.

### (3)  HBUS' OFAC Compliance Program

Internal bank documentation related to HBUS' OFAC compliance efforts regarding OFAC sensitive transactions portrays a variety of specific problems over the period reviewed by the Subcommittee.  One problem was that some HSBC affiliates continued to offer U.S. dollar accounts to prohibited persons despite HSBC Group policy and OFAC regulations, and continued to send transactions involving those accounts through their U.S. dollar accounts at HBUS.  A second problem was the ongoing practice by some HSBC affiliates and others to use methods of processing transactions which did not disclose the participation of a prohibited person or country when sending a transaction through an account at HBUS.  Even some within HSBC worried that such methods would look deceptive to its U.S. regulators.  In other cases, prohibited transactions were not detected by HSBC's WOLF filter or HBUS' OFAC filter due to programming deficiencies that did not identify certain terms or names as suspicious.  In still other cases, transactions that had been properly blocked by the WOLF or OFAC filter were released by HSBC or HBUS employees in error, due to rushed procedures, inadequate training, or outright mistakes.  Beginning in 2008, spurred in part by an upcoming OCC examination of its OFAC compliance program, HBUS took a closer look at its program as a whole.

On September 28, 2008, HBUS received a cautionary letter from OFAC regarding "12 payments processed from September 4, 2003 through February 1, 2008 which represent possible violations against U.S. economic sanctions."[1020]  That same month, HBUS learned that the OCC planned to review its OFAC operations as part of a November 2008 examination of HBUS' Payments and Cash Management (PCM) division.[1021]  In response, HBUS undertook a detailed analysis of not only the 12 transactions highlighted by OFAC, but also other prohibited transactions that had been processed through the bank since issuance of the 2005 GCL policy.

---

[1017] See 2/21/2008 U.S. Department of Treasury Press Release No. HP-834, "Rami Makhlouf Designated For Benefiting from Syrian Corruption," http://www.treasury.gov/press-center/press-releases/Pages/hp834.aspx ("The U.S. Department of the Treasury today designated Rami Makhluf, a powerful Syrian businessman and regime insider whom improperly benefits from and aids the public corruption of Syrian regime officials.").
[1018] 2/28/2008 email exchange among HBUS Andy Im and HSBC Cayman Islands Patricia Dacosta and Michelle Williams, HSBC OCC 8870981.
[1019] Id.
[1020] 9/29/2009 OFAC Cautionary Letter, HSBC-PSI-PROD-0096180-181.
[1021] See 10/3/2008 email from HBUS Lesley Midzain to HBUS Janet Burak, HSBC David Bagley, and HBUS Anne Liddy, "OFAC 'Cautionary Letter' received today," HSBC OCC 3406951-952.

On October 3, 2008, a member of HBUS' OFAC Compliance team Elizabeth
Protomastro forwarded the OFAC letter to HBUS Compliance head Leslie Midzain.[1022]  Ms.
Midzain, in turn, forwarded it to HSBC Group Compliance head David Bagley and HNAH's
regional Compliance head Janet Burak.[1023]  Ms. Midzain wrote that she was giving them an
"immediate heads up" because of the "additional [OFAC] failures since February 2008," the
upcoming OCC examination in November, and the "continued sensitivity" surrounding OFAC
compliance. She stated that the matter would "receive high priority."[1024]

On November 6, 2008, Ms. Midzain provided Mr. Bagley and Ms. Burak with detailed
charts on the 12 prohibited transactions as well as a larger number of prohibited transactions that
had been mistakenly processed by the bank.[1025]  To provide context to the figures, she noted that
HBUS processed approximately 600,000 wire transfers per week, of which about 5%, or 30,000
transactions, generated "possible [OFAC] matches which require review prior to releasing."[1026]
She wrote that, over a five-year period from 2003 to 2008, HBUS had "rejected and reported
1,212 transactions valued at $100 million" to OFAC.[1027]  She explained that, in addition, HBUS
had self-reported 79 missed transactions to OFAC that should have been blocked, but weren't.
Of those, she wrote that HBUS had identified "approx[imately] 57" that were issued subsequent
to the 2005 GCL that were "contrary to sanction requirements and for which HSBC was the
originating bank."[1028]  She noted that some of the issues had arisen after HBUS replaced its
OFAC filter in July 2007, and may have been due to gaps in the filter that were closed "as the
system [was] refined."[1029]

Ms. Midzain reported that the 79 missed transactions primarily involved Iran and
Sudan.[1030]  Other transactions involved Cuba, Iraq, Syria, Zimbabwe, and persons on the SDN
list.  Ms. Midzain explained that of the 57 missed transactions that occurred since issuance of the
July 2005 GCL policy barring HSBC affiliates from processing U.S. dollar transactions for
OFAC sensitive persons, 21 or about one-third had nevertheless originated with an HSBC
affiliate.[1031]  Of those 21, her analysis noted that about five did not contain a reference to a
prohibited person.  Her analysis suggests that an HSBC affiliate may have been using a cover
payment which would mask the nature of the transaction from HBUS.[1032]  Ms. Midzain wrote:
"Regarding Group members, since Group policy was issued JUL05, we have nonetheless
received a fairly notable number of payments that suggest HSBC banks have not been
consistently applying the policy."[1033]  She also noted that the analysis had not examined the

[1022] Emails between HBUS Elizabeth Protomastro, HBUS Lesley Midzain, and others on October 3, 2008, "OFAC
'Cautionary Letter' received today," HSBC OCC 3406952-953.
[1023] 10/3/2008 email from HBUS Lesley Midzain to HBUS Janet Burak, HSBC David Bagley, and HBUS Anne
Liddy, "OFAC 'Cautionary Letter' received today," HSBC OCC 3406951-952.
[1024] Id.
[1025] 11/6/2008 email exchanges among HBUS Leslie Midzain, HSBC David Bagley, HBUS Janet Burak, and others,
"OFAC analysis," HSBC OCC 0616010-026.
[1026] Id. at 012.
[1027] Id.
[1028] Id. at 016.
[1029] Id. at 014.
[1030] Id. at 016-017.
[1031] Id. at 017.
[1032] Id. at 016.
[1033] Id.

population of payments that HBUS stopped over the years to see how many of them also came
from HSBC affiliates.  Her figures also did not reflect the larger universe of potentially
prohibited transactions that were processed by the bank without either HBUS or OFAC detecting
them.

David Bagley, HSBC Group Compliance head, thanked Ms. Midzain for her analysis.
He also wrote:

> "As you know, we have just completed and are currently collating the results of a
> Groupwide Compliance review of compliance with our USD/OFAC policy.
>
> Whilst some of these apparent breaches of Group policy may be rather historic
> nevertheless I am determined that we should enforce our policy on a consistent and
> Groupwide basis.
>
> Given this, what I would like to do is at Group level track back relevant and apparently
> offending payments and establish root causes so as to satisfy ourselves that there can be
> no, or at the very least, far less repetition.  It is of course unrealistic to expect that no
> payments will pass through to HBUS, and at least our move to transparency in form of
> serial payments should allow these to be caught nevertheless I would prefer that
> payments were rejected at point of entry."[1034]

The OCC examination took place near the end of 2008.  It tested the bank's OFAC
systems to determine if OFAC screening was being properly applied to new accounts, wire
transfers, and other transactions.[1035]  An internal OCC memorandum stated that, as of June 30,
2008, "HBUS reported 370 items on the OFAC blocked report, valuing approximately $20
million." It reported that, from September 2003 to September 2008, HUBS had "rejected and
reported to OFAC over 1,200 transactions valuing $100 million."[1036]  The memorandum also
stated that HBUS was then processing about 600,000 wire transfers per week, of which 6%, or
about 30,000, were manually reviewed each week by four-person OFAC Compliance teams in
Delaware and New York.  The OCC wrote that, of the wire transfers that underwent manual
review, 20 to 30 per day were "escalated" and required a "disposition decision from compliance
management."[1037]  The OCC memorandum reported:

> "Although, according to management, within the past five years (9/03-9/08) there ha[ve]
> been only 80 missed payments, the bank's Compliance teams are under rigorous pressure
> to process alerts and determin[e] a disposition in a timely maner.  … [T]his strain can and
> will inhibit their mental capacity leaving gaps for errors even though permanent current
> staff members are well trained and qualified to complete the OFAC responsibilities."

[1034] 11/11/2008 email from HSBC David Bagley to HBUS Leslie Midzain and HSBC Susan Wright, "OFAC,"
HSBC OCC 0616010-011.
[1035] 7/28/2008 OCC memorandum, "OFAC Examination – Payment and Cash Management (PCM)," OCC-PSI-
01274962.  [Sealed Exhibit.]
[1036] Id. at 3.
[1037] Id. at 4-5.

On January 20, 2009, the OCC sent HBUS a Supervisory Letter with generally positive examination findings regarding its OFAC compliance efforts.[1058]   The Supervisory Letter stated:

"• OFAC Compliance is **High and Increasing.**  The quality of risk management systems is satisfactory.

• Compliance with legal and regulatory requirements is satisfactory and no violations of law or regulation were cited at this examination.

• One recommendation is made related to staffing."[1039]

The Supervisory Letter stated that the OFAC risk was high and increasing due to "almost a zero tolerance for error" under OFAC regulations and increasing growth in HBUS' PCM and retail banking businesses.  The staffing recommendation, which did not require corrective action, stated:  "Management should consider a review of current staffing requirements to ensure that there is an adequate number of permanent qualified staff to prolong the timely operations associated with OFAC related matters and to ensure adherence with regulatory requirements … as your business grows."[1040] Despite the OCC's generally positive examination, internal bank documents indicate that HBUS itself had a much more negative view of its OFAC compliance program.  In June 2009, HBUS initiated an "OFAC Program Review Project."[1041]   Four months later, in October 2009, Debra Bonosconi, the HBUS Director for Specialized Compliance overseeing the Embassy Banking business, sent an email to Anthony Gibbs, the COO of HSBC North America Legal and Compliance, commenting on a number of compliance issues, including OFAC compliance.[1042]  Ms. Bonosconi, who had begun working at HBUS in March 2008, wrote that she had only recently become aware of the negative findings of the OFAC Program Review Project.  She explained:

"This project has been underway since June and the findings that have surfaced are no different than those already identified previously.  So, we have a project that has taken far longer than it should have and findings that do not vary significantly from previous reviews.

The bottom line is, our OFAC process is in disarray and in great risk of being noncompliant.  We have multiple systems, inconsistent practices, limited communication between the various functions, and no oversight function."[1043]

This candid description of the bank's OFAC compliance program, as having "inconsistent practices," "limited communication," and "no oversight function," stands in marked contrast to the OCC findings less than a year earlier.

---

[1038] See OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434-436.  [Sealed Exhibit.]
[1039] Id. at 1.
[1040] Id. at 3.
[1041] See  10/23/2009 email from HBUS Debra Bonosconi to HBUS Anthony Gibbs, "comments," HSBC OCC 3405534-537.
[1042] Id.
[1043] Id. at 537.

Another sign of the stresses in the OFAC compliance program surfaced in December 2009, when the four-person OFAC Compliance team in New York faced an accumulated backlog of greater than 700 OFAC alerts that had yet to be reviewed.[1044]  The OFAC Compliance team requested five or six people from the Payments and Cash Management (PCM) department for ten days to help clear the backlog.[1045]  PCM responded that it had no resources to loan, and suggested asking Compliance personnel in Delaware for help.  The OFAC Compliance team in New York responded that the Delaware Compliance staff was already "fully deployed" dealing with general alerts from the CAMP monitoring system:

> "We have considered all options at this point[;] the Compliance team in DE is already fully deployed dealing with wire camp alerts and bank examiner requests for the current exam.  There is no bandwidth there at all[;] they are behind on the current alert clearing process which we are also dealing with."[1046]

In late 2011, the OCC conducted a second examination of HBUS' OFAC compliance program and, on January 25, 2012, issued a Supervisory Letter with a more negative assessment.[1047]  The Supervisory Letter stated that the OCC was "concerned about the number and severity of the deficiencies in the enterprise-wide OFAC compliance program" at HBUS and at two other HSBC affiliates in the United States, HSBC Nevada, N.A. and HSBC Trust Company (Delaware), N.A.  It stated that the OCC had reviewed reports prepared by HBUS' own auditors and by an outside consultant that "identified significant deficiencies in the program."  It noted that bank management had taken "significant steps" to address deficiencies, but concluded the "three banks lack a robust OFAC risk assessment that ensures the OFAC risks have been adequately identified so they can be managed appropriately."  The Supervisory Letter contained two Matters Requiring Attention (MRAs) by the bank:  (1) development of a "comprehensive OFAC risk assessment;" and (2) an independent review of certain real estate loans through a California branch between 2009 and 2011, involving Iran, that raised OFAC concerns.[1048]  The Supervisory Letter also included a three-page attachment identifying OFAC violations cited in seven OFAC cautionary letters since June 2009.  The OCC required HBUS to modify the AML action plan it was developing in response to a September 2010 Supervisory Letter necessitating broad improvements in its AML program to include the MRAs on its OFAC compliance program.[1049]

Since the OCC examination, OFAC has issued one more cautionary letter to HBUS.  Altogether, six of the pending OFAC letters warned that the violations might result in a civil monetary penalty, but no penalty has been imposed as of June 2012.

---

[1044] 12/11/2009 email exchange among HBUS Camillus Hughes and HBUS Michael Gallagher, Charles DelBusto, Sandra Peterson, Thomas Halpin, Chris Davies, and Lesley Midzain, "OFAC Payments," HSBC OCC 7688668-670, at 670.
[1045] Id.
[1046] Id. at 668.
[1047] See 1/25/2012 OCC Supervisory Letter HSBC-2012-03, "OFAC Compliance Program," OCC-PSI-01768561-566.  [Sealed Exhibit.]
[1048] Id. at 2.
[1049] Id. at 3.

**(4)  Server Issues**

One additional issue involving OFAC-sensitive transactions involves payment messages associated with non-U.S. dollar transactions that were sent through servers physically located in the United States, but which were not processed by HBUS and were not screened by an OFAC filter.  The key issue is whether the electronic presence of those payment messages in the United States, utilizing U.S. facilities on their way elsewhere, required application of the OFAC filter.[1050]  Despite concern expressed by HBUS, the bank decided not to turn on the HBUS OFAC filter to screen these payment messages.

**WHIRL Server.**  In the documents reviewed by the Subcommittee, server issues appear to have first arisen in 2003, when the HSBC Group Executive Committee discussed establishing a new server in the United Kingdom to process credit card transactions, instead of continuing to route those transactions through a server in the United States, for the express purpose of "avoid[ing] contravening the OFAC restrictions."[1051]  In January 2004, the HSBC Group Board of Directors approved installing a separate, so-called "WHIRL system" in the United Kingdom at an estimated cost of $20 million.[1052]  When asked about the WHIRL server, Mr. Bagley told the Subcommittee that the bank had moved the payment processing outside of the United States to protect HBUS, that he viewed it as a broad reading of OFAC rules at the time, and that he saw it as a conservative decision.[1053]

By 2005, the WHIRL server was active.  In November 2005, Mr. Bagley asked Mr. Root to follow up on certain HBMX compliance issues identified by Mexican regulators, including the processing of credit card transactions.  Mr. Bagley wrote that even through the credit card transactions "are, or will be processed on the UK Whirl server the routing of the relevant messages may pass through the U.S. first."[1054]  He also wrote:  "If this is the case then we may still have an issue dependent on how much intervention is theoretically possible on the part of the US leg."  The following day, the head of HBMX Compliance Ramon Garcia informed Mr. Root and Mr. Bagley that WHIRL transaction messages were still being routed through a U.S. server "for a fraction of a second for later transfer to the UK," which could be long enough for a "log file" to exist in the United States identifying the transactions.

**HSBC Affiliates in the Americas.**  Six months later, in April 2006, Mr. Bagley proposed that "countries in the Americas outside USA disconnect their payment routing link to the USA TP Gateway and reconnect to the UK TP."  He indicated doing so would provide two main benefits:  "firstly the ability to make payments in currencies other than USD to countries/names/entities sanctioned by USA OFAC (as permitted by GCL 050047), and secondly

---

[1050] When asked, OFAC declined to provide a definitive answer to the Subcommittee in the abstract, indicating that its analysis would have to examine specific facts.  Subcommittee briefing by OFAC (5/8/2012).

[1051] See 1/30/2004 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198571-572.  The HSBC Group Executive Committee consisted of senior executives in HSBC.

[1052] See 1/30/2004 Board of Directors minutes for HSBC Holdings plc, HSBC-PSI-PROD-0198571-572.

[1053] Subcommittee interview of David Bagley (5/10/2012).

[1054] See 11/15-22/2005 email exchanges among HSBC David Bagley, HSBC John Root, and HBMX Ramon Garcia, "HBMX – Compliance Issues," HSBC OCC 8873261-266.

to take data records outside USA."[1055]  His email raised the issue of whether electronic payment messages routed through a U.S. server could be subject to HBUS' OFAC filter and the obligation to block all potentially prohibited transactions.

In November 2006, at a meeting of the HBUS Compliance Risk Management Committee, then HBUS Compliance head Teresa Pesce advised:  "Plans are underway to implement OFAC screening for messages sent by the Americas through the global messaging gateway in the US in 2007."[1056]  Her decision to inform the committee of that development indicates that payment messages already being routed through the U.S. server were not being scanned against the OFAC filter.  If the OFAC filter was not being used, all of the payment messages being sent through the United States by HSBC affiliates in Latin America were not being screened for terrorists, drug traffickers, or other wrongdoers.

Four months later, in March 2007, Mr.  Bagley contacted Alexander Flockhart, then HSBC Latin America CEO, about Latin America payment messages being routed through the U.S. server, in light of the increased focus on OFAC compliance "on the part of both OFAC" and "our banking regulators."[1057]  Mr. Bagley noted that HBUS was required to screen all transactions for compliance with OFAC requirements, including all non-U.S. dollar transactions, which "would clearly be disadvantageous from Latin America's perspective," since the logistics of screening all those transactions "would be commercially and operationally challenging" for Latin American affiliates. Mr. Bagley informed Mr. Flockhart that they were developing a stand-alone WHIRL server in the United Kingdom that Latin America could use and which would avoid OFAC screening.  He commented that if Mr. Flockhart "want[ed] to carry out as many transactions permitted by Group policy as possible," he should relocate Latin America's payment processing "to a different Group Messaging Gateway" than the one in the United States.

Mr. Bagley also noted that HSBC Group had already "informally explored" the possible relocation of Latin America payment processing to the U.K. server, but realized that gateway was already experiencing capacity issues.  Mr. Bagley commented further that the existing situation in which "the filtering" was not turned on was making HSBC's U.S. colleagues "extremely uncomfortable":

> "Whilst we have lived with the current position for some time, it is fair to say that now that our US colleagues are on notice they feel extremely uncomfortable in allowing the position to continue indefinitely.  In essence, we will either have to have a pass and timeline for a relocation of the payment messages or will need to turn the filtering on."[1058]

Mr. Bagley does not make it clear how his U.S. colleagues were put "on notice," and when asked, he told the Subcommittee that he did not recall who he talked with at HBUS about the

[1055] 4/10/2006 email from HSBC David Bagley to HBBR Luis Eduardo, HBMX David Leighton, and others, "TP Gateways," HSBC OCC 7687437-438.
[1056] 11/13/2006 Compliance Risk Management Committee minutes for HBUS, HSBC OCC 3407449-451.
[1057] 3/13/2007 email from HSBC David Bagley to HBMX Sandy Flockhart, "Group Messaging," HSBC OCC 8874354-355.
[1058] Id. at 355.

issue, but he did indicate clearly that the OFAC filter was not turned on for the U.S. server being used to forward payment messaging traffic from HSBC affiliates in Latin America.[1059]  Five months earlier, HBUS Compliance head Teresa Pesce told the HBUS Compliance Risk Management Committee that payment messages sent by the Americas through the U.S. gateway would be scanned for OFAC beginning in 2007; Mr. Bagley's email indicates that, as of March 2007, the OFAC filter had still not been turned on, and his U.S. colleagues were "extremely uncomfortable in allowing the position to continue indefinitely."

        The following day Mr. Flockhart asked for a contact to discuss re-routing Latin American payment messaging traffic through the U.K. server.  A few days after that, Mr. Bagley provided the contact information and also notified Mr. Flockhart that HSBC Brazil was considering "giving up certain payments activity given the challenges of passing that activity through the US."[1060]  Mr. Bagley wrote that the HSBC Group had asked HSBC Brazil to postpone that decision until it was determined whether payment messaging could be "migrated elsewhere." Mr. Bagley also wrote:  "There may also need to be a conversation at some stage with Paul Lawrence [then HBUS CEO] if it is necessary to persuade HBUS to continue with payment messaging pending any migration."[1061]  In this email, the head of HSBC Group Compliance seems to be advocating sending non-U.S. dollar payments through the U.S. gateway without monitoring the transactions for OFAC compliance, pending migration of the Latin American traffic to another server.  When Paul Thurston, former head of HBMX, was asked about Mr. Bagley's comments, he expressed surprise that the HSBC Group Compliance head took that position.[1062]  In June 2007, Mr. Flockhart approved switching Latin America's non-U.S. based SWIFT traffic to the U.K. gateway citing it as the most cost effective solution.[1063]

        Around the same time, HSBC Brazil (HBBR) also sought to move its transactions from the U.S. to the U.K. server to avoid the OFAC filter.  In December 2006, HBBR contacted Malcolm Eastwood at HBEU, asking for assistance in obtaining a second SWIFT address to be used for HBBR payments going to Iran, Cuba, and other sanctioned countries.  HBBR explained that these transactions – about 50 per year – were compliant with Group policy, but ran the risk of being blocked by the U.S. server they currently utilized, which was why it wanted to switch the transactions to the U.K. server and execute them in Euros.  HBBR wrote:  "To enable it, we have been informed that we have to create a second SWIFT address (BIC) to be used exclusively for this purpose, which should also not be published by SWIFT in their books."[1064]

---

[1059] Subcommittee interview of David Bagley (5/10/2012).

[1060] 3/22/2007 email from HSBC David Bagley to HBMX Sandy Flockhart, "Group Messaging," HSBC OCC 8875066-067.

[1061] Id.

[1062] Subcommittee interview of Paul Thurston (5/1/2012).  Mr. Bagley said that the reason he suggested to Mr. Flockhart that the messages be moved to the U.K. gateway was because he had received a legal opinion, which he considered "extreme," that non-U.S. dollar messages going through a U.S. messaging center could be impacted by OFAC.  He was, thus, acting in a conservative manner to avoid violating OFAC requirements.  Subcommittee interview of David Bagley (5/10/2012).

[1063] 6/1/2007 email from HBMX Sandy Flockhart to HBMX Neelesh Heredia and others, "Group Messaging Gateway for LAM – Clear Choice Report," HSBC OCC 8874349-350.

[1064] 12/18/2006 email from HBBR Morgana Casagrande to HBEU Malcolm Eastwood and others, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876927-928.

In response, Mr. Eastwood reached out to HSBC Group Compliance and HBEU operational staff to discuss practical issues with Brazil's routing "US sanctioned items" via the U.K. server. He wrote: "I have concerns that we might be breaching at least the spirit of the US Serial Routing GCL if not the letter of it."[1065] HSBC Group Money Laundering Control Officer John Allison responded that, by using the U.S. server, Brazil was subject to an "all currency prohibition for all OFAC entries," but HSBC Group policy allowed Brazil to make payments in non-U.S. dollar currencies to entities on the OFAC list, so long as they were not linked to terrorism or weapons of mass destruction. At the same time, he expressed concern about the perception of HSBC's obtaining an additional SWIFT address dedicated to payments intended for OFAC sanctioned countries.

Mr. Eastwood forwarded this email correspondence to HBEU colleagues with the comment: "Just fyi. This all makes me very nervous!" HBEU's Rod Moxley responded that trying to identify and process transactions "which have so many conditions attached to them" was a predicament for them. He wrote: "Slightly irritating too that GHQ CMP [Group Headquarters Compliance] seem to have bent over backwards to accommodate a system which looks very dodgy to me. How about no you can't do this?"[1066] On January 2, 2007, Mr. Moxley sarcastically described setting up a second SWIFT address an "interesting concept," forwarded the idea to a colleague, and wrote: "let's set up a completely different Swift address to help avoid any problems with Cuba and Iran. Wish I'd thought of it."[1067]

On January 26, 2007, Mr. Eastwood responded to Brazil's request.[1068] He indicated in a memorandum that, after conferring with HSBC Group Compliance and operational personnel, they were not favorable to segregating certain transactions through separate SWIFT addresses, even though the transactions were permissible under Group policy, due to the possible perception of "taking action to avoid certain transactions being examined by the US authorities." Instead, Mr. Eastwood noted that HBBR could re-route all of its SWIFT traffic via the U.K. server, listing several logistical issues that would have to be resolved if Brazil wanted to move forward.

These documents raise the question of whether non-U.S. dollar payment messages referencing transactions routed through a U.S. server by HSBC affiliates were required to be screened by an OFAC filter, or whether they could move across U.S. boundaries and use U.S. facilities without triggering any OFAC prohibitions. On the one hand, HSBC Group Compliance urged Latin America to switch their messaging traffic from a U.S. to a U.K. server to avoid the delays that come with OFAC screening, while on the other hand indicating that for at least a five-month period from November 2006 to March 2007, the OFAC filter had not been turned on to screen the Latin American payment messages going through the U.S. server even though HBUS apparently had expressed concerns about not screening the messages for prohibited activity.

---

[1065] 12/21/2006 email from HBEU Malcolm Eastwood to Bill Rice and others, "Fw: Transactions with Iran/Cuba, etc.," HSBC OCC 8876927.

[1066] See 12/28/2006 - 1/4/2007 email exchanges among HBEU Malcolm Eastwood, HSBC John Allison, HBEU Rod Moxley, and others, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876925-927.

[1067] 1/2/2007 email from HBEU Rod Moxley to HBEU Andy Newman, "Transactions with Iran/Cuba, etc.," HSBC OCC 8876921.

[1068] 1/26/2007 memorandum from HBEU Malcolm Eastwood to HBBR Lucas Fragoso and others, "Trade Transaction with Iran/Cuba etc.," HSBC OCC 8876930-931.

HSBC Group knowingly put its U.S. affiliate at regulatory and reputational risk by moving payment messages through a U.S. server without scanning them against the OFAC filter.

**Turning Off OFAC Verification.**  A very different server issue arose in July 2007, when HBUS introduced a new product called Fircosoft to help monitor OFAC sensitive transactions.  The product caused a huge increase in the number of OFAC alerts, creating a backlog that began to overwhelm HBUS OFAC compliance personnel.  According to a fourth quarter 2007 Compliance Report by HBUS, the introduction of the new product caused "serious performance issues" that would "not support HBUS volumes."[1069]  On July 17, 2007, "a risk based decision was made to eliminate the verification step of all OFAC filter alerts on a temporary basis to accelerate the process of clearing the OFAC queue."[1070]  The more limited review process for OFAC sensitive transactions remained in effect for about three weeks, from July 17 to August 6.  On August 1, 2007, HBUS Chief Operating Officer David Dew wrote:  "I think that we simply must now agree on a definitive timetable for reintroduction of full OFAC controls."[1071]  When asked about this matter, Mr. Dew told the Subcommittee that he thought the limitation on the "verification step" in the OFAC filter was only stopped for about a day.[1072]  Anne Liddy told Subcommittee that she recalled that the verification step was turned off for about a month, but didn't view it as a risk to the bank.[1073]

In 2009, the same verification step in the OFAC filter was again turned off by HBUS for a few weeks.  In November 2009, due to an industry-wide switch to SWIFT202 cover payments, OFAC alerts increased dramatically at HBUS.  HBUS was so concerned about the large number of false OFAC hits being generated that it stopped the verification step, as was done in 2007.  Turning off the verification step concerned one HBUS employee enough that the employee quietly reported the action to the Federal Reserve.  The Federal Reserve examiner who spoke with the employee wrote in an email to colleagues that the HBUS employee reported:

> "On Monday Lesley Midzain, former head of BSA/AML turned off the second level filter on Chips activity without consulting anyone and with no supporting documentation.  The rational given for turning the second level filter off was to reduce the daily backlog in lieu of additional resources.  The individual who spoke to me knew this was not appropriate action and decided to call the [regulator]."[1074]

HSBC's legal counsel told the Subcommittee that the verification step was turned off for 13 days, from November 25, 2009 and December 7, 2009.[1075]  The issue raised by both incidents in 2007 and 2009, is whether HBUS' decision to turn off part of the OFAC filtering system reduced its effectiveness in screening for prohibited transactions and increased U.S. vulnerabilities to money laundering and terrorist financing.

---

[1069] 4Q07 Compliance Report from HBUS Carolyn Wind to HNAH Janet Burak and others, HSBC-PSI-PROD-0000508-016, at 509.

[1070] Global Payments System (GPS) Implementation Issues, 6 Aug 07 HUSI Audit Committee Update, HSBC OCC 1105891.

[1071] 8/01/2007 email from HBUS David Dew to Bandula Wijesinghe and others, OCC-PSI-00188404.

[1072] Subcommittee interview of David Dew (3/05/2012).

[1073] Subcommittee interview of Anne Liddy (2/22/2012).

[1074] 12/16/2009 internal  Federal Reserve memorandum, BOG-A-207130. [Sealed Exhibit.]

[1075] Subcommittee briefing by HSBC legal counsel (6/27/2012).

## C. Analysis

OFAC enforces U.S. programs aimed at exposing and disabling the financial dealings and resources of some of the most dangerous persons and jurisdictions threatening the world today, including terrorists, persons involved with weapons of mass destruction, drug traffickers, and rogue jurisdictions.  The OFAC filter is the central mechanism used to identify, stop, and block suspect transactions speeding through financial systems.  Global financial institutions have a special responsibility to respect OFAC prohibitions and comply with OFAC restrictions.  Actions taken to circumvent the OFAC filter or endanger the effectiveness of a critical safeguard may facilitate transactions undertaken by some of the worst wrongdoers among us.

The evidence reviewed by the Subcommittee indicates that, from 2001 to 2007, HSBC affiliates, with the knowledge and tacit approval of HSBC Group executives, engaged in alarming conduct sending undisclosed Iranian U-turn transactions through their HBUS correspondent accounts, without information that would otherwise have triggered OFAC reviews.  When asked, HBUS insisted on HSBC affiliates using transparent payment instructions so that all U-turn transactions would be stopped by the OFAC filter and reviewed, but when faced with evidence that some HSBC affiliates were acting to circumvent the OFAC filter, HBUS failed to take decisive action to stop the conduct some in its own organization viewed as deceptive.  In addition, from at least 2009 to early 2012, the bank's OFAC compliance program suffered from multiple deficiencies.  Still another issue is that some HSBC affiliates sent non-U.S. dollar messaging traffic through U.S. servers in which the OFAC screening was not turned on or was restricted.  The aim in many of the instances in which HSBC affiliates acted to circumvent the OFAC filter may have been to avoid the time-consuming individualized reviews that followed, rather than execute prohibited transactions.  But expediency in the face of the threats posed by the targets of OFAC prohibitions does not justify potentially violating or undermining OFAC requirements.  HBUS likewise failed to obtain information about the full scope of undisclosed OFAC sensitive transactions going through its correspondent accounts, bring to a head the issue of HSBC affiliates circumventing OFAC safeguards, and ensure all transactions were reviewed for OFAC compliance.

## V.    AL RAJHI BANK:  DISREGARDING LINKS TO TERRORIST FINANCING

For decades, HSBC has been one of the most active global banks in Saudi Arabia, despite AML and terrorist financing risks involved with doing business in that country.  Among other activities, for more than 25 years, HSBC has provided a wide range of banking services to Al Rajhi Bank, Saudi Arabia's largest private bank. [1076]  Those services included providing large amounts of physical U.S. dollars to the bank as part of HSBC's U.S. banknotes business.  After the 9/11 terrorist attack on the United States in 2001, evidence began to emerge that Al Rajhi Bank and some of its owners had links to organizations associated with financing terrorism, including that one of the bank's founders was an early financial benefactor of al Qaeda.  In January 2005, despite the fact that Al Rajhi Bank had not been indicted, designated a terrorist financier, or sanctioned by any country, HSBC Group Compliance recommended internally that, due to terrorist financing concerns, HSBC affiliates should sever ties with the bank.

In response, some HSBC affiliates disregarded the recommendation and continued to do business with the bank, while others terminated their relationships but protested HSBC's decision and urged HSBC to reverse it.  The protests continued despite a U.S. indictment the next month, in February 2005, of two individuals accused, among other matters, of cashing $130,000 in U.S. travelers cheques at Al Rajhi Bank in Saudi Arabia and smuggling the money to violent extremists in Chechnya.  In May 2005, four months after its initial decision, HSBC Group Compliance reversed itself and announced that all HSBC affiliates could do business with Al Rajhi Bank, thus allowing HBUS to decide for itself whether to resume the relationship.  For nearly two years, HSBC Banknotes repeatedly asked its AML Compliance personnel to allow reinstatement of the Al Rajhi Bank relationship, despite ongoing concerns at HBUS about the bank's possible links to terrorist financing.

On December 1, 2006, despite concern that there is "no smoke without fire," HBUS AML Compliance agreed to allow HBUS to reinstate the relationship and resume supplying U.S. dollars to Al Rajhi Bank.  Earlier, Al Rajhi Bank had threatened to pull all of its business from HSBC if the U.S. banknotes business were not restored, while HSBC personnel estimated that restoring the U.S. banknotes business would produce annual revenues of at least $100,000.  In 2007, additional information surfaced about Al Rajhi Bank's possible links to terrorism, including articles on a 2003 report by the U.S. Central Intelligence Agency (CIA) entitled, "Al Rajhi Bank: Conduit for Extremist Finance," which found that "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."  Despite that and other troubling information, HBUS continued to supply U.S. dollars to the bank, and even expanded its business, until 2010, when HSBC decided, on a global basis, to exit the U.S. banknotes business.

Al Rajhi Bank was not the only bank with links to terrorism serviced by HBUS.  Two additional examples are Islami Bank Bangladesh Ltd. and Social Islami Bank which are also located in Bangladesh.  In each case, in anticipation of revenues of $75,000 to $100,000 per year,

---

[1076] HSBC also operates an affiliate, HSBC Bank Middle East, with branches in Saudi Arabia; owns Saudi British Bank; and provides correspondent banking services to other Saudi financial institutions.

HBUS Banknotes personnel disregarded troubling evidence of possible links to terrorist financing, opened accounts for the banks, and provided them with U.S. dollars and access to the U.S. financial system.

## A. Al Rajhi Bank

Founded in 1957, Al Rajhi Bank is one of the largest banks in Saudi Arabia, with over 8,400 employees and assets totaling $59 billion.[1077] Headquartered in Riyadh, the bank has over 500 branches, mostly in Saudi Arabia, but also in Malaysia, Kuwait, and Jordan.[1078] The bank was founded by four brothers, Sulaiman, Saleh, Abdullah, and Mohamed, of the Al Rajhi family, one of the wealthiest in Saudi Arabia.

The bank began as a collection of banking and commercial ventures which, in 1978, joined together as the Al Rajhi Trading and Exchange Company.[1079] In 1987, the company converted to a joint stock company, and two years later renamed itself the Al Rajhi Banking and Investment Corporation.[1080] In 2006, the bank rebranded itself as Al Rajhi Bank.[1081] It is traded on the Saudi Arabian Stock Exchange (Tadawul), and about 45% of its shares are publicly owned.[1082] Al Rajhi family members remain the bank's largest shareholders.[1083]

Al Rajhi Bank offers a wide range of banking services including deposits, loans, investment advice, securities trading, remittances, credit cards, and consumer financing.[1084] All services are offered in conformance with Islamic requirements, including the set aside of funds for "zakat," which is used for charitable donations. The bank has won a number of awards for its operations in the Middle East.

The bank's most senior official is Sulaiman bin Abdul Aziz Al Rajhi, who at various times has held the posts of Chief Executive Officer, Managing Director, and Chairman of the Board of Directors.[1085] The bank's General Manager is Abdullah bin Abdul Aziz Al Rajhi. The board of directors consists of eleven directors, six of whom are Al Rajhi family members: Sulaiman bin Abdul Aziz Al Rajhi, Chairman of the Board; Abdullah bin Abdul Aziz Al Rajhi; Sulaiman bin Saleh Al Rajhi; Mohamed bin Abdullah Al Rajhi; Abdullah bin Sulaiman Al Rajhi; and Bader bin Mohammed Al Rajhi.[1086]

---

[1077] Al Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/default.aspx.

[1078] Id.

[1079] Id.; Al Rajhi Bank website, "Our History," http://www.alrajhibank.com.sa/our-history/index.html.

[1080] Al Rajhi Bank website, "Our History," http://www.alrajhibank.com.sa/our-history/index.html.

[1081] Id. The bank also has various subsidiaries, including Al Rajhi Capital. See Al Rajhi Capital website, http://www.alrajhi-capital.com/en/Welcome+to+ARFS/Overview/.

[1082] HBUS "Know Your Customer Profile" of Al Rajhi Banking & Investment Corp. (10/15/2010), HSBC-PSI-PROD-0102310, (hereinafter "2010 HBUS KYC Profile on Al Rajhi Bank"), at 2. About 45% of the bank's shares are publicly traded; the remainder is held primarily by members of the Al Rajhi family. Id. at 3.

[1083] 2010 HBUS KYC Profile on Al Rajhi Bank, at 3.

[1084] See Al Rajhi Bank website, http://www.alrajhibank.com.sa.aspx.

[1085] See Al Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/board-of-directors.aspx. See also 2010 HBUS KYC Profile on Al Rajhi Bank, at 3 (describing Sulaiman Abdul Aziz Al Rajhi as Chairman of the Board and Managing Director; Abdullah Sulaiman Al Rajhi as CEO; and Mohammed Lookman Samsudeen as General Manager and Chief Financial Officer).

[1086] Rajhi Bank website, "About Us," http://www.alrajhibank.com.sa/en/about-us/pages/board-of-directors.aspx.

The bank is part of an extensive group of Al Rajhi business and nonprofit ventures, which include companies engaged in money exchange services, commodity trading, real estate, poultry, construction, and pharmaceuticals.[1087]  One business which also had an HBUS account was the Al Rajhi Trading Establishment, a money exchange business owned by Abdulrahman Saleh Al Rajhi,[1088]  Its HBUS account was closed in 2005, when it merged with seven other businesses to form a new Saudi bank.  The largest nonprofit venture in the Al Rajhi group is the SAAR Foundation, which is named after Sulaiman bin Abdul Azis Al Rajhi, and supports nonprofit and business ventures around the world.[1089]  Sulaiman Al Rajhi and his family today have an estimated net worth of nearly $6 billion.[1090]

The Subcommittee contacted Al Rajhi Bank regarding its relationship to HSBC and the matters addressed in this section, but the bank has not provided any information in response to the Subcommittee's inquiry.

## B. Saudi Arabia and Terrorist Financing

The majority of Al Rajhi Bank's operations take place in Saudi Arabia, which the United States has long identified as a country of concern in the area of terrorist financing.[1091]  Following the terrorist attack on the United States on September 11, 2001, the U.S. Government began a decade-long intensive investigation into where and how terrorists obtain funding, repeatedly returning to Saudi Arabia, its banks, and its nationals as a suspected source.

In 2004, the 9/11 Commission charged with investigating the terrorist attack issued a report which found that Osama Bin Laden and al Qaeda had relied on a "financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states."[1092]   The Commission's report explained:

"Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia.  Some individual donors surely knew, and others did not, the ultimate destination of their donations."[1093]

The Commission report stated:  "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities.  It was the society that produced 15 of the

---

[1087] See, e.g., Sulimin Abdul Aziz Al Rajhi Holding Company website, http://www.alrajhiholding.com/.

[1088] See, e.g., March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3; 9/8/2008 HSBC Financial Investigations Group (FIG) report on Al Rajhi Bank, HSBC-PSI-PROD-0102813.

[1089] See "Sulaiman Al-Rajhi's life a rags to riches story," Arab News (5/29/2012), http://www.arabnews.com/?q=economy/sulaiman-al-rajhi%E2%80%99s-life-rags-riches-story.

[1090] See Profile of Sulaiman Al Rajhi & family (March 2012), Forbes, http://www.forbes.com/profile/sulaiman-al-rajhi/.  See also 2010 HBUS KYC Profile on Al Rajhi Bank at 3 (estimating family worth at $22.5 billion).

[1091] See, e.g., International Narcotics Control Strategy Reports prepared by the U.S. Department of State, 2003-2012 (identifying Saudi Arabia as a country "of concern" with respect to money laundering and terrorist financing).

[1092] The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States, (7/22/2004), at 55.

[1093] Id. at 170.

19 hijackers."[1094]  The report also stated that it "found no evidence that the Saudi government as
an institution or senior Saudi officials individually funded [Al Qaeda],"[1095] and that after terrorist
attacks began occurring in Saudi Arabia, a "Saudi crackdown … ha[d] apparently reduced the
funds available to al Qaeda – perhaps drastically – but it is too soon to know if this reduction will
last."[1096]

After several major terrorist attacks within its borders in 2003 and 2004, Saudi Arabia
took a number of steps to combat terrorist financing.  One report to Congress by the
Congressional Research Service summarized those actions as follows:

> "Since mid-2003, the Saudi government has: set up a joint task force with the United
> States to investigate terrorist financing in Saudi Arabia; shuttered charitable organizations
> suspected of terrorist ties; passed anti-money laundering legislation; banned cash
> collections at mosques; centralized control over some charities; closed unlicensed money
> exchanges; and scrutinized clerics involved in charitable collections."[1097]

Saudi Arabia also reported seizing illicit cash from terrorist organizations, shutting suspect bank
accounts, designating several individuals as terrorist financiers, and killing two of them.[1098]  In
addition, Saudi Arabia established a Permanent Committee on Combating the Financing of
Terrorism and a Financial Investigation Unit which began operations in September 2005.[1099]

Despite those advances, U.S. Government testimony and reports indicate that Saudi
Arabia continued to be a focus of concern with respect to terrorist financing.  In 2005, for
example, U.S. Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey
testified before Congress:  "[W]ealthy donors in Saudi Arabia are still funding violent extremists
around the world, from Europe to North Africa, from Iraq to Southeast Asia."[1100]  He also
testified that Saudi individuals may be "a significant source" of financing for the Iraq
insurgency.[1101]

In 2007, in its annual International Narcotics Control Strategy Report, the U.S.
Department of State wrote:  "Saudi donors and unregulated charities have been a major source of
financing to extremist and terrorist groups over the past 25 years."[1102]  A 2007 report to Congress

---

[1094] Id. at 370.

[1095] Id. at 171.

[1096] Id. at 383.

[1097] "Saudi Arabia:  Terrorist Financing Issues," Congressional Research Service Report for Congress, RL32499
(9/14/2007), http://www.fas.org/sgp/crs/terror/RL32499.pdf (hereinafter "2007 CRS Report on Saudi Arabia
Terrorist Financing Issues"), in the summary.  See also 2007 International Narcotics Control Strategy Report, U.S.
Department of State, at 355-357.

[1098] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 25.

[1099] Id. at 24.

[1100] Stuart Levey testimony before the House Financial Services Subcommittee on Oversight and Investigations and
House International Relations Subcommittee on International Terrorism and Nonproliferation (5/4/2005).

[1101] Stuart Levey testimony before the Senate Committee on Banking, Housing, and Urban Affairs (7/13/2005)
("Wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and
the ideology that fuels the terrorists' agenda.  Even today, we believe that Saudi donors may still be a significant
source of terrorist financing, including for the insurgency in Iraq.").

[1102] 2007 International Narcotics Control Strategy Report, U.S. Department of State, at 355.

by the Congressional Research Service stated: "U.S. officials remain concerned that Saudis continue to fund Al Qaeda and other terrorist organizations."[1103]   That same year, Congress enacted legislation which found that "Saudi Arabia has an uneven record in the fight against terrorism, especially with respect to terrorist financing," and required the U.S. Government to develop a long-term strategy for working with Saudi Arabia to combat terrorist financing.[1104] On the sixth anniversary of the 9/11 attack, Treasury Under Secretary Levey said in a televised interview on terrorist financing: "[I]f I could somehow snap my fingers and cut off the funding from one country, it would be Saudi Arabia."[1105]

In 2008, the U.S. State Department issued the long-term strategy required by the 2007 law.[1106]   The strategy identified goals and "performance targets" to track progress in strengthening collaboration with Saudi Arabia to clamp down on terrorist financing.  In April 2008, when questioned during a Senate hearing, Treasury Under Secretary Levey testified that, while Saudi Arabia had taken strong action against terrorists operating within its borders and was cooperating with the United States on an operational level, it was not working as hard to prevent funds from flowing to terrorists outside of its borders: "Saudi Arabia today remains the location from which more money is going to terror groups and the Taliban – Sunni terror groups and the Taliban – than from any other place in the world."[1107]

In 2009, a report prepared for Congress by the U.S. Government Accountability Office (GAO) reviewed both the State Department's long-term strategy and Saudi anti-terrorism efforts since 2005.  GAO concluded: "U.S. and Saudi officials report progress on countering terrorism and its financing within Saudi Arabia, but noted challenges, particularly in preventing alleged funding for terrorism and violent extremism outside of Saudi Arabia."[1108]   GAO wrote:

> "U.S. officials remain concerned about the ability of Saudi individuals and multilateral charitable organizations, as well as other individuals visiting Saudi Arabia, to support terrorism and violent extremism outside of Saudi Arabia.  U.S. officials also noted that limited Saudi enforcement capacity and terrorist financiers' use of cash couriers pose challenges to Saudi efforts to prevent financial support to extremists."[1109]

GAO also noted that certain performance targets set by the State Department had been dropped in 2009, such as the establishment of a Saudi Commission on Charities to oversee actions taken by Saudi charities abroad as well as certain regulations of cash couriers.[1110]   GAO recommended that the United States reinstate the dropped performance targets to prevent the flow of funds

---

[1103] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, in the summary.

[1104] See Section 2043(c), Implementing Recommendations of the 9/11 Commission Act, P.L. 110-53 (8/3/2007).

[1105] "U.S.: Saudis Still Filling Al Qaeda's Coffers," Brian Ross, ABC News (9/11/ 2007).

[1106] "U.S. Strategy Toward Saudi Arabia, Report Pursuant to Section 2043(c) of the Implementing Recommendations of the 9/11 Commission Act," U.S. Department of State (1/30/2008).

[1107] Stuart Levey testimony before Senate Committee on Finance, "Anti-Terrorism Financing: Progress Made and Challenges Ahead," (4/1/2008).

[1108] "Combating Terrorism: U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 1.

[1109] Id. at 29.

[1110] Id. at 15, 33.

from Saudi Arabia "through mechanisms such as cash couriers, to terrorists and extremists outside Saudi Arabia."[1111]

Recently, Saudi Arabia won praise for its role in foiling a terrorist plan to smuggle a bomb onto an airline flight to the United States.[1112] The State Department's most recent annual International Narcotics Control Strategy Report contains no information about Saudi Arabia's anti-money laundering or terrorist financing efforts.[1113]

## C. Alleged Al Rajhi Links to Terrorism

In the ten years after the 9/11 attack in 2001, U.S. Government reports, criminal and civil legal proceedings, and media reports have alleged links between Al Rajhi family members and the Al Rajhi Bank to terrorist financing.  The alleged links include that some Al Rajhi family members were major donors to al Qaeda or Islamic charities suspected of funding terrorism, established their own nonprofit organizations in the United States that sent funds to terrorist organizations, or used Al Rajhi Bank itself to facilitate financial transactions for individuals or nonprofit organizations associated with terrorism.

Many of the suspicions regarding Al Rajhi Bank stem from 2002, when the name of its most senior official, Sulaiman bin Abdul Azis Al Rajhi, appeared on an internal al Qaeda list of financial benefactors, and when a network of Al Rajhi-related nonprofit and business ventures located in Virginia was subjected to search by U.S. law enforcement seeking to disrupt terrorist financing activities in the United States.

**Al Qaeda List of Financial Benefactors.**  The al Qaeda list of financial benefactors came to light in March 2002, after a search of the Bosnian offices of the Benevolence International Foundation, a Saudi based nonprofit organization which was also designated a terrorist organization by the Treasury Department, led to seizure of a CD-ROM and computer hard drive with numerous al Qaeda documents.[1114]  One computer file contained scanned images of several hundred documents chronicling the formation of al Qaeda.[1115]  One of the scanned documents contained a handwritten list of 20 individuals identified as key financial contributors

---

[1111] Id. at 3.

[1112] See, e.g., "International sting operation brought down underwear bomb plot," Los Angeles Times, Brian Bennett and Ken Dilanian (5/8/2012), http://latimesblogs.latimes.com/world_now/2012/05/underwear-bomb-plot.html.

[1113] 2012 International Narcotics Control Strategy Report, Volume II Country Database, U.S. Department of State, at 287-289.

[1114] See United States v. Enaam Arnaout, Case No. 02-CR-892 (USDC NDIL), "Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements," (1/6/2003),  http://fl1.findlaw.com/news.findlaw. com/wsj/docs/bif/usarnaout10603prof.pdf (hereinafter "Arnaout Evidentiary Proffer"), at 29.  See also 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 3; "Terrorism, 2002-2005," FBI report, at 12, http://www.fbi.gov/stats-services/publications/terrorism-2002-2005/terror02_05.pdf ("On August 18, 2003, Enaam Arnaout, the director of Benevolence International Foundation, was sentenced to 11 years in federal prison after pleading guilty on February 10, 2003, to terrorism-related racketeering conspiracy charges. Arnaout had been indicted on October 9, 2002, for conspiracy to fraudulently obtain charitable donations in order to provide financial assistance to al-Qa'ida and other organizations engaged in violence and terrorism.").

[1115] Arnaout Evidentiary Proffer, at 29.

to al Qaeda.[1116]  Osama bin Laden apparently referred to that group of individuals as the "Golden Chain."[1117]  In a report prepared for Congress, the Congressional Research Service explained:

"According to the Commission's report, Saudi individuals and other financiers associated with the Golden Chain enabled bin Laden and Al Qaeda to replace lost financial assets and establish a base in Afghanistan following their abrupt departure from Sudan in 1996."[1118]

One of the 20 handwritten names in the Golden Chain document identifying al Qaeda's early key financial benefactors is Sulaiman bin Abdul Aziz Al Rajhi, one of Al Rajhi Bank's key founders and most senior officials.[1119]

The Golden Chain document has been discussed in the 9/11 Commission's report, in Federal court filings, and civil lawsuits.[1120]  Media reports as early as 2004 noted that the al Qaeda list included the Al Rajhi name.[1121]  HSBC was clearly on notice about both the al Qaeda list and its inclusion of Sulaiman bin Abdul Aziz Al Rajhi.[1122]

**2002 Search Warrant.**  Also in March 2002, as part of Operation Green Quest, a U.S. Treasury effort to disrupt terrorist financing activities in the United States,[1123] U.S. law enforcement agents conducted a search of 14 interlocking business and nonprofit entities in Virginia associated with the SAAR Foundation, an Al Rajhi-related entity, and the Al Rajhi family.[1124]  Over 150 law enforcement officers participated in the search, generating widespread media coverage.[1125]  A law enforcement affidavit supporting the search warrant detailed

---

[1116] Id. at 30.

[1117] Id. at 30.  See also 2007 CRS Report on Saudi Arabia Terrorist Financing Issues," at footnote 6.  But see "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004)("Soon thereafter, a senior al Qaeda leader held by the Justice Department in New York confirmed the document's authenticity in an interview with the FBI, referring to it as the Golden Chain, U.S. government court filings say.").

[1118] 2007 CRS Report on Saudi Arabia Terrorist Financing Issues," at 3.

[1119] A copy of the Golden Chain document was provided as Exhibit 5 to the Arnaout Evidentiary Proffer.  Copies have also appeared on the Internet with English translations.  See, e.g.,"The Golden Chain," Wikipedia, http://en.wikipedia.org/wiki/The_Golden_Chain.

[1120] See The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States, (7/22/2004), at 55.  See also, e.g., Arnaout Evidentiary Proffer at 29-30; The Underwriting Members of Lloyd's Syndicate 3500 v. Saudi Arabia, Case 3:11-cv-00202-KRG (USDC WDPA), Civil Complaint (9/8/11), http://www.investigativeproject.org/documents/case_docs/1680.pdf, at 20.

[1121] See, e.g., "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004).

[1122] See, e.g., 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 2830874-879 (transmitting  2007 Wall Street Journal article to HBUS and requesting its response); 2/3/2010 email from HBUS Jon K. Jones to HBUS Ali S. Kazmy, "Islami Bank Bangladesh Ltd. – Poss SCC," OCC-PSI-00453499 ("Al-Rajhi Bank got [its] start as a money chaining network and (Chairman Suleiman al-Rajhi appeared on the 'Golden Chain' of wealthy investors who supported Osama bin Laden.)").

[1123] See "Operation Green Quest Overview," U.S. Customs and Border Protection press release (2/26/2002), http://www.cbp.gov/xp/cgov/newsroom/news_releases/archives/legacy/2002/22002/02262002.xml.

[1124] See "Affidavit in Support of Application for Search Warrant," In Re Searches Involving 555 Grove Street, Herndon, Virginia and Related Locations, (USDC EDVA), submitted by David Kane, Senior Special Agent, U.S. Customs Service (hereinafter "Kane affidavit"), at ¶¶ 3-4 (describing investigation).

[1125] See, e.g., "Raids Seek Evidence of Money Laundering," New York Times, Judith Miller (3/21/2002).

numerous connections between the targeted entities and Al Rajhi family members and related ventures.[1126]  The affidavit stated that over 100 active and defunct nonprofit and business ventures in Virginia were part of what it described as the "Safa Group,"[1127] which the United States had reasonable cause to believe was "engaged in the money laundering tactic of 'layering' to hide from law enforcement authorities the trail of its support for terrorists."[1128]

The SAAR Foundation is a Saudi-based nonprofit organization, founded by Sulaiman bin Abdul Aziz Al Rajhi in the 1970s, named after him, and used by him to support a variety of nonprofit endeavors, academic efforts, and businesses around the world.  In 1983, the SAAR Foundation formed a Virginia corporation, SAAR Foundation, Inc., and operated it in the United States as a tax-exempt nonprofit organization under Section 501(c)(3) of the U.S. tax code.[1129] In 1996, another nonprofit organization was incorporated in Virginia called Safa Trust Inc.[1130] These and other nonprofit and business ventures associated with the Al Rajhi family shared personnel and office space, primarily in Herndon, Virginia.  In 2000, SAAR Foundation Inc. was dissolved,[1131] but the Safa Trust continued to operate.

An affidavit filed by the United States in support of the search warrant alleged that the Safa Group appeared to be involved with providing material support to terrorism.  Among other matters, it alleged that members of the Safa Group had transferred "large amounts of funds … directly to terrorist-front organizations since the early 1990's," including a front group for the Palestinian Islamic Jihad-Shikaki Faction, a designated terrorist organization.[1132]  It also detailed a $325,000 donation by the Safa Trust to a front group for Hamas, another designated terrorist organization.[1133]  In addition, the affidavit expressed suspicion about a transfer of over $26 million from members of the Safa Group to two offshore entities in the Isle of Man.[1134]  The affidavit further alleged that "one source of funds flowing through the Safa Group [was] from the wealthy Al-Rajhi family in Saudi Arabia."[1135]

The search produced about 200 boxes of information which was then analyzed and used in other investigations and prosecutions, although neither the SAAR Foundation or Safa Trust has been charged with any wrongdoing.[1136]  In 2003, Abdurahman Alamoudi, who had worked for SAAR Foundation Inc. from 1985 to 1990, as executive assistant to its president,[1137] pled guilty to plotting with Libya to assassinate the Saudi crown prince and was sentenced to 23 years

---

[1126] See Kane affidavit throughout, but in particular ¶¶ 178-180.

[1127] Kane affidavit at ¶ 1 (page 6).

[1128] Kane affidavit at ¶ 5.

[1129] Kane affidavit at ¶ 132.

[1130] Kane affidavit at ¶¶ 135-136.

[1131] Kane affidavit at ¶ 132.  See also "Raids Seek Evidence of Money Laundering," New York Times, Judith Miller (3/21/2002)(stating that, "although officially dissolved," the SAAR Foundation had recently occupied the Virginia offices subject to search).

[1132] Kane affidavit at ¶ 3.

[1133] Kane affidavit at ¶¶ 10(g), 161.  Executive Order 12947 (1995).

[1134] Kane affidavit at ¶ ¶ 103-104.

[1135] Kane affidavit at ¶ 111 (emphasis in original omitted).

[1136] See In re Grand Jury Subpoena (T-112), 597 F.3d 189 (4th Cir. 2/24/2010), at 191-192.

[1137] See United States v. Alamoudi, (USDC EDVA)(9/30/2003), "Affidavit in Support of Criminal Complaint," submitted by Brett Gentrup, Special Agent with U.S. Immigration and Customs Enforcement, (hereinafter "Gentrup affidavit"), ¶ 29.

in jail.[1138]  He had also openly supported Hamas and Hezbollah, two terrorist organizations designated by the United States.[1139]  According to an affidavit supporting the criminal complaint against him, Mr. Alamoudi admitted receiving $340,000 in sequentially numbered $100 bills from Libya while in London,[1140] and planned "to deposit the money in banks located in Saudi Arabia, from where he would feed it back in smaller sums into accounts in the United States."[1141] According to the affidavit, he also admitted involvement in similar cash transactions involving sums in the range of $10,000 to $20,000.[1142]

The documents seized in the 2002 search were returned after about 18 months, but in 2006, were sought again through subpoenas issued by a Federal grand jury in Virginia.[1143]  The Al-Rajhi related business and nonprofit ventures initially refused to re-supply the documents, then turned them over after a court imposed civil contempt fines totaling $57,000.[1144]  The Al Rajhi group then engaged in a four-year, unsuccessful court battle to nullify the fines.[1145]  In addition, in 2004, Al Rajhi Bank filed a defamation lawsuit against the Wall Street Journal for a 2002 article describing how Saudi Arabia was monitoring certain accounts due to terrorism concerns.[1146]  In 2004, the lawsuit settled; the Wall Street Journal did not pay any damages.  It also published a letter from the bank's chief executive,[1147] and its own statement that the newspaper "did not intend to imply an allegation that [Al Rajhi Bank] supported terrorist activity, or had engaged in the financing of terrorism."[1148]

**2003 CIA Report.**  While the widely publicized 2002 search fueled suspicions about Al Rajhi Bank's association with terrorist financing, a 2003 CIA report, discussed in a news article in 2007, provided another basis for concerns about the bank.

In 2003, the U.S. Central Intelligence Agency (CIA) issued a classified report entitled, "Al Rajhi Bank: Conduit for Extremist Finance."[1149]  According to Wall Street Journal reporter, Glenn Simpson, this CIA report concluded:  "Senior Al Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."[1150]  A later civil lawsuit, filed in 2011, provided a longer quotation from the same CIA report as follows:

"Islamic extremists have used Al-Rajhi Banking & Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they

---

[1138] See "Abdurahman Alamoudi Sentenced to Jail in Terrorism Financing Case," press release prepared by U.S. Department of Justice (10/15/2004).
[1139] See Gentrup affidavit at ¶ 35.
[1140] Gentrup affidavit at ¶¶ 39, 43
[1141] Gentrup affidavit at ¶ 44.
[1142] Gentrup affidavit at ¶ 45.
[1143] See In re Grand Jury Subpoena (T-112), 597 F.3d 189 (4th Cir. 2/24/2010).
[1144] Id.
[1145] Id.  See also "A Court Sheds New Light on Terror Probe," The New York Sun, Joseph Goldstein (3/24/2008).
[1146] The article was "Saudis Monitor Key Bank Accounts For Terror Funding at U.S. Request," Wall Street Journal, James Dorsey (2/6/2002), http://online.wsj.com/article/SB109813587680048521.html.
[1147] "Al Rajhi Bank's Statement on Journal's  Article," Wall Street Journal, Abdullah Sulaiman Al Rajhi (10/19/2004), http://online.wsj.com/article/SB109813521879148492.html.
[1148] HSBC Financial Intelligence Group Report of Findings on Al Rajhi Bank, HSBC OCC 7519413 (12/13/2004).
[1149] "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.
[1150] Id.

find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound.  Senior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank.  Reporting indicates that senior al-Rajhi family members control the bank's most important decisions and that ARABIC's princip[al] managers answer directly to Suleiman. The al-Rajhis know they are under scrutiny and have moved to conceal their activities from financial regulatory authorities."[1151]

According to the same Wall Street Journal article by Glenn Simpson, the 2003 CIA report alleged that, in 2000, Al Rajhi Bank couriers "delivered money to the Indonesian insurgent group Kompak to fund weapons purchases and bomb-making activities."[1152]  The report also allegedly claimed that in 2002, one year after the 9/11 attacks, the bank's managing director ordered the Al Rajhi Bank's board "to explore financial instruments that would allow the bank's charitable contributions to avoid official Saudi scrutiny."[1153]  The 2003 CIA report allegedly stated further that extremists "ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen" to use Al Rajhi Bank.[1154]

**2005 Al Haramain Prosecution.**  A third source of suspicion regarding Al Rajhi Bank's possible links to terrorism arose from a 2005 Federal indictment of al-Haramain Islamic Foundation Inc. and two of its senior officials.  Al-Haramain Islamic Foundation is a Saudi-based nonprofit organization that, in 2005, operated in more than 50 countries around the world.[1155]  Beginning in 2002, the United States designated multiple branches of the Foundation as terrorist organizations.[1156]  After freezing the assets of two such branches for "diverting charitable funds to terrorism," a U.S. Treasury Department press release stated:  "The branch offices of al Haramain in Somalia and Bosnia are clearly linked to terrorist financing."[1157]  In 2004, a Treasury Department statement called al-Haramain Foundation "one of the principal Islamic NGOs [Non-Governmental Organizations] providing support for the Al Qaida network and promoting militant Islamic doctrine worldwide."[1158]  That same year, the United States added the U.S. branch of the organization to the SDN list for acting as  an "underwrit[er] of terror."[1159]  The Saudi government issued a similar 2004 designation and ordered the al-

---

[1151] The Underwriting Members of Lloyd's Syndicate 3500 v. Saudi Arabia, Case 3:11-cv-00202-KRG (USDC WDPA), Civil Complaint (9/8/2011), http://www.investigativeproject.org/documents/case_docs/1680.pdf (hereinafter "Lloyd's lawsuit"), at ¶ 370.

[1152] "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/6/2007), http://online.wsj.com/article/SB118530038250476405.html.

[1153] Id.

[1154] Id.

[1155] United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-CR-60008-HO (USDC Oregon) Indictment (2/17/2005), at ¶ B.

[1156] See "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001).

[1157] 3/11/2002 "Designations of Somalia and Bosnia-Herzegovina Branches of Al-Haramain Islamic Foundation," U.S. Treasury Department, http://www.fas.org/irp/news/2002/03/dot031102fact.html.

[1158] "Treasury Announces Joint Action with Saudi Arabia Against Four Branches of al-Haramain In The Fight Against Terrorist Financing," U.S. Treasury Department press release No. JS-1108 (1/22/2004), http://www.treasury.gov/press/releases/js1108.htm.

[1159] See Executive Order No. 13,224 (2004); "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release (11/9/2004).

Haramain Islamic Foundation to be dissolved.[1160]   In 2008, however, Treasury noted that, despite the Saudi government's action, the organization's leadership appeared to have reconstituted itself under a new name and continued to operate.[1161]

In the United States, representatives of the al-Haramain Islamic Foundation formed, in 1999, an Oregon corporation named al-Haramain Islamic Foundation, Inc. which set up offices in Ashland, Oregon.[1162]   The corporation was operated as a nonprofit organization under Section 501(c)(3) of the U.S. tax code.[1163]   In 2004, the Office of Foreign Assets Control (OFAC) at the Treasury Department deemed al-Haramain Islamic Foundation Inc. in Oregon a "Specially Designated Global Terrorist Entity."[1164]   In 2005, the United States indicted the Foundation and two of its senior officials, Pirouz Sedaghaty and Soliman Al-Buthe, who was later designated by the United States as a terrorist financier.[1165]   Since both men were out of the country when the indictment was filed, the case was dormant for two years.[1166]   In 2007, Mr. Sedaghaty returned to the United States and was arrested at an airport.[1167]   In 2010, he stood trial, was convicted of two felonies, and sentenced to nearly three years in prison.[1168]   In the incident that led to his conviction, he and Mr. Al-Buthe used funds from an Egyptian donor to purchase $130,000 in U.S. travelers cheques from a bank in Oregon; Mr. Al-Buthe then traveled to Saudi Arabia and, in 2000, cashed the travelers cheques at Al Rajhi Bank; the money was then smuggled to violent extremists in Chechnya.[1169]

Al Rajhi Bank's role in the events that formed the basis for the prosecution attracted media attention in 2005, when the indictment was filed; in 2007, when Mr. Sedaghaty was arrested; and in 2010, when the trial took place.   Over the years, it became public that Mr. Al-Buthe, a designated terrorist financier, had been a client of Al Rajhi Bank in Saudi Arabia in

---

[1160] See, e.g., 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 19.

[1161] See "Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 35.

[1162] See United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005), at ¶ B.

[1163] Id.

[1164] See Executive Order No. 13224 (2004); "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release (11/9/2004); Al Haramain Islamic Foundation Inc. v. U.S. Dep't of Treasury, 660 F.3d 1019, 1023 (9th Cir. 2011).

[1165] See United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-CR-60008-HO (USDC Oregon) Indictment (2/17/2005).  The case was featured in the U.S. State Department's annual report on money laundering issues.  See 2005 International Narcotics Control Strategy Report, Volume II, "Money Laundering and Financial Crimes," U.S. State Department, at 16.  See also "U.S.-Based Branch of Al Haramain Foundation Linked to Terror," U.S. Treasury Department press release No. JS-1895 (9/9/2004); "Tax Case Ends Against Charity," Les Zaitz, The Oregonian (8/5/2005).

[1166] Because neither individual was in the United States, the prosecution later dropped the Foundation from the case, to prevent the case from proceeding in a piecemeal fashion.  See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (1/19/2010), at 5.

[1167] Id.

[1168] "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1.

[1169] Id.

2000,[1170] as had the al-Haramain Islamic Foundation, later designated a terrorist organization.[1171] In 2007, a Wall Street Journal article reported that Al Rajhi Bank had maintained at least 24 accounts for the al-Haramain Islamic Foundation and handled unusual transactions for it.[1172]  In January 2010, after the United States served an administrative subpoena on Al Rajhi Bank to obtain authenticated bank documents for use in the al-Haramain Foundation criminal trial, the bank refused to produce them and filed a motion in court to quash the subpoena,[1173] leading to media reports that it was refusing to cooperate with a terrorist financing prosecution.[1174]

**Links to Suspect Banks.**  In addition to the Golden Chain document, the U.S. search of Al-Rajhi related businesses and nonprofits in the United States, and the al Haramain Foundation prosecution, still another source of concern about Al Rajhi Bank involves its alleged links to other banks suspected of financing terrorism.

In 2011, a civil lawsuit filed by an insurance syndicate against Saudi Arabia and others seeking to recover insurance payments made after the 9/11 terrorist attack discussed two of those suspect banks, Bank al Taqwa and Akida Bank Private Ltd.[1175]  Both banks have been deemed by the United States as Specially Designated Global Terrorist Entities.[1176]  Regarding Bank al Taqwa, the lawsuit noted that two individuals who were former executives at Bank al Taqwa, Ibrahim Hassabella and Samir Salah, were also associated with the SAAR Foundation.[1177]  Mr. Hassabella was a former secretary of al Taqwa Bank and a shareholder of SAAR Foundation Inc. Mr. Saleh was a former director and treasurer of the Bahamas branch of al Taqwa Bank, and president of the Piedmont Trading Corporation which was part of the SAAR network.   The U.S. Treasury Department has stated:  "The Al Taqwa group has long acted as financial advisers to al Qaeda, with offices in Switzerland, Lichenstein, Italy and the Caribbean."[1178]  Regarding Akida

---

[1170] See, e.g., Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (filed 1-19-10), at 6.

[1171] See, e.g., "U.S. Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.  See also 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 3391185 (transmitting the article to HBUS); email from HBUS Ketley to HBUS colleagues, Saudi's," HSBC OCC 3391262 (sharing the article within HBUS).

[1172] "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.

[1173] See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Memorandum of Points and Authorities In Support of Petitioner's Motion to Quash USA Patriot Act Subpoena (1/19/2010).  This case was later closed as "moot."  See Order Dismissing Action As Moot (3/2/2010) ("It is hereby ordered that this action is dismissed as moot in light of the ruling issued on February 26, 2010, by Judge Michael R. Hogan of the U.S. District Court for the District of Oregon in United States v. Sedaghaty…granting the government's motion to compel petitioner Al-Rajhi Banking and Investment Corp.'s compliance with an administrative subpoena.") (emphasis in original omitted).

[1174] See, e.g., "Saudi Bank Refuses to Cooperate in U.S. Investigation into Terrorist Financiers," For The Record - The IPT Blog (1/26/2010), http://www.investigativeproject.org/1753/saudi-bank-refuses-to-cooperate-in-us.

[1175] See Lloyd's lawsuit at ¶¶ 459-460.  This lawsuit was withdrawn 11 days after being filed, with no prejudice against its re-filing in the future.  See Lloyd's lawsuit, Notice of Voluntary Dismissal, Docket document 5, 9/19/2011.

[1176] See "The United States Designates Twenty-Five New Financiers of Terror," U.S. Treasury Department press release (8/29/2002), http://www.treasury.gov/press-center/press-releases/Pages/po3380.aspx.  See also E.O. 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001); Kane affidavit at ¶ 112.

[1177] Lloyd's lawsuit at ¶ 459.

[1178] Statement by Treasury Secretary Paul O'Neill (11/7/2001).

Bank, the lawsuit complaint alleged that Sulaiman bin Abdul Aziz Al Rajhi was "on the board of directors of Akida Bank in the Bahamas" and that "Akida Bank was run by Youssef Nada, a noted terrorist financier."[1179]

As explained below, Al Rajhi Bank was also associated with Islami Bank Bangladesh Ltd., which was located in a country at high risk for money laundering, provided an account to a Bangladeshi accused of involvement with a terrorist bombing, and had been fined three times for violating AML requirements in connection with providing bank services to "militants."[1180] HSBC's own research indicated that the Al Rajhi group held about one-third of the bank's shares.  In addition, Al Rajhi Bank provided a correspondent account to Social Islami Bank, a Bangladesh-based bank whose largest single shareholder for many years was the International Islamic Relief Organization, which was designated by the United States in 2006, as a terrorist organization.[1181]  A second shareholder was the precursor to the Benevolence Islamic Foundation, also later designated by the United States as a terrorist organization.

**Suspect Bank Clients.**  A final source of concern about Al Rajhi Bank involves accounts it provided to specific clients linked to terrorism.  The accounts provided to the al-Haramain Islamic Foundation and Soliman Al-Buthe, both designated by the United States as linked to terrorism, have already been discussed.  Another example is the International Islamic Relief Organization (IIRO) which, as mentioned earlier, is a Saudi-based nonprofit organization which was added to the SDN list by the United States for "facilitating fundraising for Al Qaida and affiliated terrorist groups".[1182]  In 2003, HSBC's internal Financial Intelligence Group (FIG) raised questions about the IIRO; in 2006 a FIG report noted that the IIRO had been linked to Al Qaeda and other terrorist groups, plots to assassinate President Bill Clinton and the Pope, attacks on the Brooklyn Bridge and Lincoln Tunnel, and the 1993 attack on the World Trade Center.[1183]  According to a CRS report, press reports indicated that, until at least December 2004, the IIRO had arranged for donors to send donations directly to accounts it held at Al Rajhi Bank, advertizing the accounts in various publications.[1184]  In addition, the Lloyd's lawsuit alleged that

---

[1179] Lloyd's lawsuit at ¶ 459.  Youssef Nada was designated as a terrorist financier by the United States in November 2001.  See "Recent OFAC Actions," U.S. Department of the Treasury, (11/7/2001), http://www.treasury.gov/resource-center/sanctions/OFAC-Enforcement/Pages/20011107.aspx.

[1180] See Subsection I(2), below.

[1181] See Subsection I(2), below.  See also "Islamic Charity Charged with Terrorist Financing," U.S. Justice Department, (1/16/2008), http://www.justice.gov/usao/mow/news2008/iara.ind2.htm.

[1182] See 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted in 8/3/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh," HSBC OCC 3259936.  See also 8/3/2006 "Treasury Takes Additional Measures to Combat Iranian WMD Proliferation Iranian Nuclear & Missile Firms Targeted," Treasury press release, http://www.treasury.gov/press-center/press-releases/Pages/hp45.aspx.

[1183] 8/4/2006 FIG Report on Findings (Update) for Social Investment Bank Limited, OCC-PSI-00823818 at 12.; 11/2003 FIG Report on Findings for Social Investment Bank, Ltd., OCC-PSI-00823818, at 18.  See also In Re September 11th Litigation, C.A. 04-7280 (S.D.N.Y. 2010), at ¶ 371.

[1184] See, e.g., 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, at 9, footnote 35 (citing International Islamic News Agency (Jeddah), "IIRO Distributes Aid to Falluja War Victims," (12/21/2004), http://www.saudiembassy.net/2003News/News/RelDetail.asp?cIndex=737).  See also Lloyd's lawsuit at ¶¶ 445, 447 (alleging IIRO advertised sending donations to its accounts at Al Rajhi Bank, Accounts No. 77700-77709, in its own publications, and Al Rajhi Bank advertised sending donations to IIRO accounts at the bank in the Al Igatha Journal in several countries).

Al Rajhi Bank made or arranged for large donations to the IIRO.[1185]  Sulaiman bin Abdul Aziz
Al Rajhi, the most senior official at Al Rajhi Bank, is also alleged to have been an officer of
IIRO.[1186]

Al Rajhi Bank gained notoriety as well for providing banking services to several of the
hijackers in the 9/11 terrorist attack, including Abdulaziz al Omari who was aboard American
Airlines Flight 11.  A civil lawsuit described the bank's involvement with him as follows:

> "[M]oney was funneled to the Hamburg, Germany al Qaeda cell through the Al Rajhi
> Bank to businessmen Mahmoud Darkazanli and Abdul Fattah Zammar, who in turn
> provided the al Qaeda cell of September 11th hijackers with financial and logistical
> support.  Through Al Rajhi Bank, September 11th hijacker Abdulaziz al Omari received
> funds into his Al Rajhi Bank Account Number ….  Al Omari frequently utilized a credit
> card drawn on Al Rajhi Bank in the planning of the attacks.  On September 7, 2001, four
> days before the 9/11 attacks, al Omari received a wire transfer from Al Rajhi Bank,
> Buraidah Branch, Jeddah, Saudi Arabia …."[1187]

Taken together, the information – the Al Qaeda Golden Chain document, the 2002 search
of Al Rajhi-related entities in Virginia, the 2003 CIA report, the 2005 al Haramain Foundation
indictment and trial, the 2007 media reports, the 2010 refusal to provide bank documents in a
terrorist-financing trial, and the multiple links to suspect banks and accountholders – present an
unusual array of troubling allegations about a particular financial institution.  When asked about
these matters, Al Rajhi Bank has repeatedly condemned terrorism and denied any role in
financing extremists.[1188]  In addition, despite all the allegations, neither the bank nor its owners
have ever been charged in any country with financing terrorism or providing material support to
terrorists.

HSBC was fully aware of the suspicions that Al Rajhi Bank and its owners were
associated with terrorist financing, describing many of the alleged links in the Al Rajhi Bank
client profile.[1189]  On one occasion in 2008, the head of HSBC Global Banknotes Department

---

[1185] Lloyd's lawsuit at ¶ 446-448 (alleging "Al Rajhi Bank collected charitable donations on behalf of Sanabel al
Kheer ('Seeds of Charity'), the financial/investment arm of the IIRO, depositing the donations into Sanabel's Al
Rajhi Bank account no. 77707. …  Under the guise of IIRO funds labeled and designated for purposes such as 'war
and disaster' (Account Number for Immigrants, Refugees, and Victims of Disasters: 77702) or 'sponsor a child'
(IIRO Account Number of Deprived Children: 77704), charitable organizations such as the IIRO use banks like Al
Rajhi Bank to gather donations that fund terrorism and terrorist activities. …  Al Rajhi Bank also handled IIRO
"charitable" contributions intended to benefit suicide bombers by directing Al Igatha Journal advertisements … in
Somalia, Sri Lanka, India, and the Philippines under IIRO Account number 77709 …. On February 17, 1994, Al
Rajhi Bank made a $533,333 donation to the Saudi High Commission ('SHC') in response to a call for donations for
Bosnia and Somalia. In August 1995, Al Rajhi Bank contributed $400,000 to the SHC which was collecting
donations for Bosnia during a 12-hour telethon. The donation was identified by the Arabic newspaper Asharq al
Awsat.").

[1186] See, e.g., Lloyd's lawsuit at ¶ 9.

[1187] Lloyd's lawsuit at ¶ 449.

[1188] See, e.g., "Al Rajhi Bank's Statement on Journal's  Article," Wall Street Journal, Abdullah Sulaiman Al Rajhi
(10/19/2004), http://online.wsj.com/article/SB109813521879148492.html; "Al Rajhi Bank responds to Wall Street
Journal report," distributed by PR Newswire, (10/24/2003),
http://www.thefreelibrary.com/Al+Rajhi+Bank+responds+to+Wall+Street+Journal+report.-a0109218136.

[1189] See, e.g., 2010 HBUS KYC Profile of Al Rajhi Bank, at 6, 11.

told a colleague: "In case you don't know, no other banknotes counterparty has received so much attention in the last 8 years than Alrajhi."[1190]  Despite, in the words of the KYC client profile, a "multitude" of allegations, HSBC chose to provide Al Rajhi bank with banking services on a global basis.

## D. HSBC Relationship with Al Rajhi Bank

In the United States, Al Rajhi Bank first became a client of Republic Bank of New York during the 1970s; after Republic Bank of New York was purchased by HSBC, Al Rajhi Bank became a client of HSBC Bank United States (HBUS).[1191]  HSBC also had longstanding relationships with Al Rajhi Bank and other Al Rajhi-related businesses in other parts of the world, including the Middle East, Europe, and the Far East, which HSBC had developed separately from the relationship it assumed from Republic Bank of New York in the United States.[1192]  HSBC provided Al Rajhi Bank with a wide range of banking services, including wire transfers, foreign exchange, trade financing, and asset management services.[1193]  In addition, in 1998, HSBC Group established "HSBC Amanah," a "global Islamic financial services division" designed to "serve the particular needs of Muslim communities" in compliance with Islamic law, and provided those banking services to Al Rajhi Bank and other Al Rajhi-related businesses.[1194]

In the United States, a key service was supplying Al Rajhi Bank with large amounts of physical U.S. dollars, through the HBUS U.S. Banknotes Department.  The physical delivery of U.S. dollars to Al Rajhi Bank was carried out primarily through the London branch of HBUS, often referred to internally as "London Banknotes."  HBUS records indicate that the London Banknotes office had been supplying U.S. dollars to Al Rajhi Bank for "25+ years."[1195]  In addition to the London branch, HBUS headquarters in New York opened a banknotes account for Al Rajhi Bank in January 2001.[1196]  The U.S. dollars were physically delivered to Al Rajhi Bank in Saudi Arabia.[1197]

In January 2005, a little more than three years after the 9/11 terrorist attack on the United States, HBUS decided to end its relationship with Al Rajhi Bank due to terrorist financing concerns, as explained further below.[1198]  Nearly two years later, in December 2006, the relationship was reactivated and continued for another four years, until 2010, when it was ended

---

[1190] 5/2008 email from Christopher Lok to Gary C H Yeung, , "KYC Approval needed for: AL RAJHI BANKING & INVESTMENT CORP," OCC-PSI-00155690.
[1191] See 2010 HBUS KYC Profile of Al Rajhi Bank, at 4.
[1192] Id.
[1193] See, e.g., 2010 KYC Profile of Al Rajhi Bank at 8; 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, at HSBC OCC 0659988-997, at 8.
[1194] See HSBC website, "About HSBC Amanah," http://www.hsbcamanah.com/amanah/about-amanah.
[1195] 2010 HBUS KYC Profile of Al Rajhi Bank, at 3, 5.  The London Banknotes office supplied U.S. dollars to both Al Rajhi Bank and, until its account closed in 2005, Al Rajhi Trading Establishment.  Another HBUS branch office in Hong Kong also did banknotes business with Al Rajhi Bank beginning in 2009 .  See HBUS "Know Your Customer Profile – Banknote Information," for the Hong Kong office regarding Al Rajhi Bank (10/29/2010), HSBC-PSI-PROD-0102782-784, at 1.
[1196] 2010 HBUS KYC Profile of Al Rajhi Bank, at 2, 3.
[1197] Id. at 2.
[1198] Id.

once more due to a group-wide decision by HSBC to exit the U.S. banknotes business.  HBUS closed its banknotes account with Al Rajhi Bank in October 2010.[1199]

From 2000 to 2010, HSBC assigned a series of Global Relationship Managers to the Al Rajhi Bank account.  They include Shariq Siddiqi[1200] and Shamzani Bin Md Hussain.[1201]  In 2005, the Relationship Manager for KYC approval purposes was Beth Fisher.  From 2005 to 2010, the head of the HSBC Global Banknotes business was Christopher Lok, who was based in New York; the regional Banknotes head for the Americas was Gyanen Kumar, who was based in New York; and the regional Banknotes head in charge of the London Banknotes office was Stephen Allen.[1202]

HSBC classified Al Rajhi Bank as a "Special Category of Client" (SCC), its highest risk designation.[1203]  This designation was due in part to the bank's location in Saudi Arabia, which HSBC classified as a high risk country.  In addition, HSBC noted that the bank was owned in part by a Politically Exposed Person (PEP), Abdullah Abdul Al Rajhi, who was a major shareholder, a member of the bank's board of directors, and a member of the Northern Borders Provincial Council in Saudi Arabia.[1204]  Al Rajhi Bank was one of only a handful of bank clients that HSBC had classified as SCC clients.[1205]

### E.  Al Rajhi Trading Establishment

In addition to Al Rajhi Bank, HSBC provided accounts to Al Rajhi Trading Establishment, a money exchange business based in Saudi Arabia and owned by Rajhi family members.  This account closed in 2005, when the business, along with seven others, merged into a new bank, Al Bilad Bank in Saudi Arabia.

According to HSBC internal documents, Al Rajhi Trading Establishment opened two accounts in 1994, with Republic Bank of New York before its purchase by HSBC.[1206]  One account processed payments, such as from travelers cheques or money orders, while the other handled foreign currency exchange.  According to HSBC documents, Republic Bank of New York had a policy of not dealing with money exchange businesses, but had made an exception for Al Rajhi Trading Establishment due to a "long relationship with the bank, their knowledge of the stiff penalties (death) for drug trafficking and money laundering within the country and the general good reputation of exchange houses in Saudi Arabia."[1207]  After HSBC purchased

---

[1199] Id. 1, 15.

[1200] 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 7.

[1201] 2010 HBUS KYC Profile of Al Rajhi Bank, at 4.

[1202] 11/2006 HBUS "Banknotes Trading A Global Reach Organizational Chart As of November 2006," OCC-PSI-0000050, at 5.

[1203] 2010 HBUS KYC Profile of Al Rajhi Bank, at 1.

[1204] Id. at 1, 3.

[1205] Id. at 3.[1206] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.

[1206] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.

[1207] Id.

Republic Bank of New York, the Al Rajhi Trading Establishment accounts were handled by the HSBC International Private Banking Department.[1208]

In 2002, after the 9/11 attack on the United States, the International Private Banking Department asked to transfer the two accounts to HSBC's Institutional Banking Department in Delaware which had superior ability to monitor account activity.[1209]   In connection with the transfer, HBUS banker Joseph Harpster wrote:

> "The most recent concern arose when three wire transfers for small amounts ($50k, $3k and $1.5k) were transferred through the account for names that closely resembled names, not exact matches, of the terrorists involved in the 9/11 World Trade Center attack. … The profile of the main account reflects a doubling of wire transfer volume since 9/01, a large number of travelers checks but with relatively low value and some check/cash deposits.  According to the account officer, traffic increased because they have chosen to send us more business due to their relationship with Saudi British Bank[1210] and the added strength of HBC versus Republic. …  Maintaining our business with this name is strongly supported by David Hodghinson of [Saudi British Bank] and Andre Dixon, Deputy Chairman of [HSBC Bank Middle East].  Niall Booker and Alba Khoury [of HBUS] also support."[1211]

Douglas Stolberg head of Commercial and Institutional Banking (CIB) at HBUS forwarded the email to Alexander Flockhart, then a senior executive in Retail and Commercial Banking at HBUS, noting: "As we discussed previously, Compliance has raised some concerns regarding the ongoing maintenance of operating/clearing accounts for Al Rajhi group." He forwarded recommendations on how to handle the account:  "Retain [International Private Banking] as the relationship manager domicile for continuity purposes, and as we understand there is interest in further developing private banking business with family members.  … Domicile the actual accounts with Delaware where HBUS's most robust account screening capabilities reside."  His email also stated:

> "[T]his has become a fairly high profile situation.  Compliance's concerns relate to the possibility that Al Rajhi's account may have been used by terrorists.  If true, this could potentially open HBUS up to public scrutiny and /or regulatory criticism.  SABB [Saudi British Bank] are understandably keen to maintain the relationships.  As this matter concerns primarily reputational and compliance risks, we felt it appropriate for SMC [Senior Management Committee] members to be briefed … so that they may opine on the acceptability of the plan.  Please advise how you would prefer us to proceed."[1212]

Mr. Harpster reported a week later that Mr. Flockhart had decided to transfer the accounts to HBUS in the Delaware office.

---

[1208] Id.

[1209] Id.

[1210] HSBC owned Saudi British Bank.  See "Doing Business in Saudi Arabia," an HSBC publication, http://www.hsbc.com/1/content/assets/business_banking/1100511_hsbc_doing_business_in_saudi.pdf.

[1211] March 2002 email chain among HBUS personnel, "Al Rajhi Trading establishment," OCC-PSI-00381727, at 3.

[1212] Id. at 2-3.

Three years later, in 2005, eight Saudi money exchangers, including Al Rajhi Trading Establishment, were merged into a new Al Bilad Bank in Saudi Arabia.[1213] The HSBC accounts for Al Rahji Trading Establishment closed in November 2005.[1214]

## F. 2005: Decision to Sever Ties with Al Rajhi Bank

In 2005, despite its longstanding relationship with Al Rajhi Bank, HSBC Group Compliance decided that its U.S.-based businesses should sever ties with Al Rajhi Bank due to terrorist financing concerns.[1215]   To carry out this decision, on January 28, 2005, Teresa Pesce, head of HBUS AML Compliance, sent an email to HBUS personnel entitled, "Al Rahji Trading/Al Rahji Banking":

> "As some of you may know, the above named clients have been under evaluation by US and Group Compliance based, among other things, on relationships maintained with entities/countries on the OFAC list.   Additionally, US law enforcement has placed these entities under scrutiny.   After much consideration, Group Compliance has recommended that the US businesses sever ties with these clients based on the current regulatory environment and the interest of US law enforcement.   Accordingly, I will not approve customer profiles for or transactions with these entities.   Please make appropriate arrangements.   I am available to answer any questions you might have."[1216]

At the time the email was issued, Al Rajhi Bank had not been indicted, designated as a terrorist financier, or sanctioned by any country, including the United States.   HSBC Group Compliance based its decision on concerns that the bank had relationships "with entities/countries on the OFAC list," the bank was of "interest" to U.S. law enforcement which had placed it "under scrutiny," and severing the relationship was called for in light of the "current regulatory environment."[1217]

The 2005 decision was made several years after the 9/11 terrorist attack, as U.S. law enforcement and bank regulators directed increasing scrutiny to terrorist financing issues.   As discussed earlier, in 2004, the 9/11 Commission issued its report which included information on the role of Saudi Arabia in financing terrorism, described the "Golden Chain" of al Qaeda's financial benefactors, and noted that one of the hijackers had an account at Al Rajhi Bank. Congress held hearings on that report.   The media also disclosed in 2004, that Al Rajhi Bank's

---

[1213] See April 2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Trading Establishment, HSBC OCC 2725168-169.   Another Al Rajhi-related business, the Al Rajhi Commercial Foreign Exchange, was also one of the eight businesses that merged into Al Bilad Bank.   See 7/13/2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Commercial Foreign Exchange, HSBC OCC 2725167-168.

[1214] 4/12/12 HSBC legal counsel response to Subcommittee inquiry.

[1215] 2010 HBUS KYC Profile of Al Rajhi Bank, at 2 ("relationship exited and deactivated on 2 February 2005 due to TF issues").

[1216] 1/28/2005 email from HBUS Teresa Pesce to numerous HSBC colleagues, "Al Ra[jh]I Trading/Al Ra[jh]I Banking," HSBC OCC 1884218.

[1217]   When asked about this decision, David Bagley, the head of HSBC Group Compliance, told the Subcommittee that there was no single incident that led to the decision.   Subcommittee interview of David Bagley (5/10/2012).

most senior official was on the Golden Chain list.[1218]   In addition, 2004 saw the United States designate as terrorist organizations several Saudi-based nonprofit organizations that were also clients of Al Rajhi Bank, including the International Islamic Relief Organization and the al Haramain Foundation, adding them to the OFAC list of entities with which U.S. persons were prohibited from doing business.[1219]   U.S. prosecutors also intensified their investigation of al Haramain Foundation Inc., whose 2005 indictment would disclose that its senior officials had cashed $130,000 in U.S. travelers checks at Al Rajhi Bank in Saudi Arabia and used the money to support violent extremists in Chechnya.[1220]

On the regulatory front, in July 2004, this Subcommittee held hearings on how U.S. banks and U.S. bank regulators had failed to fully implement the tougher AML requirements enacted into law as part of the USA Patriot Act of 2001,[1221] highlighting Riggs Bank as an example.[1222]   Among other measures, the Patriot Act required U.S. financial institutions to establish AML programs, conduct special due diligence on correspondent accounts opened for foreign banks, and verify the identity of accountholders.[1223]   The law also deemed money laundering through foreign banks and the laundering of terrorism proceeds as criminal offenses in the United States.[1224]   These new provisions had given rise to new bank regulations, new examination requirements, and a new emphasis on the importance of AML controls.

HBUS' primary U.S. regulator, the OCC, scheduled an AML examination of the HBUS banknotes business to take place in 2005.[1225]   In December 2004, in anticipation of that examination, the HBUS Global Banknotes Department had completed a review of its Know Your Customer (KYC) client profiles.[1226]   In October 2004, the HSBC Global Relationship Manager for Al Rajhi Bank, Shariq Siddiqi, visited the bank and reviewed its KYC/AML procedures in detail.[1227]   Mr. Siddiqi praised the procedures and noted:  "The management

---

[1218] See, e.g., "Tangled Paths: A Sprawling Probe Of Terror Funding Centers in Virginia," Wall Street Journal, Glenn Simpson (6/21/2004).

[1219] "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or Support Terrorism," 66 FR 49079 (9/23/2001) (see Annex).

[1220] The U.S. Treasury Department was later quoted as saying Al Rajhi Bank maintained at least 24 accounts and handled unusual transactions for the al Haramain Foundation.  "US Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007), http://online.wsj.com/article/SB118530038250476405.html.

[1221] See Title III of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act) Act of 2001, P.L. 107-56 (10/26/2001).

[1222] "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act, Case Study Involving Riggs Bank," S.Hrg. 108-633 (July 15 2004).

[1223] See USA Patriot Act, §§ 312, 326, 352.

[1224] See USA Patriot Act, §§ 318, 376, 377.

[1225] See 3/8/2005 email from Daniel Jack, HBUS, to Denise Reilly and Alan Ketley in HBUS, "Re: KYC Deactivation Report for Banknotes in Feb-05," OCC-PSI-00169771 ("There has been a surge in KYC updates in the past few months due to clean-up/prep for OCC."); 6/20/2005 OCC Supervisory Letter on Global Banknote AML examination, OCC-PSI-00107505-510 (containing six Matters Requiring Attention by the bank related to AML deficiencies) [sealed exhibit].

[1226] See 1/4/2005 email from Daniel Jack, HBUS Legal Compliance, to HBUS KYC Account Managers, HBUS KYC Banknote Traders, and others, "KYC Status of Profiles for Banknotes by Office:  December 2004," HSBC OCC 2405588-589.

[1227] 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 3.

appeared fully cognizant of the reputational risks associated with terrorism financing, and confirmed Al Rajhi Bank's strong commitment to combat it."[1228]

Despite that endorsement of the bank's AML policies and procedures, HBUS AML Compliance did not approve the Al Rajhi Bank KYC profile, an action it took with respect to only a few clients out of more than 930 active client profiles reviewed.[1229]  The failure to approve the client profile meant that bank personnel were unable to do business with the client. HBUS AML Compliance Officer Alan Ketley circulated instructions on how to handle clients, including Al Rajhi Bank and Al Rajhi Trading Establishment, whose profiles had been "denied" by HBUS Compliance.  He explained that such clients must be given "10 days notice of trading termination unless a dispensation is obtained from the AML Director and an updated profile is approved by the AML Director within that 10 day period.  For current customers that 10 day clock will commence on December 7 (so December 17 will be the final day we will transact with them unless a dispensation is obtained.)"[1230]

On January 4, 2005, HBUS AML Compliance head Ms. Pesce sent an email to Daniel Jack, an HBUS AML Compliance Officer who often dealt with the London Banknotes office, instructing him to:  "[p]lease communicate that Group Compliance will be recommending terminating the Al Rahji relationship."[1231]  Mr. Jack inquired as to when that recommendation would be made.  She responded:

> "I expect to see an email from Susan Wright today.  She tells me that HBME [HSBC Bank Middle East] does not agree with Compliance and will not be terminating the relationship from the Middle East, but she/David B[agley] recommend that in light of US scrutiny, climate, and interest by law enforcement, we in the US sever the relationship from here."[1232]

Susan Wright was then the Chief Money Laundering Control Officer for the entire HSBC Group. She reported to David Bagley, head of the HSBC Group's overall Compliance Department.  The documents do not explain why HSBC Middle East disagreed with the decision or why it was allowed to continue its relationship with Al Rajhi Bank, when HSBC's Group Compliance had decided to sever the relationship between the bank and other HSBC affiliates due to terrorist financing concerns.

The decision to sever ties with Al Rajhi Bank was announced internally within HSBC on January 28, 2005.  The decision clearly affected some HSBC affiliates, such as HBUS and its

---

[1228] Id. at HSBC OCC 0659991.

[1229] 1/4/2005 email from Daniel Jack, HBUS Legal Compliance, to HBUS KYC Account Managers, HBUS KYC Banknote Traders, and others, "KYC Status of Profiles for Banknotes by Office:  December 2004," at HSBC OCC 2405588-589.  See also 3/7/2005 email from Daniel Jack to Alan Ketley and others, "Re: KYC Deactivation Report for Banknotes in Feb-05," OCC-PSI-00169771 (noting that Al Rajhi Bank was one of only two client profiles "deactivated for AML/KYC/Compliance Reasons").

[1230] 12/6/004 email from HBUS Alan Ketley to HSBC Christopher Lok, HBUS Stephen Allen, and others, "KYC Profiles – Impact of CO Denial," HSBC OCC 3185023-025.

[1231] 1/4/2005 email from Teresa Pesce to Daniel Jack, "KYC Status of Profiles for Banknotes by Office:  December 2004," HSBC OCC 2405588.

[1232] Id.

London Banknotes office which discontinued transactions with Al Rajhi Bank, but not others, such as HSBC Bank Middle East which continued doing business with Al Rajhi Bank and other Al Rajhi entities.[1233]   The Subcommittee asked but has received no explanation as to why the decision bound HSBC affiliates in the United States and Europe, but appeared to not apply to the Middle East.

Soon after the decision was announced in January 2005, HSBC Group Compliance began to narrow its scope.  On February 22, 2005, Paul Plesser, head of the HBUS Global Foreign Exchange Department, sent an email to a colleague asking whether, despite the HSBC Group Compliance decision, his office could continue to engage in foreign exchange trades with Al Rajhi Trading Establishment.[1234]   He was told by a trader from the Banknotes department: "For us is business as usual."[1235]   Mr. Plesser double-checked with HBUS AML Compliance officer Alan Ketley, asking in an email: "so I guess we are ok to continue trading?"[1236]   On March 16, 2005, Mr. Ketley affirmed that the trades could continue, forwarding an email from Ms. Pesce, head of HBUS AML Compliance, stating that the earlier HSBC Group decision no longer applied to Al Rajhi Trading:

> "Group has clarified the Al Ra[jh]i guidance issued last month.  They have evaluated Al Ra[jh]i Banking and Al Ra[jh]i Trading and now believe that the two are separated enough that relationships may be maintained with the latter but not with the former.  To be clear, recommendation is to sever with Banking only at this time."[1237]

Mr. Ketley commented:  "Looks like you're fine to continue dealing with Al Rajhi.  You'd better be making lots of money!"[1238]

In May 2005, four months after announcing the decision to sever ties with Al Rajhi Bank, HSBC Group Compliance backed down still further.  It announced that HSBC affiliates could re-establish business ties with Al Rajhi Bank, though subtly suggested that HBUS might not.  David Bagley, head of HSBC Group Compliance, announced the decision in a May 23 email sent to HSBC personnel:

> "Having now received the updated KYC from Shariq Siddiqi and reviewed the previous information received from Group Securities I am pleased to confirm that we have revised our recommendation in relation to the above.

---

[1233] See, e.g., 1/4/2005 email from Teresa Pesce to Daniel Jack, "KYC Status of Profiles for Banknotes by Office: December 2004," HSBC OCC 2405588.  See also, e.g., 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen, and others, "Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280496-497; 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher and Alan Ketley, "Al Rajhi Banking," HSBC OCC 3280505 (both emails indicating that, in late 2006, HSBC business with Al Rajhi Bank was "substantial," including through the "HSBC Amanah business").
[1234] 2/22/2005 email from Paul Plesser to Georges Atallah, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1235] 2/22/2005 email from Georges Atallah to Paul Plesser and others, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1236] 2/22/2005 email from Paul Plesser to Alan Ketley, "Al Ra[jh]i Trading/Al Ra[jh]i Banking," HSBC OCC 3111888.
[1237] 3/16/2005 email from Alan Ketley to Paul Plesser, "Fw: Al Ra[jh]I Guidance Clarified," HSBC OCC 3114022.
[1238] Id.

Accordingly we have lifted our recommendation against the commence or expansion of relationships with the above with immediate effect.[1239]  We will communicate this decision to HBEU [HSBC Europe] where I believe there are a number of pending applications.

Whilst we will advise HBUS CMP [Compliance] of the revised view within GHQ CMP [Group Headquarters Compliance] nevertheless I believe it will remain appropriate for HBUS CMP in conjunction with HBUS senior management to reach their own determination with regard to the expansion of business with Al Rajhi within the US. Although the revised view from GHQ CMP ought to be a material matter causing them to reconsider their position nonetheless, and particularly in the current US environment, I do not believe it is appropriate for us to seek to influence their determination one way or the other."[1240]

The effect of this decision was to allow HSBC affiliates to do business with Al Rajhi Bank if they chose, which meant HBUS Compliance had to determine for itself whether or not to re-establish ties with Al Rajhi.[1241]

### G. 2006:  HBUS Banknotes Account Reinstated

Although HBUS Compliance in the United States held out almost two years, after a concerted campaign by HBUS Banknotes personnel, it ended up following the lead of HSBC Group Compliance and restoring the Al Rajhi Bank account at HBUS in late 2006.  One precipitating event appears to have occurred in November 2006, when Al Rajhi Bank threatened to pull all business from HSBC, unless the U.S. banknotes services were restored.  Within a month, the account was reestablished.

The two HBUS bankers who spearheaded the effort to restore the Al Rajhi account were Christopher Lok, head of the HSBC Global Banknotes Department, working from New York, and Stephen Allen, head of the HBUS Banknotes branch in London.  For more than 20 years, the London office had supplied physical U.S. dollars to Al Rajhi Bank in Saudi Arabia, until forced to stop by the January 2005 decision.

When HSBC Group Compliance reversed the decision on Al Rajhi Bank for HSBC affiliates on May 23, 2005, HSBC Banknotes personnel expressed a desire to reopen their accounts with Al Rajhi Bank as well, while signaling a willingness to wait until the conclusion of

---

[1239] The new decision lifted the ban on relationships with both Al Rajhi Bank and Al Rajhi Commercial Foreign Exchange, another money exchange business owned by Abdullah Abdul Al Rajhi.  The decision on Al Rahhi Commercial Foreign Exchange was in addition to the earlier decision allowing relationships with Al Rajhi Trading Establishment.

[1240] 5/23/2005 email from HSBC David Bagley to HSBC colleagues, "Al Rajhi Bank," OCC-PSI-00144350, at 2.

[1241] At almost the same time, HSBC CIMB-Institutional Banking, which is part of HSBC Amanah, approved additional banking services for Al Rahji Bank, including trade, treasury, SWIFT wire transfers, foreign exchange, and asset management services. See 5/23/2005 document prepared by CIBM-Institutional Banking on Al Rajhi Banking and Investment Corporation, HSBC OCC 0659988-997, at 8.

an upcoming Global Banknotes examination by the OCC.[1242]   On May 23, 2005, Mr. Allen, head of the London Banknotes office, forwarded the HSBC Group Compliance email regarding Al Rajhi Bank to Mr. Lok, head of the Global Banknotes Department, stating: "We'll have to see if this will make any difference!"[1243]   Mr. Lok, in turn, sent an email to Ms. Pesce, head of HBUS AML Compliance, stating:  "After the OCC close out and that chapter hopefully finished, could we re-visit Al Rajhi again.  London compliance has taken a more lenient view."[1244]

The on-site work for the OCC AML examination concluded about a month later,[1245] and the HBUS London branch shortly thereafter began to discuss plans to speak with HBUS AML Compliance to allow it to resume ties with Al Rajhi Bank.  In a July 2005 meeting to discuss KYC issues, members of the HBUS London Banknotes office discussed both the results of the OCC examination and next steps to discuss the future of HSBC's relationship with Al Rajhi Bank:

> "DJ [Daniel Jack]:  We gave the OCC 108 client files.  The primary focus of their finding[s] boiled down to 18 files concentrating on the money service business[es] and high risk clients.  We obtained a satisfactory rating from the OCC although their examiners identified 5 issues considered 'Matters Requiring Attention' with urgency.[1246]
> …
>
> **Saudi:**  We lost Al Rajhi this year – we discussed this in various compliance meetings already.  SA [Stephen Allen] – a resumption decision was put off because of the OCC audit.  CL [Christopher Lok] to speak to SA after the OCC.  Allen to speak to Terry [Pesce] before his holidays.  Al Rajhi threatened to pull any new business with HSBC, unless we give them a satisfactory reason why we won't trade banknotes with them."[1247]

Al Rajhi Bank communicated the threat to "pull any new business with HSBC" unless given a "satisfactory explanation" why HSBC had stopped supplying it with U.S. dollars via its relationship managers.[1248]   That threat was not mentioned again in the documents provided to the Subcommittee.

The next month, in August 2005, Mr. Allen sent Sally Lomas, KYC manager for the London Banknotes office, a copy of the Lok email asking HBUS AML Compliance to re-visit the Al Rajhi issue, together with the HSBC Group Compliance email allowing re-establishment

---

[1242] See 5/15/2006 OCC letter to HBUS ("On June 12, 2006 we will begin a 3-week Examination of Global Banknotes, London.  We hope to complete on site work on or before June 30, 2006.").

[1243] 5/23/2005 email from HBUS Stephen Allen to HSBC Christopher Lok, "Al Rajhi," OCC-PSI-00144350, at 1-2.

[1244] 5/23/2005 email from HSBC Christopher Lok to HBUS Teresa Pesce, "Al Rajhi," OCC-PSI-00144350, at 1.

[1245] 6/20/2005 OCC Supervisory Letter, Global Banknote examination of HSBC, USA, OCC-PSI-00107505. [Sealed Exhibit.]

[1246] The MRAs cited by the OCC required the London Banknotes Office to conduct a client file review to improve client information and analysis; review client risk ratings; add expected client account activity to the client files; revise written procedures to include the need to obtain expected client activity; and improve AML training in these areas.  Id.

[1247] 7/12/2005 "HBUS London Banknotes Minutes of KYC Review Meeting," OCC-PSI-00835857, at 1, 4 (emphasis in original).

[1248] Subcommittee interview of Christopher Lok (3/29/2012)  and Alan Ketley (2/16/2012).

of the relationship for the rest of HSBC.  Ms. Lomas forwarded the emails to Lynda Cassell, then head of General Compliance at HBUS.  Ms. Lomas wrote:

> "Please find attached an email sent by David Bagley, indicating that there is no longer a recommendation against expanding relationships with Al Rajhi Bank.  I have asked Fig [HSBC Financial Intelligence Group] to check, when they do their additional work, whether the same part of the Al Rajhi fa[m]ily is in[vol]ved in both Banks."[1249]

On the same day, Ms. Pesce, head of HBUS AML Compliance, responded to the Lomas email, warning that re-opening the Al Rajhi Bank account should not be viewed as an easy decision:

> "This is not so simple.  David [Bagley] does not object insofar as HBEU [HSBC Europe] is concerned, but has left it to us to assess the US risk.  We've gotten push back from the OCC on Al Rahji Trading, which is less controversial than the bank.  We can revisit this, but I am not inclined to push ahead precipitously, especially in light of the regulatory scrutiny."[1250]

In January 2006, the Banknotes Department tried again.  Minutes of a London Banknotes meeting to discuss KYC issues recorded the following discussion:

> "Banknotes-London would like to resume business with Al Rajhi, although we have ceased trading (due to rumours in terrorist financing, the U.S. Government has now dropped those charges …)[.] [T]he rest of the HSBC group still deal with them.  LC [Lynda Cassell] advised a conference call with Terry [Pesce] is needed but before this takes place LC would like to see a memo from SA [Stephen Allen] about the history of this matter, subsequently Lynda will take this memo to Terry to arrange the conference call."[1251]

The minutes reflect that a rumor was circulating among several HSBC officials that the U.S. government had "dropped" charges of terrorist financing against the bank, which was not the case since no formal charges had ever been filed.  The minutes also indicate that all HSBC affiliates were then allowed to do business with Al Rajhi Bank other than HBUS, a fact used at one point to try to convince HBUS Compliance to allow the account.

In February 2006, Mr. Allen met with Lynda Cassell, Senior AML Policy Advisor, about Al Rajhi Bank.[1252]  That same month, Gordon Brown, who had taken over London Banknotes KYC issues from Susan Lomas, provided Ms. Cassell with a copy of Al Rajhi Bank's AML policies and procedures.[1253]  Ms. Cassell responded with an email to Mr. Brown, Mr. Allen, and others explaining:

---

[1249] 8/10/2005 email from Sally Lomas to Lynda Cassell with copies to Teresa Pesce, Alan Ketley, Stephen Allen, and others, "Al Rajhi," OCC-PSI-00343527.

[1250] 8/10/2005 email from Teresa Pesce to Sally Lomas and others, "Al Rajhi," OCC-PSI-00343527.

[1251] 1/26/2006 "HBUS London Banknotes Minutes of KYC Review Meeting," OCC-PSI-00835851, at 3.

[1252] See 3/21/2006 email from HSBC Stephen Allen to HBUS Alan Ketley and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695040.

[1253] 2/6/2006 email from HSBC Gordon Brown to HBUS Lynda Cassell, "AML Procedures:  Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250665-667, at 667.

"Gordon, in accordance to our previous conversation, the AML compliance decision to do business with Al Rajhi lies with Terry Pesce and as suggested, Stephen [Allen] should speak to Terry regarding his desire to enter into a Banknotes relationship. … In regards to Al Rajhi's AML Policy and Procedures, I find them comprehensive …. Their high risk client base generally mirrors our high risk type clients."[1254]

In March 2006, Mr. Allen and Mr. Brown exchanged emails with Mr. Ketley, a senior HBUS AML Compliance officer who worked for Ms. Pesce.[1255]  Mr. Allen wrote:

"[A]ccording to Al Rajhi, their senior management had been advised by the US State Department that they were no longer considered to be under suspicion and I was wondering whether HBUS Compliance or Security may have a contact at State … that could be explored to verify this statement?"[1256]

Mr. Ketley agreed to try to verify the information, and Mr. Allen responded:

"Thanks Alan, anything that you can do is appreciated as, with the summer heat approaching, this client becomes very active and is commercially extremely important to us – if we can ever get to re-start our business with them that is.  You may recall me telling you that we dealt with Al Rajhi for 30 years prior to being obliged to desist!"[1257]

Also in March 2006, Beth Fisher, an HBUS employee who used to be the corporate relationship manager assigned to Al Rajhi Bank, discovered that HBUS had failed to cancel a $50 million line of credit for the bank when the relationship ended.  She sent an email to Mr. Ketley:  "I thought we exited this name!"[1258]  He responded:  "I gather tha[t] Banknotes wants to revive the relationship but has not yet done so."   The next day, Ms. Fisher explained to a colleague:  "FYI, this was an HBUS London Banknotes (only) relationship which was exited a year ago due to AML Compliance concerns. …  This is NO  LONGER an HBUS relationship.  We must remove this bank from our list."[1259]

In April 2006, Susan Wright, head of AML Compliance for the entire HSBC Group, weighed in, sending an email to Ms. Pesce and Mr. Ketley asking, "what the position is with regard to the possibility of a Bank Note relationship in London" with Al Rajhi?[1260]  Ms. Pesce responded:  "It still makes me nervous.  Alan has gone out to Steve Allen for more KYC/EDD

[1254] 2/8/2006 email from HBUS Lynda Cassell to HSBC Gordon Brown and others, "AML Procedures:  AlRajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3250665-667, at 666.
[1255] 3/20/2006 email exchange between HBUS Alan Ketley and HSBC Stephen Allen and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695040.
[1256] Id.  It is unclear what his email referred to when it said that the State Department told the bank that it was no longer "under suspicion."
[1257] 3/21/2006 email from HSBC Stephen Allen to HBUS Alan Ketley and Gordon Brown, "AL Ra[jh]I," HSBC OCC 0695039.
[1258] 3/20/2006 email from HBUS Beth Fisher to HBUS Alan Ketley, "Al Rajhi," HSBC OCC 3224893.
[1259] 3/21/2006 email from HBUS Beth Fisher to HBUS Dorothy Gulman, Alan Ketley and others, "Re: Updated TSO/TCS2 spreadsheet," HSBC OCC 3225386.
[1260] 4/18/2006 email exchange between HSBC Susan Wright and HBUS Teresa Pesce, "Al Rajhi," HSBC OCC 4827027.

[Know Your Customer/Enhanced Due Diligence]."  Mr. Ketley told the Subcommittee that the
Al Rajhi Bank relationship was the only one where he was influenced by HSBC Group.[1261]

That same day, April 10, 2006, Lynda Cassell sent an email to Mr. Allen at London
Banknotes requesting information about whether Al Rajhi Bank did business in countries subject
to OFAC sanctions and how they would use U.S. banknotes, if they were restored.[1262]  He
arranged for an inquiry to be sent to Al Rajhi Bank which then took five months to respond with
limited information.[1263]  For example, in response to a question asking the bank to "confirm the
countries outside of Saudi Arabia that you do business with," Al Rajhi Bank wrote:  "All our
correspondent banks['] names are available in the Bankers Almanac."[1264]  When asked how the
bank ensures it does not utilize HBUS products or services in countries that are "OFAC-
sanctioned," the bank's entire response was:  "We apply strict due diligence and KYC
procedures to high risk countries."[1265]  Both replies did not sufficiently answer the questions
posed.

The bank provided a slightly longer answer when asked how it would use U.S.
banknotes:

"All USD banknotes we purchase [are] for our own branches['] use. … [W]e have a big
population of around 7 million foreign workers in the kingdom who mostly prefer USD
when traveling back to their countries on vacation or even when remitting money to their
families ….  Also during summer time we have a high demand from tourist[s] traveling
for their vacations."[1266]

This response suggested that, if resupplied with U.S. dollars, the bank would provide those
dollars to a wide group of persons in Saudi Arabia, many of whom would be expected to
transport the dollars across international borders into other countries.

In June 2006, HSBC Bank Middle East added its voice to that at the Banknotes group in
pushing for the account to be reopened.  Salman Hussain, then Payments and Cash Management
(PCM) Regional Sales Manager for HSBC Bank Middle East, sent an email to Mr. Ketley at
HBUS AML Compliance highlighting the potential revenue if Al Rajhi Bank were to be
reinstated as a banknotes customer:

"I am sending you this email seeking your assistance to address any issues pertaining to
Al Rajhi Bank in order to obtain compliance approval.  …  As I understand from talking
to all parties that we had an excellent relationship with Al Rajhi Bank until year 2004,
banknote[s] (David Illing) stopped doing business while being the largest revenue
generator in the Middle East.  Amanah Finance in London (Emran Ali Reza) still trade[s]

---

[1261] Subcommittee interview of Alan Ketley (2/16/2012).

[1262] 4/10/2006 email from HBUS Lynda Cassell to HBUS Stephen Allen, "Al Rajhi Banking & Investment Corp.,
Saudi Arabia," HSBC OCC 3250665.

[1263] 9/17/2006 email from Al Rajhi Bank Mohd Fazal Haque to HSBC Salman Hussain, "HSBC Bank Middle East
Limited," HSBC OCC 3280498-499.

[1264] Id. at HSBC OCC 3280498.

[1265] Id.

[1266] Id. at HSBC OCC 3280499.

with Al Rajhi Bank …. From my side, I would like to use the Islamic Overnight
Investment [product] … as an intro to this bank. The amount of potential
business/revenue is quite substantial ….”[1267]

Mr. Hussain sent copies of his email to six colleagues in various HSBC departments.

Mr. Ketley responded to Mr. Hussain on the same day as follows:

“This must be the week for Al Rajhi as yours is the second e-mail about the bank that I
have received.

HBUS exited the relationship in 2004 primarily for Compliance reasons. Earlier this
year, Banknotes London expressed their desire to re-establish the relationship and there
has been a fair amount of discussion about whether or how to do this. …

[C]ertain questions … need to be addressed before any Compliance decision can be made
about resuming the relationship. For your information, Banknotes London has been fully
embroiled in (preparing for and now in the midst of) an OCC exam so are unlikely to
have been able to pursue these questions.

The concerns about this name in the US have been rather long standing and we will need
to get extremely comfortable with Al Rajhi before we would be willing to re-establish a
relationship.”[1268]

In June 2006, the OCC completed the on-site work for its AML examination of the London
Banknotes Office and, in September, sent a Supervisory Letter to HBUS summarizing the results
and directing the London office to improve its Know Your Customer information and client risk
ratings.[1269]

Also in June 2006, Emma Lawson, who worked for Susan Wright, head of AML
Compliance for the HSBC Group, sent an email to Mr. Ketley and Ms. Pesce inquiring about
progress on the Al Rajhi Bank account.[1270] Mr. Ketley responded that they had yet to receive
answers to certain AML questions, in part because London Banknotes personnel “have been
fully engaged on an OCC exam for the past few months. The exam will end on June 30 so I
expect they will revisit the subject then.”[1271]

In July 2006, the London Banknotes office held a meeting to discuss its business
activities and prospects, and again brought up Al Rajhi Bank. A summary of the meeting stated:

---

[1267] 6/22/2006 email from HBME Salman Hussain to HBUS Alan Ketley with copies to others in HSBC, “Al Rajhi
Banking & Investment Corp. (Al Rajhi Bank), Saudi Arabia,” HSBC OCC 3250655.
[1268] 6/22/2006 email from HBUS Alan Ketley to HBME Salman Hussain and others in HSBC, “Al Rajhi Banking &
Investment Corp., Saudi Arabia,” HSBC OCC 3250655.
[1269] See 9/26/2006 OCC Supervisory Letter HSBC-2006-29, “London Global Banknote BSA/AML Examination,”
OCC-PSI-0010755-760. [Sealed Exhibit.]
[1270] 6/20/2006 email from HSBC Emma Lawson to HBUS Alan Ketley and Teresa Pesce, “Al Rajhi Banking &
Investment Corp., Saudi Arabia,” HSBC OCC 3281773-774.
[1271] 6/20/2006 email from HBUS Alan Ketley to HSBC Emma Lawson and Teresa Pesce, “Al Rajhi Banking &
Investment Corp., Saudi Arabia,” HSBC OCC 3281773-774.

"**Saudi Arabia** … [W]e are experiencing a lot of competition from Commerz [Bank] who are shipping [U.S. dollars] directly from NY [New York] into Saudi and they are offering nearly 50% cheaper prices than BN [Banknotes] quote, so work has had to be done to offer better prices to re-gain volume in this business.  We only have two customers here … but we continue to press for the re-instatement of Al Ra[jh]I but there remain ongoing KYC issues."[1272]

In the fall, at the request of Gordon Brown, KYC manager at the London Banknotes office, the HSBC Financial Intelligence Group (FIG) provided an update to an existing investigative report on Al Rajhi Bank.[1273]  The report was only three pages long and consisted primarily of information taken from publicly available publications about the bank's ownership and management.  The report also noted that a U.S. judge had dismissed the bank from a lawsuit brought by victims of the 9/11 terrorist attack, and that the World-Check database had listed the bank's Chairman and Managing Director Sulaiman Abdul Aziz Al Rajhi under its category for "terrorism."[1274]

Following receipt of the report, the KYC customer profile was updated by the HBUS Banknotes Department for Al Rajhi Bank with a view toward reinstating the account.  The profile stated in part:

"A multitude of allegations have surrounded the Al-Rajhi family implicating them in a gamut of highly adverse activities ranging from money laundering to terrorist financing.  The current facts, however, do not easily support these allegations.  Presently, no U.S. or foreign government law enforcement or regulatory body has stated, unconditionally, that any member of Al-Rajhi or any company controlled by Al-Rajhi is under sanction.  The U.S. continues to pursue relationship with Saudi Arabia and the Al-Rajhi family irregardless of the allegations being levied against charitable institutions with some presumably direct and indirect links to Al-Rajhi.  The major 9/11 lawsuit, which included Al-Rahji, has been dropped against the family and family-related institutions.

However, there is some reputational risk and the possibility that further investigations by U.S. authorities may ultimately uncover substantiating proof of the Al-Rajhi connection to terrorism is certainly a concern.  Our account relationship with Al-Rajhi will be primarily selling USD banknotes out of London.  The risk of future sanctions and the reputational risk based on the aforementioned allegations should be measured against the current risks involved in our relationship when ultimately deciding our course of action.  Therefore, London Banknotes feels that the bank poses minimal reputational risk to us."[1275]

---

[1272] 7/24/2006 "2Q06 London Banknotes Review Meeting," HBUS London Banknotes branch, HSBC OCC 2691117-124, at 122 (emphasis in original).
[1273] 10/24/2006 email from FIG Michael Ellis to HBUS Gordon Brown and others, "Report of Findings – Al Rajhi Banking & Investment Corp. – FIG," HSBC OCC 7519403-406.
[1274] Id. at 405-406.
[1275] 2010 HSBC KYC Profile of Al Rajhi Bank, at 11-12.  HSBC KYC profiles are evolving documents that retain past information stretching back multiple years.

This justification for renewing the account relationship had two key features.  First, it asserted that, despite many allegations, no government had stated "unconditionally" that Al Rajhi Bank or its owners were under sanction for financing terrorism.  Second, it focused on "current risks" and asserted that, measured against those, Al Rajhi Bank  posed only "minimal" reputational risk to HSBC.

On November 14, 2006, Christopher Lok, head of Global Banknotes, submitted the new profile for approval to Beth Fisher, the HBUS corporate relationship manager formerly assigned to Al Rajhi Bank.[1276]  Ms. Fisher responded to Mr. Lok, with a copy to Mr. Ketley and Mr. Jack in HBUS AML Compliance, "I thought this was an HSBC exit name."[1277]  Mr. Ketley replied to her, "It was exited once (2004?) – Banknotes London is looking to reopen the relationship."  He also stated:  "The profile had better be bullet proof."[1278]

Three days later, Mr. Allen sent Ms. Fisher and Mr. Ketley an email urging them to expedite their review of the client profile, which he hoped would reestablish the account, citing a threat by Al Rajhi Bank to pull all business from HSBC unless the U.S. banknotes services were restored:

"Salman Hussain, the PCM [Payments and Cash Management] Regional Sales Manager at HBME [HSBC Bank Middle East] in Bahrain, who has recently visited the subject, has called to say that Al Rajhi has now run out of patience waiting for us to re-start our banknote trading relationship and unless we can complete the kyc formalities and advise them accordingly by the end of November, they will terminate all product relationships with the HSBC Group – which I believe to be substantial.

Their main point of contention is that they feel that they were exonerated by all US legal processes from TF [Terrorist Financing] suspicion some time ago and yet we have still not been able to re-start trading with them.  Gordon [Brown] finished our latest attempt at the profit on Tuesday and you will find the kyc profile to be currently in the 'IB Pending' inbox.  Could I please ask you both to expedite your reviews so that we can attempt to prevent the loss of an important client to the Group?"[1279]

Later in the day, Mr. Allen forwarded to Ms. Fisher and Mr. Ketley an email that had been sent by Mr. Hussain after he met with the bank in Riyadh, Saudi Arabia.[1280]  Mr. Hussain had sent the email to Mr. Allen and other colleagues, informing them that Cassim Docrat, an Al Rajhi Bank representative, had told him that if the U.S. banknotes business wasn't reestablished

[1276] 11/14/2006 email from HSBC Christopher Lok to HBUS Beth Fisher, "KYC Approval needed for:  Al Rajhi Banking & Investment Corp," HSBC OCC 3279589-590.
[1277] 11/14/2006 email from HBUS Beth Fisher to HSBC Christopher Lok and HBUS Alan Ketley, "KYC Approval needed for:  Al Rajhi Banking & Investment Corp," HSBC OCC 3279589.
[1278] 11/14/2006 email from HBUS Alan Ketley  to HBUS Beth Fisher, "KYC Approval needed for:  Al Rajhi Banking & Investment Corp," HSBC OCC 3279589.
[1279] 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher and Alan Ketley, "Al Rajhi Banking," HSBC OCC 3280504-505.
[1280] 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen and others, "Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280496-497.  Mr. Salman was meeting with the bank, because HSBC Bank Middle East had never ceased doing business with it.

by the end of November, Al Rajhi Bank would "cancel any business dealings with HSBC."[1281]
His email also stated that the bank had indicated it had been able to procure a large line of credit
from one of HSBC's competitors, JPMorganChase.  Mr. Hussain wrote:

"I can't stress on the fact that we do want to do business with this institution from PCM
[Payments and Cash Management] side.  We do stand a good chance to win a US$ clearing
account thru offering Islamic Overnight Investment Product and the US $ checking clearing
thru Check 21."[1282]

Mr. Allen also sent a copy of Mr. Hussain's email to Mr. Lok, commenting:  "As ever, we
are taking an inordinate amount of time to make our minds up.  I discussed this client with Terry
[Pesce], Linda [Cassell] and Alan [Ketley] when I visited in February, we eventually received
and have now answered a rate of supplementary questions from Linda and now that she has left,
no doubt there will be more questions from Alan!"[1283]  Mr. Lok responded:

"I would tell Salman that he should relay the 'concern' Alrajhi has expressed to the higher
ups.  To cancel the Amanah business is much bigger than not dealing with banknotes.
Hopefully somebody in London will listen and given NYK [New York] Compliance a gentle
push."[1284]

That afternoon, Ms. Fisher sent an email to Mr. Allen declining to approve the new Al
Rajhi Bank client profile:

"I am not trying to be difficult, but I do not personally feel comfortable [being the] IB
[institutional banker] approving this name.  I do not know this bank.  Additionally, several
years ago, when HBUS had relationships with 2 different Al Rajhi names, management
would ask me questions about the customer every time the name appeared in the US
newspapers.  I do not know this bank personally and therefore not qualified to render an
opinion.  …  Therefore, please ask another officer to IB approve.  I am IB-Denied the KYC,
so that my name can be removed as RM [relationship manager]."[1285]

Mr. Allen responded:  "I quite understand your position and I will try another tack."[1286]

After receiving her refusal to approve the Al Rajhi Bank profile, Mr. Allen forwarded it
to Mr. Lok and asked:  "[W]ho do you suggest can/will sign this profile?  You will see that it is
pressing – perhaps David [Wilens] could IS and you could IB approve if Susan [Wright] and I
sign it again?"[1287]  Mr. Lok responded:  "At the end of the day, its compliance who's the key.

[1281] 11/17/2006 email from Salman Hussain to David Illing, Gordon Brown, Stephen Allen and others, "Al Rajhi
Bank KYC & AML Policy," HSBC OCC 3280496-497.
[1282] Id.
[1283] 11/17/2006 exchange between HBUS Stephen Allen to HSBC Christopher Lok, "Alrajhi," OCC-PSI-00150798.
[1284] Id.
[1285] 11/17/2006 email from HBUS Beth Fisher to HBUS Stephen Allen, Alan Ketley, Christopher Heusler, "Al
Rajhi Banking," HSBC OCC 3280504.
[1286] 11/17/2006 email from HBUS Stephen Allen to HBUS Beth Fisher, Alan Ketley, Christopher Heusler, "Al Rajhi
Banking," HSBC OCC 3280504.
[1287] 11/17/2006 email from HBUS Stephen Allen to HSBC Christopher Lok and David Wilens, "Al Rajhi Banking,"
OCC-PSI-00150795.  In a Subcommittee interview, Mr. Lok explained that he retained the authority to act as the
institutional banker for a client and so could approve a client profile.  Subcommittee interview of Christopher Lok

I'll speak to Ketley & ask him to re-evaluate this name."[1288]  Mr. Lok also sent an email to Mr. Allen informing him:  "Just spoke to Alan [Ketley].  He's going to read the whole file … and he's aware of the 'threat' you passed along.  His view is Alrajhi may not really walk away if we can't revert by November end, which I agree.  … W[e] should have an answer in the next few weeks."[1289]

Over the next few days, Mr. Ketley reviewed Al Rajhi Bank's AML policies and procedures.  He also asked Mr. Hussain:  "What revenue projections do you have associated with the US$ clearing and Check 21 'cash letter'" services that could be provided by HBUS to Al Rajhi Bank?[1290]  Mr. Hussain responded:  "Estimated revenue will be a minimum of $100k per annum."

Emma Lawson, in AML Compliance at HSBC Group Headquarters, also sent an email to Mr. Ketley asking, "Has progress been made."[1291]  Mr. Ketley responded:

"Your timing is uncanny and I suspect not entirely unrelated to correspondence last week from Banknotes and PCM.  I have reviewed the new documentation provided by the client and discussed it with Terry [Pesce] – she has indicated a desire to discuss with David.  Will keep you posted."[1292]

A later email indicated that Ms. Pesce also raised the matter with "the Bank's executive management."[1293]

On December 1, 2006, Mr. Ketley sent an email to Mr. Allen and Salman Hussain, with copies to Ms. Pesce and Mr. Lok, indicating he would approve re-opening the banknotes account with Al Rajhi Bank:

"[T]he purpose of this note is to confirm to you the willingness of HBUS to recommence a relationship with Al Rajhi Bank.  …

[I] am satisfied that we can do business with this entity as long as our due diligence is thoroughly documented and close transaction monitoring takes place by Compliance along with a high degree of transaction awareness being maintained by the business.

---

(3/29/2012).  David Wilens was the chief operating officer of the London Banknotes office and later became chief operating officer for the entire HBUS Banknotes Department.  See Nov. 2006 HBUS organizational chart, OCC-PSI-00000501, at 505.

[1288] 11/17/2006 email from HSBC Christopher Lok to HBUS Stephen Allen and HSBC David Wilens, "Al Rajhi Banking," OCC-PSI-00150795.

[1289] 11/17/2006 email from HSBC Christopher Lok to HBUS Stephen Allen, "Alrajhi," OCC-PSI-00150796.

[1290] 11/20/2006 email from HBUS Alan Ketley to HSBC Salman Hussain, with copies to Stephen Allen, Gordon Brown, and others, "Re: Fw: Al Rajhi Bank KYC & AML Policy," HSBC OCC 3280945.

[1291] 6/20/2006 email exchange between HSBC Emma Lawson and HBUS Alan Ketley, "Fw: Al Rajhi Banking & Investment Corp., Saudi Arabia," HSBC OCC 3281773-774.

[1292] Id.  Teresa Pesce, then HBUS AML head, told the Subcommittee that she didn't recall any specific pressure exerted by HSBC Group with regard to the Al Rajhi Bank relationship, but she knew that HSBC Group was interested in maintaining it.  Subcommittee interview of Teresa Pesce (3/30/12).

[1293] 6/3/2008 email from HBUS Denise Reilly to HBUS Alan Williamson, Daniel Jack, Anne Liddy and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 1638575.  Ms. Pesce told the Subcommittee that the United States initially raised the idea of exiting the Al Rajhi relationship.  She said she may have raised it with Susan Wright, David Bagley, and "the board."  Subcommittee interview of Teresa Pesce (3/30/2012).

Over a period of years there has been much negative publicity associated with the principals of this entity – while none of these allegations has been proven or substantiated, the notion of 'no smoke without fire' is one we must bear in mind and any business unit dealing with this entity must acknowledge the associated risks. … [T]o paraphrase an expression from English Banking, if it is in my hand and in order I will approve it."[1294]

Mr. Ketley also placed several conditions on the approval of the client profile, noting that his approval extended only to banknotes transactions and not to cash letter transactions.  He also stated that the bank could engage in wire transfers, but "I cannot support paper activity with the degree of close monitoring that would be appropriate."[1295]

Mr. Ketley noted that Christopher Lok, head of Global Banknotes, would act as the "relationship owner" of the account in place of Beth Fisher, and would "approve the profile if he is satisfied with it."[1296]

Mr. Ketley announced the decision to reopen the Al Rajhi Bank account despite, in the words of the 2006 client profile, a "multitude of allegations … implementing [Al-Rajhi] in a gamut of highly adverse activities ranging from money laundering to terrorist financing."  The decision was also made despite the refusal of the prior Al Rajhi Bank relationship manager, Beth Fisher, to approve the profile, and immediately after HSBC learned that the outside KYC database it relied on for due diligence, World Check, had identified Al Rajhi Bank's most senior official as linked to terrorism.  The decision also came one year after a 2005 U.S. indictment provided a concrete example of Al Rajhi Bank's alleged link to terrorism, disclosing how senior officials from al-Haramain Foundation Inc. had cashed $130,000 in U.S. travelers cheques at Al Rajhi Bank in Saudi Arabia and then smuggled the money to violent extremists in Chechnya.[1297]

The 2006 client profile focused on the fact that no country had indicted, issued a terrorist-related designation, or sanctioned Al Rajhi Bank or its owners, even though that was also true in 2005, when the original decision to close the account was made.  The internal HSBC emails indicate that two other major factors in the decision to restore the account were the threat made by Al Rajhi Bank to withdraw its business, and the promise of new revenue exceeding $100,000 per year.

---

[1294] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892.  Ms. Pesce told the Subcommittee that the court dismissal of charges against the bank was the single most important reason that she decided to re-open the relationship.  Both Mr. Ketley and Ms. Pesce stated that they did due diligence on Al Rajhi Bank, and both thought that the risk could be managed and that they made sure the regulators were aware of the relationship.  Subcommittee interviews of Teresa Pesce (3/30/2012) and Alan Ketley (2/26/2012).

[1295] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892.  Ms. Pesce confirmed to the Subcommittee that the HBUS relationship with Al Rajhi Bank was limited to a banknotes relationship.  Subcommittee interview of Teresa Pesce (3/30/12).

[1296] 12/1/2006 email from HBUS Alan Ketley to HBUS Stephen Allen, HSBC Salman Hussain, and others, "Al Rajhi Bank," OCC-PSI-00150892.

[1297] "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1.

221

## H. 2007 to 2010:  Additional Troubling Information

The HBUS Banknotes account for Al Rajhi Bank was formally reestablished on December 4, 2006.[1298]  Once the account was reinstated, HBUS London Banknotes began supplying an estimated average of $25 million in physical U.S. dollars per month to Al Rajhi Bank in Saudi Arabia.[1299]  HBUS informed the Subcommittee that over the next four years Al Rajhi Bank purchased nearly $1 billion in U.S. dollars from HBUS, while selling back less than $10 million.  The annual totals are as follows.

| | U.S. Dollars Sold to Al Rajhi Bank | U.S. Dollars Purchased from Al Rajhi Bank |
|---|---|---|
| 2006 | $ 0 | $ 0 |
| 2007 | $ 123 million | $ 8 million |
| 2008 | $ 202 million | $ 0 |
| 2009 | $ 369 million | $ 0 |
| 2010 | $ 283 million | $ 0 |
| Grand total: | $ 977 million | $ 8 million[1300] |

Over the next three years, troubling information about Saudi Arabia in general and Al Rajhi Bank in particular continued to circulate, but neither HSBC nor HBUS engaged in another round of internal deliberations over whether to maintain the account.  Instead, HBUS's Hong Kong branch opened a new line of banknotes trading with Al Rajhi Bank.

In July 2007, the Wall Street Journal published two lengthy articles by reporter Glenn Simpson examining Al Rahji Bank's links to terrorism.[1301]  The first article disclosed the existence of the 2003 CIA report, "Al Rajhi Bank: Conduit for Extremist Finance," and quoted its statement that "[s]enior al-Rajhi family members have long supported Islamic extremists and probably know that terrorists use their bank."  The article repeated the information that the name of the bank's most senior official, Sulaiman bin Abdul Aziz Al Rajhi, had appeared on al Qaeda's list of 20 early financial benefactors.[1302]  After the first article was published, HBUS' primary U.S. regulator, the OCC, asked HBUS to respond to its allegations.[1303]

Also in 2007, reports by the U.S. Department of State[1304] and the Congressional Research Service[1305] stated that Saudi Arabia continued to be a source of financing for Al Qaeda and other terrorist organizations, and expressed particular concern about the use of cash couriers to deliver

---

[1298] See 2010 HSBC KYC Profile of Al Rajhi Bank, at 13.

[1299] See 7/26/2007 email from HBUS Daniel Jack to HBUS Alan Ketley, "BN-LN with Al Rajhi Bank in Saudi Arabia," HSBC OCC 1413726.

[1300] Subcommittee briefing by HSBC legal counsel (7/9/2012).

[1301] "U.S. Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007); "Reported U.S. Concerns over Saudi Bank leave Compliance Officers Reading Tea Leaves," Wall Street Journal, Glenn Simpson (7/27/2007).

[1302] "U.S. Tracks Saudi Bank Favored by Extremists," Wall Street Journal, Glenn Simpson (7/26/2007).

[1303] 7/26/2007 email from OCC Joseph Boss to HBUS Alan Ketley, "Saudi's," HSBC OCC 3391185.

[1304] See 2007 International Narcotics Control Strategy Report, U.S. State Department, at 355.

[1305] See 2007 CRS Report on Saudi Arabia Terrorist Financing Issues, in the summary.

funds outside of the country.  In September, on the sixth anniversary of the 9/11 attack, Treasury Under Secretary Levey said in a televised interview on terrorist financing:  "[I]f I could somehow snap my fingers and cut off the funding from one country, it would be Saudi Arabia."[1306]  In August 2007, Congress enacted legislation expressing concern about Saudi Arabia's uneven role in terrorist financing.[1307]

In April 2008, Treasury Under Secretary Levey testified that, while Saudi Arabia had taken strong action against terrorists operating within its borders and was cooperating with the United States on an operational level, it was not working as hard to prevent funds from flowing to terrorists outside of its borders: "Saudi Arabia today remains the location from which more money is going to terror groups and the Taliban – Sunni terror groups and the Taliban – than from any other place in the world."[1308]

The 2009 GAO report prepared for Congress stated:  "U.S. officials remain concerned about the ability of Saudi individuals and multilateral charitable organizations, as well as other individuals visiting Saudi Arabia, to support terrorism and violent extremism outside of Saudi Arabia."[1309]  Also in 2009, HBUS received an inquiry from the IRS Criminal Investigation Division asking for contact information for the U.S. agent that receives service of process in the United States on behalf of Al Rajhi Bank.[1310]  In response, HBUS AML compliance officer Daniel Jack reviewed the bank's account activity for the prior 12 months.  He wrote:

> "This bank (an SCC) had a long-standing relationship (25+ years) with Banknotes-London until we closed the account in Feb-05 due to TF [Terrorist Financing] & reputational risk.  With approval from AML (A. Ketley), London re-opened the BN [Banknotes] account in Dec-06 with SCC classification due to PEP.  This client still has relationships with HSBC in the UK, UAE, France, Hong Kong and Italy. …  Following is a listing of all traders' explanations provided for alerts over the past 7+ years."[1311]

His analysis disclosed that, over the prior 12 months, HBUS had provided Al Rajhi Bank with over $200 million in U.S. dollars.[1312]

In 2010, the al Haramain Foundation trial got underway related to the cashing of $130,000 in travelers cheques at Al Rajhi Bank in Saudi Arabia to help violent extremists in Chechnya.  Prior to the trial, the United States served a subpoena on Al Rajhi Bank to obtain authenticated bank documents for use in the trial, but the bank refused to produce the documents and moved to quash the subpoena,[1313] leading to  "negative news articles," in the words of the

---

[1306] "U.S.: Saudis Still Filling Al Qaeda's Coffers," ABC News, Brian Ross (9/11/2007).

[1307] See Section 2043(c), Implementing Recommendations of the 9/11 Commission Act, P.L. 110-53 (8/3/2007).

[1308] Stuart Levey testimony before Senate Committee on Finance, "Anti-Terrorism Financing: Progress Made and Challenges Ahead," (4/1/2008).

[1309] "Combating Terrorism:  U.S. Agencies Report Progress Countering Terrorism and Its Financing in Saudi Arabia, but Continued Focus on Counter Terrorism Financing Efforts Needed." U.S. Government Accountability Office, GAO-09-883 (Sept. 2009), http://www.gao.gov/new.items/d09883.pdf, at 29.

[1310] See 5/12/2009 HBUS email exchange, "Al-Rajhi Banking and Investment Corporation, Saudi Arabia," OCC-PSI-00823520, with attachments.

[1311] Id.

[1312] Id.

[1313] See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH (USDC OR 1/19/10).

2010 KYC client profile prepared by HBUS for Al Rajhi Bank.[1314]  The trial court denied the bank's motion,[1315] and the case was later closed as "moot."[1316]

One other 2010 development was action taken by an Al Rajhi related money exchange, Tahweel Al Rajhi, to join with the largest bank in Pakistan, Habib Bank Ltd., to initiate a new funds transfer product called "HBL Fast Cash."  The new product was designed to allow the instant transfer of funds from Riyadh, Saudi Arabia, to any Habib branch in Pakistan, whether or not the sender or recipient of the funds had an account at either financial institution.  According to one media report, Hazem Elhagrasey, the head of Tahweel Al Rajhi, said:  "The new service will assure that the beneficiaries will receive payments in cash within minutes in Pakistan."[1317]  Tariq Matin Khan, Habib Bank's general manager for financial institutions and international banking, said:  "The remitters can benefit from the huge HBL network to send money to any nook or corner of Pakistan."[1318]  The Subcommittee intended to ask Al Rajhi Bank about AML safeguards to prevent misuse of this new transfer mechanism, but the bank declined to provide any information in response to the Subcommittee's inquiry.  It is unclear whether Tahweel Al Rajhi has an account at Al Rajhi Bank.

Meanwhile, from 2007 to 2010, HBUS continued to supply, through its London branch, hundreds of millions of U.S. dollars to Al Rajhi Bank in Saudi Arabia.  In addition, at Al Rajhi Bank's request, HBUS expanded the relationship in January 2009, by authorizing its Hong Kong branch to supply Al Rajhi Bank with non-U.S. currencies, including the Thai bat, Indian rupee, and Hong Kong dollar.[1319]  At the time, Gloria Strazza, a senior official in HBUS's Financial Intelligence Group, observed: "There was (and may be in the future) a fair amount of press and government attention focused on this entity.  I am not sure we would want to engage in even this limited activity for this entity but I forward some of the intelligence from our files on this bank."[1320]  Mr. Lok responded:  "This is an on-going debate that will never go away.  My stance remains the same, i.e. until it[']s proved we cannot simply rely on the Wall Street Journal[']s]

---

[1314] 2010 HBUS KYC Profile of Al Rajhi Bank, at 6.  See also 12/6/2011 HSBC AMLID Case #1434 for Al Rajhi Bank, HSBC-PSI-PROD-0102340-342.

[1315] United States v. Sedaghaty, (USDC D OR), 2010 U.S.Dist.LEXIS 144171, Order (1/12/2010).

[1316] See Al Rajhi Banking & Investment Corp. v. Holder, Case No. 1:10-MC-00055-ESH, Order Dismissing Action As Moot (3/2/2010).

[1317] "Terror-linked Saudi bank launches major remittance program to Pakistan," Khaleej Times in Saudi Arabia (4/10/2010), http://www.khaleejtimes.com/biz/inside.asp?xfile=/data/business/2010/April/business_April183.xml&section=business&col=.

[1318] Id.

[1319] See 2010 HBUS Hong Kong office KYC Customer Profile for Al Rajhi Bank, HSBC-PSI-PROD-0102304-306 (showing Hong Kong account for Al Rajhi Bank began trading 1/29/2009).  See also 4/3/2008 email from HBME Salman Hussain to HBMD David Illing and HBEU John Scott, "Al Rajhi Bank, Saudi Arabia," OCC-PSI-00156271 (showing Al Rajhi Bank requested the Hong Kong account); 5/5/2008 exchange of emails among HBUS Christopher Lok, Gary Yeung, Stephen Allen, and others, "KYC Approval needed for:  Al Rajhi Banking & Investment Corp," OCC-PSI-00155719; 6/2/2008 email from HBUS Daniel Jack to HBUS Anne Liddy, Gloria Strazza, Alan Williamson, and others, "Banknotes with Al Ra[jh]I Banking in S.A.," OCC-PSI-00343451.

[1320] 6/3/2008 exchange of emails among HBUS Gloria Strazza, Daniel Jack, Christopher Lok, Stephen Allen, and others, "Banknotes with Al Ra[jh]i Banking in S.A.," HSBC OCC 0752005-006.  AML compliance officer Daniel Jack forwarded her email to Mr. Lok, Mr. Allen, and others, noting "there is still some concern in AML/ICRO regarding TF [Terrorist Financing] & reputational risk in dealing with [Al Rajhi]," and asked for an email to "address the negative info, risk analysis and appropriateness of mitigants, and your support for maintaining the HBUS relationship."  Id.

reports and unconfirmed allegations and 'punish' the client."[1321]  In a later email, Mr. Lok commented:  "LON [London Banknotes office] already has a relationship with Alrajhi.  Adding HKG [Hong Kong Banknotes office] won't change Alrajhi's profile."[1322]  AML compliance officer Daniel Jack offered this comment to his fellow compliance officer, Alan Williamson, regarding the account:  "I believe the business owns the customer and the risk. … I don't think you should CO [Compliance Office] deny – or even hesitate now – on this for HK [Hong Kong], despite the negative info on TF [Terrorist Financing] & Rep[putational] risk, which is not new (e.g. WSJ in Jul-07, EDD in Dec-07).  I understand why Denise/Anne/Gloria are not comfortable, but I respectfully do not think it is their decision to terminate the relationship (again)."[1323]  HBUS decided to open the Hong Kong account,[1324] providing Al Rajhi Bank on average another $4.6 million per month in non-U.S. currencies.[1325]

HBUS Banknotes finally ceased doing business with Al Rajhi Bank when, in September 2010, HSBC made a global decision to exit the U.S. banknotes business, one week after the OCC sent a lengthy Supervisory Letter to the bank criticizing its AML program, including with respect to its handling of banknotes.[1326]

## I.  Servicing Other Banks with Suspected Links to Terrorism

Al Rajhi Bank was not the only bank with suspected links to terrorist financing serviced by HSBC.  Two others were Islami Bank Bangladesh Ltd. and Social Islami Bank Ltd.  Both banks cooperated with the Subcommittee's inquiries.

### (1) Islami Bank Bangladesh Ltd.

Islami Bank Bangladesh Ltd. opened its doors in 1983, designed its operations to be in conformance with Islamic requirements, and has grown to become one of the largest private banks in Bangladesh, which is one of the most densely populated countries in the world.[1327]  It

---

[1321] Id.

[1322] 7/18/2008 email from HBUS Christopher Lok to HBUS Alan Williamson and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 0760928.

[1323] 6/3/2008 email from HBUS Daniel Jack to HBUS Alan Williamson, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 1638463.  See also 5/30/2008 emails exchanged among HBUS Daniel Jack, Alan Williamson, and Betty NG, "KYC BankNote Profile is IB Approved for:  Al Rajhi Banking & Investment," OCC-PSI-00239206; HSBC OCC 1638463.

[1324] In July 2008, Mr. Williamson approved the new account and wrote to Mr. Lok, "You're in business now." 7/18/2008 email exchange between Alan Williamson, Christopher Lok, and others, "Banknotes with Al Ra[jh]I Banking in S.A.," HSBC OCC 0761014.

[1325] See HBUS Hong Kong office KYC Customer Profile for Al Rajhi Bank, HSBC-PSI-PROD-0102304-306, at 2.

[1326] See 9/20/2010 "HSBC to Exit Asian Banknotes Business," HSBC Holdings plc Announcement, http://www.hsbc.com/1/PA_esf-ca-app-content/content/assets/investor_relations/sea/ 2010/sea_100920_ wholesale_banknotes_en.pdf.  See also 2010 HBUS KYC Profile on Al Rajhi Bank, at 1 (showing account deactivated on 10/14/2010); 2010 HBUS Hong Kong office KYC Profile on Al Rajhi Bank, HSBC-PSI-PROD-0102304-306, at 1 (showing Hong Kong account deactivated on 10/29/2010).  In addition, in October 2010, both the OCC and Federal Reserve issued Cease and Desist Orders to HBUS and its parent holding company, HNAH, to require them to revamp their AML programs.

[1327] See Islami Bank Bangladesh Ltd. website, "About IBBL," http://www.islamibankbd.com/abtIBBL/abtIBBLAtaGlance.php; 4/19/2005 HSBC FIG report on Islami Bank Ltd.- Bangladesh, HSBC OCC 3241695; 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

provides a wide variety of individual and commercial banking services.[1328]  Several of the bank's
most senior officials were politically important figures within the country or in Saudi Arabia,
leading to their designations as Politically Exposed Persons in the World Check database.[1329]
According to Islami Bank Bangladesh, it has an extensive network of more than 600
correspondent accounts.[1330]

Islami Bank Bangladesh applied to open accounts with HSBC in 2000, and currently has
correspondent accounts with HSBC in 24 locations around the world.[1331]  According to the bank,
it opened a U.S. dollar account with HBUS in 2000, and U.S. dollar clearing accounts with
HSBC India and HSBC Pakistan in 2006.  In 2007, the HBUS branch in Singapore sought
approval to open an account for the bank to supply it with physical U.S. dollars, cash U.S. dollar
monetary instruments such as travelers cheques and money orders, process U.S. dollar wire
transfers, and provide other services.[1332]

**Opening 2007 HBUS Account.**  Documents show that proposals to open the 2007 HBUS
account for Islami Bank immediately raised AML concerns within HBUS AML Compliance, not
only because the bank was located in a country ranked by HSBC as at "high risk" of money
laundering[1333] and ranked by Transparency International as one of the most corrupt country in
the world,[1334] but also because members of the Al Rajhi group held a 37% direct ownership
interest in the bank.

In the fall of 2007, Kwok Ying Fung at the HBUS office in Singapore asked Beth Fisher at
HBUS AML Compliance to approve Islami Bank's KYC profile, but she declined without
explaining why.[1335]  On October 24, 2007, after receiving her response, he asked HBUS AML
Compliance to suggest someone else to approve opening the account.[1336]  Angela Cassell-Bush
suggested that he "reach out to Chris Lok to see if he is willing to be the RM [Relationship
Manager] Approver."[1337]  Ms. Fisher warned her colleagues that, given the connection between
the Bangladeshi bank and Al Rajhi Bank, "[t]his is not just an RM issue.  This is a KYC due
diligence issue."[1338]

[1328]  See Islami Bank Bangladesh Ltd. website, "Products & Services,"
http://www.islamibankbd.com/prodServices/prodServices.php
[1329] See 4/19/2005 HSBC FIG report on Islami Bank Ltd.-Bangladesh, at HSBC OCC 3241696; 5/11/2006 FIG
report on Islami Bank Bangladesh, HSBC OCC 3241693.
[1330] 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1331] See HBUS Know Your Customer Profile of Islami Bank Bangladesh Ltd. (3/9/2012), HSBC-PSI-PROD-
0117222-237 (hereinafter "2012 HBUS KYC Profile of Islami Bank"), at 2; 7/4/2012 email from Islami Bank
Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.
[1332] See 2012 HBUS KYC Profile of Islami Bank at 2.
[1333] Id. at 1.
[1334] See 2007 "Corruption Perceptions Index," Transparency International,
http://archive.transparency.org/policy_research/surveys_indices/cpi/2007 (ranking Bangladesh as 162 out of 180
countries in terms of perceived levels of corruption).
[1335] See 10/24/2007 email from HBUS Kwok Ying Fung to HBUS Jarrett Payne and Angela Cassell-Bush, "KYC
BankNotes Profile is IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739990-991.
[1336] Id.
[1337] 11/6/2007 email from Angela Cassell-Bush to Kwok Ying Fung with copies to Beth Fisher and others, "KYC
BankNotes Profile is IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739990.
[1338] 11/7/2007 email from HBUS Beth Fisher to HBUS Angela Cassell-Bush and others, "KYC BankNotes Profile is
IB Denied for: Islami Bank Bangladesh Limited," HSBC OCC 0739989.

On November 6, 2007, Mr. Fung asked Mr. Lok, head of HSBC Global Banknotes and located in HBUS offices in New York, if he would consider serving as the "RM [Relationship Manager] approver" of the Islami Bank KYC profile, so that the bank could become a "shared client" of HBUS Banknotes and HBUS Payments and Cash Management (PCM).[1339]  On November 8, 2007, Mr. Lok responded that his interest in considering a new account depended upon whether there was enough potential revenue to make the effort of vetting Al Rajhi worth it:

"First, I'm happy to be the RM [Relationship Manager] if this is an account worth chasing. How much money can you expect to make from this name?  If this can be answered positively then I will ask PCM to check out the … alrajhi connection. …  The name Alrajh has been a name heatedly debated for many years.  We terminated our trading relationship following 911 and only a year ago after London Compliance came back telling NYK the group is happy to let us resurrect the relationship that we went back. …  Not saying just because of this connection we won't do business.  It[']s just that if the revenue is there then we're prepared for a good fight."[1340]

Mr. Lok's email suggests that he expected from the outset that HBUS AML Compliance would resist opening an account for Islami Bank and it would take a "fight" to open the account.

Later the same day, Benjamin Saram of HBUS Singapore emailed Mr. Lok and others with information about the likely revenues if an account were opened for Islami Bank.  He wrote that, because approximately 60,000 Bangladeshis traveled to Saudi Arabia each year on religious pilgrimages and would require about $1,000 to $3,000 each, "we're therefore looking at about USD 60 mio [million] of currency needs on an annual basis."[1341]  He noted that, in 2006, HBUS Banknotes had netted about $47,000 in profits in Bangladesh, and expected a 53% increase in 2007, to about $75,000, explaining, "[w]e are a monopoly here, and margins are decent."[1342]  Mr. Saram estimated that, if an account were opened for Islami Bank, the "net profit would be approximately USD 75,000/ year."

Mr. Lok responded:  "One, the money is there and we should go for this account.  Two, I will jump in and wear the GRM [Global Relationship Manager] hat. …  I believe we should be able to get the K[YC] sign off."[1343]  He also asked HBUS AML Compliance to look into the possible connection between Islami Bank and Al Rajhi Bank.

The next day, November 9, 2007, HBUS AML compliance officer Angela Cassell-Bush confirmed a direct link between the two banks:

---

[1339] 11/6/2007 email from HBUS Kwok Ying Fung to HBUS Christopher Lok, "Islami Bank Bangladesh Limited," HSBC OCC 0739989.

[1340] 11/8/2007 email from HBUS Christopher Lok to HBUS Kwok Ying Fung and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739988-989.

[1341] 11/8/2007 email from HBUS Benjamin Saram to HBUS Christopher Lok, Kwok Ying Fung, and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739987-988.

[1342] Id.

[1343] 11/8/2007 email from HBUS Christopher Lok to HBUS Benjamin Saram, Kwok Ying Fung, and others, "Islami Bank Bangladesh Limited," HSBC OCC 0739987.

"[P]lease note that there is a connection between ISLAMI BANK BANGLADESH LIMITED-Bangladesh and Al-Rajhi Bank …. Based on the information we have on file, the Al - Rajhi family has been associated with Islami Bank Bangladesh Limited, since its inception. They have at least 37% direct ownership … through their ownership within the following companies: Arabsas Travel & Tourist Agency, 9.999%; Janab Yousif Abdullah Abdul Aziz Al-Rajhi, 9.936%; Al-Rajhi Company for Industry & Trade, 9.94%; Abdullah Abdul Aziz Al-Rajhi, 7.58%. This same family has major controlling interest within Al-Rajhi bank."[1344]

**Troubling Information.** HBUS' Singapore branch actually opened the account for Islami Bank in December 2007.[1345] Mr. Lok and others approved the account, despite ongoing questions about its primary shareholder, Al Rajhi Bank, whose past links to terrorist financing had received additional attention in the media during the summer of 2007. HBUS also approved the account despite troubling information about Islami Bank itself.

The troubling information about Islami Bank was contained in an internal report that had been prepared less than a year earlier by HSBC's Financial Intelligence Group (FIG).[1346] The May 2006 FIG report disclosed that, in March 2006, "Abdur Rahman, chief of the Jamaatul Mujahideen of Bangladesh (JMB), and his second-in-command, Bangla Bhai, were arrested for being responsible for the terrorist bomb blasts of August 17, 2005 in Bangladesh."[1347] The FIG report noted that Mr. Rahman had been found to have an account at Islami Bank.[1348]

The FIG report also disclosed that an investigation by the Central Bank of Bangladesh found that two branches of Islami Bank had been engaged in "suspicious transactions" and urged the bank to take action against 20 bank employees, including for failing to report the suspicious transactions.[1349] According to the FIG report, in response, Islami Bank reportedly suspended five officers and warned 15 others.[1350] The FIG report stated that Bangladeshi news articles had

---

[1344] 11/9/2007 email from HBUS Angela Cassell-Bush to HBUS Christopher Lok and others, "Islami Bank Bangladesh Limited-Bangladesh," OCC-PSI-00154139, at 1. Mr. Lok asked Ms. Cassell-Bush to doublecheck one of the shareholders, Abdullah Abdul Aziz Al-Rajhi, who was listed as holding 7.58% of the shares, suggesting that the wrong company may have been identified as the shareholder. A later email suggested that the shareholding company was not a member of the Al Rajhi group. See November and December 2007 exchange of emails among HBUS Christopher Lok, Angela Cassell-Bush, Muhammad Shohiduzzaman, and others, "Islami Bank Bangladesh Limited-Bangladesh," HSBC OCC 0741466-469. Later KYC profiles for the bank indicate, however, that the shares were, in fact, held through a company that was part of the Al Rajhi group. See, e.g., 2012 HBUS KYC Profile of Islami Bank, at 7. Islami Bank Bangladesh Ltd. has confirmed to the Subcommittee that Abdullah Abdul Aziz Al Rajhi has been both a shareholder and director of the bank. 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

[1345] See 2012 HBUS KYC Profile of Islami Bank, at 15.

[1346] See 5/11/2006 FIG report on Islami Bank Bangladesh, HSBC OCC 3241692-694.

[1347] Id. at 693.

[1348] Id. Islami Bank Bangladesh Ltd. told the Subcommittee, however, that it has never had an account for Abdur Rahman. 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

[1349] 5/11/2006 FIG report on Islami Bank Bangladesh, at HSBC OCC 3241693.

[1350] Islami Bank Bangladesh told the Subcommittee that it suspended and later fired the bank officials involved. 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001.

observed it was the third time Islami Bank had been fined by the Central Bank "for covering up militants' transactions."[1351]

Islami Bank's KYC profile repeated this information and indicated that the HSBC Global Relationship Manager had visited the bank to ask about the matter, and was told that the incident did not involve terrorist financing.[1352]   The Global Relationship Manager advised against taking any further action, attributing the AML failures to the bank's unsophisticated technology platform.[1353]   Neither the KYC profile nor the FIG report indicate whether any steps were taken to verify the bank's explanation of the incident with the Central Bank.   The KYC profile noted that, in 2006, FIG recommended classifying Islami Bank as a "Special Category Client," or SCC, HSBC's designation for its highest risk clients, but that recommendation was rejected, which meant HSBC did not subject the bank to any enhanced monitoring.[1354]

**2009 Information on IIRO Accounts.**   The account was opened near the end of 2007. About 18 months later, in May 2009, a FIG due diligence report prepared for another Bangladeshi bank with which HBUS did business, Social Islami Bank, discussed below, disclosed new information relevant to Islami Bank.   This information related to the International Islamic Relief Organization (IIRO), a Saudi nonprofit organization which, in 2006, had two of its branches and a high ranking IIRO official designated by the United States as terrorist financiers and added to the list of entities with which U.S. persons are prohibited from doing business.[1355]

The 2009 FIG report stated that the IIRO had accounts at both Social Islami Bank and Islami Bank.[1356]   It quoted a 2008 local press article saying that, in response to the action taken by the United States in 2006, Islami Bank had frozen its IIRO accounts.[1357]   The FIG report did not indicate when the accounts were first opened, what actions had been taken beyond freezing them, or how much money was involved.   In 2010, an HBUS KYC profile for Social Islami Bank referenced a letter from the Bangladeshi Central Bank, dated June 30, 2010, indicating that IIRO had accounts at three Bangladeshi banks, including Islami Bank, which needed to be closed.[1358]

Islami Bank Bangladesh confirmed to the Subcommittee that IIRO had two accounts at the bank which opened in 1993 and 1994, when IIRO was a nongovernmental organization in

---

[1351] 5/11/2006 FIG report on Islami Bank Bangladesh, at HSBC OCC 3241693.

[1352] 2012 HBUS KYC Profile of Islami Bank, at 3.

[1353] Id. (The Global Relationship Manager wrote:  "[C]onsidering that Islami Bank is involved in mass banking with a pretty large branch network without a sophisticated or integrated IT platform, there will always be a chance that isolated incidents like this might be found.  As such, we will closely monitor the future events and keep you informed as soon as any issue of concern is detected.").

[1354] Id.

[1355] See 8/3/2006 "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department press release, reprinted in 8/2/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh," HSBC OCC 3259936.

[1356] See 5/5/2009 FIG Report of Findings on Social Investment Bank Limited, OCC-PSI-00823818, at 7 (quoting 10/8/2008 article from Bangladeshnews.com).

[1357] Id.

[1358] 2012 HBUS KYC Profile of Social Islami Bank, at 4 ("The 3 bank accounts of IIRO namely i) Social Islami Bank Ltd. ii) Islami Bank Bangladesh Ltd. iii) Al-Falah Islami Bank Ltd. must be disposed off [sic] and transferred").

good standing.[1359]  It stated that after the IIRO was added to a United Nations sanctions list in 2006, it froze the accounts and reported them to the Bangladeshi Central Bank.  In 2010, according to the bank, it received an "instruction from the Central Bank at the direction of [the] Ministry of Finance" to unfreeze the accounts and "transfer the accounts" to a government owned bank, BASIC Bank, which it did.[1360]

Despite the 2008 published article, the information in the two internal HBUS documents related to Social Islami Bank, and Islami Bank Bangladesh's willingness to discuss the accounts, no information about the IIRO accounts appeared in the HBUS KYC profile for Islami Bank. While the IIRO accounts at Social Islami Bank were the focus of extensive discussions in emails and other documents by HBUS AML Compliance personnel and HBUS bankers working in Bangladesh, no similar discussions appear in any of the HBUS documents related to Islami Bank.

In September 2009, the Islami Bank KYC profile indicates that an unnamed HSBC employee requested a new enhanced due diligence report on the bank.[1361]  HBUS Compliance denied the request, indicating an update "is NOT needed at this time."[1362]

**2010 SCC Designation.**  In February 2010, HBUS AML Compliance personnel reviewed the Islami Bank account and recommended that the bank be designated an SCC client.[1363]  One key reason given for the proposed SCC designation was Islami Bank's links to the Al Rajhi group, noting that the Vice Chairman of the bank and 10% owner was Yousif Abdullah Al Rajhi, that Al Rajhi interests held about a third of the bank's shares, and Al Rajhi itself had links to terrorist financing.[1364]  Another reason given was the information provided in the 2006 FIG report, that the Bangladeshi Central Bank had issued a "notice of cause" to Islami Bank "to explain accounts owned by suspected Islamic Militants," and reportedly fined the bank for the third time "for covering up militants['] transactions."[1365]  No mention was made of the IIRO accounts.  Contrary to the outcome in 2006, in 2010, HSBC designated Islami Bank as an SCC client.[1366]

Later in 2010, an OCC AML examiner reviewing emails related to Islami Bank characterized the information provided about the bank as depicting "extreme circumstances," and recommended that the account be reviewed as part of a larger AML "look back" effort at HSBC.[1367]  In 2011, HSBC engaged in an extensive discussion with Islami Bank regarding its AML policies and procedures, also noting in its KYC profile that the bank acted as a "payout agent" for 53 money exchange businesses across the Middle East.[1368]

---

[1359] 7/4/2012 email from Islami Bank Bangladesh Ltd. to Subcommittee, PSI-IBBL-01-0001-003, at 003.
[1360] Id.
[1361] 2012 HBUS KYC Profile of Islami Bank, at 2.
[1362] Id.
[1363] See 2/3/2010 email exchange between HBUS Jon K. Jones, Ali Kazmy and others, "Islami Bank Bangladesh Ltd – Poss SCC," OCC-PSI-00453499-500.
[1364] Id.
[1365] Id.
[1366] Id.  See also 2012 HBUS KYC Profile of Islami Bank, at 3.
[1367] 10/27/2010 email from OCC AML Examiner Joseph Boss to OCC colleagues, OCC-PSI-00919631.
[1368] 2012 HBUS KYC Profile of Islami Bank, at 3-4.

Today, although HSBC exited the U.S. banknotes business in 2010, Islami Bank Bangladesh remains a customer of two dozen HSBC affiliates, including HBUS PCM, which continues to provide Islami Bank with access to U.S. dollars, U.S. wire transfers, and U.S. payment systems.[1369]

### (2) Social Islami Bank Ltd.

A third bank serviced by HSBC despite suspected links to terrorist financing is Social Islami Bank Ltd.

Social Islami Bank Ltd. was founded in 1995, changed its name from Social Investment Bank Ltd. in 2009, and is located in Bangladesh.[1370]   It operates 76 branches throughout the country and provides a variety of individual and commercial banking services, including deposits, loans, investment advice, commercial financing, foreign exchange, and wire transfers. It operates in conformance with Islamic requirements and is publicly traded on Bangladeshi stock exchanges.  Its headquarters are in Dhaka, the capital of Bangladesh, one of the world's largest cities with a population of 16 million.

Until May 2012, HSBC was one of the bank's major correspondents, providing it with services in multiple countries.[1371]   HSBC also has an affiliate located in Dhaka.  That affiliate, HSBC Bank Asia Pacific (HBAP) Dhaka, introduced Social Islami Bank to HBUS.[1372]   In 2003, HBUS Payments and Cash Management (PCM) sought to open an account for Social Islami Bank, providing it with U.S. dollar wire transfer and clearing services.[1373]

**Opening of HBUS Account.**  When HBUS first sought to open the account in 2003, it asked for an enhanced due diligence report on the bank from the HSBC Financial Intelligence Group (FIG).  In addition to noting that Bangladesh was a high risk country due to its reputation for corruption, the resulting FIG report contained adverse information about some of the bank's owners and officials.[1374]   Most serious were allegations that two shareholders, the International Islamic Relief Organization (IIRO) and the Islamic Charitable Society Lajnat al-Birr Al Islam (Lajnat al-Birr), had links to terrorism.  IIRO then held 8.62% of the total outstanding shares, and was the bank's largest single shareholder, while Lajnat al-Birr held 1.54%.

The 2003 FIG report stated the following with regard to the two shareholders:

"IIRO is a Saudi-Arabian charity.  … The IIRO was named in the 2002 lawsuit brought forward on behalf of family members of victims of the September 11, 2001 terrorist attacks.  The IIRO was accused of having 'played key roles in laundering of funds to terrorist[s] for the 1998 African embassy bombings' and having been involved in the

---

[1369] 2012 HBUS KYC Profile of Islami Bank, at 2, 7.

[1370] See Social Islami Bank website, http://www.siblbd.com/html/homepages.php; HBUS "Know Your Customer Profile" of Social Islami Bank Ltd. (2/7/2012), HSBC-PSI-PROD-0102782-789 (hereinafter "2012 HBUS KYC Profile of Social Islami Bank"), at 2.

[1371] See Social Islami Bank website, "List of Correspondents/Agency Arrangements Overseas," http://www.siblbd.com/download/CorrespondentsAgencyArrangementsOverseas.pdf.

[1372] 2012 HBUS KYC Profile of Social Islami Bank, at 7.

[1373] Id. at 2, 14.

[1374] See 11/2003 Report on Findings for Social Investment Bank, Ltd., HSBC Financial Intelligence Group, OCC-PSI-00823818, at 18 (hereinafter "2003 FIG Report on Social Islami Bank").

'financing and aiding and abetting of terrorists in the 1993 World Trade Center bombing.'  The IIRO has also reportedly funded al-Qaeda directly as well as several of its satellite groups.  Osama bin Laden's brother-in-law, Mohammed Jamal Khalifa, headed the Philippine branch of the IIRO in the 1990's.  The Philippine government has charged that the group contributed to terrorist causes there.[1375] …

Lajnat al-Birr Al Islamiah was established in 1987.  It has been stated that Lajnat al-Birr Al Islamiah was the original name of the Benevolence International [F]oundation, and that it originally had offices in Saudi Arabia and Pakistan.  According [to] the U.S. government, among the purposes of Lajnat was to 'raise funds in Saudi Arabia to provide support to the Mujahadeen then fighting in Afghanistan,' as well as to provide 'cover for fighters to travel in and out of Pakistan and obtain immigration status.'  Benevolence International has been tied to terrorism and its director, Enaam Arnaout, was indicted in 2002 with conspiring to defraud his group's donors by secretly providing financial and logistical help to al-Qaeda for a decade."[1376]

The FIG report also contained negative information about the bank's founder:

"Dr. M.A. Mannan was the chairman and founder of Social Investment Bank Ltd.  He was fired in 2000 after fault was found with his banking procedure.  It was alleged that he created an obstacle to the team of Bangladesh Bank [Bangladesh's Central Bank] during their visit to Social Investment Bank Ltd.  Additionally, he was accused of interfering with bank administrative work and with harassing a bank employee."[1377]

The FIG report concluded:

"In conclusion, it is of significant concern that the leading shareholder of Social Investment Bank Ltd. (at 8.62%), International Islamic Relief Organization, has been accused in both the Philippines and in America of funding terrorist groups.  The group is currently under investigation by the F.B.I.  Another of the bank's shareholders, Lajnat al-Birr Al Islam (at 1.54%) has also been connected to terrorist groups.  Additionally, the bank's founder and chairman was let go on allegations of interference and harassment. ... Finally, it is important to note that Social Investment Bank Ltd. is located in Bangladesh, which was ranked as the world's most corrupt nation by Transparency International."[1378]

The FIG report offered this cautious analysis about whether to open an account:

"Although the allegations presented in this report, primarily against the International Islamic Relief Organization (IIRO) and the Lajnat al-Birr Al Islamiah, are highly adverse, no U.S. or foreign government law enforcement or regulatory body has stated unconditionally, that these organizations are under sanction.  The reputational risk is significant, however, and the possibility that further investigations by U.S. authorities

---

[1375] Id. at  1-2.
[1376] Id. at  2.
[1377] Id. at  3.
[1378] 2003 FIG Report on Social Islami Bank, at 4.

may ultimately uncover substantiating proof of a connection to terrorism.  The risk of future sanctions and the reputational risk based on allegations noted in this report should be measured against the current risks involved in our relationship when ultimately deciding a course of action."[1379]

While the 2003 FIG report provided significant adverse information about Social Islami Bank and noted that Lajnat al-Birr was the original name of the Benevolence International Foundation which "had been tied to terrorism," it failed to state that, in 2002, the United States had designated the Benevolence International Foundation as a "financier of terrorism" with whom U.S. persons are prohibited from doing business.[1380]  This additional terrorism-related designation meant that when HBUS was considering whether to open an account for Social Islami Bank in 2003, Social Islami Bank was partially owned by two organizations associated with terrorist financing.[1381]

Despite its failure to provide that additional information, the 2003 FIG report provided significant negative information about Social Islami Bank and squarely raised the question of whether HBUS should be doing business with it, given the "highly adverse" allegations.  Nevertheless, on October 14, 2003, HBUS AML Compliance approved Social Islami Bank as an HBUS PCM client.[1382]  In addition, despite the bank's location in a high risk country, the terrorist links uncovered in connection with two of its shareholders and a director, HBUS opened the account without designating the bank as an SCC client warranting additional monitoring and due diligence reviews.  HBUS immediately began providing the bank with services that included clearing U.S. dollar monetary instruments and U.S. wire transfers.  Those services produced revenues from Social Islami Bank totaling about $100,000 per year.[1383]

**2005 Review.**  Two years after the account was opened, as part of a broader HSBC effort to update its KYC client profiles in 2005, Social Islami Bank was the subject of a second enhanced due diligence review.[1384]  The resulting 2005 FIG report again identified IIRO, the bank's largest shareholder, as linked to terrorism, noting that it was "alleged to have provided funding to terrorist groups such as Al Qaeda in the past," and is "alleged to have acted as a cover

---

[1379] 2003 FIG Report on Social Islami Bank, at 1.

[1380] "Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism," U.S. Treasury Department press release No. PO-3632 (11/19/2002), www.treasury.gov/press-center/press-releases/Pages/po3632.aspx.  See also Executive Order 13224, "Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or support Terrorism" (9/23/2001).

[1381] The 2003 FIG Report also failed to mention that Social Islami Bank had opened an account for Al Rajhi Commercial Foreign Exchange.  That money exchange business was part of the Al Rajhi Group, whose U.S. business and charitable ventures were the subject of a 2002 law enforcement search to disrupt terrorist financing.  The FIG may have been unaware of the account at that time, although a 2005 FIG report on Al Rajhi Commercial Foreign Exchange disclosed it. See 7/13/2005 HBUS Financial Intelligence Group (FIG) Report of Findings (Update) on Al Rajhi Commercial Foreign Exchange, HSBC OCC 2725167-168.  In 2005, Al Rajhi Commercial Foreign Exchange and seven other businesses merged into Al Bilad Bank.  Id.  According to bank counsel, the Al Rajhi Commercial Foreign Exchange account closed in July 2002.  Subcommittee briefing by HSBC legal counsel (6/27/2012).

[1382] 2012 HBUS KYC Profile of Social Islami Bank, at 14.

[1383] Id. at 8.

[1384] See 3/8/2005 email from HBUS Nanayo Ryan to HBUS FIG Michael Ellis, "Social Investment Bank Ltd Bangladesh," HSBC-PSI-PROD-0102689.

for Al-Qaeda operations in the Philippines."[1385] The FIG report stated: "Based on the frequency with which the group is connected to terrorist financing in the press, it is likely that their activities will always be under scrutiny, and future government sanctions against the group are highly probable."[1386] The report also noted that Social Islami Bank did "not appear to have correspondent relationships with many of the other major global banking corporations."[1387] The FIG report "strongly recommend[ed]" that the account not be approved "until the matter is discussed with Senior Compliance Management."[1388]

Despite the concerns raised in the FIG report, HBUS retained Social Islami Bank as a client. At the same time, to address concerns about the account, HBUS AML Compliance required the HSBC CEO for Bangladesh to provide annual approval of the account for it to stay open.[1389] Despite this requirement, the Subcommittee uncovered only one instance in which approval was granted, and when asked, HSBC was unable to provide any additional documentation.[1390]

**2006 Terrorist Designation.** Eighteen months later, on August 3, 2006, the United States designated two branches of IIRO and a high ranking IIRO official as terrorist financiers and prohibited U.S. persons from transacting business with them.[1391] Treasury Under Secretary for Terrorism and Financial Intelligence Stuart Levey said: "We have long been concerned about these IIRO offices; we are now taking public action to sever this link in the al Qaida network's funding chain."[1392]

In response, on the same day, HBUS AML Compliance placed a block on the Social Islami Bank account, so that no funds could be withdrawn. The email imposing the block noted that the Social Islami Bank brought in HBUS revenues totaling $44,000 per year.[1393]

---

[1385] 3/10/2005 "Report of Findings – Social Investment Bank Ltd. – FIG (UPDATE)," HBUS Financial Intelligence Group, OCC-PSI-00823832 (hereinafter "2005 FIG Report on Social Islami Bank"), at 2.

[1386] Id.

[1387] Id.

[1388] Id.

[1389] HBUS AML head Terri Pesce told the Subcommittee it was "unusual" to obtain CEO approval of an account. Subcommittee interview of Teresa Pesce (3/30/2012). See, e.g., 2012 HBUS KYC Profile of Islami Bank, at 14-15; 2/9/2010 email from HBUS Jon K. Jones to HBAP Sadique Reza and others, "Compliance Conditions: Social Islami Bank Ltd," HSBC-PSI-PROD-0102645.

[1390] This approval was provided in April 2005 by Steve Banner, HSBC Bangladesh CEO. He wrote with regard to Social Investment Bank: "I have been in Bagladesh for only 2 months and have not yet met any of the executives from SIBL. Based on my discussion with Shohid, however, I can see no reason why we should not continue the relationship as at present." 4/16/2005 email from HSBC Steve Banner, HSBC PSI PROD 0102765. See also Subcommittee briefing by HSBC legal counsel (4/12/2012).

[1391] See 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted in 8/3/2006 email from HBUS Sharyn Malone to HBUS Stephanie Napier and others, "Social Investment Bank, Bangladesh," HSBC OCC 3259936.

[1392] 8/3/2006 press release, "Treasury Designates Director, Branches of Charity Bankrolling Al Qaida Network," U.S. Treasury Department, reprinted at HSBC OCC 3259936.

[1393] 8/3/2006 email from HBUS Sharyn Malone to HBUS colleagues, HSBC-PSI-PROD-0102776 ("IIRO holds a 8.62% stake in Social Investment Bank (SIB), Bangladesh who is a US PCM client of HBUS since Oct. 2003. Their value to US PCM is $44K annualized.").

The next day, August 4, 2006, the HSBC Financial Intelligence Group (FIG) issued an updated due diligence report on Social Islami Bank, containing significant adverse information about IIRO.[1394]  Among other information, the FIG report noted that the World Check database relied on by HSBC for KYC information classified IIRO as associated with terrorism, linked it to providing assistance to al Qaeda and other terrorist organizations, and described it as "allegedly linked" to the 1993 World Trade Center bombing, "plots to assassinate Bill Clinton and the Pope," and "the planned destruction of the Lincoln Tunnel and Brooklyn Bridge."[1395]

Two days after that, on August 6, 2006, an HSBC institutional banker from HBAP Dhaka, Muhammad Shohiduzzaman, met with Social Islami Bank to discuss IIRO.[1396]  He wrote to the HSBC CEO in charge of the operations in Bangladesh, Steven Banner, that Social Islami Bank had told him that IIRO "never took part in any activities" at the bank, "did not even take possession of the shares," and had never been a board member.[1397]  Mr. Shohiduzzaman advised: "we are of the opinion that since IIRO is not involved in the operation of SIBL [Social Islami Bank Ltd.], there [are] no issues of concern locally.  But since the matter has been raised by the US treasury, HBUS should take appropriate measure after careful examination of all the present and potential aspects."[1398]  Mr. Banner wrote to Hersel Mehani, the HSBC sales person assigned to the account: "Based on the feedback from SIBL, IIRO's role remains that of a minority shareholder that does not seek to engage in the management of the bank.  We have no reason to disbelieve SIBL's statements.  There are therefore no grounds for me to recommend an account closure or account freeze."[1399]

Mr. Banner continued:

"I appreciate, however, that HBUS may feel compelled to act firmly in the light of OFAC's position.  This is obviously a decision that rests with HBUS and I can confirm that we will not object to such action.  That said, we would much prefer it if SIBL is allowed to withdraw the balances held with HBUS before you freeze or close the account.  From our perspective there appears to be no justification for depriving SIBL of their funds and to do so would open HSBC to unwanted reputational damage / regulatory scrutiny locally."[1400]

In essence, Mr. Banner asked for the account to be kept open but if it were frozen, to allow Social Islami Bank to pull its money first so that none of its funds would be affected.

Later that same day, August 6, 2006, HBUS AML Compliance officer Alan Ketley forwarded the email exchange to his AML Compliance colleagues, George Tsugranes and

---

[1394] See 8/4/2006 FIG Report of Findings (Update) on Social Investment Bank Limited, OCC-PSI-00823818, at 12.
[1395] Id. at 3.
[1396] 8/6/2006 email from HBAP Muhammad Shohiduzzaman to HBAP Steve Banner, "Social Invst Bank Bangladesh," HSBC OCC 3260411-412.
[1397] Id.
[1398] Id.
[1399] 8/6/2006 email from HBAP Steve Banner to HBAP Muhammad Shohiduzzaman, "Social Invst Bank Bangladesh," HSBC OCC 3260411.
[1400] Id.  See also 8/6/2006 email from HBAP Hersel Mehani to HBUS Alan Ketley, HSBC OCC 3260410.

Andrew Rizkalla, and asked for their thoughts.[1401]  Both advised closing the account.  Mr. Tsugranes wrote:

> "Although the Philippine and Indonesia branch offices were cited, the Treasury action also cited Abd Al Hamid Sulaiman Al-Mujil who is a high ranking IIRO official.  So although only the 2 branches were cited, having a top official in the organization mentioned should be cause for concern involving the IIRO.  As this organization has a 9.0% stake and does not involve itself on the day to day operations or mgmt – who is to say that they won't sooner or later or start moving funds through this acct."[1402]

Mr. Rizkalla wrote:

> "I remain firm to my first opinion, the account should be closed in an orderly fashion.  We still don't know if there is a nominee shareholder interest to IIRO, the U.S. Govt has designated IIRO for supporting terrorism, so even the small shareholder ownership entitles them to profits and dividends from Soc Invst Bank to reinvest where??. ….  Hersel says monitor the accounts for 6 months, will he be doing the monitoring??"[1403]

Despite their advice to close the account, Mr. Ketley lifted the block on the account four days after it was imposed and approved keeping the account open:

> "After reviewing the information provided by HSBC Dhaka my provisional decision is that this relationship be allowed to continue.  It will need to be designated as an SCC Category 4 (reputational risk) with immediate effect and will be subject to closer monitoring as a result ….  I am not willing to commit to the 6 months suggested by Hersel and we will review activity and determine what further action may be required as events warrant.  …  IIRO's shareholding is a minority holding and information received indicates that they exert neither management control nor have board representation.  While this entity clearly represents a heightened reputational risk to the bank, I believe that with the knowledge we have today and the controls that are being implemented we have mitigated that risk adequately."[1404]

A few days later, FIG forwarded its report on Social Islami Bank to the head of HBUS AML Compliance, Teresa Pesce.  She wrote to Mr. Ketley:  "This makes me very uncomfortable.  Can we talk to the business about this?"[1405]  Despite the discomfort she expressed and the advice of two AML compliance officers, the account was kept open.  Mr. Ketley reported to the Subcommittee that he understood that IIRO was a passive shareholder, that Social Islami was attempting to expel them, and that he talked about the account with Terri

---

[1401] 8/7/2006 email exchange among HBUS Alan Ketley, George Tsugranes, and Andrew Rizkalla, "Social Invest Bank Bangladesh," HSBC OCC 3260409-410.

[1402] Id.

[1403] Id.

[1404] 8/7/2006 email from HBUS Alan Ketley to Hersel Mehani and others, "Social Investment Bank," HSBC OCC 3260426.

[1405] 8/11/2006 email from HBUS Teresa Pesce to Alan Ketley and Andrew Rizkalla, "Re:  Report of Findings – Social Investment Bank Limited – Bangladesh – FIG," HSBC OCC 3261519.

Pesce and Denise Reilly and believed they supported his decision to maintain the account.[1406] Ms. Pesce told the Subcommittee that she did not recall much about the relationship, but the bank should have reached out to OFAC with regard to it.[1407]   HBUS OFAC Compliance officer Elizabeth Protomasto told the Subcommittee that she contacted OFAC about this relationship after the SDN designation, and was told that the bank could continue to do business with Social Islami Bank, because only two branches of the IIRO had been designated by OFAC as SDNs, not all branches and not the branch in Bangladesh.[1408]   Social Islami Bank was also designated an SCC client.[1409]

**IIRO Remained a Shareholder for Six Years.**   In September 2006, Mr. Ketley asked Mr. Mehani to obtain additional information from the Social Islami Bank about its relationship with IIRO.[1410]   In response to a question asking whether IIRO was "a customer of the bank," Mr. Mehani wrote that the bank had told him:  "IIRO has no relationship with the subject bank and do[es] not maintain or operate any account with the bank."[1411]   In 2009, however, an internal FIG due diligence report quoted a 2008 local press article stating that the IIRO did have an account at Social Islami Bank, as well as over 50,000 bank shares which FIG estimated might then be worth $733,000.[1412]   In 2010, the HBUS KYC profile referenced a Bangladeshi Central Bank letter dated June 30, 2010, stating that IIRO had accounts at three Bangladeshi banks, including Social Islami Bank, that needed to be closed.[1413]   Social Islami Bank told the Subcommittee that IIRO did have a "foreign currency account" with the bank that was opened in 1995, but has a current balance of zero.[1414]

In 2006, Mr. Mehani indicated that the bank planned to "oust" IIRO as a shareholder at its next board of directors meeting and sell IIRO's bank shares.[1415]   Mr. Mehani wrote:  "IIRO never responded to their request to provide a full address rather than a PO box and they will use this to oust them by November [2006] which is allowed according to their Articles of Association which I have a copy given by them to me."[1416]   Despite that communication, a 2006

---

[1406] Subcommittee interview of Alan Ketley (2/16/2012).

[1407] Subcommittee interview of Teresa Pesce (3/30/2012).

[1408] Subcommittee interview of Elizabeth Protomastro (6/9/2012).

[1409] See 2012 HBUS KYC Profile of Social Islami Bank, at 14 (applying SCC designation as of 8/7/2006).

[1410] September 2006 emails between HBUS Alan Ketley, Hersel Mehani and others, "Social Invest Bank Bangladesh, HSBC OCC 3260409-418.

[1411] 9/27/2006 email from HBUS Hersel Mehani to HBUS Alan Ketley and others, "Compliance issues from Trip Dhaka," HSBC-PSI-PROD-0102755-756 (answer to Question 5).

[1412] 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, OCC-PSI-00823818, at 7 (quoting 10/8/2008 article from Bangladeshnews.com).   The FIG report also stated:  "You may therefore wish to obtain information from your customer to ascertain the status of the accounts held by the IIRO in the Social Investment Bank Ltd.   You may also wish to consider the risks, including reputational risk involved in maintaining this account relationship."  Id. at 7-8 (emphasis omitted).

[1413] 2012 HBUS KYC Profile of Social Islami Bank, at 4 ("The 3 bank accounts of IIRO namely i) Social Islami Bank Ltd. ii) Islami Bank Bangladesh Ltd. iii) Al-Falah Islami Bank Ltd. must be disposed off [sic] and transferred").

[1414] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 4, PSI-SIBL-01-0001.

[1415] 9/27/2006 email from HBUS Hersel Mehani to HBUS Alan Ketley and others, "Compliance issues from Trip Dhaka," HSBC-PSI-PROD-0102755-756.

[1416] Id.  See also 2012 HBUS KYC Profile of Social Islami Bank, at 5 ("Compliance advised … that IIRO has no involvement in the running of the bank, is not a client of the bank and will likely be ousted as a shareholder [which] give considerable grounds for comfort").

Social Islami Bank board resolution authorizing sale of the shares,[1417] and HBUS' repeated inquiries into their status over multiple years,[1418] IIRO has remained a shareholder of Social Islami Bank, although its ownership interest has gradually dropped from 8.62% in 2006, to 3.85% in 2009, to 1.69% by 2010.[1419] IIRO currently holds a 1.61% interest in the bank, six years after Social Islami Bank promised to ensure the shares would be sold.[1420]

In 2009, Social Islami Bank sent a letter to HBUS indicating that it was planning to seek permission from the country's High Court to sell the shares still held by IIRO.[1421] In 2010, Social Islami Bank informed HBUS that the Bangladesh government had reached an agreement with IIRO that, after certain safeguards were put in place, would allow IIRO to begin operating in the country again.[1422] One of the conditions was that the IIRO would have to "dispose" of its Social Islami Bank account,[1423] although that account remains open today with a zero balance.[1424] Social Islami Bank informed the Subcommittee that, due to the government's actions, "the bank is under definite obligation in paying dividend/issuing bonus shares/right shares to IIRO as per the instructions of the Central Bank and Ministry of Finance which were not paid/issued in their favor till 31/05/2010."[1425]

**A Second Terrorist Financier Shareholder.** Also in 2009, a due diligence report issued by the HBUS Financial Intelligence Group identified a second, longterm Social Islami Bank shareholder that raised concerns. It disclosed that Islamic Charitable Society Lajnat al-Birr Al Islam still held a 1.54% ownership interest in the bank.[1426] The 2009 FIG report explained that World Check, the database relied on by HSBC for KYC purposes, had classified the charity "as a terrorist organization with reported tie[s] to Hamas. In September 2008, the Israeli government

---

[1417] See 12/14/2006 letter from Social Islami Bank quoting board resolution, HSBC OCC 3342182.
[1418] See, e.g., January 2007 email exchange among HBUS Muhammad Shohiduzzaman, Hersel Mehani, Alan Ketley, and others, "Social Investment Bank – IIRO," OCC-PSI-00808829; 9/23/2008 email exchange among HBUS Alan Williamson, Daniel Jack , Hersel Mahani, and others, "Social Investment Bank," OCC-PSI-00246337; 9/23/2008 email exchange among HBUS Alan Williamson, Daniel Jack, Gloria Strazza, Monique Codjoe, and others, "POSITIVE OFAC MATCH – IIRO –KYC NOTES DATABASE," OCC-PSI-00246334; 9/24/2008 call report from a meeting at Social Islami Bank, HSBC-PSI-PROD-0102615; 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102743, at 1; 2/9/2010 email from HBUS Jon K. Jones to HBAP Sadique Reza and others, "Compliance Conditions: Social Islami Bank Ltd," HSBC-PSI-PROD-0102737.
[1419] See 2012 HBUS KYC Profile of Social Islami Bank at 3-4; 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102743, at 1.
[1420] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 3, PSI-SIBL-01-001; See also 2012 HBUS KYC Profile of Social Islami Bank, at 3, 16.
[1421] 3/8/2009 letter from Social Islami Bank to HSBC Dhaka, "Information regarding Bank's ownership for KYC purposes," HSBC-PSI-PROD-0102621-625, at 1. Around the same time in 2009, HSBC's Commercial and Institutional Banking in the Asia Pacific region further expanded HSBC's relationship with Social Islami Bank by providing it with new commercial banking services. The approval form mistakenly characterized Social Islami Bank as "medium risk," erroneously said it was not an SCC designated client, and stated that none of the bank's disclosed shareholders increased the client's risk profile, despite a specific reference to IIRO. 3/10/2009 CIBM-Institutional Banking KYC Profile for Social Islami Bank Limited, HSBC-PSI-PROD-0102646.
[1422] 2012 HBUS KYC Profile of Social Islami Bank, at 4.
[1423] Id.
[1424] 7/11/2012 Social Islami Bank response to Subcommittee questions, at 2, PSI-SIBL-01-001.
[1425] Id. at 3.
[1426] 5/5/ 2009 FIG report, HSBC PSI PROD 0102696, at 3, 5.

reportedly declared it an illegal entity."[1427]  Despite this new information in the 2009 FIG report, the HBUS KYC profile on Social Islami Bank does not acknowledge it, stating instead in a note: "Updated EDD [Enhanced Due Diligence] ROF [Report on Findings] received May 5, 2009. Report provided no new, or, up to date information."[1428]  Social Islami Bank has informed the Subcommittee that Lajnat al-Birr remains a 0.22% share owner, but does not have any account at the bank.[1429]

**Sobhan Misconduct.**  The ongoing ownership of the bank's shares by IIRO and Lajnat al-Birr was not the only troubling development.  Social Islami Bank's initial Chairman of the Board, Ahmed Akbar Sobhan, also known as Shah Alam, was a well-known businessman who held, with his son, a 3.35% ownership interest in the bank since its inception.[1430]  Beginning in 2006, however, Mr. Sobhan and his son became the subjects of several criminal investigations involving bribery, corruption, fraud, and tax evasion.[1431]  In 2007, Mr. Sobhan and his son reportedly fled to the United Kingdom, after which Mr. Sobhan was the subject of corruption charges brought in his absence by the Bangladeshi Anti-Corruption Commission which sentenced him to eight years in prison.[1432]  This troubling information was detailed in the 2009 FIG report that was later described in the Social Islami KYC profile as containing no new information.[1433]

In May 2012, HSBC terminated its relationship with Social Islami Bank.[1434]  David Bagley, head of HSBC Group Compliance, told the Subcommittee, when asked, that the closure decision had been a "no brainer."[1435]  He did not explain what factors led to the termination decision.  Social Islami Bank currently has no open account with any HSBC affiliate.[1436]

## J.  Analysis

HSBC is a global bank with a strong presence in many countries confronting terrorist threats.  If safeguards are lacking, HBUS offers a gateway for terrorists to gain access to U.S. dollars and the U.S. financial system.  HSBC has a legal obligation to take reasonable steps to ensure it is not dealing with banks that may have links to or facilitate terrorist financing.

---

[1427] Id. at 5 (emphasis in original is omitted).

[1428] 2012 HBUS KYC Profile of Social Islami Bank, at 4.

[1429] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.

[1430] See "Social Investment Bank Ltd. Director's Business Information," Social Islami Bank, undated, HSBC-PSI-PROD-0102626; 2003 Bankers Almanac at 3891 (listing Mr. Sobhan with a 2.12% interest and Mr. Sobhan and his son, Sadat Sobhan, sharing a 1.23% interest).

[1431] See 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 6-7.  See also "Court orders to arrest Bashundhara chairman," The Daily Star (4/26/2012), http://www.thedailystar.net/newDesign/news-details.php?nid=231738; "Shah Alam lands in jail," The Daily Star (3/21/2011), http://www.thedailystar.net/newDesign/news-details.php?nid=178563.

[1432] See 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 6-7.

[1433] 5/5/2009 Financial Intelligence Unit Report of Findings on Social Investment Bank Limited, HSBC OCC 3261530, at 2, 6-7; 2012 HBUS KYC Profile of Social Islami Bank, at 4.

[1434] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.

[1435] Subcommittee interview of David Bagley (5/10/2012).

[1436] 7/11/2012 Social Islami Bank response to Subcommittee questions, PSI-SIBL-01-0001-004, at 002.

Banks rarely carry explicit links to terrorist financing, but in the three banks reviewed here, an array of factors raised troubling questions.  In the case of Al Rajhi Bank, the  factors included the naming of a key bank official in a list of al Qaeda financial benefactors, a U.S. law enforcement search of Al Rajhi nonprofit and business ventures in the United States to disrupt terrorist financing, a CIA report targeting the bank for being a "conduit" for extremist finance, the bank's refusal to produce authenticating bank documents for use in the criminal trial of a client who cashed travelers cheques at the bank for use by terrorists, and multiple accounts held by suspect clients.  In the case of Islami Bank, the factors included substantial ownership of the bank by al Rajhi interests, Central Bank fines for failing to report suspicious transactions by militants, and an account provided to a terrorist organization.  In the case of Social Islami Bank, the factors included ownership stakes held by two terrorist organizations whose shares were exposed but never sold as promised, and a bank chairman found to be involved with criminal wrongdoing.

In each case, HBUS and HSBC personnel were aware of the information, but approved or maintained the accounts anyway.  When an AML Compliance officer like Beth Fisher declined to approve an account, HSBC personnel found someone else to take her place.  In several cases, Christopher Lok, head of U.S. Banknotes, took on the role of relationship manager fighting for account approval.  His test for taking on that role depended in part upon how much revenue an account would produce.  Al Rajhi Bank's threat to terminate business with HSBC affiliates also appears to have galvanized HBUS' renewal of the account.

Another striking feature of these accounts is the fact that a decision by one HSBC affiliate to terminate a relationship with a bank due to terrorist financing concerns did not always lead other HSBC affiliates to follow suit.  In the case of Al Rajhi Bank, for example, HBUS terminated the relationship, but HSBC affiliates in the Middle East continued to do business with the bank.  One HBUS executive later argued that, since HSBC was already exposed to the reputational risk posed by Al Rajhi Bank through the accounts at other HSBC affiliates, its reputational risk would not increase if one more account were opened.  In May 2012, HSBC changed its policy to apply decisions to terminate a client relationship to apply globally to all its affiliates.

## VI.  HOKURIKU BANK:  CLEARING BULK TRAVELERS CHEQUES

With few questions asked and despite ongoing evidence of suspicious activity, HBUS cleared tens of millions of dollars per year in bulk travelers cheques for Hokuriku Bank of Japan. According to Hokuriku Bank, from 2005 to October 2008, HBUS cleared travelers cheques totaling between $70 million and $90 million per year for the bank, producing a grand total in less than four years of more than $290 million.  HBUS estimated that, at one point in 2008, it was clearing travelers cheques for the bank at an average of $500,000 to $600,000 per day.  The Hokuriku deposits consisted of U.S. dollar travelers cheques that were in denominations of $500 or $1,000, came in batches of sequentially numbered cheques, and were signed and counter-signed by the same person using an illegible signature.  They were made payable to one of 30 different companies or individuals, all of whom claimed to be in the used car business.  The cheque beneficiaries were clients of Hokuriku Bank, but the cheques were purchased from the same Russian bank for deposit into their accounts in Japan.  When HBUS finally asked Hokuriku Bank about those clients and the business purpose behind Russians cashing massive numbers of U.S. dollar travelers cheques on a daily basis for deposit in Japan, Hokuriku Bank claimed to have little or no KYC information or understanding of its clients' banking transactions.

The documents produced to the Subcommittee disclosed that some HBUS AML Compliance personnel raised concerns about the Hokuriku travelers cheques in 2005, but failed to investigate the transactions.  The Hokuriku travelers checks came to HBUS' attention again in 2007, during the course of an OCC AML examination which found "serious concerns related to weak policies, procedures, systems and controls" with how it processed monetary instruments,[1437] but HBUS again failed to investigate the transactions.  In 2008, during a followup OCC AML examination, the OCC singled out the Hokuriku travelers cheques as suspicious and required HBUS to obtain additional information about them.

The OCC and HBUS quickly uncovered troubling information about the travelers cheques, including that they had originated in Russia, a country at high risk of money laundering, involved millions of U.S. dollars, and had no clear business purpose.  When HBUS sought more information about the cheques, Hokuriku Bank at first delayed responding, then provided minimal information, and finally declined to investigate further, claiming to be constrained by bank secrecy laws from disclosing client-specific information.  In 2008, at the urging of the OCC, HBUS stopped accepting travelers cheques from the bank and told the OCC that it planned to close the Hokuriku account within 30 days.  HBUS later decided to continue to do business with Hokuriku Bank in other areas despite its poor AML efforts.  In 2010, during the course of another AML examination, the OCC uncovered the ongoing relationship with Hokuriku Bank. In May 2012, HBUS closed the Hokuriku Bank account, although Hokuriku Bank continues to do business with other HSBC affiliates.

---

[1437] 3/31/2007 OCC Report of Examination for HSBC bank, OCC-PSI-00304077.  [Sealed Exhibit.]

## A. Hokuriku Bank

Hokuriku Bank Ltd. is a Japanese regional bank with over 2,800 employees and 185 branches.[1438]  It also has representative offices in New York, London, Singapore, and China.[1439] Hokuriku Bank traces its origins back to 1877; in 1961, it began trading on the Tokyo Stock Exchange.[1440]  In 2003, the Hokugin Financial Group was formed in Japan, and Hokuriku Bank became a wholly-owned subsidiary of the Group.  In 2004, the Group merged with another financial institution and changed its name to Hokuhoku Financial Group Inc. which continues to operate as the bank's holding company today.[1441]  Hokuhoku Financial Group is headed by Shigeo Takagi, who has been the President of both the Group and Hokuriku Bank since 2003.[1442]

According to a 2010 HBUS Know Your Customer (KYC) Profile, Hokuriku Bank is a longstanding customer of HBUS, which has provided it with correspondent banking services in Hong Kong, Korea, and the United Kingdom, as well as the United States.[1443]  In addition to HBUS, Hokuriku Bank has correspondent relationships with several other HSBC affiliates as well, including Hong Kong and Shanghai Banking Corporation, Ltd. and HSBC Middle East.[1444] By 2001, Hokuriku Bank had become a client of HBUS' Payments and Cash Management (PCM) division which used its processing centers in New York to handle most Hokuriku transactions.[1445]

HBUS provided Hokuriku Bank with two accounts, numbered 50385 and 34738. Account No. 50385 was closed on Feb. 6, 2009, and its balance transferred to Account No. 34738, which remained open until May 2012.[1446]  HBUS provided Hokuriku Bank with access to U.S. dollars, primarily by clearing millions of dollars in U.S. dollar travelers checks each year. According to Hokuriku Bank, HBUS cleared travelers cheques totaling about $77 million in 2005, $72 million in 2006, $90 million in 2007, and $52 million in 2008, until HBUS stopped providing clearing services for the bank's bulk travelers cheques.[1447]  Those figures show that, in less than four years, HBUS cleared travelers cheques for Hokuriku Bank totaling over $290 million.  HBUS also processed wire transfers from Hokuriku Bank and provided other banking

---

[1438] See HBUS "Know Your Customer Profile" for Hokuriku Bank (hereinafter "HBUS KYC Profile")(last updated on 9/3/2010), prepared by HBUS Global Payments and Cash Management division, HSBC-PSI-PROD-0102415-425, at 417; "Hokuhoku Financial Group Inc. Annual Report 2011," (year ended March 31, 2011)(hereinafter "Hokuhoku 2011 Annual Report"), at 59, http://www.hokuhoku-fg.co.jp/english/financial/docs/fg_ar2011.pdf.
[1439] Hokuhoku 2011 Annual Report, at 1, 59.
[1440] See Hokuhoku 2011 Annual Report at 59; HBUS KYC Profile at HSBC-PSI-PROD-0102416.
[1441] Id.
[1442] HBUS KYC Profile at HSBC-PSI-PROD-0102420; Hokuhoku 2011 Annual Report, at 61.
[1443] HBUS KYC Profile at HSBC-PSI-PROD-0102417-418.  HBUS told the OCC that it first opened an account for Hokuriku Bank in 1978, through its U.S. predecessor, Marine Midland Bank, which HSBC purchased during the 1980s.  5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.
[1444] See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.
[1445] HBUS KYC Profile at HSBC-PSI-PROD-0102415-425, at 423.
[1446] Id. at 420.  HBUS closed the second account on May 21, 2012.  6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.
[1447] See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, chart entitled, "Volume of U.S. Dollar Travelers Checks to HBUS for Clearance by year," PSI-HokurikuBank-01-0001-016.  Hokuriku Bank cleared another $52 million in 2008, until HBUS stopped clearing the cheques in October 2008.

services.  In 2007, the Hokuriku account produced revenues for HBUS totaling about $47,000.[1448]

According to the HBUS KYC Profile, the initial HBUS Account Manager for Hokuriku Bank was Nanayo Ryan, and the Relationship Manager for KYC approval purposes was Beth Fisher.[1449]  In 2008, the HBUS Account Manager switched to Kgomotso Hargraves, while the Relationship Manager for KYC approval purposes switched to Wayne W. Ferguson, then Anthony Julian, then Wen Lu Wu.[1450]  The Global Relationship Manager since 2008 has been Machiko Yamashita.[1451]

### B. Travelers Cheques

Travelers cheques are typically sent by one financial institution to another via a "pouch." A pouch is an envelope or package, and pouch activity refers to the sending or receipt and processing of an item that is sent to a bank from another country by common carrier, courier, or referral agent.  Pouches typically contain currency or a monetary instrument, such as a travelers cheque, cashiers cheque, or money order, which is intended to be used to make a deposit or loan payment, or to engage in another transaction.  Pouches can be sent by an unrelated financial institution, a bank affiliate, or by an entity or individual.

In addition to physical delivery of monetary instruments, many banks, including HBUS, provide a service called "Remote Deposit Capture" (RDC).  RDC enables customers who sign up for the service to send electronic images of physical monetary instruments that they wish to present for deposit, including travelers cheques.  Processing these electronically sent deposits are sometimes referred to as part of the receiving bank's pouch activity.

At large banks, pouched monetary instruments are typically sent to a specialized facility for processing.  These facilities typically process a high volume of monetary instruments on a daily basis.  When a bank processes a pouched travelers cheque, it typically credits the amount of the cheque to the correspondent account of the client financial institution that sent the cheque. Pouch activity is often referred to as "cash letter" activity, since it consists primarily of cashing a monetary instrument by crediting an account with the amount specified on the instrument. Providing cash in exchange for a monetary instrument is also referred to as "clearing" the instrument.

HBUS has two processing centers in the United States, one in Brooklyn and one in Buffalo, New York, both of which process a high volume of monetary instruments on a daily basis.  RDC services are provided solely at the Buffalo center.[1452]  Both centers segregate travelers cheques from other types of deposits and process them separately, crediting the U.S.

---

[1448] HBUS KYC Profile at HSBC-PSI-PROD-0102415-425, at 420.
[1449] Id. at 424.
[1450] Id. at 418, 424-425.
[1451] 9/5/2008 email from Hideki Matsumoto to Michio Yamashita and others, "Hokuriku Bank," OCC-PSI-00808695, at 5.
[1452] 10/4/2010 draft OCC Supervisory Letter to HBUS, OCC-PSI-00863984-992, at 2. [Sealed Exhibit.]

dollars to the relevant client accounts.[1453]  A processing clerk typically skims each deposit to identify any sequentially numbered travelers cheques.  If the sequentially numbered cheques total more than a designated amount, the clerk is required to refer the deposit to HBUS AML Compliance for approval prior to processing.[1454]  If the sequentially numbered travelers cheques exceed another specified threshold, the processing clerk must attach a Traveler's Cheque/Money Order High Value Deposit Information (TC/MO HVDI) form to the deposit prior to processing.[1455]  If the form is not attached, the deposit must be submitted to AML Compliance for approval prior to processing.[1456]  This procedure is intended to ensure that HBUS AML Compliance is kept apprised of large deposits of sequentially numbered travelers cheques, since such cheques are often associated with money laundering or other misconduct.

U.S. banking regulators have long warned financial institutions about the money laundering risks associated with travelers cheques which can be purchased with cash by a non-customer of the bank and used to move substantial funds across international borders in ways that are difficult to trace.[1457]  Travelers cheques have been used by terrorists,[1458] drug traffickers,[1459] and other criminals.[1460]

---

[1453] 6/26/2008 Memorandum to the OCC Examiner-In-Charge Anthony DiLorenzo from OCC Examiner Elsa de la Garza, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," OCC-PSI-00885828, at 1.  [Sealed Exhibit.]

[1454] Id.

[1455] Id.

[1456] Id.

[1457] See, e.g., Federal Financial Institutions Examination Council (FFIEC) Bank Secrecy Act/Anti-Money Laundering (BSA/AML) Examination Manual, "Core Overview:  Purchase and Sale of Monetary Instruments," (6/23/2005) at 59; FFIEC BSA/AML Examination Manual, "Purchase and Sale of Monetary Instruments-Overview," (8/24/2007), at 212 ("The purchase or exchange of monetary instruments at the placement and layering stages of money laundering can conceal the source of illicit proceeds.  As a result, banks have been major targets in laundering operations because they provide and process monetary instruments through deposits.").

[1458] See, e.g., United States v. al-Haramain Islamic Foundation Inc., Case No. 6:05-cr-60008-HO (USDC Oregon) Indictment (2/17/2005); "Former U.S. Head of Al-Haramain Islamic Foundation Sentenced to 33 Months in Federal Prison," U.S. Attorney's Office for the District of Oregon press release (9/27/11), at 1 (describing how the convicted defendant cashed $130,000 in U.S. dollar travelers cheques at a bank in Saudi Arabia and then provided the funds to support violent extremists in Chechnya).

[1459] See, e.g., United States v. Wachovia Bank N.A., Case No. 10-20165-CR-Lenard (USDC SDFL), Factual Statement, Exhibit A to Deferred Prosecution Agreement (3/16/2010), at ¶ 35 (describing how Wachovia Bank processed $20 million in suspicious travelers cheques, some portion of which was suspected to include illegal drug proceeds); "How a Big U.S. Bank Laundered Billions from Mexico's Murderous Drug Gangs," The Guardian, (4/2/2011), http://www.guardian.co.uk/world/2011/apr/03/us-bank-mexico-drug-gangs.  See also Albajon v. Gugliotta, 72 F. Supp. 2d 1362, 1365 (S.D. Fla. 1999) (admitting travelers cheques as evidence of drug trafficking proceeds); United States v. $41,305.00 in Currency & Travelers Checks, 802 F.2d 1339, 1343 (11th Cir. 1986) (finding travelers cheques could be seized as drug trafficking proceeds).

[1460] See, e.g. Folk v. State, 192 So. 2d 44, 46 (Fla. Dist. Ct. App. 1966) (upholding conviction for signing a false name on travelers cheques and cashing them); United States v. Sebagala, 256 F.3d 59, 63 (1st Cir. 2001) (upholding conviction for using undeclared travelers cheques to attempt to move money fraudulently through U.S. customs).

### C. 2005 Concerns about Hokuriku Travelers Cheques

The documents produced to the Subcommittee show that HBUS AML Compliance personnel were aware of, and expressed concerns about, the large number of travelers cheques being cashed for Hokuriku Bank from at least as early as March 2005, but did little about them for years.

On March 15, 2005, HBUS AML compliance officer George Tsugranes sent an email to the HBUS account manager for Hokuriku Bank, Nanayo Ryan, in which he noted that, in less than 60 days from January to March 2005, Hokuriku Bank had deposited travelers cheques totaling over $2 million.[1461]   The email provided a chart listing 41 separate deposits over a 51-day period, showing that the deposited amounts ranged from $20,000 to $100,000 at a time; often consisted of multiple $1,000 travelers cheques; and referenced about ten different clients, including corporations and individuals.[1462]   All of the deposits were to Hokuriku Bank's Account No. 50385.  Mr. Tsugranes asked Mr. Ryan:

> "to reach out to the bank and ask that adequate KYC is on file for each name listed on the spreadsheet, whether the customer activity is consistent with the KYC, and also who is their customer base (local clients, people buying cars for export, etc.) and why US dollar travelers checks would be used for payment."[1463]

This email shows that, in early 2005, Hokuriku's pattern of making large deposits with multiple travelers cheques triggered a review by HBUS AML Compliance personnel concerned about who was behind the deposits.  Despite the request for more information in the March 2005 email, the Subcommittee received no additional documentation or information indicating that HBUS AML Compliance personnel actually sought or obtained additional KYC information from Hokuriku Bank in early 2005, regarding the travelers cheques it was cashing.

Eight months later, in November 2005, several emails indicate that HBUS AML Compliance personnel took a broader look at the cash letter/pouch activity at its Brooklyn center, apparently in an effort to detect unlicensed money service business activity.[1464]   This inquiry was not specific to Hokuriku Bank.  On Nov. 23, 2005, HBUS AML senior compliance officer Alan Ketley sent an email to AML compliance officer Mark Balawender stating that, while HBUS had "strong monitoring procedures in place for PCM clients," he wasn't sure about what was "in place for other clients" at the Brooklyn center.  He attached to the email a 21-page chart listing

---

[1461] 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku Bank C/L Activity," HSBC OCC 3113976-977.   The chart is unlikely to contain a comprehensive list of all of the travelers cheques presented by Hokuriku Bank over the course of those two months since, during 2005 alone, Hokuriku Bank cleared $77 million in travelers cheques through HBUS.  See 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, chart entitled, "Volume of U.S. Dollar Travelers Checks to HBUS for Clearance by year," PSI-HokurikuBank-01-0001.

[1462] 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku Bank C/L Activity," HSBC OCC 3113976-977.

[1463] Id.

[1464] See email exchange among HBUS AML Compliance personnel, from 11/23/2005 - 11/29/2005, HSBC OCC 3180772-797, at 773 ("I do not believe there are any formal or documented checks in place that would identify potential unlicensed money service business activity").

the "cash letter volume" for 35 bank clients over a one-year period from April 2004 to March 2005.[1465]  The data disclosed, among other information, that over the course of the year, Hokuriku Bank had cashed an increasingly larger volume of monetary instruments each month into its Account No. 50385, building from 36 items totaling about $209,000 in April 2004, to 109 items totaling over $4.3 million in March 2005.  Altogether for the year, Hokuriku Bank is recorded as having deposited at HBUS 562 "envelopes" with over 24,000 items totaling $11.2 million.[1466]

On November 25, 2005, Mr. Balawender sent an email to Mr. Ketley with his findings.[1467]  He described the Brooklyn center as engaged in "heads down volume process[s]ing."  He stated, "Given the volume/deadline driven/processing nature of the departments above, I am not sure what we can do.  …  I would anticipate a rather strong push-back from Ops and the branches, if AML Compliance were to suggest additional processes."[1468]

No further information or inquiries related to Hokuriku Bank appear in the 2005 timeframe among the documents provided to the Subcommittee in response to a broad request for all documents related to Hokuriku Bank and pouch activity.  When asked for more information about the March and November 2005 reviews, Mr. Ketley indicated that he could not recall either Hokuriku Bank or what happened in either review.[1469]

In sum, despite a specific March 2005 AML inquiry into $2 million in travelers cheques cleared for Hokuriku Bank, and a broader November 2005 inquiry that included evidence of an escalating pattern of Hokuriku deposits, HBUS AML Compliance apparently took no further action to investigate Hokuriku's cash letter activities in 2005.  The 2005 and 2006 OCC annual examination of HBUS also made no mention of AML issues related to its pouch activities or clearance of travelers cheques.[1470]

## D. 2007 OCC Pouch Examination

Two years after the internal HBUS inquiries, in early 2007, the OCC commenced an AML examination of HBUS' pouch activities.[1471]  In response, HBUS AML compliance officer George Tsugranes produced a chart listing clients with a high volume of cash letter activity during the last two months of 2006.[1472]  Hokuriku Bank was repeatedly listed, appearing in the chart more times than any other bank.  Over a 62-day period, the chart identified 100 Hokuriku deposits.  The deposit amounts ranged from $20,000 to $193,000 at a time, often consisted of multiple $1,000 travelers cheques, and referenced about a dozen clients, both corporate and

[1465] Id. at 776-797.
[1466] Id. at 776.
[1467] Id. at 773.
[1468] Id.
[1469] Subcommittee interview of Alan Ketley (2/16/2012).
[1470] See OCC Reports of Examination of HBUS, for the examination cycle ending March 31, 2005 and March 31, 2006.  [Sealed Exhibit.]
[1471] See 5/8/2007 OCC Memorandum, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-01298647 [Sealed Exhibit.]; 3/2/2007 email from HBUS George Tsugranes to HBUS Alan Ketley, HSBC OCC 3352026.
[1472] See chart, prepared by HBUS AML Compliance, HSBC OCC 3352034-037.

individual.[1473]  Many of the client names on the 2006 list had also appeared on the March 2005 list compiled by Mr. Tsugranes.  The total amount deposited over the two-month period was about $5.6 million.

Mr. Tsugranes sent the chart to his supervisor, Mr. Ketley, and wrote that "all acc[oun]ts are being checked to ensure activity is reflected on KYC."  Of the documents produced to the Subcommittee, none indicate, however, what information was "checked" with respect to Hokuriku Bank or what Mr. Tsugrantes learned.

Six weeks later, on April 24, 2007, Mr. Ketley asked HBUS AML compliance officers Mr. Tsugranes and Robert Guthmuller, to travel to the HBUS Brooklyn center "to gain a thorough understanding of what is processed … [and] what items are reviewed."[1474]  Three days later, on April 27, 2007, Mr. Guthmuller sent an email to Mr. Ketley providing him with "the Readers Digest version" of their findings after "a high level review of cash letter processing" at the Brooklyn center.[1475]

Mr. Guthmuller's email stated that the Brooklyn center "treat[ed] all clients the same," regardless of whether cash letter items involved "high risk clients."  He wrote:  "We should be drilling down on our high risk customers" and, for example, "identify those clients that in the past have sent a large number of sequentially numbered travelers checks … and monitor accordingly."[1476]  Mr. Guthmuller also wrote that the center staff had "divided loyalty," explaining:

"Their main job is processing checks – 5:00PM deadline.  But they are also asked to be the 'front line' for monitoring, referring items to Delaware for further investigation.  One job focuses on pushing items through, another is to go slower, review items, ask themselves questions – is it suspicious? – contact Delaware – wait for a response – hopefully before 5:00PM.

[O]ne solution is to have a full time compliance person review items FULLY, that means internet searches, OFAC, wor[l]dcheck etc.  Additionally the compliance person could drill down on the high risk accounts."[1477]

Mr. Guthmuller also stated that HBUS "[m]ust improve trend analysis.  Nothing done in Brooklyn."  He wrote:

---

[1473] Hokuriku Bank told the Subcommittee that, since the mid 1980s, it has limited its clients to deposits of no more than $1,000 in travelers cheques per person per day, unless the cheques were issued by Hokuriku Bank or the depositor was a "regular customer" and the bank "deemed that the funds will be collected from the customer should it turn out that the travelers' che[c]k was not duly issued."  6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 004.
[1474] 4/23/2007 email from HBUS Alan Ketley to HBUS George Tsugranes, Robert Guthmuller, Mark Balawender, and others, "Vist to Brooklyn Ops," OCC-PSI-00312153, at 5-6.
[1475] 4/27/2007 email from HBUS Robert Guthmuller to HBUS Alan Ketley, "Visit to Brooklyn OpsLink," OCC-PSI-00312153, at 4.
[1476] Id. at 5.
[1477] Id. at 5 (emphasis in original).

"We have reportedly had all travelers checks $20k and over … on Excel for 4 years but haven't used/sorted items for trend analysis. Let's start looking at it. WHAT ABOUT SEQUEN[T]IALLY NUMBERED TRAVELERS CHECKS AGGREGATING SAY $15K per day, same payee …?"[1478]

This email indicated that HBUS had compiled an extensive database of travelers cheque information, but was not using it to identify suspicious travelers cheque activity or high risk clients.

Mr. Guthmuller also wrote that the HBUS AML office in Delaware "must improve" its enhanced due diligence (EDD) efforts, including by using "more internet searches, calls on high risk clients asking questions, use of certifications, etc."[1479] His email indicated that HBUS' AML staff did not engage in sufficient due diligence activity to identify high risk clients depositing bulk travelers cheques.

Mr. Ketley forwarded the email to Anne Liddy, a senior HBUS Compliance official, with the comment, "Food for thought."[1480] He wrote: "We will look to have a meeting with Bob [Guthmuller] next week to discuss further."

Ten days later, on May 7, 2007, Mr. Tsugranes sent an email to Mr. Ketley and others stating he had "discussed the issues with the Delaware AML team and asked for some input on ways to improve our cash letter monitoring."[1481] He stated: "Below are some recommendations which will allow for both operational benefits and a more risk based monitoring approach."

His email advised reducing the monitoring of checks from Fortune 100 names, and revising the dollar limit to $100,000 to trigger review of an account of a Special Category Client (SCC). While reducing review of Fortune 100 names could be seen as an effort to target AML review efforts to higher risk transactions, imposing a $100,000 dollar limit on SCC clients, the bank's highest risk clients, set a high bar to trigger a review. With respect to Hokuriku Bank and another bank in Korea, Mr. Tsugranes advised that AML personnel track the banks' total daily deposits, "eliminate the check by check comparison," and "only investigate if an apparent MIF [Monetary Instrument Form] was not included." He wrote: "To summarize we would be focusing more on SCC clients, cutting back on some Group reviews in non HRCs [non High Risk Clients] and also tracking" a specific bank of concern.

While the Tsugranes email advocated a stronger focus on SCC clients, it did not address Mr. Guthmuller's suggestion to identify other high risk clients by analyzing the bank's travelers cheque data. His email did not, for example, include the Guthmuller suggestion to strengthen trend analysis of the cash letter activity at the Brooklyn center by utilizing the four years of travelers cheque data already included in Excel spreadsheets. The Tsugranes email also failed to include the suggestion, urged in capital letters in the Guthmuller email, to identify and investigate clients making deposits of sequentially numbered travelers checks above a specified

---

[1478] Id. at 5 (emphasis in original).
[1479] Id. at 5.
[1480] Id. at 4.
[1481] Id. at 2-3.

threshold. Instead, the Tsugranes email recommended reducing the monitoring directed toward
Hokuriku Bank by eliminating the "check by check comparison" that had been routine practice.
In the end, despite another chart disclosing multi-million-dollar Hokuriku deposits of $1,000
travelers checks, the final result of HBUS' review was to advocate devoting less rather than more
attention to the bank.

The two OCC examiners who conducted the 2007 examination told the Subcommittee
that they were very concerned about the lack of AML controls over HBUS pouch activity and
had recommended that the OCC impose a Cease and Desist Order requiring HBUS to revamp
them.[1482] They later concluded, however, that they were unable to meet the OCC standards
required for issuing the order. Instead, the OCC examiners designated the lack of AML controls
over pouch processing as a Matter Requiring Attention (MRA) which was included in the annual
OCC Report of Examination provided to the HBUS Board of Directors on July 24, 2007.[1483]
The MRA did not, however, explicitly identify the Hokuriku travelers cheques as a problem.

The OCC uses its annual Reports on Examinations to ensure bank boards are kept
apprised of serious bank deficiencies requiring action by management. The 2007 Report of
Examination notified the HBUS Board about the OCC's "serious concerns related to weak
policies, procedures, systems and controls" related to its pouch activities, and urged immediate
improvements.[1484] In September 2007, the OCC also issued a Supervisory Letter to HBUS
which again urged that "policies, procedures, systems, and controls for pouch need strengthening
and augmenting."[1485]

## E.  2008 OCC Inquiry into Hokuriku Travelers Cheques

Nine months later, in June 2008, the OCC commenced a followup AML examination of
HBUS pouch activity, looking at pouch services in additional business units.[1486] During the
course of that examination, OCC examiners identified the Hokuriku travelers cheque deposits as
an activity warranting greater scrutiny.[1487]

---

[1482] See 7/3/2007 OCC memorandum, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-
0087773 [Sealed Exhibit.]; Subcommittee interviews of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012).
[1483] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-
00304077, at 1. [Sealed Exhibit.] The MRA read in full as follows:
  "The bank provides pouch services in a number of business unites. An examination of HSBC pouch
  services resulted in serious concerns related to weak policies, procedures, systems and controls. The
  policies and controls in this area are inferior to BSA/AML controls in other areas of the bank, and remedial
  action is warranted. The absence of comprhesnive policies, procedures and adequate systems and controls
  could potentially subject the bank to undue reputation risk and/or lead to BSA/AML violations. Pouch
  serives facilitate easy movement of funds, and are favored by persons who transfer illgal and terrorist
  funds. Consequently, the Board should ensure that management implements appropriate policies,
  procedures, systems and controls for this activity. The Board should communicate the corrective measures
  to the OCC, and confirm subsequent resolution."
[1484] Id.
[1485] 9/13/2007 OCC Supervisory Letter, "Pouch Services and Middle Market at HBUS," OCC-PSI-00000391-394.
[Sealed Exhibit.]
[1486] See 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd,"
OCC-PSI-00885822-826.  [Sealed Exhibit.]
[1487] Id.

In June 2008, two OCC AML bank examiners visited the HBUS Brooklyn and Buffalo processing centers to examine their pouch activity.[1488]  One of the examiners told the Subcommittee that when they visited the Brooklyn center, they found "stacks and stacks of travelers cheques, some signed and countersigned by the same entity."[1489]  In a memorandum the examiner wrote that, at the Brooklyn center, she reviewed a Hokuriku cash letter deposit in the amount of $110,000, and found it consisted of 220 sequentially numbered travelers cheques, each for $500.[1490]  She wrote that all of the cheques were signed and countersigned by the same individual, whose name was illegible, and all were made payable to SK Trading Company Ltd. The TC/MO HVDI form attached to the deposit described SK Trading as a "used car dealer" and stated that the travelers cheque funds were to be used for a "business purpose."[1491]  The other examiner reviewed another Hokuriku deposit for $240,000 and found a similar situation involving sequentially numbered $1,000 travelers cheques that had been signed and countersigned by the same person as the other deposit and made payable to SK Trading.  The OCC examiners then contacted the HBUS cash letter department manager who explained that the Brooklyn center received three to five Hokuriku deposits daily of travelers cheques which totaled between $500,000 and $600,000 each day.[1492]  He indicated that travelers cheques were the "only types of instruments received through pouch for Hokuriku Bank."[1493]

The OCC examiners researched SK Trading and found that, according to its website, the company appeared to be headquartered in Seoul, Korea, with offices in Japan and the United States, and had been in business since 1984.[1494]  They also found that the company had been identified by other financial institutions as involved with suspicious activity.  These other financial institutions had identified suspicious wire transfers, sometimes involving millions of dollars, which were originated by individuals with Russian surnames who sent the funds from accounts at Russian banks or which were originated by corporations that sent the funds from banks in the British Virgin Islands.[1495]  The ultimate beneficiary of the funds in each case was SK Trading using accounts at various banks in Japan.  The OCC examiners noted that, in November 2006, one of the financial institutions had contacted Hokuriku Bank directly and asked it about the business purpose behind the transactions, but was told that Hokuriku Bank "could not answer this as their customer (S.K. Trading Company Limited) refused to provide information."[1496]

The OCC examiners concluded that SK Trading was "conducting high dollar volumes of activity utilizing wire transfers and pouch services," that SK Trading was involved with "numerous entities," and that the transactions involved "numerous individuals from Russia," and warranted additional investigation.[1497]  The travelers cheques' connections to Russia raised a

---

[1488] Id.
[1489] Subcommittee interview of OCC AML Examiner Elsa de la Garza, (1/9/2012).
[1490] 6/26/2008 OCC memorandum, "Pouch Transactions – Hokuriku Bank and SK Trading Company Ltd," at OCC-PSI-00885822, at 1. [Sealed Exhibit.]
[1491] Id.
[1492] Id. at 2.
[1493] Id.
[1494] Id.
[1495] Id.
[1496] Id. at 3.   (emphasis omitted).
[1497] Id. at 4.

particular red flag, since the United States has long viewed Russia as a country of "primary" money laundering concern, its highest risk category.[1498]  At the time, a 2008 report by the U.S. State Department, then the latest in a long line of annual U.S. State Department reports summarizing money laundering concerns on a country-by-country basis, described Russia as follows:

> "Criminal elements from Russia and neighboring countries continue to use Russia's financial system to launder money …. Experts believe that most of the illicit funds flowing through Russia derive from domestic criminal activity, including evasion of tax and customs duties and smuggling operations.  Despite making progress in combating financial crime, Russia remains vulnerable to such activity because of its vast natural resource wealth, the pervasiveness of organized crime, and, reportedly, a high level of corruption.  Other vulnerabilities include porous borders, Russia's role as a geographic gateway to Europe and Asia, a weak banking system with low public confidence in it, and under funding of regulatory and law enforcement agencies.  Russia's financial intelligence unit (FIU) estimates that Russian citizens may have laundered as much as U.S. $11 billion in 2007."[1499]

When the Subcommittee asked the OCC about its 2008 inquiry into the Hokuriku travelers cheques, Ms. de la Garza stated that, despite the earlier AML examination in 2007, HBUS seemed to have no AML policies or procedures in place regarding pouch activity.[1500]  She characterized the failure to monitor the travelers cheques being cashed as "not normal," and stated that they immediately brought the matter to the attention of HBUS AML Compliance. Ms. de la Garza indicated that, at first, HBUS Compliance personnel asserted that the travelers check transactions were legitimate, and that the high cost of cars in Russia accounted for the daily deposits of $500,000 or more by SK Trading.  After doing additional research and finding additional accounts with high volumes of traveler cheque deposits, often sequentially numbered and signed and countersigned by the same person, she said that HBUS AML Compliance became more concerned.[1501]

On Sept. 2, 2008, the OCC examiners met with HBUS senior compliance officials Anne Liddy and Mary Ann Caskin.[1502]  According to an OCC memorandum summarizing the meeting, Ms. Liddy disclosed that HBUS had reviewed:

> "all transactions over the past 2 months and identified a total of 20 entities (including SK Trading) which were using Cash Letter services to clear Travelers Cheques.  All 20 entites are used car dealerships. …  Four additional companies with significant dollar amounts have been identified.  (Maric Trading - $3.5 Million; Jamsou Traders - $1Million; I K Auto - $929 Thousand and Dean Corp - $587 Thousand – totals for two

---

[1498] See, e.g., "International Narcotics Control Strategy Report, Volume II, Money Laundering and Financial Crimes," U.S. State Department (March 2008), at 62.
[1499] Id. at 390.  See also "International Narcotics Control Strategy Report, Volume II, Money Laundering and Financial Crimes," U.S. State Department (March 2012), at 156 (identifying generally the same AML vulnerabilities in Russia today).
[1500] Subcommittee interview of OCC AML Examiner Elsa de la Garza (1/9/2012).
[1501] Id.
[1502] 9/3/2008 OCC memorandum, "SK Trading Co Update," OCC-PSI-00885817. [Sealed Exhibit.]

months). … The Business Unit has gone back to the Relationship Manager and Hokuriku
Bank to obtain additional information on Maric Trading and Jamsou Traders.  They will
also be inquiring on the other companies identified. …  The bank will be exiting the
Hokuriku relationship within the next 30 days."[1503]

The OCC informed the Subcommittee that the two OCC examiners who attended the meeting
understood HBUS to mean that it would close the Hokuriku account, cease all business with the
bank, and report any suspicious activity to U.S. law enforcement.[1504]

### F.  Absence of Hokuriku Bank KYC Information

In July 2008, in response to the OCC, HBUS AML Compliance initiated a more in-depth
review of the Hokuriku travelers cheques.  A search of HBUS processing records determined
that, over a 12-month period from 2007 to 2008, HBUS had received an average of 7,800
travelers checks per month from the bank with an average monthly value of about $7.4
million.[1505]  HBUS determined that "[a]ll deposits are Travellers Checks, no Money Orders
found."[1506]  An HBUS AML Compliance officer also noted:  "They seem to sell traveler's
checks which are used to purchase cars in Japan.  The purchasers of the cars often provide
Russian passports as ID."[1507]

To find out more, on July 15, 2008, HBUS AML compliance officer Stephanie Napier
sent an email to Yumi Seto at HSBC Tokyo, PCM Client Service, informing her that HBUS had
undertaken a review of Hokuriku Bank Account No. 34738 and asking her to obtain specified
KYC information related to certain deposits into that account.[1508]  The Subcommittee was unable
to determine why the email asked only about Hokuriku Account No. 34738 and not also Account
No. 50385, where the travelers cheques were typically deposited.[1509]  Nor was the Subcommittee
able to determine why the email requested information about only four entities associated with
the travelers cheque deposits:  De Araujo Roseli Aparecida (an individual), Aksys Corp., R S
Corp., and Sanhu Corp.[1510]

Ms. Napier made repeated requests for the information over the next two months without
success.[1511]  Her HSBC contact in Tokyo, Ms. Seto, repeatedly responded to her emails that

---

[1503] Id.

[1504] 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.

[1505] 7/16/2008 email from HBUS Jonathan Dean to HBUS Mary Ann Caskin and others, "Hokuriku Bank," OCC-
PSI-00407498, at 1.

[1506] Id.

[1507] Id.

[1508] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry,"
OCC-PSI-00409214-216, at 8-9.

[1509] See chart accompanying 3/15/2005 email from HBUS George Tsugranes to HBUS Nanayo Ryan, "Hokuriku
Bank C/L Activity," HSBC OCC 3113976-977; chart accompanying  email exchange among HBUS AML
Compliance personnel, from 11/23/2005 - 11/29/2005, HSBC OCC 3180776-797; chart prepared by HBUS AML
Compliance in 2007 regarding transactions in 2006, HSBC OCC 3352034-037.

[1510] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry,"
OCC-PSI-00409214  and attachment OCC-PSI-00409215-216, at 9.

[1511] Id. at 4-8.

Hokuriku Bank had indicated it was preparing a "report."[1512]   In September 2008, Ms. Seto was replaced by Ako Kobayashi who, after several attempts, obtained a single, handwritten page from the bank with the requested information.[1513]   Because the information was provided in Japanese, she translated it and, on September 9, 2008, sent both the original and her typed translation to Ms. Napier's supervisor in HBUS AML Compliance Judy Stoldt.[1514]

        The information provided by Hokuriku Bank was minimal.   In the case of the one individual who had been identified, Hokuriku Bank reported that he was a "Business man," gave his address, and stated that he worked with a company called "Sugimoto," and had a "Satisfactory" relationship with the "Originator."   In the case of the three corporations, Hokuriku Bank stated that each was involved in "Sales of Used Cars," which HBUS already knew, and provided the company's address, the date of establishment, and whether it was a private corporation or publicly traded.   Hokuriku Bank also provided the name of one beneficial owner of one company, but wasn't sure of the spelling of his name.   No reasons were given for its clients using sequentially numbered travelers cheques, having the same person sign and countersign them, or generating the high daily volume of cheques.   Ms. Stoldt forwarded the information to HBUS senior Compliance official, Anne Liddy, characterizing it as "very limited information that took us over a month to get."[1515]

### G. 2008 Decision to Stop Cashing Hokuriku Travelers Cheques

        On September 4, 2008, even before the KYC information from Hokuriku Bank was formally translated, HBUS PCM Compliance officer Alan Williamson sent an email to multiple HBUS personnel informing them that HBUS would no longer accept bulk travelers cheques from Hokuriku Bank for processing.   He explained:

> "Compliance meets monthly with senior management in the Payments and Cash Management AML Management Review Committee.   Recently we discussed the fact that Hokuriku has been sending a large number of sequential traveller's checks from a number of similar businesses through cash letter here in the US.   This use of cash letter is inappropriate and the Committee has concluded that PCM should no longer allow Hokuriku to send traveler's checks through cash letter.   Hokuriku should therefore cease the activity and make alternative arrangements, such as to make the deposits by wire, by September 30."[1516]

        The task of informing Hokuriku Bank was given to Machiko Yamashita, an HSBC employee in Tokyo who was then the designated Global Relationship Manager for Hokuriku Bank.[1517]   On September 11, 2008, he and a colleague met with Hokuriku officials who provided

---

[1512] Id. at 5-7.
[1513] Id. at OCC-PSI-00409215.
[1514] Id. at OCC-PSI-00409216.
[1515] Email exchange among HBUS personnel, from July to Sept. 2008, "Hokuriku Bank Ltd- Compliance Inquiry," OCC-PSI-00409214, at 1.   The time period was actually closer to two months.
[1516] 9/4/2008 email from HBUS Alan Williamson to HBUS Anthony Julian and others, "Hokuriku Bank," OCC-PSI-00808896, at 5.
[1517] Emails among HBUS and HSBC personnel from Sept. to Nov. 2008, "Hokuriku Bank," OCC-PSI-00808695, at 5.

additional information about the travelers cheque deposits and asked HBUS to continue clearing them.  According to Mr. Yamashita, Hokuriku Bank explained:

> "–Most of their customers related to this issue are used-car dealers for Russian buyers who are cash account holders of Hokuriku Bank through appropriate AML process.
> –The dealers are doing cash on delivery type of deals with buyers in this market therefore cash or TCs [travelers cheques] are normally used to accommodate those deals.  As such Hokuriku Bank considers it is difficult for its customers to shift their payment method to wire transfers or commercial check[s] from TCs. …
> –Since relevant customers are limited [to] around 20 – 25 names and they are all cash account holders of Hokuriku Bank, Hokuriku Bank is well prepared to cooperate with HBUS by providing necessary information."[1518]

The email also stated:  "HBUS is currently the sole Cash Letter provider for Hokuriku Bank."[1519]

The next day, Anthony Julian responded that HBUS senior management had already reviewed the matter extensively "and determined that we can not continue to support this business.  Th[i]s is not an issue for negotiation with Hokuriku."[1520]  Mr. Yamashita replied, in that event, Hokuriku Bank had requested additional time to consider whether to end the business or find a replacement service provider.  He wrote:  "We suggest that we should withdraw very carefully given the fact that Japanese regional banks' world is very small.  If we will push Hokuriku drastically, HSBC may likely have bad reputation on our PCM business in this marketplace."[1521]

A month later, on October 17, 2008, Mr. Julian sent an email to Albert Halley, head of the cash letter department at the Brooklyn processing center, advising him that Hokuriku Bank had been informed verbally and by letter that HBUS would "no longer accept bulk deposits" of travelers cheques "in excess of $5,000."[1522]  Mr. Julian advised Mr. Halley that, after October 31, 2008, any bulk travelers cheques received from the bank should be "returned to Hokuriku" via overnight mail.  Mr. Halley responded that he had been told to return "any deposits" from Hokuriku Bank after October 31 – not just deposits in the form of travelers cheques – and asked Jonathan Dean in Compliance to "confirm/clarify this new request."[1523]  After consulting with his supervisors, Mr. Dean clarified that no travelers cheques could be accepted from Hokuriku Bank, but that other commercial items could still be processed.[1524]  Mr. Dean wrote that he expected the remaining volume to be "extremely low" and asked Mr. Halley to report on the

---

[1518] Id. at 4.

[1519] Id.

[1520] Id. at 2-3.  See also email exchange among HBUS and HSBC personnel from 9/4 to 9/11/2008, OCC-PSI-00196439, at 1.

[1521] Email exchange among HBUS and HSBC personnel from Sept. to Nov. 2008, "Hokuriku Bank," OCC-PSI-00808695, at 2.

[1522] 10/17/2008 email from HBUS Anthony Julian to HBUS Albert Halley and others, "Hokuriku Bank," OCC-PSI-00808896, at 4-5.

[1523] 10/20/2008 email from HBUS Albert Halley to HBUS Anthony Julian, Jonathan Dean, and others, "Hokuriku Bank," OCC-PSI-00808896, at 4.

[1524] Email exchange among HBUS personnel, from 10/20-10/31/2008, "Hokuriku Bank," OCC-PSI-00808896, at 1-3.

types of checks received from Hokuriku Bank after October 31.  This decision to continue the
correspondent relationship varied from the September memorandum which stated that senior
HBUS AML Compliance official Anne Liddy told the OCC examiners that HBUS would be
"exiting the Hokuriku relationship within the next 30 days."[1525]

## H. Hokuriku Bank's Continued Lack of Cooperation

Even after informing Hokuriku Bank that it would no longer process any travelers
cheques, HBUS AML Compliance continued to seek KYC information from the bank in
connection with the originators of the travelers cheques, in order to complete an analysis of the
transactions and determine whether they involved suspicious activity and had to be reported to
law enforcement.

In late November or early December 2008, HBUS Compliance provided an update to the
OCC about its efforts.  According to an OCC memorandum summarizing the updated
information, after receiving an inquiry from HBUS, the company issuing the travelers cheques
dispatched investigators to the Russian bank where the travelers checks were being
purchased.[1526]  The OCC report stated:

> "The result was that five individuals were identified who were purchasing the travelers
> checks with cash at the bank.  The five individuals were then providing the checks to Mr.
> Alexander Tokarenko who is the owner of SK Trading.  Mr. Tokarenko then stamped the
> checks payable to SK Trading."

All five individuals were Russians living in Russia.  The memorandum stated that HSBC was
attempting to determine if Mr. Tokarenko owned, not only SK Trading, but also the 29 other
entities that had been identified as clearing bulk travelers cheques with HBUS.  The OCC
memorandum reported that "the total dollar amount of bulk travelers' checks processed by
HSBC for the 30 entities during the period of November 2007 to October 2008 was over $61
million."[1527]

In late November 2008, HBUS AML Compliance personnel drafted a new information
request and asked Stephanie Brown to forward it to Hokuriku Bank.  It asked whether five
named Russians (identified in the earlier investigation) were or had been account signatories or
"connected in any way" with the accounts opened by 30 specified corporations and individuals
involved with the bulk travelers cheques.[1528]  Ms. Brown forwarded the request to Ako
Kobayashi at HSBC in Tokyo who, in turn, sent it to Hokuriku Bank.[1529]

On December 3, 2008, Ms. Kobayashi sent an email to Ms. Brown indicating that
Hokuriku Bank had raised the following questions:

---

[1525] See 9/3/2008 OCC memorandum, "SK Trading Co Update,"OCC-PSI-00885817.  [Sealed Exhibit.]
[1526] 12/1/2008 OCC memorandum, "SK Trading," OCC-PSI-00888526.  [Sealed Exhibit.]
[1527] Id.
[1528] Email exchange among HBUS personnel, from Nov. to Dec. 2008, "Hokuriku Bank," OCC-PSI-00811358, at
10-13.  SK Trading Company was one of the 30.
[1529] Id. at 9-10.

> "What is the background for your queries?  Does it relate to your compliance reason or does it relate to criminal act and the police asks such information?  Where did you get those Russian names?  Since no cheques has been presented to you since Nov08, why such information is required now?"[1530]

HBUS explained that the information was needed to complete an internal investigation, and was not being requested in connection with a criminal prosecution.[1531]  Hokuriku Bank responded that it did not retain signatory cards or ownership information for the 30 accounts and had to identify and contact each of its branches where the 30 accounts were opened, which would take time.[1532]

On December 15, 2008, Ms. Kobayashi sent an email to multiple HBUS AML personnel forwarding additional questions from Hokuriku Bank about the new request for information.[1533]  She also wrote:

> "Please be advised that apparently they are not very happy with your request as they have other matters to attend toward the end of the year.  … Hokuriku Bank is not saying that they will not assist you to provide the required information however they are upset with the nature of the request without being given sufficient background.  Given the nature of the queries, please understand it is time consuming and consider to allow them more time.  They might not be able to supply the information by the end of the year."[1534]

Two days later, Denis O'Brien, head of HBUS Global Transaction Banking Compliance, sent an email answering the questions posed by Hokuriku Bank.[1535]  Later that same day, the HSBC Money Laundering Control Officer in Japan, Shinji Kawamura, sent an email to Mr. O'Brien indicating that Hokuriku Bank would not provide the requested information.  He wrote:

> "They have been good enough to provide information so far but as you may understand from bank secrecy viewpoint, they should not or cannot disclose customer information.  So they will no longer provide information.  If you need my suggestion to clear those backlogs, I will tell you that you should file suspicious transaction report to your authority."[1536]

Notwithstanding that communication, two days later, on December 19, 2008, Ms. Kobayashi sent Mr. O'Brien an email stating that Hokuriku Bank "has provided the information at their risk and confirmed that the purchasers of the travelers checks …  are not signers or are NOT connected in any way to the previously requested named relationships at Hokuriku Bank.  This should be the last favour and we cannot expect further or next assistance from them."[1537]

---

[1530] Id. at 9.
[1531] Id. at 8.
[1532] Id. at 6.
[1533] Id. at 4-5.
[1534] Id. at 5.
[1535] Id. at 3-4.
[1536] Id. at 2.
[1537] Id. at 1.

Mr. O'Brien responded:  "We are appreciative of your assistance and thank you for your diligence in this regard.  We have closed our investigation as it related to this issue."[1538]

The Subcommittee contacted Hokuriku Bank to learn more about the travelers cheques. The bank provided this additional information:

"Due to the geographic proximity of Russia across the Sea of Japan, many Japanese dealers of pre-owned automobiles are located along the coast, including the Hokuriku region.  (Hokuriku means 'North Land' in Japanese.)  Hokuriku Bank is headquartered in this area and has several branches in the surrounding areas.  Some of such dealers have accounts at Hokuriku Bank.

In a typical transaction, a customer of Hokuriku Bank (that is to say an account holder) sells a used car (or cars) to a Russian buyer who is a passenger or crew member of a ship at a nearby port.  The buyer pays with travelers' checks.  The seller/account holder brings the travelers' cheques to its bank (Hokuriku) and deposits them into its account. Hokuriku Bank accepts the travelers' checks, credits the customer's account, and sends the checks to clearing banks."[1539]

This description, which seems to describe a thriving used car business in northern Japan, does not explain why a single individual in Russia was using five individuals to purchase millions of dollars of sequentially numbered U.S. dollar travelers cheques from the same bank in Russia per month, and then signing and countersigning all of them.  Nor does it explain why the parties were using U.S. dollars to purchase used cars located in Japan or why the Hokuriku branches had so little information about the 30 clients carrying in U.S. dollar travelers cheques totaling about $500,000 to $600,000 each day.

In February 2009, HBUS closed one of the accounts held by Hokuriku Bank, Account No. 50385, and transferred its balance to Account No. 34738.  HBUS has not explained why it closed one account but not the other, or why Account No. 34738 was kept open when it was the subject of the extended HBUS inquiries to Hokuriku Bank in 2008.  Because the one account remained open, the correspondent relationship between HBUS and Hokuriku Bank continued.[1540] The OCC examiners told the Subcommittee that they had thought all of the Hokuriku accounts had been closed in 2008, and were unaware of the ongoing relationship for some time.[1541]

[1538] Id. at 1.
[1539] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, at 4, PSI-HokurikuBank-01-0001.
[1540] HBUS KYC Profile of Hokuriku Bank, at HSBC-PSI-PROD-0102415, 420.
[1541] Subcommittee interviews of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012); 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.

## I.   2010 OCC Discovery of Hokuriku Account Activity

Two years later, in the summer of 2010, two OCC AML examiners conducted a review of RDC services at the HBUS Buffalo processing center, including RDC processing of monetary instruments presented for deposit through electronic images.[1542]  During that review, one of the examiners was surprised to discover that the Hokuriku account was not only still open, but that HBUS was processing monetary instruments for Hokuriku Bank through RDC.[1543]  In an email to the OCC Examiner-in-Charge summarizing the RDC concerns that were communicated to HBUS after the examination field work, the examiner included:  "Concern related to pouch activity being conducted by HSBC for Hokuriku."[1544]  He informed the Subcommittee that the volume of activity was "significant, but not as extensive as in 2008."[1545]

In October 2010, a draft OCC Supervisory Letter detailing AML deficiencies in HBUS' RDC operations specifically identified concerns related to Hokuriku Bank.  After describing the problems uncovered in 2008, involving the bulk processing of Hokuriku travelers cheques, the letter stated:

> "[I]n late 2008, early 2009, bank management informed the OCC that it would terminate the account relationship with Hokuriku.  During the OCC's RDC review, it was again found that pouch activity was being conducted by HSBC for Hokuriku.  Upon further review, it was determined that at the time that the Bank was to have initially severed its relationship with Hokuriku, there existed two separate accounts for Hokuriku.  At that time, management decided to close the account in which the aforementioned deposits [of travelers cheques] were being processed and continue to maintain the other account.  It was through the second account that the pouch activity continued."[1546]

The draft OCC letter also recited a long list of AML concerns involving the bank's pouch activity.  The final version of this Supervisory Letter included most of the information in the draft, but dropped the paragraph that singled out Hokuriku Bank.[1547]  OCC personnel asked about the letter were unable to remember why the reference to Hokuriku Bank had been dropped.[1548]  HBUS' legal counsel told the Subcommittee that HBUS stopped processing travelers cheques through the Hokuriku account in 2008.[1549]  Hokuriku Bank similarly informed the Subcommittee that HBUS stopped processing its travelers cheques in October 2008.[1550]

---

[1542] See 10/4/2010 draft Supervisory Letter from OCC to HBUS, OCC-PSI-00863984-992.

[1543] See 9/3/2010 email from OCC Joseph Boss to OCC Sally Belshaw and others, OCC-PSI-00887684-685.  HBUS KYC Profile at HSBC-PSI-PROD-0102421; 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.

[1544] 9/3/2010 email from OCC Joseph Boss to OCC Sally Belshaw and others, OCC-PSI-00887684-685.

[1545] 5/15/2012 email from OCC to the Subcommittee, "HSBC – Hokuriku Questions," PSI-OCC-38-0001-002.

[1546] 10/4/2010 draft Supervisory Letter from OCC to HBUS, at OCC-PSI-00863990.

[1547] 10/21/2010 Supervisory Letter HSBC-2010-24 from OCC to HBUS, OCC-PSI-00880181-185.

[1548] Subcommittee interview of Teresa Tabor (5/17/2012).

[1549] Subcommittee briefing by HSBC legal counsel (5/9/2012).

[1550] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, PSI-HokurikuBank-01-0001-016, at 001.

The HBUS KYC Profile of Hokuriku Bank, updated in 2010, referenced ongoing AML concerns related to the bank, perhaps due to the OCC's renewed interest in the relationship. Among other matters, the KYC Profile indicated that, as of September 2010, despite a relationship of many years, HBUS did not have a copy on file of Hokuriku's KYC or AML policies and procedures.[1551]   The profile also indicated that HBUS had sent an AML questionnaire to the bank, but Hokuriku Bank had not yet returned it.  HBUS also noted in the 2010 profile that Hokuriku Bank did not have an independent AML compliance function within the bank, raising further questions about Hokuriku's AML efforts.[1552]

In May 2012, HBUS closed the Hokuriku Bank account.[1553]  While that action ended the direct relationship, Hokuriku Bank still has correspondent relationships with other HSBC affiliates which, in turn, have correspondent accounts at HBUS.  Accordingly, it is still possible for Hokuriku Bank to obtain U.S. dollar services through the U.S. dollar correspondent accounts of the HSBC affiliates, although Hokuriku Bank told the Subcommittee it is not doing so.

## J.  Analysis

As a major global bank, HBUS serves as a gateway for foreign banks to obtain U.S. dollars, including through the clearing of U.S. dollar travelers cheques.  HBUS AML Compliance personnel knew that travelers cheques were vulnerable to money laundering abuses, and that large numbers of sequentially numbered travelers cheques were a red flag.  In 2003, it set up a data system that captured travelers cheque information, but in five years, appeared not to use it to identify suspicious activity or high risk clients.  In 2007, the OCC found that HBUS essentially had no effective AML controls over the process used to cash travelers cheques and required the bank to strengthen its policies and procedures.

The Hokuriku Bank example illustrates the problem.  For years, Hokuriku Bank routinely presented a large volume of travelers cheques to HBUS for processing.  Most involved sequentially numbered cheques signed and countersigned illegibly by the same person.  For years, HBUS cleared the cheques with few questions asked.  The cheque volume, which involved $500,000 to $600,000 in travelers cheques per day and $70 to $90 million per year, produced a four-year total of more than $290 million.  When directed by OCC to look into the transactions, HBUS quickly discovered that most of the cheques were being purchased for cash by Russians at a Russian bank and sent to Hokuriku Bank accounts in Japan.  HSBC discovered that Hokuriku Bank had virtually no information about a network of 30, possibly related, accountholders who were physically turning in large stacks of sequentially numbered U.S. dollar travelers cheques to the bank every day.  When asked about the accounts by HBUS, Hokuriku Bank resisted finding out and claimed bank secrecy requirements prevented it from disclosing client-specific information.  HBUS also learned it was the only bank cashing the Hokuriku travelers cheques.  Later, in 2010, HBUS discovered that Hokuriku Bank had no separate AML compliance function and was left waiting to receive a copy of its written AML policies and procedures.  After the Subcommittee inquired about the account, HBUS closed it, although other HSBC affiliates are continuing to service the bank.

---

[1551] HBUS KYC Profile at HSBC-PSI-PROD-0102421.

[1552] Id.

[1553] 6/26/2012 letter from Hokuriku Bank's legal counsel to the Subcommittee, at 1, PSI-HokurikuBank-01-0001.

HBUS enabled a number of Russians engaged in suspicious activity to use a relatively small Japanese bank with weak AML controls to gain access to over $290 million in U.S. dollars in less than four years.  HBUS continued to clear the travelers cheques even after it learned of the transactions' suspicious nature.  In so doing, HBUS facilitated the suspicious transactions and failed to live up to its AML obligations, all in return for about $47,000 in annual revenues.

## VII.   HBUS PRIVATE BANK AMERICAS:  OFFERING BEARER
##         SHARE ACCOUNTS

Over the course of a decade, HBUS allowed over 2,000 customers to open accounts in the name of bearer share corporations, a type of corporation that allows secrecy by assigning ownership to whomever has physical possession of the shares.  At its peak, the Miami office had over 1,670 bearer share accounts; the New York office had over 850; and the Los Angeles office had over 30.  The Miami bearer share accounts alone held assets totaling an estimated $2.6 billion, generating annual bank revenues of $26 million.  Multiple internal audits and regulatory examinations criticized the accounts as high risk and advocated that HBUS either take physical custody of the shares or require the corporations to register the shares in the names of the shareholders.

In 2007,  HBUS Compliance circulated a draft to standardize bearer share AML safeguards across the bank, including by designating all of the bearer share accounts as high risk clients requiring enhanced due diligence and monitoring.  Internal documents show Miami and New York bank personnel successfully weakened the standards by enabling the majority of accounts not to be treated as high risk and requiring updated ownership information only once every three years.  Later, HBUS learned that the British Virgin Islands (BVI), which formed most of the bearer share corporations with HBUS accounts, was requiring the registration of all outstanding BVI bearer shares by the end of 2009.  In response, HBUS initiated an effort to require its BVI accountholders to register their shares by the legal deadline.  In 2010, HBUS also contacted its other bearer share accountholders, requiring them either to register their shares or place their shares in the custody of HBUS or a third party.  HBUS ended up obtaining registered shares or share custody for 1,155 accounts, closed over 530 accounts, and by 2012, had substantially reduced the number of bearer share accounts it maintained to 26.

Two examples of the accounts illustrate the risks they pose.  In the first, two Miami Beach hotel developers, Mauricio Cohen Assor and Leon Cohen Levy, a father and son, used bearer share accounts they opened for Blue Ocean Finance Ltd. and Whitebury Shipping Time-Sharing Ltd. to help hide $150 million in assets and $49 million in income.  In 2010, both were convicted of criminal tax fraud and filing false tax returns, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties of more than $17 million.  A second example involves two Panamanian bearer share corporations, Urigeler International S.A. - Holding Company and Birmingham Merchant S.A. - Holding Company, beneficially owned by a wealthy and politically powerful family in Peru.  The family sought a waiver from HBUS' AML requirements to avoid registering their shares or placing them in bank custody.  When asked whether the waiver was granted when the account was opened in 2007, HBUS legal counsel told the Subcommittee that "we don't know."  The account was closed in 2011.  These accounts demonstrate the risks associated with bearer share accounts, whose owners seek to hide their identities.  Today, HBUS has 26 bearer share accounts left, most of which are frozen, but also maintains a policy allowing the bank to open more bearer share accounts in the future.

## A.  High Risk Corporate Accounts

Bearer share accounts have long been viewed as being at high risk for money laundering, due to the ability of bearer shares to hide ownership of a corporation.  A 2005 U.S. Money Laundering Assessment defined bearer shares as follows:

> "Bearer shares are negotiable instruments that accord ownership of a company to the person who possesses the share certificate.  Such share certificates do not contain the name of the shareholder and are not registered, with the possible exception of their serial numbers.  Accordingly, these shares provide for a high level of anonymity and are easily negotiable."[1554]

Because of the ease of transfer and secrecy attached to bearer share corporations as well as their attractiveness to money launderers and terrorist financiers, their propensity for misuse have made them lose favor with governments and AML organizations.

**Financial Action Task Force.**  The Financial Action Task Force (FATF) is the leading international AML body.[1555]  In its 2006 report, "The Misuse of Corporate Vehicles, Including Trust and Company Service Providers," FATF highlighted the AML problems associated with bearer share corporations.  FATF explained that anonymity is a critical factor in facilitating the misuse of corporate vehicles, and bearer shares present a "special challenge to determining beneficial ownership of a corporate vehicle" because these shares "can be easily transferred without leaving a paper trail."[1556]  The FATF report noted that, while bearer shares can be used for legitimate purposes, they were also used for "money laundering, self-dealing, and/or insider trading."[1557]

**Organisation for Economic Co-operation and Development**.  The Organisation for Economic Co-operation and Development (OECD) is a 50-year-old membership organization of 34 countries including the United States, which tackles issues of common interest to promote economic development.[1558]  In a 2001 report, "Behind the Corporate Veil," the OECD identified bearer shares as one of the primary means used to achieve anonymity for the beneficial owners of corporations.  The OECD report noted that bearer shares' high level of anonymity and ease of transfer "make them attractive for nefarious purposes, such as money laundering, tax evasion, and other illicit conduct, especially when they are issued by private limited companies."[1559]  The

---

[1554] 12/2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service, http://www.justice.gov/dea/pubs/pressrel/011106.pdf, at 47.

[1555] See FATF website, www.fatf-gafi.org.

[1556] 10/13/2006  "The Misuse of Corporate Vehicles, Including Trust and Company Service Providers," at 10, FATF Publication, http://www.fatf-gafi.org/media/fatf/documents/reports/ Misuse%20of%20Corporate%20 Vehicles%20including%20Trusts%20and%20Company%20Services%20Providers.pdf

[1557] Id. at 16.

[1558] See OECD website, www.oecd.org.

[1559] "Behind the Corporate Veil: Using Corporate Entities for Illicit Purposes," OECD publication, at 30, http://www.oecd.org/dataoecd/0/3/43703185.pdf.

OECD noted that bearer shares were especially vulnerable to misuse, because of the lack of information available to authorities in the event of an investigation.[1560]

**U.S. Government.**   The United States has also criticized bearer share corporations.  In 2005, for example, multiple U.S. agencies worked together to produce a U.S. Money Laundering Threat Assessment to identify key money laundering methods.[1561]   The Assessment identified the use of shell corporations as a key AML problem and singled out bearer shares as one of the means, along with nominee shareholders and directors, "to mask ownership in a corporate entity."[1562]   It warned that bearer shares "provide money launderers with the tools to hide their identity from financial institutions and law enforcement."[1563]   In addition, Federal financial regulators warn about the risks associated with bearer shares, because they allow "ownership of the corporation to be conveyed by simply transferring physical possession of the shares."[1564]   The Federal regulators' joint AML examination manual states that due to the risk, "in most cases banks should choose to maintain (or have an independent third party maintain) bearer shares for customers."[1565]

**World Bank.**   A 2011 report issued by the World Bank on corporate transparency issues is a recent example of an international body condemning use of bearer share corporations.  It indicates that, in recent years, bearer share corporations have "generally been frozen out of the financial sector," asserts that "[n]o bank with any sort of due diligence standards is willing to conduct business with a company that has free-floating bearer shares," but also states that such corporations remain an AML threat:

> "Concerns have been raised in AML forums that companies that issue bearer shares are used extensively for illegal activities, such as tax evasion and money laundering …. In most jurisdictions, bearer-share statutes have generally been undergoing a process of reform and elimination ….
>
> Financial compliance officers and company service providers report that bearer shares have generally been frozen out of the financial sector even if they are still permitted by the laws of a particular jurisdiction. No bank with any sort of due diligence standards is willing to conduct business with a company that has free-floating bearer shares. Companies that are not required under their own laws to have bearer shares immobilized will typically have to place the share in the trust of an agent of the bank, as a condition of being accepted as a customer. …

---

[1560] Id.

[1561] See 12/2005 "U.S. Money Laundering Threat Assessment," issued by the Money Laundering Threat Assessment Working Group, which included the U.S. Departments of Treasury, Justice, and Homeland Security, Federal Reserve, and Postal Service, http://www.justice.gov/dea/pubs/pressrel/011106.pdf.

[1562] Id. at 47.

[1563] Id. at 48.

[1564] 4/29/2010 "BSA/AML Examination Manual," Federal Financial Institutions Examination Council, "Bearer Shares," at 282, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

[1565] Id.  The AML examination manual also stated:  "In rare cases involving lower-risk, well-known, long-time customers, banks may find that periodically re-certifying beneficial ownership is effective."  Id.

Given the legislative reforms of the past decade and the fact that bearer shares or share warrants featured in roughly 1 percent of the grand corruption cases we reviewed, one might be inclined to consider bearer securities to be a problem of the past. Investigators interviewed for this study from Latin America and the Caribbean disagree, however. They maintain that bearer-share companies are still a problem for money laundering investigations, that their anonymity prevents detection and impedes prosecution, and that corrupt individuals still can gain access to financial systems and undertake anonymous transactions involving considerable sums.

In practice, there is scant business rationale for the continued use of bearer securities. The claims that bearer securities are necessary to facilitate transfer of ownership and enhance liquidity no longer hold for the vast majority of countries. An electronic system of registered shares is clearly a more efficient platform for transferring equity interests.  In this case, the risks outweigh the benefits."[1566]

## B. Bearer Share Activity at HBUS

Despite the widespread, longstanding international condemnation of bearer share corporations, until last year, HBUS maintained hundreds, sometimes thousands, of bearer share accounts in the United States.  At its peak, HBUS had over 2,000 bearer share accounts, including 1,667 accounts at the International Private Bank in Miami,[1567] 851 at the International Private Bank in New York;[1568] and 33 at the International Private Bank in Los Angeles.[1569]  The Miami bearer share accounts alone have held assets totaling an estimated $2.6 billion and produced revenues to the bank of $26 million per year.[1570]

These accounts were overseen by two different Federal banking regulators.  The OCC oversaw the accounts in New York and Los Angeles, which were held in the HBUS International Private Banking division.  The bearer share accounts in Miami, however, were lodged with a different HBUS subsidiary, which was often called an International Private Bank, but was actually formed under the Edge Act, a Federal law which allows corporations to be chartered by the Federal Reserve, engage solely in international banking, and serve only non-U.S. citizens

---

[1566] "Puppet Masters:  How the Corrupt Use Legal Structures to Hide Stolen Assets and What to Do About It," World Bank (2011), at 41, 43-44.
[1567] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637 (citing 1,667 accounts in October 2007); 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan and others, "Bearer Share Corporation Policy," OCC-PSI-00226652 (citing 1,679 accounts in December 2007); but see OCC-PSI-00217164 (estimating 600 accounts in July 2007).
[1568] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637 (citing 851 accounts in November 2005); see 8/27/2007 email from Alan Williamson to Terry Westren, OCC-PSI-00318438, with accompanying 2007 List of New York Bearer Share Accounts, OCC-PSI-00318439 (citing 636 accounts in August 2007).
[1569] 11/11/2005 memorandum from OCC C. Seiler, "Bearer Share Activity," at 2, OCC-PSI-01437596 (citing 33 accounts in November 2005).
[1570] 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan, "Bearer Share Corporation Policy," OCC-PSI-00226652.

with U.S. banking needs.[1571]   Edge Act corporations are regulated by the Federal Reserve.[1572] The Miami bearer share accounts were accordingly overseen by the Federal Reserve Bank of Atlanta which conducted an annual examination of its operations.[1573]

HBUS' bearer share accounts repeatedly raised AML concerns largely because the accounts suffered from missing or inadequate KYC information.  A 2004 internal audit of HBUS' Private Bank International in Miami by HSBC Group auditors found, for example, that sixty bearer share accounts lacked "Certificates of Beneficial Owner" forms, meaning the bank had no information on who owned the accounts.  The audit also repeated a recommendation carried forward from a 2002 Group Audit that management should obtain the missing beneficial ownership information "at the earliest opportunity,"[1574] suggesting the ownership information had been missing for at least two years.  In February 2005, an HBUS Monthly Private Banking Compliance Report to HSBC Group noted that ten bearer share accounts had been frozen due to missing "Beneficial Ownership Letters," and Relationship Managers for the accounts had been notified they had 30 days to obtain the needed documents or the accounts would be closed.[1575]

**OCC Concern.**  In 2005, the OCC identified the HBUS bearer share accounts as an AML concern and, in 2006, directed HBUS to assess their AML risk and take physical control of the bearer shares.

In November 2005, the OCC conducted an AML examination of HBUS' International Private Banking division and looked at the bearer share accounts in its New York and Los Angeles offices.  In November 2005, an OCC AML examiner wrote an internal memorandum summarizing HBUS' "Bearer Share Activity" and recommending that HSBC adopt a policy to "ensure that either the bank or an acceptable third party controls the bearer shares."[1576]  The memorandum stated that the HBUS New York office then had 851 bearer share accounts and the California office had 33.[1577]  The memorandum explicitly noted the AML risks attached to the bearer share accounts and the need to obtain satisfactory evidence of the accounts' beneficial owners.  It noted that bearer share certificates allowed corporate ownership to be transferred without the bank's knowledge, and OCC policy was to require banks to maintain control of all

---

[1571] See 6/12/2008 letter from FRB of Atlanta Robert Schenck to HSBC Private Bank International Board of Directors, OCC-PSI-00107444-449; Section 25A of the Federal Reserve Act, P.L. 102-242, codified at 12 U.S.C. §§611-631.

[1572] Section 25A of the Federal Reserve Act, P.L. 102-242, codified at 12 U.S.C. §§611-631.

[1573] The Miami Edge Act corporation has undergone annual Federal Reserve audits since at least 2006.

[1574] 2/2004 Group Financial Services Audit Report on High Level Controls Review of HSBC Private Bank International, at 5, OCC-PSI-00210878.

[1575] 3/7/2005 report from HSBC Carolyn Wind and HSBC Teresa Pesce to HSBC Curt Cunningham and HSBC Anthony Gibbs, "Monthly Private Banking Compliance Report for February 2005," HSBC OCC 7695260-266.

[1576] 11/11/2005 OCC memorandum, "Bearer Share Activity," OCC-PSI-01437596.  According to the memorandum, the policy at the time was that the International Private Bank required the following for each bearer share account: an explanation for opening the account, CEO approval, and completion of a beneficial ownership letter, to be certified every 3 years, identifying the beneficial owners of the bearer share company.

[1577] Id.

bearer shares.[1578]  The memorandum also discussed new legislation in the British Virgin Islands that "provides a legal framework for immobilizing bearer shares."[1579]

As a result of the AML examination, on January 31, 2006, the OCC issued a Supervisory Letter to HBUS which included a Matter Requiring Attention (MRA) of the HBUS Board of Directors directing HBUS to strengthen AML controls over its bearer share accounts.[1580]  The Supervisory Letter stated:

> "Management should evaluate the risks associated with bearer share accounts. BSA/AML policy and procedures need to be revised to ensure that either the bank or an acceptable third party controls the bearer shares.  The bank must monitor legal requirements in countries that allow for the organization of International Business Companies (IBCs) and Private Investment Companies (PIC).  Policies and procedures need to define 'acceptable third parties' and any applicable due diligence, and specify documentation required by the bank to ensure that the shares have been properly received by the third party custodian."[1581]

The Supervisory Letter also stated that HBUS management had "agreed to implement revised policies and procedures for bearer shares in accordance with our recommendation by March 31, 2006."[1582]  When asked about this Supervisory Letter, the OCC Examiner-in-Charge at HBUS, Anthony DiLorenzo, did not remember the bearer share issue, but said that, aside from HSBC, he had not seen bearer share accounts at other large banks that he oversaw.[1583]

On March 3, 2006, HBUS responded to the Supervisory Letter with a proposal that did not completely follow the OCC instruction on bearer shares.  Instead of requiring that all bearer share certificates be placed in custody for all of its bearer share accounts, HBUS indicated that it would require custodization only for what it deemed to be high risk bearer share accounts.  For lower risk bearer share accounts, HBUS would not take possession of the shares, but would allow accountholders to submit to the bank a "beneficial ownership letter" every two years stating who had possession of the corporate shares.  HBUS committed to having a plan in place to implement this approach by March 31, 2006.[1584]

At the same time the OCC was reviewing the New York and Los Angeles bearer share accounts, the Federal Reserve was performing a "risk-focused examination" of the Edge Act subsidiary holding the Miami accounts, HSBC Private Banking Interational.  In January 2006,

---

[1578] Id.

[1579] Id. (explaining that, under the BVI legislation, international corporations formed after January 1, 2005 would have to have their shares held by  either an "authorized" or "recognized" custodian.  Companies formed prior to January 1, 2005, would have a transition period in which to either have the shares registered or have them held by a custodian).

[1580] 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00000317.  [Sealed Exhibit.]

[1581] Id. at 3.

[1582] Id.

[1583] Subcommittee interview of Anthony DiLorenzo (3/22/2012).

[1584] 3/3/2006 letter HSBC Teresa Pesce to OCC Anthony DiLorenzo, "International Private Banking BSA/AML Examination," at 2, OCC-PSI-01358804-821.

the Federal Reserve issued a Report of Examination (ROE) deeming the overall risk management framework for the Miami operation as satisfactory, while identifying as its "primary risk" the "reputational risk, arising from its international private banking and wealth management activities that are directed towards a high net-worth Latin American client base."[1585]  The ROE also deemed the Miami office's AML program as adequate, while noting numerous issues involving offshore accounts, unavailable offshore documentation, offshore shell companies "serving as operating accounts," and the addition of international private banking accounts moved from New York which added "in excess of $1 billion" to the assets under management in Miami, but made no mention of bearer share accounts.[1586]

In February 2006, as the OCC deadline approached for implementing stronger AML controls over HBUS' bearer share accounts, the head of HBUS' International Private Bank (IPB) Operations in Miami, Jeff Clous, asked a Miami law firm prepared an analysis for the bank on the Federal Reserve's policy regarding bearer share accounts.  According to Mr. Clous, the law firm reported that the Federal Reserve expected banks to conduct a risk assessment and assign risk classifications to each account for risk-based monitoring.  According to Mr. Clous, the law firm also informed him that the Federal Reserve provided banks with the option of either obtaining custody of the bearer shares or recertifying beneficial ownership of the shares on a periodic basis, based upon the account's risk classification.[1587]

Mr. Clous emailed his report of the law firm's analysis to senior personnel in the New York International Private Bank (IPB), the CEO of Private Bank America, Philip Musacchio, the Chief AML Officer of Private Bank, Susan Hoggarth, and the Head of Private Bank Operations Terry Westren.  Mr. Musacchio responded that New York would prefer to adopt this "much better and reasonable approach."[1588]  Ms. Hoggarth replied:

> "That may work for Miami, but it won't work for the OCC in NY and California. The OCC has specifically advised us that the Beneficial Ownership letters are not sufficient. We have been advised that the shares need to be held either by ourselves or an accepted third party."[1589]

Mr. Musacchio responded that he had assumed that Ms. Hoggarth would explain the Federal Reserve's position to persuade the OCC to agree to the same approach.[1590]  Ms. Hoggarth replied that the OCC examiners had already advised the bank that beneficial ownership letters were not adequate, and she did not think the OCC would accept the Federal Reserve's approach.[1591]

When the OCC's bearer share deadline arrived at the end of March 2006, however, little had changed in either the New York or Miami IPB offices.  Both continued their policy of

---

[1585] 1/19/2006 letter from FRB Atlanta to HSBC Private Bank International Board of Directors, OCC-PSI-00309434. [Sealed Exhibit.]
[1586] Id. at 2, 4-6.
[1587] 2/9/2006 email exchanges among HBUS Susan Hogart, HBUS Philip Musacchio, HBUS Jeff Clous, HBUS Teresa Pesce, and HBUS Terry Westren, "Bearer Shares – More Info," HSBC OCC 4816460-462.
[1588] Id.
[1589] Id.
[1590] Id.
[1591] Id.

obtaining periodic beneficial ownership letters from most accounts, and arranging for shares to be taken into custody only for a small percentage of accounts deemed to be higher risk.

The documents reviewed by the Subcommittee also contain no indication that the OCC followed up with HBUS on the bearer share MRA in the 2006 OCC Supervisory Letter.  When asked why, the OCC AML Examiner told the Subcommittee that he had been informed by HBUS that it had closed all of its bearer share accounts in 2006, and didn't learn until 2010, that the bearer share accounts had, in fact, remained open.[1592]

**Proposed Job Aid on Bearer Shares.**  From at least 2002 to 2007, HBUS did not have a standard policy establishing how its various branches should handle bearer share issues and what AML safeguards should be used.[1593]  In early 2007, HBUS undertook an effort to develop a standard bearer share policy that would apply to all HBUS offices.  It was an effort that would take the rest of the year.

An HBUS AML Compliance officer located in New York, Ali Kazmy, was tasked with developing the policy.  In February 2007, he emailed his supervisor, Mary Caskin, that he hoped to finalize a draft that week.[1594]  Internal documents indicate that, a few months later, the draft was circulated to other HBUS Compliance personnel for comment.  At least one colleague sought to strengthen it.  On April 17, 2007, HBUS AML Compliance officer Robert Guthmuller sent an email to colleagues stating that the policy should not make it optional for bearer shares to be classified as high risk.  Mr. Guthmuller contended that approach did not mirror other banks' policies:  "For at least the last 10 years, all private banks I know classify ALL bearer share PICs as high risk."[1595]

In June 2007, Mr. Kazmy sent a draft "Job Aid" on bearer shares to the IPB offices with bearer share accounts.[1596]  HBUS Job Aids were documents designed to provide more specific instructions to bank personnel in implementing higher level policies and procedures.[1597]  Mr. Kazmy immediately met strong resistance to strengthening the AML controls on bearer share accounts.

Teresa Garcia, who was a senior Compliance officer at the New York IPB, criticized the draft on several grounds:  for requiring all bearer share accounts to be classified as SCC accounts subject to enhanced due diligence and monitoring; requiring all shares to be held in the custody of the bank; and requiring beneficial ownership to be disclosed every two years.[1598]  Ms. Garcia wrote that, although the Job Aid was similar to an existing policy at the New York IPB, the New

---

[1592] See 5/10/2010 email exchanges among OCC Joseph Boss, Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts" OCC-PSI-00886601-606 (discussed further supra).

[1593] See 2/26/2007 email exchanges among HBUS Ali Kazmy and HBUS Mary Caskin and others, "APC Interim Procedures," OCC-PSI-00307701 ("At present, we do not have a standard bearer share policy.  I am actually working on it and expect it to be finalized this week, however it will require senior management approval.").

[1594] Id.

[1595] 4/17/2007 email from HBUS Robert Guthmuller to HBUS Nerissa Hall and Alan Williamson, OCC-PSI-00211658.

[1596] 6/18/2007 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Job Aid – Bearer Share," OCC-PSI-00617514.

[1597] Subcommittee interview of Ali Kazmy (2/29/2012).

[1598] 6/18/2007 email from HBUS Ali Kazmy to HBUS Anne Liddy, "Job Aid – Bearer Share," OCC-PSI-00617514.

York  IPB did not classify bearer share accounts as SCCs unless the nature of the beneficial
owner warranted it, and bearer certificates could be held with a third party custodian instead of
the bank.  Ms. Garcia added that the Job Aid should only require beneficial ownership disclosure
forms to be renewed every three years.   Later that day, Ms. Garcia sent another email to Mr.
Kazmy and others stating: "IPB-NY has about 500 non-high risk bearer share accounts. There is
no way we are making all these accounts SCCs."[1599]   These emails, in which Ms. Garcia opposed
the proposed AML controls, show that she saw her role in this instance as acting on behalf of the
business unit rather than acting on behalf of HBUS Compliance.

The Miami office was also critical of the proposed Job Aid.  Clara Hurtado, Director of
AML Compliance for Miami, wrote:

> "Miami also has a large number of bearer share accounts.  I too disagree with making
> these SCCs.  We are also getting an updated BOL [Beneficial Ownership Letter] every 3
> years, not 2 years.  Before anything goes out to the units, we need to be careful that we do
> not change the agreed upon policies/procedures which have been put in place based on
> local regulator requirements."[1600]

On July 25, 2007, Ms. Hurtado sent Mr. Kazmy another email stating that Miami had
approximately 600 bearer share accounts and they "could not possibly categorize them all as
high risk."[1601]   She proposed instead that Miami use the bearer shares as one indicator of a high
risk account, but that a second indicator would also have to be present before the account would
be classified as high risk and subjected to enhanced due diligence and monitoring.  She wrote:
"We feel this is a good way to capture truly high risk bearer share accounts."  Ms. Hurtado also
asserted that there was "no way to custodize in Miami and remotely was too difficult."[1602]   She
proposed instead that Miami maintain its current practice of requiring a Beneficial Ownership
Letter for new accounts with updates every three years.  She noted that the Miami policy had just
been approved by HBUS Compliance head Teresa Pesce and Compliance Officer of California
Programs, Susan Hoggarth, both of whom had agreed that Miami would not have to custodize
the shares.[1603]   These emails show that Ms. Hurtado, like Ms. Garcia, saw her role in this
instance as defending the position of the international private bank rather than the position of
HBUS Compliance.

Four days later, on July 29, 2007, Ms. Hurtado sent Mr. Kazmy another email suggesting
that the AML Director rather than the CEO should be able to approve the opening of bearer share
accounts.  She also wrote that the Miami subsidiary "will not be lowering the monitoring
thresholds on over 600 bearer share accounts," and that Miami's use of Beneficial Ownership
Letters had been approved by HBUS Corporate Compliance and the office "cannot go back and
re-paper."[1604]   The next day, Ms. Hurtado forwarded Mr. Kazmy a copy of the Miami bearer
share procedures, explaining that if he wanted to change them, he would need to "reach out to

---

[1599] Id.
[1600] Id.
[1601] 7/25/2007 email from HBUS Clara Hurtado to HBUS Ali Kazmy and others, "Bearer Share Meeting," OCC-
PSI-00217164.
[1602] Id.
[1603] Id.
[1604] Id.

the business first," and gave him contact information for Jeff Clous, head of HBUS IPB Operations in Florida.[1605]

On August 6, 2007, Mr. Kazmy forwarded Ms. Hurtado's emails to two more senior HBUS AML Compliance officials, Alan Williamson and Anne Liddy.  Though Mr. Williamson had agreed that IPB Miami should be included in the new policy, he said after reading Ms. Hurtado's emails, "unfortunately I now question my prior inclination to make them be consistent."[1606]  Mr. Williamson suggested that the new guidance be prospective from the date of issuance so that the bank would not have to do a retrospective review of bearer share accounts, stating that "may be a good idea but we should avoid locking ourselves in."  Mr. Williamson also recommended adding an "exception process" in the policy, because there is "always a special case somewhere."[1607]  Mr. Kazmy replied that the bank may have to do a retrospective review over a reasonable time period, but agreed to include the following line in the policy: "Exceptions to this Policy must be sought from the AML Director or designee in writing giving full details of the matter warranting such exception.  The written approval must be maintained in customer file and reported to Oversight & Control Group upon receipt."[1608] In August 2007, the New York IPB policy for bearer shares was slightly strengthened.  It required all new clients wishing to open a bearer share account to obtain approval from the New York IPB CEO and AML Local Compliance Officer, and further required them to register or custodize their shares.[1609]  This policy essentially treated all new bearer share accounts as high risk, though no mention was made of enhanced due diligence or monitoring obligations.  Existing bearer share accounts were kept divided into high and low risk accounts.  High risk bearer share accounts were required to register or custodize their shares.  Low risk bearer share accounts were allowed to provide a Beneficial Ownership Letter every three years, and their shares were not taken into custody.[1610]  At this time, HBUS New York held over 630 bearer share accounts.[1611]

**American Express Prosecution.**  On August 6, 2007, the U.S. Justice Department, working with the Federal Reserve and FinCEN, filed a Deferred Prosecution Agreement against American Express Bank International for criminal violations of Federal AML laws.[1612]  In August 2007, HBUS Compliance circulated information about the prosecution,[1613] not because HBUS had participated in any of the matters involving American Express,[1614] but to alert

---

[1605] 8/6/2007 email exchange among HBUS Ali Kazmy, HBUS Alan Williamson, HBUS Clara Hurtado, and others, "miami bearer share procedures," OCC-PSI-00217163.
[1606] 8/9/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00316956.
[1607] 8/6/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00217148
[1608] Id.
[1609] 8/27/2007 email exchanges among HBUS Alan Williamson, HBUS Terry Westren, and others, "OCC-PSI-00318438
[1610] Id.
[1611] 2007 List of New York Bearer Share Accounts, OCC-PSI-00318439.
[1612] United States v. American Express Bank International, Case No. 07-20602-CR-ZLOCH/SNOW (USDC SD Flor.), Deferred Prosecution Agreement (8/7/2007).
[1613] 8/9/2007 email exchanges among HBUS Ali Kazmy, HBUS Alan Williamson, and HBUS Anne Liddy, "On Boarding Bearer Share Corporation Policy Guidance," OCC-PSI-00316956.
[1614] 8/7/2007 email exchanges among OCC HBUS Daniel Jack, HBUS Alan Williamson, and others, "AML Enforcement Actions vs AmEx (Banknotes & Metals)" OCC-PSI-00217241.

employees to the prosecution, ascertain if any of the American Express clients were also clients of HBUS, and point out that the Deferred Prosecution Agreement had targeted the bank in part for lack of sufficient AML controls over bearer share accounts.[1615]

In response, on August 16, 2007, Jeff Clous, head of HBUS IPB Operations in Florida, expressed concern to Alan Williamson of HBUS Compliance about HBUS' relative dearth of AML compliance resources compared to American Express, which had twelve full time compliance staff.  He wrote:  "I believe we have resource constraints that impact our AML program that need to be addressed."[1616]

The next day, on August 17, 2007, HBUS Compliance head Carolyn Wind and Alan Williamson met with Federal Reserve officials.  During this meeting, described by HBUS as "friendly," the Federal Reserve referenced the American Express case, suggested HBUS might have similar issues, and suggested the HBUS Miami management and compliance teams take another look at risky products, such as bearer share companies.[1617]  In a summary of the meeting, Ms. Wind noted that one Federal Reserve employee commented with respect to HBUS:  "if you take the facts from the American Express case and lay them over our last report of HSBC, they are all there."[1618]  Earlier in the year, on January 24, 2007, the Federal Reserve had issued a Report of Examination for the Miami IPB which included a requirement that management "enhance the current controls over bearer share accounts to ensure that they are sufficiently risk-based and capable of detecting changes in ownership of these entities on an ongoing basis."[1619]

That same month, HBUS Compliance began conducting a "gap analysis" comparison of the American Express case versus its own AML program. On October 11, 2007, the analysis was issued and identified bearer shares as a particular concern at both American Express and HBUS.[1620]  It also announced the decision by HBUS to stop opening new bearer share accounts as of September 1, 2007, and to consider also eliminating all of its existing bearer share accounts:

"AEBI [American Express Bank International] failed to exercise sufficient control over accounts held in the names of **offshore bearer share corporations**, and until 2004 had

---

[1615] 8/7/2007 email exchanges among HBUS Daniel Jack, HBUS Michael Baez, HSBC/IBEU Gordon Brown, HBMD Sally Lomas, HBUS Michael Karam, and others, "AML Enforcement Action against AmEx businesses," OCC-PSI-00153253.  On August 9, 2007, Ali Kazmy wrote, "At this juncture, your cognizance is drawn to the recently issued enforcement action against American Express entities, who were penalized up to $55 million for BSA/AML violations including those associated with PICS/bearer share accounts." 8/09/2007 email from Ali Kazmy to Alan Williamson, OCC-PSI-00316956.
[1616] 8/20/2007 email exchanges among HBUS Alan Williamson, HBUS Camillus Hughes, and others, "AEBI Deferred Prosecution Agreement," OCC-PSI-00218380.
[1617] 8/23/2007 email exchanges among HBUS Marlon Young, HBUS Carolyn Wind, HBUS Louis Marino, HBUS Jeff Clous, and others, "File Note on Meeting with Federal Reserve Bank of Atlanta," OCC-PSI-00698461.
[1618] Id.
[1619] 1/24/2004 Board of Governors of the Federal Reserve System "Report of Examination of Edge Corporation," OCC-PSI-00388110.  1/24/2004 Board of Governors of the Federal Reserve System "Report of Examination of Edge Corporation," OCC-PSI-00107432.
[1620] 10/11/2007 "High Level Comparison of Key Anti-Money Laundering Program Deficiencies Identified at American Express Bank international," prepared by Alan Williamson and Stefan Hardy, OCC-PSI-00221959.

no policy or procedure requiring beneficial owners of such accounts to certify in writing
their continued ownership of the bearer shares.

***Bearer share accounts are known and HSBC requires written confirmation every three
years. A decision has been taken by the business not to accept new bearer share
accounts beginning 9/1/07.  Management is considering a program to eliminate all
bearer share customers.***"[1621]

Although HBUS announced a ban on opening new bearer share accounts as of September 1,
2007, it issued a new bank-wide bearer share policy three months later allowing new accounts.

**Final Bearer Shares Policy.**  On December 10, 2007, HBUS Compliance officer Paul
O'Sullivan circulated a final draft of the proposed new Bearer Share Policy.  He explained that
the policy was more flexible than first proposed, and "we will be able to maintain Bearer Share
Company accounts once the requirements of the policy are met."[1622]  The draft policy applied to
both new and existing bearer share accounts.  It required all bearer share accounts to either
register their shares or keep the shares in custody with the bank or an approved third party.  In
addition, Beneficial Ownership Letters would have to be filed every three years.  The draft
policy also permitted new accounts to be opened if they were approved by the Business Unit
head, AML Local Compliance Officer, and AML Director, or a designee.  The approvals would
have to be documented and retained in the customer file.[1623]

On December 11, 2007, HBUS Compliance officer Terry Westren responded as follows:

"If I read this correctly, it is saying that one year from the issuance of this policy, we
have to have all outstanding bearer shares (currently with clients), either registered or in
the hands of an approved Custodian.  Is this correct?  I recall when the OCC was here,
they asked for this.  AML Compliance was able to negotiate for this requirement to be
applicable only to High Risk accounts.  We then complied with this.  It looks like this is
now expanded to all outstanding bearer shares?  Of course, with the new BVI rules
coming into play in 2009, they will have to do this anyway, but I think it should be noted
this could be a considerable exercise."[1624]

Contrary to the statement in this email, however, the 2006 OCC Supervisory Letter had already
called for the bank to place all bearer shares in the custody of either the bank or an acceptable
third party, with no exceptions made for lower risk accounts.[1625]  While HBUS had responded to
the Supervisory Letter that it planning to limit that requirement to higher risk accounts, there is
no documentation showing the OCC accepted that position.  When asked about this email, the

---

[1621] Id.  (Emphasis in original.)
[1622] 12/10/2007 email exchanges among HBUS Paul O'Sullivan, HBUS Terry Westren, HBUS Mason Salit, HBUS
Tereso Suarez-Obregon, and others, "Bearer Share Corporation Policy," OCC-PSI-00226525.
[1623] 8/29/2007 Bearer Share Corporation Account "Policy Guidance," OCC-PSI-00226526.
[1624] 12/11/2007 email exchanges among HBUS Terry Westren, HBUS Paul O'Sullivan, and others, "Bearer Share
Corporation Policy," OCC-PSI-00327917**.**
[1625] See 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-
00000317.  [Sealed Exhibit.]

OCC told the Subcommittee it had been under the impression that HBUS had closed all of its bearer share accounts.[1626]

That same day, December 11, 2007, Jeff Clous, IPB Operations head in Florida, repeated the concerns he had voiced to Alan Williamson in September. Mr. Clous asserted that the draft policy would have an adverse effect on IPB business. He noted that, although IPB Miami was no longer opening new bearer share accounts, it still maintained 1,679 accounts with $2.6 billion, which generated $26 million in revenue annually. Mr. Clous also asserted that the draft policy went too far beyond what regulators required. He noted that the proposed policy required the bank to both register and custodize bearer share accounts, while the Federal AML examination manual offered a choice between those options. In addition, he noted that the draft policy would require existing bearer share accounts to register or custodize their shares by the end of 2008, even though the new BVI bearer share regulations would not require the registration of BVI bearer shares until the end of 2009.[1627]

On December 14, 2007, the HBUS Board of Directors approved its first HBUS-wide Bearer Share Policy.[1628] The bearer share policy applied to all new and existing bearer share accounts and required the client to register the shares or agree to hold the shares in custody with HSBC or a third party custodian and provide a periodic beneficial ownership certificate.[1629] AML Director Leslie Midzain gave both IPB New York and Miami IPB a full year, until 2009, to comply with the policy due to the BVI registration project which had a 2009 deadline.[1630] For the next year, New York IPB and Miami IPB continued to follow their own policies and procedures with regard to bearer share accounts.

**Federal Reserve Concern.** In 2008, an HSBC Group Audit of the New York IPB disclosed that it had 610 bearer share accounts, 31 of which had overdue Beneficial Ownership Letters, including 21 which were overdue by more than a year.[1631] In Miami, an earlier HSBC Group Audit disclosed that, as of October 2007, the Miami IPB had 1,667 bearer share accounts, 1,109 or two-thirds of which had Beneficial Ownership Letters that were more than three years old and so were overdue to get new letters.[1632] Both audits indicated that HBUS was at risk of not knowing, in many cases, who owned the corporations behind the bearer share accounts.

---

[1626] Subcommittee interview of Joseph Boss (1/30/2012) and James Vivenzio (3/15 /2012). See also 5/10/2010 email exchanges among OCC Joseph Boss, Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts" OCC-PSI-00886601-606.

[1627] 12/11/2007 email from HBUS Jeff Clous to HBUS Paul O'Sullivan and others, "Bearer Share Corporation Policy," OCC-PSI-00226652.

[1628] August 29, 2007 Bearer Share Corporation Account Policy Guidance, OCC-PSI-00226526.

[1629] Id.

[1630] See 4/18/2008 HBUS KYC Committee Meeting minutes, OCC-PSI-00241046. See also 7/3/2008 memorandum from HBUS Ali Kazmy to HBUS Leslie Midzain, OCC-PSI-00292367 ("Since BVI authorities have granted till December 2009 for all bearer shares to be registered, all BVI bearer share corporations within PB Americas will follow this time frame."). Subcommittee briefing by HSBC legal counsel (7/9/2012).

[1631] 10/2008 Group Financial Services Audit October 2008, OCC-PSI-00248215.

[1632] See 10/2007 "HSBC Group Financial Services and European Audit Report on HSBC Private Bank International, Miami and HBUS Domestic Private Banking-Florida Region," OCC-PSI-00223637; see also 12/11/2007 HSBC Private Bank International FSA Audit Issues Status Report, OCC-PSI-00226813.

On January 31, 2008, HBUS AML Compliance officer Paul O'Sullivan emailed Clara
Hurtado, Compliance officer for the Miami IPB, regarding a "De-Risking Strategy for
Miami."[1633]  He also discussed with HBUS Compliance head Carolyn Wind and senior AML
Compliance officer Alan Williamson the Federal Reserve's concerns regarding the high-risk
nature of the Miami IPB's client-base.[1634]  Mr. O'Sullivan asked Ms. Hurtado to identify the
high risk bearer share accounts for which there was no "glue to cement the relationship" and
consider terminating them.[1635]

Six months later, on June 12, 2008, the Federal Reserve issued its annual Report of
Examination (ROE) for the Miami IPB.  The ROE again identified bearer share accounts as a
problem, this time expanding the recommended action to be taken and noting, in particular, that
ownership of a bearer share account should be ascertained more frequently than every three
years:

> "Assess the risks associated with bearer share accounts and establish risk mitigation
> control measures that are appropriate for the associated level of risk.  These control
> measures may include maintaining control over bearer share accounts; entrusting bearer
> share accounts with a reliable second party; or requiring periodic certification of
> ownership. At a minimum, management should conduct a review of the bearer share
> recertification policy and ensure that accounts that pose higher risks are recertified more
> frequently than every three years."[1636]

On June 25, 2008, Peter Georgeou, deputy head of Group Audit Private Bank, emailed
the head of HSBC Group audits, Matthew King, addressing the latest Federal Reserve
examination report.  While the Federal Reserve had listed 13 required actions, Mr. Georgeou
alerted Mr. King to those he considered "more material."  On his list was: "Improved controls
and risk mitigation are required in respect of bearer share accounts and accounts held in the name
of PICs.  In addition, policies and procedures should be enhanced for identification and the
review of higher risk accounts."[1637]

On July 3, 2008, HBUS Compliance officer Ali Kazmy sent a memorandum to HBUS
Compliance and AML head Lesley Midzain summarizing changes that had been made to the
IPB's AML Procedures for 2007 and 2008.  He noted that BVI bearer shares would have to be
registered by December 2009, in accordance with the time frame set forth by BVI authorities.
He wrote that high risk bearer share accounts would also require annual recertification of
beneficial owner information, while lower risk bearer share accounts would need to recertify
beneficial ownership every three years.  In addition, he wrote that bearer share clients would be

---

[1633] 1/31/2008 email from HBUS Paul O'Sullivan to HBUS Alan Williamson and HBUS Carolyn Wind, "De-
Risking," OCC-PSI-00331923.
[1634] When asked about the 1,167 bearer share accounts, Ms. Wind told Subcommittee that she knew there were
bearer share accounts, but did not know there were that many.  She said she had talked about getting rid of bearer
share accounts and wanted tighter controls.  She also said longstanding bank clients with bearer share accounts were
not uncommon in private banking.  Subcommittee interview of Carolyn Wind (3/7/2012).
[1635] Id.
[1636] 6/12/2008 Federal Reserve Audit, at10-11.
[1637] 7/2/2008 email exchanges among HBUS Janet Burak, HBUS Bob Martin, and others, "Federal Reserve Bank of
Atlanta Review of HSBC Private Bank Miami," HBUS OCC-PSI-00725897.

required to attest that they will notify the bank if a change in ownership occurs and provide a new Beneficial Ownership Letter.[1658]   The next day, July 4, 2008, Jeff Clous, head of IPB Operations in Florida, repeated the concerns he had voiced twice before, to Alan Williamson and Paul O'Sullivan.[1659]

On November 12, 2008, the New York International Private Bank sought dispensation to open 80 new bearer share accounts for existing clients.[1640]   New York IPB employee Todd Maddison asked senior HBUS Compliance officer Alan Williamson whether Compliance would provide the needed dispensation.[1641]   Mr. Maddison said that he thought that an email written by Teresa Garcia, which outlined exceptions to the bearer share policy for the Private Bank, implied that the accounts could be opened under these exceptions:

> "Since BVI authorities have granted till December 2009 for all bearer shares to be registered, all BVI bearer share corporations within PB Americas will follow this time frame; High risk bearer share accounts will provide an annual recertification of the beneficial owners through a properly executed BOL; Standard risk bearer share accounts will provide beneficial ownership recertification every three years through a properly executed Beneficial Ownership Letter (BOL); and Clients must attest that they will notify the bank of change in ownership, as and when it takes place. A new BOL will be required from the new beneficial owner."[1642]

Some of the 80 new bearer share brokerage accounts were opened and some of them, as well as some other New York IPB bearer share accounts, were later moved to the Miami IPB.[1643]On March 18, 2009, the OCC issued a Supervisory Letter addressing AML concerns related to the HBUS Private Banking operations.  The letter indicated that one of the OCC's primary examination objectives was to "[e]valuate effectiveness of enhancements to policies and procedures for PUPID activities, bearer share accounts and monitoring processes."[1644]   Despite this objective, the letter did not address bearer share issues in its conclusions or recommendations.[1645]   The OCC's silence on the issue stands in sharp contrast to the Federal Reserve which was not only aware of the bearer share accounts, but tracking actions taken in Miami with respect to them.

---

[1638] 7/3/2008 memorandum from HBUS Ali Kazmy to HBUS Lesley Midzain, "Modifications to the Approved Private Bank Americas AML Procedures," OCC-PSI-00292367.

[1639] 10/29/2008 email exchanges among HBUS Alan Williamson, HBUS Lesley Midzain, and others, "Enquiry – co-branding," OCC-PSI-00219656.

[1640] 11/14/2008 email exchanges among HBUS Todd Maddison, HBUS Alan Williamson, and others, "Bearer share question," OCC-PSI-00248782.  HBUS legal counsel told the Subcommittee that 80 of its clients with bearer shares needed to open brokerage accounts due to a regulatory change.  Subcommittee briefing by HBUS legal counsel (7/9/2012).

[1641] 11/14/2008 email exchanges among HBUS Todd Maddison, HBUS Alan Williamson, and others, "Bearer share question," OCC-PSI-00248782.  HBUS legal counsel told the Subcommittee it did not know whether or not a dispensation was granted for these accounts.  Subcommittee briefing by HBUS legal counsel (7/9/2012).

[1642] Id.

[1643] Subcommittee briefing by HSBC legal counsel (7/9/2012).

[1644] 3/18/2009 supervisory letter from OCC to HBUS Leslie Midzain, "Private Banking BSA/AML Examination," OCC-PSI-00000445-447, at 445.

[1645] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

On May 19, 2009, the Federal Reserve issued its annual Report of Examination for the Miami IPB, which again mentioned bearer shares as a concern.  It stated in part:

> "[T]he risks posed by the international private banking activities remain significant, given the high transactional nature of the client base, a higher risk target market (Latin America), and the  existence of offshore shell companies (including offshore operating companies), including bearer share structures."[1646]

The examination report continued that the risk was increasing due to the bank's transfer of some accounts from the New York International Private Bank to the Miami Edge Corporation.  The report also noted that HBUS had taken steps to address the risk.  It noted that senior compliance personnel had sought to "de-risk" the Miami IPB's private banking activities, primarily by:

> "continued review of offshore operating shell companies, seeking to exit those relationships where the profitability of the relationships does not justify the additional compliance costs associated with the account.  This strategy, coupled with increased approval requirements for new operating company accounts, and a decision to no longer open new bearer share accounts, shows tangible steps taken towards reducing reputational risk at Corporation."[1647]

This was the third Report of Examination over a two year period to have directed HBUS to strengthen its AML controls over its bearer share accounts.

**2009 Bearer Share Project.**  In February 2009, HBUS began the "Bearer Share Project" with the goal of winding down HBUS' bearer share accounts.[1648]  Because the British Virgin Islands (BVI) had passed legislation that would require bearer share certificates to be registered or custodized by the end of the year, HSBC viewed this development as an indication that other laws would soon be passed and decided that it would begin registering or custodizing its bearer shares beginning with the accounts opened by BVI bearer share corporations.[1649]  By 2009, HBUS' international private banks operated under a new organizational structure called Private Bank Americas (PBA), and the bearer shares were treated as a group.  PBA determined that it had a total of 1,833 unregistered bearer share accounts, including 1,257 BVI bearer shares and 576 non-BVI bearer shares.  It determined that 306 were in the New York Private Bank and 1,527 were in the Miami Private Bank.[1650]  The Project began with HBUS' sending a letter to all of its BVI bearer share clients in May 2009.[1651]  The letter explained that as of December 31, 2009, HBUS would "no longer maintain accounts for companies that issue bearer shares."  It indicated that clients would need to register their bearer shares or close their accounts.[1652]

---

[1646] 5/19/2009 Federal Reserve Report of Examination of Edge Act Corporation, BOG-A-300035.  [Sealed Exhibit.]
[1647] Id. at 21.
[1648] Subcommittee briefing by HSBC legal counsel on bearer share issues (4/20/2012 and 7/9/2012).
[1649] Id.
[1650] Id.
[1651] Letter from HBUS to British Virgin Islands bearer share clients, "For Companies Incorporated in the British Virgin Islands," HSBC-PSI-PROD-0197129-133; Subcommittee briefing by HSBC legal counsel (7/9/2012).
[1652] Letter from HBUS to British Virgin Islands bearer share clients, "For Companies Incorporated in the British Virgin Islands," HSBC-PSI-PROD-0197129-133, at 129.

In 2010, the OCC, which had been silent on bearer share issues at HBUS for four years, renewed its focus on the accounts.  On May 10, 2010, one of the OCC AML examiners  sent an email to EIC Sally Belshaw, OCC attorneys in Washington  and others stating that HBUS Compliance head Terry Pesce had told him that all but one bearer share account had been closed in 2006.[1653]  One of the OCC attorneys in Washington wrote in an email that he recalled that the examiner "had been told" that there were no bearer share accounts.[1654]  The AML examiner indicated that he had just learned that HSBC still had 79 bearer share accounts held in Panama, Uruguay, Bahamas, Cayman, Belize, and Netherlands.[1655]  In June 2010, another OCC examiner at HBUS obtained a list from HBUS of 117 bearer share accounts.[1656]  On September 8, 2010, the same examiner forwarded a portion of a May 2010 New York IPB report stating it had 610 bearer share accounts, 31 of which had overdue beneficial ownership declarations.[1657]  The report also indicated that, for some accounts, the bank had no beneficial ownership declaration on file and no information about the location of some of the shares.  Later that same day, the examiner sent another email with a copy of an audit of the Miami IPB indicating it had 925 bearer share accounts, in addition to the 610 accounts in New York.[1658]  The examiner agreed to forward the Miami audit report to the Federal Reserve.[1659]  These internal communications indicate that a primary reason for OCC inaction on bearer share issues was a misimpression that the accounts had been closed four years earlier.[1660]  It also indicates a lack of coordination with the Federal Reserve which had been monitoring the bearer share issue in Miami for several years.

By the time the OCC became aware of the large number of bearer share accounts still open at HBUS, the Bearer Share Project was well underway in its efforts to reduce the account volume.  Having already sent a 2009 letter to accountholders with BVI bearer share corporations about the need to register their shares or close their accounts, HBUS followed in November 2010, by sending a similar letter to all accountholders with non-BVI bearer share corporations.

---

[1653] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

[1654] 9/8/2010 email exchanges among OCC James Vivenzio and OCC Teresa Tabor, "Bearer Share Accounts," OCC-PSI-00894871.

[1655] See 5/10/2010 email from OCC Joseph Boss to OCC Lee Straus, James Vivenzio, Monica Freas, Sally Belshaw, and others, "Bearer Share Accounts," OCC-PSI-00886601.

[1656] 6/15/2010 email from OCC Teresa Tabor to OCC Joseph Boss, [no subject], OCC-PSI-00929779 and attachment OCC-PSI-00929780.

[1657] 9/8/2010 email exchanges among OCC James Vivenzio and OCC Teresa Tabor, "Bearer Share Accounts," OCC-PSI-00894871.

[1658] 6/15/2010 email from OCC Teresa Tabor to OCC Joe Boss forwarded to OCC Elsa De La Garza, [no subject], OCC-PSI-00929779 and attachment OCC-PSI-00929780.

[1659] 9/8/2010 email exchanges among OCC Teresa Tabor and OCC Joseph Boss, "IPB Miami (Edge)," OCC-PSI-00921759-760, at 759.

[1660] See also 5/12/2011 conclusion memorandum from OCC Teresa Tabor to OCC Kerry Morse, "Latin American International Center (LAIC) Miami – BSA/AML Examination," OCC-PSI-01768568 (finding that LAIC had two bearer share accounts which "only came to the attention of the LAIC Compliance Staff based on Examiner inquiries at the commencement of the examination"; and that LAIC had not fully followed HBUS bearer share policy for these two accounts because Beneficial Ownership Letters were not obtained every three years and the shares were being held by third-party custodians but it was unclear if the custodians had been approved by LAIC and what approval process was utilized).

By June 2011, of the 1257 BVI bearer share accounts, 900 had registered their shares (so that the accounts no longer qualified as bearer share accounts) and 350 accounts had closed.[1661] Of the 576 non-BVI bearer share accounts, 255 had registered their shares, and 182 accounts were closed.[1662]  In November 2011, Private Bank Americas froze the remaining 139 non-BVI bearer share accounts, and began working to contact the accountholders and close the accounts.[1663]

As of July 9, 2012, HSBC legal counsel told the Subcommittee that HBUS Private Bank America still had 26 bearer share accounts.[1664]  HSBC legal counsel also told the Subcommittee that "all but a handful" of those accounts were frozen, because the accountholders had not registered their shares or closed their accounts.[1665]  According to HSBC legal counsel, the handful of bearer share accounts that were not frozen were beneficially owned by a single client, and the shares were being kept in the custody of a law firm in New York.  HSBC legal counsel indicated that, although HBUS' latest bearer share policy continued to allow new bearer share accounts to be opened under limited circumstances, no new bearer share account had, in fact, been opened since that policy took effect.[1666]  Internal HBUS documents indicate that as a result of the Bearer Share Project, on at least two occasions, the bank identified suspicious activity related to the accounts.[1667]

## C. Two Examples of Bearer Share Accounts

Two examples of bearer share accounts illustrate the AML risks they pose.  They involve bearer share accounts opened by Mauricio Cohen Assor and Leon Cohen Levy, which demonstrate how bearer share accounts can be used to conceal assets and evade taxes; and a wealthy Peruvian family, which demonstrates how banks can be pressured to waive AML safeguards when opening bearer share accounts.

**Cohen Bearer Share Accounts.**  Mauricio Cohen Assor and Leon Cohen Levy, father and son, were hotel developers in Miami Beach.[1668]  On April 14, 2010, both were indicted in Florida on charges of conspiring to commit tax fraud and filing false tax returns.[1669]  The Justice Department charged that the Cohens had used bearer share corporations and shell companies to help conceal $150 million in assets and $49 million in income from the IRS.  Both resided in Miami Beach, Florida.

---

[1661] Subcommittee briefing by HSBC legal counsel on bearer share issues (4/20/2012).

[1662] Id.

[1663] Id.

[1664] The Subcommittee was told that 12 accounts are located in Miami and 14 are located in New York. Subcommittee briefing by HSBC legal counsel on bearer share issues (7/9/2012).

[1665] Id.

[1666] Briefing by HSBC legal counsel to the Subcommittee on bearer share issues (4/20/2012).

[1667] See 5/6/2010 AML Oversight Committee Meeting minutes for HBUS, OCC-PSI-00860859-860, at 859.

[1668] 10/7/2010 "Miami Beach Hotel Developers Convicted of Tax Fraud," Department of Justice press release, http://www.justice.gov/usao/fls/PressReleases/101007-01.html.

[1669] See generally United States of America v. Mauricio Cohen Assor and Leon Cohen Levy, Case No. 10-60159-CR-ZLOCH(s) (USDC SD Flor.), Superseding Indictment (8/3/2010) (hereinafter "Cohen Indictment").  See also "2 Charged in Tax Evasion Scheme Involving HSBC," New York Times, http://dealbook.nytimes.com/2010/04/16/2-charged-in-tax-evasion-scheme-involving-hsbc/.

The indictment explained that "bearer share corporations are often set up in tax havens to hide the true ownership of assets, because ownership records are not maintained and nominee officers and directors are often used to appear to control the affairs of the corporation."[1670]

The indictment named two bearer share corporations used by the Cohens to open bank accounts, Blue Ocean Finance Ltd., a Panamanian bearer share corporation,[1671] and Whitebury Shipping Time Sharing Ltd., a BVI bearer share company.[1672]   The Cohens used those bank accounts to conceal their ownership of the assets deposited into them.   The indictment also disclosed that, around May 2007, an unnamed international bank asked one of the Cohens to register the shares of Whitebury Shipping and, when the request was refused, the bank closed the account.

Internal bank documents disclose that HBUS was the unnamed bank that maintained a bearer share account for Whitebury Shipping.   April 2007 transcripts of several telephone conversations between Mauricio Cohen and an HBUS banker describe the account, HBUS' request that he register the bearer shares, and his refusal to do so.   According to one of the telephone transcripts, on April 23, 2007, HBUS executive Claude Mandel, the Relationship Manager who handled the bank's relationship with Mauricio Cohen, apparently agreed to remove Mr. Cohen's name from the Whitebury account.[1673]   The next day, Mr. Cohen talked to Mr. Mandel about replacing Whitebury with another bearer share account.   Mr. Mandel offered to convert Whitebury from a BVI to a Bahamian bearer share corporation, but said that the bank no longer opened bearer share accounts.   Mr. Cohen protested and told Mr. Mandel that the bank would lose clients and that other banks take bearer share accounts.[1674]   The telephone transcripts indicate that, on April 25, 2007, Mr. Mandel and Mr. Cohen again discussed Mr. Cohen's bearer share accounts.   Despite Mr. Mandel's insisting that his bearer shares would need to be registered, Mr. Cohen convinced Mr. Mandel to check if he could convert Whitebury into a Panamanian bearer share corporation.   Mr. Cohen indicated again that he did not want to put names on the shares; when Mr. Mandel said that the shares would need to state the names, Mr. Cohen said:  "But, I can't put that, otherwise I have to declare them in the United States?  I can't do that, I don't want to declare … otherwise, I have to close the accounts with you and go to Geneva."[1675]

Minutes from a May 6, 2010 AML Oversight Committee Meeting at HBUS noted that the HBUS Private Bank was providing information on closed bearer share accounts opened by an "ex-client" as part of the investigation of Mauricio Cohen, a former HSBC client.[1676]

---

[1670] Cohen Indictment at 3.
[1671] Id. at 7.
[1672] Id. at 8.
[1673] Transcript of 4/23/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0030891-894.
[1674] Transcript of 4/24/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0030873-877.
[1675] Transcript of 4/25/2007 telephone conversation between HBUS Claude Mandel and Mauricio Cohen, HSBC-PSI-PROD-0024795-793.
[1676] 5/6/2010 HBUS AML Oversight Committee Meeting Minutes, OCC-PSI-00860859, at 859.

In October 2010, the Cohens were convicted after a jury trial, sentenced to ten years in prison, and ordered to pay back taxes, interest, and penalties totaling over $17 million.  This example demonstrates the risk of bearer share accounts being used to conceal ownership of assets and commit criminal tax evasion.

**Peruvian Family Bearer Share Accounts.**  In 2007, a senior Compliance official with the HSBC Private Bank in New York, Teresa Garcia, sought a waiver to open a relationship for a Peruvian businessman for two bearer share accounts.[1677]  According to Ms. Garcia, his business group was one of the richest and most powerful in Peru.[1678]

The bearer share corporations, Urigeler International  S.A. - Holding Company and Birmingham Merchant S.A. - Holding Company, were formed in Panama.[1679]  According to an email exchange among HBUS Compliance personnel, in 2007, opening a new bearer share account required: (1) approval by the New York International Private Bank CEO and AML Local Compliance Officer; and (2) registration or custodization of the bearer shares.[1680]

Ms. Garcia wrote that she was requesting the waiver because the businessman had indicated that he did not want to forfeit confidentiality by registering or custodizing the bearer shares.[1681]  She explained: "they wish to maintain confidentiality, and they have never been asked by our competitors with whom they bank to do this."[1682]  Manuel Diaz, President and Managing Director of HSBC Private Bank International in Miami, indicated that he supported a waiver, because he was very familiar with the family and interested in establishing a relationship with them.[1683]  Marlon Young, CEO of Private Banking Americas, also approved the waiver request.[1684]

Ms. Garcia then escalated the request to senior HBUS Compliance official Alan Williamson to determine who had authority to grant the waiver on behalf of AML Compliance.  Mr. Williamson explained that, while he had no objection to granting the waiver, the bearer shares policy was an HSBC Group mandate and any exception would have to be approved by HSBC Group Compliance.[1685]  David Ford, HSBC Global Money Laundering Control Officer, confirmed that HSBC Group approval was required for an exception to Group policy.  Mr. Ford also wrote that he was "[s]uprised can open bearer share account for offshore client with no bo

---

[1677] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 3.
[1678] Id. at 3.
[1679] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 2.
[1680] Id. at 1.
[1681] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 6.
[1682] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 3-4.
[1683] 6/20/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, "Waiver Request," OCC-PSI-00214516, at 3.
[1684] 6/25/2007 email from HBUS Marlon Young to HBUS Jaime Carvallo and others, "[redacted] Family," OCC-PSI-00214806.
[1685] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 3.

[beneficial ownership] declaration in US," and suggested checking with HBUS Compliance head
Carolyn Wind about  the OCC and Federal Reserve "view of such a structure."[1686]  Mr.
Williamson asked HSBC Group AML head Susan Wright about the request, and reported that
she was reluctant to grant the exception but would consider it.[1687]

There was a strong push for this relationship by the business side.  Manual Diaz, head of
the Miami Private Bank International, wrote:  "I FULLY SUPPORT THIS WAIVER."[1688]
Jaime Carvallo, a Miami bank executive, sent an email to the head of Private Banking Americas,
Marlon Young, enlisting his support to obtain a waiver.  Mr. Carvallo wrote:

> "Teresa Garcia must have given you heads up on the [redacted] family and the issue
> regarding their holding companies having bearer shares and the fact that they will not
> sign the BOL [Beneficial Ownership Letter].
>
> I will see one of the family members tomorrow morning and this still seems to have no
> resolution.  This is too important a family in Peru for us not to want to do business with,
> and one that has taken a lot of my time and effort to convince to start a relationship with
> us. … I would appreciate your involvement at this point, as this has become extremely
> sensitive."[1689]

Mr. Young signaled his support for the waiver the same day,[1690] and later wrote to senior HBUS
Compliance officer Alan Williamson:  "This is an important relationship for IPB [International
Private Bank] and a family that has a clean record.  It would be a shame if we are not able to
obtain an exception."[1691]  Mr. Cavallo also wrote directly to Mr. Williamson that the family was
"too important a family in Peru for us not to want to do business with."[1692]  Mr. Carvallo
estimated the family's liquid net worth,[1693] and explained that HSBC was currently competing
with another bank to help the family reorganize their businesses and facilitate the succession of
their financial assets and operating companies, which could be very profitable.[1694]

---

[1686] Id. at 1.

[1687] 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Jaime Carvallo, Marlon Young, Manuel
Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214880, at 1.

[1688] 6/20/2007 email exchange among HBUS Alan Williamson and HBUS Manuel Diaz, Teresa Garcia, and others,
"Waiver Request," OCC-PSI-00214534, at 1.

[1689] 6/25/2007 email from HBUS Jaime Carvallo to HBUS Marlon Young and others, "[redacted] Family," OCC-
PSI-00214806.

[1690] 6/25/2007 email from HBUS Marlon Young to HBUS Jaime Carvallo and others, "[redacted] Family," OCC-
PSI-00214806.

[1691] 6/26/2007 email from HBUS Marlon Young to HBUS Alan Williamson and others, "[redacted] Family," OCC-
PSI-00214891, at 1-2.

[1692] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and
others, "[redacted] Family," OCC-PSI-00215211, at 6.

[1693] 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Jaime Carvallo, Marlon Young, Manuel
Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214880, at 1.

[1694] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and
others, "[redacted] Family," OCC-PSI-00215211, at 5.

Mr. Williamson responded: "I thought so. I would do it without going to Geneva but audit wrote up DPB [Domestic Private Banking] on a similar situation."[1695] Later, he wrote: "we will do our best."[1696] Still later: "Doing what I can."[1697] David Ford pointed out that the HSBC Group policy was flexible, because the client could either declare beneficial ownership, have HSBC hold the shares, or have an acceptable third party hold the shares.[1698] On July 5, 2007, Mr. Williamson wrote that the "RM [Relationship Manger] and the Group Head are not seeing eye to eye on this one."[1699]

In 2007, HBUS opened a bearer share account in the name of Urigeler.[1700] When asked whether a waiver had been granted from the requirements that the bank hold the shares in custody and obtain an Beneficial Ownership Letter from the owner, HSBC legal counsel told the Subcommittee: "We don't know."[1701] HSBC legal counsel told the Subcommittee that the accounts was opened in New York, transferred to Miami in 2009, and closed in 2011.[1702]

This account demonstrates the difficulty of adhering to a strong bearer share policy when a wealthy and powerful family asks to open a bearer share account and obtain a waiver from requirements to either register the shares with their names or submit the shares to the custody of the bank. HBUS' bearer share policy continues to permit the bank to open bearer share accounts.

## D. Analysis

For decades, bank regulators and AML experts have cautioned against opening accounts for bearer share corporations due to the ease with which these corporations hide ownership and the frequency with which they have been used to commit money laundering, financial crime, tax evasion, and other wrongdoing. From at least 2000 to 2011, HBUS maintained a sizeable number of bearer share accounts, despite repeated regulatory questions and expressions of concern. HBUS bankers, and at times their compliance officers, pushed to open and maintain bearer share accounts. Two bearer share accounts illustrate the risks inherent in such accounts and the pressures to circumvent AML controls. While HBUS finally registered or closed most of the accounts by 2011, its policy continues to allow bearer share accounts to be opened under some circumstances.

---

[1695] 6/20/2007 email exchange among HBUS Alan Williamson and HBUS Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214534, at 1.

[1696] 6/21/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "Waiver Request," OCC-PSI-00214618, at 1.

[1697] 6/26/2007 email from HBUS Alan Williamson to HBUS Marlon Young and others, "[redacted] Family," OCC-PSI-00214891, at 1. See also 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211; 6/26/2007 email exchange among HBUS Alan Williamson and HBUS Marlon Young, Manuel Diaz, Teresa Garcia, and others, "[redacted] Family," OCC-PSI-00214891.

[1698] 7/5/2007 email exchange among HBUS Teresa Garcia and HBUS Alan Williamson, Susan Hoggarth, and others, "[redacted] Family," OCC-PSI-00215211, at 2.

[1699] Id. at 1.

[1700] Subcommittee briefing by HSBC legal counsel (7/9/2012).

[1701] Id.

[1702] Id.

# VIII.  OCC:  EXERCISING INEFFECTIVE AML OVERSIGHT

The mission of the Office of the Comptroller of the Currency (OCC) is to charter, regulate, and supervise all U.S. banks that hold a national charter.[1703]  To carry out that mission, in the words of the OCC, it conducts "regular examinations to ensure that institutions under our supervision operate safely and soundly and in compliance with laws and regulations," including AML laws.[1704]  However, the HSBC case history, like the Riggs Bank case history examined by this Subcommittee eight years ago,[1705] provides evidence that the current OCC examination system has tolerated severe AML deficiencies for years and given banks great leeway to address targeted AML problems without ensuring the effectiveness of their AML program as a whole.  As a result, the current OCC examination process has allowed AML issues to accumulate into a massive problem before an OCC enforcement action is taken.

At HSBC, during the five-year period from 2005 to 2010, OCC AML examiners conducted nearly four dozen AML examinations, identified at least 83 AML Matters Requiring Attention, and recommended two cease and desist orders to strengthen HBUS' AML program.  Despite the many AML problems identified by its examiners, OCC supervisors took no formal or informal enforcement action during nearly that entire period, allowing the bank's AML problems to fester.  In 2009, after learning that two law enforcement agencies were investigating possible money laundering through HBUS accounts, the OCC legal and enforcement divisions directed OCC AML examiners to hastily intensify and expand an ongoing AML examination to consider HBUS' AML program as a whole.  In September 2010, the expanded OCC examination culminated in a blistering Supervisory Letter identifying numerous, serious AML problems at the bank.  Many of these AML problems had been identified in prior examinations, but were tied to specific HBUS business units rather than applied bankwide, and were not resolved by bank commitments to remedy the identified problems.

The September 13, 2010 Supervisory Letter criticizing HBUS' AML deficiencies ran 31 pages long.[1706]  It cited the bank for five violations of Federal AML law.  Its list of AML problems included a backlog of over 17,000 unreviewed alerts regarding possible suspicious activity, and a failure to timely file hundreds of Suspicious Activity Reports (SARs) based upon those alerts.  The Supervisory Letter also criticized HBUS for failing to conduct any due diligence or to assess the AML risks posed by HSBC affiliates that opened U.S. dollar correspondent accounts at HBUS, even though many of those affiliates operated in high risk jurisdictions, had high risk clients, or offered high risk products.  Another problem was a three-year failure by HBUS, from mid-2006 to mid-2009, to conduct any AML monitoring of billions of dollars in bulk cash transactions, including $15 billion from 2007 to 2008 alone, with those same HSBC affiliates, despite the risks associated with large cash transactions.

---

[1703] See "FAQs – HSBC Money Laundering Enforcement Action," attached to 10/6/2010 email from OCC James Vivenzio to OCC colleagues, "HSBC FAQs," OCC-PSI-00898845, at 5.
[1704] Id.
[1705] See "Money Laundering and Foreign Corruption:  Enforcement and Effectiveness of the Patriot Act," U.S. Senate Permanent Subcommittee on Investigations, S.Hrg. 108-633 (July 15, 2004).
[1706] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335, at 342.  [Sealed Exhibit.]

In addition, the Supervisory Letter criticized HBUS' failure to conduct any AML monitoring of $60 trillion annually in wire transfer activity by customers domiciled in countries rated by HBUS as lower risk, unless a customer was individually rated as high risk, while also criticizing the bank's country risk assessment process. The OCC attributed the bank's monitoring failure in part to HBUS' goal of minimizing AML staffing requirements. To place the magnitude of the AML vulnerability created by HBUS in context, the OCC noted that, from 2005 to 2009, HBUS' wire activity had grown from 20.4 million to 30.2 million wire transactions per year, with annual dollar volumes climbing from $62.4 trillion to $94.5 trillion, an increase of 50%. The OCC also noted that HBUS had become the third largest user of the CHIPS wire transfer system which provides 95% of U.S. dollar cross-border and nearly half of all domestic wire transactions totaling $1.5 trillion daily.[1707]

The letter didn't stop there. It also offered a slew of criticisms of the techniques used by HBUS to identify suspicious activity, describing them as "ineffective," "inadequate," and overly reliant on a "highly discretionary manual monitoring approach," all of which decreased the number of AML alerts. Additional problems included inappropriate procedures to close alerts; an "inadequate focus on country risk instead of customer risk"; the failure to assign high risk ratings to high risk clients, including Politically Exposed Persons; inadequate and unqualified AML staffing; inadequate AML resources; and high turnover in AML leadership. Despite its own failures to take proactive steps to oversee the bank, the OCC letter noted that the bank had not been proactive enough in identifying and remediating its own AML problems:

> "Through year-end 2009, the OCC has issued 83 BSA/AML Matters Requiring Attention ('MRAs'). The bank has a history of not identifying BSA/AML problems proactively. Instead, the bank has taken a reactive posture, choosing to focus its attention on correcting specific deficiencies identified by regulators without taking comprehensive action to identify and correct deficiencies in the bank's overall BSA/AML program."[1708]

A month later, on October 4, 2010, the OCC issued a Cease and Desist Order requiring HBUS to revamp its AML program.[1709] In response, HBUS committed to making major changes.

At the time the OCC issued the October Cease and Desist Order, it had been conducting regular AML oversight of HBUS for six years, raising the issue of how such deep-seated AML deficiencies could have gone on at the bank without the regulator's taking action. Part of the answer is that HBUS, like other international banks, presented the OCC with a number of AML challenges. It functioned as the U.S. nexus for one of the largest banks in the world. The HSBC network was not based in the United States, and its central focus was not on U.S. customers or U.S. businesses, but on other areas of the globe. HSBC affiliates operated in a number of jurisdictions which faced huge AML risks from terrorist financing, drug trafficking, tax evasion, and other law enforcement problems. The HSBC Group was also one of the largest participants

---

[1707] Id. at 342-343.

[1708] Id.

[1709] See In re HSBC Bank USA, N.A., Case No. AA-EC-10-98, Department of the Treasury Comptroller of the Currency, Consent Order (10/4/2012), OCC-PSI-00904698. On the same day, the Federal Reserve issued a Cease and Desist Order against HBUS' holding company, HSBC North America Holdings, Inc. (HNAH) to require it to strengthen its AML program. See In Re HSBC North America Holdings, Inc., Case No. 10-202-B-HC, before the Board of Governors of the Federal Reserve System, Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act as Amended (10/4/2012).

in international wire transfer systems and a leader among global banks in moving large amounts
of physical currency around the world, with all the attendant AML risks inherent in large cash
transactions. HSBC also handled numerous high risk clients and high risk products. In addition,
as OCC examinations disclosed over the years, it was a financial institution with inadequate
AML resources; inadequate AML systems and controls; and inadequate AML leadership.

HBUS itself was a large, complex, and growing financial institution with numerous
business lines, products, and services, as well as millions of customers. It also had
correspondent accounts for more than 80 HSBC affiliates as well as financial institutions around
the world. From the time the OCC became HBUS' primary regulator in 2004, it oversaw HBUS'
AML program and conducted regular examinations throughout the bank. Year after year, those
AML examinations exposed AML deficiencies. Each time problems were identified, HBUS
promised to correct them and sometimes did. But those corrective actions were narrowly
targeted and, instead of improving, the bank's overall AML program deteriorated, resulting in
the dramatic failures described in the September 2010 Supervisory Letter.

The focus of this section is to chronicle the OCC's AML oversight efforts at HBUS and
draw from that case history potential lessons regarding OCC examinations of AML controls at a
large global bank; how AML problems can accumulate over years despite the OCC's presence,
and what can be done to strengthen the OCC's AML oversight. Problems include the OCC's
decision to treat AML deficiencies as a consumer compliance problem rather than a management
problem with safety and soundness implications; its practice of foregoing the citation of legal
violations for the failure to comply with mandated components of a AML program; its use of
narrowly focused AML examinations without also examining a bank's overall AML program; its
failure to make timely use of informal and formal enforcement actions to compel AML
improvements; and its use of Supervisory Letters that sometimes muted examination criticisms
or weakened recommendations for reforms. Actions to remedy these problems would strengthen
the OCC's AML oversight and help protect the U.S. banking system from being misused for
terrorist financing, money laundering or other misconduct.

## A. Background

### (1) Key Anti-Money Laundering Laws

Federal law defines money laundering as "the movement of illicit cash or cash equivalent
proceeds into, out of, or through the United States [or] … United States financial
institutions."[1710] Federal anti-money laundering laws also apply to terrorist financing, including
any legally obtained funds if intended for use in planning, committing, or concealing a terrorist
act.[1711] These laws arose as a result of law enforcement investigations demonstrating that
terrorists, drug traffickers, tax evaders, and other criminals were using financial transactions to
execute their crimes, including by transferring funds across international lines, recharacterizing
illicit proceeds as legitimate funds, hiding assets, and using financial and corporate secrecy laws

---

[1710] 31 U.S.C. § 5340(2).
[1711] See, e.g., 18 U.S.C. § 981(a)(1)(G) (civil forfeiture laws applicable to laundered proceeds also apply to terrorist
assets).

and practices to block inquiries into their activities.  U.S. AML laws are designed to prevent these wrongdoers from misusing the U.S. financial system to commit their crimes.

Three key laws lay out the basic AML obligations of U.S. financial institutions, the Money Laundering Control Act of 1986, the Bank Secrecy Act of 1970, and the USA Patriot Act of 2002, which amended both prior laws.[1712]

The Money Laundering Control Act, enacted partly in response to hearings held by this Subcommittee in 1985, was the first law in the world to make money laundering a crime.  It prohibits any person from knowingly engaging in a financial transaction which involves the proceeds of a "specified unlawful activity."[1713]  The law provides a long list of specified unlawful activities, including, for example, terrorism, drug trafficking, fraud, and foreign corruption.  The Bank Secrecy Act (BSA), as amended by the Patriot Act, imposes AML obligations on a designated list of financial institutions operating in the United States to ensure they do not facilitate money laundering or become conduits for terrorist financing.

**AML Requirements.**  The Bank Secrecy Act mandates that covered financial institutions establish an effective AML program that meets four minimum requirements:

> 1)  It has a system of internal controls to ensure ongoing compliance.
> 2)  It designates an individual responsible for managing AML compliance.
> 3)  It provides AML training for appropriate personnel.
> 4)  It requires independent testing of AML compliance.[1714]

These four components are sometimes referred to as the "pillars" of an effective AML program.  The first requirement for a system of AML "internal controls" involves development of risk-based policies and procedures to detect and prevent money laundering.[1715]  At a large bank, these safeguards would include Know Your Customer (KYC) policies and procedures, including developing a customer identification program, conducting due diligence reviews, and assessing customer risk; a monitoring system to analyze account and wire transfer activity to detect suspicious activity; and a system for reporting suspicious activity to law enforcement.  To ensure AML controls are implemented effectively, banks are also required to provide appropriate resources, infrastructure, and staff.

---

[1712] For a more detailed discussion of U.S. AML laws, see "Anti-Money Laundering:  Issues Concerning Depository Institution Regulator Oversight," testimony of the General Accounting Office, Report No. GAO-04-833T, (6/3/2004), before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, at 4-6. http://www.gao.gov/new.items/d04833t.pdf

[1713] 18 U.S.C. §§ 1956-57.

[1714] See 31 U.S.C. § 5318(h)(1) and 12 C.F.R. Section 21.21(b)(1).  All Federal bank regulators have adopted the same requirements within their own regulations.  The OCC will cite apparent violations of Section 21.21(b)(1).  However, it will not cite violations for the four subcomponents (Sections 21.21 (c)(1)-(4)), whereas the other Federal banking agencies will.  The OCC's practice is inconsistent with the other Federal regulators.  As will be demonstrated later in this report, this practice potentially spares the bank from more strenuous criticism from its regulator.

[1715] 31 U.S.C. § 5318(h)(1)(A) and 12 C.F.R. Section 21.21(c)(1).

The second requirement is to designate a qualified individual for coordinating and monitoring the bank's day-to-day AML compliance.[1716]  The AML compliance officer must be knowledgeable about the law and have the time, expertise, authority, and resources needed to ensure bank compliance with AML requirements.   The AML compliance officer should also have the authority to make regular reports to the bank's board of directors or a board designated committee.

The third requirement is for the bank to provide adequate training to all personnel with AML responsibilities.[1717]  AML training should be ongoing to ensure bank personnel are kept up-to-date with the law.  The fourth requirement is for the bank to conduct independent testing of its AML program and controls to ensure compliance with the law and to identify and correct any AML deficiencies.[1718]  This function is typically performed by a bank's internal audit group or by an outside auditor with AML expertise.

**Other AML Requirements.**  In addition to requiring covered financial institutions to establish effective AML programs, Federal AML laws include a number of other statutory requirements, including requiring banks that keep records outside of the United States to produce them within a specified period of time;[1719] to obtain identifying information for persons seeking to open or maintain accounts,[1720] and requiring appropriate due diligence when opening and administering accounts for foreign financial institutions or senior foreign political figures.[1721]  The Bank Secrecy Act also authorizes and the U.S. Department of Treasury has issued regulations requiring covered financial institutions and other businesses to file reports on large currency transactions and suspicious activities to guard against money laundering.[1722]

## (2)  AML Oversight In General

The Secretary of the Treasury is the primary Federal regulator charged with enforcing key Federal AML laws.[1723]  To help carry out those responsibilities, in 2003, the Secretary established the Executive Office for Terrorist Financing and Financial Crimes, headed by a Deputy Assistant Secretary.  This office oversees the operation of the Financial Crimes Enforcement Network (FinCEN), a Treasury bureau which, among other duties, develops AML regulations and guidance, analyzes currency transaction reports and suspicious activity reports filed by financial institutions, and interacts with local, state, Federal, and international law enforcement as well as other financial intelligence units around the world.  Treasury also oversees the Office of Foreign Assets Control (OFAC) which is primarily responsible for enforcing U.S. sanctions laws to detect and block financial transactions and assets belonging to identified terrorists, persons associated with weapons of mass destruction, drug traffickers, and rogue jurisdictions.

---

[1716] 31 U.S.C. § 5318(h)(1)(B) and 12 C.F.R. Section 21.21(c)(3).
[1717] 31 U.S.C. § 5318(h)(1)(C) and 12 C.F.R. Section 21.21(c)(4).
[1718] 31 U.S.C. § 5318(h)(1)(C) and 12 C.F.R. Section 21.21(c)(2).
[1719] 31 U.S.C. § 5318(k)(2).
[1720] 31 U.S.C. § 5318(l).
[1721] 31 U.S.C. § 5318(i).
[1722] See, e.g., 31 U.S.C. §§ 5313 and 5318(g); 31 C.F.R. §§ 103.11 and 103.21 et seq.
[1723] See, e.g. 31 U.S.C. §§ 5311 et seq.  (Treasury Secretary charged with carrying out key anti-money laundering laws) and § 5341 (Treasury Secretary given lead role in development of national anti-money laundering strategy).

Although FinCEN is the administrator of Federal AML regulations in the United States, it does not examine banks.  That task is assigned to Federal bank regulators which are charged with monitoring bank compliance with AML laws through their examination procedures.  Any AML violations they discover are reported to FinCEN which can, among other actions, impose civil monetary penalties on financial institutions for the violations.[1724]

Significant responsibility for AML oversight, thus, rests with Federal bank regulators.  The decisions they make with respect to AML policies and procedures, AML examinations, and safety and soundness ratings consequences for AML deficiencies will in large measure determine the importance that both regulators and financial institutions place on achieving effective AML controls.

**Oversight of Financial Institutions.**  At the end of 2010, the United States had over 7,600 federally insured commercial banks and savings institutions.[1725]  In addition, the United States had over 7,300 federally insured credit unions.[1726]  On the federal level, these financial institutions are overseen by four agencies:  the Federal Reserve which supervises state-chartered banks that are part of the Federal Reserve System and certain financial holding companies; the Federal Deposit Insurance Corporation (FDIC) which supervises state-chartered banks that were not part of the Federal Reserve System;[1727] the Office of the Comptroller of the Currency (OCC) which supervises banks and savings associations with national charters, and certain U.S. affiliates of foreign-owned banks;[1728] and the National Credit Union Administration (NCUA) which supervises Federal and state-chartered credit unions.  In addition, state banking authorities supervise and examine state-chartered institutions.

The primary responsibility of the Federal bank regulators is to ensure the "safety and soundness" of the financial institutions they supervise.  One key mechanism they use to carry out that responsibility is to conduct safety and soundness examinations on a periodic basis and provide the results in an annual Report of Examination (ROE) to the Board of Directors of each financial institution.  Safety and soundness examinations are conducted to assess the risk that an insured bank poses to the Federal Deposit Insurance Fund.  All FDIC-insured institutions contribute to this insurance fund through assessments which are typically collected on a quarterly basis.  The assessment amounts are based, in part, on a bank's safety and soundness ratings.

---

[1724] See FinCEN Enforcement Actions, http://www.fincen.gov/news_room/ea/ ("Under the Bank Secrecy Act (BSA), 31 U.S.C. 5311 et seq., and its implementing regulations at 31 C.F.R. Chapter X (formerly 31 C.F.R. Part 103), FinCEN may bring an enforcement action for violations of the reporting, recordkeeping, or other requirements of the BSA.  FinCEN's Office of Enforcement evaluates enforcement matters that may result in a variety of remedies, including the assessment of civil money penalties.").

[1725] See the Federal Deposit Insurance Corporation's (FDIC) Statistics at a Glance, (Fourth Quarter 2010).  This includes 6,529 commercial banks and 1,128 savings institutions. http://www.fdic.gov/bank/statistical/stats/2010dec/industry.html

[1726] See the National Credit Union Administration's (NCUA) 2010 Annual Report, "Insurance Fund Ten-Year Trends" chart, page 133.  This figure includes 4,589 Federal and 2,750 state-chartered credit unions. http://www.ncua.gov/Legal/Documents/Reports/AR2010.pdf

[1727] The FDIC also acts as a backup regulator for all financial institutions with Federal deposit insurance.

[1728] Until recently, the Office of Thrift Supervision (OTS) supervised Federal savings associations and institutions, but it was abolished by the Dodd Frank Wall Street Reform and Consumer Protection Act.  All OTS duties were officially transferred to the OCC on July 21, 2011.

The largest U.S. financial institutions are supervised under a "continuous examination" program.  Under this program, examiners are always on-site at the institution, as opposed to periodically arriving on-site, conducting an examination, and then departing for the next bank after finalizing the ROE.  Examinations at smaller community banks are typically conducted on a 12- or 18-month exam cycle.  Examiners are typically on-site at smaller community banks for only a few weeks.

**Interagency AML Examination Manual.**  In June 2005, the Federal Financial Institutions Examination Council (FFIEC) issued a joint AML Examination Manual.[1729]  This manual was developed by the Federal bank regulators, in collaboration with FinCEN, OFAC, and state banking agencies.  It was developed to provide current and consistent AML examination procedures and guidance to examiners across the Federal banking agencies and the financial institutions they oversee.  The manual has been updated three times to incorporate regulatory changes and reflect feedback from the banking industry and examination staff.  The most recent version of the manual was released in April 2010.[1730]

**Safety and Soundness Examinations.**  Federal bank regulators conduct several different examinations at the financial institutions they supervise.  The most important is the safety and soundness examination.  Federal bank regulators conduct safety and soundness examinations to assess the risks that a bank poses to the Federal Deposit Insurance Fund (DIF) and to maintain public confidence in the integrity of the banking system.  These examinations help prevent identified problems from deteriorating to the point of bank failures, the costs of which are often borne by the DIF.  The DIF is funded by assessments that the FDIC charges banks.  These assessments are derived from the level of insured deposits that a bank holds and the inherent risks that the bank poses to the DIF, which are calculated in part from a bank's safety and soundness component ratings and composite rating.

Safety and soundness examinations are designed to determine the financial condition of an institution, assess the effectiveness of its risk management practices, and aid in the development of effective and timely corrective actions.  The examinations evaluate the bank's adherence to a variety of laws and regulations, identify and assess key risks, and identify and assess any problems.

**CAMELS Ratings.**  Safety and soundness examinations are organized around a rating system called CAMELS, an acronym for the six components that are evaluated.  The CAMELS rating system evaluates a financial institution's:  (C) capital adequacy, (A) asset quality, (M) management effectiveness, (E) earnings, (L) liquidity, and (S) sensitivity to market risk.  Each component of the CAMELS rating is based upon a qualitative analysis of various factors

---

[1729] The FFIEC is a formal interagency body empowered to prescribe uniform principles, standards, and report forms for the Federal examination of financial institutions by the Federal Reserve, FDIC, OCC, NCUA, and the Consumer Financial Protection Bureau (CFPB), and to make recommendations to promote uniformity in the supervision of financial institutions.  See FFIEC website, http://www.ffiec.gov/.  In 2006, the State Liaison Committee (SLC) was added to the Council as a voting member.  The SLC includes representatives from the Conference of State Bank Supervisors, the American Council of State Savings Supervisors, and the National Association of State Credit Union Supervisors. The CFPB became an FFIEC member in 2011.  The Office of Thrift Supervision was also an FFIEC member, until the agency was abolished in 2011.

[1730] See 4/29/2010 "BSA/AML Examination Manual," Federal Financial Institutions Examination Council, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

comprising it.  CAMELS ratings use a scale of 1 to 5, with "1" being the best rating and "5" the worst.

The CAMELS component ratings also serves as the basis for a bank's "Composite Uniform Financial Institution Rating," often referred to as the "composite rating" or the overall "bank rating."   The composite rating also uses a scale of 1 to 5, and generally bears a close relationship to the component CAMELS ratings, although it is not simply an average of them.  For composite ratings, 1 is the highest rating and signifies a safe and sound institution with no cause for supervisory concern, 3 signifies an institution with supervisory concerns in one or more areas, and 5 is the lowest rating, which signifies an unsafe and unsound bank with severe supervisory concerns.

When the FDIC assesses bank insurance fees for a particular institution, it takes into consideration both the CAMELS component ratings and the composite rating.  Lower ratings, signifying a higher risk institution and a greater threat to the Deposit Insurance Fund, can lead to a higher deposit insurance assessment,[1731] which in turn can affect net income.

**Specialty Examinations and Ratings.**  In addition to safety and soundness examinations, Federal bank regulators also conduct various specialty or secondary examinations targeting particular aspects of the institutions they supervise.  These specialty examinations, which are separate and distinct from safety and soundness examinations, are important in their own right, and focus on such areas as information technology (IT), trust operations, compliance with the Community Reinvestment Act (CRA), and compliance with consumer protection laws.[1732]

Each of these specialty examinations has its own unique rating system based upon an interagency agreement on what elements should be considered and how the rating should be calculated.  For example, IT examinations produce ratings under a "Uniform Rating System for Information Technology"; trust examinations produce ratings under a "Composite Uniform Interagency Trust Rating" system; CRA examinations produce ratings under a "Community Reinvestment Act Rating" system; and consumer compliance examinations produce ratings under a "Uniform Interagency Consumer Compliance Rating" system.[1733]

---

[1731] See page 3 – sample deposit insurance assessment invoice, http://www.fdic.gov/deposit/insurance/assessments/EV2Sample.pdf.
[1732] According to the OCC, typical issues addressed by these specialty examinations are as follows:
- Information Technology (IT) Examinations – evaluate IT-related risks including operations, information security programs, and IT governance processes within supervised financial institutions and technology service providers.
- Trust/Asset Management Examinations – determine if an institution's policies or administration of trust accounts has resulted in a contingent liability or estimated loss that could damage the institution's capital.
- Consumer Compliance Examinations – assess a financial institution's compliance with federal consumer protection laws and regulations.
- Community Reinvestment Act (CRA) Examinations – ensure compliance with the CRA, to include meeting the credit needs of the community that the financial institution serves, including residents of low- and moderate-income neighborhoods.

See OCC website, "Examinations: Overview," http://www.occ.gov/topics/examinations/examinations-overview/index-examinations-overview.html
[1733] 7/26/2006 OCC Report of Examination of HBUS for the examination cycle ending March 31, 2006, OCC-PSI-00422079, at 4.  [Sealed Exhibit.]

These ratings are typically presented in the annual Report of Examination provided to a financial institution by its primary regulator.  They are typically included in a section which lists all of the ratings assigned to the bank during the year.  The specialty examination ratings are calculated and presented separately from the CAMELS component ratings which give rise to the bank's overall Composite Uniform Financial Institution Rating.  In OCC Reports of Examination, for example, the ratings are usually presented in the following format:

**Ratings**

**Composite Uniform Financial Institution Rating**
  Component Ratings:
    Capital
    Asset Quality
    Management
    Earnings
    Liquidity – Asset/Liability Management
    Sensitivity to Market Risk

**Uniform Rating System for Information Technology**
**Composite Uniform Interagency Trust Rating**
**Uniform Interagency Consumer Compliance Rating**
**Community Reinvestment Act Rating.**[1734]

While specialty examination ratings do not automatically or routinely affect either the CAMELS component or composite ratings, if a specialty examination identifies significant problems that are extensive enough to potentially affect the financial condition of the bank, including through the imposition of large civil money penalties, reimbursable violations, or reputational risk, it may contribute to a downgrade of one or more of the CAMELS component ratings which, in turn, may affect the composite rating.[1735]  Downgrades to safety and soundness ratings due to problems identified through specialty examinations are not common, however, and are reserved for extreme cases.

**AML Examinations.**  An examination focusing on AML compliance is considered a specialty examination.  Each of the Federal banking agencies has examiners specially trained to conduct AML examinations.  AML examinations do not, however, produce a separate specialty rating, since no interagency agreement has produced an AML rating system.  Instead, at Federal banking agencies other than the OCC, AML examination findings are generally addressed as one of the safety and soundness considerations in the Report of Examination (ROE) and included in the development of the bank's safety and soundness ratings.  Typically, AML examination

---

[1734] Id.
[1735] See, e.g., Federal Financial Institutions Examination Council, "Uniform Financial Institutions Ratings System," 61 FR 245, at 67021 (12/19/1996), http://www.gpo.gov/fdsys/pkg/FR-1996-12-19/pdf/96-32174.pdf ("Generally, the impact of specialty area examination findings are reflected in the composite and Management component ratings.").

results impact the CAMELS management component rating, which may be downgraded if management fails to maintain an adequate AML program.

The CAMELS management component rating is designed to reflect the ability of bank management to adequately identify, measure, monitor, and control problems and manage risks.[1736]  Although AML compliance is just one factor in rating the management component, a bank's failure to maintain an adequate AML program can expose a bank to significant reputational risk, remedial costs, and civil money penalties.  When such factors are present, Federal bank regulators normally take them into account when assigning the management component rating.  If the management component is downgraded, it may also in certain circumstances lower the bank's overall composite rating, with potentially severe impacts on the financial institution's reputation, risk profile, and insurance assessment fees.

In contrast to this approach, which is used by the Federal Reserve, FDIC, and NCUA, the OCC does not treat AML examinations as a safety and soundness matter and does not routinely take AML deficiencies into account when assigning a bank's CAMELS management rating.  Instead, the OCC treats AML examinations as a matter of consumer compliance and includes consideration of AML deficiencies when determining an institution's consumer compliance rating.  The OCC's approach is explained more fully below.

**Violations of Law.**  In their supervisory programs, Federal bank regulators assign a high priority to the detection and prompt correction of violations of law.  Such violations may involve statutory or regulatory requirements.  Regulators typically list all significant violations of law (as opposed to isolated or technical violations) in the annual Report of Examination provided to a bank's board of directors.  The board of directors, in turn, is charged with initiating prompt and appropriate corrective action.

Listing one or more statutory or regulatory violations in a Report of Examination is not uncommon.  They may result from bank management's unfamiliarity with the governing law, misinterpretation of the requirements, negligence, or willful noncompliance.  The more egregious the nature of the violation, the more severe the repercussions may be.  Willful noncompliance with statutory or regulatory requirements, for example, may result in civil money penalties against the bank or individual bank managers as well as removal actions against bank personnel, officers, or  directors.  Violations are also viewed as significant adverse reflections on bank management capabilities and may lead to a downgrade of the CAMELS management component rating.  The underlying causes of the violation play a significant role in that assessment.

**Enforcement Actions.**  If a bank regulator becomes concerned about the condition of a financial institution, it has a wide range of informal and formal enforcement actions that could be used to require corrective action.  Informal actions are viewed as voluntary actions and include requesting that the financial institution issue a safety and soundness plan, board resolution, or commitment letter pledging to take specific correction actions by a certain date.  Another informal action is a memorandum of understanding, which is a signed agreement by both the regulator and the board of directors addressing various actions that the financial institution will

---

[1736] See, e.g., Federal Financial Institutions Examination Council, "Uniform Financial Institutions Ratings System," 61 FR 245, at 67021 (12/19/1996), http://www.gpo.gov/fdsys/pkg/FR-1996-12-19/pdf/96-32174.pdf.

take to correct its problem areas.  Informal actions are nonpublic and are not enforceable in court.  On the other hand, formal enforcement actions are legal proceedings which can include issuing a consent order or a cease and desist order requiring the financial institution to stop an unsafe or unsound practice or to take affirmative action to correct identified problems; imposing a civil money penalty; suspending or removing personnel from the financial institution; suspending or banning personnel from the banking industry; revoking the bank charter; or referring misconduct for criminal prosecution.  Formal actions are disclosed to the public and are enforceable in court.  Failure to comply with an order can subject the bank to civil money penalties.

With respect to AML enforcement, in July 2007, the Federal bank regulators issued joint interagency guidance entitled, "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements."[1737]  This guidance sought to promote consistent implementation of Section 8(s) of the Federal Deposit Insurance Act and Section 206(q) of the Federal Credit Union Act, both of which require Federal bank regulators to conduct AML examinations and identify AML problems in Reports of Examination.  Both sections also require Federal bank regulators to issue a cease and desist order in the event that a bank fails to provide or maintain an adequate AML program.  The guidance affirms the Federal bank regulators authority and responsibility for enforcing AML requirements and use of cease and desist order to correct identified problems.

### (3)  OCC AML Oversight in General

Because it oversees the largest and most complex banks operating in the United States, some of which operate affiliates in high risk jurisdictions, maintain accounts for high risk clients, or offer high risk products vulnerable to money laundering and terrorist financing, the OCC plays a crucial role in ensuring bank compliance with U.S. AML laws.

**OCC Organization.**  The OCC oversees about 2,000 nationally-chartered banks and savings associations and about 50 U.S. affiliates of foreign-owned banks.[1738]  In 2011, the OCC's budget, which is paid for by assessments on the financial institutions it regulates, totaled about $875 million.[1739]  As of 2011, about 3,700 OCC employees were stationed in 66 offices nationwide, organized into four districts known as the Northeastern, Central, Southern, and Western districts, with agency headquarters in Washington, D.C.[1740]

Several groups within the OCC contribute to AML oversight.  Examiners with special expertise conduct the actual AML examinations, evaluate bank AML programs, and identify AML deficiencies.  They provide their findings to the Examiner-In-Charge at a particular

---

[1737] See 7/19/2007 "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements," reprinted in 8/24/2007 FFIEC BSA/AML Examination Manual, at R-1 to R-7, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2007.pdf.

[1738] See 2011 OCC Annual Report, at 1, chart entitled "National Banking System at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf; OCC website, "About the OCC," http://www.occ.gov/about/who-we-are/comptroller-of-the-currency/bio-thomas-curry.html.

[1739] 2011 OCC Annual Report, at 1, chart entitled "OCC at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf.

[1740] 2011 OCC Annual Report, at 1, chart entitled "OCC at-a-Glance," http://www.occ.gov/publications/publications-by-type/annual-reports/2011AnnualReport.pdf .Id.; OCC website, "About The OCC," http://www.occ.gov/about/who-we-are/district-and-field-offices/index-organization.html.

financial institution.  At large banks, if AML deficiencies are identified, the Examiner-In-Charge works with the OCC Department of Large Bank Supervision to evaluate the AML examination findings and direct efforts to ensure bank compliance with the law.  Bank supervision personnel also work with counsel in the Enforcement and Compliance Department and the Legal Department to determine whether AML enforcement actions are needed and, if so, what actions to take.

During most of the years reviewed by the Subcommittee, the OCC was headed by John C. Dugan who served as the Comptroller of the Currency until his five-year term expired in 2010.  In August 2010, he was succeeded by John Walsh who served as Acting Comptroller until April 2012, when Thomas Curry was confirmed by the Senate to serve as the new Comptroller of the Currency.  The second in command during most of the years reviewed was First Senior Deputy Comptroller and Chief Counsel Julie Williams.  The head of the Department of Large Bank Supervision, which oversees the largest nationally-chartered U.S. banks and U.S. branches of foreign banks was Michael L. Brosnan.  One of his chief deputies was Grace Dailey who helped oversee HBUS, until the end of 2010, when she left that post for another, and was replaced by Sally Belshaw.  Two other key OCC officials in AML enforcement were Daniel Stipano, Deputy Chief Counsel, and James Vivenzio, senior legal counsel for AML matters.  In addition, the Director of the Enforcement and Compliance Department was Richard Stearns.

**OCC Examinations Generally.**  Much of the OCC workforce is devoted to conducting or supporting safety and soundness examinations of the banks regulated by the OCC.  In general, for a large bank, the relevant OCC district office assigns an Examiner-in-Charge (EIC) and a team of examiners to work on-site at the bank, on a fulltime basis under a continuous examination program.

Under the OCC's continuous examination program, the EIC is assigned to a particular institution for five years.  At the five-year mark, the EIC is then assigned to another bank.  The EIC is assisted by a team of examiners that are also assigned to the bank on a full-time basis, but do not have similar five-year term limitations.  Members of the examination team may rotate to other banks at various intervals as needed.  Regardless, examiners work at the bank year-round and should have a firm and immediate grasp on any issues and problems affecting the bank.

**Supervisory Strategy.**  The EIC is responsible for developing an annual supervisory strategy.  The supervisory strategy is a prospective work plan for examining the bank, based on perceived risks.  The strategy addresses supervisory areas of interest, including what targeted examinations will be conducted throughout the coming year.  Targeted examinations address what are called "specialty areas," such as Information Technology, Consumer Compliance, Community Reinvestment Act, and Trust areas.  The EIC develops the supervisory strategy, including strategies with respect to the specialty areas with input from examiners, called "team leads," who have lead responsibility for conducting the examinations in those areas.  At the OCC, AML compliance is not considered a separate specialty area, but is included within Consumer Compliance specialty examinations.  The EIC ultimately presents the annual supervisory plan for approval to the deputy comptroller for Large Bank Supervision at OCC headquarters in Washington.

**Targeted Examinations.** Based on the supervisory strategy, a series of specialized or "targeted examinations" is conducted throughout the year. OCC "Request Letters" are sent to a bank approximately 30 days before the start of each targeted examination. Request Letters give the bank advance notice of the examination and include a list of requested items that the bank should assemble for the examiners to review at the start of the examination.

The examiners then conduct an examination of a specific area of the bank and write a "Conclusion Memorandum" summarizing their findings for the EIC. The examiners may also contribute to any related Supervisory Letter that the EIC sends to bank management and any relevant portion of the annual Report of Examination provided to the bank's board of directors.

Supervisory Letters are used by the OCC officially to inform a bank of the findings of a specialty examination and issues that warrant management's attention. For large banks under continuous examination, the OCC typically uses Supervisory Letters to provide detailed information to bank management about each specialty examination completed throughout the year. In addition to describing the examination findings, the Supervisory Letter can cite an apparent violation of law or a "Matter Requiring Attention" (MRA), meaning it requires the attention of the bank's senior management. Both violations and MRAs require prompt corrective action by the bank.[1741] A Supervisory Letter may also include one or more "recommendations" to enhance bank performance or compliance in a particular area. Under OCC regulation and practice, "recommendations" do not require corrective action by bank management.[1742] OCC personnel told the Subcommittee that the Supervisory Letters written by EICs should accurately reflect the findings and criticisms in the conclusion memoranda written by the examiners.[1743]

Before issuing a Supervisory Letter, the EIC is required to forward a draft of the letter to the OCC's Senior Deputy Comptroller in Washington for review. If the Supervisory Letter cites an AML violation or MRA requiring corrective action, it is referred to the Large Bank Review Committee (LBRC), which is comprised of three senior staff with AML expertise.[1744] The LBRC members are the senior legal counsel with AML expertise from the Legal Department, the Director for Bank Secrecy Act and Money Laundering Compliance, and the Director for Enforcement and Compliance. The LBRC was established in response to problems associated with the Riggs Bank AML examinations nearly ten years ago and is intended to ensure that OCC AML experts review field examiners' work and promote consistency in AML enforcement across large national banks. Until recently, it was optional for the LBRC to have the examiner's Conclusion Memorandum upon which the draft Supervisory Letter is based, but the LBRC has recently begun to require both before it will undertake a review of the draft letter.[1745]

**Report of Examination (ROE).** On an annual basis, for each large bank, the OCC issues a Report of Examination (ROE), summarizing the condition of the bank. The ROE normally includes all of the bank's ratings arising from examinations of the bank's safety and soundness and specialty areas, as well as all cited violations of law and significant MRAs.

---

[1741] Subcommittee interviews of Joseph Boss (1/30/2012) and James Vivenzio (3/15/2012). Mr. Vivenzio told the Subcommittee, "An exam cited with an MRA is a failure" on the part of the bank.
[1742] Id.
[1743] Subcommittee interview of Joseph Boss (1/30/2012) and Elsa de la Garza (1/9/2012).
[1744] Subcommittee interview of James Vivenzio (3/15/2012).
[1745] Id.

Depending on the circumstances, the issues noted in Supervisory Letters provided to bank management throughout the year may or may not be referenced in the ROE.  The EIC sends the ROE with a cover letter to the bank's board of directors so that it has a written record of the regulator's concerns.  In addition, on an annual basis, the EIC attends a board meeting and presents the consolidated examination findings contained in the ROE to ensure the Board is fully informed about the bank's ratings, financial condition, and any deficiencies.

**AML Examinations.**  Like other Federal bank regulators, the OCC treats AML examinations as a specialty or targeted examination, and employs examiners with specialized AML expertise to conduct them.  Upon completing an AML examination, the examiner is required to submit a Conclusion Memorandum to the Examiner-In-Charge of the bank describing the examination findings, any apparent violations of law, and possible recommendations, MRAs, or enforcement actions.  The Examiner-In-Charge then sends a Supervisory Letter to the bank summarizing the AML examination findings and presenting any violations, MRAs, or recommendations.

At the end of the year, when the OCC readies the annual Report of Examination (ROE) for the bank and summarizes examination findings made during the year, the OCC does not treat AML deficiencies as a safety and soundness matter.  It does not discuss AML problems in the ROE's analysis of safety and soundness issues, nor does the OCC routinely take AML deficiencies into account when assigning the bank a CAMELS component rating for management or its overall composite rating.

Instead, unique in the Federal Government, the OCC subsumes AML issues within its consideration of consumer compliance issues.[1746]  The ROE discusses AML compliance in a section entitled, "Consumer Compliance" and combines that discussion with consideration of the bank's compliance with consumer protection and civil rights laws.  In addition, the OCC takes AML deficiencies into consideration when assigning a bank's consumer compliance rating, even though the Uniform Interagency Consumer Compliance Rating System does not include AML considerations when specifying how to calculate that rating.

Consumer compliance examinations normally cover a bank's compliance with consumer protection laws, such as laws requiring accurate disclosures of fees and interest rates, understandable mortgage and credit card disclosures, and avoidance of unfair or deceptive practices.  They also examine a bank's compliance with civil rights laws, such as prohibitions against discrimination against persons on the basis of race, religion, national origin, or other prohibited categories.[1747]  The examinations test, for example, the adequacy of a bank's

---

[1746] See 9/2007 "Comptroller's Handbook – Bank Supervision Process," Appendix D, at 89, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_pdf/banksupervisionprocess.pdf, ("However, the OCC does incorporate into the consumer compliance rating examination findings pertaining to compliance with the Bank Secrecy Act (BSA), anti-money laundering (AML), and Office of Foreign Asset Control (OFAC).").  See also 2006-2010 OCC Reports of Examination for HBUS.  [Sealed Exhibits.]

[1747] The OCC has identified a long list of relevant laws, including the Truth in Lending Act, Fair Credit Billing Act, Consumer Leasing Act of 1976, Fair Credit Reporting Act, Equal Credit Opportunity Act, Fair Debt Collection Practices Act, and Electronic Fund Transfers Act.  See "Comptroller's Handbook**Error! Main Document Only.** – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.

operating systems to track compliance with consumer protection laws, the documentation it uses for consumer products, and the content of files related to such products as mortgages, consumer loans, and credit cards. Those considerations are key to ensuring bank compliance with consumer protection and civil rights laws, but do not include and have no relevance to compliance with AML requirements to guard against money laundering and terrorist financing.

Like CAMELS ratings, consumer compliance ratings use a scale of 1 to 5, with "1" being the best rating and "5" the worst.[1748] The consumer compliance rating is calculated and presented separately in the OCC's ROE, and typically has no impact on a bank's component CAMELS ratings or its overall composite rating and, thus, no impact on an evaluation of the bank's safety or soundness.[1749] A bank's consumer compliance rating typically comes into play if a bank wants to open a new branch or expand into a new area of consumer lending; the OCC generally will not approve such an application, unless the bank has a consumer compliance rating of 1 or 2, showing that it is treating its customers fairly.[1750] Those considerations are not relevant, however, to AML compliance issues. Additionally, there is no logical reason why poor AML compliance should lower a bank's consumer compliance rating when the two have virtually nothing in common.

An internal OCC review raised these same concerns. In 2005, following the Subcommittee's report on the OCC's inadequate AML oversight of Riggs Bank, the OCC's Quality Management Division issued an internal report evaluating the OCC's AML supervision program.[1751] That report found that the interagency consumer compliance rating system was not designed to and did not address AML issues. It noted that the rating was "geared to more traditional consumer protection regulations, such as Regulation Z and Regulation B, but is silent relative to BSA/AML compliance issues."[1752] The report also noted: "Since the consumer compliance rating system was developed as a FFIEC initiative, OCC cannot modify the ratings outside of FFIEC." The report recommended that the OCC work with the FFIEC to try to change the ratings system to incorporate AML issues, but seven years later, the ratings system still excludes consideration of AML issues, perhaps because no agency other than the OCC attempts to combine consumer compliance and AML concerns into a single rating.

**AML Violations.** In addition to subsuming AML concerns within its consumer compliance rating system, the OCC also has a unique approach to citing AML violations in its Supervisory Letters and Reports on Examination (ROE).

---

[1748] See "Comptroller's Handbook – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.

[1749] OCC officials told the Subcommittee that, in some circumstances, the consumer compliance rating could be taken into account when evaluating a bank's CAMELS management rating, although that was not typical. Subcommittee interview of James Vivenzio (3/15/2012) and Joseph Boss (1/30/2012).

[1750] See, e.g., 12 C.F.R. Section 5.13(a)(2); branch application for national banks, at 7, http://www.occ.gov/static/licensing/form-branch-relo-app-v2.pdf; Branches and Relocations, Comptrollers Licensing Manual, at 4, http://www.occ.gov/publications/publications-by-type/licensing-manuals/branches.pdf.

[1751] 5/18/2005 "Bank Secrecy Act/Anti-Money Laundering Supervision," prepared by OCC Quality Management Division, HSBC OCC 2495056.

[1752] Id. at 7.

Like other Federal bank regulators, the OCC often includes a list of apparent violations of law in its annual Reports of Examination.  Those violations span a wide range of banking laws and regulations, including, for example, consumer compliance concerns.[1753]  In the AML area, however, the Subcommittee has learned that the OCC has adopted a practice of limiting the types of AML violations it will cite either in a ROE or Supervisory Letter.

Currently, all Federal bank regulators, including the OCC, will cite an apparent violation of law in a Supervisory Letter or ROE if the regulator determines that a financial institution's entire AML program has failed.  For the OCC, that citation would be an apparent violation of 31 U.S.C. § 5318(h)(1) and the OCC implementing regulation, 12 C.F.R. Section 21.21(b)(1).  On the other hand, if the OCC were to determine that a bank failed to comply with one of the four mandated components of an effective AML program – described earlier as internal controls, an AML compliance officer, AML training, and independent testing – the Subcommittee has been told that, contrary to all other Federal bank regulators, the OCC generally will not cite a violation of one of the individualized program components, even though each component has its own statutory basis.  For example, if a bank failed to provide adequate AML internal controls, Federal bank regulators other than the OCC would cite the bank for violating 31 U.S.C. § 5318(h)(1)(A).  In contrast, the OCC routinely forgoes the citation of violations of the individual AML program components, instead typically designating such a deficiency as a Matter Requiring Attention (MRA) by the bank.[1754]

To examine the difference in the approach of the OCC versus other Federal banking agencies, the Subcommittee reviewed five years of reports compiled by the U.S. Treasury's Financial Crimes Enforcement Network (FinCEN) which, among other matters, track the AML statutory violations cited by the agencies.[1755]  Over the five year period from 2007 to 2011, the FinCEN reports show that the OCC conducted about 6,600 examinations and cited pillar violations only 16 times.  In comparison, the Federal Reserve conducted about 4,800 examinations and cited pillar violations 159 times.  The FDIC conducted about 12,800 examinations and cited pillar violations 714 times.  The OCC approach is out of alignment with that of its peers.

Treating the failure of an AML pillar component as an MRA rather than an AML violation sends a more muted message about the importance of the AML deficiency and the need to correct it in a prompt manner.  A matter requiring "attention" simply does not have the same urgency as a statutory "violation."  In addition, citing a violation of law when one critical

---

[1753] 7/26/2006 OCC Report of Examination for HBUS, OCC-PSI-00422079, at 2-3 (citing violations of the Equal Opportunity Act and Consumer Protections for Depository Institution Sales of Insurance regarding disclosures). [Sealed Exhibit.]

[1754] One OCC senior legal counsel specializing in AML matters told the Subcommittee that the OCC "will not cite pillar violations" and instead lists them as MRAs which are not enforceable in court.  He said that the OCC uses the same approach when reporting AML examination findings to FinCEN, describing the OCC's reporting as "cleaner" and not "cluttered with component violations" like the other agencies.  Subcommittee interview of James Vivenzio (3/15/2012).

[1755] See "Federal Banking Agency Bank Secrecy Act Compliance Examination:  Consolidated Quarterly Report," (2001-2011), prepared by FinCEN, using data supplied by the OCC, Federal Reserve, FDIC, NCUA and the Office of Thrift Supervision, PSI-FinCEN-04-0063-296; 7/2012 chart, "Bank Secrecy Act Pillar Violations 2007-2011," prepared by the Subcommittee.  [Sealed Exhibits.]

component of a bank's AML program is inadequate sends a strong message to management that its AML program is deficient, does not meet minimum statutory requirements, and requires remediation to ensure compliance with all four statutory requirements.

**AML Enforcement Actions at Large Banks.**  When the OCC identifies AML deficiencies at a bank, it can use informal or formal enforcement actions to compel the bank to correct the deficiencies and strengthen its AML controls.

Informal actions include nonpublic commitment letters, board resolutions, or memoranda of understanding in which the bank makes written commitments, with fixed deadlines, to take specific actions.  To take an informal action against a large bank, an Examiner-in-Charge must obtain the approval of the Large Bank Supervision Department in Washington.  While these agreements are not enforceable in court, they can provide quick and effective tools to produce reforms.  The OCC, however, disfavors the use of informal actions in AML cases, and has taken only eight informal enforcement actions against large banks for AML deficiencies since 2005.[1756]

To take a formal enforcement action against a large bank, such as a Cease and Desist Order, the Examiner-in-Charge must submit a recommendation to the OCC's Washington Supervision Review Committee (WSRC).[1757]  The WSRC is comprised of senior managers in the agency and acts as an advising body to the Senior Deputy Comptroller.  It was established to promote consistency in the agency's application of formal enforcement actions.  To present a recommendation, the Large Bank Supervision Department and the Legal Department prepare pertinent examination information and a memorandum for the WSRC.  Counsel from the Enforcement and Compliance Division also participates.  The WSRC ultimately determines whether a program violation can be supported and cited, which would also require the OCC to issue a Cease and Desist Order.

According to the OCC, from 2005 to 2011, the OCC issued 43 Cease and Desist Orders against both large and smaller sized banks with AML deficiencies, compared to 2 by the Federal Reserve and 52 by the FDIC, and assessed $124 million AML-related civil money penalties, accounting for 62% of the total penalty assessments by Federal banking agencies.[1758]  At the same time, the statistics also indicate that the OCC is not resolving AML problems at an early stage but, as with HBUS, may be allowing AML problems to accumulate until they necessitate severe enforcement action.

The interagency guidance on AML enforcement provides all Federal banking agencies with guidelines on the use of formal enforcement actions to ensure bank compliance with AML laws, but does not offer any guidance on the use of informal actions.  Among other provisions, the guidance states that if a Supervisory Letter contains an identical AML violation or MRA that was not corrected since the prior examination, typically referred to as a "repeat" violation or MRA, the agency must issue a formal enforcement action to require corrective action.[1759]  Under

---

[1756] Subcommittee briefing by OCC legal counsel (7/13/2012).
[1757] See, e.g., "Process for Taking Administrative Enforcement Actions Against Banks Based on BSA Violations," OCC 2005-45, Attachment, Appendix A to OCC 2004-50, OCC-PSI-00176030.
[1758] Subcommittee briefing by OCC legal counsel (7/14/2012).
[1759] See 7/19/2007 "Interagency Statement on Enforcement of Bank Secrecy Act/Anti-Money Laundering Requirements," in the Federal Financial Institutions Examination Council's Bank Secrecy Act/Anti-Money

a 2004 Memorandum of Understanding between FinCEN and Federal bank regulators, FinCEN must be notified of, among other things, all AML-related formal and informal enforcement actions taken with respect to a particular bank.[1760]

## B.  OCC Oversight of HBUS

HBUS is located within the OCC's Northeastern District which is currently headed by Deputy Comptroller Toney Bland.  The OCC Examiner-in-Charge of HBUS was Anthony DiLorenzo from 2004 until 2008, when his term expired, and he was replaced by Sally Belshaw.  Ms. Belshaw served as the HBUS Examiner-in-Charge until December 2010, when she was promoted to Deputy Comptroller for Large Bank Supervision.[1761]  The current OCC Examiner-In-Charge at HBUS is Kris McIntire.

### (1)  Chronology of OCC AML Oversight of HBUS

The OCC has been the primary regulator of HBUS since July 2004, when it inherited oversight of a bank already subject to a formal enforcement action to strengthen its AML program.  HBUS has been criticized at times for poor AML controls for over the past decade, but until 2010, the OCC failed to take any enforcement action to compel the bank to implement an effective AML program.

**Inheriting an AML Problem.**  Over the past 30 years, HBUS, through its predecessor banks, has changed its bank charter three times, switching between OCC and Federal Reserve oversight in 1980, 1993, and 2004.[1762]  The first switch took place in 1980, when HSBC acquired 51% control over Marine Midland Bank in New York.  Marine Midland Bank was then a state-chartered bank, a member of the Federal Reserve System, and subject to oversight by both the New York State Banking Department and the Federal Reserve.  In connection with the 1980 acquisition, however, it converted its charter to a national bank subject to oversight by the OCC.  By 1987, HSBC had assumed 100% control of the bank.  In 1990, the OCC downgraded the bank's CAMELS composite rating, which remained unchanged through 1993.[1763]  On December 31, 1993, Marine Midland switched back to a state-chartered bank in New York subject to Federal Reserve supervision.  After its first examination, the Federal Reserve upgraded its rating.[1764]

Six years later, in 1999, Marine Midland Bank acquired two more banks and renamed itself HSBC Bank USA, N.A. (HBUS).  In 2003, HBUS was cited by both the Federal Reserve

---

Laundering Examination Manual, Appendix R, at R-4 ("Failure to correct a previously reported problem with the BSA Compliance Program").

[1760] See Memorandum of Understanding between FinCEN and bank regulators, http://www.ffiec.gov/bsa_aml_infobase/documents/FinCEN_DOCs/Memo_Understand_Sept04.pdf.

[1761] See 12/13/2010 "OCC Announces Changes to the Its Large Bank Supervision Leadership Team," OCC press release NR 2010-140, http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-140.html.

[1762] See the Federal Reserve's National Information Center, http://www.ffiec.gov/nicpubweb/nicweb/InstitutionHistory.aspx?parID_RSSD=413208&parDT_END=99991231.

[1763] See 1/19/1990 and 5/31/1993 OCC targeted examinations.  [Sealed Exhibits.]

[1764] See 3/31/1994 Federal Reserve Bank of New York examination conducted jointly with the New York State Banking Department.  [Sealed Exhibit.]

and New York State Banking Department for maintaining an inadequate AML program.[1765]
Regulators cited fundamental, wide-ranging problems, including ineffective monitoring of wire
transfers and monetary instruments, ineffective recordkeeping and reporting of currency
transactions, inadequate customer due diligence and enhanced due diligence, and a failure to
report suspicious activities. The Federal Reserve noted that AML deficiencies identified in prior
examinations had not been corrected, that bank management was reactive rather than a proactive
with respect to its AML program, and that the compliance function had a lack of influence as
evidenced by ongoing, uncorrected problems.[1766] On April 30, 2003, both regulators entered
into a formal agreement with the bank requiring it to "upgrade and improve" its AML internal
controls.[1767] The agreement required:

> "○Development of a compliance program,
>   ○An effective system and methodology related to monitoring efforts,
>   ○A system for evaluating suspicious transactions,
>   ○A customer due diligence program, and
>   ○The development and implementation of appropriate risk assessments."[1768]

On March 22, 2004, while this formal enforcement action was still unfolding, HBUS
announced its intention to once more seek a national bank charter from the OCC. On July 1,
2004, after acquiring Republic Bank Delaware, HBUS changed its charter a third time and again
became a national bank subject to oversight by the OCC. As a condition to approval of its new
national charter, HBUS agreed to comply with the provisions of the 2003 agreement requiring
AML improvements. HBUS, thus, began its tenure with the OCC operating under an agreement
requiring it to address a host of AML deficiencies.

**Terminating the AML Agreement Despite 30 MRAs.** The OCC produced its first
Report of Examination (ROE) for HBUS less than a year later.[1769] The ROE covered
examinations conducted through March 31, 2005. It noted as the first Matter Requiring
Attention of the bank its obligation to implement the AML requirements in the 2003 agreement
and concluded that the bank had made significant progress. The ROE stated that HBUS had
already "developed a written Anti-Money Laundering (AML) program, including a system of
internal controls" and established an "AML Oversight and Control Group … responsible for
maintaining enterprise wide AML policies and procedures, identifying red flags and establishing
transaction monitoring criteria." It stated that the bank had "[i]mplemented controls [that]
provide for effective monitoring of various transactions throughout all departments of the bank
… for both non-customers and customers … designed to identify unusual and/or suspicious
activities." It stated that HBUS had "enhanced monitoring abilities through the Customer
Activity Monitoring Program (CAMP) system." The ROE also stated that HBUS had
established a "written Customer Due Diligence program" which included procedures to "ensure
the identification and timely, accurate, and complete reporting of all known or suspected

---

[1765] See 12/31/2002 Federal Reserve Bank of New York examination conducted jointly with the New York State
Banking Department.  [Sealed Exhibit.]
[1766] Id.
[1767] OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2005, OCC-PSI-00107637,
at 10-11 (describing the formal agreement).  [Sealed Exhibit.]
[1768] Id. at 10.
[1769] Id.

violations of law against or involving the bank, to law enforcement and supervisory authorities." It said that HBUS had also "created risk rating criteria to identify categories of customers whose transactions and banking activities pose heightened risk of money laundering and other illegal activities." It noted that the bank operated an Investigative Control and Reporting Office and a Financial Intelligence Group to conduct enhanced due diligence.

The ROE concluded: "OCC examiners reviewed compliance with the agreement, and found the bank to be in technical compliance with the requirements." It said that termination of the formal agreement would be considered following targeted AML examinations of certain high risk areas in the bank.[1770] Given the breadth and depth of the AML problems depicted in the 2003 agreement signed less than a year earlier and the relatively short time that the bank had to correct its AML deficiencies, the ROE's positive statements were surprising.

Over the next year, until early 2006, OCC AML examiners completed seven AML examinations at HBUS. The examinations reviewed multiple HBUS departments with higher risk activities, including Embassy Banking, Global Banknotes, Foreign Correspondent Banking, wire transfers, and International Private Banking. Each of the examinations identified significant AML deficiencies. The problems included noncompliance with the bank's AML policies (4 of 7 exams), weak monitoring procedures (5 of 7), weak customer due diligence procedures (5 of 7), inadequate written policies requiring revision (6 of 7), and untrained staff (5 of 7). For example, the examination of the Global Banknotes department found that customer information was missing from a number of files and that a number of banknotes clients were not being monitored at all.[1771] The examination of the bank's wire transfer operations found that monitoring was being conducted on a manual rather than automated basis, and identified one trust account that "had a significant amount of wire transfer activity in a short period of time and involved wire transfers to entities and/or individuals from high risk geographies," had undergone no monitoring, and whose accountholder had not received an enhanced due diligence review.[1772] The examination of the Embassy Banking department found over a dozen incidents of suspicious activity involving one embassy account over eight months, yet the bank had failed to close the account, despite an HBUS policy requiring closure in that circumstance.[1773] The International Private Bank examination found 540 high risk accounts that needed annual reviews that had yet to be completed; account reviews whose conclusions were not consistently supported; and high risk bearer share accounts whose shares were not under bank control and posed a risk that the bank was unaware of the true account owners.[1774]

When viewed together, the examinations identified systemic AML problems, a situation consistent with the extensive AML enforcement action instituted by the Federal Reserve and

---

[1770] Id. at 11.
[1771] 6/20/2005 OCC Supervisory Letter to HBUS on Global Banknote Examination, OCC-PSI-00107505. [Sealed Exhibit.]
[1772] 1/23/2006 OCC Supervisory Letter to HBUS on Wire Transfer Examination, OCC-PSI-00107522. [Sealed Exhibit.]
[1773] 11/23/2005 OCC Conclusion memorandum "BSA/AML Examination – HSBC USA International Private Bank," OCC-PSI-01258252; 1/30/2006 OCC Supervisory Letter to HBUS on Embassy Banking Examination, OCC-PSI-00107529. [Sealed Exhibits.]
[1774] 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00107537-542. [Sealed Exhibit.]

New York Banking Department.  Many of the problems cited in the OCC examinations, including weaknesses in customer due diligence and monitoring, were prominent features of the 2003 agreement.  In response to the AML examination findings, the OCC Examiner-in-Charge sent Supervisory Letters which, together, identified 30 Matters Requiring Attention (MRAs) requiring corrective action by HBUS.[1775]  Despite issuing over 30 MRAs in just over 12 months, on February 6, 2006, the OCC determined that the condition of the AML agreement had been met and terminated the agreement.[1776]

**AML Deficiencies Continue.**  On July 26, 2006, the OCC provided HBUS with another annual Report of Examination covering the period up to March 31, 2006.[1777]  In the section entitled, "Matters Requiring Attention," the ROE included AML matters as an MRA, but provided this mixed message about the state of HBUS' AML program:

> "During the year, we identified a number of areas lacking consistent, vigilant adherence to BSA/AML policies, and provided management with supervisory letters addressing specific areas in need of strengthening.  Bank policies are acceptable.  Management responded positively and initiated steps to correct weaknesses and improve conformance with bank policy.  We will validate corrective action in the next examination cycle."[1778]

Later in the report, in the section discussing the bank's "Consumer Compliance Rating," the ROE stated that HBUS had "a satisfactory BSA compliance program," that its controls were generally effective, and "no violations of law were noted."  It also stated:  "However, each examination resulted in MRAs, typically non-adherence to internal policies and procedures ….  This recurring pattern is listed as a Matter Requiring Attention in this Report of Examination."[1779]  The ROE also criticized an internal group dedicated to testing AML

---

[1775] The 30 MRAs required corrective action to address weak AML monitoring procedures, weak AML due diligence, inadequate AML training, and inadequate AML policies.  Monitoring problems were noted, for example, in all four Supervisory Letters issued in January 2006.  See 1/17/2006 OCC Supervisory Letter to HBUS on Foreign Correspondent Banking, OCC-PSI-00000295-301, at 299-300  (Monitoring is weak and is not detecting patterns of activity "below system parameters" and monitoring wire transfers is a "manual process and therefore subject to inefficiencies and potential errors"); 1/23/2006 OCC Supervisory Letter to HBUS on Wire Transfers, OCC-PSI-00107522-528, at 526 ("[T]he effectiveness of automated monitoring through CAMP is diminished in the absence of effective investigations of alerts that the system generates."); 1/30/2006 OCC Supervisory Letter to HBUS on Embassy Banking, OCC-PSI-00107529-536, at 534 ("Embassy Banking Compliance management must ensure that high-risk and Special Category of Client (SCC) accounts are monitored and reviewed on a consistent and frequent basis."); 1/31/2006 OCC Supervisory Letter, "International Private Banking BSA/AML Examination," OCC-PSI-00107537-542, at 540-541 ("Management must establish standards for CAMP alert reviews that require well-documented reasons for conclusions .… [E]xisting policies and procedures governing PUPID do not provide for adequate identification, monitoring and controlling of the risk inherent in such activity.… [T]here are no procedures in place to ensure activity logs are kept current on a scheduled basis. To effectively manage, monitor and report the potential risks associated with PUPID activity, logs must be revised to distinguish funds transfers payable to the account holder initiating the transfer, from those payable to a third-party non-account holder.").
[1776] 7/26/2006 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2006, OCC-PSI-00422079, at 5.  [Sealed Exhibit.]
[1777] 7/26/2006 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2006, OCC-PSI-00422079.  [Sealed Exhibit.]
[1778] Id. at 2.
[1779] Id. at 12.

compliance, the Compliance Review Unit, which, according to the ROE, was understaffed, performed weak analysis, and needed to be revamped.

HBUS' typical response to these examinations was to develop AML policies and procedures in response to the specific AML problems identified by the OCC.  Those policies and plans often were narrowly targeted, and later examinations found that bank personnel sometimes failed to implement or comply with them.

A year later, on July 24, 2007, the OCC's annual Report of Examination contained a more negative assessment.[1780]  This report covered examinations conducted through March 31, 2007.  The letter transmitting the ROE stated:

> "A number of business areas continue to lack vigilant adherence to BSA/AML policies. Supervisory letters issued during the year highlighted a number of thematic deficiencies in the execution of BSA/AML policies and procedures at the business level. Management continues to respond positively to correct weaknesses noted, and to improve conformance with bank policy.  However, it remains critical that sound policies adopted by the Board and management are executed consistently in the business lines."[1781]

In the report itself, the section entitled, "Matters Requiring Attention," included this MRA:

> "During the past year, examiners identified a number of common themes in that businesses lacked consistent, vigilant adherence to BSA/AML policies.  Bank policies are acceptable; however, the execution of these policies in the various business lines requires strengthening.  Management continues to respond positively and initiated steps to improve conformance with bank policy."[1782]

The MRA, which called for "strengthening" the "execution" of AML policies in "the various business lines," provided a general instruction to pay more attention to AML compliance.

A second MRA was more specific and issued a warning about the need to strengthen AML controls on HBUS pouch services, meaning bank services to clear monetary instruments from abroad, including bank checks, money orders, and travelers cheques.[1783]  The MRA stated that pouch services "facilitate easy movement of funds, and are favored by persons who transfer illegal and terrorist funds."  It noted that pouch services were being provided by multiple HBUS business lines.  The ROE described the pouch examination as having "resulted in serious concerns related to weak policies, procedures, systems and controls … inferior to BSA/AML controls in other areas of the bank."  The ROE also stated that "remedial attention is warranted,"

---

[1780] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-00304077.  [Sealed Exhibit.]
[1781] Id. at 2.
[1782] Id. at 1.
[1783] Id.

and warned that ongoing inadequate AML controls over pouch activities "could potentially subject the bank to undue reputation risk and/or lead to BSA/AML violations."[1784]

By the end of 2007, the OCC completed 21 AML examinations, many of which identified serious AML problems.[1785] Many of these examinations identified the same serious problems noted in earlier examinations, some of which cut across business lines. The examinations include AML issues in the London Banknotes office, Corporate and Institutional Banking, Retail Banking, Pouch Services, and Investment Banking. The examination that identified the most serious AML deficiencies, and which was included as an MRA in the annual ROE, related to pouch services which seemed to be operating without any AML controls. The pouch examination cited insufficient AML policies and procedures, a lack of monitoring for suspicious activities, inadequate AML controls and training, and inadequate independent testing of pouch services for AML compliance.[1786] Examples of potentially suspicious activity included sequentially numbered travelers cheques endorsed by the same exchange house and processed through several cash letters; a transaction that included a starter check for $105,000; and $130,000 in sequentially numbered travelers cheques presented in bearer form with the payee line left blank.[1787] OCC examiners initially recommended that a formal enforcement action be taken to effect corrective action in the pouch area, but no formal or informal action was taken.[1788]

The 21 examination reports and the Supervisory Letters that followed identified numerous AML deficiencies, including noncompliance with bank policy, poor monitoring, weak to nonexistent due diligence reviews, inadequate policies requiring revision, and untrained staff. Altogether, from February 2006 to December 2007, the Supervisory Letters identified another 34 AML MRAs, but no violations were identified or enforcement actions taken.

**AML Deficiencies Displaced by Financial Crisis.** On July 15, 2008, the OCC issued its annual Report of Examination for HBUS, summarizing examination activity conducted through

---

[1784] Id. See also the discussion of the bank's Consumer Compliance Rating, at 12.

[1785] Eight of the 21 examinations were limited to following up on corrective actions promised earlier, all of which were found to have been carried out.

[1786] 2/23/2007 OCC "Conclusion memorandum for HSBC Middle Market BSA/AML Examination," OCC-PSI-01263216; 4/10/2007 OCC Conclusion memorandum "BSA/AML Examination – HSBC, USA, NA – Pouch Activities", OCC-PSI-00899202 (reviewing pouch activities at the International Private Bank, Domestic Private bank, retail banking, and Payments and Cash Management business units). [Sealed Exhibits.]

[1787] Id. at 208.

[1788] Subcommittee interview of Joseph Boss (1/30/2012), Elsa de la Garza (1/9/2012), and Anthony DiLorenzo (3/22/2012). Upon receipt of the recommendation, the Examiner-in-Charge asked the AML examiners to prepare an analysis of whether the proposed enforcement action, a Cease and Desist Order, met OCC enforcement standards. The AML examiners concluded that, despite the serious AML deficiencies, the problems in the pouch area did not rise to the level of a violation of law and would be applied to a bank with a high composite rating for safety and soundness, and so did not meet OCC standards for issuing a Cease and Desist Order. See 6/14/2007 OCC memorandum, OCC-PSI-01298625; 7/3/2007 OCC memorandum OCC-PSI-00877731. [Sealed Exhibits.] One examiner told the Subcommittee that although the pouch activity did not meet OCC enforcement standards, he felt a Cease and Desist Order was nevertheless warranted at the time. Subcommittee interview of Joseph Boss (1/30/2012). The deputy head of Large Bank Supervision told the Subcommittee that she did not recall being informed about the enforcement recommendation or seeing the Conclusion Memorandum that laid out the problems in the pouch area at HBUS. Subcommittee interview of Grace Dailey (6/15/2012).

March 31, 2008.[1789]  Despite referencing a troubling AML examination involving the bank's Embassy Banking department, described below, for the first time since 2004, the ROE did not contain any MRA related to AML concerns.  This development may have been due, in part, to the deepening financial crisis then sweeping the U.S. financial system, raising questions about virtually every major financial institution.  HBUS' AML issues may have been displaced by OCC efforts to analyze the bank's safety and soundness, including each of its CAMELS components.  Nevertheless, the ROE did reference ongoing AML concerns at the bank.

The OCC letter transmitting the ROE included this paragraph about AML issues:

"Although BSA/AML internal systems and controls are generally effective, the examination of the Government and Institutional Banking (GIB) operations disclosed a number of significant … compliance concerns.  Management developed a plan to address the issues, and we are presently validating that the actions taken are addressing our concerns."[1790]

Although the ROE contained no MRA related to AML concerns, in the section discussing HBUS' composite rating, the ROE again referenced the examination that uncovered serious AML deficiencies in the GIB department:

"Our examination of BSA/AML practices in the Government and Institutional Banking (GIB) department during the first quarter of 2008 resulted in a number of concerns including:  inconsistent adherence to internal policies and procedures, inadequate systems, the need to strengthen controls, and inconsistent monitoring processes.  Management is aware of the deficiencies and developed a plan to address the issues.  We are in process of validating that the corrective action plan addresses our concerns satisfactorily."[1791]

Although these AML deficiencies were discussed in the composite rating section, there is no indication they affected the rating which remained unchanged from the prior year.

AML issues were discussed a third time in the section of the ROE analyzing HBUS' Consumer Compliance Rating.  For the first time, this section included a lengthy discussion of the high AML risks incurred by HBUS' banking operations.  The ROE stated:

"BSA/AML examinations were conducted in Middle Market, Government and Institutional Banking, Corporate Trust, Investment Banking, Customer Activity Monitoring Program, and London Banknotes follow-up. …

HBUS is the largest Embassy banking services provider. The bank is also active in the precious metals, jewelry, garment, and Middle Eastern carpets industries.  HBUS has numerous accounts to Politically Exposed Persons and Money Service Businesses.  The bank ranks in the top three banks in CHIPS and SWIFT wire transfer volume, and is a

---

[1789] 07/15/2008 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2008, HSBC OCC 3601119. [Sealed Exhibit.]
[1790] Id. at 2.
[1791] Id. at 3.

leader in global foreign correspondent relationships.  As the U.S. dollar clearing bank for the Global HSBC network, HBUS maintains numerous relationships with institutions worldwide.  …  The bank does business with numerous customers in both High Intensity Drug Trafficking Area and High Intensity Money Laundering and Related Financial Crime Area locations.  HBUS provides pouch services through several business units.  Historically, pouch services are vulnerable to money laundering risk."[1792]

Despite this recitation of the AML risks facing HBUS, the ROE stated that the bank's AML controls were "generally effective, with no violations noted."  It also stated that "certain areas within GIB required strengthening."[1793]

**Embassy Banking Examination.**  The ROE's multiple references to GIB, the Government and Institutional Banking department that housed the bank's Embassy Banking services, were included, because in January 2008, former GIB employees alerted the OCC to a host of problems in the Embassy Banking unit.  HBUS had dramatically increased its Embassy Banking business, after the closure of Riggs Bank and the decision by Wachovia Bank to exit the business.[1794]  By January 2006, the bank had over 2,500 embassy accounts with $485 million of deposits under management,[1795] and the business continued to grow.  The former employees described numerous problems, including apparent employee misconduct, inappropriate business transactions, noncompliance with bank policy, inadequate account monitoring, and erroneous and misleading regulatory and internal reports.

Over the next few months in 2008, an OCC examination confirmed the allegations.[1796]  The examination found, for example, that GIB had allowed two high risk embassy accounts involving Libya and Saudi Arabia to operate outside of restrictions specified in Memoranda of Understanding (MOU) established for each Embassy relationship.  The examination found unacceptable levels of risk, inadequate account monitoring, and suspect transactions.  One example involved a $20 million wire transfer that was variously explained as needed to pay the expenses of Libyan prisoners in the United States and elsewhere, or for "legal expenses and consultation that will lead to the establishment of a bilateral agreement with the US for cooperation on judicial affairs that related to future prisoner transfers."[1797]  The examination reported that when HBUS Compliance asked an Embassy Relationship Manager for information about one of the high risk accounts, it received insufficient explanations and, in some cases, the Relationship Manager took up to four months to obtain client responses.

---

[1792] Id. at 13-14.

[1793] Id. at 13.

[1794] See 1/30/2006 OCC Supervisory Letter regarding HBUS Embassy Banking, OCC-PSI-00107529-736, at 529-530; "HSBC to Open D.C. Branch, Pursue Embassy Clients," <u>Washington Post</u>, Terence O'Hara (10/5/2004)(quoting Riggs spokesperson: "As a service to our remaining embassy clients, Riggs is working closely with HSBC to ensure a smooth transition."), http://www.washingtonpost.com/ac2/wp-dyn/A7285-2004Oct4?language=printer.

[1795] 1/30/2006 OCC Memorandum,"4Q05 Embassy Banking Examination," OCC-PSI-00107529; 1/30/2006 OCC Supervisory Letter to HBUS, OCC-PSI-00107529.  [Sealed Exhibit.]

[1796] 10/8/2008 OCC Memorandum, "Royal Embassy of Saudi Arabia (RESA) March 2008 Examination Conclusions," OCC-PSI-01434609; 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593; 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00899215.

[1797] 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593, at 5.

In addition, the examination found that Embassy Banking had been opening new
accounts without notifying HBUS AML Compliance, which was against bank policy and led to
unmonitored account activity.  The OCC determined that two of five accounts opened for one
high risk embassy relationship had not been disclosed to AML Compliance.  It found that over
45 letters of credit for other Embassy Banking clients, ranging in amounts from a few thousand
dollars to $3 million, were also undisclosed.  Another problem was that Embassy Banking was
executing transactions for persons who were not clients – so-called PUPID transactions that were
Payable Upon Proper Identification – without logging in some of the transactions and without
screening the transaction beneficiaries against OFAC's SDN list, in contravention of U.S. law.
Still another problem was that Embassy Banking personnel had identified multiple instances of
suspicious activity involving some accounts, but had not closed the accounts, despite an HBUS
policy requiring closure under those circumstances.  The OCC also identified a backlog of over
3,000 unreviewed alerts, some dating back to 2007, relating to potentially suspicious transactions
in Embassy accounts.

The OCC examiner concluded that GIB's "AML program is not effective in identifying
and mitigating risk, especially considering the nature of its clientele and the types of products
and services it provides."[1798]  The examiner recommended issuance of a Cease and Desist Order
requiring immediate corrective action and prohibiting new Embassy Banking accounts until
AML controls were in place.  The OCC decided, however, not to issue a Cease and Desist Order
or take any other informal or formal enforcement action with respect to the Embassy Banking
accounts.[1799]  In May 2008, HBUS submitted an action plan to the OCC and began addressing
the AML deficiencies at GIB.  A later examination was conducted to determine whether the GIB
commitments were carried out and found that they were.  In July 2008, the Report of
Examination sent to HBUS acknowledged the AML deficiencies uncovered in Embassy
Banking, but did not treat them as a Matter Requiring Attention by the HBUS board.

**AML Deficiencies Continue Amid Law Enforcement Inquiries.**  On July 6, 2009, the
OCC sent HBUS the annual Report of Examination covering the period up to March 31,
2009.[1800]  Like the prior year's ROE, it contained no Matter Requiring Attention related to AML
issues.  The letter transmitting the ROE noted, however, that AML concerns were ongoing
nonetheless:

"Compliance with BSA/AML remains a high priority and a key reputation risk.  As part
of the 'compliance transformation project,' this area is also undergoing significant

---

[1798] 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00899225.

[1799] The AML examiner told the Subcommittee he was not given any reason for OCC's inaction in this matter, but
was simply told there would be no enforcement action.  He said it was his understanding that the Examiner-in-
Charge had discussed the matter with the deputy head of Large Bank Supervision in Washington before telling him:
"Grace said there would be no C&D."  Subcommittee interview of Joseph Boss (1/30/2012).  The Examiner-in-
Charge told the Subcommittee that he did not recall talking to a superior about the matter, but thought he "probably
did because it was a significant issue."  Subcommittee interview of Anthony DiLorenzo (3/22/12).  The deputy head
of Large Bank Supervision did not recall having a discussion about a Cease and Desist Order involving Embassy
Banking at HBUS.  Subcommittee interview of Grace Dailey (6/15/12).

[1800] 6/07/2009 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2009, OCC-PSI-
00270034.  [Sealed Exhibit.]

change.  The company has high-risk clients and businesses and the current leadership needs to be strengthened.  Plans are underway to address this concern."[1801]

This letter was the first to be signed by Sally Belshaw, who had replaced Anthony DiLorenzo as the OCC Examiner-in-Charge at HBUS, upon conclusion of Mr. DiLorenzo's five-year term.  It was the fifth in a row to identify AML compliance as a high priority issue.

For the first time, the ROE contained a "Risk Assessment Summary" table which included a reference to AML issues.  The table indicated that AML risk was "High," AML risk management was "Satisfactory," and the aggregate AML risk at HBUS was "High" and "Stable."[1802]

Later in the report, in the section discussing the bank's "Consumer Compliance Rating," the ROE stated that HBUS' compliance risk was "high due to the bank's lines of business which offer several products historically associated with money laundering."  It repeated much of the language from the last ROE describing the bank's high risk businesses and customers.  It also indicated that HBUS needed to strengthen its AML leadership:

"Although the BSA/AML program is effective overall, we recently highlighted the need to strengthen leadership in the area.  When the BSA Director resigned in 2007 the role of the HBUS Compliance Director was expanded to include oversight of the BSA/AML program.  The current Compliance Director has been in place since second quarter 2008.  In addition to BSA responsibility in the U.S., the Compliance Director also has responsibility for Canada, Mexico and the Securities businesses.  We believe that a complex, high-risk institution like HBUS needs a BSA/AML Officer who is highly qualified and experienced and have recommended that such a person be dedicated to the function.  A search is underway."[1803]

The discussion of AML leadership was prompted by the 2007 departure of HBUS' AML head Teresa Pesce after four years on the job, followed by the departure of the head of HBUS Compliance, Carolyn Wind after seven years on the job.  After Ms. Pesce left, Ms. Wind had served as both Compliance and AML head.  Leslie Midzain was then hired to serve in both roles as well, serving as the bank's AML head even though her background was in Canada and she had no U.S. AML experience.  In 2010, the OCC would ask for her replacement due to her lack of AML expertise and would also criticize the weak AML leadership shown by the regional Compliance head, Janet Burak.  In addition to AML leadership problems, the ROE noted that HBUS Compliance was undergoing a reorganization, and that the Compliance Review Unit, originally dedicated to AML independent testing, was also being reorganized and its mission expanded to other compliance issues.

During 2008, the OCC completed six more examinations, one of which focused on reviewing corrective actions to prior problems.  Of the remaining five, one involved additional

---

[1801] Id. at 2.
[1802] Id.
[1803] Id. at 16.

work on the AML deficiencies at GIB's Embassy Banking unit.[1804]  Another focused on AML issues affecting the Payments and Cash Management (PCM) department which helped provide a variety of cash services to clients, including correspondent accounts.[1805]  The PCM examination found fundamental flaws in its AML controls, including inadequate monitoring, poor review of account alerts, and suspicious transactions involving money service businesses.  The PCM examination found, for example, that PCM "systems and controls are less than satisfactory and do not provide an appropriate level of monitoring for suspicious and unusual activity for all of the activities in the business unit."  One example involved an account alert which found that a U.S. money service business was sending wire transfers through its HBUS correspondent account to an Ethiopian bank for credit to an account it held at that bank, in effect sending money to itself.  The alert was reviewed, PCM personnel determined more information was needed, but the alert was closed and the transactions continued.

Similar problems had been identified in a 2006 OCC examination of foreign correspondent banking which resulted in an MRA requiring PCM to conduct a review of its money service business accounts.  As a result of the 2008 examination, OCC examiners recommended three MRAs, one of which directed PCM to conduct a review of its money service business accounts, which appears to be a "repeat MRA" from the 2006 examination.  Several months later, the OCC Examiner-in-Charge sent a Supervisory Letter to HBUS including the three MRAs, but did not characterize the request for an account review as a "repeat MRA" that would necessitate an enforcement action, instead referring to "PCM's delay in initiating a special review for Money Services Businesses (MSB) type of entities, as required by a previous MRA, has resulted in increased risk."[1806]

A third examination in 2008, focused on HBUS Compliance Review Unit (CRU) which was dedicated to reviewing AML compliance at the bank.  The examination found its work satisfactory but also directed HSBC's internal audit unit to test the CRU's workpapers for reliability and directed the CRU to conduct an immediate review of the PCM department which had not undergone an internal AML review for over three years.[1807]  Additional examinations focused on AML issues at Card Services[1808] and Banknotes offices in Singapore and Hong Kong.[1809]

In 2009, the OCC conducted eight more AML examinations.  Three followed up on the problems uncovered in connection with HBUS' pouch activities, Embassy Banking and PCM services.[1810]  Additional examinations assessed HBUS' OFAC compliance[1811] and AML controls

---

[1804] 8/14/2008 OCC Memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227; 9/4/2008 OCC Supervisory Letter to HBUS on GIB examination, OCC-PSI-00107607.  [Sealed Exhibit.]

[1805] 12/7/2007 OCC Memorandum, "BSA/AML Examination - Payment and Cash Management," OCC-PSI-01263586.  [Sealed Exhibit.]

[1806] 4/21/2008 OCC Supervisory Letter HSBC-2007-24, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107597.  [Sealed Exhibit.]

[1807] 4/9/2008 OCC Supervisory Letter to HBUS on CRU examination, OCC-PSI-00107594.  [Sealed Exhibit.]

[1808] 2/11/2008 OCC Memorandum, "Card Services Compliance Examination," OCC-PSI-00938171.

[1809] 6/2/2008 OCC Memorandum, "Singapore/Hong Kong Banknotes Examination," OCC-PSI-00107603.

[1810] 1/22/2009 OCC Supervisory Letter HSBC-2008-16, "Pouch Service BSA/AML Examination," OCC-PSI-00107615; 6/24/2009 OCC Supervisory Letter HSBC-2009-10, "Global Institutional Banking BSA/AML Examination," OCC-PSI-00107628.  [Sealed Exhibits.]

involving correspondent banking[1812] and private banking.[1813]  Those examinations identified additional AML problems.  For example, the private banking examination concluded:  "HSBC's Private Bank BSA/AML does not adequately manage the risks associated with DPB-NY/CA [Domestic Private Bank offices in New York and California] and IPB-NY [International Private Bank in New York]."[1814]  Supervisory Letters sent to HBUS described the AML problems, some of which had been detected in a 2006 examination of private banking, but made no mention of repeat MRAs that would require an enforcement action.

Altogether in 2008 and 2009, the Supervisory Letters identified 12 more MRAs in the AML field, but no informal or formal enforcement actions were taken.  These 12 MRAs were on top of the 71 MRAs identified from 2005 to 2007.

In the spring of 2009, a new development intensified OCC's focus on AML problems at HBUS.  The OCC was contacted by two Federal law enforcement agencies regarding separate Federal investigations into possible money laundering through accounts at HBUS.  The first contact, in June 2009, was from the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE) unit investigating possible laundering of illegal drug proceeds.[1815]  The second  contact, around August or September 2009, was from a U.S. Assistant Attorney General in West Virginia investigating a Medicare fraud.[1816]

Senior OCC officials in Washington arranged to meet with the ICE representatives. On September 1, 2009, the meeting took place in Washington and was attended by the OCC Deputy General Counsel Daniel Stipano, Deputy Controller in charge of Large Bank Supervision Grace Dailey, OCC senior legal counsel with AML expertise James Vivenzio, the OCC AML examiners at HBUS, and the ICE representatives.[1817]  After the meeting concluded and the ICE representatives left, OCC personnel continued to discuss supervision of HBUS.  According to a memorandum summarizing the meeting, the lead AML examiner at HBUS informed the other meeting participants that, during his tenure at the bank, HBUS had been the subject of 83 AML-related MRAs, and he had twice recommended issuance of a Cease and Desist Order to compel the bank to strengthen its AML controls.[1818]  According to the meeting memorandum, Mr.

---

[1811] 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434. [Sealed Exhibit.]

[1812] 3/3/2009 OCC Supervisory Letter HSBC-2008-34,"Correspondent Banking BSA/AML Examination," OCC-PSI-00107618.  [Sealed Exhibit.]

[1813] 3/18/2009 OCC Supervisory Letter HSBC-2008-32, "Private Banking BSA/AML Examination," OCC-PSI-00000445; 9/19/2008 OCC Memorandum "HSBC BSA/AML Private Bank Exam-File Review-Draft," OCC-PSI-01274467.  [Sealed Exhibits.]

[1814] Id.

[1815] See 9/29/2009 email exchanges between OCC Jim Vivenzio, OCC Joseph Boss, OCC Teresa Tabor, OCC Sally Belshaw, and others, "HSBC," OCC-PSI-00928756.

[1816] Subcommittee briefing by OCC (3/15/2012).

[1817] See 9/29/2009 email exchanges between OCC Jim Vivenzio, OCC Joseph Boss, OCC Teresa Tabor, OCC Sally Belshaw, and others, "HSBC," OCC-PSI-00928756-758.

[1818] 9/1/2009 Memorandum to Files from OCC Examiners Joseph Boss and Elsa de la Garza, OCC-PSI-01416833. See also Subcommittee interviews of Elsa de la Garza (1/9/2012), Joseph Boss (1/30/2012), and James Vivenzio (3/15/2012).

Stipano "stated that he was unaware of the recent history of HBUS and that he wanted a thorough review."[1819]

After this meeting, the OCC directed its AML examiners to draw up an investigative plan and expand an ongoing AML review to encompass a comprehensive review of the entire AML program at HBUS. On September 3, 2009, the OCC sent a letter to HBUS informing it that a regularly scheduled AML examination of the Banknotes department that started in July and for which field work was completed in August 2009, was being expanded.[1820]  Additional staff was added to the AML team.

**Expanded AML Examination.**  For the first time since the OCC inherited HBUS from the Federal Reserve, it directed its AML examiners to conduct a holistic review of HBUS' AML program, instead of focusing on AML issues in particular banking services or departments.  The AML examiners quickly found fundamental problems related to the specific AML deficiencies identified over the years.  This examination would continue throughout 2010.

In March 2010, the OCC issued its first AML-related Supervisory Letter that cited HBUS for a violation of law, for failing to file Suspicious Activity Reports (SARs) in a timely manner.[1821]  The Supervisory Letter stated that its AML examination had found that the bank had a backlog of over 17,000 alerts, in four business units, identifying potentially suspicious activity that had not been investigated to determine whether a SAR should be filed.[1822]  The OCC determined that 98% of those alerts were generated in the "High Risk Monitoring Group," and 14% were six months or older.[1823]  The OCC gave the bank a deadline of June 30, 2010, to clear the backlog and instructed the bank to develop a risk-based system for reviewing and resolving those alerts.  In addition to the backlog of alerts, OCC examiners had found significant backlogs in the bank's handling of AML-related subpoenas and Section 314(a), and 314(b) requests for information from other banks, though those items were not specifically discussed in the Supervisory Letter.[1824]

Shortly after delivering the Supervisory Letter, the OCC Examiner-in-Charge for HBUS Sally Belshaw and the head of Large Bank Supervision Grace Dailey met with the HSBC Group CEO Michael Geoghegan and the HNAH and HBUS CEO Brendan McDonough on April 20, 2010.  In that meeting, the OCC officials informed the bank officials that the agency had identified serious AML deficiencies throughout the bank.  According to a memorandum prepared by Ms. Belshaw summarizing the meeting, the discussion included the following:

---

[1819] 9/01/2009 Memorandum to Files from Examiners Joseph Boss and Elsa de la Garza, at OCC-PSI-01416833. [Sealed Exhibit.]

[1820] On 9/21/2009, the OCC sent HBUS a request letter for an extensive amount of new information on 25 Latin America-based institutions.  There would be eight additional requests for more information through early February 2010.  See 2/6/2010 HBUS email from Janet Burak to Brendan McDonagh, OCC-PSI-00787479.

[1821] 3/10/2010 OCC Supervisory Letter HSBC 2010-03, "Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542. [Sealed Exhibit.]

[1822] Id.

[1823] 4/28/2010 Report of Examination of HBUS, for the examination cycle ending December 31, 2009, OCC-PSI-00899872, at 7. [Sealed Exhibit.]

[1824] See "Background Information on HSBC's Alert Backlog as of the week of February 8, 2010," prepared by OCC, OCC-PSI-01358494.

He [Mr. Geoghegan] asked when I thought things went bad. Grace and I described the spotty history of the bank relative to BSA/AML compliance. The bank converted to a national charter with a Formal Agreement (Fed) that they addressed. We also noted the regular and frequent citing over the years of MRAs in almost every examination we conducted. In those cases, management reacted to our findings and took corrective action. This, however, culminated in a systemic concern that we ultimately characterized as ineffective management (BSA/AML officer last year and now the compliance program overall). We believe that over the years, the people and program did not advance to keep pace with the risk. Systems enhancements are only now being achieved (and moved up in light of our concerns). Talent left the organization and was not replaced by people with sufficient technical skills to lead. Succession/bench strength for the compliance area is now inadequate. MIS has not evolved to permit early identification of risks/concerns. The backlog issue is a symptom of these management weaknesses….

We discussed several areas in some specificity including HBUS' policies/practices with respect to monitoring of affiliate activity (should be to same, not lesser, standard than other correspondents as is currently the case). We highlighted findings of weakness in KYC in several areas: bank notes, wire activity, domestic & international customers. We highlighted our recent concerns/questions about management's ability to address the backlog problem (and violation) given weaknesses we are seeing in data integrity in reports, quality of alert dispositioning, and the lack of independent review/oversight of that process. Our supervisory letter requires that backlogs be completely corrected by June 30th. We emphasized that not only must the number be addressed, but they must be effectively dispositioned (qualified reviewers guided by appropriate policy/process, adequate documentation, appropriate/timely SARs filed), and an ongoing system of controls must be in place to ensure the process is sustainable. We will be requiring qualified, independent verification of that as part of the process.[1825]

**2010 Report on Examination.** On April 28, 2010, three months earlier than normal, the OCC delivered its annual Report of Examination (ROE) to HBUS, covering the period up to December 31, 2009.[1826] Like the Supervisory Letter, this ROE cited HBUS for violating the Bank Secrecy Act due to its failure to file timely SARs, the only violation listed.[1827] The letter transmitting the ROE stated:

"Perhaps most disconcerting, we have identified significant weaknesses in compliance, particularly in Bank Secrecy Act/Anti-Money Laundering (BSA/AML), that are likely to have costly financial and reputation implications. Management is responding to the concerns we are raising, but was not effective in preventing these weaknesses from becoming serious problems. … An extended examination is revealing serious

---

[1825] 4/20/2010 OCC Memorandum, "Meeting w/Michael Geoghegan and Brendan McDonough," OCC-PSI-00905522.
[1826] 4/28/2010 Report on Examination of HBUS, for the examination cycle ending December 31, 2009, OCC-PSI-00899872 [Sealed Exhibit.]
[1827] Id. at 7.

breakdowns and violations.  We will likely be requiring additional action to address this concern."[1828]

In addition, for the first time, the ROE discussed HBUS' AML problems in the context of HBUS' CAMELS management rating, although the rating remained unchanged from the prior year.  The ROE noted that HBUS was the subject of several ongoing investigations that could damage its reputation, and the OCC was "increasingly concerned with weaknesses in compliance (particularly BSA/AML) risk management," including "the quality of BSA/AML monitoring and compliance."  The ROE stated that the ongoing AML examination "is revealing weaknesses that have impacted our overall assessment of the program and its management."[1829]

The ROE also discussed the AML problems in the section on HBUS' Consumer Compliance Rating and disclosed that it was lowering that rating as a result.  The ROE stated:

> "[W] are lowering our assessment of the quality of compliance risk management from satisfactory to weak .…  The high level of BSA/AML/OFAC risk associated with HBUS' business activities is a significant factor in our assessment.  …  In addition to the high level of risk presented by its business activities, HBUS has a high quantity of risk based upon significant indications that the bank is not in compliance with all laws and regulations. …  Based upon our work to date, we have identified deficiencies relating to HBUS' transaction monitoring, analysis of customer due diligence information, adherence to the USA PATRIOT Act; and filing of Suspicious Activity Reports (SARs). …  We are changing our assessments of both HBUS' BSA/AML program and its overall compliance management program from satisfactory to weak.  These changes are based upon our concerns regarding (1) the lack of effective compliance oversight provided by the head of HNAH/HBUS' compliance department, (2) the ineffective results to date of HBUS' project to implement a new model for its compliance structure and process, and (3) the deficiencies that we have identified to date during our expanded examination of HSBC's Global Banknotes business and the concerns raised by multiple external parties."[1830]

The OCC lowered HBUS' Consumer Compliance Rating even though it did not identify any problems related to bank compliance with consumer protection or civil rights laws.  The OCC's actions contravened the interagency agreement on how to calculate this rating, which required a focus on consumer protection and civil rights laws, not AML requirements.

Although its Consumer Compliance Rating was lowered, the bank's safety and soundness ratings remained unchanged.  Neither the CAMELS management component rating nor the overall composite rating were lowered.  These unchanged ratings meant that the bank would also not incur any added Federal deposit insurance fees, despite its elevated AML risk.

On April 15, 2010, the OCC's Washington Supervision Review Committee approved an Order of Investigation "concerning potential violations of law and unsafe and unsound conduct

---

[1828] Id. at transmittal letter.
[1829] Id. at 3-4.
[1830] Id. at 6.

in connection with the BSA/AML policies and practices of HSBC Bank USA, N.A."[1831]  The issuance of the Order was based on the preliminary findings of the expanded AML examination, which by that point had identified evidence of a backlog of alerts that had not been processed for suspicious activity reporting; failure to adequately monitor foreign affiliates; and failure to adequately monitor wire transfer transactions for customers in countries designated "standard" or "medium" risk by the bank.

On September 13, 2010, the OCC issued the 31-page Supervisory Letter described earlier, outlining a long list of significant AML problems at HBUS.[1832]  The Supervisory Letter also cited the bank for a violation of the Bank Secrecy Act statute for failing to maintain an effective AML program.  The letter informed HBUS that "the bank's compliance program and its implementation are ineffective, and accompanied by aggravating factors, such as highly suspicious activity creating a significant potential for unreported money laundering or terrorist financing."[1833]  In addition, the letter stated:

> "Since the OCC terminated the Formal Agreement in February 2006, the bank has had a high number of MRAs and the OCC continues to identify serious deficiencies in the bank's BSA/AML compliance program. Over the past two years, the examination scopes have included many of same areas that are of concern at this examination. The OCC has issued twelve MRAs during this period, many of which address similar issues compared to its current concerns, including the adequacy of compliance leadership, alert management, and monitoring systems."[1834]

In October 2010, six years after becoming HBUS' primary Federal regulator, the OCC issued its own formal enforcement action, a Cease and Desist Order requiring corrective action on many of the same problems identified by the Federal Reserve seven years earlier in 2003.[1835]

**Federal Reserve Ratings.**  The OCC was not the only Federal banking regulator that examined HBUS.  Because HBUS had federally insured deposits, the FDIC acted as a secondary regulator.  In addition, the Federal Reserve was responsible for regulating HBUS' holding company, HSBC North America Holdings (HNAH) as well as an Edge Act Corporation that HBUS owned in Florida.  The Subcommittee did not attempt to review the oversight exercised by these two other regulators.  The Subcommittee did note, however, that as of 2009, the Federal Reserve Bank of Chicago maintained a lower rating for HNAH's risk management, in part because of the AML problems at HBUS.

The 2009 Federal Reserve report stated:  "[T]he primary driver for the overall rating is the unsatisfactory BSA/AML program.  BSA/AML risk is currently the highest inherent Legal and Compliance risk for HNAH."[1836]  The Federal Reserve report stated that the bank's

---

[1831] 04/9/2010 OCC Memorandum, "Order of Investigation – HSBC Bank USA, N.A., New York, NY", OCC-PSI-00899481.

[1832] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21," OCC-PSI-00864335. [Sealed Exhibit.]

[1833] Id. at 336.

[1834] Id. at 335.

[1835] See In re HSBC Bank USA, N.A., Case No. AA-EC-10-98, Department of the Treasury Comptroller of the Currency, Consent Order (10/4/2012), OCC-PSI-00904698.

[1836] See Federal Reserve Bank of Chicago report as of December 31, 2009, BOG-SR-001368, at 1. [Sealed Exhibit.]

compliance program had focused "inward on alignment with Group, cost reduction, and centralization without sufficient focus on implementing and maintaining good risk identification, control, measurement, and management processes."[1837]  It also noted that "HNAH's strategic plan was to focus on customers and business lines with international connections, which present higher levels of BSA/AML and OFAC risks."  According to the Federal Reserve:

> "[T]he significant weaknesses and issues identified by regulators on the BSA/AML program underscores senior compliance management's inability to self-identify compliance risks and to note significant control deficiencies in a timely fashion.  While the inabilities of senior compliance management [are] a primary driver for the downgrade[1838] of board and senior management oversight rating, the lack of a sound risk management function that adequately includes compliance risk is also a contributor."[1839]

In October 2010, on the same day and in coordination with the OCC, the Federal Reserve issued its own formal enforcement action with respect to HNAH, requiring it to strengthen its "firmwide compliance risk management program," including with respect to AML compliance, and ensure that HBUS complied with the OCC order.[1840]

### (2)  Six Years of AML Deficiencies

An OCC presentation providing an "AML Retrospective (2001-2011)" includes a chart showing that, from January 2005 to March 2010, the OCC issued 85 AML-related Matters Requiring Attention to the HBUS Board of Directors, which was a third more AML-related MRAs than the next closest major bank.[1841]  An experienced OCC AML examiner told the Subcommittee:  "I thought I saw it all with Riggs, but HSBC was the worst situation I'd ever seen."[1842]

The following chart summarizes many of the OCC-issued MRAs related to AML problems at HBUS.  It shows that the examinations repeatedly revealed critical AML problems across HBUS business units, many of which offered high risk products, had high risk clients, or engaged in high risk activities vulnerable to money laundering and terrorist financing.  Twenty-one of the examinations identified problems with the bank's AML monitoring systems, including in its wire transfer, pouch, foreign corresponding banking, international and domestic private banking, retail banking, credit cards, Embassy banking, Banknotes, and Payment and Cash

---

[1837] Id. at 2.

[1838] This targeted examination did not result in a downgrade at the overall holding company level.

[1839] Id. at 5.

[1840] See In Re HSBC North America Holdings, Inc., Case No. 10-202-B-HC, before the Board of Governors of the Federal Reserve System, Cease and Desist Order Issued Upon Consent Pursuant to the Federal Deposit Insurance Act as Amended (10/4/2012).

[1841] See undated presentation, "BSA Officer Roundtable:  Bank Secrecy Act Policy and Legal Update," by John Wagner, OCC Director of BSA/AML Compliance, and James Vivenzio, OCC Senior Attorney for BSA/AML, chart entitled, "BSA/AML MRA:  Large Banks: Full Information System Extract (LBIS)," OCC-PSI-01768523. See also Subcommittee interviews of Elsa de la Garza, Joseph Boss, and James Vivenzio (confirming HBUS had an unusually high number of MRAs compared to other banks); 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335 at 9 ("Since the OCC terminated the Formal Agreement in February 2006, the bank has had a high number of MRAs").  [Sealed Exhibit.]

[1842] Subcommittee interview of Joseph Boss (1/30/2012).

Management operations.  Inadequate customer due diligence and client information were
similarly identified in multiple business lines and services.  Noncompliance with bank policy
was another common problem.  Inadequate staffing and AML training were also repeatedly
identified, as were weaknesses in internal reviews of AML compliance.  Later on, weaknesses in
AML leadership at the bank were also identified.  When AML examiners were allowed to
undertake a broader analysis of the AML program, they identified additional fundamental
problems involving backlogs, inappropriate assessment of country and client risk, favored
treatment of HSBC affiliates, and massive gaps in monitoring.

   For more than six years, from July 2004 until April 2010, despite compiling a litany of
AML deficiencies, the OCC never cited HBUS for a violation of law, never took a formal or
informal enforcement action, and turned down recommendations to issue Cease and Desist
Orders targeting particularly egregious AML problems, even though the same problems surfaced
again and again.  The OCC's failure to compel HBUS to remedy the AML deficiencies
repeatedly identified by its examiners over a six-year period indicates that systemic weaknesses
in the OCC's AML oversight model require correction.

## Matters Requiring Attention (MRAs) and Recommendations in OCC Supervisory Letters for HSBC Bank USA, N.A.
### January 2005 - July 2009

| # of BSA Exams | Supv. Letter Date | Business Line/Area Examined | # MRAs* | # Rec.* | Bank Not Following Policies | Weak Monitoring Procedures | Weak CDD/EDD Procedures | Insuff. Staff Levels | Backlogs Noted | Policies Need Revision | Staff Needs Training | Independent Testing Problems | BSA Officer Inadeq. | OFAC Issues | Sum of MRAs |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | **Internal Control Pillar Issues** | | | | | | **Training Pillar** | **Independent Testing Pillar** | **BSA Officer Pillar** | | |
| 1 | 1/26/2005 | 4Q04 USA Patriot Act Exam | 6 | 0 | x | | x | | | x | x | | | | 6 |
| 2 | 6/20/2005 | 1Q05 Global Banknote Exam | 6 | 0 | x | x | x | | | x | x | | | | 12 |
| 3 | 8/9/2005 | Embassy Banking Exam | 0 | 0 | | | | | | | | | | | 12 |
| 4 | 1/17/2006 | 3Q05 Foreign Corresp. Banking Exam | 7 | 0 | x | x | x | | | x | x | | | | 19 |
| 5 | 1/23/2006 | 3Q05 Wire Transfer Exam | 5 | 0 | x | x | x | | | x | x | x | | | 24 |
| 6 | 1/30/2006 | 4Q05 Embassy Banking Exam | 4 | 0 | | x | | x | | x | x | | | | 28 |
| 7 | 1/31/2006 | 3Q05 Intn'l Private Banking Exam | 7 | 0 | x | x | x | | x | x | x | | | | 35 |
| | | Provisions of the 2003 Written Agreement were terminated 2/6/2006 with the above similar/systemic findings from the first seven BSA/AML exams. | | | | | | | | | | | | | |
| 8 | 4/12/2006 | 1Q06 Domestic Private Banking Exam | 3 | 0 | | x | x | | | x | x | | | | 38 |
| 9 | 4/27/2006 | 1Q06 GIB Exam | 0 | 1 | | | | x | | | | x | | | 38 |
| 10 | 6/14/2006 | 1Q06 Compliance Review Unit (CRU) Exam | 4 | 0 | | | | x | | x | | x | | | 42 |
| 11 | 7/13/2006 | 1Q06 Trade Services Operations | 0 | 3 | | | x | | | x | | | | | 42 |
| 12 | 9/26/2006 | 2Q06 London Global Banknote Exam | 3 | 0 | x | x | x | | | x | x | | | | 45 |
| 13 | 10/19/2006 | Retail Services Compliance Exam | 1 | 0 | | x | | | | | | | | | 46 |
| 14 | 12/1/2006 | Metris Exam (Credit Cards) | 5 | 0 | | x | x | | | x | x | | | | 51 |
| 15 | 1/8/2007 | Taxpayer Financial Services Compliance Exam | 0 | 2 | | | | | | | | | | | 51 |
| 16 | 3/8/2007 | Corporate and Institutional Banking Exam | 4 | 1 | x | | x | | | x | | x | | x | 55 |
| 17 | 3/19/2007 | 3Q06 GIB Exam | 3 | 0 | | x | | x | | x | | | | | 58 |
| 18 | 3/27/2007 | 3Q06 Retail Banking Exam | 3 | 7 | | x | x | | | x | | | | | 61 |
| 19 | 3/29/2007 | 4Q06 CAMP Review | 1 | 0 | | | | | | | | | | | 62 |
| 20 | 5/22/2007 | OCC Visit to India | 0 | 0 | | x | | | | | | | | | 62 |
| 21 | 6/17/2007 | CAMP Follow-up | 0 | 0 | | | | | | | | | | | 62 |
| 22 | 6/20/2007 | 1Q07 Corporate Trust Exam | 0 | 0 | | | | | | | | | | | 62 |
| 23 | 8/6/2007 | 2Q07 Internal Audit and CRU Follow-up Exam | 0 | 1 | | | | | | | | x | | | 62 |
| 24 | 8/21/2007 | 3Q07 London Banknote Follow-up Exam | 0 | 0 | | | | | | | | | | | 62 |
| 25 | 8/21/2007 | 3Q07 GIB Follow-up Exam | 0 | 0 | | | | | | | | | | | 62 |
| 26 | 9/13/2007 | Pouch Services and Middle Market Exam | 5 | 0 | x | x | | | | x | x | | | | 67 |
| 27 | 9/21/2007 | Investment Banking Exam | 3 | 0 | | x | x | | | x | | | | | 70 |
| 28 | 9/21/2007 | Taxpayer Financial Services Follow-up Exam | 1 | 0 | x | | | | | | | | | | 71 |
| 29 | 10/15/2007 | Retail Services Compliance Exam | 0 | 1 | | | | | | | | | | | 71 |
| 30 | 2/11/2008 | Card Services Compliance Exam | 0 | 3 | | x | | | | x | | | | | 71 |
| 31 | 4/9/2008 | 1Q08 Audit and CRU Exam | 2 | 1 | | | | | | | | x | | | 73 |
| 32 | 4/21/2008 | 4Q07 PCM Exam | 3 | 0 | | x | | | | x | | x | | | 76 |
| 33 | 6/2/2008 | Singapore/Hong Kong Banknotes Exam | 0 | 2 | | | | | | | | | | | 76 |
| 34 | 7/10/2008 | Taxpayer Financial Services Compliance Exam | 1 | 0 | | | | | | | | | | | 77 |
| 35 | 9/4/2008 | 2Q08 and 3Q08 GIB Exam | 2 | 0 | x | x | x | x | x | x | x | | | | 79 |
| 36 | 1/20/2009 | 4Q08 OFAC Exam | 0 | 1 | | | | x | | | | | | | 79 |
| 37 | 1/22/2009 | 3Q08 Pouch Follow-up Exam | 0 | 0 | | | | | | | | | | | 79 |
| 38 | 3/3/2009 | 4Q08 Correspondent Banking Exam | 0 | 2 | | | | x | | | | | | | 79 |
| 39 | 3/18/2009 | 4Q08 Private Banking Exam | 2 | 1 | | x | | | | x | | | | | 81 |
| 40 | 3/18/2009 | 4Q08 PCM Exam | 0 | 1 | | | | x | | | | | | | 81 |
| 41 | 5/27/2009 | Taxpayer Financial Services Compliance Exam | 0 | 0 | | | | | | | | | | | 81 |
| 42 | 6/24/2009 | 2Q09 GIB Follow-up Exam | 1 | 3 | | x | | | | x | | x | | | 82 |
| 43 | 7/7/2009 | Compliance Management Exam | 1 | 0 | | | | | | | | x | x | | 83 |
| | | TOTALS | 83 | 30 | 10 | 19 | 13 | 8 | 2 | 21 | 11 | 9 | 1 | 1 | |

Prepared by the U.S. Senate Permanent Subcommittee on Investigations, July 2012.

### C.  OCC Systemic Failures

The OCC's failure for six years to take action to force correction of fundamental problems in HBUS' AML program allowed those problems to fester and worsen.  Five key weaknesses in OCC oversight contributed to its those failures:  (1) treating AML deficiencies as a consumer compliance issue instead of a management issue; (2) unnecessarily restricting citations of AML program violations; (3) failing to match narrowly focused AML examinations with broader reviews; (4) failing to make better use of formal and informal enforcement actions in the face of continuing AML problems; and (5) issuing Supervisory Letters that sometimes did not accurately convey the AML problems identified in examinations.  AML problems that surfaced even after bank commitments to cure identified problems was also a common thread.

### (1)  Treating AML Deficiencies As A Consumer Compliance Issue

The OCC is the only Federal bank regulator that does not address AML problems within the context of a bank's safety and soundness considerations and ratings, instead treating them as a matter of consumer compliance.  This approach raises at least three concerns.  First, combining AML and consumer compliance concerns undermines and confuses the consumer compliance rating.  AML compliance issues are unrelated to consumer protection and civil rights laws and should have no bearing or impact on a bank's consumer compliance rating.  Inserting AML considerations into the rating process also directly contravenes the Uniform Interagency Consumer Compliance Rating System specifying how that rating is supposed to be calculated and what it is supposed to signify.[1843]  In the case of HBUS, the OCC ended up lowering its consumer compliance rating in 2010, without citing any evidence that the bank was failing to comply with consumer protection or civil rights requirements.

Secondly, failing to maintain an effective AML program is more properly viewed as a management issue that should contribute to a bank's CAMELS management rating and, ultimately, the bank's composite rating.  Federal banking agencies have agreed, for example, that a bank with a "2" CAMELS management rating means that "significant risks and problems are effectively identified, measured, monitored, and controlled" by bank management.[1844]  In contrast, a bank with a "3" management rating signifies "management and board performance that needs improvement or risk management practices that are less than satisfactory given the nature of the institution's fiduciary activities."  A 3 rating also means that the "capabilities of management or the board of directors may be insufficient for the size, complexity, and risk profile of the institution's fiduciary activities.  Problems and significant risks may be inadequately identified, measured, monitored, or controlled."[1845]  These descriptions of the significance of the CAMELS management rating are directly applicable to management efforts to ensure an effective AML program.

---

[1843] See "Comptroller's Handbook – Consumer Compliance Examination," Appendix A, "Uniform Interagency Consumer Compliance Rating System," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/overview/default.htm?startat=over00013.htm.  Compare with FDIC, http://www.fdic.gov/regulations/laws/rules/5000-1700.html; Federal Reserve Bank, http://www.fedpartnership.gov/bank-life-cycle/topic-index/bank-rating-system.cfm; Consumer Financial Protection Bureau, http://www.consumerfinance.gov/guidance/supervision/manual/examinations/.

[1844] See Uniform Interagency Management Component Ratings:  http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_paginated/banksupervisionprocess/default.htm?startat=bank00108.htm

[1845] Id.

Interagency agreement on the significance of a bank's overall composite rating is also compatible with this approach. Federal banking agencies have agreed that a composite rating of "2" means that a bank is "in substantial compliance with laws and regulations," that "overall risk management practices are satisfactory," and "there are no material supervisory concerns and, as a result, the supervisory response is informal and limited."[1846] A "3" composite rating means banks:

> "exhibit some degree of supervisory concern in one or more of the component areas. These financial institutions exhibit a combination of weaknesses that may range from moderate to severe; however, the magnitude of the deficiencies generally will not cause a component to be rated more severely than 4. Management may lack the ability or willingness to effectively address weaknesses within appropriate time frames. Financial institutions in this group generally are less capable of withstanding business fluctuations and are more vulnerable to outside influences than those institutions rated a composite 1 or 2. Additionally, these financial institutions may be in significant noncompliance with laws and regulations. Risk management practices may be less than satisfactory relative to the institution's size, complexity, and risk profile. These financial institutions require more than normal supervision, which may include formal or informal enforcement actions."[1847]

These categories fit seamlessly with management issues related to AML concerns.

Currently, Federal banking agencies other than the OCC routinely consider AML deficiencies as one factor in assigning a bank's management rating and may downgrade that rating if management fails to maintain an adequate AML program. The management component rating is a reflection of management's ability to adequately identify, measure, monitor, and control problems and significant risks. The failure to maintain an adequate AML program exposes a bank to significant reputational risks, potentially large civil money penalties, and criminal prosecution. When such factors are present, it makes sense for a bank regulator to weigh them when assigning the bank's management rating. If the management component is downgraded, it may also in certain circumstances lower the overall composite rating, with potentially severe impacts on the financial institution's reputation, risk profile, and insurance assessment fees.

In the case of HBUS, after documenting widespread and serious AML deficiencies, citing the bank for two violations of law, noting the potential for large civil money penalties, and criticizing both bank management and the board of directors for failing to provide an adequate AML program, the OCC downgraded the bank's consumer compliance rating, but not its CAMELS management rating. The bank's composite rating was also unaffected. The result is

---

[1846] See Uniform Financial Institutions Rating System, discussed in 9/2007 "Comptroller's Handbook – Bank Supervision Process," http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/_pdf/banksupervisionprocess.pdf, at 55.
[1847] Id.

that HBUS executives and directors escaped any CAMELS consequences for their poor AML
management.[1848]

A third, related problem is that because consumer compliance is a specialty examination
area with its own, separate rating system, a lower consumer compliance rating will rarely impact
a bank's composite rating.  The OCC Reports of Examination make it clear that the consumer
compliance rating is not a contributing factor that has a routine impact on a bank's composite
rating.  HBUS was also aware that its composite rating was generally insulated from the
problems with its AML performance, as indicated in a February 2010 email from the HNAH
compliance head Janet Burak to top HNAH and HBUS executives Brendan McDonagh and Irene
Dorner.  At a time when HBUS was in the midst of an intensifying AML examination which
would ultimately lead to a Cease and Desist Order, Ms. Burak wrote:

> "I met with the OCC today.  … Sally [Belshaw, the OCC Examiner-in-Charge]
> also indicated that they are considering downgrading their assessment of
> Compliance Risk Management … although [Sally] indicated that if they make
> that decision it will not impact the Bank's composite CAMELS rating … and
> would not likely impact the Management rating component."[1849]

This email demonstrates that bank officials were aware of how the process for rating
AML performance had little real impact on the safety and soundness ratings that carried
important consequences.  It suggests that if AML problems had CAMELS consequences
on a routine basis, they might have greater significance for management.

The OCC Reports of Examination on HBUS occasionally discuss the bank's
AML problems in the part of the report analyzing its management rating or composite
rating, perhaps because the issue is relevant to those discussions.  But the OCC confined
the impact of the bank's AML problems to lowering HBUS' consumer compliance rating
and not its CAMELS management or composite ratings which remained unaffected.

The OCC's peculiar treatment of AML concerns as a consumer compliance issue has
multiple negative consequences.  National banks that fail to maintain adequate AML programs
may end up receiving more favorable safety and soundness ratings than they deserve, because
the consumer compliance ratings have almost no impact on their management or composite
ratings.  They may also receive lower consumer compliance ratings than they deserve for the
opposite reason.  Another consequence is that the bank's deposit insurance assessments remain at
a lower level than they should, as a result of safety and soundness ratings that do not fully reflect
their AML risks.  Treating AML concerns as a management issue would mitigate those negative
consequences and create a stronger incentive for national banks to focus on their AML
obligations.  To strengthen its AML oversight, the OCC should bring its practice into alignment
with all other Federal bank regulators, remove AML considerations from its consumer
compliance ratings, and consider AML issues in the context of the CAMELS management
component.

---

[1848] A related problem is that because the Federal Reserve downgraded HBUS' holding company due to the AML
problems at HBUS, HNAH executives ended up incurring lower ratings for HBUS' AML management failures, but
HBUS executives did not.
[1849] 2/24/2010 email from HNAH Janet Burak to HBUS Brendan McDonagh and Irene Dorner, HSBC OCC
3405315.

### (2)  Restricting Citations of AML Program Violations

A second peculiarity in OCC AML oversight is its failure to cite violations of law in its Supervisory Letters and annual Reports of Examination when a bank fails to comply with one of the four statutorily mandated components of an effective AML program – described earlier as internal controls, an AML compliance officer, AML training, and independent testing – even though each of the four program components has its own statutory basis.[1850]  Instead, the OCC has adopted a practice of not citing violations of the individual AML program components, instead treating any such deficiency as a Matter Requiring Attention (MRA) by the bank.[1851]

Although MRAs require corrective action by bank management, they are separate and distinct from violations of law.  OCC guidance provides that MRAs should address bank practices that "deviate from sound fundamental principles and are likely to result in financial deterioration if not addressed," or that "result in substantive noncompliance with laws."[1852] MRAs are intended to target weak policies and practices before they result in violations, and provide an interim step before finding a bank in violation of the law.  At the same time, because MRAs signify matters that require the "attention" of management, they do not carry the same legal weight and urgency as violations of law.  While they play an important role in AML oversight by focusing bank officials on emerging AML problems, if they take the place of statutory violations, MRAs can end up misleading a bank about the seriousness of an AML deficiency, delay remedial action, and allow an AML problem to fester.  Citing a bank for noncompliance with the law, on the other hand, carries more severe consequences if left unaddressed.  It also sends a much stronger message to bank management about the need for prompt corrective action, and lends more weight to any subsequent formal or informal enforcement action in the event the problem continues.

The OCC's practice of not citing a bank for violating the individual statutory requirements for an effective AML program meant that OCC examiners were effectively limited to using only MRAs to compel reform of an identified problem.  In the case of HBUS, OCC AML examiners repeatedly identified instances in which HBUS failed to comply with one or more of the four pillar requirements of an effective AML program.  HBUS often responded by addressing some of the narrow problems identified, but not the broader underlying programmatic deficiencies, perhaps because the problems were identified in the more neutral language of an MRA rather than as a violation of law.

---

[1850] See 31 U.S.C. § 5318(h)(1)(A)-(D).

[1851] One OCC senior legal counsel specializing in AML matters told the Subcommittee that the OCC "will not cite pillar violations" and instead lists them as MRAs which are not enforceable in court.  He said that the OCC uses the same approach when reporting AML examination findings to FinCEN, describing the OCC's reporting as "cleaner" and not "cluttered with component violations" like the other agencies.  Subcommittee interview of James Vivenzio (3/15/2012).  As indicated earlier, annual reports compiled by FinCEN show that, for the five year period from 2007 through 2011, OCC examiners cited only 16 pillar violations in more than 6,600 AML examinations.  That total represents more than 10 times fewer violations than the nearest Federal bank regulator, despite the OCC's having conducted nearly 1,800 more AML examinations.  See 2007-2011 Federal Banking Agency Bank Secrecy Act Compliance Examination, "Consolidated Quarterly Reports," PSI-FinCEN-04-0063-296.  [Sealed Exhibit.]

[1852] OCC's "Examiner's Guide to Problem Bank Identification, Rehabilitation, and Resolution," page 24. http://www.occ.gov/publications/publications-by-type/other-publications-reports/prbbnkgd.pdf

**AML Compliance Officer.**  In one case, in 2009, the OCC determined that the HBUS AML head was not qualified for the position, a rare personnel decision prompted by the bank's deteriorating AML program.  Having a qualified AML compliance officer is one of the four critical requirements of an effective AML program and is mandated by statute and regulation.[1853] An OCC AML examiner wrote the following about the problem:

> "Over the past three years, HBUS has had three BSA/AML Officers.  Ms. Lesley Midzain is the current Board designated BSA/AML Officer for HBUS.  She has held this position since April 2008.  She has limited BSA/AML knowledge and industry experience and is not considered qualified for the position of BSA/AML Officer.  This finding is based on numerous interviews by both OCC HSBC resident staff and other OCC large bank staff.  She has not enhanced her knowledge of U.S. law related to BSA/AML through formal training, other than internal web based training.  It should be noted that even with limited knowledge of U.S. law and regulation, Ms. Midzain has assumed responsibility for both BSA/AML and Compliance.
>
> We communicated to the HBUS President and to Ms. Janet Burak, Chief Compliance Risk Officer that Ms. Midzain does not possess the technical knowledge or industry experience to continue as the BSA/AML  Officer.  Ms. Midzin's knowledge and experience with BSA/AML risk is not commensurate to that of other BSA/AML positions held at other large national banks."[1854]

The FFIEC AML Examination Manual states that "the appointment of a BSA compliance officer is not sufficient to meet the regulatory requirement if that person does not have the expertise, authority, or time to satisfactorily complete the job."[1855]  The OCC viewed HBUS as a large complex financial institution with numerous high risk aspects that required a fully qualified AML expert to administer the bank's AML program. To express the urgent need for the bank to hire a qualified AML director, the OCC could have cited HBUS for violating the law, but chose instead to issue a Supervisory Letter listing the issue as an MRA.[1856]  The bank responded by keeping the targeted official as its head of compliance, hiring a new AML director, and requiring that new AML director to report to the compliance head with no AML expertise.  The new AML director left after about nine months.[1857]

**AML Internal Controls over Pouch Services.**  In another instance, in January 2007, an OCC examination identified serious AML problems with HBUS' pouch services, which appeared to be operating with virtually no compliance with AML standards.  Pouch services involve clearing U.S. dollar monetary instruments such as travelers cheques, bank cheques, and money orders.  The AML problems included a lack of monitoring for suspicious activity, insufficient policies and procedures, and a lack of AML controls.  As a result, the OCC

---

[1853] See 31 U.S.C. § 5318(h)(1)(B) and 12 C.F.R. Section 21.21(c)(3).

[1854] 5/15/2009 OCC Memorandum, "Compliance Management Exam," OCC-PSI-01438115.

[1855] 4/29/2012 FFIEC BSA/AML Examination Manual, "BSA/AML Compliance Program – Overview – BSA Compliance officer," at 36, http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2010.pdf.

[1856] 7/7/2009 OCC Supervisory Letter 2009-01 "Compliance Management Examination," OCC-PSI-00107631.

[1857] 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-00000341 (deeming problems with the independent testing pillar component inadequate to justify citing a legal violation).  [Sealed Exhibit.]

broadened its examination to pouch services at other HBUS business units, including the PCM, International Private Banking, Domestic Private Banking and retail banking departments.  That examination uncovered additional significant AML deficiencies that had been identified in examinations of other business lines, involving pillar program components such as lack of AML internal controls, training, and independent testing, with systemic implications.[1858]  The examination concluded with respect to HBUS pouch services:

> "The results of this examination combined with the history of past examinations (i.e. significant number of MRAs) are an indication that program goals and objectives have not been met.  The board needs to establish a program with defined elements for policies and procedures, systems and controls, training and independent audit to ensure unwarranted risk is being identified, monitored and mitigated to an acceptable level."[1859]

The OCC examiners recommended that a formal enforcement action be brought against the bank to compel immediate correction of the problems in pouch services.  However, after researching OCC standards for bringing enforcement actions, the examiners determined that, to issue a Cease and Desist Order, the agency was required, in part, to cite a violation of law.[1860]

---

[1858] 4/10/2007 OCC Memorandum "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-00899202 at 202 and 204 (reviewing pouch activities at the International Private Bank, Domestic Private bank, retail banking, and Payments and Cash Management business units).

[1859] Id. at 9.

[1860] 6/14/07 OCC memorandum from Joseph Boss to Anthony Dilorenzo, "Pouch Exam," OCC-PSI-01298625; 7/3/07 OCC memorandum from Elsa de la Garza to Anthony Dilorenzo, "BSA/AML Examination – HSBC, USA, NA – Pouch Activities," OCC-PSI-00877731.  See also OCC Policies and Procedures Manual 5310-3 (Rev).  The June 14, 2007 memorandum described the OCC's enforcement standards as follows:

"There are two types of enforcement actions prescribed by the OCC.  They are 'informal actions' and 'formal actions.'  PPM 5310-3 (Rev.) describes the criteria for considering whether or not an enforcement action should be taken against a financial institution.  Generally, the nature, extent, and severity of the bank's problems will dictate the necessity for an action.  The nature, extent and severity of a bank's problems can range from identified weaknesses that arc considered narrow in scope and correctible to significant and substantial problems and weaknesses that jeopardize the safe and sound operation of the bank.  In all instances a number of other factors must be taken into consideration before the imposition of an action.  Some of those factors are:
- Overall rating of the financial institution.
- Financial condition of the financial institution.
- Past cooperativeness of management.
- Management's ability and willingness to correct identified problems in appropriate timeframes ….

The examiner also identified the standards used to assess whether or not a violation may be cited:

"As stated earlier, in order for the OCC to take any form of enforcement action, certain criteria must be considered.  This also applies in considering citing a violation under 12 CFR 21.21.  For citing a violation of 12 CFR 21.21 the following must be evident:
- The bank lacks a BSA compliance program that covers one or more of the required program elements (internal controls, training, audit, responsible personnel);
- Fails to implement a written BSA compliance program;
- Exhibits significant BSA compliance program deficiencies coupled with aggravating factors such as evidence of widespread, blatant structuring or money laundering, insider complicity, repeat failures to file currency transaction reports or suspicious activity reports, or other substantial BSA violations; or
- Fails to respond to supervisory warnings concerning significant BSA compliance program deficiencies."

Although OCC written guidance states that one criteria for a formal enforcement action is whether: "[t]he bank lacks a BSA compliance program that covers one or more of the required program elements (internal controls, training, audit, responsible personnel)," OCC personnel told the Subcommittee that the OCC had interpreted this language to allow a violation of law to be cited only for a complete program failure, and not when a single pillar or even multiple pillars of an AML program are inadequate.[1861]  The examiners determined that they could not conclude that HBUS' entire AML program was ineffective at that time.  Accordingly, despite the significant AML deficiencies found in connection with HBUS pouch services, the OCC examiners concluded they could not cite a violation of law and so withdrew their request for a formal enforcement action.  Instead the OCC included a single MRA on pouch services in a Report of Examination sent to the bank in July 2007,[1862] and five MRAs in a Supervisory Letter sent to the bank two months later.[1863]

The OCC's decision not to cite violations of law or take formal or informal enforcement action to correct severe AML deficiencies that contravene key AML statutory requirements makes no sense.  An effective AML oversight effort must be able to act in just such circumstances, and premise an enforcement action on any statutory requirement, including that financial institutions have AML internal controls, an AML compliance officer, AML training, and independent testing, without having to find that virtually all four statutory requirements are being violated at the same time.

Federal bank regulators other than the OCC routinely cite violations of law when a bank fails to comply with one or more of the pillar components of an AML program.[1864]  By declining to do the same, the OCC is diluting the importance of the four components; it is essentially sending a message that a bank can lack one or more of the components as long as its entire AML program is not compromised.  In addition, by restricting itself to MRAs rather than citations of legal violations, the OCC is unnecessarily diluting its ability to send a strong message that a bank needs to promptly correct a program element, such as an inadequate AML compliance officer or a set of missing AML controls.  By limiting its examiners to using  MRAs instead of citing statutory violations, the OCC is, in effect, allowing particular problems to fester, as happened in the HBUS case.  In addition, by restricting citation of individualized program violations, the OCC is impairing the ability of examiners to pursue formal enforcement actions, which is exactly what happened in the case of the HBUS pouch activities.

Finally, failing to identify violations of laws and regulations may mislead or confuse bank management.  Violations are addressed prominently in the Reports of Examination and Supervisory Letters.  A bank's directors and managers should be aware of apparent violations of

---

[1861] Subcommittee interviews of OCC James Vivenzio (3/15/2012), Joseph Boss (1/30/2012), and Elsa de la Garza (1/9/2012).
[1862] 7/24/2007 OCC Report of Examination of HBUS, for the examination cycle ending March 31, 2007, OCC-PSI-00304077.  [Sealed Exhibit.]
[1863] 9/13/2007 OCC Supervisory Letter HSBC-2007-01, "Pouch Services and Middle Market," OCC-PSI-00000391. [Sealed Exhibit.]  One examiner informed the Subcommittee that, even though they determined the AML deficiencies in HBUS' pouch services did not meet the OCC's enforcement guidelines, he still felt that an enforcement action should have been initiated.  Subcommittee interview of Joseph Boss, (1/12/12 and 1/13/2012).
[1864] See 2007-2011 Federal Banking Agency Bank Secrecy Act Compliance Examination, "Consolidated Quarterly Reports," PSI-FinCEN-04-0063-296.  [Sealed Exhibit.]

law, given their potentially punitive nature and the bank's responsibility to initiate appropriate corrective action.  Violations that are instead reduced to MRAs may mislead a bank by omitting references to specific laws or regulations; downplay the importance of the targeted activity; and insulate the bank's ratings from downgrades that would spur corrective action.  Examiners evaluate bank ratings, including the CAMELS management rating and its consumer compliance rating on a number of factors, including management's compliance with laws and regulations, its responsiveness to previously reported violations of law, MRAs, and audit findings.  Removing violations from that equation enables a bank to obtain more favorable ratings than it may deserve.  To strengthen its AML oversight, the OCC should bring its practice into alignment with all other Federal bank regulators and allow examiners to cite violations of law when a bank fails to comply with one or more of the four statutorily mandated components of an AML program.

### (3)  Using Narrowly Focused Exams

A third AML oversight practice of concern involves the use of narrowly focused AML examinations that don't also include an examination of a bank's overall AML program.  At HBUS, the OCC designed an AML supervisory strategy to examine the institution over a three year cycle using targeted examinations.  HBUS had 32 different business units with varying degrees of AML risk, all of which were to be examined.  The plan called for business units with the highest AML risks to be examined first.  According to the examiners, the mandate was to examine all 32 business units over a three-year cycle, taking 8 to 10 weeks to examine a business unit from start to finish, using Supervisory Letters to communicate examination results.[1865] According to the plan, OCC examiners would not return to a previously examined area until it had examined all 32 business units, and the adequacy of management's corrective actions for any MRAs would be reviewed once the entire institution had been examined.

The OCC had to depart from this plan given the significant AML risks uncovered at some business units.[1866]  In addition, with only two full-time AML examiners dedicated to HBUS, and given the complexity, breadth, and volume of its high risk activities, the OCC had difficulty meeting the three-year objective but strived to achieve it.[1867]  The result was a series of narrowly focused, targeted examinations.  As each examination concluded, a Supervisory Letter was issued with MRAs or recommendations addressing the AML issues at each specific business unit.

This examination approach, which failed to provide any mechanism for also taking a holistic view of the bank's AML program, raised at least three issues in the HBUS setting:  it impeded understanding of fundamental problems with the bank's AML program and allowed systemic problems to fester, it required duplicative efforts, and it made verification of corrective action more difficult.  First, the narrow focus of the individual examinations at HBUS made it difficult for OCC examiners to understand the bank's AML program as a whole, to detect systemic problems, or make the case for correcting them.  Instead, the OCC continued to review

---

[1865] Subcommittee interview of Joseph Boss (1/30/2012), and Elsa de la Garza (1/9/2012).
[1866] The OCC revisited, for example, the Global Banknotes unit in 2005, 2006, 2007, 2008, and 2009 and targeted exams of Embassy Banking  in 2005, 2006 (three times), 2007, 2008, and 2009.
[1867] AML examiners told the Subcommittee that two additional full time AML examiners were needed to meet the three-year cycle at HBUS, but that staff dedication would have been disproportionate to AML examination staffing at other large national banks.  While they were assisted at times by other examiners, the vast bulk of the AML examinations at HBUS were carried out by two OCC AML examiners.

individual business units on a serial basis, addressing the AML problems uncovered in each examination.  As a result, the OCC requested and HBUS provided narrow corrective actions, allowing more systemic problems to go unaddressed for years. In addition, it required OCC examiners to address similar AML problems in multiple business units on a repetitive basis.

**HSBC Affiliate Issues Missed.**  The limitations of this approach can be seen in the way in which targeted reviews of key bank areas, such as correspondent banking and the Payments and Cash Management (PCM) department, missed major AML deficiencies involving HSBC affiliates.  It was only in 2010, when OCC AML examiners were allowed to take a broad-based review of HBUS' AML program, that the examiners focused on the fact that HSBC affiliates played a large role in HBUS' correspondent banking and PCM businesses, but were not subjected to the same AML controls as other clients.  The OCC examiners discovered, for example, that HBUS did not conduct any due diligence review of HSBC affiliates or attempt to evaluate their AML risks.[1868]  The OCC examiners also discovered that HBUS had stopped monitoring all banknotes business with HBSC affiliates for a three-year period, from mid-2006 to mid-2009, even though those transactions involved billions of dollars of cash and high risk countries like Mexico.[1869]  The OCC also learned that HBUS failed to conduct routine account monitoring for dozens of affiliates located in lower risk countries.  Still another problem was that OCC examiners determined that HBUS was using an inappropriate process to assess country risk, and was assigning low risk ratings to countries such as Mexico, that should have been designated high risk.  Narrowly focused exams, without more, simply didn't identify affiliates as an important AML concern that cut across multiple business lines.

**AML Staffing Issues Fragmented.**  A second example involves a series of three AML examinations conducted by the OCC in early 2009, disclosing insufficient staffing to conduct AML monitoring activities in three critical business units, OFAC compliance, Correspondent Banking and the Payments and Cash Management (PCM) department.  OCC examiners looked at each business unit individually and the Examiner-in-Charge issued three different Supervisory Letters that questioned the bank's staffing levels and resource commitment in each unit for AML purposes.[1870]  By conducting three different examinations with no overarching analysis of AML staffing issues across the bank, the OCC failed to identify inadequate AML staffing as a systemic issue and deal with it in an efficient and effective basis.  Instead, each Supervisory Letters focused on a single business line or functional area under review, with no cross references to the other areas having the same problem, at the same time.  The recommendations contained in two of the Supervisory Letters, issued in March 2009, contained nearly identical wording, including

---

[1868] See 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335. [Sealed Exhibit.]

[1869] In the summer of 2009, OCC examiners learned for the first time that affiliates' banknotes activity was not monitored when examining banknotes activity involving an HSBC affiliate in Mexico.  The key law enforcement meeting took place the next month, and the banknotes examination was then expanded to look at other AML issues. The banknotes monitoring problem was included in the Supervisory Letter issued a year later identifying a host of AML problems at HBUS.  See 8/12/2009 OCC memorandum, "Banknotes Issues," OCC-PSI-00917881-882.

[1870] 1/20/2009 OCC Supervisory Letter HSBC-2008-41, "Office of Foreign Asset Control Examination," OCC-PSI-00000434; 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618; 3/18/2009 OCC Supervisory Letter HSBC-2008-40 "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624.  [Sealed Exhibits.]

the same misspelled word.[1871]  As a result, the staffing issues were addressed in a fragmented manner in three different recommendations rather than in a single MRA focusing on the broader problem.

It was not until 2010, after the OCC directed its AML examiners in September 2009, to undertake a more holistic analysis of HBUS' AML program that staffing was examined in a broader way.  On March 3, 2010, an OCC Supervisory Letter discussing the discovery of an HBUS backlog of over 17,000 unreviewed alerts noted that staffing concerns had been raised three times in 2009, and identified it as a Matter Requiring Attention by the HBUS Board: [1872]

> "In the past, HSBC has had other backlogs, and we have expressed concerns over the course of our supervision about the levels of staffing and the qualifications of personnel assigned to complete reviews.  …
>
> In three Supervisory Letters last year, we expressed concerns about the levels of staffing dedicated to BSA/AML/OFAC compliance. These letters include the supervisory letter issued on January 20, 2009 at the conclusion of our OFAC examination, the supervisory letter issued on March 3, 2009 at the conclusion of the correspondent banking examination, and the supervisory letter issued on March 18, 2009 at the conclusion of the Payment and Cash Management examination."[1873]

Even then, however, the MRA on staffing was narrowly targeted:  "Management must ensure that a sufficient number of qualified professionals are engaged to address the 2,488 alerts within the High Risk Monitoring Unit that were generated six or more months ago."  Six months later, when the OCC concluded its broad-based examination of the HBUS AML program as a whole and issued a 31-page Supervisory Letter analyzing key problems, inadequate and unqualified AML staffing was finally presented as a systemic problem across the bank.[1874]

**We Didn't Know What We Had.**  One of the OCC AML examiners immersed in the HBUS AML examinations for years told the Subcommittee that, upon learning of various law enforcement concerns about HBUS in September 2009, "we'd been doing all of these targeted examinations and we didn't know what we had."[1875]  It apparently took that jolt from law enforcement for OCC senior personnel to authorize the OCC AML examiners to develop a broad-based plan to look at the HBUS AML program as a whole, tie various problems together, and identify the most important AML deficiencies requiring correction.  While the narrowly focused AML reviews were important to examine particular business units and identify specific issues within those offices, such examinations were incomplete and ineffective without a broad-

---

[1871] Compare 3/3/2009 OCC Supervisory Letter HSBC-2008-34, "Correspondent Banking BSA/AML Examination," OCC-PSI-00107618, at 619, with 3/18/2009 OCC Supervisory Letter HSBC-2008-40 "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107624, at 625.  [Sealed Exhibits.]
[1872] 7/7/2009 OCC Supervisory Letter HSBC-2010-03,"Backlog of Monitoring Alerts and Enhanced Due Diligence Requests," OCC-PSI-00851542.  [Sealed Exhibit.]
[1873] Id.
[1874] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335, at 337-338. [Sealed Exhibit.]
[1875] Subcommittee interview of Joseph Boss (1/30/2012).

based look at the bank's AML program as a whole to identify fundamental and cross-cutting issues critical to an effective AML effort.

Still another problem created by the narrowly focused AML examinations was that they complicated efforts by OCC examiners to verify that corrective actions mandated in OCC MRAs were implemented before closing out an MRA.  One issue was that examiners weren't supposed to return to re-examine the relevant business unit until much later, theoretically after completing a three-year review of all 32 HBUS units.  In reality, the examiners had to ignore that aspect of the examination plan to verify that corrective action was taken.  But even then, validation of the effectiveness of the remedies often required duplicative, repetitive efforts since many of the same problems had to be analyzed in multiple, individual business units.  In addition, while HBUS and the OCC examiners were focused on AML problems in individual business lines and services, fundamental problems began to build up, including backlogs of unreviewed alerts, collections of unmonitored accounts, and overly favorable treatment of HSBC affiliates.

The HBUS case history provides ample evidence that a stovepipe AML supervisory strategy that focuses solely on serial examinations of individual business lines or services without also examining a bank's AML program as a whole creates a fragmented and inefficient view of a bank's AML program, wastes resources, encourages piecemeal corrective actions, fails to identify fundamental problems which are allowed to fester, and diminishes the usefulness of AML examination findings and corrective actions.  To strengthen its AML oversight, the OCC should require its AML examiners to combine narrowly focused AML examinations with at least an annual examination of key elements of the bank's AML program as a whole.

### (4)  Failing to Use Enforcement Actions

The HBUS case history, like the Riggs Bank case history before it, betrays an ongoing reluctance by the OCC to use either informal or formal enforcement actions to compel AML improvements, even when a bank is cited for years for significant AML problems.

The OCC identified serious AML deficiencies at HBUS for six years in a row, with the most AML-related MRAs of any bank it supervised, without considering or initiating a nonpublic, informal enforcement action.  The reluctance to use informal enforcement actions appears to be a cultural preference rather than the result of any guidance or policy.  As mentioned earlier, the OCC disclosed to the Subcommittee that it has taken only eight informal enforcement actions against large banks for AML deficiencies since 2005.[1876]  This approach is especially disconcerting in the HBUS case, since the bank expressed a willingness to work with the regulator to implement reforms.  Informal remedies – which include requesting that the financial institution issue a safety and soundness plan, board resolution, commitment letter, or memorandum of understanding pledging to take specific correction actions by a certain date – offer useful tools that provide an interim step before a formal enforcement order that is public and carries legal penalties.  These tools can be effective, but were not even considered by the OCC in the HBUS AML context.

The HBUS case history also discloses a reluctance on the part of the OCC to use formal enforcement actions to correct AML deficiencies.  Two examples involve AML examiners' who

---

[1876] Subcommittee briefing by OCC legal counsel (7/13/2012).

twice recommended issuing a Cease and Desist Order against HBUS after finding severe AML deficiencies in the bank's pouch activities and Embassy Banking unit, but no enforcement action followed.  In the case of the pouch activities, as discussed earlier, despite overwhelming evidence of substantial AML deficiencies, two OCC AML examiners agonized over whether they could make the case for an enforcement action and ultimately reversed their initial recommendation for a Cease and Desist Order.  In the case of the Embassy Banking unit, as discussed earlier, again despite overwhelming evidence of the bank's failure to implement effective AML controls, an OCC examiner was told point blank by his superiors, with no further explanation, that no Cease and Desist Order would be issued.  The failure of OCC officials to seriously consider a formal enforcement action in either of these two extreme cases demonstrates an enforcement problem.

The OCC's AML enforcement guidance is clear in stating:  "Even when the facts do not support citation of a BSA compliance program violation, the OCC may take a formal or informal enforcement action to ensure action."[1877]  In addition, the OCC website explains:

"The OCC may take enforcement actions for violations of laws, rules or regulations, final orders or conditions imposed in writing; unsafe or unsound practices; and for breach of fiduciary duty by institution-affiliated parties (IAP)."[1878]

These statements seem to provide the regulatory foundation and flexibility needed for the OCC to act quickly to address serious AML deficiencies, yet the HBUS case history demonstrates that the OCC remains hesitant to act, even in the face of severe AML problems and even after years of AML MRAs on record.  To strengthen its AML oversight, the OCC should give strong direction to its examiners about the availability of enforcement options and create new mechanisms to require bank supervisory, enforcement, and legal personnel to review the need for formal or informal enforcement actions at banks with severe or longstanding AML deficiencies.

### (5)  Issuing Weak Supervisory Letters

A final issue involves the OCC's use of Supervisory Letters.  The HBUS case history indicates these letters do not always accurately convey examination findings or the need for corrective action.

Supervision Letters are the means by which an OCC Examiner-in-Charge officially informs a bank of examination findings, apparent violations of law, and MRAs warranting management attention.  Violations and MRAs require corrective action by bank management; "recommendations" do not.  In theory, OCC examination findings and changes to resolve AML deficiencies should be conveyed accurately in the related OCC Supervisory Letters sent to bank management; in reality, the HBUS case history showed that some Supervisory Letters muted criticisms or weakened recommended reforms.

**PCM Examination.**  One striking example of the discrepancies that arose between examination findings and Supervisory Letters involved the 2007 examination of HBUS' Payment and Cash Management (PCM) operations.  PCM specialized in global cash flow

---

[1877] "Process for Taking Administrative Enforcement Actions Against Banks Based on BSA Violations," OCC 2005-45 Attachment Appendix A to OCC 2004-50. OCC-PSI-00176030.
[1878] http://www.occ.gov/topics/laws-regulations/enforcement-actions/index-enforcement-actions.html

coordination, using such tools as wire transfers, cash letters, and controlled disbursement services.  The volume of PCM activity at HBUS, given the bank's size, global reach, and appetite for risk, was huge both in terms of dollars and number of transactions.  In 2009, for example, PCM processed 30.2 trillion wire transfers involving $94.5 trillion.[1879]

In December 2007, the OCC completed an examination of AML controls in PCM operations and found that the bank was not adequately monitoring PCM transactions.[1880]  The OCC examination noted fundamental flaws in the bank's AML controls and monitoring systems to identify suspicious activity as well as actions to clear alerts without adequately reviewing the circumstances and filing required SARs.  It also recited several examples of suspicious activity and criticized the bank's Compliance Review Unit which is supposed to conduct independent testing of HBUS' AML controls but had not reviewed the PCM operations in three years.  The examination findings included the following:

- "Systems and Controls are less than satisfactory and do not provide an appropriate level of monitoring for suspicious and unusual activity for all of the activities in the business unit.
- In reviewing customer activity, there were several accounts which warranted additional monitoring and/or in which monitoring practices were inadequate." [1881]

The examination also identified three MRAs that should be brought to the attention of HBUS' board of directors.[1882]

The Supervisory Letter signed by the OCC Examiner-in-Charge and sent to HBUS was issued four months later, on April 21, 2008, and conveyed a very different message about PCM operations, in part because HBUS had begun to correct the identified problems.[1883]  The Supervisory Letter stated that the examination of PCM operations found that "the quality of risk management systems is satisfactory"; "compliance with legal and regulatory requirements is satisfactory"; and "the quality of PCM compliance risk management is satisfactory."  It continued:  "Policies and procedures are adequate; however, control systems needed to detect and report suspicious activity warrant improvement."[1884]  These mild statements made in the spring of 2008, are worlds apart from the blunt examination findings issued in December 2007.

---

[1879] 9/13/2010 OCC Supervisory Letter HSBC-2010-22, "Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') Examination – Program Violation (12 U.S.C. § 1818(s); 12 C.F.R. § 21.21)," OCC-PSI-00864335.  [Sealed Exhibit.]

[1880] 12/7/2007 OCC memorandum  "BSA/AML Examination – Payment and Cash Management," OCC-PSI-01263586.

[1881] Id.

[1882] The three MRAs were:  "1) management needs to improve client monitoring and analysis in order to obtain an accurate view of potential risk.  When an alert is generated, a more thorough review of available information needs to be initiated; 2) management must ensure that CRU [Compliance Review Unit] appropriately identifies and accurately reports on all issues, including MRAs.  In addition, MRA follow-up by CRU needs to address all corrective action and include testing to determine the adequacy of actions taken; and 3) management needs to ensure that decisions related to not filing SARs are documented and maintain this information in a log." Id.

[1883] 4/21/2008 OCC Supervisory Letter HSBC-2007-24, "Payment and Cash Management BSA/AML Examination," OCC-PSI-00107597. [Sealed Exhibit.]

[1884] Id. at 1.

Despite its language, the Supervisory Letter did include the three MRAs which, together, implied a significant breakdown in the bank's internal controls.

**Embassy Banking Examination.**  A second example involved HBUS' Embassy Banking examination.  As discussed earlier, in January 2008, after being contacted by two former employees, OCC conducted an examination and confirmed a wide array of troubling practices in the Embassy Banking unit.  They included significant internal control problems, suspicious activity involving two high risk embassy accounts, noncompliance with bank policy, inadequate due diligence and monitoring, transactions being conducted without OFAC screening – describing, in short, some of the most egregious AML deficiencies recorded in any HBUS AML examination.[1885]  On May 20, 2008, the OCC examiner completed a Conclusion Memorandum with the examination findings, stating that the Embassy Banking's "AML program is not effective in identifying and mitigating risk, especially considering the nature of its clientele and the types of products and services it provides."[1886]  The memorandum recommended issuance of a Cease and Desist Order to ensure immediate remediation of the AML risks.  The OCC examiner also discussed the recommendation for a formal enforcement action with the Examiner-in-Charge, but was informed that no Cease and Desist Order would be issued.  HBUS was verbally informed of the examination findings and immediately began work to address the problems.  In July, a follow-up examination looked at the bank's remedial efforts and found that progress had been made.[1887]

On September 4, 2008, a Supervisory Letter summarized the March and July examinations was sent to HBUS.[1888]  The letter's mild tone failed to convey any of the egregious AML deficiencies or suspicious activity uncovered during the examinations, using instead bland language that conveyed minimal concern or urgency.  The letter began:

- "The quality of risk management is satisfactory, but needs improvements in certain areas.
- Compliance with legal and regulatory requirements is satisfactory and no violations of law or regulation were cited at this examination.
- We noted several deficiencies in the GIB BSA/AML program that warrant the immediate remedial attention of senior management."[1889]

The letter continued with a string of positive statements:  "Management is competent and capable."  "The automation of existing systems and controls, together with current staff levels, will ensure a timely and efficient process for monitoring accounts …."  "Currently, monitoring remains backlogged; however, management has developed a plan to bring the monitoring up to date."  "Current systems and controls are satisfactory."  "Compliance Risk is stable."

---

[1885]  See also earlier discussion; 5/20/2008 OCC Memorandum, "Government and Institutional Banking," OCC-PSI-00928614; 10/8/2008 OCC Memorandum "Royal Embassy of Saudi Arabia (RESA) March 2008 Examination Conclusions", OCC-PSI-01434609; 4/3/2008 OCC Memorandum "Libyan Relationship Review," OCC-PSI-01434593.
[1886] 5/20/2008 OCC Memorandum "Government and Institutional Banking", OCC-PSI-00899215.
[1887] See 8/14/2008 OCC Conclusion Memorandum, "Government and Institutional Banking Update," OCC-PSI-00899227.
[1888] 9/4/2008 OCC Supervisory Letter HSBC-2008-07, "Government and Institutional Banking BSA/AML Examination," to HBUS, OCC-PSI-00107607.  [Sealed Exhibit.]
[1889] Id. at OCC-PSI-00107607-608.

The Supervisory Letter continued:

> "Our current review has noted a marked improvement to GIB's BSA/AML program from
> the second quarter of 2008 examination. Management has implemented corrective action
> in most of the areas of concern. The new GIB Compliance manager has implemented
> numerous objectives to ensure that potential risk is readily identified and mitigated to
> acceptable levels.

> There are still some issues with system and controls, resources and alert monitoring;
> however, based on the current review those deficiencies are noted as MRAs."[1890]

The Supervisory Letter then reduced the AML examiner's request for a formal enforcement
action against the bank to two narrow MRAs asking HBUS to: (1) "develop plans with
milestones to further define and automate the risk identification and monitoring functions," and,
in the interim, "continue to enhance methods to reduce weaknesses associated with manual
intervention" and prevent "unauthorized changes" to a spreadsheet with account information;
and (2) cure a backlog of 1,800 alerts, some dating back to 2007, by September 15, 2008.[1891]

The September Supervisory Letter simply did not convey the urgency or severity of the
examination findings from several months earlier regarding AML problems in the Embassy
Banking department. In addition, while it presented two MRAs requiring corrective action, its
mild tone and lack of detail may make bringing an enforcement action difficult if the bank fails
to remedy the identified problems in a timely fashion.

**AML Staffing Problems.** A third example of discrepancies between examination
findings and the Supervisory Letters that follow involved staffing issues.

In 2006, two OCC Supervisory Letters included MRAs that required HBUS to increase
AML staffing in its Embassy Banking unit to monitor transactions[1892] and in its Compliance
Review Unit to conduct internal reviews of the bank's AML controls.[1893] In 2007, another
Supervisory Letter again included an MRA about increasing AML staffing in the Embassy
Banking unit.[1894] Two years later, in 2009, OCC AML examiners conducted examinations of
HBUS' OFAC Compliance unit, Correspondent Banking, and PCM department, and identified
staffing issues at all three. In February 2009, the OCC examiners wrote an internal
memorandum to the file recording a disagreement with their supervisor concerning staffing. In
the memorandum, the examiners identified inadequate AML staffing as "a repetitive issue that is
of concern" that "should be elevated to an MRA instead of a recommendation for the
Correspondent Banking (March 3, 2009 Supervisory Letter) and Payment and Cash Management
examinations (March 18, 2009 Supervisory Letter)."[1895] The memorandum also noted that the

---

[1890] Id. at 609.
[1891] Id. at 610.
[1892] 1/30/2006 OCC Supervisory Letter to HBUS, OCC-PSI-00107529, at 534-35. [Sealed Exhibit.]
[1893] 6/14/2006 OCC Supervisory Letter HSBC-2006-16, "Compliance Review Unit Examination," OCC-PSI-
00000341. [Sealed Exhibit.]
[1894] 3/19/2007 OCC Supervisory Letter HSBC-2006-30, "Government and Institutional Banking BSA/AML
Examination," OCC-PSI-00107567, at 569-570. [Sealed Exhibit.]
[1895] 2/5/2009 OCC Memorandum to files, "Staffing issue – Correspondent Banking," OCC-PSI-00899201.

two OCC examiners had discussed the issue with the OCC Examiner-in-Charge who disagreed
with the examiners' assessment, because "there are no violations being cited and staffing is a
management decision." The memorandum concludes: "Based on our growing concerns
regarding Ms. Midzain's qualifications to hold the position as BSA/AML officer, her lack of
concern with our recommendations and a slow deterioration of the bank's BSA/AML Program,
[we] will recommend to EIC Belshaw that we complete a Compliance Management examination
to assess BSA management as soon as possible."

The Examiner-in-Charge sent out three Supervisory Letters related to the examinations
that had been conducted. Each reduced the requested MRA down to a recommendation that
"management should consider a review of current and immediate staffing." At that point, the
OCC had identified staffing problems in five business units through six exams over a period of
four years, but the most recent Supervisory Letters treated the need to increase AML staffing as a
recommendation rather than an MRA requiring corrective action. While it is the function of an
Examiner-in-Charge to make the ultimate decision on MRAs and recommendations, this
example demonstrates a clear division between the Examiner-in-Charge and her staff and a
refusal to take strong action by the more senior OCC official.

In Washington, the OCC's Large Bank Review Committee, which reviewed about six
draft Supervisory Letters per year for HBUS and sometimes had a copy of the underlying
examinations, also noted occasional discrepancies between the examination findings and draft
Supervisory Letters. In addition, some LBRC members began to notice after the fact that some
examinations had revealed more significant AML problems and criticism of HBUS operations
than were conveyed by the approved Supervisory Letters to HBUS management. As a result, the
LBRC now requires both the AML examiner's Conclusion Memorandum and the Examiner-in-
Charge's draft Supervisory Letter before it will begin a review of the draft letter.[1896] This
change should help reduce the discrepancies and ensure senior OCC officials have a more
complete view of AML problems at the banks being examined.

### D. Analysis

AML laws are not intended to protect bank customers or the bank; they safeguard the
U.S. financial system and the nation as a whole. As the regulator of nationally chartered banks,
which are among the largest, most complex, and global of U.S. banks, the OCC plays a critical
role in ensuring AML compliance. It is the OCC that needs to ensure the U.S. affiliates of global
banks function as well-guarded gateways that keep out risk rather than invite it in.

To fulfill its AML obligations, the OCC needs to strengthen its AML oversight and
revamp its AML supervisory and enforcement approach to bring them into closer alignment with
other Federal bank regulators. Five reforms are key. First, it should treat AML deficiencies as a
matter of safety and soundness, not consumer protection, and ensure ineffective AML
management is taken into consideration when assigning a bank's CAMELS management and
composite ratings. Second, the OCC should allow its examiners to cite violations of law for
individual pillar violations as well as program-wide violations. Third, the OCC should ensure
that narrowly focused examinations are considered in tandem with examinations that take a
holistic view of a bank's AML program. Fourth, the OCC should make more use of informal

---

[1896] Subcommittee interview of James Vivenzio (3/15/2012).

enforcement actions and reconsider its standards for issuing formal enforcement actions to compel AML reforms.  Finally, the OCC should instruct its Examiners-In-Charge to accurately reflect AML examination findings, without turning them into such mild recommendations that they mislead bank management into thinking their AML programs are functioning well, when they are not.  Many OCC examiners see the problems; it is OCC supervisors and enforcement that need to act to strengthen the OCC's AML oversight efforts.